UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

―――――――――――――――――――――――――――

|  |  |  |
|---|---|---|
| Joseph Strauch and Timothy Colby, | : | |
| and on behalf of themselves and all those | : | |
| similarly situated | : | CIVIL NO.: |
| | : | 3:14-cv-956 (JBA) |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| Computer Sciences Corporation | : | |
| | : | May 8, 2015 |
| Defendant. | : | |

―――――――――――――――――――――――――――

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION OF FLSA
COLLECTIVE ACTION AND ISSUANCE OF NOTICE**

William J. Anthony (ct 17865)
Kristi Rich Winters (ct 28066)
Jackson Lewis P.C.
18 Corporate Woods Boulevard, 3rd floor
Albany, New York 12211

David R. Golder (ct 27941)
David C. Salazar-Austin (ct 25564)
Jackson Lewis P.C.
90 Statehouse Square, 8th Floor
Hartford, CT  06103

Counsel for Defendant
Computer Sciences Corporation

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES .................................................................................................. i

I. PRELIMINARY STATEMENT ....................................................................................1

II. STATEMENT OF FACTS..............................................................................................4

    A. About Computer Sciences Corporation ...............................................................4

    B. The High-Level Job Duties for which System Administrators are Responsible ...............4

    C. CSC's Complex Organizational Structure as Pertains to System Administrators ............8

        1. At the Business Unit Level ............................................................................8

        2. The System Administrators' Place in the Company's Technology Family ................9

        3. System Administrators in GIS .......................................................................10

    D. Plaintiffs Deny Performing The Exempt Job Duties Performed by Senior
       Professional System Administrators ...................................................................11

    E. Plaintiffs' Efforts to Solicit Named Plaintiffs and Putative Class Members ..................12

III.    ARGUMENT ................................................................................................................14

    A. Plaintiffs' Unique Job Situations are *not* Representative of Senior Professional
       System Administrators ........................................................................................16

        1. Plaintiffs Disavow the Senior Professional Job Description Almost
           Entirely, and Cannot Even Agree on which of the Duties They *Did* Perform ............16

        2. Plaintiffs' Declarants Establish That the Job Duties of the System Administrators
           Are Significantly Different From the Senior Professional Job Description, and the
           Job Duties of the Named Plaintiffs ...............................................................19

        3. The Senior Professionals' Dramatically Different Pay Scale Precludes them
           from Being Similarly Situated to the Rest of the Putative Class ...........................21

        4. Plaintiffs' Overtime Claims Require Highly Individualized Inquiries That
           Are Not Capable Of Determination On A Collective Basis .................................23

        B. Plaintiffs' Notice and Request for Confidential Information Is Improper .................28

1. The Court Should Order that Court-Authorized Notice Be Issued by a
Third-Party Administrator .....................................................................................28

2. Plaintiffs' Proposed Order Suggests an Unbalanced and Unfair Approach
to the Notice Process ............................................................................................31

3. The Form of the Notice is One-Sided and Dismissive of CSC's Interests
in a Balanced Notice ............................................................................................34

III.   CONCLUSION....................................................................................................................36

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Aguirre v. SBC Commc'ns, Inc.*,
  2007 WL 772756 (S.D. Tex. Mar. 12, 2007)..........................................................15

*Ayers v. SGS Control Servs.*,
  2004 U.S. Dist. LEXIS 25646 (S.D.N.Y. Dec. 16, 2004) .....................................34

*Bah v. Shoe Mania, Inc.*,
  2009 U.S. Dist. LEXIS 40803 (S.D.N.Y. May 13, 2009)........................................35

*Basco v. Wal-Mart Stores, Inc.*,
  No. Civ.A. 00-3184, 2004 WL 1497709 (E.D. La. July 2, 2004)............................15

*Cannon v. Time Warner NY Cable LLC*,
  No. 13-cv-02521-RM-MJW, 2014 U.S. Dist. LEXIS 124047 (D. Colo. Sept. 5, 2014)........29

*Clarke v. JPMorgan Chase Bank, N.A.*,
  No. 08 CIV. 2400 CM/DCF, 2010 WL 1379778, at *16 (S.D.N.Y. Mar. 26, 2010) .............25

*Colon v. Major Perry St. Corp.*,
  No. 12 CIV. 3788 JPO, 2013 WL 3328223 (S.D.N.Y. July 2, 2013)....................................21

*Combs v. Skyriver Commc'ns, Inc.*,
  159 Cal. App. 4th 1242 (2008) ........................................................................26

*D'Antuono v. C & G of Groton, Inc.*,
  No. 3:11CV33 MRK, 2011 WL 5878045 (D. Conn. Nov. 23, 2011) ....................................34

*Davis v Charoen Pokphand (USA) Inc.*,
  303 F. Supp. 2d 1272 (M.D. Ala. 2004) .............................................................15

*Dean v. Priceline.com, Inc.*,
  2001 WL 35961086 (D. Conn. June 6, 2001).......................................................24

*Diaz v. Elect. Boutique of Amer., Inc.*,
  2005 U.S. Dist. LEXIS 30382 ........................................................................18

*Freeman v. Nat'l Broad. Co., Inc.*,
  80 F.3d 78 (2d Cir.1996).................................................................................25

*Freeman v. Wal-Mart Stores, Inc.*,
  256 F. Supp. 2d 941 (W.D. Ark. 2003)................................................................15

*Gordon v. Kaleida Health*,
  No. 08-CV-378S, 2009 U.S. Dist LEXIS 95729 (W.D.N.Y. Oct 14, 2009) ..........................31

i

*Guillen v. Marshalls of MA, Inc.*
    (*"Guillen I"*), 750 F.Supp.2d 469 (S.D.N.Y.2010) ..............................................................19

*Guzelgurgenli v. Prime Time Specials Inc.*,
    883 F. Supp. 2d 340 (E.D.N.Y. 2012) ..........................................................................32, 33

*Haines v. Southern Retailers, Inc.*
    939 F. Supp. 441 (E.D. Va. 1996) ......................................................................................25

*Hamadou v. Hess Corp.*,
    915 F. Supp. 2d 651 (S.D.N.Y. 2013).................................................................................35

*Heckler v. DK Funding, LLC*,
    502 F. Supp. 2d 777 (N.D. Ill. 2007) ................................................................................34

*Helfelfinger v. EDS Corp.*,
    580 F. Supp. 2d 933 (C.D. Cal. 2008) ...............................................................................26

*Hendricks v. J.P. Morgan Chase Bank, N.A,*
    No. 3:09-CV-613 (JCH), 2009 WL 5170180 (D. Conn. Dec. 15, 2009)...............................14

*Hoffman-La Roche Inc. v. Sperling*,
    493 U.S. 165 (1989).........................................................................................................14

*Holt v. Rite Aid Corp.*,
    333 F. Supp. 2d 1265 (M.D. Ala. 2004) ..................................................................... passim

*Jackson v. Papa John's USA, Inc.*,
    No. 1:08-CV-2791, 2009 U.S. Dist. LEXIS 31887 (N.D. Ohio Apr. 15, 2009)......................33

*Jenkins v. TJX Companies Inc.*,
    853 F. Supp. 2d 317 (E.D.N.Y. 2012) ....................................................................14, 18, 21

*Jones v. Casey's Gen. Stores*,
    517 F. Supp. 2d 1080 (S.D. Iowa 2007) .............................................................................34

*Khan v. Airport Mgmt. Servs., LLC*,
    No. 10 CIV. 7735 NRB, 2011 WL 5597371 (S.D.N.Y. Nov. 16, 2011)................................17

*Lizondro-Garcia v. Kefi LLC*,
    300 F.R.D. 169 (S.D.N.Y. 2014) ......................................................................................32

*Mike v. Safeco Ins. Co. of Am.*,
    274 F. Supp. 2d 216 (D. Conn. 2003).............................................................16, 17, 24, 25

*Moore v. Eagle Sanitation, Inc.*,
    276 F.R.D. 54 (E.D.N.Y. 2011) .......................................................................................35

*O'Neill-Marino v. Omni Hotels Mgmt. Corp.*,
   2001 WL 210360 (S.D.N.Y. Mar. 2, 2001) ...........................................................25

*Orphanos v. Charles Indus., Ltd.*,
   1996 WL 437380 (N.D. Ill. July 29, 1996).............................................................27

*Pippins v. KPMG, LLP*,
   759 F.3d 235 (2d Cir. 2014)..................................................................... passim

*Pippins v. KPMG LLP*,
   921 F. Supp. 2d 26 (S.D.N.Y. 2012), *aff'd*, 759 F.3d 235 (2d Cir. 2014) ..............22

*Robinson v. Empire Equity Group, Inc.*,
   No. WDQ-09-1603, 2009 U.S. Dist. LEXIS 107607 (D. Md. Nov. 18, 2009) ......................30

*Romero v. H.B. Auto. Grp., Inc.*,
   No. 11 CIV. 386 CM, 2012 WL 1514810 (S.D.N.Y. May 1, 2012) ......................................21

*Ruggles v. WellPoint, Inc.*,
   591 F. Supp. 2d 150 (N.D.N.Y. 2008) ............................................................29, 33

*Sharpe v. APAC Customer Servs.*,
   No. 09-CV-329-bbc, 2010 U.S. Dist. LEXIS 95377 (W.D. Wis. Mar. 29, 2010)..................33

*Smallwood v. Illinois Bell Tel. Co.*,
   710 F. Supp. 2d 746 (N.D. Ill. 2010) ............................................................32, 33

*Templeton v. Fred Meyer Stores, Inc.*,
   No. 10-CV-607-BR, 2010 U.S. Dist. LEXIS 115856 (D. Or. Oct. 26, 2010) ......................29

*West v. Border Foods, Inc.*,
   No. 05-2525, 2006 WL 1892527 (D. Minn. July 10, 2006) ..................................................15

*Whitehorn v. Wolfgang's Steakhouse, Inc.*,
   767 F. Supp. 2d 445 (S.D.N.Y. 2011)...........................................................32, 35

*Witteman v. Wis. Bell, Inc.*,
   No. 09-cv-440-vis, 2010 U.S. Dist. LEXIS 8845 (W.D. Wis. Feb. 2, 2010) .........................33

*Wlotkowski v. Mich. Bell Tel. Co.*,
   267 F.R.D. 213 (E.D. Mich. 2010) .............................................................................33

*Wren v. Rgis Inventory Specialists*,
   No. C-06-05778JCS, 2007 WL 4532218 (N.D. Cal. Dec. 19, 2007) ....................................28

**OTHER AUTHORITIES**

29 C.F.R. §541.200(a)(2)-(3) ................................................................................................25

29 C.F.R. §§ 541.200(a)(2)-(3), 541.202(b) ........................................................................25

29 C.F.R. § 541.201(b) ...........................................................................................................25

29 C.F.R. § 541.400 ....................................................................................................1, 16, 24

29 C.F.R. § 541.400(a)(1) .......................................................................................................26

29 C.F.R. § 541.400(a)(2) .......................................................................................................26

29 C.F.R. § 541.400(a)(3) .......................................................................................................26

29 C.F.R. § 541.601(a) ...........................................................................................................27

29 C.F.R. § 541.700(a) ...........................................................................................................25

29 C.F.R. § 541.708 ................................................................................................................26

69 Fed. Reg. at 22,160 ...........................................................................................................24

## I.       PRELIMINARY STATEMENT

Plaintiffs Joseph Strauch and Timothy Colby ("Plaintiffs") seek an extraordinary remedy: not only do they seek conditional certification of a collective that exceeds 4,000 Computer Sciences Corporation ("CSC") employees across the country, but the employees they allege to be non-exempt workers are in fact highly paid System Administrators, computer professionals explicitly tasked with complex system and database administration.

This is not a typical collective action, with a narrow group of employees performing the same job duties at the same or similar locations across the country (e.g., assistant managers working in virtually identical retail stores).  Rather, Plaintiffs seek to certify a collective that includes highly paid, skilled computer professionals—with professional certifications, extensive experience, and sophisticated skill sets—by relying almost exclusively, and insufficiently, on their common job titles and their place in the Human Resources job structure system.  Plaintiffs' reliance on job titles is especially misplaced here, as the Department of Labor instructs that "job titles vary widely and change quickly in the computer industry."  29 C.F.R. § 541.400.

Plaintiffs' definition of the collective implicitly acknowledges that two upper levels of System Administrators (Advisors and Principals) are exempt, but Plaintiffs nonetheless attempt to unify the remaining three levels of Systems Administrators (Associate Professionals, Professionals, and Senior Professionals) by describing their jobs as a rote and mechanical process. *Compare Pippins v. KPMG, LLP*, 759 F.3d 235, 245 (2d Cir. 2014) ("We are unpersuaded by the argument that when Audit Associates…perform only a rote process, but that when more senior members of the audit team review the same work papers, their exertions, however rooted in greater experience and sophistication, suddenly becomes the work of an entirely different profession").  These computer professionals, especially at the Senior

Professional level, are highly compensated due to their experience, training, skills and value, and work in a wide variety of work environments—from supporting the Defense Cyber Investigations Training Academy, to ensuring that the U.S. Armed Forces' communications are safe and secure from enemy combatants, to ensuring that, should a Fortune 500 company's servers crash in the middle of the day, those systems are back up and running as quickly as possible.

In this massive, diverse group, Plaintiffs futilely seek to include the high-level Senior Professional System Administrator position.   Although certification of the entire collective is inappropriate, CSC defers those arguments to the decertification stage.  As to the Senior Professional group, however, there is no basis for including them, even conditionally, in Plaintiffs' proposed collective for a number of reasons.

First, Plaintiffs cannot be the representatives of a class of Senior Professional System Administrators because they disavow the Senior Professional job description.  Consequently, the Court is left with no class-wide mechanism to assess the job duties of the putative class members, and Plaintiffs are by their own admission not similarly situated to a class of Senior Professionals as that position was designed by CSC.

Second, the declarations submitted with Plaintiffs' Memorandum ("Pl. Mem.") attempt to trivialize the job duties performed by System Administrators, but in doing so only highlight the differences between the job as designed by CSC, and as allegedly performed by the individual System Administrators. Again, this disavowal of the Senior Professional job description deprives the Court of any basis for analyzing the group on a class-wide basis.

Third, Plaintiffs have no evidence of any common policy or plan that violated the law, as evidenced in large measure by the disparity between the salaries of Senior Professionals and their

peers.  CSC's preliminary analysis reveals that nearly *one-third* of all Senior Professionals currently employed at CSC have a base pay of $100,000 or more, and should thus be excluded from the class, with many more earning just slightly less than this threshold.  Among the Opt-in Plaintiffs alone, there is an Associate Professional earning $35,530 and a Senior Professional making $100,403.04, nearly *three times* as much.  Plaintiffs do not even suggest the existence of a common plan or policy that can explain this enormous compensation disparity.

Fourth, CSC's key defenses in this case—that Plaintiffs are exempt under the Administrative, Professional, Computer Employee or Combination Exemptions—require highly individualized analyses that preclude conditional certification.  Indeed, the regulations of the Fair Labor Standards Act ("FLSA") make clear that factually nuanced job *duties*, and not job *titles*, are determinative of the applicability of exemptions.

In deference to the Court's desire to streamline the case, undersigned counsel welcomed a proposal to more manageably define the putative class, offering to agree to conditional certification if Plaintiffs' proposal was reasonable.[1]  Although the Court agreed that this was a "good plan,"[2] Plaintiffs' proposal never came.  Nevertheless, to focus the issues in dispute as much as possible, CSC agrees to the conditional certification of Associate Professional and Professional System Administrators.  CSC limits its objection to the highly paid, highly skilled Senior Professional System Administrators, and to the significant flaws in Plaintiffs' proposed Notice and Order granting conditional certification.

Accordingly, for the reasons set forth more fully below, Plaintiffs' Motion for Conditional Certification should be denied, in part, so as to exclude Senior Professionals to whom the Plaintiffs cannot plausibly be "similarly situated."

---

[1] Transcript of Status Conference dated April 1, 2015, at pp. 10 -11 (attached as Exhibit 1 to the Declaration of David C. Salazar-Austin ("Salazar-Austin Dec.") filed herewith).
[2] *Id.*

## II.      STATEMENT OF FACTS

### A.  About Computer Sciences Corporation

Computer Sciences Corporation ("CSC"), based in Falls Church, Virginia, has a significant presence across the globe, with approximately 72,000 professionals serving clients in more than 70 countries.[3]   CSC is a global leader of next-generation information technology ("IT") services and solutions, with a stated mission of enabling superior returns on clients' technology investments through best-in-class industry solutions, domain expertise and global scale.[4]

Among CSC's many, highly-skilled computer professionals are System Administrators. These System Administrators provide their talents and expertise to serve CSC's internal, commercial and governmental clients, all in support of CSC's mission to be a world class provider of IT services and solutions.[5]

### B.  The High-Level Job Duties for which System Administrators are Responsible

The System Administrator jobs were conceived of as, and ultimately determined to be, exempt jobs.[6]   CSC painstakingly developed job descriptions for the System Administrator positions, in an effort to accurately reflect the work done by the System Administrators, consistent with the company's purpose of ensuring that System Administrators were indeed performing exempt work.[7]

There are five levels of System Administrators: the Associate Professional, Professional, Senior Professional, Advisor and Principal.[8]   By not including them within the

---

[3] Declaration of Heidi Josephson ("Josephson Dec.") (attached as Exhibit 2 to the Salazar-Austin Dec.) ¶ 4.
[4] Josephson Dec. ¶ 5.
[5] Josephson Dec. ¶ 6.
[6] Josephson Dec. ¶ 7.
[7] Engelmann Dep. 34:10-35:7, 39:22-24, 71:16-17, 75:6-14, 156:16-23 (cited pages of which are attached as Exhibit 3 to the Salazar-Austin Dec.)
[8] Job Descriptions, CSC005824 - 5875 (attached as Exhibit 4 to the Salazar-Austin Dec.)

definition of the proposed collective, Plaintiffs acknowledge that the Advisor and Principal positions are exempt positions.   Just one step removed from the Advisor level, the Senior Professional job description establishes essential job functions of the position, including but not limited to the following:

- Performs moderately complex systems and database administration.  Monitors and tunes appropriate systems to ensure optimum level of performance.

- Supports the design and configuration of complex system landscapes.

- Supports complex data/media recoverability through system backups and database archive operations.  Plans, coordinates and directs appropriate level data refresh strategies.

- Oversees, recommends and implements appropriate level database solutions and enhancements to ensure an improvement in system reliability and performance.

- Interacts with client management to answer questions, problems and requests regarding complex system issues.[9]

Of course, given the number of System Administrators at CSC, and the five different levels of System Administrator within the company, there are many other complex, sophisticated job duties performed by System Administrators.   For example, Plaintiff Timothy Colby acknowledged the following duties: "perform troubleshooting and isolate and diagnose system problems," and then recommend a course of action,[10] "perform hardware and software upgrades as required by the client,"[11] "install and test upgrades and configure systems and services,"[12] analyze, log and track software/hardware matters of significance pertaining to servers to meet business needs,[13] coordinate hardware installations and upgrades, and software upgrades with

---

[9] Senior Professional Job Description, CSC005829  (attached as Exhibit 4 to the Salazar-Austin Dec.)
[10] Colby Dep. pp. 149:20-21; 103:2-24 (cited pages of which are attached as Exhibit 5 to the Salazar-Austin Dec.)
[11] Colby Dep. pp. 150:4-5.
[12] Colby Dep. pp. 150:20-21.
[13] Colby Dep. pp. 94:22 – 95:24.

regard to operating systems,[14] and coordinate "testing, upgrades and configuration of system files and services," as it related to a server's operating system, by installing the operating system, "making sure that all the services are running, making sure that you communicate with the server via IP, making sure it's on network and redundancy is set up."[15]  Colby also explained that, as opposed to Level 1 help desk support, he provided "Level 3 expertise to the [project management organization] and other technical disciplines in the planning and execution of new infrastructure products" offered by CSC.[16]

Even as between the two named Plaintiffs, Colby and Strauch appear to disagree on the types of duties they performed.  For example:

- Strauch disclaimed the essential job function of "documenting events to ensure continuous function,"[17] but Colby acknowledged that he was responsible for documenting "system events to ensure continuous functioning."[18]

- Colby denied that he worked on "complex" matters, or at least contended that he did not find them complex due to his industry experience and training;[19] Strauch readily admitted that he "worked on complex issues."[20]

- Colby testified that he utilized "corporate tools to record change and problem activities for tracking purposes";[21] Strauch denied having done so.[22]

- More globally, Colby denied performing eight of the ten essential functions of a Senior Professional, and as to the other two, admitted that he only "partially" performed those duties.[23]  In contrast, Strauch admitted to performing two of the essential functions completely, and to performing two more at least in part.[24] Even the duties to which they admitted do not completely overlap: Strauch denied any responsibility for designing and configuring complex system landscapes,

---

[14] Colby Dep. pp. 99:5-15.
[15] Colby Dep. pp. 105:12-106:8.
[16] Colby Dep. pp. 72:24-73:24.
[17] Strauch Dep. pp. 114:15 – 23 (cited pages of which are attached as Exhibit 6 to the Salazar-Austin Dec.)
[18] Colby Dep. pp. 104:1-5.
[19] Colby Dep. pp. 95:7-23.
[20] Strauch Dep. pp. 117:2-4.
[21] Colby Dep. pp. 108:14-17.
[22] Strauch Dep. pp.116:3-7.
[23] Colby Dep. pp. 151:2 – 154:20.
[24] Strauch Dep. pp. 119:3 – 123:22.

while Colby admitted responsibility for configuring systems;[25] and Strauch admitted to providing "leadership and work guidance to less experienced personnel," but Colby denied doing so.[26]

These System Administrators typically come to CSC with significant computer experience, and generally hold professional certifications in the computer technology field.[27]  As Colby explained: "to be a system administrator takes about a year and a half to two years to get the basic certifications and the basic education that you need to understand" the role.[28]  Prior experience and training is critical because System Administrators, as a group, receive no standardized or consolidated training as to how to perform their job duties.[29]

Critically, the job duties of the System Administrator can vary significantly depending on the business unit in which they operate, the nature of the client whose systems they support, the type of operating system they work on, the professional skills and experience they have, and a wide variety of other factors.[30]  System Administrators provide services to a wide variety of CSC's clients.  They work with the U.S. Armed Forces, the Department of Defense, and the Defense Cyber Investigations Training Academy.[31]  They also work with a wide variety of commercial entities, from United Technologies Corporation and its many subsidiaries, to General Dynamics, to Raytheon, to Boeing, to Textron, to Ingersoll Rand.[32]

By way of example, System Administrators like Colby support commercial clients in an office environment, but CSC also has System Administrators who are embedded with the military, who go out on missions with the military teams they support, who are responsible for protecting top secret, mission-critical information, who ensure that communications between

---

[25] Strauch Dep. pp. 120:7-14; Colby Dep. pp. 152:13-16.
[26] Strauch Dep. pp. 123:19-22; Colby Dep. pp. 154:18-20.
[27] Colby Dep. pp. 72:1-11, 145:9-13.
[28] Colby Dep. pp. 145:9-13.
[29] Colby Dep. pp. 80:23 – 81:5.
[30] Josephson Dec. ¶ 8.
[31] Josephson Dec. ¶ 9.
[32] Josephson Dec. ¶ 10.

military personnel out in the field and at headquarters remain secure and that communication systems remain operational, and who almost exclusively come to CSC with a military background that enables them to perform their duties under the pressures associated with any military operation.[33]  Plaintiffs' proposed class would group Colby, sitting at his desk in upstate New York, with individuals out on active missions with the U.S. Armed Forces.

Further highlighting the disparity between the putative class members' job duties is their compensation level.  Among the opt-in Plaintiffs alone, System Administrators' annual salaries vary wildly, between $35,000/year and $100,000/year.[34]  Plaintiffs' class theory requires the Court to conclude that all Senior Professional System Administrators perform the same job duties, including those individuals making nearly *three times* as much as their purported peers.

## C.  CSC's Complex Organizational Structure as Pertains to System Administrators

### 1.  At the Business Unit Level

At a high level, Systems Administrators are primarily, but not exclusively, found within two business units: Global Infrastructure Services ("GIS"), a 20,000 employee organization working with commercial business to provide next generation infrastructure services that accelerate businesses' IT performance and deliver their IT needs; and the North American Public Sector ("NPS"), which provides IT, business operations and specialized engineering services for local, state and federal government clients across North America.[35]  CSC's commercial business line and its government business line do not coincide, and are maintained as separate business lines due to the different types of contracts they hold.[36]

---

[33] Declaration of Albert Argel ("Argel Dec.") (attached as Exhibit 7 to the Salazar-Austin Dec.) ¶¶ 4 – 6.
[34] See Extract from CSC016502, Column F (attached as Exhibit 8 to the Salazar-Austin Dec.)
[35] Deposition of Patricia Calisi ("Calisi Dep.") (cited pages of which are attached as Exhibit 9 to the Salazar-Austin Dec.) 113:7-11; 133:1 -134:7
[36] Calisi Dep. pp. 134:16-21.

Given its size, CSC developed a layer system to organize its thousands of employees.[37] Layer 1 of the organization is comprised solely of CSC's Chief Executive Officer, with Layers 2 through 8 reporting up to him.[38]  System Administrators are located as high as Layer 5, where certain subject matter experts reside, while the remaining System Administrators are spread throughout Layers 6, 7 and 8.[39]  As of December 2014, CSC had over 1,500 System Administrator positions, spread throughout at least 162 unique organizational units.[40]

### 2.  The System Administrators' Place in the Company's Technology Family

Plaintiffs suggest that they represent the very bottom rung of CSC's computer professionals, but that is not the case.  In GIS alone, there are approximately 1,522 *non-exempt* US employees in technical roles, all of whom operate at functionally lower levels than their System Administrators peers, working in project management, desktop support, network technician and other roles (e.g., Technician, Field Technician, Computer Operator, Configuration Management, Customer Support, Data Entry Clerk, Helpdesk Technician, Helpdesk Coordinator, Network Technician, System Technician, and Telecommunication Technician).[41]  This includes non-exempt Help Desk professionals[42]; as Plaintiff Colby explained, the Help Desk provides "Level 1" support to CSC's clients, while he and his fellow System Administrators performed Level 2 or 3 service to those same clients.[43]

Although Plaintiffs make much of the "Job Family" "Discipline," "Function" and "Job Series" designations that CSC uses, in reality these designations are simply tools used by Human Resources to organize the tens of thousands of individuals CSC employs.  As Heidi Josephson, a

---

[37] Calisi Dep. pp. 19:21-20:21.
[38] Calisi Dep. pp. 19:23 – 22:20.
[39] Calisi Dep. pp. 21:2 – 22:20.
[40] Calisi Declaration (attached as Exhibit 10 to the Salazar-Austin Dec.) ¶ 4.
[41] Calisi Dec. ¶ 5.
[42] Calisi Dec. ¶ 5.
[43] Colby Dep. pp. 112:7-113:16.

principal in CSC's Compensation group, explained: "We have currently over 1,500 job titles and we categorize them by family, discipline, function and job series…We just are trying to categorize things to help navigate through the job descriptions."[44] Grouping them together in this way in no way enables CSC, or anyone else, to determine whether one pocket of System Administrators in GIS, supporting a single client's Windows systems, is performing duties similar to another pocket of GIS System Administrators supporting a different client's Unix systems—much less the System Administrators in NPS, or other business units.

### 3. *System Administrators in GIS*

Within GIS, System Administrators can be organized by the technology environment they work in, by region, or by what type of work they are doing (e.g., patching, standard operating environment set-ups, recovery services).[45] They are also grouped by "offerings," including workplace and service management offering (for example, System Administrators working on product development), and the platform and data center offering.[46]

Further, in 2014, GIS rolled out a Next Generation Delivery Model, a pod operating model that organizes System Administrators into five distinct, color-coded teams.[47] This system differentiates the System Administrators' job duties across clear lines, and is designed to promote responsiveness, in part, through "scarce skill segmentation." For example, System Administrators assigned to the "Purple Team" handle "complex incident and service request resolution," while the "Blue Team" handles "custom and complex project fulfillment."[48] In short, for those System Administrators assigned to a color team, the pod operating model ensures

---

[44] Deposition of Heidi Josephson ("Josephson Dep.") 15:23 – 16:7 (cited pages of which are attached as Exhibit 11 to the Salazar-Austin Dec.)
[45] Calisi Dep. pp. 103:22 – 105:4.
[46] Calisi Dep. pp. 62:5-9; 147:3-24.
[47] Calisi Dec. ¶ 6; CSC0222983 – 86 (NGDM PowerPoint) (attached as Exhibit 12 to the Salazar-Austin Dec.)
[48] *Id.*

that they are *not* performing the same job duties as the System Administrators assigned to different color teams.  Of course, not all GIS System Administrators are organized via this pod system—some clients have accepted this new organizational system, while others have not, thus highlighting yet another difference between the putative class members.[49]

***

The large number of System Administrators precludes the job descriptions from capturing every job duty that each of the company's thousands of System Administrators perform on a daily basis.[50]  There are simply too many System Administrators, in too many distinct organizational units, with too many distinct responsibilities, to permit CSC to capture each and every job duty performed by the company's System Administrators.

### D. Plaintiffs Deny Performing the Exempt Job Duties Performed by Senior Professional System Administrators

Plaintiff Timothy Colby denied performing eight of the ten essential functions of a Senior Professional, and as to the other two, admitted that he only "partially" performed those duties.[51] With regard to those duties, he admitted to performing "moderately complex systems administration," and admitted that he worked "with configuration of complex systems," including "higher level" work such as "clustering multiple servers together in one logical package."[52]  Strauch too disclaimed six of the essential job functions entirely, and as two others, admitted only that he partially performed them.[53]  Of the ten essential job functions, he fully admitted to performing only two of them.[54]

---

[49] Calisi Dec. ¶¶ 7-8.
[50] Josephson Dep. pp. 71:1-11.
[51] Colby Dep. pp. 151:2 – 154:20.
[52] Colby Dep. pp. 114:23-24; 151:14-23; 152:21 – 153:17.
[53] Strauch Dep. pp. 119:3 – 123:22.
[54] *Id.*

This alone highlights the differences between the putative class members. Most egregiously, Colby readily admits that his position required him to perform almost *none* of the *ten* essential job functions of the Senior Professional position as designed by CSC—despite that this is one of the three groups of System Administrators that he purports to represent in this case.

### E.  Plaintiffs' Efforts to Solicit Named Plaintiffs and Putative Class Members

Plaintiffs' primary counsel, Outten & Golden LLP, have undertaken aggressive measures to construct this proposed class and collective action. Although the court-authorized notice of collective action has not yet issued, there are already 85 opt-in Plaintiffs.[55] The first opt-in notice was filed July 16, 2014, just 15 days after Plaintiffs filed the Complaint; the most recent notice was filed three days ago, on May 5, 2015.[56]

Discovery to date reflects that the named Plaintiffs have been actively contacting other putative class members and soliciting participation outside the court-authorized notice process.[57] For instance, Strauch contacted a potential class member and stated that CSC was sued several years ago for the same reason—misclassification—and agreed on a $24 million settlement.[58] Strauch also voiced his opinion to another putative class member about CSC, stating "My biggest fantasy would be for the Solaris team to start quitting every two weeks, LOL . . . see where that leaves the company."[59] Plaintiffs have also invited potential class members to visit Plaintiffs' counsel's website (http://www.csclawsuit.com/) to learn more about the lawsuit and fill out a questionnaire.[60]

---

[55] Salazar-Austin Dec. ¶ 15.
[56] Docket Nos. 7, 158.
[57] Strauch Solicitation Messages (attached as Exhibit 13 to the Salazar-Austin Dec.)
[58] *Id.*
[59] *Id.*
[60] *Id.*

In documents produced May 7, 2015, at 6:28 p.m.—on the eve of CSC's deadline to oppose their conditional certification motion—Plaintiffs produced 134 pages of solicitous LinkedIn messages from Plaintiffs' counsel to CSC System Administrators.[61]   The messages make clear that, since at least December 2013—*nearly a year-and-a-half ago*—Plaintiffs' counsel have been identifying System Administrators by surveying their LinkedIn profiles, and then sending them unsolicited messages stating that they "believe that CSC violated federal and state wage and hour laws by misclassifying system administrators as 'exempt' from overtime pay and failing to pay them time and a half for all hours worked over 40 in a workweek."[62] The messages go on to say that any "information that you provide to us could help us obtain a recovery on behalf of current and former CSC system administrators across the country."[63]

Plaintiffs' counsel not only prematurely built the putative class, but also proactively recruited at least one of their two *named Plaintiffs*.  In his deposition, Colby admitted that Outten & Golden initially contacted him, and not vice versa;[64] that he was not expecting the initial contact from Outten & Golden, but rather the firm's LinkedIn message came "out of the blue";[65] and that, before the unsolicited message from Outten & Golden, he had not even *thought* about suing CSC.[66]  Then, when undersigned counsel inquired about the content of Outten & Golden's unsolicited contact with him before the lawsuit was even filed, Plaintiffs' counsel directed Colby not to answer on the basis of the attorney-client privilege—nonsensically arguing that Outten & Golden contacted Colby, and not vice versa, for the purpose of "obtaining or receiving legal advice."[67]

---

[61] LinkedIn Solicitation Messages (attached as Exhibit 14 to the Salazar-Austin Dec.)
[62] *Id.*
[63] *Id.* at P006934 – 35.
[64] Colby Dep. pp. 10:6 – 11:6.
[65] Colby Dep. pp. 12:18 – 13:8, 15:16 – 22.
[66] Colby Dep. pp. 16:17 – 24.
[67] Colby Dep. pp. 10:9 – 12:15.

Given Plaintiffs' zealous recruitment efforts, the notice period effectively opened in July 2014, and remains open to this day. Nevertheless, Plaintiffs' motion seeks an overly long 90-day notice period, and permission to issue the court-authorized notice multiple times.

## III.   ARGUMENT

The collective action mechanism should be employed only in cases involving "common issues of law and fact arising from the same alleged . . . activity," such that resolution of common issues in one proceeding would promote efficiency and judicial economy. *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989). "[D]istrict courts in this circuit have typically undertaken a two-stage inquiry." *Hendricks v. J.P. Morgan Chase Bank, N.A*, No. 3:09-CV-613 (JCH), 2009 WL 5170180, at *5 (D. Conn. Dec. 15, 2009) (internal quotations omitted). At this initial stage of the process, Plaintiff must demonstrate that the proposed members of the class are similarly situated. *See id.* Critically, "as numerous courts in this Circuit have held, the mere classification of a group of employees—even a large or nationwide group—as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes." *Jenkins v. TJX Companies Inc.*, 853 F. Supp. 2d 317, 323 (E.D.N.Y. 2012).

The Plaintiffs' own deposition testimony, and the declarations CSC has submitted, highlight the irrefutable differences between the Senior Professionals and the two other groups that the Plaintiffs purport to represent. On the evidence before the Court, there is no basis to conclude that Senior Professionals are "similarly situated" to the other employees with whom the Plaintiffs seek to group them. *See id.* ("[b]ecause of extensive discovery that has already taken place . . . [t]he Court agrees that it should determine whether to certify this collective action based on the full evidence before it"); *see also Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265,

14

1274 (M.D. Ala. 2004) (it is "appropriate to carefully consider the submissions of the parties with respect to the collective action allegations" where "the court has been presented with fairly extensive evidence on the issue of whether putative class members are similarly situated").

Because Senior Professionals are not similarly situated to the Professional and Associate Professional System Administrators, it would be futile for the Court to conditionally certify a collective that includes this highly paid group of employees.  Neither "the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if [the Court] were to overlook facts which generally suggest that a collective action is improper." *West v. Border Foods, Inc.*, No. 05-2525, 2006 WL 1892527, at *7 (D. Minn. July 10, 2006) (denying motion for conditional certification).[68]  Plainly, "[i]t would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated." *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) (denying conditional certification); *see also Basco v. Wal-Mart Stores, Inc.*, No. Civ.A. 00-3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004) ("[t]o create a collective action class, including the cost associated with that when a Court is convinced that there is insufficient support for same prior to its certification would be an exercise in futility and wasted resources…").[69]

---

[68] Copies of all unreported cases are attached as Exhibit 1 to this memorandum.

[69] Plaintiffs assume that a "fairly lenient" standard should apply to their motion.  The rationale supporting such leniency evaporates, however, because Plaintiffs have had an opportunity to conduct discovery with respect to CSC's policies and procedures. *See Davis v Charoen Pokphand (USA) Inc.*, 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004); *see also Aguirre v. SBC Commc'ns, Inc.*, 2007 WL 772756, at *9 (S.D. Tex. Mar. 12, 2007) (where discovery had been conducted, "this court does not accept the substance of plaintiffs' affidavits or depositions over that submitted by the defendants, but examines the evidence to determine whether it is appropriate to certify a class"); *Holt*, 333 F. Supp. 2d at 1270-74 (same).  Despite Plaintiffs' disingenuous characterization of discovery being in its early stages, the fact is that this case has been pending for nearly ten months, three 30(b)(6) and two plaintiff depositions have been taken, and Defendants have produced more than 20,000 pages—not including voluminous Excel spreadsheets containing comprehensive data regarding the entire putative class.  Plaintiffs' counsel also have recruited *more than 80 opt-in plaintiffs*, an effectively limitless fount of information regarding CSC, its structure, and the System Administrators' job duties. There is, in short, no proper basis for the leniency to which Plaintiffs assume they are entitled.

CSC's goal, consistent with the Court's stated objective, is to minimize this waste of the Court's and the litigants' resources.  Had Plaintiffs responded to CSC's request, in open court, for a proposal regarding conditional certification, this briefing could have been avoided entirely.  Nevertheless, in the spirit of streamlining the case, CSC defers to the decertification stage its arguments regarding the impropriety of certifying a collective action of Associate Professionals and Professional System Administrators.  The *Senior* Professionals, however, are too distinct to survive even the modest threshold in place at conditional certification.

**A.  Plaintiffs' Unique Job Situations are *not* Representative of Senior Professional System Administrators**

**1.  Plaintiffs Disavow the Senior Professional Job Description Almost Entirely, and Cannot Even Agree on which of the Duties They *Did* Perform**

This district has held that a misclassification case should not be conditionally certified when, as is the case here, a plaintiff claims to be nonexempt by expressly disavowing the tasks enumerated in a job description for an exempt position.  *See Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003) (denying conditional certification).  In such a case, judging the merits of the claim would be "extremely individual and fact-intensive" since the Court would have to engage in individual inquiries in order to determine if each potential plaintiff possessed the same job responsibilities as Plaintiff.  *See id.* at 219.  This is particularly so in the computer technology industry.  *See* 29 C.F.R. § 541.400 ("Because job titles vary widely and change quickly in the computer industry, job titles are not determinative of the applicability of [the computer employee] exemption").

Plaintiffs have failed to put forth sufficient evidence that they are sufficiently similar to the Senior Professionals they purport to represent.  Instead of arguing that the job description is that of a non-exempt position, Plaintiffs testified clearly that the Senior Professional job

description and its litany of essential job functions do not accurately describe their job duties.  To the contrary, as discussed in Section II, *supra*, Colby admitted performing only two of the ten essential job functions, and even then, he admitted to performing those two only in part.  Strauch also disavowed the majority of the job description, and even as to the four essential job functions he partially or fully acknowledged, only *one* of those job functions overlapped with Colby.  In short, the Plaintiffs disavow the job description that they necessarily rely upon to bind the class together, and then cannot even agree on which of the job functions they *did* perform.  *See Mike*, 274 F. Supp. 2d at 221 (denying conditional certification where plaintiff "expressly disavows this job description and claims that, on a task-to-task, day-to-day basis, he spent the balance of his time performing non-administrative functions despite the fact that his job description calls for him to perform some administrative functions"); *Khan v. Airport Mgmt. Servs., LLC*, No. 10 CIV. 7735 NRB, 2011 WL 5597371, at *4 (S.D.N.Y. Nov. 16, 2011) (denying conditional certification where plaintiffs could not show that they and the other employees "were similarly situated with respect to the claim that they were required to perform [non-exempt] job duties in contravention of the formal job description").

Plaintiffs' disavowal of the job description undercuts their entire class theory, which explicitly relies on the alleged "consistency and uniformity" with which CSC manages its System Administrators.  (Pl. Mem., p. 18.)  On the one hand, Plaintiffs' testimony and the declarations of twenty-four of their former co-workers make it clear that they do not perform the exempt job duties set forth in the job description.  On the other hand, Plaintiffs rely on CSC's "job structure"—the common family, discipline, function, job series, and job titles—to unify

their class.  As Ms. Josephson explained, however, these HR structural tools are used merely "to help navigate through" the same job descriptions that they now disavow.[70]

In this case, understanding the Senior Professional position would impermissibly require endless individualized inquiries into the job duties of each Senior Professional.  *See Diaz v. Elect. Boutique of Amer., Inc.*, No. 04-CV-0840E(Sr), 2005 U.S. Dist. LEXIS 30382, at **13-15 (W.D.N.Y. Oct. 13, 2005) (finding plaintiffs were not "similarly situated" to those they sought to represent based on the existence of individual inquiries needed to resolve plaintiffs' exempt status).  Indeed, Plaintiffs' counsel explained to the Court that, "consistent with [his] interviews" with the Opt-in Plaintiffs,  he expects *all* of them to say "No I don't do that" when questioned about the essential job functions set forth in the job description.[71]   This highlights the individualized inquiries necessary here—if they do not do the job described in the company's Senior Professional job description, one can only learn what they *did* do by interviewing them individually, as Plaintiffs' counsel has already been doing.

With a proposed collective that spans the country, and could encompass more than 4,000 employees, Plaintiffs' disavowal of the job descriptions leaves the Court with no class-wide mechanism for determining whether the Senior Professionals are "similarly situated" to the lower levels of the System Administrator position.  *See, e.g.*, *Jenkins*, 853 F. Supp. 2d at 324 (rejecting the proposition that any employee classified "as exempt by a company that does business nationwide is entitled to approval of a collective action for all employees of that business—who may number in the thousands and be spread across 50 states—simply based on the employee's testimony that he was required to perform non-exempt tasks) (internal quotations omitted).  Indeed, of the 24 declarations upon which they seek to rely, only five were authored by Senior

---

[70] Josephson Dep. 15:23 – 16:7.
[71] Court Conference Transcript, at pp. 8-9.

Professionals—approximately .3% of the total number of Senior Professionals in the putative class. On this razor thin basis, Plaintiffs cannot lump Senior Professionals into their proposed class. *See Guillen v. Marshalls of MA, Inc.* (*"Guillen I"*), 750 F.Supp.2d 469, 477 (S.D.N.Y.2010) ("the fact that ASMs were responsible for performing non-exempt tasks in contravention of their written job requirements in nine stores in a particular metropolitan area, out of 820 stores nationwide, provides little basis to believe that Guillen is similarly situated to ASMs throughout the country with respect to his claim regarding ASM job responsibilities").

### 2. Plaintiffs' Declarants Establish That the Job Duties of the System Administrators Are Significantly Different From the Senior Professional Job Description, and the Job Duties of the Named Plaintiffs

Plaintiffs' briefing resorts to the familiar tactic of trivializing the putative class members' job duties in order to establish the non-exempt nature of the Senior Professional position. The Second Circuit has rejected this type of transparent attempt to color the perception of the Court, opting instead to analyze the underlying facts to gain a true understanding of the employees' job duties. *See Pippins v. KPMG, LLP*, 759 F.3d 235, 245 (2d Cir. 2014) ("the facts presented by plaintiffs indicate a role for Audit Associates that undermines the plaintiffs' trivializing characterization of their work"). Even so, Plaintiffs' tactic backfires here because, by trivializing their job duties, they have established insurmountable differences between their jobs and the Senior Professional position as designed by CSC. This, in turn, prevents the Court from concluding that all 1,466 Senior Professionals are "similarly situated" to the few whose jobs allegedly deviate so completely from CSC's job description.

The declarations that Plaintiffs proffer contrast starkly with CSC's job description for the Senior Professional position. One declarant, Richard Conway, went so far as to describe his

duties as "routine, mundane and even somewhat mind-numbing;"[72] another described his duties as "'cookie-cutter because of the repetition…'"[73]   A surprising number of declarants used the exact same analogy to describe their job duties.  For example:

- "I was similar to an auto mechanic that performed routine oil changes."[74]
- "I would say my job is a lot like an auto mechanic's."[75]
- "I do the same thing most weeks, similar to an auto mechanic."[76]
- "In these respects my job is much like that of an auto mechanic."[77]
- "In that sense, my job is a lot like that of an auto mechanic."[78]

Even Colby used this *exact same* analogy in his deposition, testifying that "it would be like being an auto mechanic."[79]

Notably, however, the Senior Professional job description makes *absolutely no mention* of this type of repetitive, mechanical work.  To the contrary, it emphasizes the high-level job duties befitting a Senior Professional, including systems and database administration, the analysis of system data for capacity and planning purposes, the recommendation and implementation of database solutions and enhancements, support of the design and configuration of complex system landscapes, and interaction with clients to answer questions, problems, and requests regarding "complex system issues."[80]  The Senior Professional job description explicitly requires "six or more years of experience in a client-server environment,"[81] and the national pay range for Senior Professionals dictates a salary range of between $74,000 and $110,900.[82]  The declarants describe their job as that of a blue collar auto mechanic, but the job description

---

[72] Conway Declaration (Docket No. 156-3.)
[73] Rothrock Declaration (Docket. No. 156-21.)
[74] *Id.*
[75] Soule Declaration (Docket. No. 156-23.)
[76] Conway Declaration.
[77] Delgado Declaration (Docket No. 156-4.)
[78] Farkas Declaration (Docket No. 156-7.)
[79] Colby Dep. pp. 143:18-20.
[80] *See* Exhibit 4, Senior Professional Job Description, at CSC005829.
[81] *Id.* at CSC005830.
[82] Josephson Dec. ¶ 12.

contemplates a highly paid, white collar computer professional who interacts directly with CSC's clients on matters of at least moderate complexity relating to computer systems and databases. The discrepancy is an obvious obstacle to conditional certification.

The declarations submitted only exacerbate the problem endemic to Plaintiffs' deposition testimony: they seem to describe a position completely at odds with the Senior Professional position as designed by CSC. Because Plaintiffs have not and cannot establish that all 1,466 Senior Professionals are similarly situated, conditional certification as to this group is improper.

### 3. The Senior Professionals' Dramatically Different Pay Scale Precludes them from Being Similarly Situated to the Rest of the Putative Class

As discussed above, in order to proceed as a collective action, Plaintiffs must come forth with "evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes." *Jenkins*, 853 F. Supp. 2d at 323 (internal quotations omitted). The dramatically different pay scale for Senior Professionals, as compared to Associate Professional and Professional System Administrators, reflects that this common thread is not present in this case.

Courts within the Second Circuit have recognized that the existence of different pay scales is among the factors that can preclude conditional certification. *See Colon v. Major Perry St. Corp.*, No. 12 CIV. 3788 JPO, 2013 WL 3328223, at *7 (S.D.N.Y. July 2, 2013) (denying conditional certification as to a subgroup of the proposed collective due in part to "markedly different pay scales"). As the *Colon* court recognized, significant disparities in compensation reach "the essentials of the job" to such a degree that groups separated by this disparity cannot be "subject to the same policy" and do not "share any sort of factual nexus." *Id.; see also Romero v. H.B. Auto. Grp., Inc.*, No. 11 CIV. 386 CM, 2012 WL 1514810, at *12 (S.D.N.Y. May 1, 2012) ("Where a collective action contains a mix of employees, some of whom are classified

exempt from the FLSA's requirements, and some of whom are classified as non-exempt, there is no factual nexus between the collective action members' situations, and conditional certification is not appropriate").

The pay scales for Senior Professionals, particularly as compared to Associate Professionals, highlights the absence of a common policy that renders the putative class members "similarly situated" for collective action purposes.   The pay range midpoint for Senior Professionals, according to CSC's national pay range, is $92,400.[83]   In stark contrast, the midpoint for Associate Professionals is $60,500—$31,900 less per year than the Senior Professionals.[84]   According to CSC's systems, 31.7% of all Senior Professional System Administrators currently employed at CSC—nearly *a full third of all Senior Professionals*—have a base pay of $100,000 or more per year; meanwhile, 0% of current Associate Professional System Administrators have a base pay at that high level.[85]   The Second Circuit has described employees earning between $41,000 and $64,000[86] at a national accounting firm as "well-compensated professionals at a top national accountancy practice;" the national pay range for Senior Professionals at CSC, a national leader in providing IT services, requires that they be paid a *minimum* of $74,000, and as much as $110,900.[87]   *Pippins*, 759 F.3d at 252 (quoting *Freeman v. Nat'l Broad. Co., Inc.,* 80 F.3d 78, 86 (2d Cir.1996)) ("[t]he FLSA is properly considered a shield to protect unwary workers; it is not a sword by which [professionals] at the pinnacle of accomplishment and prestige in [their profession] may obtain a benefit from their employer for

---

[83] Josephson Dec. ¶ 11.
[84] Josephson Dec. 11.
[85] Josephson Dec. ¶ 13.
[86] *Pippins v. KPMG LLP*, 921 F. Supp. 2d 26, 43 (S.D.N.Y. 2012),  *aff'd*, 759 F.3d 235 (2d Cir. 2014)

[87] Josephson Dec. ¶ 12.

which they did not bargain....the DOL interpretative guidelines should be read in an effort to promote the FLSA's purpose, not to frustrate it").

Anecdotal evidence further highlights how the pay disparity between the putative class members precludes conditional certification.  For example, Opt-in Plaintiff and declarant Christian Rothrock, an Associate Professional in the GIS business unit, earned an annual salary of \$35,530.[88]  Opt-in Plaintiff Pierre Wills, a Senior Professional in the NPS business unit, earned an annual salary of \$95,000.[89]  Yet Plaintiffs' class theory suggests that these two individuals, holding different job titles and working in different business units, one of whom earns *nearly three times* more than the other, are somehow similarly situated to each other.

By excluding System Administrators who earn over \$100,000, Plaintiffs acknowledge that some System Administrators are exempt, while others are not.  Plaintiffs offer no evidence of CSC's "common plan," however, that explains why 31.7% of current Senior Professionals are admittedly exempt, while 68.3% are allegedly non-exempt.  As defined by Plaintiffs, the collective arbitrarily includes Opt-in Plaintiff Pierre Wills (\$95,000/year), but excludes Opt-in Plaintiff Joe Williams (\$100,403.04/year);[90] Plaintiffs' theory offers no explanation as to what separates these individuals, aside from \$5,000 in salary.  Absent evidence of a common plan that explains why some Senior Professionals are exempt, and others are not, Plaintiffs cannot establish that Senior Professionals are similarly situated to the remainder of the collective.

### 4.  Plaintiffs' Overtime Claims Require Highly Individualized Inquiries That Are Not Capable Of Determination On A Collective Basis

Given the complex, highly technical job duties of the collective, there are at least four FLSA exemptions at issue in this case: the Administrative, Professional, Computer Employee

---

[88] Extract from CSC016502, Column F.
[89] *Id.*
[90] *Id.*

and Combination Exemptions.[91]   The analysis required to determine whether these exemptions apply to each member of a collective that could exceed 4,000 members is an absurdly onerous task that no Court can bear.

Courts have routinely observed that "the 'similarly situated' inquiry ... must be analyzed in terms of the nature of the job duties performed by each putative plaintiff, because the ultimate issue to be determined is whether each employee was properly classified as exempt." *Holt*, 333 F. Supp. 2d at 1272 (denying collective action notice where duties of each employee needed to be individually evaluated).   The process "[d]etermining whether an employee is exempt is extremely individual and fact-intensive, requiring 'a detailed analysis of the time spent performing administrative duties' and 'a careful factual analysis of the full range of the employee's job duties and responsibilities.'"   *Mike*, 274 F. Supp. 2d at 220 (quoting *Cooke v. General Dynamics Corp.*, 993 F.Supp. 56, 59–61 (D.Conn.1997)); *see also Dean v. Priceline.com, Inc.*, 2001 WL 35961086, at *2 (D. Conn. June 6, 2001) (same); *Trinh*, 2008 WL 1860161 at *4 ("whether [potential opt-in plaintiffs are 'exempt' necessarily involves a fact-by-fact inquiry into the circumstances of each employee to see if he or she falls within an administrative, outside sales, highly compensated, combination, or any other exemption.").

This is particularly so in a case, like this one, that involves a computer professional position—a position so complex and hyper-technical that the minutiae of the position are hard to grasp, and the job titles alone offer little insight into what the day-to-day responsibilities of the employee may be.   *See* 29 C.F.R. § 541.400 ("Because job titles vary widely and change quickly in the computer industry, job titles are not determinative of the applicability of [the computer employee] exemption"); 69 Fed. Reg. at 22,160 ("Where the prescribed duties tests are met, the

---

[91] The highly compensated exemption may also be implicated, although Plaintiffs have defined the collective to avoid the impact of this exemption.

[computer] exemption may be applied regardless of the job title given to the particular position"); *Clarke v. JPMorgan Chase Bank, N.A.*, No. 08 CIV. 2400 CM/DCF, 2010 WL 1379778, at *16 (S.D.N.Y. Mar. 26, 2010) ("The computer employee exemption applies to a 'computer systems analyst, computer programmer, software engineer, or other similarly skilled worker,'" and thus "an employee's job *duties*, not his job *title*, determine whether the exemption applies") (emphasis in original).

Here, the Court will need to make the following determinations, among others, to adjudicate the FLSA claims of each purported member of the collective action class:

- The job duties actually performed by each individual on a daily basis. *See Freeman v. Nat'l Broad. Co.*, 80 F.3d 78, 82-83 (2d Cir. 1996) (recognizing that "factual findings as to the nature of the plaintiffs' employment" is the heart of the overtime-exemption inquiry); *Haines v. Southern Retailers, Inc.* 939 F. Supp. 441, 447 (E.D. Va. 1996) (the "focus necessarily must be on what 'activities or duties the employee *actually* performs").

- The time each individual spent performing each of his or her day-to-day tasks. *See, e.g.*, *Mike*, 274 F. Supp. 2d at 220-21.

- The importance of each duty performed by each employee. 29 C.F.R. § 541.700(a).

- Whether and to what extent each individual's job duties involved the performance of work directly related to the management or general business operations of CSC.   29 C.F.R. §541.200(a)(2)-(3).

- Whether and to what extent each individual's job duties involved the performance of computer network, internet, or database administration. 29 C.F.R. § 541.201(b).

- Whether and to what extent the individual's job duties involved the exercise of discretion and independent judgment "in the light of all the facts involved in the particular employment situation." 29 C.F.R. §§ 541.200(a)(2)-(3), 541.202(b).

- Each individual's level of autonomy. *See O'Neill-Marino v. Omni Hotels Mgmt. Corp.*, 2001 WL 210360, at *9 (S.D.N.Y. Mar. 2, 2001) (employee left largely unmonitored because he was trusted by his supervisor exercised discretion).

- Whether and to what extent the individual had any technical degrees or specialized computer certifications. *See Bagwell*, 385 F. Supp. 2d at 1323.

- Whether and to what extent each individual was responsible for administering CSC's databases or maintaining server capacity. *See Helfelfinger v. EDS Corp.*, 580 F. Supp. 2d 933, 961-62 (C.D. Cal. 2008) (administration of company's databases, including maintaining proper server capacity, is exempt work).

- Whether and to what extent the individual consulted with users to determine hardware, software, or system functional specifications. 29 C.F.R. § 541.400(a)(1).

- Whether and to what extent the individual designed, developed, documented, analyzed, created, tested or modified computer systems or programs based on user or system design specifications. 29 C.F.R. § 541.400(a)(2).

- Whether and to what extent the individual designed, documented, tested, created or modified computer programs related to machine operating systems. 29 C.F.R. § 541.400(a)(3).

- Whether the individual performed a sufficient mix of different types of exempt duties to qualify for the combination exemption. 29 C.F.R. § 541.708.

Plaintiffs have gone to great lengths to demonstrate the similarities of the putative collective—even using the same "auto mechanic" analogy in Colby's deposition and five separate declarations—but ironically, it is one of the common threads that they rely upon that best exemplifies the need for individual analysis.  All of the declarations state that one of the System Administrators' central job functions is to troubleshoot computer systems for CSC and its clients,[92] and each discusses the ticketing process through which they receive specific issues to troubleshoot.[93]  Plaintiffs fail to acknowledge, however, that "troubleshooting, installation, and problem resolution" are often deemed exempt job duties.  *See, e.g.*, *Bobadilla*, 2005 WL 2044938 at *7-8 (computer professional exemption applied where responsibilities included "problem resolution"); *Bagwell* 385 F. Supp. 2d at 1320-21, 1326 (administrative exemption applied where duties included "problem solving, looking at the network to determine what the issues were"); *Combs v. Skyriver Commc'ns, Inc.*, 159 Cal. App. 4th 1242, 1266 (2008)

---

[92] *See, e.g.*, Declaration of Cheri Johnson ¶ 11 (Docket No. 156-11) ("I would say that I am primarily a troubleshooter….").
[93] *See, e.g.*, Declarations of Johnson, Rothrock, Farkas, Soule and Conway.

(employee exercised discretion where he engaged in "troubleshooting"); *Orphanos v. Charles Indus., Ltd.*, 1996 WL 437380 (N.D. Ill. July 29, 1996) (administrative exemption applied where employee assisted customers in "installing" and "troubleshooting" equipment).   Thus, with regard to this single job duty, the Court faces the insurmountable task of analyzing what type of troubleshooting each employee was responsible for,[94] what percentage of the work day each employee spent on troubleshooting, and other similar, highly-individualized inquiries.

Further, by excluding System Administrators earning $100,000 or more, Plaintiffs' definition of the collective operates as an admission that at least some System Administrators perform one or more exempt job duties.   *See*  29 C.F.R. § 541.601(a) ("An employee with total annual compensation of at least $100,000 is deemed exempt under [the FLSA] if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee ....").   Only an individualized analysis of the putative class members can determine which admittedly exempt job duty the employee performed, whether that exempt duty constituted the employee's primary job duty, and other inquiries essential to deciding the merits of CSC's exemption arguments.

The broad diversity of the proposed collective precludes conditional certification.   The class definition encompasses different business units, three different job titles, three different job descriptions with between six and ten essential job functions each, three different pay scales, 162 unique organizational units, over 4,000 employees spread throughout Layers 5, 6, 7 and 8 of the company, and an endless variety of job duties.   On these facts, the determinations to be made in connection with CSC's exemption arguments can only be made individually.   Conditional

---

[94] For example, the declarants admit that many of the tickets they were asked to troubleshoot took *several days* to resolve.   *See, e.g.*, Soule Declaration, ¶ 15; Delgado Declaration, ¶ 12.

27

certification of the proposed collective, particularly to the extent it encompasses the more advanced, complex work of the Senior Professionals, is thus implausible and inappropriate.

**B.  Plaintiffs' Notice and Request for Confidential Information Is Improper**

Plaintiffs have repeatedly operated at the very edges of propriety when soliciting class members.  As Colby admitted in his deposition, they even recruited *him* "out of the blue,"[95] and then used a "plaintiff's choice of forum" argument to oppose CSC's motion to transfer.  Through their efforts, they have constructed a class consisting of 85 Opt-in Plaintiffs, all of whom opted in before the Court even authorized a Notice.  To ensure that CSC's employees, current and former, are not improperly solicited, harassed or otherwise subjected to repetitive, unwanted overtures from Plaintiffs and their counsel in violation of the court-authorized notice process, the Court should reject the Notice and Order that Plaintiffs have proposed in this case.

**1.  The Court Should Order that Court-Authorized Notice Be Issued by a Third-Party Administrator**

To insulate the putative class members from further solicitation or intrusions on their privacy, CSC proposes the use of third party administrator—paid for in full by CSC—to facilitate the issuance of notice.   This is a necessary step given the aggressive recruitment tactics already employed by Plaintiffs and their counsel.

Courts have long recognized the use of third party administrators as a means to "protect the privacy of potential class members."  *See, e.g., Wren v. Rgis Inventory Specialists*, No. C-06-05778JCS, 2007 WL 4532218, at *9 (N.D. Cal. Dec. 19, 2007) ("Therefore, Plaintiffs shall be required to bear the cost of providing notice, and contact information shall be provided only to a

---

[95] Colby Dep. pp. 12:18 – 13:8, 15:16 – 22.

third-party administrator").[96]  Third party administrators also help ensure that, once "the Court is fully engaged in supervising this notice process," Plaintiffs refrain from "employing advertisement notices to the putative class," which could otherwise result in "an apparent conflict between the court-authorized notice and those communications made by counsel to potential plaintiffs."  *Ruggles v. WellPoint, Inc.*, 591 F. Supp. 2d 150, 164 (N.D.N.Y. 2008).   As the *Ruggles* court explained, "the court-controlled mechanism should trump any attorney driven notice and resolve any post-conditional certification notice in favor of the Court's controlled process." *Id.*  Permitting near-constant contact with the putative class members through multiple modes of communication (websites, e-mails, home phone numbers, work phone numbers, cell phone numbers), and not limiting notice to a single court-authorized process, would be "dissonant with the intent of the FLSA statute that the Court play a significant role in prescribing the terms and conditions of communications from the named plaintiffs to the potential members of the class on whose behalf the collective action was commenced."  *Id.*

Plaintiffs' overzealous recruitment efforts demonstrate the risk to the putative class if the Court grants them access to all of the putative class members' work, home and cell phone numbers, e-mail addresses, and Social Security Numbers.[97]  As Colby admitted, Plaintiffs' counsel contacted him—without warning, request or prior knowledge—to ask him if he would be interested in serving as named plaintiff in this case.[98] *Holt*, 333 F. Supp. 2d at 1268 (denying conditional certification and noting that "courts, as well as practicing attorneys, have a

---

[96] *See also Cannon v. Time Warner NY Cable LLC*, No. 13-cv-02521-RM-MJW, 2014 U.S. Dist. LEXIS 124047, at *22-23 (D. Colo. Sept. 5, 2014) (recommending use of third-party administrator); *Templeton v. Fred Meyer Stores, Inc.*, No. 10-CV-607-BR, 2010 U.S. Dist. LEXIS 115856, at *2-4 (D. Or. Oct. 26, 2010) (ordering use of third party administrator to "better protect the sensitive personal information of Defendant's former and current" employees, where Defendant had agreed "to assume unconditionally the financial responsibility for the use of a third-party administrator").

[97] Plaintiffs also request that all of this data, for more than 4,000 people, be produced within 14 days.  Compliance with that timeframe is not realistic.  CSC would require *at least* 30 days to generate a report with that information.

[98] Colby Dep. pp. 10:6 – 11:6, 12:18 – 13:8, 15:16 – 22, 16:17-24.

responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation") (internal quotations omitted).   Then, Plaintiffs' counsel refused to disclose the substance of their recruitment efforts under the shield of the attorney-client privilege, leaving the Court and CSC with no means of determining what was said to recruit Colby (and, very likely, other opt-in Plaintiffs) into this action.

Moreover, Plaintiffs (through their counsel) have set up websites discussing the lawsuit, and are directing potential Opt-in Plaintiffs to those websites.   There is evidence of Strauch's recruiting efforts, including him telling putative class members about the prior *Giannetto* case and the amount that case settled for,[99] and explaining to them his "fantasy" that System Administrators will resign their employment at CSC.   There is even evidence that, *since at least December 2013*, Plaintiffs' counsel have been contacting putative class members via LinkedIn and explaining their belief that Systems Administrators have been misclassified and are entitled to overtime pay.[100]   On this evidence, there is no boundary to how Plaintiffs might misuse the putative class members' personal information.

Given the potential for abuse, the Court should not grant Plaintiffs access to the personal information they request, and should instead authorize the use of a third party administrator for purposes of issuing notice.   CSC's willingness to cover the cost of the third party administrator obviates any cost concern that might otherwise militate against adoption of such a process.[101]

---

[99] *Id.*

[100] *See, e.g.*, P006938 (Exhibit 14).

[101] Notably, some courts have ordered plaintiffs to bear costs associated with a third party administrator. *See, e.g.*, *Robinson v. Empire Equity Group, Inc.*, No. WDQ-09-1603, 2009 U.S. Dist. LEXIS 107607, at *19-20 (D. Md. Nov. 18, 2009)(requiring that the parties' notice plan provide for notices to be "mailed by a neutral third-party administrator," with costs of the notice plan initially to be borne by both parties).   CSC's plan eliminates this cost to Plaintiffs.

## 2. Plaintiffs' Proposed Order Suggests an Unbalanced and Unfair Approach to the Notice Process

First, Plaintiffs request an order compelling CSC to provide additional, unnecessary personal information, including e-mail addresses, personal cell phone numbers, and Social Security numbers.  They even seem to request *former* phone numbers ("all known telephone numbers") and addresses ("all known addresses"), suggesting the possibility that Plaintiffs will seek to contact them even via outdated contact information.   This request is improper.   Any information beyond employee name and last known address is unwarranted and intrusive, and could encourage improper and unauthorized contact.  *See, e.g., Gordon v. Kaleida Health*, No. 08-CV-378S, 2009 U.S. Dist LEXIS 95729, at *31 (W.D.N.Y. Oct 14, 2009) ("[t]he Court agrees that, in the interest of privacy, [defendant] need not produce phone numbers, social security numbers, dates of birth, and e-mail addresses").  Of course, if mail is returned as undeliverable, CSC will work with Plaintiffs to ensure that Notice is received by all putative class members.

Indeed, although Plaintiffs make a blanket statement that they need phone numbers (Pl. Mem., p. 24), they never explain *why* they need them or what they plan to do with them.  If Notice is to be mailed, as Plaintiffs propose, there is no apparent need for phone numbers of any kind—home, work, cell or otherwise.  Certainly, the Court should not facilitate telephonic recruitment efforts that may not comport with the court-authorized process that Plaintiffs' purport to want.  (Pl. Mem, p. 20 ("Court-authorized notice is preferable…").)  Indeed, concern about these types of communications with putative class members underpinned Judge Margolis's order that CSC should anonymize the putative class data produced to Plaintiffs.[102]

---

[102] Margolis Order, Docket No. 143.

Second, Plaintiffs seek an abnormally long 90-day opt-in period.  *See Whitehorn v. Wolfgang's Steakhouse, Inc.,* 767 F. Supp. 2d 445, 452 (S.D.N.Y. 2011) (noting 90 day opt-in periods are generally only acceptable "where the period is agreed upon between the parties or special circumstances require an extended opt-in period").  Although the Court-authorized notice of collective action has not yet issued, there are already 85 opt-in Plaintiffs.[103]  The first opt-in notice was filed July 16, 2014, just 15 days after Plaintiffs' filed the Complaint.  Given the aggressive measures taken by Plaintiffs and their counsel to build up the putative collective, the notice period has effectively been open since mid-July.  Not only have Plaintiffs offered no explanation as to why an overly long 90-day window is appropriate in this case, but they fail to acknowledge that their solicitation efforts over a 10 month period weighs heavily against such a lengthy window.  *See Guzelgurgenli v. Prime Time Specials Inc.*, 883 F. Supp. 2d 340, 357 (E.D.N.Y. 2012) ("Here, the Plaintiffs have not provided any 'special circumstances' to warrant a ninety-day opt-in period").  As a result, the proposed 90-day notice period should be cut in half, allowing for a more conventional 45-day period.  *See Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169, 181 (S.D.N.Y. 2014) ("The Proposed Notice and attached opt-in form shall also state that individuals may opt in to the collective action within 45 days after the mailing date").  This shorter period also helps facilitate the completion of discovery, including discovery to be taken from the Opt-in Plaintiffs, without having to seek extensions of the Court's scheduling order.

Third, Plaintiffs request permission to issue a "reminder" notice to the putative class members, despite offering no explanation as to why such a reminder would be necessary.  Reminder notices are generally "unnecessary and potentially could be interpreted as encouragement by the Court to join the lawsuit."  *See Smallwood v. Illinois Bell Tel. Co.*, 710 F. Supp. 2d 746, 753-54 (N.D. Ill. 2010).  The proper purpose of a Notice "is simply to inform

---

[103] Salazar-Austin Dec. ¶ 15.

potential class members of their rights.   Once they receive the information, it is their responsibility to act as they see fit."   *See Witteman v. Wis. Bell, Inc.*, No. 09-cv-440-vis, 2010 U.S. Dist. LEXIS 8845, *9 (W.D. Wis. Feb. 2, 2010) (rejecting the plaintiff's application to send a reminder notice); *Wlotkowski v. Mich. Bell Tel. Co.*, 267 F.R.D. 213, 219 (E.D. Mich. 2010) (citing *Witteman* and rejecting circulation of reminder notice); *Smallwood*, 710 F. Supp. 2d 746 (same).

Critically, Plaintiffs demand permission to circulate a reminder notice but fail to provide *any* reason why a reminder notice would be appropriate or necessary in this case.   *See Guzelgurgenli*, 883 F. Supp. 2d at 358 (denying "Plaintiffs' request to send a reminder notice" because they had "not identified any reason why a reminder notice is necessary in this particular case").   Instead, Plaintiffs' counsel offer their personal opinion that many people intend to opt in but neglect to do so due to "the distractions of work and everyday life."   (Pl. Mem., p. 25.)   The opinions of Plaintiffs' counsel are hardly surprising or persuasive given the complete absence of a factual, case-specific reason to issue a reminder notice.

Moreover, a second Notice inherently suggests to the recipient that he or she did something wrong when they chose to disregard the first Notice.   As such, a second Notice may bring up participation rates, but not for the right reasons.   Indeed, other courts considering this issue have soundly rejected a second mailing.   *See, e.g.*, *Witteman; Wlotkowski; Smallwood*; *Sharpe v. APAC Customer Servs.*, No. 09-CV-329-bbc, 2010 U.S. Dist. LEXIS 95377 (W.D. Wis. Mar. 29, 2010) ("At this stage, I will grant defendant's request and limit plaintiff's contact with potential class members to the one-time mailing of the approved notice"); *Ruggles*, 591 F. Supp. 2d 150, 164 (N.D.N.Y 2008); *Jackson v. Papa John's USA, Inc.*, No. 1:08-CV-2791, 2009 U.S. Dist. LEXIS 31887 (N.D. Ohio Apr. 15, 2009) (denying supplemental notice even as to

33

those individuals who did not receive initial notice).

### 3.  The Form of the Notice is One-Sided and Dismissive of CSC's Interests in a Balanced Notice

As an initial matter, the most sensible approach to addressing the form of the Notice is to require the parties to craft jointly a Notice and then submit it to the Court for approval.  This limits the likelihood of extensive briefing, lessens the burden on the Court, and increases the chances of a properly balanced Notice.  CSC stands ready to engage in this collaborative process in the event the Court grants conditional certification.  *See D'Antuono v. C & G of Groton, Inc.*, No. 3:11CV33 MRK, 2011 WL 5878045, at *7 (D. Conn. Nov. 23, 2011) (ordering parties to submit a joint revised notice, and in the absence of agreement, ordering the parties to submit separate status reports explaining "the disagreements and reasons for each party's respective preferences").

That said, the form of Plaintiffs' proposed notice is improper because it is overly solicitous, one-sided, and fails adequately to provide CSC's description of the lawsuit, including why CSC does not owe putative class members for overtime (e.g., the putative class members are properly classified as exempt).  Instead, the notice improperly portrays the case as a free chance at money for any current or former CSC System Administrator.  CSC's concerns with the form of the proposed Notice are numerous.  For example:

First, Plaintiffs take ten lines to describe their case, but spare less than one line to describe CSC's defenses. Court-sanctioned notices should be accurate and balanced, not misleading.  *See Heckler v. DK Funding, LLC*, 502 F. Supp. 2d 777, 780 (N.D. Ill. 2007) (the Court should issue "a fair and accurate notice [which does not] leave significant opportunity for misleading potential plaintiffs"); *Ayers v. SGS Control Servs.*, 2004 U.S. Dist. LEXIS 25646, *5 (S.D.N.Y. Dec. 16, 2004) ("language in the notice should be fair and balanced"); *Jones v.*

*Casey's Gen. Stores*, 517 F. Supp. 2d 1080, 1089 (S.D. Iowa 2007) ("[O]ne-sided, misleading communications with putative opt-in collective members . . . could easily have the effect of tainting the entire putative class and jeopardizing this entire litigation.").

Second, Plaintiffs describe the benefits of participating in the collective action, but do not discuss the potential downsides.  The putative class members should be apprised, at a minimum, of their discovery obligations, including that they could be deposed or required to participate in the written discovery process,[104] and could be ordered to testify at trial. *See Whitehorn*, 767 F. Supp. 2d at 450 (holding that "such text is routinely accepted"); *Bah v. Shoe Mania, Inc.*, 2009 U.S. Dist. LEXIS 40803, *11-12 (S.D.N.Y. May 13, 2009) ("Plaintiff must modify the notice to inform the potential plaintiffs that, if they opt in, they may be asked to (1) appear for depositions; (2) respond to written discovery; (3) testify at trial and/or (4) pay litigation costs.").  Potential plaintiffs should also be made aware of the potential that they will be required to pay costs if they do not prevail in this action.  *Moore v. Eagle Sanitation, Inc.*, 276 F.R.D. 54, 61 (E.D.N.Y. 2011) (determining such language to be among the "reasonable additions" to the notice).

Third, the title of the notice includes the words "overtime pay lawsuit" in over-large, bold lettering, which immediately suggests the possibility of a windfall to the putative class members. A more typical title directing System Administrators to review the Notice is appropriate.

Fourth, the recipients of the Notice are not sufficiently apprised of their right to do nothing, but rather are told that they are "allowed to join" the lawsuit.  Again, the Notice should be more balanced by indicating that class members can effectively opt out of the lawsuit by doing nothing.  For example, this section should have language along the lines approved by the Court in *Hamadou v. Hess Corp.*, 915 F. Supp. 2d 651, 669 (S.D.N.Y. 2013):

---

[104] Judge Margolis has already ordered that at least some class members will be required to respond to written discovery and sit for depositions, so this potential burden is not purely hypothetical.  Docket No. 138.

> This notice is to locate persons who wish to join this case and are eligible to join this case and has no other purpose. Your right to participate in this suit may depend upon a later decision by the federal court that you and the Class Representatives are 'similarly situated.'

Fifth, the explanation of the status of the case should be made clearer.  At present, it merely indicates that the Court has not ruled on the merits.  A proper notice should include a more nuanced discussion of the status and potential outcomes of the case.

Sixth, the Notice is rife with skewed language seemingly designed to solicit participation. For example, the Notice speaks of "maximizing" potential damages and the preservation of evidence (Section 3), equates not joining the lawsuit to giving up money (Section 6), and asks for updated contact information to facilitate Plaintiffs' counsel sending money to the putative class members in the event of a judgment or settlement (Section 7).  Indeed, the Notice's repetitive use of the term "money" is itself overly solicitous.  A more balanced Notice is essential to the court-authorized notice process.

If the Court prefers briefing on the form of the notice, as opposed to the parties' collaborative effort to produce a Notice for the Court's approval, CSC is prepared to brief all of its concerns about the form of the Notice, and to produce its own, independent Notice for the Court's review.

## III.   CONCLUSION

For all of the foregoing reasons, CSC respectfully requests that the Court issue an Order denying Plaintiffs' Motion for Conditional Certification of FLSA Collective Action and Issuance of Notice.

Respectfully submitted,

DEFENDANT,
COMPUTER SCIENCES CORPORATION

By its attorneys,

*/s/ William J. Anthony*
Jackson Lewis P.C.
William J. Anthony (ct 17865)
Kristi Rich Winters (ct 28066)
18 Corporate Woods Boulevard, 3rd floor
Albany, New York 12211
Telephone: 518-434-1300
Fax: 518-427-5956
Anthonyw@jacksonlewis.com
Kristi.Winters@jacksonlewis.com

David R. Golder (ct 27941)
David C. Salazar-Austin (ct 25564)
90 Statehouse Square, 8th Floor
Hartford, CT  06103
Tel: (860) 522-0404
Fax: (860) 247-1330
golderd@jacksonlewis.com
salazard@jacksonlewis.com

Brett M. Anders*
220 Headquarters Plaza
East Tower, 7th Floor
Morristown, NJ 07960
Tel: (973) 538-6890
andersb@jacksonlewis.com

Cary G. Palmer*
Nathan W. Austin*
801 K Street, Suite 2300
Sacramento, CA 95814
Tel: (916) 341-0404
palmerc@jacksonlewis.com
AustinN@jacksonlewis.com

\*  admitted *pro hac vice*

37

<u>CERTIFICATION OF SERVICE</u>

I hereby certify that on May 8, 2015, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


*/s/ William J. Anthony*
William J. Anthony