| | |
|---|---|
| JOSEPH STRAUCH and TIMOTHY COLBY, individually and on behalf of all others similarly situated,<br>    *Plaintiffs,*<br>    *v.*<br>COMPUTER SCIENCES CORPORATION,<br>    *Defendant.* | Civil No. 3:14-CV-956 (JBA)<br><br>June 30, 2017 |

## RULING ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs Joseph Strauch, Timothy Colby, Charles Turner, and Vernon Carre, current and former System Administrators ("SAs") at Defendant Computer Sciences Corporation ("CSC"), bring this overtime misclassification action under the Fair Labor Standards Act ("FLSA") and the state laws of California, Connecticut, and North Carolina, claiming that CSC has mistakenly classified them and fellow employees with the same job titles as exempt. On June 9, 2015, the Court granted [Doc. # 168] conditional certification of a FLSA collective action for a class consisting of all SAs with the titles "Associate Professional System Administrator," "Professional System Administrator," or "Senior Professional System Administrator" (the bottom three tiers of CSC's five-tier system administrator hierarchy) who earned less than $100,000 annually. In the instant motion [Doc. # 323], Plaintiffs seek certification of three state law classes under Fed. R. Civ. P. 23(b)(3) for California, Connecticut and North Carolina, each consisting of two sub-classes: (1) a sub-class combining two more junior categories of SAs: the "Associate Professional SAs" and the "Professional SAs," and (2) a sub-class composed of the "Senior Professional SAs." For the reasons set forth below, the Court GRANTS in part and DENIES in part Plaintiffs' Motion.

## I.     Background

Defendant CSC is a multinational information technology ("IT") corporation that employs about 72,000 people and provides IT services to a variety of companies throughout the world. (Ruling on Mot. for Conditional Cert. [Doc. # 168] at 2; Def.'s Mem. Opp'n Mot. for Class Certification ("Opp'n")[Doc. # 309] at 2-3.) During most of the relevant period of this case, CSC contracted both with governmental entities and private corporations to provide IT services ranging from (i) basic helpdesk operations to (ii) more complex computer and software installation and maintenance and (iii) comprehensive, business-wide IT solutions. (*Id.* at 3-4.)

The putative classes are comprised of the three bottom levels of System Administrators in CSC's five-level hierarchy. SAs are ranked above the non-exempt helpdesk employees and other technicians (Ex. 68 ("Calisi Decl.") to Opp'n [Doc. # 309-68] ¶ 5) and generally, as their job title suggests, they administer an enterprise's computer system to ensure that it stays running by providing support for problems the helpdesk cannot solve, patching software, setting up computers and servers, and providing data recovery services. Despite this general description, many SAs work on longer-term projects that do not fall easily into this set of activities. (Opp'n at 4.) SAs can also be grouped by area of specialization, such as databases, Lotus Notes email, calendar and instant messaging system, or building servers, which may entail physically plugging in components, creating a virtual computer, or installing an operating system onto a computer. (*Id* at 3.)

The location where SAs work varies. Because CSC provides business services to many different corporations, some SAs work in CSC offices, others directly support CSC's clients on-site, and some work remotely from their homes via internet and cell phone. For example, named plaintiff Joseph Strauch worked at the CSC offices in Kearny Mesa, San Diego from 1999 – 2004

(Ex. 29 ("Strauch Tr.") to Opp'n [Doc. # 309-29] at 27) while Nicholas Combs worked on a military base (Ex. 9 ("Combs Tr.") to Opp'n [Doc. # 309-9] at 10-11.). Mr. Strauch subsequently worked remotely from home and provided IT support to businesses nationwide via remote log-in and telephone from 2007-2014. (Strauch Tr. 58-59.)

Plaintiffs proffer several common forms of proof to support their claims of class-wide misclassification, including a global set of job descriptions, a company-wide set of best practices called the "core processes," and various agreements CSC enters into with its clients to provide particular services, which they claim will enable the fact-finder to determine the tasks performed by the class members. These common forms of proof are addressed first, followed by a discussion of the actual job duties of the named plaintiffs and the opt-in plaintiffs as developed in discovery.

## A.    The Job Classification System

Plaintiffs maintain that CSC's globally consistent job-titling system, rolled out in 2006 along with a set of consistent job descriptions and set of "essential job functions" for each position, shows that the primary job functions were at heart routine and rote. In these internal documents, Defendant describes its system as providing managers with "more information about work accountabilities and minimum requirements," and as ensuring that CSC was in compliance with FLSA (Ex. 30 ("Job Classification Training") to Sagafi Aff. [Doc. # 304-30] at CSC017726). One of the goals in drafting the new job descriptions was to "ensure that [CSC was] consistently describing the predominant work performed" across all the U.S. employees. (Ex. 40 ("Josephson Tr.") to Sagafi Aff. [Doc. # 304-40] at 133.)

Each job title—Associate Professional SA, Professional SA, and Senior Professional SA— was accompanied by a comprehensive job description whose "fundamental purpose . . . [was] to communicate to CSC management and employees information regarding their job title, job[]

duties, responsibilities and requirements." (Ex. 4 to Strauch Tr.) These job descriptions incorporate terminology taken directly from the FLSA's description of various exemptions, including verbs like "coordinate," the use of "complex" as an adjective, and the catchall "matters of significance" to describe the problems that SAs are called on to resolve. Plaintiffs argue this terminology carries no independent meaning and was "sprinkled" into the job descriptions to help support the exempt classification.

This job-titling and description system demonstrates Defendant's belief in some degree of homogeneity among employees in these job classifications. Not only was there some degree of homogeneity in job duties, but CSC used that homogeneity to distinguish between exempt and non-exempt job classifications by using the title 'technician' to identify nonexempt jobs and using the title 'administrator' to identify exempt jobs. (Ex. 38 ("Engelmann Tr.") to Pl.'s Mot. [Doc. 304-38] at 93). Pursuant to this system, CSC classified its Technicians, Field Technicians, Helpdesk Technicians, Helpdesk Coordinators, System Technicians and Telecommunications Technicians as non-exempt and by contrast classified all System Administrator positions as exempt. (Def.'s Mem. Opp'n Mot. to Certify ("Opp'n") [Doc. # 309] at 4.)[1]

---

[1] In 2014, in order to better manage its human resources and ensure that SAs's skills were not going to waste or overlapping with other team members, CSC divided the SAs into five color-coded teams (e.g. the Blue Team, the Purple Team) by broad job duty. One team was responsible for "Complex Incident and Service Request Resolution" while another team was responsible for "Custom and Complex Project Fulfillment." (Calisi Decl. ¶ 7). This reorganization ensured that some SAs who previously performed a mix of job duties were assigned solely to long term projects. Jason DeConti, for example, testified that after the reorganization into color-coded teams,

> he just focus[es] on the projects that need to be worked on, you know. I'm engaged on one thing at a time—well, not necessarily one thing at a time, but each project, you know, I'm focused on. And then when that's done, I move on to the next heavy hitter, which is fun. (Ex. 10 ("Deconti Tr.") to Opp'n [Doc. # 309-10] at 20; 50.)

The Associate Professional System Administrator—the lowest rank of the three levels of SA at issue in his case—has a brief "Job Summary" that reads, "[i]nstalls, investigates and resolves matters of significance with computer software and hardware equipment" and lists six "Essential Job Duties:"

1. Analyzes, logs, tracks and resolves software/hardware matters of significance pertaining to networking connectivity issues, printer, servers and applications to meet business needs.
2. Performs troubleshooting to isolate and diagnose common system problems; documents system events to ensure continuous functioning. Recommends course of action and implements as approved.
3. Upgrades system software and hardware components as required to meet business needs; coordinates backups. Ensures upgrades are occurring in accordance with established parameters.
4. Coordinates the installation of client department specific applications and systems. Determines appropriate method for installing applications and systems. Resolves matters of significance and implements corrective course of action as needed.
5. Installs, tests, upgrades and configures system files and services to enhance performance.
6. Utilizes standard corporate tools to record change and problem activities for tracking purposes.

(Ex. 4 ("Assoc. Prof. Sys. Admin. Description") to Sagafi Decl. [Doc. # 304-4].)

The Professional System Administrator's job summary reads "[i]nstalls, investigates and resolves routine and complex matters of significance with computer software and hardware equipment," and the essential job functions are:

1. Analyzes, logs, tracks and resolves complex software/hardware matters of significance pertaining to networking connectivity issues, printer, servers and applications to meet business needs.
2. Coordinates hardware/ software installations and upgrades to ensure work is properly performed in accordance with company policy. Recommends resolution to complex

matters of significance and coordinates the implementation of the approved course of action.

3. Coordinates and monitors troubleshooting to isolate and diagnose common system problems, document system events to ensure continuous functioning, recommends course of action and implements as approved.

4. Oversees the installation of client department specific applications and systems, ensures installations are in accordance with appropriate operating procedures, determines revisions or updates to installation as needed.

5. Coordinates testing upgrades and configuration of system files and services, ensures changes are in accordance with appropriate operating procedures, recommends revisions or changes based upon results, prepares for and prescribes approaches to possible downstream implications.

6. Utilizes standard corporate tools to record change and problem activities for tracking purposes.

(*Id.*)

The Senior Professional Systems Administrator job summary reads "[p]rovides support for moderately complex technical and team management activities related to system and database administration," and has ten essential job functions:

1. Performs moderately complex systems and database administration, monitors and tunes appropriate systems to ensure optimum level of performance.

2. Oversees appropriate level software installation and upgrade and related software packages.

3. Collects and reviews system data for capacity and planning purposes. Analyzes capacity data and develops capacity plans for appropriate level enterprise-wide systems. Coordinates with appropriate management personnel in implementing changes.

4. Supports the design and· configuration of complex system landscapes.

5. Supports complex data/media recoverability through system backups and database archive operations. Plans, coordinates and directs appropriate level data refresh strategies.

6.  Oversees, recommends and implements appropriate level database solutions and enhancements to ensure an improvement in system reliability and performance.

7.  Oversees and applies appropriate support packages/patches to maintain system integrity.

8.  Develops and maintains appropriate system documentation to ensure that documentation is current. Oversees the maintenance of the library of system-supporting process and procedure documentation.

9.  Interacts with client management to answer questions, problems and requests regarding complex system issues.

10. Provides leadership and work guidance to less experienced personnel.

(*Id.*) Throughout all of the job descriptions across all three levels of SA, the use of multiple verbs within some sentences (e.g. "analyzes, logs, tracks, and resolves") and the multiple sentences within some of the numbered descriptions (e.g. "Coordinates the installation . . . . . Resolves matters of significance. . . .") underlines the fact that each of these essential job duties encompasses various tasks.

The parties dispute whether each of the essential job functions can be assigned a single meaning that encompasses a finite and definite set of tasks. For example, the first job duty under the associate professional system administrator (. . . [R]esolves software/hardware matters of significance pertaining to networking connectivity issues, printer, servers and applications . . . ) might apply to an SA who diagnoses problems with internet connection, an employee who helps a user recover a password, one who creates email accounts for all new hires, one who physically assembles computers to a client's specifications, one who loads programs onto a computer, one who updates programs, or one who diagnoses problems with printers. Below, the Court will discuss the extent to which these broad job descriptions capture a reasonably finite or definite set of tasks that permits the common proof to support the claims of the class. While some of the variation in

actual job duties may be immaterial for the analysis (e.g. whether an SA troubleshoots problems with Lotus Notes email or Microsoft Exchange email), other differences may have an impact on whether a job is exempt or non-exempt (e.g. whether an SA has discretion to implement system-wide solutions to problems), and will thus have an impact on whether the common proof is sufficient to support the claims of the class.

### B. The Core Processes

The Plaintiffs offer Defendant's core processes to demonstrate how SAs' discretion and judgment are restricted in performing the essential job functions. CSC's proprietary management system, Catalyst, and the public-source IT Infrastructure Library ("ITIL") set forth a set of core processes that provide guidelines regarding the best ways to structure teams and the kinds of practices necessary for efficient achievement of goals for information technology service organizations. CSC's Fed. R. Civ. P. 30(b)(6) deponent Frank Cebula testified that the audience for the Catalyst documents was "people engaged in management . . . account management or project management, service delivery management" (Ex. 37 ("Cebula Tr") to Sagafi Aff. [Doc. # 304-29] 198-199) and that the policies enabled project managers to ensure efficient completion of tasks by ensuring everyone followed industry standards. He testified that the core processes included having a daily service review meeting, implementing a change control process, establishing a system of escalation for problem solving, having a team dedicated to service restoration, and having a root cause analysis process. (Cebula Tr. at 181.)

One process—the "change control process"—restricts the ability of an SA to make changes to a computer system without proper authorization. For instance, James Atkinson, a System Administrator at Electric Boat in Connecticut, testified that

as an administrator I was even more bound by procedure as far as my actions on the server. A mistake on our part could cause a system outage. So we as admin are much more procedure driven. . . . We have to have prior approval to do anything that might cause an outage. . . . I know that other admins have to have those planned outages or work scheduled well in advance.

(Ex. 2 ("Atkinson Tr.") to Opp'n. [Doc. # 309-2] at 187-188.) However, these change control processes differ from client to client and Mr. Atkinson emphasized that Electric Boat was particularly strict because they build nuclear submarines. (*Id.* at 184.) Mr. Cebula testified that the change control process "probably varies more client to client than any of the other ones . . . . [N]ot only that [different clients] have different procedures, but depending on the circumstances, you might have different entities weigh in." (Cebula Tr. at 182-183.)

A second core process that restricts SAs' autonomy is the "escalation and notification" procedure. Though this procedure, too, vary from client to client, it delineates how long an SA may spend working on a ticket before escalating to the next level and moving on to a different project. (Cebula Tr. at 215-217.) Shaun Smith, an SA employed by CSC but embedded at Boeing testified that "[a] break fix issue [normally has] . . . a ten-hour restore time frame as opposed to a request for service which [has] . . . more like a five-day time frame." (Ex. 30 ("S. Smith Tr.") to Opp'n [Doc. # 309-31] at 30.) By contrast, Vernon Carre, another of the named plaintiffs, testified that he had to escalate a ticket to the next level if he could not resolve a problem within thirty minutes. (Ex. 6 ("Carre Tr.") to Opp'n [Doc. # 309-6] at 19.)

A third core process is the "root cause analysis," which prescribes a set of steps an IT support team must take to diagnose a major problem. The Catalyst root cause procedure sets forth 11 steps, including "determine resource requirements," "schedule meeting," "gather/analyze data," "brainstorm solution," "identify/input action items," "perform action items," "verify resolution,"

"update action items," and "generate RCA report." (Ex. 12 ("Catalyst Scheduled Service Delivery")
to Sagafi Aff. [Doc. 304-13] at CSC038094-95.)

SAs testified that they were aware of change control processes and that restrictions placed
on their ability to implement solutions affected the time in which a task could be accomplished.
For example, Mr. DeConti described the process of migrating the active directory to fit into a new
design created by the client. While the task may not be that complicated ("it's just longer and drawn
out") it is conducted under strict client change control with backups and backouts in place because
a mistake could disrupt the entire system. (*Id.* at 29.) These change control procedures require SAs
to secure permission from various entities, and thus slow down the speed with which an SA works.
Such change control processes also demonstrate that the SA does not exercise full discretion over
the client's computer system.

The SAs who discussed root cause analysis, however, did not treat it as a significant
restriction on their autonomy. Patricia Smith testified that root cause analysis was essentially
"working with a group of people to discuss what you feel caused the problem" and then the
documentation of "what [the problem] was and what the impact on the business was and . . .
recommendations for what can be done to prevent that from happening again." (Ex. 30 ("P. Smith
Tr.") to Opp'n [Doc. # 309-30] at 137-139.)

C.     The Master Service Agreements ("MSAs")[2]

Plaintiffs submit a set of Master Service Agreements that govern CSC's relations with its
clients to show that the actual job duties of SAs are limited by the contractual provision between

---

[2] The MSAs were filed under seal to protect the expectations of CSC's clients—non-parties
to this action—who designated the documents confidential. The Court consequently avoids
directly quoting from the documents.

CSC and its clients. These contracts delineate the various services CSC provides to particular clients. For example, in the "incident management" section of the agreement between CSC and one of its clients, CSC promises to provide both Level 2 and Level 3 support services and to resolve reported problems according to a severity ranking agreed on between the parties. (Ex. 9 to Sagafi Aff. [Doc. # 304-9] at 1-2.) However, despite Plaintiffs' contentions, the MSAs do not specify who is assigned to perform which tasks, and thus do not adequately identify which tasks are performed by SAs. (*See also* Ex. 20 to Pl.'s Mot. [Doc. # 304-20] (MSA with a different client that sets forth a long list of services CSC provides to the client, including installation and maintenance of all system software and planning the deployment and retirement of machines, but does not identify who performs these services or what tasks are required to perform these services).)

Some of CSC's clients provide manuals that contain hyperlinks to step-by-step instruction guides for different services that SAs perform. For example, one client's manual contains hyperlinks to "work instructions" for activities like building a server. The hyperlinks for this activity then lead to specific checklists of steps that the client specifies must be completed during the server build process. (Ex 7 to Sagafi Aff. [Doc. # 304-7] at CSC038423.)[3]

### D.     The Named Plaintiffs

#### 1.     Joseph Strauch: Representative of the California Class

Joseph Strauch is a California resident who was employed by CSC as an SA from 1999 to 2014 with two several-months-long hiatuses, one in 2004 and one in 2011. (Strauch Tr. at 33-34.)

---

[3] The actual checklists are not available, since the documents were provided in hard copy form and the hyperlinks are to locations within a particular company's internal network. There appear to be dozens, if not hundreds, of different checklists for different installations an SA may have to perform.

During his time as an employee he worked on two contracts: one for the county of San Diego, California (1999-2007) and one with Boeing (2007-end of employment) where he focused on supporting Solaris, a Unix-based operating system.[4] (*Id.* at 34.)

Mr. Strauch worked primarily for two teams: the Unix incident response team and the Unix service request team (*id.* at at 78) and not in any of the other CSC teams, including the "Build Team," the "Professional Services" team, the teams that supported Windows products, the Middleware team (the team responsible for web servers), the Storage Team, the Access Provisioning team, and the Network Services team. (*See id.* at 78-81.)

In 2012, Mr. Strauch rotated between the Unix incident team and the service request team at 4-6 week intervals. (*Id.* at 41-42.) When he was on the incident team, he spent all of his time resolving tickets.[5] Typical problems for which Mr. Strauch resolved tickets included assigning new passwords when a user forgot his or her password, helping a user connect to a server ("connectivity"), and helping users restore missing files by finding them on the backup tapes. (*Id.* at 51-53.) To resolve connectivity issues, Mr. Strauch testified that he would log in to make sure the website to which the user wanted to connect was up and running, check to "see if it was a disc issue or something obvious," and then, if the problem remained unresolved, "pass the ticket along

---

[4] An operating system is the basic level of software in a computer. It interacts with a system's hardware and provides a platform on which other programs can be installed. Common computer operating systems are Microsoft Windows or Mac OS. Unix is a competing operating system. Solaris is a version of Unix that can be licensed by companies for use in their enterprises. *See* Unix Overview Data sheet, available at http://www.opengroup.org/UNIX (last accessed April 18, 2017).

[5] Tickets are the mechanism by which some tasks are assigned to SAs. Tickets originate as problem reports by users at a client. Once a user has reported a problem, "Boeing has a ticket system, and those tickets would appear in your queue that have been assigned to you" that were graded in terms of level of severity. (Strauch Tr. at 48.)

to the web people." (*Id.* at 55.) When doing this kind of troubleshooting, Mr. Strauch would try to identify the problem from the face of the ticket, call the user who reported the problem if necessary, and then diagnose the problem by relying on his experience. (*Id.* at 52-55.) He testified that in connection with at least one assignment, he worked on average more than 44 hours per week. (*Id.* at 84.)

On the "service request team," Mr. Strauch was responsible for "adding a user, adding patches, and maybe upgrad[ing] some utilities . . . ." (*Id.* at 65.) Within this rubric, he also updated backup programs, added disk storage space, and added space to different directories. (*Id.* at 71.) These tasks were time-limited, which was the primary distinction between service request team and incident response team. (*Id.* at 66-67.)

Mr. Strauch testified that he never worked with the web server group and that he lacked the knowledge and abilities to administer a web server. (*Id.* at 55-56.) Further, he did not work with Windows products because they were "too complicated" and required a different set of skills than his. (*Id.* at 78.) Because Mr. Strauch worked remotely from 2007 to 2014, he did not perform any tasks that required physically interacting with a computer on-site, including tasks like replacing a failed hard disk. (*Id.* at 58-59.)

When asked to explain whether his actual job duties fell within the job descriptions for Associate Professional System Administrator, Professional System Administrator, and Senior Professional System Administrator, Mr. Strauch responded that he performed almost all of the duties listed for the Associate Professional System Administrator, but that none of the activities listed in Essential Job Function Four ("Coordinates the installation of client department specific applications and systems. Determines appropriate method for installing applications and systems;

Resolves matters of significance and implements corrective course of action as needed.") and that

he had no opinion on whether the matters he worked on were "significant." (*Id.* 113-116.)

Mr. Strauch similarly testified that he performed almost all of the functions listed in items

1, 2, 3, 5, and 6 of the job description for Professional System Administrator, but that he did not

perform function four: "Oversees the installation of client department specific applications and

systems, ensures installations are in accordance with appropriate operating procedures,

determines revisions or updates to installation as needed." (*Id.* at 116-119.)

With respect to the Senior Professional System Administrator description, Mr. Strauch did

not work with databases, so any description including databases did not apply to him. He also did

not perform functions three, four, six, eight, or ten:

> [3] Collects and reviews system data for capacity and planning purposes. Analyzes
> capacity data and develops capacity plans for appropriate level enterprise-wide
> systems. Coordinates with appropriate management personnel in implementing
> changes. [4] Supports the design and configuration of complex system landscapes.
> . . . [6] Oversees, recommends and implements appropriate level database solutions
> and enhancements to ensure an improvement in system reliability and
> performance. . . . [8] Develops and maintains appropriate system documentation to
> ensure that documentation is current. Oversees the maintenance of the library of
> system-supporting process and procedure documentation. . . . [10] Provides
> leadership and work guidance to less experienced personnel.

(*Id.* at 120-123)

Mr. Strauch's testimony established that he performed a finite set of different tasks that

could be grouped under the general rubrics of responding to problems reported by users,

troubleshooting those problems with a small set of typical solutions, and elevating problems he

could not solve to specialists. (*Id.* at 41.) The tasks he performed were relatively rote and routine,

including the resetting of passwords and the restoration of files. (*Id.* at 51-53.) His ability to act

with discretion was limited by the rules restricting time he was allowed to spend on a task. (*Id.* at 66.)

### 2. Timothy Colby: Representative of the Connecticut Class

Timothy Colby is a Connecticut resident who worked at CSC from October 2011 to February 2014 as a "system administrator professional." (Ex. 8 to Opp'n ("Colby Tr.") [Doc. 309-8] 70:19-22.) He performed "general server maintenance" at CSC and his primary function was to "build and maintain Windows servers,"[6] (*Id.* at 59, 78) with 95 percent of his time dedicated to "run[ing] and maintain[ing] the computers]. . . . [O]ur typical tasks were to make sure the servers were up and running." (*Id.* at 69-70.) He also performed server builds, which consisted of "putting the components [of a computer] together:" "physically get the server, install any components that didn't come pre-installed . . . rack the server, cable it, configure remote access, and then go back to the office and run the automated installation process." (*Id.* at 71.)

In comparing his actual job duties to those listed in the essential job functions, Mr. Colby explained that "I wouldn't say what we did was necessarily complex" and "I never touched networking and I never touched applications." (*Id.* at 95.) Like Mr. Strauch, Mr. Colby did not perform essential job function four. (*Id.* at 105.) In general, Mr. Colby testified that "most of the higher level things that are on this job description were handled by management." (*Id.* at 109.) Further, in describing how his job duties related to those of the first-level help desk technicians,

---

[6] The word "server" can mean either (1) a computer program or process used by many clients in a network simultaneously, or (2) the physical computer on which the server program is hosted. As described below, "virtualization" is the process of using one physical computer to house many virtual servers. Mr. Colby's testimony does not make clear how much of his time was dedicated to trouble-shooting the server programs, and how much was dedicated to the manual labor of physically manipulating the components of the host computer.

Mr. Colby explained that the help-desk technicians were "Level 1" employees who responded to user requests, and that

> Level 2 work to me is really the bulk of what I did because it's the day-to-day run and maintain. It's the day-to-day trouble ticket stuff, the stuff that you're just going to kind of take care of quickly. You know how to do it. There's an established procedure. You plug and play.

(*Id.* at 114.)

Mr. Colby's testimony reflects the fact that some of what SAs do is manual labor. Sometimes building a server involves running cable into rooms, manually placing components into the computer box, and placing the computer box within an office. (*Id.* at 71.) His testimony also clarified the division of labor between help-desk employees and second-level SAs. SAs build up a base of knowledge that enables them to solve many problems quickly, but the base of knowledge comes from experience. Thus, they are capable of solving problems that the help-desk cannot solve, but at the second level, they are not involved in implementing system-wide changes.

### 3.     Vernon Carre: Representative of the North Carolina Class

Vernon Carre is a North Carolina resident who began working at CSC in 2009 and after three or four months began working from home. (Ex. 6 ("Carre Tr.") to Opp'n [Doc. # 309-6] at 17-18.) He remained at CSC as a System Administrator Professional with one break for FMLA leave until his retirement in 2013. (*Id.* at 18.) He worked "45 to 50 [hours per week], usually at the higher number" (*id.* at 84) and when he had on-call duty, he had to have a working cell phone and make himself available 24 hours a day. For on-call duty, he needed to be able to log in within 15 minutes of receiving a call and had 30 minutes to identify and fix any problem. (*Id.* at 19.)

Mr. Carre testified that he spent the bulk of his time "troubleshoot[ing] tickets" and that while "there were always nuances in a ticket, they were pretty much the same issues . . . customers

couldn't get email, customers couldn't send email, people couldn't connect to their mailbox," meaning that, Mr. Carre worked primarily with email programs and specifically with Microsoft Outlook. (*Id.* at 83-84)

To diagnose or troubleshoot problems, Mr. Carre would read "the event logs, for example, of the Exchange server and see if [he] could determine [the cause of the problem]" because users did not have access to the event logs. (*Id.* at 89.) He also logged onto individual users' PCs or laptops to "fix[] issues there." (*Id.* at 65.) He explained that to resolve some problems, he would google them and if he found a solution, he might speak to a superior about implementing that solution. (*Id.* at 114.)

Although Mr. Carre testified that he spent his time troubleshooting, he disagreed that he performed Associate Professional SA essential job function two, "Perform troubleshooting to isolate and diagnose common system problems; document system event to ensure continuous functioning, recommend course of action, and implement as approved" because he was not authorized to make changes to the system, making the second half of the sentence inapposite. (*Id.* at 112-113, 117.) Like Mr. Strauch and Mr. Colby, Mr. Carre did not perform essential job function four. (*Id.* at 118.) With respect to the next level, Professional SA, Mr. Carre did not coordinate or monitor activities, but only did troubleshooting himself. (*Id.* at 123.) Finally, with respect to the Senior Professional SA, because of his seniority, Mr. Carre provided some leadership and training to more recent hires, but he did not perform any of the other nine functions identified in the job description. (*Id.* at 124-130.)

Mr. Carre's testimony highlighted the fact that some SAs specialize in a product or system. Mr. Carre focused on Microsoft e-mail. It also fleshed out one of the ambiguities in the word "troubleshooting." Mr. Carre denied that he was authorized to make changes to a system, and thus

that he did not perform essential job function number two. Nonetheless, he did resolve user problems and in that sense engaged in troubleshooting.

### 4. Charles Turner[7]

Charles Turner began work at CSC in February, 2001 and continues to work for CSC; from 2001 to 2014 in Farmington and St. Louis, Missouri, and since that time in Colorado. (Ex. 34 ("Turner Tr.") to Opp'n [Doc. 309-34] at 47, 16, 21.)

Mr. Turner did not recall ever having the job title System Administrator (he believed he was an MTSA, but did not recall what the acronym stood for, as well as a Subject Matter Expert), and that he currently is a "systems engineer." (Turner Tr. 47-49.) While at CSC, Mr. Turner has worked on several different accounts, including for Motiva Enterprises and Textron, Incorporated, but over the course of his entire tenure, he has always focused on the email service Exchange. (Turner Tr. 61-62.) Mr. Turner testified that while he had the skills to administer Exchange, he did not have the skills to support the Lotus Notes email system, for example.[8] (*Id.* at 62.)

Mr. Turner provided a useful overview of the range of teams he could remember that CSC uses to support his client, Textron:

> there's a team that does firewall work, and they have some overlap with the networking team who oversee the routers. There's the Wintel team . . . They are effectively in charge of all Wintel servers at the OS level as opposed to the application level, which is what I support.[9] There's several different UNIX teams

<hr>

[7] Plaintiffs have abandoned their claim for a Missouri class. Mr. Turner nonetheless remains a Named Plaintiff.

[8] Exchange is a Microsoft email program. Lotus Notes is an IBM email program.

[9] OS stands for "operating system." (*See* Footnote 6.) The operating system is the foundational software that interacts with the hardware in a computer and provides a platform for the various programs (or, as Mr. Colby describes them, "applications") that are installed on the computer.

that support different UNIX systems. There's a perimeter team now that supports perimeter mail servers both for CSC and for various different clients. There is a mainframe team out of Wichita which supports the Cessna mainframe for Textron; the backup team that is responsible for the net backup environment for our Norwich Data Center. There is a team for touch labor, I forget what their name is, but they work in the data center at Norwich, Connecticut.

(*Id.* at 64-65) Mr. Turner explained that he has to interact with all of these teams because "their work is essential for my stuff to stay running," but that he was not competent to serve as a team member on those teams because his expertise was limited to Exchange. (*Id.* at 66-67.)

With respect to his training and the steps he takes to keep current, Mr. Turner stated that IT knowledge becomes obsolete very quickly and that he kept current through CSC-sponsored courses and "mostly you wing it, you learn the new technology as it gets put in at wherever site you're working." (*Id.* at 22-23.) Mr. Turner also kept current by "reading online . . . CSC offers digitized versions of [training books] and other than that, it's mostly trial and error, or reading TechNet." (*Id.* at 23.)

This latter testimony pointed to a part of the SA's job duties that is not rote or routine. In order to perform their job, SAs must become acquainted with new products as they are released. Instead of relying on pre-established routines and checklists, SAs learn by doing, and this requires trial and error and experimentation.

The testimony of the four named plaintiffs illustrates the kind of actual job duties that are performed by SAs under their various job descriptions. This testimony reflects that much of an SA's activity consists of responding to various problems reported by users and that SAs work through a mental checklist of potential solutions that they develop through experience and on-the-job learning over time. Insofar as users experience a regular set of errors, the named plaintiffs' testimony suggests that the resolution of those problems is a relatively rote task. The SAs'

knowledge is specialized and highly technical, but their discretion on the job is limited in various ways, in part by the time restrictions placed on resolving a problem (potentially spelled out in the MSA governing the relationship) and in part by change restrictions and other controls.

###     E.      Opt-in Plaintiffs Who Have Been Deposed

Both parties rely on the depositions of many of the opt-in Plaintiffs in addition to the testimony of the Named Plaintiffs. This testimony permits examination of the actual job duties of individual SAs and comparison of that testimony to the common evidence presented by Plaintiffs. Plaintiffs argue that this testimony reveals that, even where actual job duties differ from individual to individual, they are all relatively routine, rote activities. Defendant by contrast argues that the testimony shows that the actual job duties of SAs are much more disparate than the common proof would suggest, presumably meaning that the variation in actual job duties may be material to determination of whether a given employee is exempt, necessitating individual hearings to determine if class members deserve relief. A brief summary of some of the salient testimony follows with emphasis on those aspects of the testimony that are relevant to the determination of an SA's status as exempt.

####         1.   Testimony of Associate Professional System Administrators

Defendants submit the testimony of three associate professional system administrators, James Atkinson, Patrick Nelis, and Ronald Novotny. In addition, Plaintiffs submit declarations from Mr. Nelis and Mr. Atkinson, as well as the declaration of Steve Donegan. In their declarations, each stated that he was an Associate Professional System Administrator. (See Ex. 62 ("Atkinson Decl.") to Sagafi Aff. [Doc. # 304-62] ¶¶1-3; Ex. 70 ("Donegan Decl.") to Sagafi Aff. [Doc. # 304-70] ¶¶ 1-3; Ex. 75 ("Nelis Decl.") to Sagafi Aff. [Doc. # 304-75] ¶¶ 1-3; and Ex. 23 ("Novotny Tr." to Opp'n. [Doc. # 309-24] at 23.)

Mr. Atkinson testified that he spends about 30 hours a week on ID maintenance, and explained that this job duty involved "You know, putting Johnny Jones in this group . . . versus another group. Or add him to another group on top of whatever—based on what the end user's job function change is." (Atkinson Tr. at 83; 100-102).

In addition, Mr. Atkinson spent significant amounts of time on projects. He testified that he "was involved for two years in the printer refresh project and another project [more recently], MSDS printers for installing 24 printers there." (*Id.* at 52.) He explained that this work involved attending meetings and "[t]his refresh being different, we were just supporting [Electric Boat's] purchase of printers. And basically I was given a number of print queues that needed to be built, and our network engineer was involved in the meeting. And he gave me and IP scope, IP range to use for installing these printer queues." (*Id.* at 78-79.)

Mr. Nelis testified that the distribution of his actual job duties shifted about a year ago due to an internal reorganization at CSC. Prior to that reorganization, he performed the following actual job duties: grant permissions to servers to access storage devices, reboot devices, visit worksites to change drives and failed components, provide daily monitoring of switches, replace component parts of switches, plug in fiber optics cables, and zone switches. (Ex. 21 ("Nelis Tr.") to Opp'n. [Doc. # 304-22] at 122-123). Now that he has moved to the purple team, he spends 90% of his time responding to trouble tickets raising problems with data storage. When the trouble tickets raise actual storage problems (as opposed to misidentifying the problem and being re-routed), "we know right away what to do. . . . you can look up on the system . . . exactly . . . where the server is getting its storage from. And we process the ticket with EMC saying this guy says that these particular ones that belong to this server are having trouble, and here are the log files that may show where the trouble is. . . . It's very cookie-cutter." (Nelis Tr. at 127-28.)

Mr. Novotny testified that when he was assigned to the CATIA team at Electric Boat, he was responsible for the creation of user IDs and resetting passwords and that he responded to tickets for "keyboards, mice, replace hard drives, power supplies. . . .and password resets." (Ex. 23 ("Novotny Tr.") to Opp'n. [Doc. # 304-23] at 52.) Later, Mr. Novotny moved to the IPDE team, where he supports a set of computer programs that provide computer assisted design. His team has "break/fix" responsibilities for those programs. When asked "if something goes wrong, you have to resolve that issue?" he responded, "Well, the ticket is sent to us, and then we try to resolve it ourselves. If we we can't then they send a ticket over to Siemens and correspond with them to have them fix it." (*Id.* at 56.)

Steve Donegan, whose deposition was not submitted, identifies the following actual job duties in his declaration: "I spend the majority of my time doing some combination of the following: building, racking, installing, maintaining, patching, updating, and upgrading servers." (Donegan Decl. ¶ 4.)

Mr. Nelis testified that his job duties were restricted by written procedures that anyone could follow. When asked if he ever completes tasks for which there was no standard operating procedure, he said no and explained that when a client asks for something novel, he reports the request to EMC and, if approved, EMC provides him a written guideline to follow. (Atkinson Tr. at 120.)

Two of the Associate Professional SAs commented on the use of "complexity" in their job descriptions. Mr. Atkinson testified that his work was not complex: "I'm hung up on the word, complex. To me what I deal with is not complex. I deal with mundane items. They're complex to the end user." (Atkinson Tr. at 54.) Mr. Nelis testified that he did "rudimentary analysis about the

problems, including ones that are complex. But the real analysis was being done by EMC . . . ." (Nelis Tr. at 161.)

This testimony establishes that the Associate Professional System Administrators support a wide range of products: some perform manual labor to fix broken components, some support CAD programs, some provide system access and email access. Despite this variety of products supported, their work is not complex and does not involve wide ranges of discretion or independent judgment. Much of the work is restricted by guidelines or procedures set forth by a client or by CSC itself.

### 2. Testimony of Professional System Administrators

The parties submit the deposition transcripts of 20 individuals who were Professional System Administrators during at least part of their tenure at CSC.

### a. Server Support

Many professional SAs described the work they do as relating to servers. Some were tasked with building servers. For example, named plaintiff Timothy Colby testified that he performed server builds, which he described as "putting the components [of a computer] together:" "physically get the server, install any components that didn't come pre-installed . . . rack the server, cable it, configure remote access, and then go back to the office and run the automated installation process." (Colby Tr. at 71.) Jason DeConti likewise testified that earlier in his career, he typically did "server admin work, building servers" using checklists, among other tasks. (Ex. 10 ("Deconti Tr.") to Opp'n [Doc. # 309-10] at 20.) Michael Glanovsky testified that he spends 70-80% of his time building servers, which involves following a step-by-step process documented on a shared wiki (Ex. 13 ("Glanovsky Tr.") to Opp'n [Doc. # 309-13] at 89-90.)

The process could also involve installing operating systems by following steps on a wiki[10], or installing particular programs to the specifications of a given client. *See also* the testimony of John Nall, Margaret Victor, and Matthew Vita. (Ex. 20 ("Nall Tr.") to Opp'n [Doc. # 309-20] at 22, 27; Ex. 35 ("Victor Tr.") to Opp'n [Doc. # 309-35] at 103-04; Ex. 36 ("Vita Tr.") to Opp'n [Doc. # 309-36] at 110.)

### b. System Maintenance and Outages

Many professional system administrators testified that their actual job duties entailed maintaining a program or suite of programs and making sure that they were up-to-date and running. Jason DeConti testified that earlier in his career, he typically did "run and maintain work," which could include, for example, ensuring that every Internet Explorer installed on his client's servers was up-to-date by going from server to server and "running a script" that was given to him. (DeConti Tr. at 21.) Nicholas Combs, who works from Camp Lejeune, a U.S. Marine Corps base in North Carolina, testified that he spent much of his time "maintaining a virtual environment" by reading automatically-generated logs to discover the underlying causes of outages. (Combs Tr. at 101; 103-104.)

This kind of maintenance work may also include the installation of individual programs (see Ex. 7 ("Clay Tr.") to Opp'n [Doc. # 309-7] at 99-100), the creation and deletion of user accounts, IDs and passwords (*id.* at 106) or the application of routine software patches (Ex. 28 ("Schneeberg Tr.") to Opp'n [Doc. # 309-28] at 67.)

---

[10] A "wiki" is a webpage that can be edited by any user. Mr. Glanovsky testified that the SAs use wikis to write down step by step procedures and checklists for solving problems. (Glanovsky Tr. at 90, 95) Any SA can add a checklist or procedure for a new problem, and SAs can correct or update old procedures that are out of date or contain a mistake. (*Id.* at 102-103.)

### c. Troubleshooting

One common job activity that almost all SA's mentioned in the course of their testimony was troubleshooting. However, the meaning ascribed to this term varied from person to person. Norman Thatch, a system administrator living in South Carolina who worked remotely for Boeing, testified that troubleshooting involved searching the internet with google to find reports of similar errors and using the CSC-generated knowledge base as a reference work to do the same thing. (Ex. 33 ("Thatch Tr.") to Opp'n [Doc. # 309-33] at 53.) Paul Tagliaferri testified that he troubleshot hard drives and explained that the process was quite simple: if the green LED light on the hard drive was lit, the drive was operating properly, but if the amber light was lit, the drive was faulty and he would replace it. (Ex. 32 ("Tagliaferri Tr.") to Opp'n [Doc. # 32] at 65.) Scott Schneeberg testified that his acquired fifteen years of experience enabled him to troubleshoot many problems without having to search the internet:

> Years ago certain problems that I would encounter with this application would leave me having to search on-line, search the vendor's knowledge base, search other folks who may have encountered this. Now several years later I might have seen the same problem many times and with that knowledge and experience I no longer have to go to a knowledge base, I no longer have to call the vendor, I have a good basis of where to start troubleshooting.

(Ex. 28 ("Schneeberg Tr.") to Opp'n [Doc. # 309-28] at 38.) Ernest Cardenaza testified that he was a more senior troubleshooter and that he was called on only if the helpdesk and the desktop support team could not resolve the user's problem. Ex. 5 ("Cardenaza Tr.") to Opp'n [Doc. # 304-5] at 39-41.) For him, troubleshooting involved taking user reports of problems and diagnosing them to determine if he should report the problem to IBM or simply reboot the computer.

(Cardenaza Tr. at 54.)[11] Mr. Cardenaza also supported Blackberry phones in the same manner, contacting RIM (Research in Motion, the maker of Blackberry) to find solutions to problems reported by users. (*Id.* at 41:15-42:7.) This typically involved first looking on Blackberry's website to see if they listed a solution and, failing that, contacting RIM directly.

Richard Branson testified that his job consisted primarily of 1) installing software, 2) troubleshooting problems in software already installed and 3) waiting for tickets. (Ex. 4 ("Branson Tr.") to Mem. Opp'n. [Doc. #304-4] at 62-64.) Mr. Branson described an example of trouble-shooting:

> Monday, we were working on just a really strange problem. I would install the software called MQ series which I've installed dozens of times and it didn't work. So I got the developer, the guy who develops the software, and I got on and talked to him and I says, 'Hey, listen, this is not working.' And then we went through all the things that I did and I said, 'Okay. Well, I did all that.' And he says, 'Okay. Let's uninstall it and reinstall it.' So we did, and this is over the, let's say from about 8 o'clock in the morning until about noon. But about 11 o'clock, we just were pulling our hair out and I says, 'Well, the only thing I can think of is it has something to do with file locking.' And file locking—now, we-re troubleshooting, right? File locking is what prevents another program from writing to a file while another—while somebody else is trying to write. So you can't have two applications writing to the same file but there was—there is no other application running that we could think of that we could find that was blocking this file locking issue.
> So I says, 'Well, maybe it's the--maybe it's the McAfee scanner.' So—because, you know, I don't know if you know anything about McAfee, it's pretty invasive. It checks everything. And sure enough we stopped the McAfee scanner about 11 o'clock and everything started working.

[11] In this passage, Mr. Cardenaza is describing his duties while at his previous employer, Zurich. However, he later testified that his duties did not change at all when CSC hired him to perform computer support for Zurich. (Cardenaza Tr. at 62-63.)

(*Id.* at 141-142.) Mr. Branson then explained that, once he had diagnosed the problem, he called the McAfee vendor and explained his diagnosis. The McAfee vendor initiated a global change to the anti-virus program and that fixed the problem for all of the CSC computers. (*Id.*)

William Kurrelmayer explained that his troubleshooting was "somewhere between level two and level three" support (where level one support is the initial interaction between a user and a helpdesk employee), but not full level three support because that would involve creating software architecture rather than simply following processes and procedures. (Ex. 16 ("Kurrelmayer Tr.") to Opp'n [Doc. # 309-16] at 85-86). Similarly, Kay DeLira defined troubleshooting broadly to include determining the cause of any problem that might arise, whether it was a hardware or a software problem. (Ex. 11 ("DeLira Tr.") to Opp'n [Doc. # 304-11] at 19.) As she later noted, she did not "dig deep" to try to solve problems no one had ever seen before; if she encountered a typical problem with an easy solution, she would fix it, but new problems would be elevated. (*Id.* at 101.)

### d. Projects

Another area in which deposition testimony revealed a range of different tasks were "projects." At the Professional SA level[12], William Kurrelmayer testified that his project work involved "storage migration" which was not simply copying folders from one location to another, but using vendor-supplied tools to move data from one storage array to another. (Kurrelmayer Tr. at 88.) Jason DeConti (who became a Senior Professional SA in 2013) testified that he worked on an "active directory migration" in which

> we basically had to take each and every single one of the computer devices that were
> in Active Directory and move them into this new model that they designed. That
> takes considerable amounts of months in order to do without failing. [The reason

_____

[12] As noted above, Associate Professional SAs were involved in projects, too. Mr. Atkinson, for example, created printer queues for 24 new printers.

it takes longer is that] [t]here's . . . a lot of change management. So we have to basically put into place change requests that need to be approved by the line of business. And they want to make sure that if it fails, they have backouts and everything else."

(DeConti Tr. at 28-29.)

### 3. Testimony of Senior Professional System Administrators

The parties have submitted sixteen deposition transcripts of SAs who were Senior Professional SAs during some portion of their tenure at CSC. There is some overlap between this group and the group of Professional SAs. Interestingly, some individuals moved from being Senior Professional to Professional SAs over the course of the years. Also, many testified that their duties did not change after the transition. For example, Michelle Masal testified that downgrading from Senior Professional SA to Professional SA, her job duties remained the same. (Ex. 18 ("Masal Tr.") to Opp'n. [Doc. # 309-18] at 297-298).) More commonly, SAs testified that their job titles changed over the years, but there was little variation in their job duties. Kay DeLira stated that "from all the years I worked with CSC there was all different titles, but my job never changed." (DeLira Tr. at 25-26.)

Many of the Senior Professional SAs described actual job duties that were indistinguishable from the Professional SAs, including building and maintaining servers, supporting applications, and troubleshooting problems. Brandon Kettler testified that "[p]rimarily, [in 2014-2015] my time was spent performing Windows administration tasks like patching, cleaning up active directory. It's a lot of maintenance work. It's kind of tedious and boring." (Ex. 14 ("Kettler Tr.") to Opp'n [Doc. # 309-14] at 47.) Scott Schneeberg testified that 75% of his job was comprised of responding to "production trouble calls that come in get assigned to me. Daily requests to deploy artifacts into our development and stage environments. Perusing system logs to track down problems reported

by users. Troubleshooting log-on problems. . . . A large portion is troubleshooting. Besides log-on problems, other issues reported by end users that require digging into more system logs. So that is the majority of the daily day." (Schneeberg Tr. at 101.) John Nall testified that he spent 25% of his time maintaining and troubleshooting servers and software, that he spent 30% of his time ensuring that the client's computers were compliant with security requirements, and that he spent 50% of his time on projects. When he installed and configured servers, "[t]he system architecture team would determine what was needed as far as hardware specifications. They would order the server, and then they would have specifications for how when I installed the operating system, how it was to be configured, file systems to be laid out, any additional software that needed to be installed." (Nall Tr. at 39.) Gerald Michalak testified that

> we'd have a conference call in the morning to review failed backups, multiple data issues in the backups, status of each TSM server, its database size, because they have a limited size, make sure the data that we did capture is being copied off site. That kind of thing. Then, during the day, after the meeting, we would actually repair any—or try to rerun any backups that had failed or were having issues.

(Ex. 19 ("Michalak Tr.") to Opp'n [Doc., # 309-19] at 81-82.)

Some Senior Professional SAs performed projects that required more sophisticated skills or that had a broader impact on the client or its business. For example, instead of building individual servers, Brandon Kinnas testified that he created templates for virtual machines: "creating the templates is the significant portion of the job because you're—according to CSC's policy and our customer's policy, you're creating a template that's used to build all of their virtual machines going forward; therefore saving you time because you don't have to build a new virtual machine each time and then patch that virtual machine and make it compliant for the rest of the system." (Kinnas Tr. at 106.) Patricia Smith testified that she spent about 40% of her time on longer

term projects. (P. Smith Tr. at 37-38.) She illustrated her project work with a computer assisted design program called ELCADD. Together with a fellow system administrator, Thomas Hamilton, she helped adapt this system to Electrict Boat's needs. (*Id.* at 112-113.) Mr. Hamilton spent two years on this project and worked with Electric Boat to specify its needs, which he then communicated to the vendor for modification of the software. (*Id.* at 114.) Ms. Smith coordinated the recording of problems and bugs. (*Id.* at 115-117.) Together with Mr. Hamilton, she determined which could be fixed by the SAs and which needed to be passed back to the vendor for resolution. (*Id.*)

Defendant has submitted transcripts of persons who were team leaders or exercised some management function, but some of them do not appear to be members of the class. For example, Derrick Rosborough was hired to be the Citrix team lead. He characterized himself as "kind of the technical face of CSC, in regards to how we deal with the clients and the different clients that I work with." (Ex. 26 ("Rosborough Tr.") to Opp'n [Doc. # 309-26] at 18.) However, Mr. Rosborough's job title, "System Administrator: Lead" appears to fall outside the class. (*See* Ex. 5 ("2015 Annual Evaluation") to Rosborough Tr.) Jeffrey Farough, who testified that he was team leader for the virtualization project at Boeing, taught the team how to operate within Boeing's requirements:

> I didn't direct them in the sense of telling them what to do. It was more direction of process. This is the way we—this is the way CSC handles the Boeing account. This is the way we handle tickets. This is the way we troubleshoot, the way we escalate.

(Farough Tr. at 36-38.) His job title is also "System Admnistrator: Lead." Despite Mr. Farough's leadership tasks, he specified that all of his work is governed by a set of very specific rules:

Q. With regard to your day-to-day function, how much direction and instruction are you taking from somebody versus knowing what to do and how to do it on your own?

A. Again, that's difficult to answer, and here's the reason why: Everything I do for Boeing or CSC is, in some manner, scripted.

Q. What does that mean, 'scripted'?

A. It means when I set up a host, I have a list from Boeing that says these are the configuration steps or configuration settings that we want on our hosts because our testing department has determined those are the best for our environment and equipment. As for the CSC side, that is the ticket SLA that we work under. Depending on the severity of the ticket, there's set of steps I'd have to go through.

(Farough Tr. at 75.)

### 4. Testimony Regarding Essential Job Duties

During many of the depositions, the deponent was asked to read the job descriptions for the three levels of SA and determine whether his or her actual job duties corresponded to any of the descriptions. As noted above, many deponents rejected the use of words like "complex" to describe their tasks. (*See* Atkinson Tr. at 52; P. Smith Tr. at 41; Carre Tr. at 83; Combs Tr. at 103-04; Turner Tr. at 103.)

Whereas the named Plaintiffs testified that they performed a broad cross-section of the essential job functions, some of the opt-in plaintiffs testified that their actual job duties did not correspond to the job descriptions at all, or that there were only minor areas of overlap. A striking example of this occurred during Ms. Smith's deposition:

Q: In your opinion, do any of these job descriptions accurately capture what you do on a day-today basis at CSC from 2011 to the present?
. . .
A: No, not really.
Q: Of the three job descriptions that you looked at, is any one job description the closest or the – the least bad?
A: No.
. . .

31

Q: Are you aware of any document that describes what you do on a day-to-day basis at CSC?
A: No.

(Smith Tr. at 106-108.) Despite this colloquy, Ms. Smith conceded that approximately 60% of her time was spent on application support and that, as part of her application support, she did "patching work," "help-desk tickets, on-call . . . [and] code deployment." (*Id.* at 50.) The help-desk tickets that Ms. Smith receives are those that could not be resolved by the help-desk staff in the first instance. (*Id.* at 53.) In addition, when an outage occurs, that is her top priority. (*Id.* at 40). Outages are "not usually complex" to fix, but the amount of time it takes to fix them varies from several minutes to a day or two. (*Id.*)

## II. Procedural Posture

Plaintiffs' Complaint alleges that CSC misclassified them both under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and under the respective state laws of the three proposed classes. Plaintiffs were granted [Doc. # 168] conditional certification of a collective action pursuant to 29 U.S.C. § 216, consisting of "all persons who were, are, or will be employed by CSC nationwide from July 1, 2011 to the present as Associate Professional System Administrators, Professional System Administrators, or Senior Professional System Administrators, who earned less than $100,000 annually, and who were classified as exempt from the overtime pay requirements of the FLSA." The Plaintiffs now seek certification of three state classes, each composed of two sub-classes.[13]

---

[13] The Amended Complaint sought certification pursuant both to Rule 23(b)(2) and (b)(3), but Plaintiffs have abandoned their claim for certification under 23(b)(2). Further, the Amended Complaint sought to certify four state classes, including Missouri. Plaintiffs have abandoned allegations of a Missouri class, as well.

Plaintiff Strauch brings the California Class Action for violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* and seeks damages for CSC's unfairly competitive practices in failing to pay overtime under the FLSA and California law. The putative California class further seeks damages for unpaid overtime premiums pursuant to Cal. Wage Order No. 4-2001 and Cal. Labor Code §§ 510 and 1194, for failure to provide itemized statements of hours worked as required by Cal. Wage Order No. 4-2001 and Cal. Labor Code §§ 226, 1174, and 1174.5, and for failure to provide regular meal and rest breaks pursuant to Cal. Wage Order No. 4-2001 and Cal. Labor Code §§ 218.5, 226.7, and 512. Further, pursuant to California's Private Attorney General Act ("PAGA"), including Cal. Labor Code § 2699(a), Plaintiff Strauch brings this action as an aggrieved employee seeking penalties for employer violations of the California Labor Code and IWC Wage Orders.

Plaintiff Colby brings the Connecticut Class Action for violation of the Connecticut Minimum Wage Act ("CMWA") seeking damages for failure to pay overtime as required by Conn. Gen. Stat. § 31-68 and failure to pay all wages due under Conn. Gen. Stat. § 31-71b and c.

Plaintiff Carre brings the North Carolina Class Action for violation of North Carolina's Wage and Hour Act, N.C. Gen. Stat. § 95-25.1 *et seq.* and implementing regulations, 13 N.C. Admin Code 12.0300, *et seq.*

### III.   Legal Standard

#### A.   Rule 23

A party seeking class certification under Federal Rule of Civil Procedure 23 "'must affirmatively demonstrate . . . compliance with the Rule,' and a district court may only certify a class if it 'is satisfied, after a rigorous analysis,' that the requirements of Rule 23 are met." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 237–38 (2d Cir. 2012) (quoting *Wal–Mart Stores, Inc. v.*

*Dukes*, 131 S. Ct. 2541, 2551 (2011)). The proponent of class certification bears the burden of showing that the proposed class satisfies Rule 23's requirements. *Glatt v. Fox. Searchlight Pictures*, 811 F.3d 528, 538 (2d Cir. 2015). Where multiple sub-classes are proposed, "each sub-class must satisfy all of the requirements of Rule 23(a)." *Burka v. New York City Transit Auth.*, 110 F.R.D. 595, 601 (S.D.N.Y. 1986).

The "rigorous analysis" will "frequently" include "some overlap with the merits of the plaintiffs' underlying claim." *Wal-Mart,* 131 S. Ct. at 2551. "Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 151 (1982); *see also Amgen Inc v. Connecticut Ret Plans & Trust Funds,* 133 S. Ct. 1184, 1194-95 (2013) ("Although we have cautioned that a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." (internal quotation marks and citations omitted).)

"Generally, there are two steps that a district court must take when considering a motion for class certification pursuant to Rule 23." *Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90, 100 (E.D.N.Y. 2014). First, the court must ensure that the four requirements of Fed. R. Civ. P. 23(a) are satisfied. "Once a court has concluded that Rule 23(a)'s four requirements have been satisfied, it must then proceed to the second step, i.e., determine 'whether the class is maintainable pursuant to one of the subsections of Rule 23(b).'" *Goodman*, 300 F.R.D. at 101

(quoting *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007)). Plaintiffs move under Rule 23(b)(3), which permits the certification of a class where the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

As spelled out in more depth below, in FLSA misclassification cases, the generalized evidence must shed some light on whether the plaintiff class has been properly categorized as exempt. *See Myers v. Hertz Corp.*, 624 F.3d 537, 548-49 (2d Cir. 2010) (at least some of the subissues involved in determining propriety of exemption must be "answered with respect to the members of the class as a whole through generalized proof;" *see also Perez v. Allstate Ins. Co.*, No. 11–1812, 2014 WL 4635745 (E.D.N.Y. Sept. 16, 2014), 2014 WL 4635745, at *20 (predominance is "met where the primary job duties of [class members] are largely similar for purposes of the . . . exemption determination"). For this reason, an overview of the state minimum wage laws and relevant exemptions is necessary.

### B.     The State Minimum Wage Requirements and the Exemptions

Although Defendant argues that "there are at least four different multi-factor exemptions that differ under the three state laws at issue" (Mem. Opp'n at 1) and that "there are multiple, multi-prong exemptions at issue that differ under the three state laws (Mem. Opp'n at 27), Defendant does not identify which exemptions it intends to claim. At oral argument, the parties focused on the administrative exemptions, which exist in all three states, and the computer worker exemptions, which exist in California and North Carolina. The exemptions are briefly set forth below.

### 1.     The California Exemptions

In California, wages and exemptions are governed by the Industrial Welfare Commission's ["IWC"] Wage Orders. IWC Wage Order No. 4-2001 regulates wages, hours and working conditions for, *inter alia*, professional and technical workers. Under that wage order, the administrative exemption applies only if the following five conditions are met:

> The employee must (1) perform "office or non-manual work directly related to management policies or general business operations" of the employer or its customers, (2) "customarily and regularly exercise[ ] discretion and independent judgment," (3) "perform[ ] under only general supervision work along specialized or technical lines requiring special training" or "execute [ ] under only general supervision special assignments and tasks," (4) be engaged in the activities meeting the test for the exemption at least 50 percent of the time, and (5) earn twice the state's minimum wage.

*Eicher v. Advanced Bus. Integrators, Inc.,* 151 Cal. App. 4th 1363, 1371 (2007) (quoting Wage Order No. 4-2001 § 1(a)(2).) As summarized in *Sirko v. International Business Machines,* the Wage Order incorporated the then-current federal regulations:

> [I]n the first condition, the phrase 'directly related to management policies or general business operations' includes, but is not limited to, 'work in functional areas such as . . . computer network, internet and database administration.' 29 C.F.R. § 541.201 (2001). Under California law, work must also be 'of substantial importance to the management or operation of the business of [the employee's] employer or his employer's customers.' *Id.* § 541.205(a). Employees' work is of substantial importance if they 'carry out major assignments in conducting the operations of the business, or [their] work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business.' *Id.* § 541.205(c)

> Section 541.205 provides specific guidance with respect to employees in the data processing field, such as systems analysts and computer programmers. *See id.* § 541.205(c)(7). For example, if such an employee is 'concerned with the planning, scheduling, and coordination of activities which are required to develop systems for processing data to obtain solutions to complex business, scientific, or engineering problems of his employer or his employer's customers, he is clearly doing work directly related to management policies or general business operations.' *Id.*

As to the second condition, '[f]actors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance' include 'whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; . . . whether the employee has the authority to waive or deviate from established policies and procedures without prior approval; . . . [and] whether the employee provides consultation or expert advice to management.' *Id.* § 541.202(b). Independent judgment means that an employee 'has authority to make an independent choice, free from immediate direction or supervision,' but not that this choice is not 'reviewed at a higher level.' *Id.* § 541.202(c). The power to make independent recommendations may suffice to meet the second condition. *See id.*

*Sirko v. Int'l Bus. Machines Corp.*, No. CV 13-03192 DMG SSX, 2014 WL 4452699, at *8 (C.D. Cal.

Sept. 3, 2014).

In addition to the administrative exemption, the California code provides for both a

professional exemption and a computer professional exemption.

The Professional Exemption is defined as an employee who meets all of the following:

(a) Who is licensed or certified by the State of California and is primarily engaged in the practice of one of the following recognized professions: law, medicine, dentistry, optometry, architecture, engineering, teaching, or accounting; or
(b) Who is primarily engaged in an occupation commonly recognized as a learned or artistic profession. For the purposes of this subsection, "learned or artistic profession" means an employee who is primarily engaged in the performance of:
    (i) Work requiring knowledge of an advanced type in a field or science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, or work that is an essential part of or necessarily incident to any of the above work; or
    (ii) Work that is original and creative in character in a recognized field of artistic endeavor . . . ; and
    (iii) Whose work is predominantly intellectual and varied in character . . . and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

(c) Who customarily and regularly exercises discretion and independent judgment in the performance of duties set forth in subparagraphs (a) and (b).

(d) Who earns a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515(c) as 40 hours per week.

8 Cal. Admin. Code § 11040(1)(A).

The Computer Professional Exemption encompasses any employee in the computer software field who meets all of the following:

(1) The employee is primarily engaged in work that is intellectual or creative and that requires the exercise of discretion and independent judgment.

(2) The employee is primarily engaged in duties that consist of one or more of the following:

(A) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications.

(B) The design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications.

(C) The documentation, testing, creation, or modification of computer programs related to the design of software or hardware for computer operating systems.

(3) The employee is highly skilled and is proficient in the theoretical and practical application of highly specialized information to computer systems analysis, programming, or software engineering. A job title shall not be determinative of the applicability of this

(4) The employee's hourly rate of pay is not less than thirty-six dollars ($36.00) or, if the employee is paid on a salaried basis, the employee earns an annual salary of not less than seventy-five thousand dollars ($75,000) for full-time employment, which is paid at least once a month and in a monthly amount of not less than six thousand two hundred fifty dollars ($6,250). . . .

Cal. Labor Code § 515.5(a). The computer professional exemption does not apply to an individual who "is engaged in the operation of computers or in the manufacture, repair, or maintenance of computer hardware and related equipment." *Id.* § 515.5(b)(3).

## 2. The Connecticut Exemptions

The Connecticut administrative exemption, set forth in the regulations at Regs. Conn. State Agencies § 31-60-15, tracks the California exemption for the most part but differs in one key fashion. Whereas the California exemption requires that an employee's duties and responsibilities merely "involve" the exempt duties, Connecticut, like the FLSA, applies the exemption only to employees "whose primary duty consists of" the exempt activities.

The Connecticut professional exemption tracks the California exemption in substance. Connecticut has no computer professional exemption.

## 3. The North Carolina Exemption

North Carolina Gen. Stat. § 92-25.1 *et seq.* guarantees payment of a minimum wage, requires record-keeping, and imposes certain other obligations on employers. However, not all employees are covered by the North Carolina minimum wage laws. Specifically, N.C. Gen. Stat. § 95-25.14 exempts "any person employed in an enterprise engaged in commerce or in the production of goods for commerce as defined in the Fair Labor Standards Act" from most of the North Carolina wage protections.

Courts have interpreted this exemption to require dismissal of state law claims for overtime where a person is otherwise covered by FLSA. *Compare Martin v. Airborne Exp.*, 16 F. Supp. 2d 623, 629 (1996), *aff'd* 155 F. 3d 559 (4th Cir. 1998) *with Martinez-Hernandez v. Butterball, LLC*, No. 5:07-cv-174-H(2), 2011 WL 1211772 (E.D.N.C. March 30, 2011) (permitting plaintiff to proceed under both FLSA and North Carolina statute because plaintiff alleged an independent violation of North Carolina's higher minimum wage not covered by the FLSA).

## IV. Discussion

Plaintiffs seek to certify three classes:

**California Class:** All persons who were, are, or will be employed by CSC in California as Associate Professional System Administrators, Professional System Administrators, and Senior Professional System Administrators, at any time from July 1, 2010 through the date of the final disposition of this action, who earn or earned less than $100,000 in total annual compensation, and who were not members of the TTR segment of CSC. The California Class contains two subclasses: (1) the Associate Professional System Administrators and Professional System Administrators defined above; and (2) the Senior Professional System Administrators defined above.

**Connecticut Class:** All persons who were, are, or will be employed by CSC in Connecticut as Associate Professional System Administrators, Professional System Administrators, and Senior Professional System Administrators, at any time from July 1, 2012 through the date of the final disposition of this action, who earn or earned less than $100,000 in total annual compensation, and who were not members of the "Test and Training Ranges" segment ("TTR") of CSC. The Connecticut Class contains two subclasses: (1) the Associate Professional and Professional System Administrators defined above; and (2) the Senior Professional System Administrators defined above.

**North Carolina Class:** All persons who were, are, or will be employed by CSC in North Carolina as Associate Professional System Administrators, Professional System Administrators, and Senior Professional System Administrators, at any time from July 1, 2012 through the date of the final disposition of this action, who earn or earned less than $100,000 in total annual compensation, and who were not a members of the TTR segment of CSC. The North Carolina Class contains two subclasses: (1) the Associate Professional System Administrators and Professional System Administrators defined above; and (2) the Senior Professional System Administrators defined above.

(Mot. for Class Certification [Doc. # 302] at 1-2.)

Despite the fact that each sub-class must independently satisfy the requirements of Rule 23, Plaintiffs have not briefed the sub-classes separately. The Court will first address the North Carolina classes because the motion to certify those classes is opposed for legal reasons independent of the other two states. However, since no party claims that the work performed by

SAs in California differs from that performed by SAs in Connecticut, the Court will discuss those two state classes together, addressing the two proposed sub-classes in turn.

### A. The North Carolina Class

As Defendant notes, "[u]nder N.C. Gen. Stat. § 95–25.14, the FLSA preempts North Carolina's minimum-wage (§ 95–25.3), overtime (§ 95–25.4), and record-keeping (§ 95–25.15(b)) provisions" and parties who can seek relief under the FLSA may not, therefore, seek relief under North Carolina's minimum wage and overtime statutes. *Luna-Reyes v. RFI Const., LLC*, 109 F. Supp. 3d 744, 752 (M.D.N.C. 2015). At oral argument, Plaintiffs insisted that their Complaint was pleaded broadly enough to encompass aspects of the law not preempted by the FLSA including, for example, the payday provisions set forth at N.C. Gen. Stat. §95-25.6.

Despite this representation, Plaintiffs' Complaint alleges only one cause of action for a failure to pay required overtime pay "in violation of N.C. Gen Stat. § 95-25.1 *et seq*," (*see* Amended Complaint [Doc. # 240] ¶ 133) and a failure to "keep, make preserve, maintain, and furnish accurate records of time worked by Plaintiff Carre . . ." in violation of N.C. Gen. Stat. §§ 95-25.13 and 95-25.15. However, N.C. Gen. Stat. 95-25.13 only addresses promised wages, not records of hours worked and therefore is inapplicable here. The other claims explicitly set forth in the Complaint are all preempted by N.C. Gen. Stat. § 95–25.14. Because these state law claims are preempted, the Court cannot certify either proposed North Carolina sub-class.

### B. The Connecticut and California Sub-classes

Plaintiffs seek to certify two remaining classes: a California state law class and a Connecticut state law class. These classes each encompass two distinct sub-classes: (1) a sub-class that combines the Associate Professional SAs and the Professional SAs, and (2) a sub-class

composed exclusively of certain Senior Professional SAs.[14] Because the common proof for California and Connecticut is identical, and because the range of actual job duties performed by SAs in California and Connecticut appears to be similar, the Court will not distinguish by state, but will distinguish by sub-class where necessary.

### 1. Standing and Ascertainability

The Second Circuit has "recognized an implied requirement of ascertainability in Rule 23." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (internal quotation marks omitted). "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Id.* at 24–25 (internal quotation marks omitted). In *In re Initial Public Offerings Securities Litigation.* (*"In re IPO"*), the Second Circuit rejected a class as unascertainable where membership turned on the intent with which class members purchased securities, since determination of intent would require individualized hearings. *In re IPO*, 471 F.3d 24, 44-45 (2d Cir. 2006).

Under this heading, Defendant challenges certification for both sub-classes on grounds of standing, arguing that the class definitions include employees who may not have worked more than 40 hours per workweek and who thus could not have been injured by any FLSA violation. (Mem. Opp'n [Doc. # 309] at 24-25.) Plaintiffs respond that individual differences in damages do not create an ascertainability problem because "there is no merit to [the] argument that class certification should be denied because some [class members] may not have worked any overtime."

---

[14] Although Plaintiffs seek certification of two sub-classes for each state, they have only advanced one named Plaintiff for each state. Thus, Joseph Strauch, a Senior Professional SA, is to be representative for both proposed sub-classes in California, and both Connecticut sub-classes are to be represented by Timothy Colby, a Professional SA.

*Spencer v. No Parking Today, Inc.*, No. 12 Civ. 6323, 2013 WL 1040052, at *26 (S.D.N.Y. Mar. 15, 2013), *report and recommendation adopted*, 2013 WL 2473039 (S.D.N.Y. June 7, 2013). Plaintiffs argue that this is a question of damages, not of standing.

The Second Circuit, in *Denney v. Deutsche Bank AG*, established a slightly stricter standard regarding standing than other circuits.

> We do not require that each member of a class submit evidence of personal standing. At the same time, no class may be certified that contains members lacking Article III standing. The class must therefore be defined in such a way that anyone within it would have standing.

*Denney v. Deutsche Bank AG*, 443 F.3d 253, 263–64 (2d Cir. 2006) (internal citations omitted) Thus, Defendant's challenge is readily met by redefining the classes to include only those persons who worked more than 40 hours per week. *Robidoux v. Celani,* 987 F.2d 931, 937 (2d Cir.1993) ("A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly.") This redefinition would not run the risk of assuming liability in the definition of the class because the core issue in this case is not whether a given class member worked more than forty hours in a week, but whether CSC misclassified the employee.

### 2. Rule 23(a) requirements

Fed. R. Civ. P. 23(a) requires that the putative class be sufficiently numerous, that there be common questions of law or fact, that the claims or defenses of the representative parties be typical of the class, and that the representative parties will fairly and adequately protect the interests of the class. Of the four requirements under Rule 23(a), Defendant only contests the second,

commonality.[15] Defendant combines this attack on commonality with its attack on predominance under Rule 23(b)(3), but the Court will separate the two issues for analytical clarity.

---

[15] Although Defendant does not contest numerosity, typicality, or adequacy, the Court addresses them briefly in this footnote.

Rule 23(a)(1) requires class members to be "so numerous that joinder of all members is impracticable." "Numerosity is presumed at a level of 40 members." *Morrison v. Ocean State Jobbers, Inc.*, 290 F.R.D. 347, 353 (D. Conn. 2013). The California and Connecticut classes have 442 and 224 members respectively.

Typicality under Rule 23(a) "requires that the claims of the class representatives be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (quoting *In re Drexel Burnham Lambert Grp., Inc.,* 960 F.2d 285, 291 (2d Cir. 1992). "'While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'" *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir. 2000). Defendant has not raised any defenses unique to the named Plaintiffs.

Plaintiffs must also show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Under Rule 23(a)(4), adequacy of representation is measured by two standards. First, class counsel must be 'qualified, experienced and generally able' to conduct the litigation. Second, the class members must not have interests that are 'antagonistic' to one another." *In re Drexel Burnham Lambert Grp., Inc.,* 960 F.2d at 291. As a result of the 2003 amendments to the Federal Rules of Civil Procedure, however, the issue of appropriate class counsel is guided by Rule 23(g) rather than Rule 23(a)(4). Defendant does not contest the adequacy of the Plaintiffs or their counsel and Plaintiffs assure the Court that they will vigorously litigate the class's shared grievances and class counsel is highly experienced as lead counsel in wage and hour class actions, including those on behalf of technical support workers like the SAs here. The Court is satisfied that class counsel adequately represent the interests of the putative class. As will be discussed below, Plaintiffs will be permitted to re-plead to add a representative party for the California class.

Fed. R. Civ. P. 23(a)(2) requires "the plaintiff to demonstrate that the class members have suffered the same injury" and that "[t]heir claims . . . depend upon a common contention . . . [that] is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (internal citations omitted). Although "Rule 23(a)(2) and (3) analysis has become stricter in light of the Supreme Court's recent decision in *Wal–Mart Stores* . . . . [t]he weight of authority rejects the argument that *Wal-Mart Stores* bars certification in wage and hour cases." *Flores v. Anjost Corp.*, 284 F.R.D. 112, 125 (S.D.N.Y. 2012) (*citing Espinoza v. 953 Associates LLC*, 280 F.R.D. 113 (S.D.N.Y. 2011) (distinguishing *Wal-Mart* and finding that failure to pay overtime and minimum wages as a result of an employer's policies and practices constitutes an injury susceptible to class-wide resolution)).

"Commonality does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrants class treatment." *Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 651 (S.D.N.Y. 2013). "In wage cases, the commonality requirement is usually satisfied where the plaintiffs allege that defendants had a common policy or practice of unlawful labor practices." *Spencer v. No Parking Today, Inc.*, No. 12 CIV. 6323 ALC AJP, 2013 WL 1040052, at *15 (S.D.N.Y. Mar. 15, 2013), *report and recommendation adopted*, No. 12 CIV. 6323 ALC AJP, 2013 WL 2473039 (S.D.N.Y. June 7, 2013) (collecting cases).

However, where a court is presented with conflicting evidence that is relevant to the determination of whether putative class members are exempt or non-exempt, such "factual disputes are relevant to the determination whether [the Plaintiff] has presented a claim that is capable of classwide resolution, and, to the extent they are material, must be resolved before a Rule 23(a) determination may be made." *See Cuevas v. Citizens Fin. Grp., Inc.*, 526 F. App'x 19, 21 (2d Cir. 2013) (vacating and remanding where district court failed to weigh probative strength of "policy documents and job descriptions . . . which suggested that the [employees] performed primarily the same duties company-wide" against "declarations that . . . if credited, suggested that [the employees'] primary duties varied in respects material to whether they were exempt or non-exempt").

Plaintiffs present five common questions:

1. Whether SAs' job duties are directly related to CSC's management policies or general business operations within the meaning of the administrative employee overtime exemption;
2. Whether SAs' primary duties require the exercise of independent discretion and judgment with respect to matters of significance, within the meaning of the administrative employee overtime exemption;
3. Whether SAs perform the duties of computer systems analysts, computer programmers, software engineers, or similarly skilled workers;
4. Whether SAs worked overtime for which CSC did not compensate them;
5. Whether CSC willfully misclassifies SAs as exempt from overtime pay requirements, thereby depriving them of overtime pay.

(Mem. Supp. Mot. Class Certification at 23.)

The common evidence that Plaintiffs argue is sufficient to answer these questions are the job descriptions, along with an understanding of how the duties delineated therein are limited by contractual requirements set forth in the MSAs and management policies regarding timely completion of tasks and best practices for IT. Plaintiffs maintain that this evidence establishes what

the class members' job duties are and enables the court to determine whether such job duties should be classified as exempt. (Mem. Supp. Mot. for Certification [Doc. # 303] at 25.)

Plaintiffs urge the Court to read the job descriptions with a careful eye as they are "sprinkled" with legally conclusory terms like "matters of significance," but that if the Court ignores these conclusions, it will see that "SAs are primarily low level IT troubleshooters." (*Id.* at 33.) Defendant responds that "there are no such job descriptions, policies, or processes that detail the actual duties performed here" and that the only evidence of actual job duties, for the purpose of the commonality analysis, can be gleaned from the deposition testimony. (Opp'n at 41.) Defendant's position treats the delineation of essential job functions in the job descriptions as meaningless.

CSC's carefully thought-out job descriptions and titling system, along with the testimony of its corporate representatives, go a long way to establishing commonality. The job descriptions were designed to be a globally consistent system that provided managers with "more information about work accountabilities and minimum requirements" (Job Classification Training at CSC017726). One of the goals in drafting the new job descriptions was to "ensure that [CSC was] consistently describing the predominant work performed" across all the U.S. employees. (Josephson Tr. at 133.)

This consistent description promoted FLSA compliance and enabled CSC to distinguish between allegedly exempt SAs and non-exempt technicians. (Job Classification Training at CSC017726.) Because of the care and purposefulness with which these descriptions were developed, and because these descriptions go well beyond a mere policy of blanket exemption without specification of duties or without distinction between those performing exempt and those performing non-exempt work, this case is not one in which Plaintiffs have merely set forth a

blanket exemption policy as determinative of the outcome. *C.f. Myers v. Hertz Corp.*, 642 F.3d 537, 549 (2d Cir. 2010) (endorsing 9th Circuit's reasoning in *In re Wells Fargo Overtime Litig.*, 571 F.3d 953 (9th Cir. 2009) which concluded that a blanket exemption policy, standing alone, is not determinative).

While the Court does not agree with Plaintiffs' generalized characterization of SAs' actual job duties, it does find that the essential job functions developed by CSC for the purpose of describing SAs' work provide meaningful descriptions that suggest a finite and definite set of actual job duties. The essential job functions CSC lists for Associate Professional SAs illustrate that their actual job duties include (1) solving user problems concerning network connectivity, printers, servers, and program; (2) troubleshooting common system problems and documenting the solutions; (3) upgrading software and hardware; (4) installing programs and computers and resolving problems encountered after installation; (5) installing and upgrading files; and (6) recording changes made.

Similarly, the common evidence suggests that Professional SAs perform the following actual job duties: (1) solving more complex user problems concerning network connectivity, printers, servers, and programs; (2) coordinating installation and upgrades of hardware and software; (3) coordinating and monitoring troubleshooting; (4) overseeing the installation of programs and computer systems; (5) coordinating the upgrading of client computer systems; and (6) recording changes made.

This common evidence also suggests that the actual job duties of the Associate Professional SAs and the Professional SAs overlap to a significant degree: where the Associate Professional SAs performs certain tasks, the common evidence suggests that the Professional SAs oversee or manage those same tasks.

It is more difficult to discern a list of actual job duties from the job description for Senior Professional SAs, however, because of jargon. The first essential job function simply restates the job title: senior professional SAs "perform moderately complex systems and database administration." This description does not inform the Court what tasks might be performed and problematically leads to the inference that the other essential job functions are not "systems and database administration." One further essential job function is so jargon-ridden that it fails to suggest any actual job duties: a Senior Professional SA "supports the design and configuration of complex system landscapes." The Court cannot infer any actual job duties from this description. The remainder of the essential job functions do permit inference to actual job duties and suggest that Senior Professional SAs oversee software installation and upgrades, collect data about system performance in order to make recommendations about new equipment, supervise others in helping to back up data, in improving database usage and design, and in the application of patches to software, oversee the library of system documentation, speak with client management about system-wide problems, and provide leadership and mentoring to more junior system administrators.

Defendants object to the use of this common evidence to determine actual job duties because, it claims, the depositions and other individualized evidence show that actual job duties vary so widely as to defeat commonality. (Opp'n at 27.) Defendant points to deposition testimony in which some putative class members stated they performed most of the listed job functions, while others performed only some and some "largely disavowed the job descriptions." (*Id.* at 30.) Defendant further argues this evidence reveals that SAs work in "widely varied groups and teams, under different conditions, and . . . have different supervisors, job duties, and educational

backgrounds." (*Id.* at 28.) Defendant then asserts that common job descriptions (like policy documents) are insufficient where there is evidence tending to support the opposite position. (*Id.*)

This response "speaks largely to the stricter common proof requirement of Rule 23(b)(3)" *Benedict*, 314 F.R.D. at 469 (denying class certification on predominance grounds but finding sufficient allegations of commonality despite divergent work experiences on the basis of identical job classification, identical job descriptions, and identical legal questions); *see also Sirko*, 2014 WL 4452699 at *10 (finding commonality satisfied where defendant had a generic position description for purported class of tech workers but actual activities varied).

Under *Cuevas* the Court cannot find the commonality requirement satisfied without first resolving any "factual disputes . . . relevant to the determination whether [the Plaintiff] has presented a claim that is capable of classwide resolution." *Cuevas v. Citizens Fin. Grp., Inc.*, 526 F. App'x 19, 21 (2d Cir. 2013).

With respect to the Associate Professional and Professional SAs, Defendant does not bring forth evidence that contradicts the job duties inferable from the common evidence in ways material to the analysis of exemptions. The depositions and declarations of the Associate Professional SAs described above reveal a wide variety of different tasks, from configuring print queues to plugging in fiber optic cable to replacing mice to reading data storage logs, but this testimony does not stand in tension with the tasks suggested by a reading of the common evidence and it does not suggest that some Associate Professional SAs perform exempt work while others perform non-exempt work. Rather, the work is sufficiently uniformly of a type such that a finder of fact could determine on a class-wide basis whether it was exempt or non-exempt.

With respect to the Professional SAs, there is one prevalent contradiction between the testimony of the SAs and the tasks identified by the common evidence: most Professional SAs

disavowed that they coordinated or oversaw or managed the tasks delineated in the essential job functions, asserting rather that they performed the tasks themselves. This contradiction, however, can be resolved by reading the job descriptions in connection with the testimony of the representative plaintiffs to reflect that Professional SAs perform the underlying tasks rather than managing others in the performance of those tasks. Notably, reading the descriptions in this fashion suggests that the Associate Professional and Professional SAs are appropriately grouped together into one sub-class.

Additionally, many of the Professional SAs claimed not to understand what was meant by "matters of significance" and disputed use of the adjective "complex" to describe what they do, which highlights the fashion in which the job descriptions may be inflated and may be salted with legal conclusions, but they do not reveal the kinds of contradictions that would undermine the commonality analysis. The finder of fact must determine whether the tasks themselves are exempt and cannot simply rely on legal conclusions built into the definitions to perform this function.

The evidence here thus diverges from the evidence in *Williams v. Lockheed Martin Corp.*, in which the court found that "the broad categories of work including installation, configuring, troubleshooting, and maintenance, encompass varying tasks with varying levels of complexity which are executed with varying levels of judgment. *Williams v. Lockheed Martin Corp.*No. 09CV1669 WQH POR, 2011 WL 2200631, at *12 (S.D. Cal. June 2, 2011) The evidence fails to show that the tasks performed by the proposed class members are 'reasonably definite.'" Likewise, this case diverges from *Benedict*, in which the court observed that the plaintiffs varied in amount of client contact, whether or not they advised the client, how they solve computer problems, and whether they simply react to computer problems or proactively seek to improve they system by working with the engineers and management. *Benedict*, 314 F.R.D. at 469 Here, by contrast, the

evidence confirms that what Associate Professional SAs do with respect to installation, troubleshooting, configuring, and maintenance is relatively uniform and includes replacing hardware parts, reviewing logs, and plugging components in. The same is true of the Professional SAs, who perform the same tasks, but at the next level of sophistication and complexity. Thus, under the analysis required by *Cuevas*, the evidence proffered by Defendants regarding individual Associate Professional and Professional SAs does not undermine or contradict the common proof in ways relevant to the exemption analysis. Rather, it confirms that the two job categories are appropriately grouped together in one sub-class and that the actual job duties inferable from the job descriptions, with the exception of descriptions involving coordination or management, align with the actual job duties as described by individual SAs. This sub-class satisfies Fed. R. Civ. P. 23(a)'s commonality requirement.

The evidence stands otherwise with respect to the Senior Professional SAs. First, as noted, it is difficult to decipher the meaning of some of the essential job functions and the Court therefore cannot identify concrete job duties associated with those functions. Second, some Senior Professional SAs testified that, although they had been promoted from Professional SA to Senior Professional SA, their job duties did not change. For these people, the job functions inferable from the Senior Professional SA job descriptions do not fit their actual job duties, confounding an exemption analysis based on the common evidence. Third, some Senior Professional SAs testified to performing long and complex projects that do not fit squarely within the job duties suggested by the common evidence but that are relevant for the exemption analysis. Patricia Smith, for example, testified that a fellow SA Thomas Hamilton spent approximately two years working with CSC's client, Electric Boat, and a software vendor to adapt a computer assisted design program to the needs of Electric Boat. For the last six months of that project, she herself spent 40% of her time

resolving problems that arose with this program, either with Mr. Hamilton or by reporting problems to the vendor. Similarly, Mr. Kinnas testified that he spent a significant portion of his time designing the template for all of the client's virtual servers. These kinds of projects are not readily inferable from the job descriptions and other common evidence, and therefore militate against a finding of commonality.

For the proposed sub-class of Associate Professional and Professional SAs, CSC's classification system, which delineates a set of essential job functions, then categorizes employees by determining which job functions they perform, designed with an eye to compliance with FLSA, provides the "glue" that binds the class together. *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 164 (S.D.N.Y. 2014) ("Unlike the claims in [*Wal-Mart Stores*], Plaintiffs' NYLL claims do not require an examination of the subjective intent behind millions of individual employment decisions; rather, the crux of this case is whether the company-wide policies, as implemented, violated Plaintiffs' statutory rights. Put differently, Bloomberg's overtime policy is the 'glue' that the Supreme Court found lacking in [*Wal-Mart Stores*].")

However, the evidence of record regarding actual job duties of individual Senior Professional SAs undermines claims of commonality based on CSC's classification system and job categorization for that proposed sub-class. Simply put, the evidence suggests that while some may perform tasks that are largely non-exempt, others may perform enough exempt tasks to treat them as exempt, and the wide array of tasks they perform, especially with respect to projects and troubleshooting, cannot be readily inferred from the common evidence. Under *Cuevas*, the Court finds that the proposed sub-class of Senior Professional SAs lacks commonality.

### 3. Rule 23(b)(3): Predominance

Having concluded that the Senior Professional SAs do not share enough actual job duties to satisfy the commonality inquiry, the Court turns to the predominance inquiry only with respect to the remaining proposed sub-class of Associate Professional and Professional SAs. Fed. R. Civ. P. 23(b)(3) requires that common issues "predominate." This requirement is "far more demanding that Rule 23(a)'s commonality requirement." *Amchem Products v. Windsor*, 521 U.S. 591, 623-24 (1997). Even "assuming some questions may be answered with generalized proof, [class certification should be denied if they] are not more substantial than the questions requiring individualized proof." *Glatt*, 811 F.3d 528, 539 (vacating certification of class "because the most important question in this litigation cannot be answered with generalized proof . . . .").

The "predominance" requirement of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623. The requirement's purpose is to "ensure[ ] that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,* 502 F. 3d 91, 104 (2d Cir. 2007) (alteration omitted) (quoting *Amchem,* 521 U.S. at 615). "Therefore the requirement is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Myers*, 624 F.3d at 547 (internal citations omitted).

The parties identify troubleshooting as one core area of dispute for the predominance analysis. Defendant contends that what constitutes troubleshooting differs from SA to SA in such a way that individualized inquiry will be required to determine whether the actual job duties of any

54

given Associate Professional or Professional SA qualify him or her as exempt. (Opp'n at 36.) Plaintiff responds that the process of troubleshooting is the same for each SA: "the evidence shows that this nonexempt work follows a consistent pattern: SAs identify common problems by reviewing reports or system logs, and rely on their own or their team's experience, rely on CSC documentation, or search the internet. If SAs cannot solve problems using this routinized approach, they escalate the problem to someone else." (Reply [Doc. # 314] at 5.)

Plaintiffs usefully articulate the legal issue, describing the kinds of troubleshooting that courts have found to be exempt and distinguishing it from kinds of troubleshooting found to be nonexempt: "Courts have held that 'troubleshooting' is nonexempt when tech workers rely on 'checklists and manuals' or 'skill and experience to apply and adapt those materials. In contrast, courts have found troubleshooting did require discretion where there were no canned answers and workers had to be creative, analyze the issue, determine what tests needed to be run, and recommend a solution." (Reply at 5-6 (internal quotations and citations omitted).)

Upon review of the evidentiary record, the Court concludes that the vast majority of examples of troubleshooting given by Associate Professional and Professional SAs do not require individualized inquiry to determine the whether or not the work is exempt. Mr. Tagliaferri's testimony that he troubleshot hard drives and replaced defective ones is not "directly related to the . . . general business operation of the employer or its customers." Similarly, Mr. Cardenaza's testimony that he troubleshot difficult problems diagnosing a problem and then either rebooting the computer or passing the problem on to IBM for resolution because he did not touch IBM's code, is not directly related to the general business operations of CSC or its clients.

The few examples of troubleshooting in the testimony of Associate Professional or Professional SAs that border on the exemptions do not appear frequently enough to demonstrate

that SAs spend a majority of their time performing even arguably exempt work. For example, Mr. Branson's testimony that he troubleshot a piece of software ("MQ") that kept locking and that his solution resolved a system-wide problem, may be directly related to the general business operations of CSC's client and thus at least potentially exempt. This example, however, involved four hours of work on one morning and his testimony suggested that most of the rest of his time was spent performing non-exempt tasks such as resetting passwords, creating accounts, and then adding software:

> A majority of the time it's . . . password resets, that's probably the No. 1; account requests, that's probably No. 2; and then software, adding software, adding security type packages for websites, just adding Network File Systems mounts, storage area network requests. . . . And the list just goes . . . on and on . . . . It's just repetitive.

(Branson Tr. at 69.)

This case differs from the facts presented in *Benedict v. Hewlett-Packard Co.*, 314 F.R.D. 457, 477-78 (N.D. Cal. 2016). In *Benedict*, some employees wrote code, advised clients and exercised judgment while others did not. Here, there is no evidence that SAs are writing code or advising clients; at best, some were writing brief scripts that functioned as shortcuts.

On the basis of the evidentiary record before the Court, common issues of law or fact predominate over individual inquiries with respect to Plaintiffs' proposed sub-class of Associate Professional and Professional SAs. While some of the testimony suggests that some of the tasks performed by some Professional SAs may qualify as exempt, the time dedicated to such tasks is a small percentage of their total work time.

### 4. Rule 23(b)(3): Superiority

Fed. R. Civ. P. 23(b)(3) also requires the Court to determine whether "substituting a single class action for numerous trials in a matter involving substantial common legal issues and factual

issues susceptible to generalized proof will achieve significant economies of time, effort and expense, and promote uniformity of decision." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d. Cir. 2013). Defendant devotes one paragraph to arguing that a class action is not superior, stating that Plaintiffs lack a trial plan, that the forum is inconvenient because the majority of class members are in California, and that individualized inquiry will outweigh common issues of fact. Plaintiffs respond that their common evidence, plus representative testimony from the named Plaintiffs, will suffice and submit their trial plan.

Here, substituting a single class action for adjudication of the claims of each of the Associate Professional and Professional SAs would achieve economies of time by eliminating individual trials asking the same questions and would promote uniformity of decision. Further, where some SAs have been misclassified but have not worked enough overtime to make it cost-efficient to pursue an individual claim, substitution of the class mechanism will permit them to pursue their claims. The Court thus finds that the class action is a superior method of adjudicating the merits of the sub-class of Associate Professional and Professional SAs.

## V.    Conclusion

For the reasons set forth above, the Court GRANTS in part and DENIES in part Plaintiffs' motion. The Court does not certify any North Carolina classes. The Court likewise does not certify the proposed California and Connecticut Senior Professional sub-classes. The Court certifies the California and Connecticut sub-classes comprised of Associate Professional and Professional SAs, defined as follows:

> California Class: All persons who were, are, or will be employed by CSC in California as Associate Professional System Administrators or Professional System Administrators, at any time from July 1, 2010 through the date of the final disposition of this action, who earn or earned less than $100,000 in total annual

compensation, who worked more than forty hours per week, and who were not members of the "Test and Training Ranges" segment ("TTR") of CSC.

<u>Connecticut Class</u>: All persons who were, are, or will be employed by CSC in Connecticut as Associate Professional System Administrators or Professional System Administrators, at any time from July 1, 2012 through the date of the final disposition of this action, who earn or earned less than $100,000 in total annual compensation, who worked more than forty hours per week, and who were not members of the TTR of CSC.

The Court notes that there is no named Plaintiff to represent the California class because Mr. Strauch is classified as a Senior Professional SA and permits Plaintiffs to amend their complaint for the limited purpose of adding a representative plaintiff for the California class. *Jones v. Goord*, 435 F. Supp. 2d 221 (S.D.N.Y. 2013) (finding that adding representative plaintiff is permissible where amendment to add a named Plaintiff for a subclass would not prejudice defendant previously on notice of claim and where amendment would not be futile).

IT IS SO ORDERED.

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 20 day of June 2017.