## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

JOSEPH STRAUCH et al, individually and on
behalf of all others similarly situated

               Plaintiffs,

v.

COMPUTER SCIENCES CORPORATION,

               Defendant.

CIVIL ACTION NO.:
3:14-cv-956 (JBA)

May 31, 2019

## REPORT AND RECOMMENDATION

## I.  SUMMARY

By Order dated January 24, 2019, the Honorable Janet Bond Arterton appointed the

undersigned, D. Charles Stohler, as Special Master in this matter. (Doc. # 491). The Order specifies

that the Special Master "shall oversee the damages data retrieval, exchange and calculation process

regarding the damages issues outlined in the Court's prior order (Doc. # 487)." The Court's

Endorsement and Scheduling Order provides:

> Defendant CSC shall expeditiously determine whether it can retrieve the original
> timekeeping data, free from the "anomalies" that it claims mar the data previously
> produced to Plaintiffs and the class. In conjunction with this process, Defendant
> shall ascertain whether there are any data, for class members with incomplete job
> title layer data, indicating change in job title prior to the time periods covered by
> the currently produced layer data for those class members. Defendant shall provide
> all needed access to Plaintiffs' forensic expert, whose fees and costs are to be borne
> by Defendant, to enable him or her to adequately audit the Defendant's data
> restoration and retrieval process.

(Doc. # 487).

The appointment of the Special Master followed a Trial and Jury Verdict for Plaintiffs under the Fair Labor Standards Act ("FLSA") and California and Connecticut State Wage and Hour laws. (Doc. # 442). The Court entered Judgment for the certified FLSA collective and state law classes of Plaintiffs on January 5, 2018. (Doc. # 444). On November 9, 2018, the Court issued its Ruling on Remedies (Doc. # 479). The Court then held Status Conferences on the damages issues. The Endorsement and Scheduling Order quoted above followed the Status Conference of January 18, 2019. (Doc. #s 487 and 493).

During the January 18, 2019 Status Conference, the Court stated: "The ultimate goal of [this] process is to find a way back to reasonably trustworthy databases, such that a correct description of hours -- thus, damages -- for the class members can be prepared." (Doc. # 493, p. 40). The Order Appointing Special Master states:

> The Court strongly believes that any damages data disputes should be resolved through the meet-and-confer process. However, in the event that the parties are unable to resolve a dispute, the Special Master shall prepare a Report and Recommendation to resolve outstanding damages-related issues for submission to this Court.
>
> 1.    The Court directs the parties, the Plaintiffs' expert and/or the Special Master to file a report summarizing the results of the process to review the issues outlined in the Court's prior order (Doc. # 487) to facilitate damages data retrieval, exchange and calculation on or before March 25, 2019.  If the parties are unable to resolve any outstanding damages-related issues, they shall submit the dispute to the Special Master.
>
> . . .
>
> 4.    The Special Master shall hold regular status conferences to provide a forum for the parties and/or the forensic expert to discuss progress of data retrieval and analysis, and any foreseeable issues arising in the damages calculations process between parties, and to discuss    such other matters as scheduled by the Special Master.
>
> . . .

9.    The Special Master shall proceed with all reasonable diligence to oversee damages data exchange and calculations. . . .

(Doc. # 491).

This document is the Special Master's Report and Recommendation. Based on the Judge's Order, the Special Master oversaw and facilitated the data retrieval, exchange and analysis process and addressed the damages issues such that the parties have prepared a joint Summary of Damages. (Exhibit 1). See Sections II and IV.

The parties worked diligently and met with the Special Master regularly, but it was necessary to extend the original March 25, 2019 deadline to April 17, 2019 (Doc. # 497), to May 17, 2019 (Doc. # 499) and finally to May 31, 2019 (Doc. # 502). The extensions were necessary because of difficulties in the extraction and exchange of data; identification of "missing" or incomplete data, which required the re-running of full histories on class members,[1] particularly in Defendant's Human Resource Information Systems ("HRIS" or "Layer Data"); newly discovered data resulting from the additional data extraction; factual and legal disputes on the inclusion of certain class members; and preparation of mutually agreed upon damages calculations.

The Special Master oversaw the process by monitoring the parties' correspondence and through multiple telephone conference calls, which were held at least weekly. The parties submitted written status reports before almost every telephone conference. The Special Master summarized every call. Twice the Special Master sought legal briefs on disputed issues; decisions followed, and the process continued. (Exhibits 2 and 3). The Special Master's role has been to facilitate the process and was limited to making decisions only when necessary so the process did not stall.

---

[1] Although the FLSA provides for a "collective," for ease, most references to members of the collective and state law classes are referred to as "class members" or included on the "Class List."

The parties have prepared a joint Summary of Damages, which is attached as Exhibit 1. The Special Master recommends the Court adopt these damages calculations and order Judgment such that the payments to the affected class and collective members can be made as soon as possible.

Defendant CSC has indicated its plans to object to certain aspects of the Special Master process and this Report. The Court clarified the process for objections in its Order dated May 16, 2019:

> Any objections by the parties to the Special Master's final report and damages calculation must be filed with the Court within 10 days of the filing of the final report and damages calculations, with any responses filed within seven days of the filing of the objection. The failure to file a timely objection shall constitute a waiver of any objection.

(Doc. # 501). Section III below summarizes the key disputed issues and the Special Master's decisions and supporting rationale.

## II. PROCESS

### 1. Procedure

The parties held telephone conferences at least weekly on the following dates: January 29; February 5, 12, 19, 28; March 6, 7, 13, 21, 27; April 2, 10, 15 (2 calls), 17, 24; and May 2, 9, 15, 21 and, 24. The parties submitted status reports before each call; following each call, the Special Master provided a Summary of the Call which detailed the Key Points and the Action Items for the week. (See examples in Exhibits 2 and 3). The Special Master also was copied on key emails between the parties and the Plaintiffs' expert. On March 1, 2019, Plaintiffs' expert submitted a report directly to the Special Master. (Exhibit 4). On March 7, 2019 the Special Master participated in a three-hour Skype call with experts from both sides to review actual data on Defendant's HRIS systems.

Because of the aggressive deadline for the resolution of these issues and the difficulties in querying and exchanging the relevant data, the Special Master regularly provided specific deadlines for the completion of the individual tasks, often on a day-by-day basis. On two occasions, the Special Master required briefing and then provided the detailed rationale on: 1) the decision to re-run all of the Layer Data (Summary of Call dated March 13, 2019 and attached decision, Exhibit 2); and 2) the decision on the Class List issues (Summary of Call dated May 2 and attached decision dated May 6, 2019, Exhibit 3). The underlying substantive issues are explained in Section III.

The Court's Order requires Defendant to "provide all needed access to Plaintiffs' forensic expert to enable him or her to adequately audit Defendant's data restoration and retrieval process." (Doc. # 487). Plaintiffs hired expert Daniel Regard and Intelligent Discovery Solutions, Inc. ("iDS"). Working with Mr. Regard were Jimil Patel, Molly Adams, Eddie Siu, Alex Antonov and Nina Cortella. Defendant identified in-house subject matter experts, principally Stephanie McFarlane. Other CSC employees included Steve Cowans, Ray Wright, Christina Shirley, Rosemary Whalen and Kevin Raffoul. Most of the conference calls listed above included Plaintiffs' expert, and the Special Master often spoke directly with the individual expert(s). There is an issue on the payment of Plaintiffs' expert's fees as detailed in Section III.

2. **Phases**

The process had three main phases: 1) review of timekeeping issues, which involved Defendant's e-TES and MyTime Systems; 2) exchange and auditing of the Layer Data, which involved Defendant's three HRIS systems used during the relevant period called P42, P44 (SAP systems) and Workday systems; and 3) identifying and resolving damages issues, which meant determining who should be included on the Class List. The damages phase included resolution of factual and legal issues and agreement on the Summary of Damages.

The initial timekeeping phase of extracting and exchanging the e-TES and MyTime Data was essentially completed by March 6, 2019. (In completing the Layer Data phase and the damages calculations, it was necessary to retrieve additional timekeeping data.) The e-TES and MyTime data involved the extraction of timekeeping data for all class members not just the 262 originally identified as having anomalies.

The second phase involved the retrieval and analysis of the relevant Layer Data, that is, the HRIS histories for the class members whose class status was at issue. The parties took strong positions on whether the Layer Data for all class members should be pulled. Initially, the Special Master decided that it would only be extracted for the 89 class members who were disputed, not the full histories for every member. However, as the process continued, Plaintiffs' expert identified approximately 160 employees where data was missing or incomplete. This issue, along with others, was summarized in a detailed six-page report from Plaintiffs' expert dated March 1, 2019. (Exhibit 4). The Special Master participated in a lengthy quality control session with counsel and both sides' experts to review the alleged missing and incomplete data. The parties then briefed the issue, and the Special Master decided that the full histories of every class member should be run. (Exhibit 2). Completing the full Layer Data extraction and exchange allowed the parties to move to addressing the damages issues.

To do the damages calculations, it was necessary to determine who would be included on the Class List, which involved resolving numerous factual and legal issues. The parties narrowed their damages disputes to two issues that ultimately required decisions by the Special Master: 1) How to address approximately 40 potential FLSA collective members who did not receive Opt-in Notices in 2015, and therefore did not have the opportunity to opt-in into the collective; and 2) Whether to include on the Class List individuals who Defendant contends were not employees of

CSC, the sole Defendant in the litigation. The parties fully briefed these issues on April 23, 2019 and filed Responsive Briefs on April 30, 2019. After additional extended input on two weekly conference calls, the Special Master decided the issues on May 6, 2019. (See Summary of Call dated May 2 and May 6 Decision, Exhibit 3.)

The parties exchanged several versions of the Class List. Based on their progress on who should be on the Class List, the parties submitted versions of their damages calculations on March 13-14, May 2, 14, 23, 29 and 30. As required by the Special Master, the parties submitted a joint Summary explaining their positions by letter dated May 23, 2019. All issues have been resolved, and the parties have submitted an agreed-upon Summary of Damages that the Special Master recommends the Court adopt. (Exhibit 1).

## III.    KEY DECISIONS AND ISSUES

The Special Master followed the Court's strong direction that damages data disputes should be resolved through the meet-and-confer process (Doc. # 491). Accordingly, the Special Master guided the process but did not make decisions unless necessary. This Section highlights the key decisions in the order they arose and includes the Special Master's rationale where appropriate. There were many other decisions on disputed issues not included here.

### 1.    Scope of process

Initially, and throughout the process, Defendant questioned the scope of the Special Master's authority as set forth in the Court's Order. (Doc. # 487). This surfaced in numerous areas such as whether to pull the data for all class members under the timekeeping systems or the Layer Data systems. In each circumstance, the Special Master evaluated how the goal of returning to a reasonably reliable data set could be accomplished in the most limited, efficient and cost-effective

manner. This resulted in running all of the timekeeping data, not just for the original 262 individuals where anomalies had been identified. Similarly, after attempting to do a more limited data extraction and exchange for the 89 individuals initially identified in the Layer Data process, the Special Master required a re-run of all of the Layer Data. (Exhibit 2).

Similarly, Defendant has contended that the Special Master, as well as Plaintiffs' expert, should have no role in the damages process. The Court's Orders make it clear that the Special Master's role is to "facilitate damages data retrieval, exchange and calculation on or before March 25, 2019. If the parties are unable to resolve outstanding damages-related issues, they shall submit the dispute to the Special Master." (Doc. # 491; see also Docs. # 499 and 502). Accordingly, this Report and Recommendation addresses how the damages should be paid to the affected individuals in the class.

## 2.    Role of Plaintiffs' Expert

Plaintiffs' expert iDS expended significant effort throughout this process, often outside of business hours and on weekends, because of the aggressive deadlines, the several different systems used by Defendant during the relevant period, the unavailability of Defendant's personnel who provided the original data, and the location of counsel in a different time zone. Daniel Regard, Jimil Patel and other iDS personnel spent numerous documented hours on Skype and conference calls auditing the data. Approximately one month into the Special Master process, Mr. Regard sent to the Special Master a six-page detailed summary of the difficulties in auditing the data exchanged to date. (Exhibit 4). In relevant part, Mr. Regard summarized the issues which made this data retrieval exercise challenging and time-consuming:

1. None of the original data extractions were properly documented (we do not know today what was done then).
2. None of the original data extractions were properly audited.

3. None of the people who performed the original data extractions are working on the new extractions.
4. The current "class-list" was derived from the damages spreadsheet, which, in turn, was derived from the CSC-produced 2017 hourly data.
5. It is not clear what list or method was used to extract the 2017 hourly data.
6. It is not clear if or how the original substitute employee numbering system was relied upon or impacted the original data extractions but we know that this system ultimately created data integrity issues and has since been abandoned.

Mr. Regard's Report summarizes many additional issues that were found for the <u>first time</u> in this Special Master process.

In its Status Report and as discussed in the weekly conference call on April 2, 2019, Defendant objected to the Plaintiffs' expert being involved in the damages calculation process. This prompted the Special Master to decide in the April 2, 2019 Summary of the Call:

> The expert's involvement in the class list process is appropriate and part of the data extraction and retrieval process. However, that is not true for the damages calculations process, as Plaintiffs' counsel agrees. Thus, Plaintiffs' expert should ensure that its invoices clearly itemize their services and do not seek reimbursement from Defendant for any work in the damages calculations phase.

Plaintiffs' expert has submitted three invoices as of the date of this Report: one dated March 26, 2019 for services through February 28, 2019; one dated May 8, 2019 for services through March 31, 2019; and one dated May 28, 2019 for services through April 30, 2019. Plaintiffs' expert has not received payment for any of their services. In the conference call on May 24, 2019, Defendant said it did not intend to pay for Plaintiffs' expert services for two reasons: 1) Plaintiffs' expert services have exceeded the audit function contemplated by the Court's Order; and 2) the fees charged are excessive and insufficiently detailed. On May 28, 2019, Defendant modified its position by letter and states that it will pay for "reasonable" fees incurred, but that the work done and fees charged by iDS are excessive and insufficiently documented. Defendant also objects to

the Special Master's involvement in any determination or guidance related to these expert's fees. Plaintiffs provided a detailed response to Defendant's letter on May 29, 2019.

During the call on May 24, 2019, the Special Master asked, but did not require, both parties to consider payment by Defendant of 90% of the initial iDS invoice (issued March 26, 2019 for February time). The Special Master used as a guide the 60-day payment period for payment of the Special Master's fees set forth in the Court Order Appointing Special Master. (Doc. # 491). Plaintiffs accepted the Special Master's suggestion. Defendant did not and has indicated it will file an objection to the Court. The first time this issue was discussed was in the conference call on May 21, 2019 because Plaintiffs raised the non-payment in an e-mail dated May 17, 2019. Defendant has never objected to the hiring of Mr. Regard and iDS nor did it object to the invoices when received in March or in early May.

The Special Master has reviewed the Plaintiffs' expert's invoices submitted to date as well as the detailed positions filed by the parties. The Special Master notes that this process is unique in that the Court required the Defendant to pay for the services of Plaintiffs' expert, much of which were performed under the oversight of the Special Master. (Doc. #s 487, 493). The Special Master has had hours of direct involvement with Plaintiffs' expert(s) and has seen many e-mails, reports and supporting documentation prepared by iDS during the data retrieval and exchange process. The invoices reflect that work and do not charge for services on the damages calculations. There is no question the iDS expert(s) must be paid because their work has been critical to verifying the data restored and produced during this process. They have not exceeded the role expected by the Court of "essentially accompanying the surgeons in the operating room and seeing what they're doing and being able to recount for the Court whether the process is one that has reasonable reliability. The forensic expert is, in other words, something like an auditor." (Doc. # 493, p.41).

However, given that these payment issues are now being raised so close to the May 31, 2019 deadline, the Special Master recognizes that a decision on the reasonableness of the invoices for the work performed and the fees charged by iDS will require additional inquiry and/or evidence, whether by the Special Master or the Court. The Special Master recommends that the Court do such additional inquiry or order the Special Master to do so.

### 3. End Date for Damages

In extracting the timekeeping data, the parties agreed that the appropriate end date for the calculations would be when the Court entered Judgment on January 5, 2018. (Doc. # 444).(This was agreed in the conference call on February 20, 2019.) The Special Master believes this is the appropriate date because Judgment entered on that date, not the date of the Jury Verdict. (Doc. # 442). To the Special Master's knowledge, this is the date that has been used throughout the process.

### 4. Layer Data

Initially the Special Master held that it was only necessary to retrieve the relevant Layer Data for the 89 individuals originally identified by Plaintiffs as having incomplete or missing data. However, as the process continued, the Special Master determined that it was necessary to re-run all of the Layer Data from the three HRIS systems (P42, P44 and Workday) for all potential class members. (Exhibit 2). This decision resulted from numerous conversations, review of emails and supporting data, and the Special Master's direct participation in an extended three-hour Skype session on March 7, 2019.

The decision to re-run all of the Layer Data was necessary to develop a complete and reliable Class List. It is the way to ensure that the hours for the approximately 158 additional individuals identified in this process will receive credit for all of their hours. The decision requiring re-running the data does not exceed the Court's Order and is necessary to ensure a reasonably

reliable data set. The decision does not reopen or provide for additional discovery nor does it expand the class. Consistent with other decisions in this Special Master process, this Layer Data decision does <u>not</u> expand the class definition; instead it identifies those individuals who should have been included in the original class definitions. (See Exhibit 2). Re-running the Layer Data resulted in a four-step process which allowed the parties to get to a clean Class List.

### 5. Job Codes Outside of the United States

In numerous emails in late March, Defendant raised an issue, which the parties termed "the location of work" issue, involving potential class members working in non-U.S. locations. After review of the situation and the parties' detailed positions, which involved significant legal data privacy issues under the European GDPR Standards, the Special Master held that the parties should engage in a "filtered" approach. Plaintiffs wanted a more comprehensive approach and objected to this "filtering" because it left unanswered questions and potentially could lead to the omission of class members who worked in non-U.S. locations. After repeated proposals between the parties and communications with the Special Master, Defendant provided de-identified data and the issue was resolved. The employees in such non-U.S. positions affected by this issue have been excluded from the class.

### 6. Legal Entities other than Defendant

In reviewing the job codes for the individuals to be included on the Class List in early April, Defendant identified approximately 84 individuals on the original Class List who it claimed should not have been there because they worked for legal entities other than the named Defendant CSC. Defendant claimed that the representative Plaintiffs did not have standing to represent such employees, and Defendant was not responsible for any harm to these employees. Plaintiffs' strongly objected to the exclusion of this group. The parties exchanged information about the

relevant company codes and the number of employees affected, most of whom worked for an entity called CSC Covansys Corporation.

The parties were unable to agree on this issue and briefed it on April 23, 2019 and April 30, 2019. The parties also were given an opportunity to explain their positions in two weekly telephone conferences during which the Special Master requested additional information from Defendant. On May 6, 2019, the Special Master decided that the individuals who worked for legal entities other than CSC should be included in the class. The decision affects 84 class members, 68 of whom received Opt-in FLSA Notices and 14 who Opted-in. Throughout the litigation there were discovery responses and deposition testimony involving these individuals.

In response to several requests from the Special Master, the only evidence Defendant provided that these entities were separate from CSC were three IRS Form W-2 examples showing that some employees received paychecks directly from a "non-CSC" separate company. Despite several opportunities, Defendant did not provide any other evidence or legal authority to show that these entities would not either be joint employers or a "single employer enterprise" with CSC under the relevant FLSA Standards. See 29 C.F.R. § 791.2, *Juarez v. 449 Restaurant, Inc.*, 29 F. Supp.3d 363, 367 (S.D.N.Y. 2014); see also *Michalow v. East Coast Restoration and Consulting Corp.*, 2017 W.L. 9400690 (E.D.N.Y. 2017). (Exhibit 3).

The Special Master recommends that the employees of the "non-CSC" legal entities be included in the class for the reasons set forth in Exhibit 3. These individuals are included in the parties' Summary of Damages. (Exhibit 1).

7. **FLSA Opt-in Class Notice**

As a result of the data retrieval and exchange process, the parties identified approximately 40 potential FLSA collective members who did not receive notice in 2015, and therefore did not

have the opportunity to opt-in to the collective. In 2015, the Court ordered notice to be sent to the parties, which was done, based on data supplied by Defendant as of June 20, 2015. Notices were sent on July 16, 2015 and then supplemented on July 23, 2015. (Doc. # 168). The parties disagree on the cutoff date and whether the list of the approximately 40 individuals who were hired between June 22, 2015 and July 20, 2015, and who were identified in this process, should receive notice.

As a result of Defendant's failure to provide complete and accurate data in 2015, Plaintiffs' proposed that the employees hired between June 22, 2015 and July 20, 2015 be given a Notice to inform them of the existence of this case and that they were qualified to receive Notice in 2015, but did not. Plaintiffs requested either these individuals be given the opportunity to opt-in or to receive a Notice explaining the issue.

Defendant disagrees strongly and argues that providing notice to potential FLSA collective members impermissibly expands the class post-trial, citing the Court's prior ruling that "Plaintiffs cannot expand the class now." (Doc. # 476, p.32). The parties briefed the issue on April 23 and 30, 2019 and discussed it at length with the Special Master. For the reasons set forth in the detailed decision, the Special Master recommends that a "New Notice" be sent to the affected individuals. (Exhibit 5). This decision does not expand the definition of the class. See *Garcia v. Tyson Foods*, 890 F. Supp.2d 1273, 1297 (D. Kan. 2012); *Garrett v. Hamtramck*, 503 F.2d 1236, 1246 (6th Cir. 1974); and *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 310-311 (6th Cir. 1975). Because they are not opting-in, this decision also does not affect Defendant's right to have called these individuals as witnesses during discovery or trial. Not to provide notice to these individuals who were excluded because of Defendant's error would thwart the remedial purposes of the FLSA and would improperly exclude employees who should be entitled to a remedy. See *Chen v. Major League*

*Baseball Properties, Inc.*, 798 F.3d 72, 76 (2d Cir. 2015); *Ruggles v. Wellpoint, Inc.*, 687 F. Supp.2d 30, 38 (N.D.N.Y. 2009).

Moreover, any claims that result from this New Notice should be equitably tolled to allow the individuals to pursue their rights as if they had been properly notified in 2015. The doctrine of equitable tolling allows the Court to extend the statute of limitations on a case-by-case basis to prevent inequity. *Knox v. John Varvatos Enterprises Inc.*, 282 F.Supp.3d 644, 657 (S.D.N.Y. 2017) citing, *Warren v. Gavin*, 219 F.3d 111, 113 (2d Cir. 1999), cert. denied, 531 U.S. 968 (2000); *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 170 (S.D.N.Y. 2014).

The Special Master's decision outlines the key provisions of the New Notice. (Exhibit 3). Both parties were invited to submit language for the New Notice. In response, Plaintiffs submitted a draft Notice on May 8, 2019, and then a revised Notice on May 14, 2019, based on further Special Master input. Defendant refused to participate in this process and indicated it intends to object.

The Special Master recommends that the New Notice be sent as set forth in Exhibit 5. The Special Master understands that these individuals (hired between June 20, 2015 and July 22, 2015) are not included in the calculations of FLSA damages in the Summary of Damages. (Exhibit 1).

## 8.     Highly Compensated Employee Exemption

Defendant claimed that there are approximately 23 potential class members whose base salary was less than $100,000 but other payments made by the Company caused them to have total compensation in excess of $100,000. Defendant claimed they should be excluded from the class based on the relevant class and collective definitions that only include employees "who earned less than $100,000 annually." (See Doc. #s 168, 327 and 339). This issue was briefed as part of the Class List issue on April 23, 2019 and April 30, 2019. After discussion with the Special Master,

Defendant withdrew its position on this issue and has now included these employees in the class based on their base salaries without regard to other potential compensation sources.

### 9. Post Judgment Interest

During several conversations in the damages phase in May, the parties reviewed their positions on pre and post judgment interest and focused on two points: 1) the parties agreed that the end date for the post judgment interest calculations will be when the Judgment is paid out; and 2) after initially disputing when the post judgment interest period should start, the parties agreed that the period begins on January 5, 2018, the date of the Judgment. (Doc. # 444).

### 10. PAGA Penalty Amount

In their joint submission on the damages issues dated May 23, 2019, the parties identified and briefed a dispute on how penalties should be paid pursuant to the California Private Attorney General Act. Specifically, the question involved when the $100 payments for "subsequent violations" would be paid pursuant to Cal. Labor Code Section 558. Defendant proposed, and Plaintiffs agreed, that such payment would be $100 for each violation occurring after July 1, 2014.

### 11. Interest for Connecticut-based FLSA Opt-ins:

The parties disagreed on how to pay interest under the FLSA and the Connecticut Minimum Wage Act for those individuals who opted-in to the FLSA collective such that their FLSA claims started before July 1, 2012 but who also were Connecticut class members effective July 1, 2012. Plaintiffs submitted that the pre-July 1, 2012 period should be at the higher Connecticut statutory interest rate and then switch to the lower federal rate upon the commencement of their FLSA claims effective July 1, 2012. Defendant's position is that the amount should be fixed at the lower federal rate for the entire period. After review of the issue, Plaintiffs' agreed with Defendant's position, and the issue is resolved.

## IV. DAMAGES

On May 23, 2019, the parties provided a joint submission on the two then remaining damages issues and represented that there were no further timekeeping, Layer Data or damages issues. The two issues have been resolved. Accordingly, the parties have jointly prepared and agreed on the attached Summary of Damages as of May 31, 2019. (Exhibit 1). The Special Master has reviewed the calculations and the Summary in detail and understands that the parties have established a daily interest rate to be applied going forward. The Special Master also has received a list of the individual calculations and damages awards as well as supporting spreadsheets. The calculations include the employees described above who Defendant claimed were employees of "non-CSC" legal entities. The calculations do not include FLSA damages for those individuals who will receive the New Notice in Exhibit 5.

The Special Master recommends that the Court order damages to be paid as set forth on Exhibit 1, which is supported by the underlying calculations for the individual awards, following the expiration of the objection period and the entry of Amended Judgment.

## V. CONCLUSION

The parties have engaged in good faith in an extensive meet-and-confer process which has been overseen and facilitated by the Special Master. The Special Master has made decisions as necessary to guide the scope and the progress of the entire process. The process and decisions are in accord with relevant law and based on reasonably trustworthy data sets as well as logic, practicality and fundamental fairness to the parties and the members of the classes and collective.

The Special Master recommends that the Court order:

1. The payment of damages as set forth on the attached Exhibit 1.

2. The issuance of the attached New Notice to those individuals who should have received notice of their right to opt-in to the FLSA collective in July 2015. (Exhibit 5).

3. The payment of fees submitted by Plaintiffs' expert iDS, following a determination, based on further inquiry and evidence, of the reasonableness of the invoices for the work performed and the fees charged; such inquiry to be done by the Court, or the Special Master, as the Court directs.

Pursuant to the Court's Order dated May 16, 2019, any objections by the parties to this final Report and damages calculation must be filed with the Court within 10 days of the filing of the final Report and damages calculations, with any responses filed within seven days of the filing of the objection. The failure to file a timely objection shall constitute a waiver of any objection. (Doc. # 501).

Respectfully submitted,

D. Charles Stohler
Special Master
Carmody Torrance Sandak & Hennessey LLP
195 Church Street, P.O. Box 1950
New Haven, CT 06509-1950
(203) 777-5501
Email: cstohler@carmodylaw.com
Federal Bar # ct07816

## **CERTIFICATION**

I hereby certify a copy of the foregoing was filed electronically on the above date. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

_____
D. Charles Stohler

# EXHIBIT 1

**STRAUCH, ET AL., V. COMPUTER SCIENCES CORP. (CSC)**
**3:14-cv-956-(JBA)**

**SUMMARY OF DAMAGES**

| FLSA* | Total overtime exposure | $ | 4,904,095.92 |
|---|---|---|---|
| | Total liquidated damages | $ | 4,904,095.92 |
| | Total interest on exposure | $ | 241,508.43 |
| | Total potential exposure | $ | 10,049,700.27 |

| CT** | Total overtime exposure | $ | 1,677,294.31 |
|---|---|---|---|
| | Total liquidated damages | $ | 1,677,294.31 |
| | Total interest on exposure | $ | 663,335.10 |
| | Total potential exposure | $ | 4,017,923.72 |

| CA | Total overtime exposure | $ | 2,404,267.05 |
|---|---|---|---|
| | Total doubletime exposure | $ | 171,411.62 |
| | Total interest on exposure | $ | 1,405,868.90 |
| | Total liquidated damages | $ | 465,922.43 |
| | Total interest on liquidated damages | $ | 11,472.47 |
| | Total PAGA penalties | $ | 228,450.00 |
| | Total potential exposure | $ | 4,687,392.47 |

Total: $ 18,755,016.46

*For purposes of display, the FLSA figures include opt-ins in Connecticut who opted in before July 1, 2015 and thus have partially overlapping FLSA and Connecticut claims. These individuals have both FLSA and Connecticut claims.

**For purposes of display, the Connecticut figures include opt-ins in Connecticut who opted in on or after July 1, 2015 and thus have completely overlapping FLSA and Connecticut claims. These individuals have both FLSA and Connecticut claims.

# EXHIBIT 2

**Strauch et al v. Computer Science Corp. (CSC)**
**3:14-cv-956-(JBA)**

**Special Master Conference Call**
**March 13, 2019**

**SUMMARY OF CALL**

**AGENDA**

- Status of Layer Data and Missing Hours Issues
- Report on e-TES remaining issues
- Calculations
- Discussion of need for additional sessions
- Next scheduled meeting: March 21, 2019 at 12pm.

**PARTICIPANTS**

Plaintiffs' Counsel
    Jared Goldman (Outten & Golden LLP)
    Genevieve Casey (Feinberg Jackson Worthman & Wasow LLP)
    Todd F. Jackson (Feinberg Jackson Worthman & Wasow LLP)
    Darin Ranahan (Feinberg Jackson Worthman & Wasow LLP)

Plaintiffs' Expert
    Jimil Patel (iDiscovery Solutions, Inc.)

Defendant's Counsel
    Nathan W. Austin (Jackson Lewis P.C.)
    Alexa Farmer (Jackson Lewis P.C.)

**KEY POINTS**

1.      On March 11, 2019, the parties provided briefs with numerous attachments on the issue of re-running the Layer Data for all potential class members. The parties also exchanged related e-mails on the Missing Hours data (152-158 employees).

2.      The Special Master provided the decision on the Layer Data issue and explained the rationale as set forth on Attachment A. In summary, the parties will cooperate to re-run the Layer Data in conjunction with Plaintiffs' expert no later than March 25, 2019, the original Court deadline. The Special Master will request an extension for the calculation phase until April 17, 2019. This approach is to ensure that the Layer Data are reasonably reliable and trustworthy.

3.      Plaintiffs' expert Patel identified three remaining issues with the e-TES data: 1) a minor conversion issue, which the parties agreed to table; 2) an issue involving military leave where the extracted data did not agree with the data reviewed during the Skype session held on March 7, 2019. Defendant agreed to provide an explanation for this discrepancy; and 3) an issue with duplicate data involving 28 people. Plaintiffs accepted Defendant's explanation that the duplicate data resulted from a reorganization. The list of the 28 employees already has been provided, and Defendant agreed to provide the relevant dates for each individual. Defendant will supplement the list if other employees affected by this issue are discovered.

4.      Shortly before the call, Plaintiffs sent an e-mail to counsel and the Special Master stating they had completed a preliminary updated damages calculation. Plaintiffs then sent a summary of their analysis to the Special Master on a confidential ex parte basis. Defendant represented it had completed such an analysis as well, and agreed to send it on an ex parte basis. The Special Master will review the submissions to determine if there are issues that will need to be resolved and/or briefed. The amounts in the analysis likely will be supplemented once the Layer Data process is completed. The parties will discuss the status and issues on the call on March 21, 2019. (Note: the Special Master did not request the ex parte submission from the Plaintiffs and immediately raised it with the Defendant during the call. After discussion, the parties agreed to the process, but will not send additional ex parte communications.)


**ACTION ITEMS**

1.      By Thursday March 14, 2019, Plaintiffs' expert will send to Defendant its proposal on how to conduct the re-run of the Layer Data. Defendant will respond by Friday March 15, 2019. Defendant's personnel will schedule a telephone call with Plaintiffs' expert on March 15, 2019 to discuss and agree upon the approach to re-running the data. By the end of the day on Thursday March 14, 2019, Defendant will identify whether there is an index or list of the 25 to 30 infotypes so that Plaintiffs' expert can prepare its proposal. Defendant will provide such a list if one exists. During the call Defendant's counsel provided additional copies of the data dictionaries for the two infotypes it has identified as relevant. The parties will provide a report to the Special Master on the status of the Layer Data re-run by Monday March 18, 2019. The topic

will be discussed during the call on March 21, 2019, especially to identify any issues that might not be resolved by the re-run. (e.g., the Missing Hours data involving the 152- 158 employees).

2.	Defendant will provide a summary of its preliminary damage calculations to the Special Master on an ex parte basis by March 13, 2019. (There will be no further ex parte communications.) The Special Master will compare it to Plaintiffs' submission to identify issues that will need to be resolved. The damage analyses will be supplemented once the Layer Data re-run is complete. The goal is to have the parties resolve the damages issues on a meet and confer basis, with Special Master involvement as necessary. The parties will discuss the damages calculation issues and process in the March 21, 2019 call.

3.	On the remaining e-TES issues, Defendant will provide: 1) an explanation of the military leave discrepancies; and 2) the relevant dates of the 28 employees affected by the duplicate data issue.

4.	The Special Master will file a Request to Modify the Order Appointing Special Master (Doc # 491) seeking an extension to April 17, 2019 for the calculations phase. The Layer Data re-run will be completed by March 25, 2019, the date in the Court Order.

5.	The next scheduled call will be Wednesday March 21, 2019 at 12 pm. On March 20, 2019, the parties will provide a written status update on the open matters.

**SCHEDULE**

1.	The parties will participate in conference calls on the following schedule:

Thursday March 21, 2019 **12 pm** *(note change in time)*
Wednesday March 27, 2019 3 pm
Wednesday April 3, 2019 3 pm
Wednesday April 10, 2019 3 pm
Monday April 15, 2019 3 pm
Wednesday April 17, 2019 3 pm *(Report(s) completed)*

Additional conferences will be scheduled as required. All times listed EST.

Call in: (877) 674-2487 Pw 366233.

## DECISION ON LAYER DATA ISSUE

The following is the summary of the decision on the Layer Data as reviewed by the Special Master during the call.

- I have carefully reviewed the briefs and supporting materials submitted by the parties on March 11, 2019 on the issue of whether to re-run the Layer Data for all class members to confirm the scope of the class. I also have reviewed the parties' positions on the list of 152-158 individuals who might be class members but for whom there are no hours records ("Missing Hours").

- For the reasons I will detail, the data should be re-run as quickly as possible, including a quality control process in conjunction with the Plaintiffs' expert.

- The parties will have until the original Court ordered deadline of **March 25, 2019** to complete this data retrieval and exchange process. I will continue to be involved in directly observing the data pull and validation as necessary.

- I will file a request with the Court to extend the overall deadline to complete the entire process until **April 17, 2019**. The data retrieval process will <u>not</u> be extended. The extension will be to complete and resolve any damage calculations issues. If necessary, I will schedule and hold evidentiary hearings if there are calculation issues unresolved as of **April 17, 2019**.

- This process has been reviewed with the Judge to whom it is appropriate and in accord with the Court's Orders and comments in the status conferences, particularly in the conference of January 18, 2019. This approach is designed to ensure the Layer Data are reasonably reliable and trustworthy.

## Plaintiffs' Position

- Plaintiffs submit that the best and only way to ensure a reliable and accurate damages assessment is to pull the Layer Data in a single, quality-controlled process, then to cull the list to exclude those who are outside of the class. Plaintiffs argue that this will ensure there are no missing members; they submit that the short delay occasioned by re-running the data outweighs the risk of inaccuracies.

- Plaintiffs submit that re-running the data likely means that some of the other issues, particularly involving the additional 152-158 individuals, will be resolved. Plaintiffs believe this approach will provide a definitive class list.

- Plaintiffs argue that their expert has confirmed the suspected anomalies and errors and has raised numerous other questions. The expert believes the best, most efficient and most reliable method will be to re-run the data.

- Plaintiffs emphasize that the March 7, 2019 quality control session where the parties reviewed several examples with the Special Master proved that errors exist with the P42, P44 and Workday data that go beyond the 91 class members originally identified.

## Defendant's Position

- Defendant submits three reasons for not retrieving the full Layer Data on all class members: (1) re-running the data is outside the scope of what the Court ordered; (2) the exercise could result in adding class members who did not get class notice and were not part of the class that went to trial; (3) Plaintiffs' attempts are a disguised request for additional discovery.

- Defendant quotes the transcript of the Status Conference held with the Judge on January 18, 2019 (Doc # 493) and argues that re-running all the data exceeds what the Judge intended for the limited data retrieval.

- Defendant also complains that the Plaintiffs' expert was to audit, not direct, the actual retrieval. Defendant also argues that it should not have been required to pull the full timekeeping records under the e-TES and MyTime systems.

- On the issue of the 152-158 "newly identified" individuals, Defendant states that the Plaintiffs have long had the information on at least 107 of the 152, and could have raised these issues much earlier. For example, it notes that none of the individuals in the group of 107 for whom Plaintiffs provided information in October 2017 was determined to be in the class. (Plaintiffs disagree and say they now know that determination was incorrect because there are individuals in the class on that list of 107.) Nevertheless, Defendant claims that Plaintiffs had access to this information, failed to investigate or raise these issues in a timely manner and should not be allowed to do so now. Defendant sees the Plaintiffs' actions as attempts to conduct additional discovery or to expand the class.

## Decision

- The parties will cooperate and re-run the Layer Data from the three HRIS systems (P42, P44 and Workday) for all potential class members. The goal is to develop a complete, reliable class list. Cooperating means that Plaintiffs' expert can be on site with the Defendant's personnel as necessary. (Note the parties recognize that there may be better ways to do this without in-person meetings.) The re-run of the data and the quality control validation process will be completed by **March 25, 2019**, the date set in the Court Order.

- I have reviewed the parties' submissions carefully to come to this conclusion. I have heard directly from Plaintiffs' experts - Mr. Regard, Mr. Patel and Ms. Adams - most particularly in the March 7, 2019 Skype session, where for more than three hours we reviewed the types of errors in the HRIS systems. As part of that process and the numerous conference calls, I have had the opportunity to question and to interact directly with the Plaintiffs' experts. I understand Defendant's concern that the experts are acting more as "directors" than "auditors"; however, given the number and types of errors that have been uncovered, the lack of documentation in the initial data retrieval process, and the absence of any personnel from Defendant who can explain what happened during the original data retrieval processes, the active role of the experts is justified.

- Re-running the Layer Data likely will eliminate, or significantly reduce, other outstanding issues, such as the Missing Hours data for the 152-158 employees. The parties will continue their efforts to resolve those issues if not addressed by the re-run process.

- I have reviewed carefully whether re-running the data goes beyond the Court Order. The goal is to have reasonably reliable data, and the piecemeal approach which I have pushed the parties to do for the last several weeks does not achieve that purpose. (See Special Master Summary of Calls dated February 13, 20, March 1 and 7, 2019). After seeing some of the data first hand, there are several types of errors that will not be identified by running the Layer Data only on the 91 individuals.

- Re-running the Layer Data does not reopen or provide for additional discovery. My involvement results from Defendant acknowledging it had provided erroneous data; it now has had approximately six weeks to explain and/or correct the data with Plaintiffs' expert auditing the process. It has not done so to date, and, the best course of action is to re-run the data. This process should avoid challenges by class members, by individuals who were or might be excluded from the class, or by the parties in future proceedings in this litigation.

- Similarly, this decision does not expand the class. Certainly, Defendant is correct that the class definition cannot be expanded post trial. However, here the clarification of the records is to identify who should be included in the original class definition. It does not change or expand the class definition.

- The overall goal to resolve all of the data retrieval, exchange and calculation issues through a logical and accurate process is best achieved by re-running the Layer Data. This is the path back to "reasonably trustworthy databases."

- Plaintiffs and their expert will make themselves available and continue to provide all necessary information and responses promptly to Defendant in order to complete the Layer Data re-run by the deadline.

- I will seek an extension from the Court to allow the calculations process to be extended to **April 17, 2019**. The data retrieval process will be completed by **March 25, 2019**.

- This process has been reviewed with the Court, including the overarching goal as the Court stated in its Endorsement and Scheduling Order dated January 18, 2019 (Doc. #487) and its Orders dated January 24, 2019 (Doc. #491).

# **EXHIBIT 3**

**Strauch et al v. Computer Science Corp. (CSC)**
**3:14-cv-956-(JBA)**

**Special Master Conference Call**
**May 2, 2019 at 3 pm**

**SUMMARY OF CALL AND STATUS REPORT**

## AGENDA

- Discussion of Issues Briefed:

    - FLSA Opt-in Notices.
    - Highly Compensated Employee Exemption;
    - Exclusions based on Company Codes

- Damages Issues

- Other Issues

- Next scheduled meeting: May 9, 2019 at 12 pm
  (Extended Conference call to resolve damages issues)

## PARTICIPANTS

Plaintiffs' Counsel
 Jared Goldman (Outten & Golden LLP)
 Genevieve Casey (Feinberg Jackson Worthman & Wasow LLP)
 Todd Jackson (Feinberg Jackson Worthman & Wasow LLP)
 Darin D. Ranahan (Feinberg Jackson Worthman & Wasow LLP)

Plaintiffs' Expert
 Daniel Regard (iDiscovery Solutions, Inc.)
 Alexander Antonov (iDiscovery Solutions, Inc.)

Defendant's Counsel
 Nathan W. Austin (Jackson Lewis P.C.)
 David Golder (Jackson Lewis P.C.)
 Alexa Farmer (Jackson Lewis P.C.)

KEY POINTS

**NOTE:** This Summary of the May 2, 2019 call includes information provided to the Special Master after the call and includes the Special Master decisions as of May 6, 2019.

1.      On April 30, 2019, the parties provided Responsive briefs on three issues: 1) FLSA Class Notice; 2) Highly Compensated Employee Exemption; and 3) Exclusions based on Company Codes. These briefs supplemented the original briefs dated April 23, 2019. The parties also exchanged additional information by e-mails dated May 3, 2019, which are Attachments A and B. In its May 3, 2019 e-mail, Defendant withdrew its position on the Highly Compensated Exemption issue. The decision on the two remaining Class List issues is Attachment A to this Summary.

2.      On May 2, 2019, the parties provided their revised damage calculations. See discussion below on a new issue involving employees of U.S. entities working abroad.

3.      **FLSA Class Notice:**

The parties initially disputed four categories of employees who were on the original list of 72 employees Plaintiffs claimed should have received FLSA opt-in notices: a) employees who were wrongly identified as "missing" from the lists produced in 2015; b) employees who were paid on an hourly basis; c) employees who began work in covered positions after June 20, 2015; and d) employees who worked for U.S. Companies, but abroad during this 2015 period. The parties have resolved categories a) and b); the decisions on the remaining two categories are below and in Attachment A. The Special Master required the parties to exchange their lists of the remaining employees who did not receive opt-in notices in 2015. By e-mails dated May 3, 2019 they identified 40 employees but disagreed on their inclusion in the class. (The relevant e-mails are Attachments B and C).

The Court's Order dated June 9, 2015 (Doc. # 168) provided that "Notice shall be sent by first class mail to all persons who were, are or will be employed by CSC . . . ." The Court also ordered Defendant to provide data within 21 days so Notice could be sent. On June 30, 2015, Defendant produced data which covered the period through June 20, 2015. Defendant argues it could have used June 9, 2015, the date of the Court Order, as the cut-off date. On July 17, 2015, Defendant supplemented the data, but still only through the period of June 20, 2015. The 40 names now identified were not included in the data produced by Defendant on June 30, 2015 or July 17, 2015. The Class Administrator sent Notice on July 16, 2015 and then a supplemental Notice on July 23, 2015.

The list of 40 individuals the parties exchanged includes employees with employment start dates between June 22, 2015 and July 20, 2015. Defendant contends that none of the 40 should receive notice of the litigation because the cut off should be June 20, 2015, the date Defendant used to provide the data required by the Court. Plaintiffs contend all 40 should be included based on the date the supplemental notice was sent. Plaintiffs do not seek to include employees who were hired after July 23, 2015 in the class, and there were no additional notices sent in the litigation.

Based on these facts (which were first discussed during the call on May 2, 2019), the identified employees should receive a "New Notice" as detailed in the decision. (Attachment A). This follows the Court's direction that "notice under the FLSA is intended to inform as many potential plaintiffs as possible of the collective action and their right to opt-in." (Doc. # 168 at 9). Moreover, given the apparent reason for their original omission, these individuals should be given notice of their right to be included in the class. This includes the six employees who were employed after Defendant supplemented the data on July 17, 2015. That date appears to be arbitrary, and cutting off the list then rather than on July 23, 2015, when the Supplemental Notice was sent, would be equally arbitrary. It would treat the group affected by the same issue differently.

Since the production of the list of 40, the parties have reviewed and identified two employees, James Beal and Aaron Smith, who should not receive the New Notice. The parties now agree that Mr. Smith should be excluded because of his limited time worked. They do not agree on Mr. Beal, who worked abroad. As set forth below, the employees who worked abroad should be excluded, which means that Mr. Beal will not receive the New Notice unless additional facts show he worked in the U.S.

In summary, 38 of the 40 individuals identified by the parties should receive the New Notice, set forth in the decision in Attachment A. Aaron Smith has been excluded by agreement. James Beal should be excluded because he worked abroad.

4.    **Highly Compensated Employee Exemption:** As noted above, on May 3, 2019, Defendant withdrew its argument on this issue. (Attachment C). This means that the 23 employees identified will be included in the class based on their base salaries.

5.    **Exclusions Based on Company Codes:** During the call on May 2, 2019, Defendant provided information identifying those CSC-related entities it claims are not defendants. Despite the request from the Special Master, Defendant has not provided any information or legal authority justifying its position that such entities do not meet the definitions of joint employers or single employer enterprises under the FLSA. The decision on this issue is Attachment A.

6.    **Damages:** The parties provided their damage calculations and detailed spreadsheets before the call on May 2, 2019 and have supplemented the materials since the call. As requested, both parties have segregated the employees affected by the contested issues. Defendant has excluded all such employees from the calculations it sent. Plaintiffs only have excluded those employees affected by the FLSA Notice issue; they have included the employees affected by the Highly Compensated Exemption and Company Code issues. Several other damages issues were discussed:

   a)   Defendant committed to provide the two types of missing hours data identified in Plaintiffs' e-mail dated May 2, 2019: 1) the employees for whom there are no hours data for the entire period; and 2) the employees where the hours data do not overlap with time spent in covered positions. Defendant will provide this data no later than

May 6, 2019. This data will be subject to audit and quality control by Plaintiffs' expert.

b) In the cover e-mail sent with its damage calculations on May 2, 2019, Defendant stated it intends to exclude employees of U.S.-based companies when they worked abroad. Plaintiffs objected to this issue being raised now, especially because the opportunity to brief it has passed and because of its similarity to the issue with non-U.S. Companies that took weeks to resolve during this process. Defendant responded that it considers the matter to be a damages issue – not a Class List issue. This is the issue affecting James Beal as well as 22 other employees.

After review of the relevant law and Defendant's previous explanation of the issue in its April 9, 2019 status report, those individuals employed by Defendant should be excluded from the Class List for the periods when they worked abroad. §213(f) provides that the relevant sections of the FLSA do not apply to any employee whose services during the workweek are performed within a foreign country. 29 U.S.C. § 213(f). Defendant identifies the 23 employees (including James Beal) in its 9:23 pm May 3, 2019 e-mail.

The parties will confer on the other damage issues and will identify any remaining issues so they can be discussed during the extended call scheduled for May 9, 2019. Any issues not identified will be waived.

## ACTION ITEMS

1.      Since the May 2, 2019 call, the parties have exchanged much of the information noted above. The parties also sent e-mails explaining their positions on the FLSA Notice issue, which have been summarized above.

2.      Pursuant to the decision on the FLSA Notice issue (Attachment A), Plaintiffs will submit their proposed New Notice to the 38 employees who did not receive opt-in notices in 2015 by May 8, 2019 for discussion during the May 9, 2019 call. Defendant will have the opportunity to respond, and the Special Master will include the text of the New Notice in the Report and Recommendation to be filed with the Court by May 17, 2019.

3.      The parties will confer on their damage calculations and identify all open issues in their status reports to be filed by May 8, 2019.  Any issues not identified will be waived.

4.      The parties will file status reports on May 8, 2019 to be discussed on May 9, 2019.

**SCHEDULE**

| | | |
|---|---|---|
| Wednesday May 8, 2019 | | *(Status Reports and responses to damage calculations due)* |
| Thursday May 9, 2019 | 12 pm | *(Extended Conference call to resolve all damages issues)* |
| Wednesday May 15, 2019 | 3 pm | *(Conference call to finalize damage calculations)* |
| Friday May 17, 2019 | | *(Report(s) completed)* |

Additional conferences will be scheduled as required. All times listed EST.
Call in: <u>(877) 674-2487</u> Pw 366233.

# ATTACHMENT A

## ATTACHMENT A

## <u>DECISION ON CLASS LIST ISSUES</u>

The data exchange, extraction and validation process has been a significant, time-consuming undertaking, and the parties have been able to reach consensus on most of the numerous issues that have arisen throughout the Special Master process. The parties could not agree on three areas on the Class List, which required briefing: 1) a number of individuals who are potential FLSA collective members did not receive class notice in 2015; 2) certain employees might be excludable from the class based upon their total compensation (Highly Compensated Exemption); and 3) certain employees may not have been employees of Defendant based upon their "Company Code." After full briefing and discussion of the issues during two weekly conference calls, Defendant has withdrawn its position on the second issue involving the Highly Compensated Exemption.

### 1. FLSA Opt-in Notice

As noted in the Summary of the Call, the parties have identified 40 potential FLSA collective members who did not receive notice in 2015, and therefore did not have the opportunity to opt-in to the collective. The facts are explained in the Summary of Call and are not repeated here. This decision explains the rationale for requiring a "New Notice" to be provided to these employees (now reduced to 38), what it should say and the process by which it should be accomplished.

As the result of Defendant's failure to provide complete and accurate data in 2015, Plaintiffs propose that these employees be given the opportunity to opt-in to the FLSA collective now. In the alternative, Plaintiffs propose that these employees be given notice that would inform them of the existence of the case and that they were qualified to receive notice in 2015 but did not because of Defendant's error. Plaintiffs request the new notice specify that judgment was entered and give the employees information about how they can contact either Plaintiffs' counsel or another attorney. Plaintiffs request that the notice include information about the amount of overtime attributable to each individual as determined from the hours data. In addition, Plaintiffs contend that the limitations period for these employees' individual claims should be equitably tolled.

Defendant argues that providing notice to potential FLSA collective members impermissibly expands the class post-trial. In support of this position, Defendant contends that the Court's prior ruling that "Plaintiffs cannot expand the class now" (Doc. # 476) is the law of the case. Defendant also cites legal authority it says prohibits expanding the definition of the class post-trial.

Resolving this issue does not involve expanding the class definition nor does it involve expanding the class. Instead, the issue is how to fix the situation, discovered following a jury trial and judgment for Plaintiffs, where a group of potential FLSA collective members did not receive opt-in notices due to Defendant's apparent error in providing complete and accurate data.

It is a question of how to address the fact that these individuals should have been included in the class as defined. It does not expand the class definition. This conclusion is bolstered by noting why the Special Master process exists in the first place: Defendant discovered other errors in the hourly data while doing the initial damages calculations.

The *Garcia v. Tyson* foods decision cited by Defendant supports the conclusion that the focus here should be on the definition of the class. 890 F. Supp.2d 1273, 1297 (D. Kan. 2012). In analyzing the decisions in *Garrett v. Hamtramck*, 503 F.2d 1236, 1246 (6th Cir. 1974) and *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 310-311 (6th Cir. 1975), the *Garcia* court notes that the problem in those cases was the expansion of the class definition. That is not the case here: there is no change to the class definition.

Likewise, the Court here has not ruled on this issue such that it is the "law of the case." There is no ruling on the issue of whether individuals who are now identified as potential FLSA collective members should be given notice post-trial.

Defendant raises concerns that by adding potential class members now means it has been deprived of the opportunity to raise individualized defenses or to call these individuals as witnesses during discovery or trial. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011). However, this decision does not allow these individuals to opt-in as Plaintiffs' propose in their first alternative. Instead, it mirrors Plaintiffs second alternative such that the New Notice to be sent will provide an explanation of what happened in this litigation, why notice is being sent now and what rights the individuals have. To accept Defendant's argument that it is simply too late to do so would thwart the remedial purposes of the FLSA and improperly exclude employees who should be included. *See Chen v. Major League Baseball Properties, Inc.*, 798 F.3d 72, 76 (2d Cir. 2015); *Ruggles v. Wellpoint, Inc.*, 687 F. Supp.2d 30, 38 (N.D.N.Y. 2009).

Any claims that result from this New Notice should be equitably tolled to allow the individuals to pursue their rights as if they had been properly notified in 2015. Neither party has been able to identify any legal authority for allowing opt-ins post-trial, which shows how unusual and extraordinary this situation is. The doctrine of equitable tolling allows a court to extend a statute of limitations on a case-by-case basis to prevent inequity. *Knox v. John Varvatos Enterprises Inc.*, 282 F.Supp.3d 644, 657 (S.D.N.Y. 2017) citing, *Warren v. Gavin*, 219 F.3d 111, 113 (2d Cir. 1999), *cert. denied*, 531 U.S. 968 (2000). To avoid the inequitable circumstance of excluding these 40 (now 38) individuals due to Defendant's apparent error, equitable tolling is appropriate. *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 170 (S.D.N.Y. 2014).

**New Notice**

At the conclusion of the damages process, the Court should approve sending a New Notice proposed by the parties, which at a minimum will contain the key provisions listed below. The New Notice should be sent as soon as practicable to the 38 potential FLSA collective members using a similar format and process approved by the Court earlier in the litigation. (Doc. #175). The parties will agree on the language and details of the New Notice as part of the

Special Master process, and it will be included in the Report(s) to be filed by May 17, 2019 (See Summary of Call for schedule):

Key provisions of New Notice:

1.   A clear explanation of the existence and status of the case, including that after a jury trial, judgment was entered for the collective;
2.   The recipients were entitled to receive notice of this lawsuit in 2015, but due to Defendant's apparent error, they did not;
3.   The recipients were entitled to opt-in to the FLSA collective in 2015, which means they might have rights to damages;
4.   The Court has now ruled that the recipients have the right to pursue those rights to damages. If they do so, any actions will be equitably tolled and will not be barred by any statute of limitations.
5.   The recipients have the right to be represented by an attorney of their choosing including Plaintiffs' counsel. Plaintiffs contact information will be provided;
6.   The recipients retain their right to file independent claims.
7.   A clear statement of no retaliation.

## 2.   Company Codes Issue

Defendant claims that employees who worked for legal entities other than CSC cannot be included in the class because those entities never have been defendants in this litigation and have caused no harm to Plaintiffs. Further, Defendant asserts that the representative Plaintiffs worked for CSC entities and do not have standing to sue "non-CSC" legal entities.

Plaintiffs strongly object on the grounds that Defendant has just raised this issue after providing information on employees of these entities throughout the litigation and damages process. Plaintiffs note that Defendant has not complied with the continuing obligation to produce relevant data under F.R.C.P. 37 (c). Most importantly, Plaintiffs argue there is no evidence to conclude that the entities are separate from CSC under the relevant FLSA standards.

This issue was first raised in Defendant's status report dated April 9, 2019. It affects approximately 84 class members, 68 of whom received FLSA opt-in notices, and 14 who opted in. Defendant has provided discovery responses including these entities and their employees, has offered relevant deposition testimony on this point, and has included many of these employees in its initial damage calculation in January 2019. (See Doc. # 484; Exhibits B and C to Plaintiffs' brief dated April 23, 2019; Exhibits A, B and C to Plaintiffs' Responsive brief dated April 30, 2019). The issue also was never raised in Defendant's several attempts to decertify the class. (Doc. #s 343, 373 and 447).

Analyzing the relevant Company Codes logically was a part of Plaintiffs expert(s) auditing the Layer Data to determine where the errors were in the legacy data. The expert(s) asked about the Company Codes which led to Defendant taking the position that employees who worked for "non-CSC" companies should be excluded from the class. The largest number of employees worked for one entity called CSC Covansys Corp.

The parties exchanged e-mails, conferred, and discussed the issue with the Special Master on several occasions. (See Summary of Calls on April 10, 15, 24 and May 2, 2019). Defendant provided information on the Company Codes and identified nine "Separate Legal Entities" in its brief dated April 23, 2019. (By e-mail dated April 26, 2019, Defendant has reduced the number to eight.) During the call on April 24, 2019, the Special Master asked the parties to address the relevant FLSA legal standards, particularly for joint employers and/or single employer enterprises. See 29 C.F.R. § 791.2; *Juarez v. 449 Restaurant, Inc.*, 29 F. Supp.3d 363, 367 (S.D.N.Y. 2014); (See Summary of Call of April 24, 2019.) During the call on May 2, 2019, the Special Master again asked Defendant if it had any evidence or legal arguments to offer. It did not offer any.

The only information Defendant has provided on this point are W-2 examples showing that some employees were paid directly by a "non-CSC" separate legal entity. Defendant has not rebutted Plaintiffs' argument or evidence that these entities would either be joint employers or a single employer enterprise. It appears undisputed that the "non-CSC" and CSC entities are under the same common ownership or financial control, have interrelated operations, provide the same or similar services, share the same HRIS system, and have centralized Human Resources functions. These facts meet the single employer enterprise test. *Juarez* at 363. Similarly, the evidence supplied likely would meet the standard for joint employment. *Michalow v. East Coast Restoration & Consulting Corp.*, 2017 WL 9400690 (E.D.N.Y. 2017).

Accordingly, in the absence of any factual or legal response from Defendant despite having ample opportunity to do so, I conclude that no such evidence exists, especially since this issue has been raised so late in the litigation and despite the continuing obligation to update discovery under F.R.C.P. 37 (c). The employees of the Separate Legal Entities listed in Defendant's April 23, 2019 brief are to be included in the class.

# ATTACHMENT B

| | |
|---|---|
| **From:** | Genevieve Casey <genevieve@feinbergjackson.com> |
| **Sent:** | Friday, May 3, 2019 6:23 PM |
| **To:** | Austin, Nathan W. (Sacramento); D. Charles Stohler |
| **Cc:** | CSC Plaintiff Counsel; Golder, David R. (Hartford); Farmer, Alexa M. (Hartford) |
| **Subject:** | [EXTERNAL] RE: Plaintiffs' Updated Proposal re FLSA Notice Errors in 2015 |

Just for additional clarity on the below, we wanted to mention that although on yesterday's call we anticipated that our updated list would include 41 people, today we identified another individual from the original list who appears to have been paid hourly during the relevant period; he has now been excluded as well, bringing our total to 40.

**From:** Genevieve Casey
**Sent:** Friday, May 3, 2019 1:55 PM
**To:** Austin, Nathan W. (Sacramento) <Nathan.Austin@jacksonlewis.com>; 'D. Charles Stohler'
<CStohler@carmodylaw.com>
**Cc:** CSC Plaintiff Counsel <CSCplaintiffcounsel@outtengolden.com>; Golder, David R. (Hartford)
<David.Golder@jacksonlewis.com>; Farmer, Alexa M. (Hartford) <Alexa.Farmer@Jacksonlewis.com>
**Subject:** Plaintiffs' Updated Proposal re FLSA Notice Errors in 2015

Dear Mr. Stohler and Counsel,

As directed during yesterday's Special Master call, we write regarding our proposal with respect to potential FLSA members who did not receive notice in 2015 due to CSC omitting them from the notice lists.

Below is a chart with the names of the 40 individuals Plaintiffs have identified as remaining in this group. From our April 10 list of 73, we have now omitted people based on Test & Training Ranges data and "HRLY" entries in the Employee Subgroup field, as well as the 4 people noted in CSC's April 30 brief.

For each person, we have included the dates of their first entry in the data in a covered position. As discussed yesterday, all of these people began working in covered positions before the date of the second FLSA opt-in notice, July 23, 2015. In addition, almost all of them started working in covered positions before July 17, 2015, the date when CSC provided a supplemental list of names and contact information for opt-in notice.

| Employee ID | Name | First Covered Entry |
|---|---|---|
| 629474 | James Beal (629474) | 10/18/2014 |
| 11500945 | Aaron Smith (11500945) | 4/20/2015 |
| 11503236 | Demetrius Manuel (11503236) | 6/22/2015 |
| 11503252 | Delmorita Samuel (11503252) | 6/22/2015 |
| 11503277 | David DeFrank (11503277) | 6/22/2015 |
| 11503289 | Wayland Gunner (11503289) | 6/22/2015 |
| 11503324 | Tony Eck (11503324) | 6/22/2015 |
| 637426 | Patrick O'Malley (637426) | 6/27/2015 |
| 704708 | Rajendra Arya (704708) | 6/27/2015 |

| 11503146 | William McGinnis (11503146) | 6/29/2015 |
|---|---|---|
| 11503458 | Chris Petsch (11503458) | 6/29/2015 |
| 11503465 | Megan Gearhart (11503465) | 6/29/2015 |
| 11503647 | Matt Crites (11503647) | 6/29/2015 |
| 11503648 | Terry Lindsay (11503648) | 7/1/2015 |
| 11503649 | James Lindley (11503649) | 7/1/2015 |
| 11503652 | Cory Chapman (11503652) | 7/1/2015 |
| 11503653 | MATTHEW Frank (11503653) | 7/1/2015 |
| 11503660 | Bryan Mohr (11503660) | 7/1/2015 |
| 11503700 | Shane Fowler (11503700) | 7/1/2015 |
| 11503747 | Bradley Fields (11503747) | 7/1/2015 |
| 11503751 | Paul Brittin (11503751) | 7/1/2015 |
| 11503775 | Joseph Bechtoldt (11503775) | 7/1/2015 |
| 712067 | Jazmine Robinson (712067) | 7/4/2015 |
| 714870 | William Eldredge (714870) | 7/4/2015 |
| 11501443 | Nicole Dorsey (11501443) | 7/4/2015 |
| 634017 | Charles Sullivan (634017) | 7/6/2015 |
| 11503861 | Wendell Betts (11503861) | 7/6/2015 |
| 11503933 | Joe Pierce (11503933) | 7/6/2015 |
| 11503944 | Ryan Mooney (11503944) | 7/6/2015 |
| 11503958 | Aaron Gatlin (11503958) | 7/6/2015 |
| 11504161 | Shane Pryor (11504161) | 7/6/2015 |
| 583966 | Raina Mason (583966) | 7/11/2015 |
| 11504138 | Peter Baum (11504138) | 7/13/2015 |
| 11504228 | Denise Mariane Arrey (11504228) | 7/13/2015 |
| 668378 | Joshua Shaw (668378) | 7/18/2015 |
| 11504449 | Stella O'Brien (11504449) | 7/20/2015 |
| 11504484 | zi-kossivi Athiogbey (11504484) | 7/20/2015 |
| 11504505 | Muhammad Rizwan (11504505) | 7/20/2015 |
| 11504539 | Diana Moland (11504539) | 7/20/2015 |
| 11504649 | Nikki Ulmer (11504649) | 7/20/2015 |

We have also provided copies of the correspondence from CSC in 2015 regarding the lists they provided for the FLSA notice. In his June 30, 2015 email attaching the initial list, Mr. Salazar-Austin notes, "If further investigation reveals the need to supplement this list, consistent with Judge Arterton's Order, then we will promptly notify you." CSC did then supplement the list on July 17, yet still did not include the individuals listed above. Copies of the relevant 2015 correspondence from counsel for CSC are attached.

Our proposal is that CSC should produce the remaining timekeeping data for each System Administrator on this list, as some are included on the list of people for whom no timekeeping data was produced, and each should then receive a Court-approved notice and an opportunity to opt in to this litigation or to pursue a separate claim. The notice would be individualized to inform the person of the amount of overtime they recorded in CSC's timekeeping data. This approach is consistent with the order that "Notice shall be sent by first class mail to all persons who were, are, **or will be** employed by CSC nationwide from July 1, 2011 to the present" and who otherwise meet the FLSA collective definition in Judge Arterton's Ruling Granting Plaintiffs' Motion for Conditional Certification, ECF No. 168 at 12-13 (emphasis added); *see also id.* at 9-10, approving dissemination of a reminder notice in keeping with the fact that "notice under the FLSA is

intended to inform as many potential plaintiffs as possible of the collective action and their right to opt in" (citations omitted).

If the Special Master decides that allowing these individuals to opt in would not be appropriate, at minimum they should receive notice of the lawsuit, the verdict, the fact of their omission from the 2015 lists, and the amount of overtime recorded in CSC's timekeeping systems in order to allow them to make informed decisions about whether to pursue their claims.

Regardless of whether these individuals are permitted to opt in to this lawsuit, equitable tolling should apply to their claims for the period from when opt-in notice was mailed out to the present to allow them to pursue the claims they would have been able to pursue had they been notified at that time. *See* Apr. 23 Letter from G. Casey to C. Stohler at 3-4.

We expect to receive CSC's analysis of the list of individuals in this category and their proposal today. Again, we would be happy to confer with counsel for CSC about this issue.

Thank you,
Genevieve

<table>
<tr><td>Feinberg<br>Jackson<br>Worthman<br>& Wasow LLP</td><td>GENEVIEVE CASEY<br>2030 Addison St., Ste. 500<br>Berkeley, CA 94704<br>Tel. 510/269.7998<br>feinbergjackson.com</td></tr>
</table>

PRIVILEGE AND CONFIDENTIALITY NOTICE
This electronic mail message, and any documents, files, or previous e-mail transmissions attached to or forwarded with it, may contain information that is privileged, confidential, and/or otherwise legally protected and exempt from disclosure. Unless this message is addressed to you or you are authorized to receive it for the person to whom it is addressed, any disclosure, copying, distribution, or other use of the information contained herein is strictly prohibited. If you have received this electronic mail message in error, please destroy the message and any attachments immediately and notify the sender by reply e-mail to genevieve@feinbergjackson.com.

# ATTACHMENT C

# D. Charles Stohler

| | |
|---|---|
| From: | Austin, Nathan W. (Sacramento) <Nathan.Austin@jacksonlewis.com> |
| Sent: | Friday, May 3, 2019 8:57 PM |
| To: | Genevieve Casey; CSC Plaintiff Counsel |
| Cc: | Golder, David R. (Hartford); Farmer, Alexa M. (Hartford); Anthony, William J. (Albany); D. Charles Stohler |
| Subject: | [EXTERNAL] Strauch v. CSC |
| Attachments: | 168 Order on Motion for Conditional Cert 4847-6938-9092 v.1.pdf |

Mr. Stohler and Ms. Casey:

I appreciate sending Plaintiffs' emails from earlier today. Immediately below is CSC list of people who did not receive the opt-in notice.

| Employee ID | Name | Start Date | Job Title | Job Code |
|---|---|---|---|---|
| 11503236 | DEMETRIUS MANUEL | 6/22/2015 | Professional System Administrator | 51000737 |
| 11503252 | DELMORITA SAMUEL | 6/22/2015 | Professional System Administrator | 51000737 |
| 11503277 | DAVID DEFRANK | 6/22/2015 | Professional System Administrator | 51000737 |
| 11503289 | WAYLAND GUNNER | 6/22/2015 | Associate Professional System Administrator | 51000251 |
| 11503324 | TONY ECK | 6/22/2015 | Professional System Administrator | 51000737 |
| 637426 | PATRICK O'MALLEY | 6/27/2015 | Professional System Administrator | 51000737 |
| 704708 | RAJENDRA ARYA | 6/27/2015 | Professional System Administrator | 51000737 |
| 11503146 | WILLIAM MCGINNIS | 6/29/2015 | Professional System Administrator | 51000737 |
| 11503458 | CHRIS PETSCH | 6/29/2015 | Professional System Administrator | 51000737 |
| 11503465 | MEGAN GEARHART | 6/29/2015 | Professional System Administrator | 51000737 |
| 11503647 | MATT CRITES | 6/29/2015 | Professional System Administrator | 51000737 |
| 11503648 | TERRY LINDSAY | 7/1/2015 | Associate Professional System Administrator | 51000251 |
| 11503649 | JAMES LINDLEY | 7/1/2015 | Professional System Administrator | 51000737 |
| 11503652 | CORY CHAPMAN | 7/1/2015 | Associate Professional System Administrator | 51000251 |
| 11503653 | MATTHEW FRANK | 7/1/2015 | Associate Professional System Administrator | 51000251 |
| 11503660 | BRYAN MOHR | 7/1/2015 | Professional System Administrator | 51000737 |
| 11503700 | SHANE FOWLER | 7/1/2015 | Associate Professional System Administrator | 51000251 |
| 11503747 | BRADLEY FIELDS | 7/1/2015 | Associate Professional System Administrator | 51000251 |
| 11503751 | PAUL BRITTIN | 7/1/2015 | Associate Professional System Administrator | 51000251 |
| 11503775 | JOSEPH BECHTOLDT | 7/1/2015 | Associate Professional System Administrator | 51000251 |
| 712067 | JAZMINE ROBINSON | 7/4/2015 | Professional System Administrator | 51000737 |
| 714870 | WILLIAM ELDREDGE | 7/4/2015 | Associate Professional System Administrator | 51000251 |
| 11501443 | NICOLE DORSEY | 7/4/2015 | Associate Professional System Administrator | 51000251 |
| 634017 | CHARLES SULLIVAN | 7/6/2015 | Associate Professional System Administrator | 51000251 |
| 11503861 | WENDELL BETTS | 7/6/2015 | Professional System Administrator | 51000737 |
| 11503933 | JOE PIERCE | 7/6/2015 | Professional System Administrator | 51000737 |
| 11503944 | RYAN MOONEY | 7/6/2015 | Associate Professional System Administrator | 51000251 |
| 11503958 | AARON GATLIN | 7/6/2015 | Professional System Administrator | 51000737 |

| | | | | |
|---|---|---|---|---|
| 11504161 | SHANE PRYOR | 7/6/2015 | Associate Professional System Administrator | 51000251 |
| 583966 | RAINA MASON | 7/11/2015 | Professional System Administrator | 51000737 |
| 11504138 | PETER BAUM | 7/13/2015 | Professional System Administrator | 51000737 |
| 11504228 | DENISE MARIANE ARREY | 7/13/2015 | Professional System Administrator | 51000737 |
| 668378 | JOSHUA SHAW | 7/18/2015 | Professional System Administrator | 51000737 |
| 11504449 | STELLA O'BRIEN | 7/20/2015 | Associate Professional System Administrator | 51000251 |
| 11504484 | ZI-KOSSIVI ATHIOGBEY | 7/20/2015 | Associate Professional System Administrator | 51000251 |
| 11504505 | MUHAMMAD RIZWAN | 7/20/2015 | Professional System Administrator | 51000737 |
| 11504539 | DIANA MOLAND | 7/20/2015 | Professional System Administrator | 51000737 |
| 11504649 | NIKKI ULMER | 7/20/2015 | Associate Professional System Administrator | 51000251 |

The difference between our two lists is James Beal and Aaron Smith. James Beal worked in Japan according to the P44 data:

| PersNo | Personnel Number | Start date(0000) | End Date(0000) | Action Type(0000) | Start date(0001) | End Date(0001) | Job | Job_Desc | Work_Center_state | WC Country | Employment Status | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00629474 | James Beal | 2/1/2012 | 2/13/2015 | US-Job Title Change | 10/18/2014 | 2/13/2015 | 51000251 | Assoc Prof:System Adminis | | JP | Active | 4 |
| 00629474 | James Beal | 2/14/2015 | 8/28/2015 | FT-Active employee | 2/14/2015 | 4/3/2015 | 51000251 | Assoc Prof:System Adminis | | JP | Active | 4 |

Last week, Plaintiffs produced a list of people who they contended should have received notice, and who also were due overtime in an effort to meet and confer on this issue. Aaron Smith was not on that list, and that is because he only worked three days according to the clocking data I provided to Ms. Casey via email on April 17 in response to her request for data for the 73 people Plaintiffs originally contended should have received notice:

| LBDTL_REC_NUM | WORKER_ID | WORKER_LST_NAME | WORKER_FST_NAME | WEEKEND | ACTUAL_DATE | WO_ |
|---|---|---|---|---|---|---|
| 549260768 | 11500945 | SMITH | AARON | 01-MAY-15 | 27-APR-15 | EA01 |
| 549260769 | 11500945 | SMITH | AARON | 15-MAY-15 | 09-MAY-15 | EA01 |
| 552527582 | 11500945 | SMITH | AARON | 26-JUN-15 | 20-JUN-15 | EA01 |

CSC's position is that the remaining 38 people should not receive a supplemental notice, nor should their claims be tolled. Judge Arterton's order certifying the class and requiring a notice be mailed was dated January 9, 2015. The order required that CSC provide Plaintiffs a list of class members "[w]ithin 21 days," which was January 30, 2015. (Emphasis original) Docket 168, p. 12 (attached for your convenience). A rational reading of the order is that the list that was to be produced by June 30, 2015 include people who were class members through the date of the order, June 9. CSC went beyond the date of the order, providing data through June 20, 2015. The initial list of 3,056 people on June 30, 2015, pursuant to the court's order. Plaintiffs' position has been that CSC erred by omitting people who may have entered into the collective through its *second* mailing date, July 23, 2015. The Court's order clearly did not contemplate that the list would include employees through a mailing date, because it required that the data be produced within 21 days of the order, **June 30, 2015.** CSC complied with the Court's order and produced data on June 30, 2015, and that data covered the period through June 20, 2015, which went beyond the June 9, 2015 order date. CSC supplemented that production with a list of 348 more people identified through the same date, June 20, 2015. As argued in our briefs, Plaintiffs could have requested another mailing to potential FLSA opt-ins during the course of the litigation, but chose not to do so, and should not be allowed to belatedly send notices now after receiving a favorable verdict.

Regarding the compensation to be included in the determination of whether employees earned less than $100,000 annually, CSC will withdraw its argument that the additional earnings from Infotype 15 identified should be included in determining whether members of the classes and collective earned less than $100,000 and rely only on the annual salary amounts under the understanding that the annual salary amounts are also the only compensation that will be used in determining damages, as both parties have done in their damages calculations. Please confirm that the parties are in agreement on this point.

Thank you.

Nate

Nathan W. Austin
Attorney at Law
**Jackson Lewis P.C.**
400 Capitol Mall
Suite 1600
Sacramento, CA 95814
Direct: (916) 288-3023 | Main: (916) 341-0404
Nathan.Austin@jacksonlewis.com | www.jacksonlewis.com
*Jackson Lewis P.C. is honored to be recognized as the "Innovative Law Firm of the Year" by the International Legal Technology Association (ILTA) and is a proud member of the CEO Action for Diversity and Inclusion initiative*

# EXHIBIT 4

Memorandum

Date:   Friday, March 1, 2019
From:  Dan Regard (iDS)
To:      Mr. Stohler, Mr. Austin
Copy:  Ms. Casey, Mr. Goldman, Mr. Patel (iDS), Ms. Adams (iDS)
Re:      Current Issues and Questions on CSC Data Extractions

This status update is a work in progress. I am providing existing identified issues, with the following caveats:

To my understanding,

1. None of the original data extractions were properly documented (we do not know today what was done then).
2. None of the original data extractions were properly audited.
3. None of the people who performed the original data extractions are working on the new extractions.
4. The current "class-list" was derived from the damages spreadsheet, which, in turn, was derived from the CSC-produced 2017 hourly data.
5. It is not clear what list or method was used to extract the 2017 hourly data.
6. It is not clear if or how the original substitute employee numbering system was relied upon or impacted the original data extractions but we know that this system ultimately created data integrity issues and has since been abandoned.

Because of the foregoing items, and because we are observing the extractions without the ability to rapidly try-fail-and-revise these data extractions, there are issues being found now for the first time, and there is a finite speed at which we can (and have already) uncovered issues with the original and now secondary data extractions.

Furthermore,

1. We have not received any of our requested data dictionaries for the data sources. This means that we (iDS) do not know all available fields, or the precise nature (i.e. applicability) of fields that have been produced.
2. We have not yet received documentation of the operational date ranges for the three layer data systems (P42, P44, and WorkDay ["WD"])
3. We have not completed visual (Skype) quality control audits for any of the most recent data extractions. We have not even started visual auditing for the most recent Layer Data and we have only done a few inspections on the first batch of the third set of eTES data.
4. We do not have full documentation, yet, on the techniques or choices used to extract the MyTime or Layer (P42, P44, Workday) data.

Without this baseline documentation, especially the data dictionaries the date range documentation, and the completed visual audits, we will not know all potential issues (or solutions).

Estimates of the current problems that I understand led to this current exercise, have been found to have been understated by both parties:

1. CSC identified 262 people for whom hourly data was to be re-extracted. That process revealed that the 262 was not a precise number. After testing within and outside that group, it was expanded to all class members.
2. PTF identified 91 people for whom layer data was to be re-extracted. After partial testing of that extraction, and review of the previous layer data sets, it is clear that 91 people is not enough, and that the methods used for the 91 people, at least with respect to P44, may need to be adjusted and re-run (i.e. scope changes and technique changes).

With those baseline issues, here are the current questions that we (iDS) have about the data extractions:

## eTES

The eTES data is being pulled for all class members for the 3rd time. All batch (9 of 9) has been pulled and delivered as of tonight. In the first batch we have identified one employee where the data is properly extracted (via visual confirmation) but appears to have multiple records for the same day. CSC is looking into this. Now that we have other the batches, we will test for outliers and anomalies, share those with CSC, and, assuming no major issues, start visual auditing.

Attached is an eTES spreadsheet with details on 2 weeks of data for Sandra Thomas. Each week shows her time entry twice – once with her middle initial, once without, on multiple work orders.

These are:
- On the week of 07/30/10, Sandra Thomas (Ref # 516109) had two work orders with identical hours
- On the week of 08/06/10, Sandra Thomas (Ref # 516109) had two work orders with identical hours


## MyTime

MyTime was pulled for all employees. Visual Auditing has begun (14 employee-weeks). We are coordinating with CSC to schedule time to continue.

There are some people that have already been identified via comparison of data set 2 to data set 1 that show differences in daily or weekly time, both within the 262 and outside of the 262. The daily time examples went from less than 8 hours to more than 8 hours in one day. The weekly time examples expanded from less than 40 hours to more than 40 hours in one week.

Attached is a MyTime spreadsheet with details on 10 daily employees (from California), and 6 weekly employees.

By way of example, two instances outside of the 262 include:
- On the day of 8/12/17, Kim Tran (Ref # 599637) had 1 hour. Now has 10 hours.
- On the week of 12/10/16, Paul Christidis (Ref # 628453) had 10 hours. Now has 44 hours.

## Layer Data

Data for P42, P44, and WD was extracted for 91 people. It resulted in many more records for many people, especially from P42. By way of example:

- Nazarath Tokatlian (Ref # 524809) originally had 2 records (produced previously, presumably from P42) that related to October, 2011. Now we have 15 records in P42 and 2 in P44. I.E we had no previous records for him from P44.
- Michael Shapiro (Ref # 525300) originally had 3 records (2 in P44 and one in WD). Now we have 2 in P42, 9 in P44, and 1 in WD. I.E. we had no previous records for him from P42, and fewer in P44).

Attached is a layer-data spreadsheet showing these examples with more detail.

Also within the extractions, the number of records is increased, but it appears that the date range restrictions for P44 (12/24/11 – 03/09/15) was too narrow because there are still gaps in the records for at least 3 employees between P44 and WD. These are:

- Grover Boone (Ref # 580440), gap from 8/29/15 to 10/30/15
- Linda Bryson (Ref # 704012), gap from 8/29/15 to 10/30/15
- Kevin Humphrey (Ref # 711998), gap from 8/29/15 to 10/30/15

Attached is a 2nd layer-data spreadsheet showing these examples with more detail.

Overall, the review of data discrepancies in the layer data does reveal why it should be limited to the 91 people PTF was able to identify via gaps. Especially since gaps were only assumed where end dates for specific positions were not previously produced, but are now.

## Class Members with completely missing data

On the call Thursday, February 28, 2019, the parties discussed class members who appeared earlier in the 2015 or 2017 data productions, but do not appear on the 2019 class list, or in the 2019 data extractions.

These are as follows:

There are 152 employees who appeared in the 2015 and 2017 layer data productions, but not in the 2017 hours production and, as a result, are not on the current class list derived from the 2017 hours production. Therefore no hourly data (eTES or MyTime) has been produced for these 152 employees. These appear on tab 1 of the attached MISSING spreadsheet.

There are 74 employees who appear in the previously produced November 2017 compensation data, and appear in previous layer data productions under covered positions, but were not in the 2017 hours production and, as a result, are not on the current class list derived from the 2017 hours production. Therefore no hourly data (eTES or MyTime) has been produced for these 74 employees. These appear on tab 2 of the attached MISSING spreadsheet. All of these employees also appear within the 152 on tab 1. (i.e. a total of 152).

There are 4 Opt-In employees who have no layer data. 2 of those also have no previous hourly data and are not on the current class list. These appear on tab 3 and 4 of the attached MISSING spreadsheet. They are not within the 152 on tab 1 (i.e. a total of 152 + 2 = 154). These 4 are:

2 on the current list, but not in the 91, but also have no layer data:

| REVISED Employee Reference No# | Consent to Join Filed | Personnel Number | Any Time Data Produced? | On List of 990? |
|---|---|---|---|---|
| BA-484 | 7/29/15 | | N | N |
| RP-254 | 8/25/15 | 688254 | | N |

2 not on the current list, and therefore have no currently pulled hourly data:

| REVISED Employee Reference No# | Consent to Join Filed | Personnel Number | Any Time Data Produced? | On List of 990? |
|---|---|---|---|---|
| BL-309 | 10/2/14 | 678309 | | |
| MS-628 | 12/8/14 | 685628 | | |

Finally, there are 10 employees for whom some hourly data was previously received, but do not appear in the damages spreadsheet, and are not currently on the 2019 class list. Three of these are opt-ins. These are as follows:

| Ref Number | Name |
|---|---|
| 579481 | REILLY, MICHAEL |
| 599714 | Flores, Vicente |
| 632900 | STEENBERGH, BARRY |
| 660964 | Patel, Mahendra J |

| | |
|---|---|
| 676882 | Ibrahim, Fathi A |
| 704369 | Maler, Craig |
| 704804 | ALAWWA, SAJITH |
| 705651 | Naseem, Mohd |
| 803303 | Grandhi, Vasu |
| 804543 | Sood, Gaurav |

The detail for this appears on tab 5 of the attached MISSING spreadsheet. This adds to the 154 to give a total of 164 employees who we have questions about as to whether or not they should be part of the class list, or they should have hourly or layer data, or whether they are excluded from the class list due to (a) lack of potential damages, (b) salary range, (c) fall outside of the class date range, or (d) did not hold a covered position.

## 19 Individuals in Compensation Data Still Investigating

We are still investigating an additional 19 individuals who appear in the compensation data CSC produced in November 2017, but do not appear in the hourly data produced at that time, and are not on the current class list. We are still looking into this group. They are listed below and in an attached spreadsheet.

| Pers No | Name |
|---|---|
| 526785 | SINGER, CYNTHIA |
| 535656 | MARCINIAK, JAMES |
| 536880 | DELAND, CYNTHIA |
| 597027 | MADSEN, BRUCE |
| 597072 | DIAMOND, MAXWELL |
| 597077 | LICHTENSTERN, HENRY |
| 597147 | JENSEN, DALE |
| 597174 | NICKERL, JEFFREY |
| 597221 | LAGRONE, JAMES |
| 597279 | CUDNIK, LAWRENCE |
| 597303 | SCHMIDT, JOHN |
| 597327 | RALEY, LARRY |
| 597381 | PHILLIPS, THOMAS |
| 689514 | BOWMAN, TROY |
| 709001 | ACHIKANATH CHERAKARA, ASOKAN |
| 801718 | GULATI, KUNAL |
| 803707 | DEENADAYALAN, DEEPA |
| 1501167 | RAJENDRAN GANESH |
| 11500431 | MCGOUGH, WILLIAM |

We are available Monday and Tuesday to resume visual inspection audits on eTES and MyTime, as well as layer data.

Thank you,
Dan Regard

# **EXHIBIT 5**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

# Because you worked for Computer Sciences Corporation ("CSC") as a Professional or Associate Professional System Administrator between July 1, 2011 and the present, you have the right to request payment for overtime work through a lawsuit.

*A court authorized this notice. This is not a solicitation from a lawyer.*

Dear NAME,

You are receiving this letter because a judge has decided that you have certain rights that you can exercise to request payment for the overtime hours you worked. Please read this notice, so that you can decide whether and how to best protect your rights.

## 1. Background: The *Strauch* Class Action for Overtime Pay on Behalf of CSC System Administrators

In 2014, System Administrators sued CSC for unpaid overtime. This case is called *Strauch v. Computer Sciences Corporation*, Case No. 14-cv-956 (JBA) (D. Conn.). The Plaintiffs in the *Strauch* case claimed that CSC owes System Administrators overtime pay for hours worked over 40 in a week under the Fair Labor Standards Act (FLSA). In June 2015, the Court in the *Strauch* case gave System Administrators the chance to join the case. In July 2015, a Court-authorized Notice was mailed to System Administrators, and approximately 618 of them decided to join the case then.

In December 2017, the Court held a two-week jury trial, and the Plaintiffs won. Associate Professional and Professional System Administrators who joined the case will now get money for the overtime hours they recorded in CSC's timekeeping systems.

## 2. Why You Are Receiving This Letter About Your Rights

You are receiving this letter because **the Court has determined that you should have gotten the Notice sent in July 2015, but due to apparent errors in CSC's data, you did not.**

Now, you have a chance to assert your rights. You may be able to request compensation for the overtime hours you worked at CSC. You cannot participate in the *Strauch* case, so the Court has decided that you have the right to learn about your rights so that you can file your own lawsuit if you wish.

### 3. **<u>The Time Period for Which You Can Request Overtime Pay</u>**

Because you should have had a chance to join the case earlier, the Court has decided that you have the right to pursue your rights with the benefit of a longer time period than usual. Therefore, if you pursue your claims, the time period at issue will be the same as if you had joined the *Strauch* case in 2015.

### 4. **<u>No Guarantee of Success If You Request Overtime Pay</u>**

Although the Court has found that CSC owes money to the System Administrators who joined the *Strauch* case, it has not made any decisions about you, other than deciding that you should get a chance to learn about your rights to bring your own case. There is no guarantee that you will be paid money if you request overtime pay in a lawsuit against CSC.

### 5. **<u>Lawyers Are Available To Help You</u>**

You can choose an attorney to represent you. The lawyers who represent the Plaintiffs in the *Strauch* case are willing to help you understand your options. They can be contacted at:

XX

### 6. **<u>No Retaliation</u>**

It is against the law for CSC to fire, discipline, or retaliate against you for pursuing your rights. If you believe that you have been retaliated against, you may contact the *Strauch* Plaintiffs' counsel or any other lawyer of your choosing.