UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

_____

|  |  |  |
|---|---|---|
| Joseph Strauch and Timothy Colby, | : | |
| and on behalf of themselves and all those | : | |
| similarly situated | : | CIVIL NO.: |
| | : | 3:14-cv-956 (JBA) |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| Computer Sciences Corporation | : | |
| | : | |
| Defendant | : | |
| | : | JUNE 17, 2019 |

_____

**DEFENDANT CSC'S OBJECTIONS TO
SPECIAL MASTER'S REPORT AND RECOMMENDATION**

## I.    PRELIMINARY STATEMENT

Pursuant to this Court's order appointing the Special Master (Dkt. 491) and Rule 53 of the Federal Rules of Civil Procedure, Defendant Computer Sciences Corporation ("Defendant" or "CSC") hereby objects to the Special Master Report and Recommendation ("R&R") (Dkt. 503), specifically with regard to Layer Data (Sec. III(4)), Legal Entities other than Defendant (III(6)), and FLSA Opt-in Class Notice (Sec. III(7)).  CSC also objects to the Role of Plaintiffs' Expert (III(2)) as it relates to Plaintiffs' expert's fees.

This could, and should, have been an easy process to resolve the data transfer errors that created duplicates and the other limited gaps in the data.  CSC proposed the need to address the data transfer error to the Court, and Plaintiffs vehemently opposed the exercise, even though it was clear that there was a data transfer error that wrongly skewed the damages for a subset of System Administrators who had certain time entries duplicated multiple times and appeared to "work" more than 24 hours in a day.  *See* January 18, 2019, Transcript, *attached as* <u>Exhibit A</u>.  As proof that CSC's

request—and the Court's order—to examine and rectify this discrete data issue was well warranted, the nine people identified in the declaration of Stephanie McFarlane's declaration dated January 16, 2019 had a combined reduction in overtime wages of over $3.3 million in the recently completed calculations submitted with the R&R.  In direct contradiction of the Court's clear order and instructions, the Special Master allowed Plaintiffs to greatly expand, direct, control the entire process, and engage in post-trial discovery.

As a result, the R&R is flawed in three major regards.  First, the R&R failed to incorporate all the new facts and issues discovered in this process.  Because the Special Master allowed Plaintiffs to expand the scope and analyze data that had never been analyzed in this lawsuit before, that data revealed that the certified classes in this case include people who were not employed by CSC, the only named Defendant in this lawsuit.  That new information further undermines this Court's class certification orders and raises standing problems.  The R&R wrongly orders that the employees of **_non-CSC_** legal entities be included in the class.  Second, on other facts and issues, the R&R issues recommendations that have no basis in the law.  Specifically, the R&R wrongly directs that this Court expand the classes and issue new FLSA notices.  The Special Master lacks the authority to expand the certified Rule 23 classes to include previously unidentified people after trial or direct new FLSA notices be issued to individuals who do not fit within the Court's FLSA collective and start a new lawsuit.

Finally, CSC objects to paying all of iDS's fees and seeks direction from this Court on how this issue should be briefed.

## II.    Relevant Procedural Background

The relevant procedural background demonstrates that the narrow process contemplated and ordered by this Court was expanded into full blown post-trial discovery by Plaintiffs.

The Court ordered this case to the Special Master with clear instructions that Defendant should do just two things.  First, "Defendant CSC shall expeditiously determine whether it can retrieve the original timekeeping data, free from the 'anomalies' that it claims mar the data previously produced to Plaintiffs and the class." Dkt. 487.  Second, "[i]n conjunction with this process, Defendant shall ascertain whether there are any data, for class members with incomplete job title layer data, indicating change in job title prior to the time periods covered by the currently produced layer data for those class members."  Dkt. 487 (emphasis added).  On the call with the Court, Plaintiffs identified a small subset of individuals with potential "gaps" in their layer data. This original list included approximately 89 individuals.  *See* Ex. A, at pp. 42-45.

During the process, CSC demonstrated to Plaintiffs and the Special Master what it had previously explained to this Court:  there was an error that caused the duplication of records for a subset of class members.  This error was an inadvertent error that occurred when database tables were joined as part of the original extraction process.

However, in addition to the data transfer error and job titling issue, the Special Master allowed the process to expand to encompass not only the entire class of 990 people, but also the entire putative class of over 4,000 people.  After the damages were re-calculated based on the newly extracted data, Plaintiffs' damages calculations dropped from over $32 million to approximately $18.75 million.  The reductions in damages were largely attributed to the duplication of hours records and Plaintiffs' inaccurate assumptions of the time periods that class and collective members should be included in their respective classes.  The analysis of newly extracted data revealed facts and issues that cannot be ignored and were wrongly addressed by the Special Master in the R&R.

III.    **OBJECTIONS TO R&R**

Findings of fact and conclusions of law made or recommended by the Special Master must be reviewed *de novo*.  *See* Rule 53(f)(3)-(4).  All portions of the R&R that have been objected to shall be reviewed *de novo*, where as those portions not objected to are assessed for clear error. *See CA, Inc. v. Simple.com, Inc.*, 2009 U.S. Dist. LEXIS 25241, *3-4 (E.D.N.Y. March 5, 2009). Here, Defendant specifically objects to various portions of the Special Master's R&R and these subsections must therefore be reviewed *de novo*.

The R&R failed to incorporate ***all*** the new facts and issues that were discovered in the post-trial damages process.  Specifically, the Court should rule that individuals who worked for non-CSC legal entities be excluded from the class.  In addition, the Special Master's expansion of the certified Rule 23 classes is contrary to law and must be rejected.  Moreover, the Special Master's direction that new FLSA notices be issued to start a new lawsuit is flawed.  All three of these aspects of the R&R must be reversed.  Finally, the R&R findings as related to the iDS fees should be reversed and reserved for the Court.

### A. System Administrators Who Worked for Separate Legal Entities Other Than CSC Lack Standing to Benefit from Any Judgement

The R&R wrongly recommends that individuals who did not work for the sole Defendant, CSC, remain in the class.  *See* Dkt. 503, Section III(6), pp. 12-13.  The expanded data extraction and review process revealed that a segment of the class did not work for CSC, the only defendant in this lawsuit.  Pursuant to the law, those facts cannot be ignored.  To the extent there are multiple companies at issue, it is Plaintiffs' burden to establish joint employment, which they have failed to do.  The R&R wrongly shifts that burden to CSC and should be rejected.

It is a well-established principle that a representative plaintiff must have individual standing to assert claims against the defendant in the case, because the plaintiff's right to represent a class is

dependent on his eligibility to sue in his own right.  *See also Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40 n. 20 (1976) ("[t]hat a suit may be a class action, however, adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent" [internal quotation marks omitted]), quoting *Warth v. Seldin,* 422 U.S. 490, 502 (1975); *Ramos v. Patrician Equities Corp.,* 765 F.Supp. 1196, 1199 (S.D.N.Y.1991) ("[a] plaintiff, including one who is seeking to act as class representative, must have individual standing to assert the claims in the complaint against each defendant being sued by him"); *Akerman v. Oryx Communications, Inc.,* 609 F.Supp. 363, 376 (S.D.N.Y.1984) ("Membership in a plaintiff class is similarly insufficient to mitigate a lack of individual standing.  The fact that plaintiffs seek certification as representatives of a class at least one of whose members most probably will have purchased from each of the proposed [defendants] in no way alters the fundamental requirement that each plaintiff have standing to sue each defendant.").

In addition, "[i]t is axiomatic that the federal courts lack jurisdiction over a lawsuit unless a plaintiff alleges a concrete and particularized injury-in-fact that is fairly traceable to a ***defendant's*** wrongful conduct and redressable by a court order." *Flynn v. DirectTV, LLC*, 2018 WL 3970913, at *3 (Aug. 20, 2018) (emphasis added) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Crupar-Weinmann v. Paris Baguette Am., Inc.*, 861 F.3d 76, 79 (2d Cir. 2017)).[1]  Put simply, in the absence of an employment relationship, a plaintiff will not have standing to sue for a wage claim. Consequently, any judgment against CSC cannot apply to System Administrators who worked for other corporate entities.

---

[1] Unreported cases are attached as <u>Exhibit B</u>.

Here, as a result of Plaintiffs' expert's requirement that all data for everyone in the covered job codes be extracted from the P42, P44 and Workday systems, CSC discovered that data for foreign companies would be extracted. To identify only US-based employees, the extractions were limited to employees who worked for US-based Company Codes. The Company Codes identify operating units, and in some cases, separate legal entities. The inclusion of Company Codes in the extractions from all three systems made it apparent that employees for legal entities other than Defendant Computer Sciences Corporation were included even though they did not work for CSC.

It is undisputed that there is, and always has been, only one defendant in this case: Computer Sciences Corporation. It is the only legal entity served with the lawsuit and, thus, has been the only defendant entity through this litigation from its inception and through trial. By definition, only those individuals who worked for CSC can be class and collective members. That fact cannot be ignored. The data extractions during the Special Master process identified the following Company Codes[2] that are separate organizational units within CSC:

**Computer Sciences Corp. Company Codes**

| Company Code | Organization Name |
|---|---|
| 1010 | CSC Corporate |
| 1200 | FSG-Computer Sciences Cor |
| 1203 | FSG - Mynd Corp. |
| 1571 | Global Outsourcing Svcs |
| 4100 | Federal Sector - HQ's |
| 4107 | Federal - Civil |
| 4114 | Federal - Defense |
| 4145 | Federal Sector NORCO |
| 4528 | Federal - NYMMIS |

---

[2] The newly extracted data also showed that the Named Plaintiffs in this lawsuit, Joseph Strauch, Timothy Colby, Vernon Carre, and Charles Turner worked only for Company Code 1571, Global Outsourcing. Thus, Plaintiffs do not have standing to represent individuals from the non-CSC Company Codes. Equally significant, all ten Plaintiffs who testified at trial worked for Company Code 1571. In short, the only evidence from class members who Plaintiffs presented at trial were from System Administrators employed by company code 1571. Plaintiffs presented no evidence from any of their testifying witnesses who worked for the other company codes.

However, there are three company codes that are not separate organizational units, but instead are separate legal entities:

**Separate Legal Entities**

| Company Code | Company Name | Legal Entity |
|---|---|---|
| 1285 | ATS US | CSC Covansys Corporation |
| 4113 | Federal - Eagle Alliance | Eagle Alliance |
| 4138 | Federal - CSR | Computer Sciences Raytheon |

Throughout the Special Master process, company code 1285 was inquired about extensively after the initial extractions of layer data from P44, one of CSC's previous HRIS systems. Company Code 1285 is CSC Covansys Corporation, a separate legal entity, incorporated in Michigan. Employees of that company are therefore employees of a different legal entity than the one entity named in this lawsuit. The same is true of the other two entities. The employees of these non-CSC entities received W-2s from the company that employed them, not CSC. Anyone who worked for a Company Code that is associated with a different U.S. corporate entity not named in the present lawsuit should therefore not be part of the class because they were not employed by the defendant in this lawsuit. Despite the law and evidence, the "Special Master recommends that the employees of the 'non-CSC' legal entities be included in the class . . . ." *See* Section III(6), p. 13. However, to reach that conclusion, the Special Master flipped the burden of proof to Defendant to prove that CSC was not a joint employer or part of a single enterprise. *See* Section III(6), p. 13. It is Plaintiffs' burden to establish that the non-CSC entities jointly employed the worker and whether any individuals from those companies should be part of the class or collective, as articulated by case law the Special Master uses in support of his R&R. *See, e.g., Juarez v. 449 Rest., Inc.,* 29 F. Supp. 3d 363, 370 (S.D.N.Y. 2014) ("the Court must focus on whether Plaintiff has provided sufficient evidence that employees at all three Moonstruck Diners were, in fact, subject to the same unlawful policies."). Notably, the

Special Master himself acknowledges these individuals are employees of "non-CSC" entities, yet still recommends they remain in the class. *See id.*, at pp. 12-13. Defendant objects to this recommendation as it is contrary to case law. Furthermore, the Special Master's recommendation, in this respect, will open the possibility that Defendant will need to file before the Court a renewed Motion for Decertification and/or a Motion to Dismiss for subject matter jurisdiction based on Article III standing as a result of allowing employees who are now identified as not working for CSC to be considered class members. Defendant further maintains its objection to the propriety of the class and collective certification notwithstanding the Special Master's improper rulings.

## B. The R&R Wrongly Expands the Rule 23 Classes, Which Is Contrary to the Law of the Case and Case Law

The R&R wrongly recommends that the Connecticut and California classes should be expanded. *See* Dkt. 503, Section III(4), pp. 11-12. The Special Master claims that his report is not expanding the class, but that is exactly what the R&R does. Specifically, the R&R recommends adding individuals to the Connecticut and California Rule 23 classes who had never received notice to opt-out and who were not part of the classes that went to trial. The R&R essentially orders that five Connecticut individuals and 28 California individuals, who did not receive Rule 23 class notice, should be added to the classes post-trial[3].

In coming to this conclusion, the R&R wrongly ignores the law of the case and existing case law. This Court was very clear on this point: "The Court agrees with Defendant that **Plaintiffs cannot expand the class now**." *See* Dkt. 476 (emphasis added). Given that this Court has already ruled on this issue, the "law of the case doctrine" applies and the Court's holding that the class cannot be expanded now, post-trial, should be adhered to. *See New York City Dep't of Finance, et al. v. Twin*

---

[3] Only two of the Connecticut individuals have damages, so the other three do not meet the class definition. Similarly, in California, only 16 of the 28 people have damages and one of those individuals was an FLSA opt-in.

*Rivers, Inc., et al.*, No. 95 CIV. 1389 HB HBP, 1997 WL 299423 (S.D.N.Y. June 5, 1997) (defining the "law of the case doctrine" as "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case).

The Court's order was sound in this regard given that, at this post-trial juncture, case law is clear that the class simply cannot be expanded. The Rules Enabling Act embodies the requirements of due process by providing that federal procedural rules "shall not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2072. Rule 23 provides no shortcut to recovery for absent class members or the named representatives: Each plaintiff remains obligated to provide "the requisite proof," and Rule 23 gives the court "no power to define differently the substantive right of individual plaintiffs as compared to class plaintiffs." *State of Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 318 (5th Cir. 1978). Similarly, "a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011). Consequently, CSC has the due process right to challenge every element of every plaintiff's claim. While the Court may decrease the size of a class post-trial, *see Garcia v. Tyson Foods, Inc.*, 890 F. Supp. 2d 1273, 1298, 2012 U.S. Dist. LEXIS 118965, *85, 2012 WL 3594212 (D. Kan. Aug. 21, 2012), a class should not be expanded post-trial. *See, e.g., Garrett v. Hamtramck*, 503 F.2d 1236, 1246 (6th Cir. 1974) (explaining the district court could not expand the classes certified at the same time it entered its dispositive order because that deprived the defendants of the ability to challenge the expanded classes); *see also EEOC v. Detroit Edison Co.*, 515 F.2d 301, 310-11 (6th Cir. 1975) (overruled in part on other grounds). Consequently, the R&R wrongly recommends that the Connecticut and California classes should be expanded and should be reversed, which is yet another basis for a renewed motion for decertify the classes.

C. **The Special Master Wrongly Ordered That Additional FLSA Notices Be Issued** *Post-Trial* **to Individuals Who Are Not in the Putative Collective in This Case So Those Individuals Can Bring Claims in** *Another* **Case**

The R&R wrongly recommends that a new FLSA notice should be issued to a subset of 38 individuals who are not part of the FLSA collective so they can bring an FLSA claim in another case. *See* Dkt. 503, Section III(7), pp. 13-15. This extraordinarily unprecedented recommendation is flawed and must be rejected for the following reasons.

First, CSC is not aware of any precedent supporting this extraordinary remedy recommended by the Special Master. The purpose of an FLSA notice is to inform plaintiffs of their rights to file a consent in ***this*** case, not to serve as attorney advertising for a second case to be filed. The FLSA limitations period measures two or three years from the date written consent is filed with the court. See 29 U.S.C. §§ 255, 256(b). Thus, unlike a traditional class action, where the statute of limitations is tolled for putative class members when the complaint is filed, the filing of an FLSA collective action complaint does not toll the statute of limitations of a putative class member's FLSA claims. *See Partlow v. Jewish Orphans' Home*, 645 F.2d 757, 758 (9th Cir. 1981). In fact, while ruling on Plaintiffs' Motion for Conditional Certification, the Court in this case outlined this fundamental concept in collective actions: "The FLSA provides employees with a right to sue on behalf of themselves and 'other employees similarly situated' for claimed violations of the FLSA; such a joint, or 'collective,' action requires potential plaintiffs to 'opt in' to the suit in order to benefit from any judgment." *Strauch v. Comput. Scis. Corp.*, No. 3:14CV956 JBA, 2015 WL 3727804, at *2 (D. Conn. June 9, 2015) (citing 29 U.S.C. § 216(b)). It is well settled that "plaintiffs become members of the collective ***only*** after they affirmatively consent to join it." *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2015) (emphasis added, citations omitted). Thus, whether or not any individuals identified through this process received notice, if they did not opt in, they cannot be found to be part of the collective.

10

Second, the protective order in this case makes clear that information gathered in this lawsuit was to be used for this lawsuit only.  *See* Dkt. 4 (requiring that confidential information is "solely for use in connection with the action, in which this Order issued").  In addition to the Standing Order, Plaintiffs agreed to, and iDS employees signed, a Confidentiality Agreement referencing the Standing Protective Order and agreeing that they would not use the confidential information gathered in the Special Master process "for any purpose other than this litigation."  *See* Confidentiality Agreements signed by Plaintiffs' experts, *attached hereto as* <u>Exhibit C</u>.  Thus, any information gathered within this Special Master process is subject to this Court's own Protective Order and cannot be used for notice issued for any intended future action.  The R&R wrongly contradicts those protective orders.

Third, this Court already correctly rejected a similar tactic by Plaintiffs in this lawsuit, and that prior holding should remain intact.  This is not the first time that Plaintiffs attempted to attract potential clients for cases beyond the instant one.  Specifically, Plaintiffs sought to use an FLSA consent form whereby opt-ins would simultaneously opt in to future actions outside of the present lawsuit.  In a Joint Status Report regarding this reminder notice, CSC's position was that the provision "constitutes an improper attempt on the part of Plaintiffs' counsel to solicit plaintiffs for unknown and unfiled future actions against not only CSC, but also against other unidentified 'entities or persons.'"  *See* Dkt. 189, Joint Status Report, p. 8.  This Court agreed and consequently struck from Plaintiffs' proposed reminder notice the following language: "I also consent to join any separate or subsequent action to assert my claims against CSC, and/or any related entities or persons potentially liable." Dkt. 201 (Aug. 14, 2015).  In other words, the Court has already appropriately rejected similar notice efforts, which would improperly solicit individuals to bring or join a separate lawsuit against CSC outside of the present action.

Fourth, the R&R wrongly states as justification for this extraordinary remedy that it was due to "Defendant's failure to provide complete and accurate data in 2015."  *See* Dkt. 503, p. 14.  That

statement is wrong.   The following facts demonstrate there was no error or failure by CSC. Conditional certification of the FLSA collective was granted here on June 9, 2015.   *See Strauch*, 2015 WL 3727804.   The order expressly stated that notice was to be mailed to "all persons who were, are, or will be employed by CSC nationwide from July 1, 2011 **to the present**" in relevant positions and classified as exempt.   *Id.*, *7 (emphasis added).   Consequently, the people who should have received notice were those in the position up through the date of the order, **June 9, 2015**.   It would be impossible for CSC to send Plaintiffs the list of employees on the day of the Court's order.   Indeed, the Court ordered that CSC had "**21 days**" to provide Plaintiffs with a class list.   *See id.*   Pursuant to that order, on June 30, 2015, CSC provided Plaintiffs with a class list that contained contact information for 3,057 potential FLSA opt-ins.   The latest date of hire or termination in that list was June 20, 2015, beyond the June 9, 2015 date of the order.   In other words, CSC's list was overinclusive and included people outside the scope of the certified collective.   Because some individuals were mistakenly left off the original list, CSC provided Plaintiffs' counsel a supplemental list on July 16, 2015.   The latest date of hire or termination in that second, supplemental list was also June 20, 2015. In short, Defendant provided an accurate class list pursuant to the Court's order requesting data up to the "present," which, at the time, was June 9, 2015.

If that was not enough, the Special Master further recommends that any claims resulting from this improper new notice be equitably tolled.   *See* Dkt. 503, Section III(7), p. 15.   This, too, is improper and contrary to case law and the law of this case.   "[E]quitable tolling is considered a drastic remedy applicable only in rare and exceptional circumstances."   *Contrera v. Langer*, 278 F. Supp. 3d 702, 723 (S.D.N.Y. 2017), *citing A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011). "The Supreme Court has made clear, however, that the conditions for applying the doctrine are strict. 'Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his

way.'" *Id.*  The second prong of the equitable tolling test "is met only where the circumstances that caused a litigant's delay are both extraordinary and beyond its control."  *Knox v. John Varvatos Enters.*, 282 F. Supp. 3d 644, 658 (S.D.N.Y. 2017), *citing Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 756 (2016).  Plaintiffs previously requested equitable tolling, and the Court has already denied equitable tolling in its order on remedies.  *See* Dkt. 479, p. 11-13 (denying equitable tolling acknowledging that Plaintiffs' had a high burden that they failed to meet in this case).  Here, Plaintiffs had the putative class list showing the cut-off date of June 20, 2015.  If Plaintiffs wanted a second notice to issue for SAs who became SAs after June 20, 2015, Plaintiffs could have requested to do so.  It is far too late now.

Thus, the Special Master's R&R has gone beyond the Court's prior orders, has no basis in the law, has no basis in the facts or procedural history of the case, and should be rejected.

**D. Plaintiffs' Experts' Bills Are Excessive, Outside the Scope of the Process Ordered by the Court, and Involve Tasks Beyond the "Auditing" Per Court Order**

CSC objects to the Special Master's recommendations related to the role of Plaintiff's expert and their fees, as recommended in the Special Master's R&R at Section III(2), on the grounds that such recommendations are outside of the Special Master's role and are reserved for the Court, that it is not Defendant's burden to establish reasonableness of expert's fees, and that Defendant can only be ordered to pay Plaintiffs' expert "reasonable" fees upon the Court's order and evaluation of the same.  Plaintiffs recently requested a status conference with the Court to discuss the briefing regarding the expert fees.  *See* Dkt. 507.  CSC reserves its rights to object to the expert fees and seeks direction from the Court on the briefing of this issue.  In the meantime, CSC offers the following to inform the Court's determination on the process.

First, CSC objects to the entirety of the Special Master's recommendation as to Plaintiffs' counsel's expert fees.  *See* Dkt. 503, Section III(2), pp. 8-11.  Determining whether Plaintiffs' expert

fees are unreasonable is an issue that is traditionally left for the District Court. *See Reit v. Post Props.*, No. 09 Civ. 5455(RMB)(KNF), 2010 WL 4537044, *2 (S.D.N.Y. Nov. 4, 2010) (instructing in context of expert fees for deposition that "[t]he determination of a reasonable fee and for what services, including preparation, falls solely within [the court's] province.") (internal quotations and citations omitted).  Moreover, this is not an issue that the District Court empowered the Special Master to decide.  (Dkts. 487; 491.)

Second, the R&R improperly flips onto CSC the Plaintiffs' burden to establish the reasonableness of iDS's fees.  The law is clear that the party *seeking* reimbursement bears the burden of demonstrating the reasonableness of the fees sought.  *See, e.g, Carafino v. Forester*, No. 03 Civ. 6258(PLK) (DF), 2005 WL 1020892, at *1 (S.D.N.Y. Apr. 29, 2005) (citation omitted).  "Where the party seeking reimbursement fails to meet its burden, the court may exercise its discretion to determine a reasonable fee." *Id.* at *2 (citations omitted); *see also The Mark Andrew of the Palm Beaches v. GMAC Commercial Mortgage Corp.*, 01 Civ. 1812(JGK) (MHD), 2003 U.S. Dist. LEXIS 13217, at *3 (S.D.N.Y. July 31, 2003) (holding that "[T]he party that seeks reimbursement bears the burden . . . of demonstrating the reasonableness of the amounts claimed").

Third, CSC should be required to pay only for iDS's "reasonable" fees.  The law is clear that "[w]hile a party may contract with any expert it chooses, the court will not automatically tax the opposing party with any unreasonable fees charged by the expert." *Almonte v. Averna Vision & Robotics Inc.*, No. 11-CV-1088S, 2014 WL 287586, at *3 (W.D.N.Y. Jan. 24, 2014) (quoting *Reit v. Post Props., Inc.*, No. 09 Civ. 5455, 2010 WL 4537044, at *2 (S.D.N.Y. Nov. 4, 2010)).  There was nothing in the Court's order that contradicts this well-established rule.  Indeed, there was nothing in the Court's order that instructs CSC to pay all of Plaintiffs' expert's fees, regardless of whether they are reasonable or not.  (Dkt. 487.)  There was nothing in the Court's order that instructs CSC to pay all of Plaintiffs' expert's fees, regardless of whether it was work that should have been performed, or

regardless of whether it was billed at too high a rate for the Connecticut market.  (Dkt. 487.)  In short, there is nothing in the Court's order that gave Plaintiffs and iDS a blank check to perform any work it wanted to perform and bill that work at whatever rate it wanted to bill the work.  That is not the law.  That is not reasonable.

Similarly, there is nothing in the Court's order indicating that CSC must pay iDS's fees pursuant to the same 60-day schedule that the Court required the Parties to pay the Special Master's fees.  (Compare Dkt. 487 and Dkt. 491.)  Indeed, if the Court wanted CSC to pay iDS's fees and costs pursuant to a 60-day schedule or some other timetable, the Court could have indicated such in the Court's order.  (Dkt. 487.)  The Court's choice not to include a scheduled timeline clearly indicates that the reasonableness and timing of iDS's fees should be determined pursuant to the Rules of Civil Procedure and established case law interpreting those rules.  To be clear (and to rebut one of Plaintiffs' anticipated straw-man arguments), CSC does not intend to object to iDS's entire bill with the goal of paying $0.00 to iDS.  CSC intends to comply with the Court's order that it is obligated to pay iDS's fees for the process.  CSC, however, still has the right—and intends to exercise its right pursuant to well-settled law—to object to iDS's fees.  CSC should be required to pay only for iDS's "reasonable" fees as determined by the Court, not by the Special Master.

Finally, the law is clear that an expert "may not insist on advance payment, and may not set a flat fee before he knows what he will be called upon to do; he may instead charge only a reasonable hourly fee." *Johnson v. Spirit Airlines, Inc.*, No. CV 07-1874, 2008 WL 1995117, at *1 (E.D.N.Y. May 6, 2008); *Conte v. Newsday, Inc.*, No. CV 06-4859, 2011 WL 3511071, at *3 (E.D.N.Y. Aug. 10, 2011) (citing Fed. R. Civ. P. 26(b)(4)(E) and stating that the Rule does not entitle the plaintiff "to payment in advance" for his expert).  As the court explained in *Conte*, Defendants' counsel retained the expert and therefore it is "his responsibility to pay [the expert]." 2011 WL 3511071, at *3. While the Court's order and Rule 26 entitles Plaintiffs' counsel to

reimbursement for "reasonable fees" in connection with iDS's time for this process, CSC is under no obligation to advance those fees or pay the expert's bills prior to the Court's order. *See id.*

Again, CSC seeks direction from the Court as to how these fee issues should be raised and briefed by the Parties.

## IV.    **CONCLUSION**

CSC respectfully objects to the Special Master's Report and Recommendation and requests that the Court thereby reject Special Master's Report and Recommendation as argued herein.

Respectfully submitted,

DEFENDANT,
COMPUTER SCIENCES CORPORATION

By its attorneys,

*/s/ William J. Anthony*
JACKSON LEWIS P.C.
William J. Anthony (ct 17865)
Kristi Rich Winters (ct 28066)
677 Broadway, 9th Floor
Albany, New York 12207
Telephone: 518-512-8700
Anthonyw@jacksonlewis.com
Kristi.Winters@jacksonlewis.com

David R. Golder (ct 27941)
David C. Salazar-Austin (ct 25564)
Alexa M. Farmer (ct 30052)
90 State House Square, 8th Floor
Hartford, CT  06103
Tel: (860) 522-0404
Fax: (860) 247-1330
golderd@jacksonlewis.com
david.salazar-austin@jacksonlewis.com

Brett M. Anders*
220 Headquarters Plaza
East Tower, 7th Floor
Morristown, NJ 07960
Tel: (973) 538-6890
andersb@jacksonlewis.com

Cary G. Palmer*
Nathan W. Austin*
400 Capitol Mall, Suite 1600
Sacramento, CA 95814
Tel: (916) 341-0404
palmerc@jacksonlewis.com
AustinN@jacksonlewis.com

*  admitted *pro hac vice*

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that, on June 17, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties of record by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

*/s/ William J. Anthony*
William J. Anthony

# EXHIBIT A

```
              UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - x
JOSEPH STRAUCH, ET AL.,      |
             Plaintiffs,  | No: 3:14-CV-00956 (JBA)
                             |
v.                           |
COMPUTER SCIENCES CORP.,     |
             Defendant.   | January 18, 2019
- - - - - - - - - - - - - - x 11:11 a.m.



                          141 Church Street
                          New Haven, Connecticut


            TELEPHONIC STATUS CONFERENCE



B E F O R E:

        THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
```

```
                            Official Court Reporter:
                            Tracy L. Gow, RPR
                            tracy_gow@ctd.uscourts.gov
                            203.910.0323
```

2

```
 1   A P P E A R A N C E S:

 2   For Plaintiffs:
          TODD JACKSON, ESQ.
 3        Feinberg, Jackson, Worthman & Wasow LLP
          383 4th Street, Suite 201
 4        Oakland, CA 94607
          510.269.7998
 5        Fax: 510.269.7994
          Email: todd@feinbergjackson.com
 6
     For Defendant:
 7        WILLIAM J. ANTHONY, ESQ.
          DAVID R. GOLDER, ESQ.
 8        Jackson Lewis, P.C.
          90 State House Square, 8th Floor
 9        Hartford, CT 06103-3708
          860.522.0404
10        Fax: 860.274.1330
          Email: anthonyw@jacksonlewis.com
11               golderd@jacksonlewis.com

12        NATHAN W. AUSTIN, ESQ.
          Jackson Lewis, P.C. - Sacramento,CA
13        801 K Street
          Suite 2300
14        Sacramento, CA 95814
          916-341-0404
15        Fax: 916-341-0141
          Email: austinn@jacksonlewis.com
16

17

18

19

20

21

22

23

24

25
```

1          (Teleconference commenced, 11:11 a.m.)

2          THE COURT:  Good morning, Counsel.  This is *Strauch*

3   *v. Computer Sciences Corporation*, 14-CV-956.  May I have

4   appearances, please, starting with plaintiff?

5          MR. JACKSON:  Todd Jackson, Your Honor, on behalf of

6   plaintiff and the classes.  I will be doing -- there are a

7   number of colleagues here today.  I will be doing most of the

8   talking and any colleagues who speak, as we've done in the

9   past, will introduce themselves.  It is possible that

10   Mr. Ranahan will speak, as well, as necessary.

11          MR. GOLDER:  Good morning, Your Honor.  This is

12   David Golder for the defendant.  Also on the line is William

13   Anthony and Nate Austin.  I will be doing most of the

14   speaking on the call this morning, but my colleagues might

15   join in, as well; and to the extent that they do, they'll

16   introduce themselves.

17          THE COURT:  That's fine.  I was surprised to hear

18   that we have at least one of these disputes -- there seem to

19   be two, but I do congratulate you on having worked

20   assiduously to narrow where your differences are.

21          The first is with respect to what happens when the

22   defendant's time records show multiple entries on the same

23   day.  And the other is, what happens when you don't have

24   layer data for a class member showing that class member, at

25   least for a period of time, to be a class member, so -- but

1   let's start with the first one, because when I read your

2   status reports I thought that it really boiled down to we

3   should be using the E-TES and MyTime data that was provided

4   to the plaintiffs, and that's been a source of some rocky

5   road in the past, or we should have individualized damages

6   hearings, which you might imagine is not something I would

7   favor.

8          So we had a stipulation that kept the plaintiff from

9   using all sorts of other ways of analyzing the hours.  It had

10  all the appeal of time-keeping records that would be

11  attributable to the defendant and meet its obligations under

12  *Anderson v. Mt. Clemens Pottery*.  But we now have a

13  submission from the defendants that I don't quite understand,

14  about why what Stephanie McFarlane found from her analysis of

15  two weeks of, I think it was nine employees, should be at

16  such odds with what the time records provided to the

17  plaintiffs should show.

18         So maybe I'll ask Mr. Golder to explain to me how

19  you can get these variations from what was provided to the

20  plaintiffs.

21         MR. GOLDER:  Sure, Your Honor.  And before I get to

22  that, Your Honor, I just want to take a step back and just

23  note, because the Court mentioned *Mt. Clemens*, and say, as we

24  have to this Court before, that *Mt. Clemens* is a

25  burden-shifting case if someone proves that time records

1    don't exist or if time records are inaccurate.  It's not

2    intended for plaintiffs to get a windfall.  It's not intended

3    for plaintiffs to get triple what they worked or more than

4    what they worked.

5          The stipulation in this case that Your Honor just

6    mentioned is somewhat consistent with getting accurate

7    information and trying to get accurate damages for the

8    plaintiffs.  If you look at the stipulation, it says

9    specifically that damages would be based on the hours of work

10   that plaintiffs recorded in CSC's time-keeping systems.

11         And at the time of the stipulation, the issue that

12   was proposed, we had a 23(f) appeal pending to the Court,

13   Second Circuit court, and one of the issues related to the

14   individualized damages that would apply here in this case.

15   And plaintiffs proposed, in agreement for us to withdraw that

16   piece of our 23(f) petition, that they would not seek

17   individualized damages or off-the-clock time, that they would

18   just have damages go as to the e-TES records, okay.

19         And the stipulation clearly says that damages are

20   based on those records, and, specifically, work that

21   plaintiffs recorded, okay.  The stipulation does not say the

22   damages equal the time records.  It doesn't say damages equal

23   the time records if there's evidence that there are data

24   problems that demonstrate legal impossibilities like

25   employees working for more than 24 hours in a day.  That's

1    not what the stipulation contemplated.  That's not what the

2    stipulation says.

3            To Your Honor's question about what happened with

4    the data, we're still trying to figure out what problem

5    exists and how it existed.  But for the vast majority of the

6    data that we provided -- 88 percent -- we don't think there

7    was any issue with it.  For a small section of the data,

8    there was a problem, and we've been trying to uncover that

9    problem, and we're showing the Court that there is a problem,

10   and we're showing the plaintiffs that there is a problem, and

11   we're just trying to figure out what is accurate.

12           THE COURT:  So my question is, Mr. Golder, isn't

13   this a little late in the game to be doing that?

14           MR. GOLDER:  Well, Your Honor, damages did not come

15   up until after the jury verdict, and we did not realize that

16   this was a problem.  I assume that plaintiffs did not realize

17   that the data showed that their clients were tracking more

18   than 24 hours in a day.  If they did, they never raised that

19   issue to us.  But once we uncovered the problem, we're

20   looking into the problem and trying to figure out what that

21   problem is and getting the information so that we can figure

22   out, again, based on the stipulation, based on what *Mt.*

23   *Clemens* says, what is the actual time that these plaintiffs

24   worked and what is the actual time these plaintiffs recorded

25   in CSC's time-keeping system.  Again, not what was the data

1   problem that doubled or tripled their time.

2        And, also, Your Honor, just to note what plaintiffs

3   filed last night, our position still is that the time records

4   are accurate, and the testimony from the plaintiffs are the

5   time records are accurate.  That's the testimony.  What's

6   going on is there's clearly a data-transfer issue that

7   happened that skewed the data in a way that there are some

8   people, a small segment of the group -- again, there are

9   thousands and thousands of weeks of data here that we're

10  talking about -- but for this small segment, there was a

11  problem and it's grossly skewing the damages in a way that's

12  not appropriate.

13       THE COURT:  So the stipulation said that we would be

14  making the damages determination, quote, "based on the hours

15  of work that plaintiffs recorded in CSC's time-keeping

16  system, largely e-TES and a successor system called MyTime."

17       When you produced to the plaintiffs the data that

18  showed the hours of work that the plaintiffs recorded, A,

19  when was that done?  And, B, what care was taken to ensure

20  that the representation that it was accurate was accurate?

21       MR. GOLDER:  Your Honor, I can't answer that

22  question, and I don't even know if my colleague, Nate Austin,

23  can answer that question, in terms of when it was done.  But

24  in terms of the accuracy, I don't know everything that our

25  client did to determine whether the information was accurate

1   or not, but they went through a process, I'm sure, to try to

2   make sure that the information that we were turning over was

3   accurate.  And for the vast majority of the information that

4   was turned over, we believe close to 88 percent, it was

5   accurate.

6        You know, the reason why this small percentage --

7   it's just about 12 percent -- is inaccurate, we're not sure

8   why and we're note sure how it became a problem.  But it's

9   clear that it's a problem, and we're looking to uncover it so

10  we can figure out what is the time that plaintiffs recorded

11  in CSC's time-keeping system.

12        THE COURT:  So the stipulation is from October 2017.

13  And between that time and the present, the plaintiff says

14  that defendant said the plaintiffs had all the data that

15  would be used, that there were no errors, argued for no more

16  evidence or discovery; Dr. Breshears' report was excluded

17  after oral argument and by agreement on that condition; and

18  no challenges to the data was going to be permitted.

19        So I guess what concerns me is that, even if you

20  believe -- and I don't think Ms. McFarlane's submission

21  exactly is the tightest scientific evidence -- but even if

22  you believe, because there are some 26-hour-day entries, that

23  there's something wrong, I am very concerned that that is

24  being raised at this point.

25        MR. GOLDER:  Well, Your Honor, we are raising the

1   issue and dealing with the issue in due time.  And if we knew

2   it was an issue, you know, two years ago, we would have dealt

3   with it back then, Your Honor.  But, again, the stipulation

4   clearly says it's based on the hours of work that plaintiffs

5   recorded.  Not what it shows.  What plaintiffs recorded.

6           THE COURT:  I agree.

7           MR. GOLDER:  So if someone has 24 hours, but they

8   only recorded eight, the stipulation says they only get eight

9   hours.  And that's what *Mt. Clemens* would say, too.  *Mt.*

10  *Clemens* specifically says within the decision that only when

11  time records accurately reflect the period worked can they be

12  used in an appropriate measure of the hours worked.  That's

13  what it says.  And it's clear, if someone who has 26 hours in

14  a day, that is not accurate.

15          THE COURT:  Right.  No, I agree.

16          MR. GOLDER:  And if someone clocked in at 24 hours,

17  and it was because their time got tripled, as opposed to the

18  times that, quote, "plaintiff recorded," that's not what the

19  stipulation says.

20          THE COURT:  All right.  We got a verdict in December

21  of 2017.  This is now January of 2019.  I'm just not

22  persuaded that appropriate diligence has been attended to in

23  the defendant's production of data that is supposed to meet

24  the definition of hours of work that the plaintiffs recorded.

25  That's one concern.

1              The other is the trial testimony included

2    significant testimony about "on call."  And when people would

3    be on call, they could legitimately claim 24 hours a day for

4    the period of time that they were on call.  They were

5    required to be available, they were at CSC or the client's

6    disposal 24/7 for the period of time they were on call.  That

7    would produce a 24-hour-a-day hours, and that would seem

8    appropriate.  26, I agree, says something's wrong.

9              Let me ask you two things:  How many 26-hour-a-day

10   entries are there?

11             MR. GOLDER:  I can't speak to that, Your Honor

12   specifically.  But let me just respond to what the Court just

13   said about "on call" time.  There was no testimony, Your

14   Honor -- and I know the Court knows that there's a specific

15   requirement for "on call" time to be considered working time.

16   You can be on call and not be considered working, and there

17   was no testimony in court regarding meeting the burden of

18   establishing that this "on call" time was considered working

19   time.  There was no instruction to the jury that "on call"

20   time was working time.  There was no issue about

21   off-the-clock work in the trial.  In fact, the issue of

22   off-the-clock work was taken off the table by plaintiffs

23   raising that issue with us, and us -- and defendant entering

24   into a stipulation with the Court.

25             So I don't think the Court can say 24 hours means

1   this individual was working off the clock.  There was no

2   testimony to support that at all.  Certainly no

3   representative testimony at all about this issue.  So I don't

4   think that would be appropriate.

5          Again, the stipulation says plaintiffs -- time that

6   plaintiffs recorded.  And the testimony that we've gotten in

7   deposition is that the time that they worked they recorded in

8   e-TES and MyTime.  They weren't working off the clock.  They

9   were working -- when they were working, they were clocking

10  for it.  That's the testimony we have.  That's what the

11  stipulation says.  So I think it would be inappropriate if

12  the Court all of a sudden decided that individuals testifying

13  who -- these individuals who testified in court -- I think it

14  might have been one person -- Vernon Carre.  I don't think

15  Vernon Carre has this bad issue.  So he's not representative.

16  He was not a representative plaintiff.  He's not

17  representative of anything going on in this California having

18  to do with this data problem.  So we just think that would be

19  highly inappropriate for the Court to do.

20         THE COURT:  Was he the person who testified about

21  when he was assigned to "on call" he would go out shopping

22  and stock up on all of the food he would need for the week he

23  was going to have to be available 24/7 for the defendant?

24  Was that Mr. Carre?

25         MR. GOLDER:  I believe that was, Your Honor.

1          MR. ANTHONY:  Yes, Your Honor.

2          THE COURT:  And I'm not quite sure -- Mr. Golder,

3    are you saying that he wouldn't be entitled to record having

4    worked 24 hours a day?

5          MR. GOLDER:  Mr. Carre, if he was working 24 hours

6    in a day, he can record it.  But he didn't record 24 hours in

7    a day.  Again, the Court is bringing up an "on call" issue.

8    There's a specific legal test that needs to be met to

9    determine whether or not you're "on call" is considered

10   working time, and it goes through the various factors of

11   control and the ability to not take a call and how often it

12   happens and the like.  And that was not an issue in this

13   case.  That was not even testimony that was supposed to come

14   out in this case, because we had stipulated on that

15   plaintiffs are not seeking any off-the-clock time.

16         THE COURT:  Okay.  But why are you calling that

17   off-the-clock time?  If they recorded it as 24 hours a day

18   when they were required to be available all the time -- they,

19   therefore, couldn't take alternative work -- they had an

20   obligation to do this to the exclusion of anything else, and

21   then the type of testimony that Mr. Carre gave.  Why do you

22   call this off-the-clock time when they were required to be on

23   duty?

24         MR. GOLDER:  Your Honor, it's off-the-clock time,

25   Your Honor, if it's not recorded in our time-keeping

1    systems.

2         THE COURT:  Okay.

3         MR. GOLDER:  I don't believe -- and I don't have

4    Vernon Carre's time records in front of me, but I don't think

5    -- I appreciate how he testified in court to engender

6    sympathy, but I don't think he ever tracked 24 hours in a day

7    on his time-keeping reports, and I don't think he would have

8    even testified that he was working 24 hours in a day.

9         And, again, Your Honor, this is not the problem

10   we're talking about.  We're talking about a data problem and

11   we are not talking about "on the clock" or "off the clock."

12        I don't know if the Court is going to somehow assume

13   that people working 26 hours in a day somehow maybe they

14   would be working off the "on call," but there was no

15   testimony regarding this.  There is no evidence regarding

16   this.

17        THE COURT:  I think we can accept, Mr. Golder, that

18   there are not 26 hours in the day --

19        MR. GOLDER:  I'm just making sure.

20        THE COURT:  -- that could have been recorded by a

21   plaintiff in the defendant's time-keeping system.  That's

22   fine.

23        Where, however, are the 24-hour days in the data

24   coming from, other than the plaintiffs having recorded that

25   time?  I mean, you talk about stuff being doubled or -- I

1     mean, I don't understand.  I certainly understand and agree

2     that there is something fluky by coming up with entries that

3     are 26 hours a day.  And that's easy to just winnow those

4     out.  But I think you're also applying this to those entries

5     that are 24 hours a day, and where do those come from?

6           MR. GOLDER:  That's part of the issue that we're

7     looking to uncover, and that's part of the issue that

8     Stephanie McFarlane, who gave note to the Court.  We haven't

9     looked at every single of these multiple time data issues.

10    But, again, Your Honor, we are just trying to do what's

11    consistent with the stipulation and what's consistent with

12    *Mt. Clemens*, which is figure out the time that plaintiffs

13    recorded in CSC's time-keeping system, not with that doubled

14    or tripled.

15          THE COURT:  That's what I'm trying -- I'm trying to

16    explore that with you.  If your system reflects entries by

17    the plaintiffs from time to time of 24 hours a day, then

18    that's consistent with the stipulation, even though you think

19    it reflects a data flaw.

20          MR. GOLDER:  Okay.  I see what the Court is saying.

21    So, Your Honor, the difference is, our time-keeping system

22    does not show 24 hours in a day.  If you look at our

23    time-keeping system, which is what Stephanie McFarlane did,

24    it would show, for example, that that person worked only

25    eight hours and only put eight hours of time in the system a

1    day.  But what happened was, there was an issue with the

2    transfer of the data -- we're not sure why, we're not sure

3    how -- an issue with the data that it was double- or

4    triple-counted.

5         And, again, to the extent this Court doesn't want to

6    adopt the position that we had in our status statements to

7    the Court, then an alternative would be for the parties to

8    continue to meet and confer and figure out this issue like we

9    have figured out other issues, as the Court noted earlier in

10   the call, and get it right and figure out what the hours of

11   work that plaintiffs recorded -- again, that's a quote

12   directly from the stipulation and that's consistent with what

13   *Mt. Clemens* would say, as well -- get accurate information.

14   Not a windfall, not giving plaintiffs more than what they

15   worked for, merely because there was a data issue for a

16   small, small segment of this population.

17        THE COURT:  When you say "a small, small segment,"

18   you seem to say you think it's 12 percent.  That's not so

19   small; is it?

20        MR. GOLDER:  I think 12 percent is pretty small.

21   Your Honor, we did massive amounts of data transfer and

22   massive amounts of data collection in this case.  The fact

23   that there could be at some point along the line some sort of

24   computer error or some kind of human error that caused a

25   problem with 12 percent, I don't think that's surprising,

1   Your Honor.

2          THE COURT:  So you think that where there are

3   multiple entries on a day, that that's where your data

4   retrieval system is doubling or tripling?

5          MR. GOLDER:  Yes, Your Honor.  And, again, Your

6   Honor, it might be that two entries on a day might be okay or

7   not.  But we know that, at least for the employees that

8   Stephanie McFarlane looked at, there was a problem and they

9   were double- and triple-counted.  So we're just trying to

10  figure out what the plaintiffs recorded in our time-keeping

11  systems so we can be true to the stipulation and true to *Mt.*

12  *Clemens*.

13         THE COURT:  How many individuals does your estimate

14  of 12 percent multiple entries translate into in?

15         MR. GOLDER:  We're still figuring that out, Your

16  Honor.  I think we initially thought it was around 50, but I

17  might be more than that.  We're still trying to determine

18  that, Your Honor.

19         THE COURT:  And do you have an actual listing of who

20  those individuals are?

21         MR. GOLDER:  Not in front of me, Your Honor, but we

22  could --

23         THE COURT:  No, no, but --

24         MR. GOLDER:  Again, once we figure out who

25  this -- everyone who is affected by this issue, we can get a

1    list and send it to the plaintiffs, Your Honor.

2              THE COURT:  So if it's only 50 employees, that error

3    drives the multimillion-dollar discrepancy that the parties

4    have?

5              MR. GOLDER:  Yes, Your Honor.  Because when you're

6    working 24 hours in a day, seven days a week -- and, again,

7    if the Court recalls, these are not low-wage earners.  These

8    are individuals making 70, $80,000, when you're tracking at

9    24/7 for weeks on time, that adds up very quickly.  And we

10   put in our status report for the Court about how, even if you

11   just lop off the -- just look at the top 17 people, it

12   accounts for 62 percent of the California overtime in double

13   damages.  So 17 people account for 4.4 million.  The top

14   person is over $600,000.  And if you look at the average for

15   the California class, it's $16,000.

16             So it's clearly an outlier problem.  Clearly a

17   problem -- obviously there's not more than 24 hours in a day.

18   There's a data problem.  This is not hours worked.

19             THE COURT:  Okay.  I'm not bowled over by your

20   single-entry data average as a solution, but let me hear from

21   the plaintiff on why -- on whether they have a basis for

22   disputing that this is a data problem, without regard to when

23   this problem was found -- was discovered.  Mr. Jackson.

24             MR. GOLDER:  I apologize.  This is David Golder.

25   Mr. Jackson, I apologize for jumping in, but I just wanted to

1  point one thing out before plaintiff spoke, which my

2  colleague informed me that it's roughly 260 employees over

3  7100 weeks.

4       THE COURT:  Not 50.

5       MR. GOLDER:  It's more than 50.

6       THE COURT:  It's 271?

7       MR. GOLDER:  It's roughly 260 employees over about

8  7000 weeks.  You know, the --

9       THE COURT:  And that's what the 12 percent is?

10      MR. GOLDER:  Yes, Your Honor.

11      THE COURT:  Okay.  All right.  Mr. Jackson.

12      MR. JACKSON:  Your Honor, I think that latest

13 interchange points out precisely why we entered the

14 stipulation and precisely why the records that CSC gave us 14

15 months ago and have vouched for repeatedly ought to be

16 enforced as written.  CSC had the chance to fix whatever it

17 now claims are errors a long time ago, and let me tell you

18 why precisely that is the case.

19      Mr. Golder just told you that there were 50

20 individuals who were affected by this so-called data error.

21 He then said it was 260 individuals.  We do not know what the

22 next answer will be, neither does Mr. Golder, as he has

23 repeatedly stated they don't know what happened or why.

24      The time to know what happened or why, or whether

25 their data was accurate, was when they produced it 14 months

1    ago and made it the basis of a stipulation that was entered

2    for multiple reasons.  Those reasons include knowability of

3    the damages, speed, and the mechanical nature of the damages.

4    All of which would have been achieved had CSC honored the

5    stipulation and done proper due diligence to give us data

6    that was accurate.

7              They have given us data that they say is accurate.

8    They have given us data that they have repeatedly vouched

9    for, including in front of this court, where they very

10   explicitly said they didn't want us to be able to do any

11   discovery.  They now disavow that in a way that absolutely

12   necessitates discovery on our part if we are, in fact, to

13   protect the class from completely unverified statements about

14   a database that we've never seen when we've been given

15   records which were said to be the hours records 14 months ago

16   and then they were vouched for multiple, multiple times.

17             As to how it cannot be a data entry error, Your

18   Honor, I believe the Court has it exactly right.  There may

19   be some people who entered all of their "on call" time.  That

20   could reflect up to a 168 hours in a week.  And, in fact,

21   depending on how they recorded it -- that is to say, if they

22   worked a shift in some cases, and there's evidence that they

23   did work longer than a 24-hour shift, if somebody worked,

24   say, a 40-hour shift and they recorded that as 40 hours in

25   one lump, then that might show 40 hours on one day, but, in

1  fact -- or multiple entries on one day adding up to 40, but

2  that might be time that was really worked over several days.

3      So even the seemingly anomalous more than 24 hours a

4  day could, in fact, be accurate.  But we know that the "on

5  call" -- and you are correct.  Mr. Carre said he said goodbye

6  to his friends for the weeks that he was working -- that he

7  was working "on call" -- that could be a 168-hour week.

8      And, so, it is entirely plausible that these hours

9  are correct.  More importantly, defendants stipulated they

10  would give us the hours.  They then gave us those hours over

11  a year ago.  They then multiply confirmed that they were

12  correct.  They had an expert report or a report very clearly

13  laying out the way in which we calculated damages from those

14  records in February, and yet didn't say a word -- February of

15  last year -- didn't say a word about these now newly-found

16  so-called data errors.

17      And, so, what we have is a process where they are

18  only late in the game when it saves them substantial amounts

19  of overtime owing to a class which has a jury verdict in

20  December of 2017, only then do they say that there's an error

21  and that they essentially cannot honor their stipulation,

22  that they can't cabin how big the error is, they can't say

23  who it applies to, how it happened or how they will unwind

24  it.  They simply say that we should meet and confer some more

25  in order to come up with something which isn't the records

1  they gave us, presumably absent discovery.  That's not

2  appropriate.  The hours should be calculated from the data

3  that CSC gave us.  If it is not calculated --

4          THE COURT:  Mr. Jackson, when you received data --

5          MR. JACKSON:  Your Honor, if it's not -- I'm sorry,

6  Your Honor, I can't -- I didn't hear you.

7          THE COURT:  I'm sorry.  This doesn't allow the other

8  person to know that the first person is speaking.  My

9  question is --

10          MR. JACKSON:  Yes.  My apologies.

11          THE COURT:  My question is:  The records that you

12  received, did those records anywhere reflect recording more

13  than 24 hours in a single day?

14          MR. JACKSON:  Yeah.  And what we did with those,

15  Your Honor, as we laid out way back in -- a long time ago,

16  and what we've done with them is we have limited overtime in

17  any given day to 24 hours.  If, say, there was an entry of 30

18  hours, we assumed that that was worked time, but worked time

19  from multiple days that was recorded on a single day.  We

20  then moved that to the weekly column.

21          And the only cap that we did is, because legally

22  we're not sure you can have more than 168 hours in a week

23  under the law, although CSC could have chosen in its record

24  to pay someone for more than 168, and perhaps that's what the

25  records reflect, but we capped the week at 168 hours.  So

1    those may be people who are recording their hours, all of

2    their "on call" hours.  It's a minuscule number of records

3    that are over 24, in our estimation.  It's somewhere around

4    300 out of somewhere around 28,000 records -- I'm sorry,

5    weeks.  300 weeks out of 27,500-some-odd weeks.

6         So we could lop off the 24.  The way we dealt with

7    it was to assume that they were worked, and then just move

8    them to the weekly column because we agree there can't be

9    more than 24 hours in a day.  There could, however, be

10   multiple days recorded on a single day.

11        But back to the nut.  If, in fact -- and Mr. Golder

12   laid it out.  He said you use the records if they accurately

13   reflect the hours, under *Mt. Clemens*.  What CSC is now saying

14   is that their records they believe don't accurately reflect,

15   so they don't want to honor the stipulation to use the

16   records they provided.  And if that is the case, then each

17   and every member of the class has a right, under *Anderson v.*

18   *Mt. Clemens*, to come and set forth the hours they worked.

19   They get the rebuttal presumption under *Mt. Clemens*, and CSC

20   will have a chance to say why the hours that each and every

21   individual worked are wrong.

22        If what we're looking for is to not honor the

23   stipulation, to not have the damages calculation be what the

24   parties agreed to, which is knowable, speedy, mechanical.

25   If, in fact, what we're looking for is that each and every

1  person have the right to come in and say exactly the hours

2  they worked, we can do that.  We have done that before.  I

3  would note that in the instance where we did it, in the

4  Farmer's case, we reached agreement on -- of about a thousand

5  people, we reached agreement on about 990 of them and had

6  hearings for ten of them, which took about two hours a piece

7  and somewhere around 15 to 20 hours totals.

8         So we can do that process.  It will require

9  discovery.  It will require the records of each and every

10  class member.  It will require that we get their individual

11  HR jacket.  It will require some hearings.  It will require

12  thousands of hours of attorney time.  But if we're not

13  honoring the stipulation, that is, in fact, the alternative,

14  an order of a Special Master in order to run through each and

15  every person.  We can do it.  We will do it, if necessary.

16  But we think the proper course is to honor the agreement that

17  was reached.

18         They had a duty to provide us with the hours that

19  they had recorded.  They had sole access.  CSC had sole

20  access to its own records that it is now claiming that it

21  failed in its due diligence with multiple stops where it

22  could have corrected the so-called errors, including a very

23  clear statement by plaintiff of how we were using those

24  records.  And with that very clear statement, we asked

25  repeatedly that CSC just show its work, that it tell us what

1  it was doing so that we could understand and get this process

2  right quickly and appropriately.  It took a court order that

3  the parties meet and confer for us to even meet and confer

4  where we solved the vast majority of the very minor data

5  issues.  And really the thing left is this hours left, which

6  CSC says we do not want to use the records that we've

7  provided and vouched for.

8          If that is not going to be the process, then the

9  process has to be individualized damages determinations.  As

10  I noted, we entered the stipulation as a compromise.  We

11  planned a trial around it.  We planned our evidence around

12  it.  And we did it for knowability, speed and in order to

13  make this process mechanical and straight-forward.  It's not

14  a stipulation that doesn't reflect compromise on our part.  I

15  assume it reflects compromise on CSC's part.

16          THE COURT:  So let me understand -- let me

17  understand what you're saying.  There is a large bulk of the

18  class, for which there is not a data problem.  In other

19  words --

20          MR. JACKSON:  I don't know that that's the case.

21          THE COURT:  Well, if there are -- what did you tell

22  me, 27,000 class members?  They say only 12 percent had

23  multiple entries of hours per person per day.  That leaves

24  the others that we can just -- you can just use the data that

25  you have, because there's no challenge to it.

1            If, in fact -- and I really do find it very

2    surprising that the defendant doesn't know whether its 50

3    people or 260 people who constitute this number of 12

4    percent.  But if, in fact, it is either of those, that is a

5    more -- is that not a more doable universe, to send out to

6    those individuals a copy of the weekly -- their weekly

7    entries into the e-TES or MyTime system and ask them to --

8            MR. JACKSON:  Your Honor --

9            THE COURT:  -- confirm or refute?

10            MR. JACKSON:  Your Honor, I would note that there

11    are about -- so it's a huge number of individuals.  I'm

12    hearing 260 individuals.  And it should not be limited to

13    just those individuals, because, in fact, what we're hearing

14    is there may have been data errors up and down the line.  We

15    don't know what due diligence was done.

16            And, in fact, the only data error that CSC is

17    raising is one that saves them ten million dollars in owed

18    wages.  There may, in fact, be errors in the earlier data,

19    which we are unable to fully test.  We agreed to it by

20    stipulation as a matter of expedience for the class and for

21    the individuals, in order to get their decision made and to

22    get them their money in their pocket as soon as possible.

23            If, in fact, CSC -- it can't disavow only the data

24    which costs it money.  If its data is not good, then the

25    stipulation has not been honored.  That they waited 14 months

1    and only when it saves them a vast amount of money is simply

2    deeply prejudicial and not appropriate.

3         If we're going to throw out CSC's data, then it

4    should be thrown out and each and every individual -- and let

5    me give you the example of Vernon Carre.  Mr. Golder said

6    Mr. Carre did not record his "on call" time, so that he is

7    actually not being paid under the stipulation for all of the

8    time that is not recorded and not requested in their data.

9    So, presumably, CSC agrees that that is accurate.  That,

10   however, may not be accurate.

11        It is, in fact, the case that Mr. Carre may want to

12   be paid for that time, but agreed, in order to make things

13   work, that there be this stipulation, which is knowable,

14   mechanical and fact.  Once it is not that, then Mr. Carre has

15   every bit of right to challenge his finding based on their

16   data as everyone else, because that data is, according to

17   CSC, unreliable, and, more importantly, CSC has actually

18   repudiated the stipulation that it made as a compromise.

19        They can't have only the benefit of that compromise

20   and none of the downside of it.  That simply is unfair.  It

21   deeply would prejudice plaintiffs.  It deeply changed how we

22   tried the case.  It deeply changes a number of things.

23        And, so, no, we don't think that that makes it more

24   doable.  That's not something we think is appropriate.  You

25   either throw out the data and Mr. Carre gets to come in and

1    talk about his 168-hour week where he didn't see his friends
2    and he stayed waiting to do the work that CSC required of
3    him, and he is paid for all that time.  Not just the people
4    who recorded that time that they're now claiming is a data
5    entry.
6           So either we go back and look at all these records
7    and look at all of the accuracy of the individuals.  *Mt.*
8    *Clemens* says where they're not reliable records -- and CSC is
9    facially telling you these records are not reliable.  We
10   don't know why, but they're not reliable.  That applies to
11   all of CSC's data, not just the data that saves them money.
12          MR. GOLDER:  Your Honor, could I --
13          THE COURT:  Let me ask a question.  Mr. Golder, I am
14   looking back at Ms. McFarlane's affidavit, and I don't see
15   any date on which she performed this sampling.  She signs her
16   affidavit January 16, but, surely, since the issue of damages
17   has been in play at a minimum since December of 2017, work
18   had been done on this database.
19          When did you put Ms. McFarlane on the task of
20   looking at these entries for -- what was it nine people?
21          MR. GOLDER:  Yes, Your Honor.  It was recent.  The
22   individual who we were connecting with at CSC is no longer
23   with the company.
24          Your Honor, I need to respond to a few things that
25   Mr. Jackson said.  In terms of defendant knowing whether it's

1    50 or 260, we do know.  I, Your Honor, do not know.  Nate

2    Austin has been more involved with the data collection issue,

3    so he knows the answer, which is why I said 260.

4          Also, Your Honor, we are not saying that the e-TES

5    records -- we're not saying that the e-TES time and the

6    MyTime is inaccurate.  What we are saying is that there was a

7    problem with the data transfer.  That's what we're saying.

8    We're not disavowing the stipulation.  We are -- the

9    stipulation says it's based on the hours of work that

10   plaintiffs recorded, recorded in the system.  Not duplicate

11   entries, not something that happened in a data transfer

12   issue.

13         We are honoring the stipulation.  We are honoring

14   *Mt. Clemens*.  We are not saying the e-TES and MyTime is

15   inaccurate.  We're saying that for a small percentage of the

16   data that got transferred to plaintiffs, it's inaccurate and

17   we're looking to resolve the issue to determine what is

18   accurate so the individuals can get time worked.

19         Mr. Jackson presents this Court with a false

20   choice -- either we accept the stipulation and people are

21   working 26 hours in a day or we have individualized damages

22   hearings and trials for 260 people.  And that's not the case,

23   Your Honor.  We would object to that, because, again, part of

24   the issue with the stipulation was plaintiffs were getting

25   away from the individualized damages issue that threatened

1  the class.  And if we go back to that, then we would argue

2  that the class is not proper for that reason.  But, in any

3  event, the issue can be resolved by us reviewing the

4  information with our client and continuing to meet and

5  confer.

6        And I know the Court and plaintiffs have said it's

7  been a long time since the trial, but we are still here today

8  dealing with issues, going back and forth and making sure

9  that we're getting the information right.  Just because this

10 problem is something that has a huge monetary consequence

11 doesn't mean it shouldn't be on the list of things that we're

12 trying to figure out and trying to figure out in doing right.

13        THE COURT:  So when are you going to reach an end

14 point when you can say, Okay, we got it all figured out, this

15 is the data, we'll just run with this data?  When is that end

16 point going to come?

17        MR. GOLDER:  I'm sorry, Your Honor.  I didn't mean

18 to cut you off.  But we've been talking with our client and

19 we're hopeful that this process -- we can figure this out in

20 the next 30 to 60 days.  But, again, we're working with our

21 client to make this happen.

22        THE COURT:  So when you say --

23        MR. JACKSON:  Your Honor --

24        THE COURT:  -- the problem is a data transfer, that

25 suggests to me that you can go back a generation or two in

1   what your work has been and get the original data that would
2   constitute the hours of work that the plaintiffs recorded.  I
3   realize that sounds a little simplistic, but what's wrong
4   with it?
5        MR. GOLDER:  I think that's -- I'm not entirely sure
6   what the Court is saying, but I think that's what we're
7   trying to do, Your Honor, is we're going back to the
8   time-keeping systems and figuring out what it was that these
9   individuals recorded; again, to figure out what it is that
10  they actually worked.
11       THE COURT:  What does that look like?  I mean, I
12  gather that the employees enter online their hours each week,
13  that that is then recorded and compiled, and then we advance
14  several generations to how that data is massaged.  Can you go
15  backwards?
16       MR. GOLDER:  I believe so, Your Honor.  And that's
17  what we're trying to do with our client.
18       MR. JACKSON:  Your Honor, Todd Jackson here.  In
19  February -- on the 16th of February, 2018, in Document 452
20  filed before this Court, CSC last's line on page 3 of that,
21  before the signature, is:  "CSC is investigating some SAs who
22  have unusually high damages awards to determine if there's
23  any reason for these anomalies that is causing an improper
24  overpayment."
25       That is a year ago, Your Honor, and not a peep.  And

1     there is something fundamentally wrong with the idea that

2     they can go back into records, which we have never had a

3     chance to understand what they are now doing.  If they are,

4     in fact, to go back in records, we have to do discovery on

5     every step of that, in order to do the proper step by our

6     clients.  And we have to do it for all of the data in all of

7     its iterations.

8           So, for instance, there were lower hours in some

9     earlier data.  And is that correct and why?  And what process

10    did they use in that?  And was there a data transfer there.

11    We have to go through with a fine-tooth comb every single

12    data transfer if we are altering the stipulation.

13          Let me note this:  While they say it's not a big

14    number of people, there are 683 individuals that we have

15    damages for.  The so-called "data issue" we're now hearing

16    covers 260 of them.  We think it may be somewhere in there;

17    but, again, we can't see.  We're like, What is the data error

18    and how did it happen?  They're telling us that approximately

19    more than a third of the class -- something like maybe 40

20    percent of the class -- has a data error.  That is only the

21    data error, in their estimation, that affects the damages in

22    an upward manner.

23          We have a right, for the remaining 60 percent of the

24    class, to figure out if they made other data errors that

25    harmed that class.  If, in fact, their data is not reliable,

1   then the only appropriate thing to do is do the process that

2   they are describing, because it's going to take a long time

3   for them to unwind whatever mistake they claimed they made,

4   and it's going to take us a long time to make sure that they

5   didn't unwind -- that they didn't in different ways make a

6   bunch of other errors.

7          If we're doing that with all of this data and not

8   just the data that benefits them by saving them money, then

9   we should do it for everyone.  That will be a long discovery

10  period.  We will be another year out.  The core of the

11  stipulation, which was knowability and it being mechanical

12  and fast will have been lost at that point.  And at that

13  point it is more effective and probably even more efficient

14  to simply do damages for each and every one of the 683

15  people.  Where, in fact, there is strong evidence that their

16  data is reliable for any of those people, or accurately

17  records hours, et cetera, but then we would use -- that

18  data will probably get used.  If not --

19          THE COURT:  I'm sorry.  Could you just back up and

20  repeat that last sentence?

21          MR. JACKSON:  Yes.  February 16th of 2018, Document

22  452, the sentence was:  "In addition, CSC is investigating

23  some SAs who have unusually high damages awards to determine

24  if there is any reason for these anomalies that is causing an

25  improper overpayment."

1          That, presumably, is this issue.  They knew about

2     that a year ago.  Why it wasn't solved then just a few months

3     after they provided the data, we do not know.  We do now

4     deeply wonder if there are other errors in this data that

5     have not come to light.  We can't see into that data.  So

6     they have known, and they have done nothing and now suggest

7     that we should revisit only that data which costs them money.

8          THE COURT:  Okay.  All right.  Counsel, we're

9     getting a little repetitive here.

10         MR. GOLDER:  Yeah, Your Honor.  This is David

11    Golder.  I''d like to respond, if I may, to a couple

12    things.

13         THE COURT:  Not repetitively.

14         MR. GOLDER:  First, Your Honor, again, we're not

15    looking to alter the stipulation.  We are not saying that

16    e-TES time and MyTime is inaccurate.  That's not what we're

17    saying.  And, again, what we're hearing is questions of

18    diligence but not actually saying that their clients are

19    working 26 hours in a day.

20         Again, Your Honor, we can look at this information,

21    and we might be even able to look at everyone, if plaintiffs

22    are looking for us to do that.  And, again, we shouldn't let

23    the tail wag the dog here, Your Honor, meaning we appreciate

24    that it's a very large number, but we should also appreciate,

25    Your Honor, that there is clearly a problem here.  Clearly a

1    problem that runs counter to what the stipulation says,

2    counter to what *Mt. Clemens* says, and it's a problem that we

3    should uncover and figure out what happened and get it right.

4         Again, just like we're figuring out these other

5    damages issues at this late stage in the game, we can

6    continue to do that with this.  We're close to resolving all

7    these issues, and we think we can resolve all these issues

8    cooperatively.

9         I don't think it's appropriate at this late stage of

10   the game, when we're in the midst of resolving all these

11   issues, to say, Okay, that's it, we've had enough time, we

12   should say 24 hours for these people who clocked less than

13   that but had duplicate entries.

14        THE COURT:  So here's what I think we should do.  I

15   think that if this "identified but mysterious" data transfer

16   error is one that can be uncovered, and the original data can

17   be retrieved and run again without whatever the transfer

18   error was, this may well work out.  This is apart from why

19   it's only happening now.

20        If, in fact -- can I take 45 days as halfway between

21   30 and 60? -- 45 days the defendant is ready to show

22   plaintiffs' expert how they got back to the original data,

23   then we can see if we have a solution that is consistent with

24   the stipulation.

25        The expert from the plaintiff will have to be given

1    access through whoever the defendant is using to identify the

2    data transfer error and reset the clock.  I think it's only

3    fair that that expert chosen by the plaintiff be paid for by

4    the defendant.

5         I think that sounds to me as if it represents a

6    feasible way to not have an identified data problem distort

7    the damages picture.  At the same time, it does not reward

8    the defendant for its lack of diligence in discovering this

9    problem, but it allows us a time frame in which it seems

10   plausible that we can bring the issue to closure.

11        Mr. Golder, how does that appear to you?

12        MR. GOLDER:  Your Honor, I believe -- I'm not

13   entirely sure what the Court is saying.  Are we reintroducing

14   experts?  For Breshears, we had him as an expert and you

15   denied our Motion to Strike and then they withdraw his

16   report, although they're just using all his inferences

17   anyway.  So, are we re-engaging experts?

18        THE COURT:  No, not "experts" plural.  I am

19   permitting the plaintiff to designate an expert who will work

20   with and in conjunction with whoever is doing this data

21   roll-back for you, to be able to ensure that it is being done

22   in a technologically or scientifically satisfactory way.  Not

23   new experts.  This is not inviting a counter-expert.  It is

24   providing the plaintiff and the Court with a way to be

25   assured that whatever more data manipulation that's going on

1    is done in an accountable way so that we can get back to the

2    point that we should have been a year ago.

3           And I don't see why the plaintiff should have to pay

4    for that.  Whether it's Breshears or whoever it's going to

5    be, it's going to be somebody who knows how to analyze the

6    data feed from a run to see where the duplication or

7    triplication seems to have occurred, such that you can go

8    back and eliminate it and have a clean run.

9           What this does is, it means we are not looking back

10   at all the data for all the employees.  That does not seem to

11   be at all a good idea, because if, in fact, we have, as a

12   result of this process, a database that shows the hours of

13   work that the plaintiffs recorded, we're home.  So that's my

14   purpose.

15          MR. GOLDER:  I think that process is fine, Your

16   Honor.

17          THE COURT:  Okay.

18          MR. GOLDER:  Again, we'll find out if we can

19   complete the process within 45 days.  I hope the Court would

20   allow us -- if it turns out that it takes longer than we

21   think or hope, we could report back to the Court in that

22   regard.

23          THE COURT:  What I'm going to do is --

24          MR. JACKSON:  Your Honor --

25          THE COURT:  -- I'm going to give you 60 days.  And I

1    am inclined to appoint a Special Master for you to oversee

2    this.  This Special Master may not have to lift a finger.

3    This Special Master may be involved in a very complex

4    retrieval system.  I don't know.

5          But I would invite recommendations of a Special

6    Master that you would propose, and along with that, get their

7    hourly rate that they would be willing to do this work for.

8          I just -- I think it is not going to be productive

9    beyond now, because it's going to be very technical to come

10   back to the Court directly without having this interim

11   process take place.

12         Mr. Jackson, you wanted to be heard?

13         MR. JACKSON:  Your Honor, yes.  A couple of really

14   key issues for why we don't think this process likely to work

15   well.  And at a minimum, we would like -- because this is new

16   to us, we would like some time to think about it and provide

17   a filing to the Court as to why we're concerned about it, but

18   let me start with the most obvious.

19         We have heard multiple times from defendants that

20   they have, in fact, changed time-keeping systems and that

21   they don't have the original data.  If they do not have the

22   original data, there is no way this process could come

23   anywhere close to being accurate; and, so -- there's huge

24   spoliation issues here.

25         If, in fact, they don't have their original data in

1  its original form and the expert that you're talking about is
2  a data forensic expert who will have to crawl back through
3  every iteration of this data and how it came to be, to make
4  sure that forensic expert is back to the base data as base
5  entered, we have very strong reason to believe that data
6  doesn't exist, according to what defendants have told us so
7  far.  That's issue one.
8      Issue two is, we do believe we have to do it for all
9  the data, because we need to know whether the base data
10  exists, whether that original source entry -- so I think
11  we're talking about a source entry that we don't even know if
12  it exists.  They have databases that they may believe
13  represent those source entries, but we don't -- I'm pretty
14  sure they don't have them, of course that's if what they've
15  told us so far, and we should have the ability to note that.
16  So there's huge spoliation issues.  There are huge issues
17  with whether all of the data is correct.  And if some of it
18  is spoiled, the inference has to be that all of it is
19  spoiled.
20      We actually don't think the data is necessarily
21  wrong, and we think that there's a very simple solution,
22  which Your Honor referred to, which is lop off hours over 24
23  in a day, if you'd like, and then we just use the data that
24  they've vouched for multiple times.  That is an appropriate
25  response to the conduct by defendant, and it is appropriate,

1   given their multiple, clear statements that this data is

2   complete and accurate.

3           It's even more so that they've known for over a year

4   if there was an error and they have not -- after February of

5   2018, they're still telling the Court this data is exactly

6   right.

7           The second part is that we have to have

8   on-the-record deposition ability to test whatever they do.

9           The third is this:  We've spent over a year

10  wrangling this data in the dark, wrangling it without any

11  response from defendants.  We have spent hundreds upon

12  hundreds of attorneys hours, maybe thousands, and tons and

13  tons of time and money manipulating data which they are now

14  disclaiming.

15          At a minimum, in addition, if we have to go through

16  this process, we should be paid for all of our time and all

17  of the expenses that we have incurred.  It simply is

18  outrageous, the conduct, and it harms our clients and really

19  affects their possible due process rights.

20          So we think it's ultimately going to be faster to

21  simply do individual determinations.  Or the Court can, with

22  one order today, just say, Use the hours that are recorded,

23  that have been provided.  We will run that calculation, and

24  you have damages.  Defendants can claim whatever they want

25  after that.

1          But we are deeply concerned about spoliation.  We're

2     deeply concerned about this process leading to a dead end,

3     more delay.  And it really has to be all of the data, in

4     order for us to understand what's happening.  We also have to

5     have discovery on how they're doing this, because they have

6     been facially saying they're making errors, without being

7     subject to explaining those under oath.

8          MR. GOLDER:  Your Honor, this is David Golder.  Mr.

9     Jackson just gave a parade of hypothetical horribles that may

10    or may not happen, and I think the Court's process puts in

11    place a system whereby, if issues come up, that those issues

12    can be raised at the time when they come up.

13         There's no evidence that there's any spoliation

14    issue or anything like that.  And I'm kind of confused that

15    Mr. Jackson thinks it's faster to have individualized damages

16    trials than go through the process that the Court just

17    aligned.

18         THE COURT:  Okay.  Here's what we're going to do.

19    In 60 days, we're going to have the results submitted to the

20    Court from the process that I have proposed that I'm

21    directing the parties to engage in.  The ultimate goal of

22    that process is to find a way back to reasonably trustworthy

23    databases, such that a correct description of hours -- thus,

24    damages -- for the class members can be prepared.

25         We don't need to anticipate that the data is all

1  gone.  We don't have to anticipate that there has been

2  spoliation.  We don't have to anticipate that depositions or

3  other discovery is needed.  That will -- if ever -- become

4  evident from what the plaintiffs' expert, who is essentially

5  accompanying the surgeons in the operating room and seeing

6  what they're doing and being able to recount for the Court

7  whether the process is one that has reasonable reliability.

8  The forensic expert is, in other words, something like an

9  auditor.

10        And I think that this process, which will cost the

11  plaintiffs nothing in expenses or fees -- for now -- is

12  reasonably time-effective, hopefully substantively effective,

13  and we'll see in 60 days whether this idea has been a

14  productive one.

15        That means you need to get me, immediately, your

16  proposed Special Master.  I know you won't agree on that

17  either.  I'm going to ask you -- this is hard -- to try to do

18  it by the end of the day.  And the reason is that I'm going

19  to be unable to attend to your case for about three weeks and

20  I'd like to get this moving.  Okay?

21        Now, the second question that came up is one that

22  related to the records that don't pick up tier information, I

23  gather, immediately from the first evidence of a job title

24  that would show that employee to be a qualified class member.

25  It seems to me this presents a very different issue.  This is

1    not one that relates to the issue of time-keeping for the

2    hours of work but the data that shows what was the job title

3    for the person for whom these entries were being made.

4         This full -- this layer data that you talk about is

5    something I am very surprised to hear about from the

6    plaintiff, because whether or not you've gotten accurate data

7    in the past, you would have been able to pick up gaps in how

8    you ascertain who is in the class, which, presumably, you do

9    from the layer data.

10        So why is this just coming up at this point, when

11   job titles is something that has been in play since the

12   motion for class certification?

13        MR. JACKSON:  We have -- so, after the motion for

14   class certification -- and the answer is, it's not just

15   coming up.  It came up the moment we received underlying

16   data.  The motion for class certification, the information we

17   had there was for the FLSA opt-ins, not for the class

18   members.  We didn't receive all the data around the class

19   members until November of 2017, and then we didn't receive

20   all the hours until shortly after that, in early 2018.

21        So we raised that immediately that -- and this

22   actually goes to the same data issues that have come up.

23   This is not our data; it's CSC's.  CSC, in fact, has this

24   layer data somewhere -- or they've lost it; it's one of the

25   two -- but they have not provided that layer data.  We have

1     been asking for it for over a year, and they simply have

2     refused to cooperate.  There's been total silence on that

3     until very recently.

4            And, so, our concern is, they're saying they don't

5     have certain layer data for people, that they didn't keep the

6     underlying databases.  So this should be subject to the same

7     forensic accounting system.  Either we find the data or, if

8     CSC's records are not reliable on the layer data, then we

9     make an inference that where we have layer data showing

10    they're in the class, that it be used.

11           To put a very clear point on how long we have been

12    pursuing this without any response from defendants, we

13    briefed it in February of 2018.  We briefed this exact issue.

14    We briefed that we were concerned about it.  We've raised it

15    for a long, long time.  There has been a refusal to cooperate

16    in that.  And, so, only after all of that refusal to

17    cooperate and provide that information did we ultimately say

18    we have to make an inference that where we have some layer

19    data showing class membership and overtime hours for those

20    persons the Court should infer that they were members of the

21    class.  Again, that inference can be made right now.  All of

22    these issues can be resolved with two orders right now.

23           But this isn't just coming up.  This is CSC's data

24    that they have refused to clarify, provide or engage with us

25    about until very, very recently, and we briefed it fully to

1  the Court a year ago.

2          This, I think, highlights why we need to be able to

3  do a forensic analysis of all the data.  There have been

4  multiple issues that we've raised that they have not

5  responded to.  It's only now that they're disavowing their

6  own data under stipulations that they've entered.  So, in

7  that 60 days, we hope that the forensic accountant will be

8  able to find the source data for these issues.

9          MR. GOLDER:  Your Honor, this is David Golder from

10  the defendant.  I want to respond to a couple things,

11  hopefully to help the Court understand the scope of what's

12  going on.  Mr. Jackson portrayed a picture, again, that the

13  sky is falling.  But for this issue, we're only dealing with

14  27 people.

15          MR. JACKSON:  It's more than that, Your Honor.  I

16  can -- if Your Honor wants, I can -- it's more than that.

17          Again, the shifting numbers and things involved just

18  highlights that defendants haven't taken a hard look at this

19  data until now and they're gathering advantage from

20  on-the-fly, where they've had notice of these issues for over

21  a year.  And, so, if we're going to subject this to a process

22  of a forensic analysis of the underlying data, then we will

23  do that and we will look at all the data.

24          THE COURT:  So is there some way to take -- you've

25  identified who these 27 people are, Mr. Golder, to the

1   plaintiffs?

2          I didn't hear what you said, Mr. Jackson.

3          MR. JACKSON:  I said we identified them a long time

4   ago.  Over a year ago.  We briefed it to the Court in

5   February.  But it's more than that, I believe.  We need to

6   figure out the exact number.  We're trying to do that now,

7   Your Honor, but it's more people than that.

8          And, again, that limited scope just means that they

9   should have answered this question a long time ago so the

10  Court didn't have to make an inference.

11         THE COURT:  So if we have 27 identifiable people,

12  then as you go through this process, this forensic data

13  analysis, couldn't you keep an eye out for those 27 people to

14  ascertain whether there is anything in that data showing some

15  kind of a change before the system starts picking them up as

16  whatever they're qualifying job title was, so that you can

17  tell --

18         MR. JACKSON:  We could, Your Honor, and will.

19  There's 89 of them, is what we believe.  It's not 27.  Again,

20  we're deeply concerned about the shifting numbers from

21  defendant on this.  But we will keep an eye out on all of the

22  data, because we'll have to go through all of the data as

23  part of the forensic process to figure out --

24         THE COURT:  All right.

25         MR. GOLDER:  Your Honor, I just want to make a note.

1     I appreciate Mr. Jackson is trying to paint a picture of us

2     in a poor light, but I'll remind the Court that they

3     proceeded to trial with the data that showed this issue of

4     whether people were in or out of the class and didn't raise

5     it until after the case was over -- the trial was over.

6              THE COURT:  Okay.  What we have now is an imperfect

7     database from which to calculate, A, hours worked, and, B,

8     membership in the class.  This forensic analysis that is

9     going on, that the defendant says it's already started to

10    figure out why some anomalies have shown up, can just as well

11    include the examination, once you get back to the original

12    database, of anything that shows a change for these

13    people -- 89 or 27 or some other number -- because if, in

14    fact, there is an unbroken line of an employee logging in

15    hours per day, and then at some point the job title, clicking

16    into the database but no other change in status being noted,

17    then maybe the plaintiffs' inference is a fair one.  I have

18    no way to know.

19             So let's be sure that you include that task, which

20    is -- I am assuming a personnel record reflects personnel

21    changes.  So if a person is moving from one job category to

22    another job category, it would show up.  And if it doesn't

23    show up in the class period, then we'll entertain the concept

24    of the inference that that person, who at some point is in

25    the -- is a class member, was a class member when there is no

47

1   other personnel activity to indicate to the contrary.

2           So put that in the task at hand.  And I would like

3   to have from you a report by March 25.  That report can be

4   the parties, the experts, the Special Masters -- all or some

5   of the above -- but it will give the Court an understanding

6   of what has been determined and what cannot be determined,

7   and we'll make our decisions going forward on how we'll

8   calculate damages based on that.

9           Okay.  Anything else?

10          MR. JACKSON:  What was the date on that, Your Honor?

11          THE COURT:  March 25.  Okay?  Anything else that we

12  can take up?  If not, I will leave you to scurrying around to

13  give me Special Master names, which we can act on before the

14  end of the day.  That's a pretty pressured project, I know,

15  but please do your best.  Okay?  Anything else?

16          MR. GOLDER:  Nothing from the defendant, Your

17  Honor.

18          THE COURT:  From the plaintiff?

19          MR. JACKSON:  Not at this time.  Thank you, Your

20  Honor.

21          THE COURT:  Thank you very much.  Have a nice day.

22          Goodbye.

23          (Teleconference concluded, 12:34 p.m.)

24

25

1            COURT REPORTER'S TRANSCRIPT CERTIFICATE

2     I hereby certify that the within and foregoing is a true and

3     correct transcript taken of the proceedings in the

4     above-entitled matter.

5

6                              /s/  Tracy L. Gow
                               Tracy L. Gow, RPR
7                              Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

2014 WL 287586
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Cristino ALMONTE, Plaintiff,
v.
AVERNA VISION & ROBOTICS INC., Defendant.

No. 11–CV–1088S(Sr).
|
Jan. 24, 2014.

**Attorneys and Law Firms**

David R. Addelman, Addelman & Marszalkowski, PC,
Buffalo, NY, for Plaintiff.

Eric Samuel Bernhardt, Jeffrey F. Baase, Rupp, Baase,
Pfalzgraf, Cunningham & Coppola LLC, Buffalo, NY, for
Defendant.

## DECISION AND ORDER

H. KENNETH SCHROEDER, JR., United States
Magistrate Judge.

**\*1** This matter was referred to the undersigned by the
Hon. William M. Skretny, in accordance with 28 U.S.C. §
636(b), for all pretrial matters, including hearing and
disposition of all nondispositive motions. Dkt. # 6.

Currently before the Court is plaintiff's motion for an
order directing the reasonable scheduling and
compensation of plaintiff's expert witnesses for
deposition. Dkt. # 26.

### *BACKGROUND*

Plaintiff commenced this personal injury action in New
York State Supreme Court, Erie County, seeking

compensation for personal injuries sustained in a
workplace accident in Medina, New York on November
19, 2008. Dkt. # 1. The defendant removed the matter to
this Court based upon diversity jurisdiction. Dkt. # 1.
Defendant is a Canadian corporation. Dkt. # 1.

In accordance with the Court's Case Management Order,
plaintiff disclosed his expert witnesses on October 23,
2012. Dkt. # 25.

By e-mail dated December 2, 2013, defendant's counsel
requested proposed dates for the depositions of plaintiff's
occupational safety expert, John Coniglio, and plaintiff's
vocational rehabilitation expert, Alan Winship. Dkt. # 29,
p. 12. Mr. Coniglio is charging plaintiff an hourly rate of
$315 for his services and demands $2,520 per day for an
eight hour deposition, payment required in advance. Dkt.
# 26–2 & Dkt. # 31, ¶ 10. Mr. Winship completed a
vocational/earning capacity evaluation and report of
plaintiff at a cost of $4,200 and demands $1900 for 3.5
hours of deposition—an hourly rate of more than
$540—with an additional $1900 charged should the
deposition extend beyond 3.5 hours, payment required in
advance. Dkt. # 25; Dkt. # 26–2 & Dkt. # 31, ¶¶ 11, 13 &
16.

On December 17, 2013, following discussions regarding
availability, defendant noticed Alan Winship's deposition
for January 16, 2014 and John Coniglio's deposition for
January 20, 2014. Dkt. # 29, pp. 24 & 26. On December
19, 2013, Alan Winship's deposition was rescheduled to
January 15, 2014. Dkt. # 29, p. 32.

By e-mail dated December 20, 2013, plaintiff's counsel
requested advance payment of the deposition fees charged
by Mr. Coniglio and Mr. Winship. Dkt. # 29, p. 35.

By letter dated December 20, 2013, counsel for defendant
objected to advance payment and to the payment of a flat
fee. Dkt. # 29, p. 37. Specifically, counsel noted that Mr.
Winship's flat fee for a half day equated to an hourly rate
of $475,[1] while the hourly rate Mr. Winship charged
plaintiff was $250. Dkt. # 29, p. 37. Defendant proposed
payment in advance of one hour of the hourly rate the
expert charged plaintiff, with the remainder invoiced at
that hourly rate for time actually expended. Dkt. # 29, p.
37.

[1]    It appears that defense counsel calculated Mr.
       Winship's hourly rate by dividing $1900 by 4 hours.

By e-mail dated December 30, 2013, Mr. Coniglio's
deposition was rescheduled to January 10, 2014. Dkt. #

29, ¶ 28. In that e-mail, plaintiff's counsel objected to defendant's demand that plaintiff's expert witnesses reserve time for a deposition without confidence that the time reserved would be compensated. Dkt. # 29, pp. 44–45. Plaintiff's counsel suggested a commitment of two hours with an agreement to reschedule if additional time was needed. Dkt. # 29, p. 45. By e-mail dated January 2, 2014, plaintiff's counsel reiterated: "I am willing to address your request with the witnesses that payment be made within 30 days, but before I do, I am seeking an acknowledgment that you are going to pay them for the time you ask that they reserve." Dkt. # 29, p. 51. By letter dated January 2, 2014, plaintiff's counsel reiterated that if defendant did not wish to pay a flat fee, defendant's counsel should commit to payment for the number of hours it expected the deposition would require, with the understanding that additional time could be scheduled should that estimate prove insufficient, and requested confirmation that defendant would pay the expert within 30 days of the deposition. Dkt. # 26–4.

**\*2** By e-mail dated January 2, 2014, counsel for defendant responded:

> I cannot guarantee how long the depositions will go. However, because you continue to demand that I do so, I estimate that Mr. Coniglio's deposition will last 3–4 hours, Mr. Winship's 2–3 hours.... These estimates are made in good faith, but we do not agree to be bound by them. If we cannot complete the depositions in the time estimated, we would expect to continue the depositions or reschedule them within the constraints of the existing scheduling order. We also will not agree to pay for unused time. Finally, we will pay for reasonable preparation time as required under the FRCP, and we have never indicated otherwise.

Dkt. # 29, p. 56.

By e-mail dated January 3, 2014, plaintiff's counsel advised:

> I am not asking you to guarantee when you will finish the depositions. I understand that you can't provide a guarantee. But there is a difference between asking for a guarantee ... and asking you to allow me to tell the witnesses how much of their time is going to be required and whether they should expect to be paid for the scheduled time. Your refusal to address this specific concern leaves Plaintiff on the hook for the difference between what the witnesses charge and what you eventually agree to pay them. I will try to schedule the witnesses for whatever time you request, 2 hours, 3 hours, whatever, I just need you to commit to paying for that time.

Dkt. # 29, p. 58. By letter dated January 3, 2014, counsel for defendant reiterated agreement to pay plaintiff's expert witnesses their usual hourly rates for the time spent in preparation for and during deposition, but refused to pay a flat fee; to pay in advance; or to pay for time set aside, but not utilized, for deposition. Dkt. # 26–3, p. 2. Defense counsel requested the appearance of Mr. Coniglio and Mr. Winship at their depositions as scheduled. Dkt. # 26–3, p. 2.

On January 9, 2014, plaintiff's counsel advised defendant's counsel that plaintiff's expert witnesses would not appear for deposition until the fee issue was resolved. Dkt. # 29, ¶ 28. Mr. Winship demanded $500 as a cancellation fee, which plaintiff's counsel requests that defendant be ordered to pay. Dkt. # 31, ¶ 18.

### *DISCUSSION AND ANALYSIS*

Plaintiff argues that it is unreasonable to expect retained witnesses to reserve a day for deposition, thereby forgoing other business opportunities, without a guarantee of compensation for the time reserved. Dkt. # 30. Plaintiff notes that he cannot compel the experts to appear for deposition and risks a motion to preclude if they do not appear because of uncertainty as to payment. Dkt. # 30, p. 2. Plaintiff explains that his experts request advance

payment because of prior difficulty obtaining reimbursement following depositions. Dkt. # 31, ¶ 16.

Defendant objects to the expert witnesses' demand for advance payment and payment of a flat fee or payment for time reserved, but not utilized, for deposition. Dkt. # 29. In addition, defendant believes that this motion is premature, arguing that "plaintiff's experts should be deposed, they should submit invoices for their time, and then, only if there is a dispute about the fees, a motion should be filed." Dkt. # 29, p. 4.

**\*3** Fed.R.Civ.P. 26(b)(4)(A) provides that "[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial." Fed.R.Civ.P. 26(b)(4)(E) provides that

> Unless manifest injustice would result, the court must require that the party seeking discovery: (i) pay the expert a reasonable fee for time spent in responding to discovery under Rule 26(b)(4) (A) ...

"The rule and the case law makes it clear that the parties seeking court intervention to determine a reasonable fee for an expert deposition should do so retrospectively—that is, after the deposition has taken place." *Conte v. Newsday, Inc.,* No. CV 06–4859, 2011 WL 3511071, at \*3 (E.D.N.Y. Aug. 10, 2011). In the instant case, however, the expert witnesses' demands for advance payment require Court intervention prospectively.

The underlying purpose of Rule 26(b)(4)(E) "is to compensate experts for their time spent participating in litigation and to prevent one party from unfairly obtaining the benefit of the opposing party's expert's work free from cost." *New York v. Solvent Chemical Co., Inc.,* 210 F.R.D. 462, 468 (W.D.N.Y.2002), *quoting Goldwater v. Postmaster General,* 136 F.R.D. 337, 339 (D.Conn.1991). "In implementing this rule, courts aim to calibrate the fee so that [parties] will not be hampered in efforts to hire quality experts, while [their adversaries] will not be burdened by unfairly high fees preventing feasible discovery and resulting in windfalls to the expert." *Mannarino v. United States,* 218 F.R.D. 372, 374 (E.D.N.Y.2003) (internal quotation omitted).

"Courts expect some reasonable relationship between the services rendered and the renumeration to which an expert

is entitled." *Id.* at 375 (internal quotation omitted). "By its nature, a flat fee runs counter to this principle." *Id.* However, "the expert certainly should be reimbursed for any time during which he was unavailable to do other work." *McHale v. Westcott,* 893 F.Supp. 143, 151 (N.D.N.Y.1995). Accordingly, the Court agrees that defendant should be required to compensate plaintiff's expert witness for the amount of time the expert witness is asked to reserve for the deposition. As defense counsel recognizes, the expert should also be compensated for time spent preparing for a deposition. *Solvent Chem. Co.,* 210 F.R.D. at 471. The Court will not direct advance payment. *See Johnson v. Spirit Airlines, Inc.,* No. CV 07–1874, 2008 WL 1995117 (E.D.N.Y.2008) (expert witness "may not insist on advance payment, and may not set a flat fee before he knows what he will be called upon to do; he may instead charge only a reasonable hourly fee."). Moreover, the Court will not direct payment of a cancellation fee given that the cancellation was nearly a week before the deposition and was occasioned by the need for court intervention in a *bona fide* dispute.

"While a party may contract with any expert it chooses, the court will not automatically tax the opposing party with any unreasonable fees charged by the expert." *Reit v. Post Props., Inc.,* No. 09 Civ. 5455, 2010 WL 4537044, at \* (S.D.N.Y. Nov. 4, 2010). Courts consider the following factors in assessing the reasonableness of a requested fee: (1) the witness's area of expertise; (2) the education and training that is required to provide the expert insight that is sought; (3) the prevailing rates for other comparably respected available experts; (4) the nature, quality and complexity of the discovery responses provided; (5) the cost of living in the particular geographic area; (6) any other factor likely to be of assistance to the court in balancing the interests implicated by Rule 26; (7) the fee being charged by the expert to the party who retained him; and (8) fees traditionally charged by the expert on related matters. *Broushet v. Target Corp. .,* 274 F.R.D. 432, 433 (E.D.N.Y.2011). Absent explanation as to the disparity, and assuming the veracity of defense counsel's statement that Mr. Winship charged $250 per hour for work performed on behalf of plaintiff, the Court finds unreasonable Mr. Winship's hourly deposition rate of more than $540. *See Solvent Chem. Co.,* 210 F.R.D. at 468 (party seeking to be reimbursed bears the burden of demonstrating that the fee sought is reasonable). The Court declines to set a reasonable rate absent additional submissions addressing the factors set forth above and encourages the parties to resolve this issue without further Court involvement.

**Almonte v. Averna Vision & Robotics Inc., Not Reported in F.Supp.3d (2014)**

2014 WL 287586

### *CONCLUSION*

**\*4** For the reasons set forth above, plaintiff's motion (Dkt.# 26), is granted in part and denied in part. Depositions of Mr. Coniglio and Mr. Winship shall be completed by March 28, 2014. Dispositive motions shall be filed by May 16, 2014. If no dispositive motions are filed, the parties shall appear before the undersigned for a status conference on May 29, 2014 at 10:00 a.m.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 287586

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.


Neutral
As of: June 17, 2019 7:25 PM Z

# CA, Inc. v. Simple.com, Inc.

United States District Court for the Eastern District of New York

March 5, 2009, Decided; March 5, 2009, Filed

02 Civ. 2748 (DRH) (MLO)

**Reporter**

2009 U.S. Dist. LEXIS 25241 *

CA, INC., Plaintiff, - against - SIMPLE.COM, INC., WIRED SOLUTIONS, LLC., a revoked Nevada LLC, Defendants.

**Subsequent History:** Objection denied by, in part, Objection granted by, in part, Summary judgment granted, in part, summary judgment denied, in part by CA, Inc. v. Simple, Inc., 780 F. Supp. 2d 196, 2009 U.S. Dist. LEXIS 25242 (E.D.N.Y., Mar. 5, 2009)

**Prior History:** CA, Inc. v. Simple.com, Inc., 2009 U.S. Dist. LEXIS 25240 (E.D.N.Y., Mar. 5, 2009)

## Case Summary

### Overview

In this patent infringement action, the court construed the disputed claim terms. The court construed "content" to mean "any form of digital data stream that may be supplied or sent to a computing system such as a personal computer." Additionally, the court construed the phrase "a layer acts independently of other content within a particular HTML document" to mean that the activity associated with a layer, such as moving or resizing, does not depend on other content within a particular HTML document.

### Outcome

Disputed claim terms construed.

**Counsel: [*1]** For Plaintiff: Samuel F. Ernst, Esq., Robert D. Fram, Esq., Michael M. Markman, Esq., & Leonard Joseph Martiniak, Esq., COVINGTON & BURLING, San Francisco, California.

For Defendants: John P. McEntee, Esq. & David A. Scheffel, Esq., FARRELL FRITZ, P.C., Uniondale, New York.

For Defendants: John E. Lynch, Esq. & Joseph P. Zammit, Esq., FULBRIGHT & JAWORSKI LLP, Minneapolis, Minnesota.

For Defendants: Celeste M. Butera, Esq. & Stephen J. Smirti, Jr., Esq., RIVKIN RADLER LLP, Uniondale, New York.

GALE R. PETERSON, ESQ., Special Master, San Antonio, Texas.

**Judges:** Denis R. Hurley, United States Senior District Judge.

**Opinion by:** Denis R. Hurley

## Opinion

**MEMORANDUM & ORDER**

**HURLEY, Senior District Judge**

### INTRODUCTION

Plaintiff CA Inc. ("CA"), formerly known as Computer Associates International Inc. filed this action for declaratory relief claiming that United States Patents Nos. 6,272,493, 6,434,563 and 6,535,882 (the '493, '563, and '882 Patents respectively) are invalid, unenforceable and not infringed. (Pl.'s 2d Am. Compl.(Dkt. No. 46), at 2-3, 5-6; 3d Am. Compl. (Dkt. No. 631), at P 34.) Defendants Simple.com, Inc. and Wired Solutions, L.L.C. (collectively "Simple") counterclaimed, charging CA with infringing the '493, '563, **[*2]** and '882 Patents. (Am. Answer & Countercl. (Dkt. No. 43), at PP 11-25 & Prayer for Relief P 5.).

By Order dated March 31, 2004, in response to an application by Plaintiff, the Court determined that the appointment of a special master was warranted in the instant case and directed the parties to provide a joint list of three suggested masters. From that list, the Court, pursuant to Rule 53 of the Fed. R. of Civ. Proc., appointed Gale R. Peterson, Esq. as Special Master by Order dated June 2, 2004. That Order provides in relevant part:

> In addition to such non-dispositive matters, any summary judgment motion shall first be presented to the master for a report and recommendation. Moreover, as the instant

case involves patent infringement, all hearings consistent with Markman v. Westview Instruments., 517 U.S. 370, 384, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996), will be held before this master. After such hearing, the master shall issue a report and recommendation regarding all disputed patent claims. In all of these functions, the master shall stand in the stead of the magistrate judge. See Fed. R. Civ. P. 53(g). . . . Review of and appeal from all orders and recommendations, as well as the appropriate standard of review  [*3] shall be governed by Federal Rule of Civil Procedure 72 and the associated case law. See Fed. R. Civ. P. 53(b)(2)(D). The timing of such reviews and appeals shall also be governed by Rule 72 and the associated case law. See id.

(Order dated June 2, 2004 (Dkt. No. 152), at 2-4.)

The purpose of this Memorandum and Order is to address the Special Master's work product from one of his multiple case-related tasks, viz. his March 2, 2006 Report and Recommendation Regarding Claim Construction (Dkt. No. 559) ("R& R"). Some portions of the Claim Construction R & R have not been objected to by the parties. As to those, the Court's review has been for clear error and, having found none, those portions are adopted. Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., 447 F. Supp. 2d 329, 331 (S.D.N.Y. 2006) (citing Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 149, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)); Johnson v. Zema Sys. Corp., 170 F.3d 734, 739 (7th Cir. 1999) ("If no objection or only partial objection is made, the district court judge reviews those unobjected portions for clear error.") (citing Goffman v. Gross, 59 F.3d 668, 671 (7th Cir. 1995); Campbell v. United States Dist. Court, 501 F.2d 196, 206 (9th Cir. 1974)).

Before  [*4] addressing the portions of the R& R which have been objected to, the applicable standard of review and pertinent legal principles will be presented together with an overview of the patents in suit.

## APPLICABLE LAW

### I. Standard of Review

All portions of the R&R that have been objected to shall be reviewed de novo. Fed. R. Civ. P. 72(b); Thomas E. Hoar, Inc. v. Sara Lee Corp., 900 F.2d 522, 525 (2d Cir. 1990).

### II. Claim Construction Standard

The construction of patent terms is a question of law determined by the court. Markman v. Westview Instruments,

Inc., 52 F.3d 967, 983-84 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 372, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). A court must determine the meaning of disputed claim terms "from the perspective of one of ordinary skill in the pertinent art at the time of filing," and in doing so may rely upon a patent's claim language, specification, prosecution history and extrinsic evidence. Chamberlain Group, Inc. v. Lear Corp, 516 F.3d 1331, 1335 (Fed. Cir. 2008); Phillips v. AWH Corp., 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc). Due to their enhanced reliability and the fact that they were made in direct contemplation of the invention, the claim language and patent specification  [*5] are accorded the greatest significance, followed by the prosecution history and extrinsic evidence. Id. at 1318-19.

Claims are the focal point of a patent because they "define the invention to which the patentee is entitled the right to exclude." Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004). The interpretation of disputed terms begins with the claim language itself and its plain meaning to one of ordinary skill in the art. Phillips, 415 F.3d at 1312-13; see also Amgen Inc. v. Hoechst Marion Roussel, Inc., 457 F.3d 1293, 1301 (Fed. Cir. 2006) ("claim construction must begin with the words of the claims themselves"). However, claims do not stand alone; they must be read in light of the accompanying specification and claim terms should "normally" be used consistently throughout the patent. Markman, 52 F.3d at 979; Phillips, 415 F.3d at 1314.

Although the specification is "the single best guide to the meaning of a disputed term," a court may not import "limitations into a claim from the written description." Chamberlain Group, Inc., 516 F.3d at 1335; see also E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1433 (Fed. Cir. 1988)  [*6] (holding that it is improper to read a limitation "into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim"); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (stating that the specification is usually "dispositive[,] . . . the single best guide to the meaning of a disputed term"). Moreover, although a claim is not necessarily limited to embodiments disclosed in the specification, "repeated and definitive remarks in the written description" can be used to refine claim language. Computer Docking Sta. Corp. v. Dell, Inc., 519 F.3d 1366, 1374 (Fed. Cir. 2008) (citing Watts v. XL Sys., 232 F.3d 877, 882 (Fed. Cir. 2000) which states that "repeated and definitive remarks in the written description could restrict a claim limitation to a particular structure"). In fact, when a patentee gives a "special definition . . . to a claim term . . . that differs from the meaning it would otherwise possess . . ." the patentee's "lexicography governs." Phillips,

415 F.3d at 1316; *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("A claim term will not receive its **[*7]** ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history."); *Vitronics Corp.*, 90 F.3d at 1582 ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.") (citing *Markman*, 52 F.3d at 979); *cf. Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1291 (Fed. Cir. 2008) (stating that if a patent "specification does not reveal any special definition for . . . [a term, it must be construed] according to [its] . . . ordinary meaning"). Moreover, unless an embodiment disclosed in the specification was "clearly" disclaimed or found to be "inconsistent with unambiguous language in the patent's specification or prosecution history," it should usually be included when determining claim scope. *Oatey Co. v. IPS Corp*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) (citations omitted); *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1138-39 (Fed. Cir. 2007); *see also id.* at 1138 (eliminating one of twenty-one "preferred" embodiments disclosed among two patent specifications because it was **[*8]** inconsistent with the unambiguous language of the patent specifications) (citations omitted); *see generally PSN Ill., LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1166 (Fed. Cir. 2008) (limiting *Oatey*, stating: "*Oatey* is not a panacea, requiring all claims to cover all embodiments. . . . Likewise, during prosecution, an applicant may have cancelled pending claims but not amended the specification to delete disclosure relevant only to the cancelled claims.").

In addition to the patent claims and the written description, a court may consult the prosecution history while construing disputed claim terms. *See Phillips*, 415 F.3d at 1317. The prosecution history can "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Id.* Moreover, "a statement made by the patentee during [the] prosecution history of a patent in the same family as the patent-in-suit can" further elucidate disputed claim language or "operate as a disclaimer." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007) (citing *Microsoft Corp. v. Multi-tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004)). **[*9]** However, since the prosecution history merely represents "an ongoing negotiation between the [United States Patent and Trademark Office] . . . and the applicant," it "often lacks the clarity [and probative value] of the specification." *Phillips*, 415 F.3d at 1317.

Although a court should attach greater value to intrinsic evidence, which includes the patent's claims, written description and prosecution history, it may also use extrinsic evidence to interpret disputed claim language. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. It can be used to inform the court of the technology, background and nuances related to the disputed claim terms. *Phillips*, 415 F.3d at 1318; *Vitronics*, 90 F.3d at 1644. However, extrinsic evidence is often flawed because it: (1) is not contemporaneous with the patent; (2) may not reflect the understanding of one skilled in the art; or (3) may be biased or generated for the purpose of litigation. *See Phillips*, 415 F.3d at 1318. In fact, "expert testimony at odds with the intrinsic evidence must be disregarded." *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1361 (Fed. Cir. 2005) **[*10]** (citing *Phillips*, 415 F.3d at 1318).

## OVERVIEW OF PATENTS IN SUIT

### I. Summary of the Technology at Issue

The technology claimed in the '493, '563, and '882 Patents is meant to provide, what the patentees term, a windowed content manifestation environment ("CME") within one web browser session on a personal computer. In effect, a CME allows multiple window objects (commonly referred to as windows) to be displayed and used at the same time on one web browser screen. An exemplary CME is displayed below in Figure 2B, [1] from the '493 and '882 Patents. [2]

A CME is created when a user accesses a web page, which then transfers content, including data and software, over the Internet to the user's personal computer. This content **[*11]** is then processed to create a CME, such as the one shown below in Figure 2B, of the '493 and '882 Patents. The CME can also be created by loading software onto the personal computer, via a CD-ROM for example, and then accessing a web page. [3]

---

[1] The Court attempted to ensure that the figures reproduced herein are clear images. Nonetheless, many of the figures contained in this Memorandum are best viewed electronically, *i.e.* on a computer screen, as certain features and colors may not be easily perceptible when reproduced in black and white.

[2] The '493 and '882 Patents contain identical versions of Figure 2B. In fact, the specifications of the two patents are nearly identical. Figure 2B is also reproduced below at page 17.

[3] A CD-ROM is a compact disc used to store data such as software files. Software companies routinely use CD-ROMs to store their large programs. Customers then purchase these CD-ROMS and download the software onto their computers.



**Figure 2B of the '493 and '882 Patents**.

A CME is everything shown on the web browser screen in Figure 2B above as item 201. [4] The CME shown in Figure 2B allows a user to have more than one movable or stationary window within a web browser screen. [5] According to Simple, this is an improvement over the prior art because the claimed invention lets one open, view, and otherwise use multiple windows on the same web browser screen, without requiring content updates over the Internet and without having to go back and forth from one web page to another. For example, a user could hypothetically open the "NEWS" and "TRAVEL" windows, shown above, in the same web browser screen as well as another window featuring [*12] stock quotes. According to the patentees, this would previously have required multiple web browsers and/or content updates over the Internet.

Windows, appearing within a CME, deliver content and can be manipulated by the user. Examples of windows include the "NEWS" and "TRAVEL" boxes, items 203 and 204 in Figure 2B, as well as item 208. Users can also scroll through, close, resize and minimize windows depending upon which module controls, or "MCs," [*13] they select or how they interact with the window. [6] Windows can be freely moved within the

---

[4] A web browser is a program that lets one access web pages over the Internet on a personal computer, laptop or mobile communication device. Examples of web browsers include Microsoft's Internet Explorer, Netscape's Navigator or Mozilla's FireFox. Web browsers are distinguishable from operating systems because web browsers run on top of operating systems, usually with other software programs like word processors, email programs and even another web browser. Word Perfect and Microsoft Word are examples of word processing programs and Lotus Notes is an example of an email package.

[5] The patents in suit refer to windows as window objects. However, to enhance the clarity of this section, the Court will use the term windows instead of window objects.

[6] For example, one could hypothetically launch another window,

---

CME or be tiled. Tiled windows are windows that are adjacent to but can not overlap other windows.

Module controls appear within a control section and let users close, minimize or otherwise operate on windows. The control section usually appears on the top portion of a window and is visually analogous to the top bound portion of a legal pad. In Figure 2B, the control section of the TRAVEL window is the bar/strip at the top of item 203. The left portion of the control section contains the "TRAVEL" title used to identify the window, and the right section contains module controls. As its name indicates, the control section would allow a user to alter window objects using the module controls or move them around by clicking on the control section with a [*14] mouse and then dragging the window to a desired location within the CME. What follows is a detailed analysis of the '493, '563, and '882 Patents.

## II. The Shared Prosecution History of the Patents in Suit

The '493 Patent, entitled "System And Method For Facilitating A Windows Based Content Manifestation Environment Within A WWW Browser," was filed for on January 21, 1999, and issued on August 7, 2001. As initially filed, the '493 Patent contained 47 claims. During prosecution, claims 1 to 13 were granted while the remaining claims were canceled and a "continuation type application" was subsequently directed to the canceled subject matter. (Dkt. No. 366, Ex. 4, Supplemental Amendment to Application No. 09/234,297, at SIM006199, 006081.)

The '563 Patent, entitled "WWW Browser Configured To Provide A Windowed Content Manifestation Environment," is a continuation-in-part of the '493 Patent. The '563 Patent was filed for on December 9, 1999, and issued on August 13, 2002. [7]

The '882 Patent [*15] is a continuation of the '493 Patent and is also entitled "System And Method For Facilitating A Windows Based Content Manifestation Environment Within A WWW Browser." The '882 Patent was filed for on April 26, 2001, and issued on March 18, 2003. All three patents have a related prosecution history and both the '563 and '882 Patents

---

entitled "RENT A CAR" within the CME by clicking on the "RENT A CAR" logo or link in the TRAVEL window, item 203 in Figure 2B. A user could also scroll up and down a window by clicking on the scroll bar, such as the one located on the right side of the TRAVEL and NEWS windows in Figure 2B.

[7] The '563 Patent incorporates application number 09/252,076 by reference. Application 09/252,076 matured into United States Patent No. 6,321,209 (the '209 Patent), which incorporates the '493 Patent by reference.

are subject to terminal disclaimers which cause them to expire on the same day as the '493 Patent. (Dkt. No. 366, Ex. 5, File Wrapper for the '563 Patent, SIM-006395; Dkt. No. 366, Ex. 6, File Wrapper for the '882 Patent, SIM-006950).

## III. The Patents in Suit Share Many Similarities

The patents in suit describe nearly the same subject matter. All three patents are directed to enabling a windows based content manifestation environment within one screen of a web browser. In fact, the '493 and '882 Patents have identical specifications apart from their abstracts. (*See* Markman Tr. 80:10-13.) Notably, the '493, '563, and '882 Patents differ only somewhat in claim scope. The '493 Patent claims an entire system, the '563 Patent claims a specially configured network client and the '882 patent claims a network client, a system and an apparatus. *See* '493 Patent Cl. **[*16]** 1 (claiming a "system"); '563 Patent Cl. 1 (claiming a "network client"); '882 Patent Cl. 1 (claiming a "network client"), Cl. 16 (claiming a "system"), Cl. (claiming an "apparatus"). Notably, the first 15 claims of the '882 Patent are very similar to the claims of the '563 Patent and claims 16 and 17 of the '882 Patent are very similar to claim 1 of the '493 Patent.

Most of the technology described by the patents in suit is similar and stems from the '493 Patent. Accordingly, the Court will discuss these common elements first and then discuss the distinct components found in the '493, '563, and '882 Patents as necessary, to place the disputed patent claims in context.

## IV. Content Transfer Processes Utilized by the Patents in Suit

Figure 1A, reproduced at 14, appears in the '493 and '882 Patents while another almost identical version of Figure 1A appears in the '563 Patent. In all three patents, Figure 1A illustrates the overall system in which server side personnel create content, which is then transferred over an electronic data network, such as the Internet, to a user. Once transferred, the content is processed to facilitate a windows based content manifestation environment in accordance **[*17]** with the patents in suit. The transferred content may include: (1) entire software systems, or portions thereof, used to create windows based content manifestation environments according to the '493, '563, and '882 Patents; (2) software files used to customize "window objects" in accordance with the patents in suit; or (3) data to be delivered to an end user utilizing a windows based content manifestation environment contemplated by the patents in suit. Within the context of the patents in suit, the term window object includes modules,

such as draggable modules ("DMODs") and tiled modules ("TMODs"), as well as layers, such as content display layers.

## A. Window Objects Are a Critical Component of the Content Manifestation Environment Described by the Patents in Suit

Window objects and their behavior within a windowed content manifestation environment lie at the heart of the subject matter claimed by '493, '563, and '882 Patents. Window objects manifest content and are capable of having "control attributes." *E.g.*, '563 Patent, Cl.1, 6. These control attributes allow a user to, among other things, move, resize, minimize and maximize a window object or act upon the content manifested therein. **[*18]** *See, e.g.*, '563 Patent, Cl.1, 6. Window objects can also dynamically "manifest" content and be acted upon without requiring a refresh of the windows based content manifestation environment. *See, e.g.*, '563 Patent, Cl.1, 6. In this context, "refresh" means updating "the displayed web page with the newest content." (R&R at 173.)

## B. How Windows Based Content Manifestation Environments Are Delivered to a User

The purpose of the system shown below is to produce or facilitate a "windowed content manifestation environment," like the ones shown in Figures 2B and 2A of the '493 and '882 Patents, reproduced *infra* at 17 and 22 respectively, and Figure 2 of the '563 Patent, reproduced *infra* at 20, in a "CLIENT SYSTEM" ("client system"). *See, e.g.*, '493 Patent col. 6, ll. 60-64. One example of a client system would be a computer used at home or in the office.



FIG. 1A

**Figure 1A of the '493 and '882 Patents**.

The "SVR SYSTEM" ("server system") in Figure 1A, above, may contain or be associated with a "DATA STORE" ("data store"). *E.g.*, '493 Patent col. 6 ll. 54-60. This data store is used to house "HTML documents and other associated files" used to facilitate a "windows based content manifestation **[*19]** environment." [8] *E.g.*, '493 Patent col. 6, ll. 64-67, col. 11, ll. 19-25, 49-67. Once a particular web site is accessed by a user, certain content files within the data store are transmitted to the client system over the Internet, and then utilized, viewed or executed in a web browser such as Microsoft's Internet Explorer. *E.g.*, '493 Patent col. 7, ll. 1-25.

The specific content transferred from the data store to the client system depends on the claimed invention. While the data store in the '493 Patent may house and transfer the entire software system necessary to provide a windows based content manifestation environment, the data store described by the '563 Patent merely stores and transfers HTML files necessary to deliver data content and construct the appearance of certain window objects in a content manifestation environment. *Compare* '493 Patent col. 7, ll. 1-25 *with* '563 Patent col. 9, ll. 29-53. This is because the '563 Patent details the use of a customized **[*20]** browser that already has the source code for certain components of a windows based content manifestation environment in place while the '493 Patent requires that an entire software system be downloaded from the server system. *Compare* '493 Patent fig. 1A, item 106 *with* '563 Patent fig. 1A, item 106; *see also* '563 Patent col. 9, ll. 29-41 ("[T]he present invention provides a complete console solution. . . . Although, some web code may be downloaded at startup of [a] client system . . . to determine the contents of button bars, etc., the same is parsed for relevant data only . . . ."). On the other hand, the content transferred from the server system to the network client will differ on a claim by claim basis for the '882 Patent. *E.g.*, '882 Patent Cl. 1 (claiming a network client), Cl. 16 (claiming a system).

The embodiments shown in Figures 2B and 2A, reproduced *infra* at 17 and 22 respectively, can be facilitated by software which is locally loaded or sent over the Internet. According to the '493 and '882 Patents, a windows based content manifestation environment may also be "operated by loading a local version of a software package" via "CD-ROM." *E.g.*, '493 Patent col. 7, ll. 26-41. **[*21]** The locally loaded software would "include HTML [files] and scripts" capable of enabling "a windows based CME within a WWW browser client" and "configured to cause the WWW browser client to

access a network site (e.g., a web site, etc.) to download a windows definition." *E.g.*, '493 Patent col. 7, ll. 26-41. An example of a "windows definition" would be "a file or set of files that initialize a set of modules that are displayed within a windows based CME." *E.g.*, '493 Patent col. 7, ll. 26-41.

## V. Embodiments of the Claimed Content Manifestation Environment

Figures 2B and 2A, reproduced *infra* at 17 and 22 respectively, appear in the '493 and '882 Patents while Figure 2, reproduced *infra* at 20, appears in the '563 Patent. All three figures represent "preferred" embodiments of the windows based content manifestation environment claimed by the patents in suit.

## A. Figure 2B, A Windows Based Content Manifestation Environment Featuring DMODs

A visual representation of a preferred embodiment of the '493 and '882 Patents is provided below in Figure 2B. *E.g.*, '493 Patent fig. 2B, col. 5, ll.1-5, col. 10, ll. 33-60. Figure 2B is discussed first since it utilizes draggable DMODs, which are preferred **[*22]** over the tile TMODs shown in Figure 2A, reproduced *infra* at 22. *E.g.*, '493 Patent col. 8, ll. 32-34.



**Figure 2B of the '493 and '882 Patents**.

The numerically labeled items in Figure 2B will be further described below, as necessary. As shown above, the user has accessed a web site with the URL "www.windows-website.com." Once at this web site, the server system housing its content and the software files necessary to implement a windows based content manifestation environment transmits the necessary data over the Internet to the user's web browser client. *See, e.g.*, '493 Patent fig. 1A, col 6, ll. 50 - 67; col. 7, ll. 1-26. Immediately thereafter, a user can view, move, resize, maximize or minimize items 203, and 204, the "travel related content" and "dynamic news feed"

---

[8] HTML is a programming language used to develop web pages. In combination with other programs, such as JavaScript and DHTML, HTML can be used to create the windowed content manifestation environment claimed by the patents in suit.

windows, without requiring a "refresh" of www.windows-website.com. (Simple's Supp. Amendment to Application No. 09/234,927 at SIM-006199; Examiners Reasons For Allowance at SIM-006225; *see also, e.g.*, '493 Patent fig. 5A and 5B, col. 57, ll. 24-65 (illustrating and describing "a process to facilitate window type operations within a WWW browser client")). Items 203 and 204 are DMODs which can be freely **[\*23]** moved within the content manifestation environment of a "WWW browser client." '493 Patent, col. 6, ll. 21-24, col. 10, ll. 17-32.

Along with travel related content and dynamic news feed windows, Figure 2B also shows "a content display layer" and a "set of web site" control and navigation buttons, items 208 and 210 respectively. *E.g.*, '493 Patent col. 9, ll. 2-6, col. 10, ll. 21-32. The content display layer, can be: (1) a "static, always visible window . . . positioned within a WWW browser" content manifestation environment or (2) it can "pop-up," and/or be "draggable." *E.g.*, '493 Patent col. 10, ll. 34-51. In any of these embodiments, the content display layer can be utilized "whenever content not destined for manifestation within a particular window module is to be presented." *E.g.*, '493 Patent col. 10, ll. 34-51. This pop-up functionality is comparable to: (1) "a dialog box [that] pops up in an operating system screen environment when an error condition is realized" or (2) an advertisement that pops up when a particular web page is accessed. *See, e.g.*, '493 Patent, col. 9, ll. 39-44.

Content display layers can also be scrolled through. Scrolling is necessary to "allow [for the] management **[\*24]** of content that extends beyond a bottom edge of a visible area." *See, e.g.*, '493 Patent col. 9, ll. 7-20 (describing the scroll function in modules).

The control and navigation buttons shown below in item 210 are used "to control the appearance and operation of a web site . . . ." *E.g.*, '493 Patent col. 9, ll. 57-60. For example, if one were to click on the "$" symbol shown below, a new window object displaying financial data could emerge within the content manifestation environment, without requiring a refresh of the web site.



Item 210

### B. Figure 2, a Preferred Embodiment of the '563 Patent Featuring DMODs

Figure 2, of the '563 Patent, shown below, depicts a content manifestation environment "provided within a customized WWW browser . . . that has been configured to manifest content within DMOD type window modules that may be freely moved within the . . . [content manifestation environment]." '563 Patent col. 9, ll. 54-59. Figure 2 is quite similar to Figure 2B from the '493 and '882 Patents. As shown below, the user has accessed a web site with the URL, "www.simple.com." Once at the web site, the custom configured web browser client loads the relevant data files from **[\*25]** the server system and creates the windows based content manifestation environment in Figure 2.



**Figure 2 of the '563 Patent**.

Item 202 above contains DMODs for: (1) accessing email; (2) displaying a "city guide . . . feed"; and (3) displaying a "telephone white pages content source," items 204, 206 and 208 respectively. '563 Patent col. 9, ll. 59-65. These DMODs are taught in almost the same manner as the DMODs in the '493 Patent. *Compare* '563 Patent cols. 6-10 *with* '493 Patent cols. 6-9. For instance, item 210, the "SPONSORS" window, is taught in accordance with the '209 Patent, which incorporates the '493 Patent by reference. '563 Patent col. 9, ll. 65-67, col. 10, ll. 1-12; '209 Patent col. 5, ll. 50-60. As a result, items 204, 206, 208, and 210 have a content display area and a control section. They can also receive dynamic data feeds and be acted upon without requiring a refresh of the content manifestation environment.

### C. Figure 2A, a Windows Based CME Featuring TMODs

Figure 2A, shown below, depicts a windows based content manifestation environment featuring TMODs, tiled modules, "arranged in [a] table fashion." *E.g.*, '493 Patent col. 9, ll. 52-56. The parties **[\*26]** have agreed that the term "tiled" means arranged to be adjacent and non-overlapping. (R&R at 82; Defs.' Mem. of Law in Supp. of Summ. J. on Claim Construction (Dkt. No. 365), at 12; Decl. of Chris Martinak in Supp. of the Claim Construction Br. of Pl. CA (Dkt. No. 326), at Ex. 9, Microsoft Press Computer Dictionary (stating that to tile is to "fill adjacent blocks of pixels on the screen with a

design or pattern without allowing any blocks to overlap")).



FIG. 2A

**Figure 2A of the '493 and '882 Patents.**

The TMODs in Figure 2A feature a "content display section," item 242, and a set of "Module Controls." The module controls allow TMODs to be acted upon by the user without requiring a refresh. However, Simple asserts that TMODs cannot be moved freely because they must remain in a tabled structure of rows and columns. The exact behavior of TMODs is in dispute and will be further discussed below. The Court will now describe the modules shown above.

**D. DMOD's and TMOD's Are Used to Embody the Window Objects Critical to Facilitating a CME**

Both DMODS and TMODS have "(1) a control section, and (2) a related content display section." *E.g.*, '493 Patent col. 6, ll. 13-17. However, **[*27]** DMODs represent the "preferred" embodiment of a module because they can "act like any other window such as those within a windows based operating system desktop environment" and can be moved freely throughout a content manifestation environment. *See, e.g.*, '493 Patent col. 8, ll.29-34. An exemplary window module is displayed below in Figure 1D of the '493 and '882 Patents. [9]



FIG. 1D

**Figure 1D of the '493 and '882 Patents.**

The definition of a "control section" is disputed by the parties and will be discussed in greater detail below. What follows is a brief description of module controls and content display sections.

Module controls, as shown below, are found in a control section and appear in both DMODs and TMODs. Module controls, when operated on by "mouse clicks, mouse-overs, double clicks, etc." can cause their associated module to minimize, close, maximize, resize, or launch a help window. *E.g.*, '493 Patent col. 6, ll. 37-44.

 **Module Controls**

For example, if one were to click on the "X" button above, the window object it controlled **[*28]** would close.

Both DMODs and TMODs also have content display sections, as shown above in item 122 of Figure 1D, which can be minimized or restored. In addition, content display sections may also be equipped with "scroll controls," as shown above in item 126 of Figure 1D. Scroll controls may be contained within a "scroll bar," item 128 above. '493 Patent col. 9, ll. 6-21. This scrolling functionality, just as it does in a layer, allows a user to view and manage "content that extends beyond a bottom edge of a visible area." *See, e.g.*, '493 Patent

---

[9] The '563 Patent contains a version of Figure 1D that is almost identical to the one appearing in the '493 and '882 Patents.

col. 9, ll. 7-20.

## VI. Why the Patents in Suit Are Claimed to be an Improvement Over Prior Art

According to Simple, the claimed subject matter of the '493, '563, and '882 Patents is an improvement over prior art because it allows a user to manipulate window objects displaying dynamic content without causing a web site to refresh or stop running. '493 Patent, col. 3, ll. 64-67, col. 4, ll. 1-7; '563 Patent col. 4, ll. 2-22; '882 Patent col. 3, ll. 58-67 - col. 4, ll. 1-15; Resp. & Amendment to Application No. 09/234,297 at SIM006245. User actions do not trigger a refresh because the patents in suit do not deliver content through the use of static [*29] code. Static code is limited because it merely presents graphically-bordered screen sections within a web browser content manifestation window that display content but must be completely re-drawn each time a user-selectable screen-related operation is selected. *See* Resp. & Amendment to Application No. 09/234,297 at SIM006243-47; *e.g.*, '493 Patent col. 3, ll. 25-40. Instead, the '493, '563, and '882 Patents describe a web browser client equipped with "program objects that continuously execute within a browser content manifestation environment." (Resp. & Amendment to Application No. 09/234,297 at SIM006246). Some of these program objects, specifically window objects, can be configured to display other window objects within their content display sections. *E.g.*, '493 Patent col. 6, ll. 16-21. These program objects and their functionality are facilitated by the use of "technologies provided by . . . DHTML (dynamic HTML) [and the] [J]avascript . . ." programming languages. (Response and Amendment to Application No. 09/234,297 at SIM006243).

## DISCUSSION

The parties have raised various objections to the R&R. CA objects to the Special Master's construction of the following terms: (1) "acts [*30] independently"; (2) "content"; (3) "network client"; (4) "executes within"; and (5) "control section." (CA's Objections to Special Master's Report & Recommendation Regarding Claim Construction (Dkt. No. 573) (CA's Claim Construction Objections), at 1-3.) For its part, Simple asserts that the following terms were improperly construed:(1) "window object"; (2) "content"; (3) "continuously manifested"; and (4) "solely contained within." (Defs.' Mem. in Supp. of Their Objections to Special Master's Report & Recommendation Regarding Claim Construction (Dkt. No. 568) ("Simple's Claim Construction Objections"), at 1.) Each disputed term will be addressed below.

In construing the disputed claim terms, the Court will first present the Special Master's construction of the term and then summarize the parties' objections or counter arguments, as necessary. Next, the Court will provide its own analysis of the disputed term. Unless stated otherwise, the Court's analysis will construct the disputed claim term by referring: (1) to the applicable claim language; (2) to the remainder of the specifications and other relevant intrinsic evidence such as the prosecution history of the patents in suit; and [*31] (3) if necessary, to the relevant extrinsic evidence.

Unlike the parties and the Special Master, the Court will address the term "content" before construing any other disputed term. The Court finds this sequence to be analytically consistent with the '493, '563, and '882 Patents since one cannot define a "window object" without knowing the meaning of "content." Specifically, a "window object is a Module or a Layer," and a "layer acts independently of other ***content***." *E.g.*, '493 Patent col.5, l. 64, col, 6, ll. 7-8 (emphasis added). Since understanding exactly what "content" means within the context of the patents in suit informs the definition of a "layer," and subsequently, a "window object," the Court finds it advantageous to construe the term "content" first. The Court will address the remaining disputed terms in the order in which they are addressed in the R&R.

## I. "[C]ontent"

### A. The Special Master's Recommended Construction

The Special Master recommended that the term "'content' . . . should have the meaning provided in the glossary, namely, 'any form of digital data stream that may be supplied or sent to a computing system such as a personal computer,' ***and may include window object [*32] size and position information***." (R&R at 140 (emphasis added to reflect the language added by the Special Master)); *see also, e.g.*, '493 Patent col. 5 ll 46-48. The Special Master also interpreted the intrinsic evidence to exclude, from the scope of "content," data that was not sent from a server to the client computer system. (*See* R&R at 137-38 (stating "the patentees have used the term 'content' to broadly connote most if not all data sent from the server to the client").) Accordingly, under the Special Master's proposed construction of the term, any "size and position information provided by a user via module controls does not appear to be 'content.'" (*Id.*)

### B. The Parties' Objections

The parties object to the Special Master's proposed

construction and propose greatly varying interpretations of the term "content." CA "proposes 'content' be construed to mean 'any form of digital data stream that may be supplied or sent to a computing system such as a personal computer, regardless of the source of that data.'" (CA's Claim Construction Objections at 10.) In essence, though CA agrees with the Special Master's adoption of the glossary definition of the term "content," they disagree with **[\*33]** the Special Master's additional restriction that "content" does not include "'size and position information provided by a user via module controls.'" (*Id*. at 9-10 (quoting R&R at 138).)

Simple asserts that the meaning attributed to "Content" in its patent glossary should not be applied consistently throughout the entire patent. Instead Simple would have the Court apply the glossary definition of "content" only to instances where the capitalized term "Content" is used and apply "its ordinary and customary meaning in the context of the specification" every time the un-capitalized term "content" is used. (Simple's Claim Construction Objections at 4-5.) Specifically, Simple urges that "content" be limited to "text, graphics, or 'media information such as news, data, weather, sports, and the like . . . , things that are displayed within a window object.'" (Simple's Claim Construction Objections at 5-6.) Having summarized the Special Master's proposed construction and the parties' corresponding objections, the Court will put forth its own analysis.

## C. Analysis

The Court's analysis of the term "content" will entail the following steps: (1) constructing the term based upon a review of the claim **[\*34]** language and the specifications of the patents in suit; (2) addressing the Special Master's additional language and modification of the term to exclude size and position information provided by a user; and (3) addressing the arguments raised by the parties.

## 1. According to the Claim Language of the Patents In Suit, the Term "content" Cannot Be Limited to the Information Displayed on Screen

The claim language of the patents in suit clearly establishes that content must include: (1) window object attributes such as size and location; (2) the address of a network client source; and of course, (3) information displayed in a content manifestation environment. According to claim 1 of the '493 Patent, "content" is processed to produce a window object. In this context, "content" includes the attributes of a window object such as size and window position which have been loaded into the host database and then sent to the client side to

determine the appearance of the window object itself. *E.g.*, '493 Patent col. 11, l. 48- col. 12, l. 27. Claims 4, 5, and 6 of the '493 Patent, and claims 9, 10, and 11 of the '563 and '882 Patents all indicate that "information . . . manifested within [a] . . . **[\*35]** window object" as well as the source address of that information fall within the scope of "content" sent to a network client over an electronic data network. For example, claim 4 of the '493 Patent claims:

> The system according to claim 1, wherein said associated ***content includes at least one address of a network content source*** that is configured ***to download information*** to said data processing system via said electronic data network, ***said information to be manifested*** within said at least one window within said content manifestation environment.

'493 Patent Cl.4 (emphasis added). The emphasized claim language clearly indicates that "content" is more than the information displayed on screen. A step-by-step analysis of claim 4 indicates that: (1) a user on a network client receives "content" from a remote server system over the Internet, as per claim 1; (2) this "content" includes the "address of a network content source" and other information that may be displayed on screen; (3) the network client accesses said address and downloads information; and finally (4) the received information is then displayed within a window object. Having reviewed the claim language of the patents in suit, the **[\*36]** court will supplement its construction of the term "content" by referring to the specifications of the '493, '563, and '882 Patents.

## 2. According to the Specifications of the Patents in Suit, the Term "content" Cannot Be Limited to the Information Displayed on Screen

The specifications of the '493, '563, and '882 Patents indicate that: (1) "content" should not be limited to information "displayed within a window object" and (2) it can be received from any source. The specifications of the patents in suit state that "content" can include "window object instructions, content, data, and content stream data." '493 Patent col.7, ll. 64-67; '563 Patent col. 7, ll. 31-40; '882 Patent col.7, ll. 64-67. The specifications of the '493, '563, and '882 Patents also state that "content" can be "received via an electronic data network, from a local hard disk, etc." '493 Patent col. 8, ll. 57-59; '563 Patent col. 8, ll. 30-32; '882 Patent col. 8, ll. 57-59. The use of the term "etc." is noteworthy because it indicates that the patentees' list was not meant to be exhaustive. Consequently, content can be received from other sources besides "an electronic data network . . . [or] a local hard disk." An **[\*37]** example of this additional source would be "a stream of

position data coming from a mouse interface while the user moves the mouse to drag a . . . [window object]" around the claimed content manifestation environment. (*See* CA's Claim Construction Objections at 10.) Having reviewed the relevant intrinsic evidence, the Court will define the term "content."

### 3. "[C]ontent" Defined

The intrinsic evidence before the Court, compels the adoption of the glossary definition of "content," specifically, "any form of digital data stream that may be supplied or sent to a computing system such as a personal computer." *E.g.*, '493 Patent col. 5 ll 46-48. According to the patents in suit, "content" includes but is not limited to: (1) information delivered to a user; (2) window object attributes such as size and location; (3) the address of a network client source; and (4) window object instructions. In fact, the claim language of the '493, '563, and '882 Patents indicates that information displayed on screen is merely a part of what is considered "content." Additionally, "content" can be received from various sources including, but not limited to, an electronic data network and "a local hard disk." *E.g.*, **[*38]** '493 Patent col. 8, ll. 57-59. Since the foregoing descriptors fall within the glossary definition of "content" found in the '493, '563, and '882 Patents, the Court will let the patentees' lexicography stand. Having construed the term "content," the Court will discuss why it disagrees, in part, with the Special Master's recommended construction and address the parties' objections.

### 4. The Special Master Unnecessarily Added Language to the Patentees' Glossary Definition of "content" and Then Incorrectly Modified His Definition of "content" to Exclude Data Supplied By a User

The Special Master was correct in adopting the glossary definition of "content" but his use of clarifying language is superfluous and raises the possibility of confusion. The Special Master recommended that the term "'Content' . . . should have the meaning provided in the glossary, namely, 'any form of digital data stream that may be supplied or sent to a computing system such as a personal computer,' *and may include window object size and position information*." (R&R at 140 (emphasis added).) Although the Court agrees that the term "content" should have the meaning provided by the identical glossaries found in the '493, **[*39]** '563, and '882 Patents, the additional phrase "and may include window object size and position information" is counterproductive because it could be misconstrued as limiting the glossary definition of the term "content." Indeed, the phrase "any form of digital data" already includes "window object size and position information."

The Special Master also improperly limited the term "content"

to exclude data supplied by a user. (R&R at 137-38; Special Master's Report and Recommendation Regarding Anticipation and Obviousness (Dkt. No. 592) ("Anticipation and Obviousness R&R"), at 76.) According to the Special Master, "the patents-in-suit indicate that size and position information provided by a user, *e.g.*, through minimizing and resizing, is not 'content' . . . [because it's] size and position information from a user is not part of 'a digital data stream that may be supplied or sent to a computing system such as a personal computer.'" (Anticipation and Obviousness R&R at 76 (quoting '493 Patent col.5, ll. 46-48); R&R at 137-38.) The Special Master also seems to narrow his definition of "content" to data sent from a server to a client over an electronic data network. (R&R at 137 (stating **[*40]** "the foregoing demonstrates that the patentees have used the term 'content' to broadly connote most if not all data sent from the server to the client").) However, the Special Master's focus on an electronic data network as a source of content directly contradicts statements in the specifications of the '493, '563, and '882 Patents, which provide that "content" can be "received via an electronic data network, from a local hard disk, etc." '493 col. 8, ll. 57-59; '563 Patent col. 8, ll. 30-32; '882 Patent col. 8, ll. 57-59.

The use of the phrase "received via an electronic data network, from a local hard disk, etc." is critical because it demonstrates that the patentees did not intend to limit the sources from which "content" could be received by the network client described by the patents in suit. First, the patents in suit clearly state that "content" can be received from "a local hard drive." If "content" originates from a local hard drive, it is already on the host client/computer and need not have been transferred over an electronic data network. Rather, the "content" could have arrived on the local hard drive: (1) as a result of data entry; (2) after being transferred from a CD **[*41]** ROM or other data storage device; or (3) as a result of certain data processing functions performed on the local hard drive. [10] The foregoing list is in no way exhaustive and could include numerous other entries. In short, "content" found on a local hard disk, as used in the context of the patents in suit, need not be transferred over an electronic data network, such as the Internet. In addition, the word "etc." indicates that: (1) the patentees did not list every source from which "content" can be received and (2) it is possible for "content" to be "supplied" by a user action such as dragging a window object across its content manifestation environment

---

[10] An example of this data processing could be when calculations are performed, which produce a great deal of coordinates and data points as output. These coordinates and data **[*42]** points could then be displayed on screen as a graph or chart.

or even resizing it. [11] As the Court has just shown, explicitly listing every source from which "content" can be received would likely be an exercise in futility. As such, the Court finds that the Special Master incorrectly limited the scope of "content" by indicating that it must be sent over an electronic data network and that it can not be supplied by a user.

According to the Special Master, "the patents-in-suit indicate that size and position information provided by a user, e.g., through minimizing and resizing, is not 'content' . . . [because] size and position information from a user is not part of 'a digital data stream that may be supplied or sent to a computing system such as a personal computer.'" (Anticipation and Obviousness R&R at 75-76 (citing '493 Patent col.5, ll. 46-48) (emphasis in original); R&R at 137-38.) The Court sees no reason to find that the position and size information attributed to a particular window object is no longer "content" once it is altered by a user. (Contra Anticipation and Obviousness R&R at 76 (stating that ". . . [S]ize and position information from a user, such as dragging and resizing based on the window element controls, is not 'content.' However, it appears that window element size and position information not input by a user should be considered 'content.'").) Indeed, position and size information is still "supplied" by a user when she drags a window object across its content manifestation environment. Having assessed the Special Master's construction of the term "content," the Court [*44] now turns to the parties' objections and arguments.

**5. CA's Arguments and Proposed Construction**

The Court agrees, almost entirely, with CA's objections to the

_____

[11] Dragging a window object across its content manifestation environment would produce a string of coordinates, indicating its new position. The coordinates would change for every new location of the window object. Accordingly, dragging a window object can produce a stream of "content" in the form of multiple position coordinate values. For example, a window object can initially be positioned at a value of 100 on the "X" or horizontal axis and 100 on the "Y" or vertical axis. If the new X and Y coordinates were 50 and 50, the act of dragging a window object across a screen would produce coordinate position values from 100 down to 50 for both the X and Y axises.

In addition, when a user resizes a window object, its size information changes. For example, if a window object has size values of: (1) length = 10 and (2) width = 10, these values would be altered every time a user adjusted the size of a window object. However, a user will not likely be able to instantly shrink the size from values of (1) length = 10 and (2) width = 10, to values of (1) length = 5 and (2) width = 5. Rather the data values will likely change incrementally [*43] from 10 to 5.

Special Master's construction of the term "content," but will not go so far as to stray from the patentees' lexicography. CA is correct in asserting that "content:" (1) can include any form of digital data stream and (2) can be sent from any source. (CA's Claim Construction Objections at 9-10.) However, adding the phrase "regardless of the source of that data" is unnecessary since it is already subsumed within the glossary definition of "any form of digital data stream that may be supplied or sent to a computing system such as a personal computer." E.g., '493 Patent col. 5, ll. 46-48.

**6. Simple's Arguments**

Simple's assertion that "content" should be defined differently when it is capitalized is inconsistent with the '493, '563, and '882 Patents. To wit, the capitalized term "Content" is only used four times in the '493 Patent. One instance is the glossary entry for "Content" and another instance is the glossary definition of "Content Manifestation Environment." The other two instances are as the first word of a sentence. However the [*45] un-capitalized term "content" is used hundreds of times throughout the '493 Patent. This pattern of usage is also consistent with the '563 and '882 Patents. Were the Court to apply Simple's reasoning, the only time "content" would have the meaning assigned to it would be the entry in the patent glossary which defines it. In other instances, one of ordinary skill in the art would be left to guess whether "content" had its ordinary meaning or the special definition ascribed to it in the patent specification.

In support of their assertion that the term "content" should be treated differently when it is capitalized, Simple cites _Renishaw PLC v. Marposs Societa' per Azioni_, 158 F.3d 1243, 1249 (Fed. Cir. 1998), for the proposition that "'[w]ithout an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning.'" (Simple's Claim Construction Objections at 5.) However, this reliance is misplaced because _Renishaw_ expressly provides that "where there are several common meanings for a claim term, the patent disclosure serves to point away from the improper meanings and toward the proper meaning." 158 F.3d at 1250. Indeed as Simple has acknowledged, [*46] _Renishaw_ also states that a patentee's own lexicography should govern when she has defined a term "'with reasonable clarity, deliberateness, and precision.'" (Simple's Claim Construction Objections at 5 (citing _Renishaw_, 158 F.3d at 1249)); _see also Phillips_, 415 F.3d at 1316; _Durel Corp. v. Osram Sylvania Inc._, 256 F.3d 1298, 1303-04 (Fed. Cir. 2001); _Sinorgchem_, 511 F.3d at 1136-39; _Abraxis Bioscience, Inc. v. Mayne Pharma Inc._, 467 F.3d 1370, 1376 (Fed. Cir. 2006); _PC Connector Solutions LLC v. SmartDisk Corp._, 406 F.3d 1359, 1363 (Fed. Cir. 2005). In

this instance, the patentees have clearly defined their terms in a glossary. As such, the Court must look to this definition when faced with the "several common meanings" which can be attributed to "content."

## D. The Court's Ruling on the Term "content"

CA's objection to the Special Master's construction of "content" is granted in part while Simple's objection is denied. The Court defines "content" exactly as the glossaries of the '493, '563, and '882 Patents do, to wit, "any form of digital data stream that may be supplied or sent to a computing system such as a personal computer." *E.g.* '493 Patent col.5, ll.46-48.

## II. "[W]indow [*47] object"

Simple objects to the Special Master's construction of the term "window object," but only as part of its objection to the Special Master's construction of the term "a layer acts independently of other content within a particular HTML document." (Simple's Claim Construction Objections at 1). For reasons discussed in the following section dealing with the phrase "a layer acts independently of other content within a particular HTML document," [12] the Court adopts the Special Master's construction of "window object," as a "module or a layer." (R&R at 139.)

## III. "[A] layer acts independently of other content within a particular HTML document"

The phrase "a layer acts independently of other content within a particular HTML document" is not found in any claim but remains critical to defining the scope of the patents in suit because it defines an embodiment of a "Window Object." The term "Window Object" ("window object") appears in every independent claim of the '493, '563, and '882 Patents. "A window object is a Module or a Layer." *E.g.* '493 Patent col. 5, l. 64. A "Layer" ("layer") is defined in identical glossaries found in the '493, '563, and '882 Patents [*48] as follows:

> A Layer is a WWW browser content display section produced within a content manifestation environment (CME) including, but not limited to, any object within an HTML document that may be scaled, dragged, or otherwise operated upon such as an IMG object, a SPAN object, a DIV object, a form element, etc. and which may be associated with program logic such as within a script,

---

[12] *See infra* § C.3.

etc. A layer has its own properties including, but not limited to, a name, etc. within an HTML rendition model such as those defined by DHTML standards. Additionally, *a layer acts independently of other content within a particular HTML document*.

*E.g.*, '493 Patent col. 5, l. 65 - col.6, l. 8 (emphasis added). Accordingly, construing the phrase "a layer acts independently of other content within a particular HTML document," directly impacts every claim in the '493, '563, and '882 Patents. Having placed the disputed phrase in the context of the patents in suit, the Court will review its proposed constructions.

## A. The Special Master's Recommended Construction

According to the Special Master, "'a layer acts independently of other content within a particular HTML document' means that the activity associated with [*49] a layer, such as moving or resizing, does not depend on other content within a particular HTML document." (R&R at 139-40.) The Special Master's recommended construction was built upon an extensive analysis which included the following steps: (1) construing the term "window object" according to the claim language and specifications of the '493, '563, and '882 Patents; (2) describing the relevant technical background of a "layer" in the context of HTML and DHTML standards; (3) defining the attributes of a layer within the context of the specifications of the patents in suit; and (4) analyzing the source code disclosed in the '493 Patent in order to determine how certain embodiments of the claimed invention would operate in light of the requirement that a layer act independently of other content in the same HTML document. (*Id.* at 90-137.)

After framing the term "window object" in the context of the of the claim language of the patents in suit, the Special Master turned to their specifications. (*See id.* at 90-97 (construing the term "window object" according to claim 1 of the '493, '563, and '882 Patents).) Based on the identical glossaries found in the specifications of the '493, '563, [*50] and '882 Patents, the Special Master defined a "window object" as a "Module or Layer." (*Id.* at 98 (citing '493 Patent col. 5, l. 64; *CCS Fitness*, 228 F.3d at 1366).) Combining the teachings of the specifications with the requirements of the claim language of the patents in suit, the Special Master determined that, at the least, DMODs and TMODs were layers which had to "act independently of other content." Next, the Special Master, construed the term "layer."

As an initial matter, the Special Master established that the patentees' glossary definition of the term "layer" would control. (R&R at 99.) What remained was to resolve the

parties' dispute over exactly how the glossary definition was to be interpreted. In analyzing the definition of the term "layer," the Special Master noted that a "layer" can be placed in the context of "HTML" and have properties as defined by "'DHTML standards.'" (*Id*. at 99-100.) [13] According to the Special Master, associating the properties of a "layer" with DHTML allows a window object to: (1) execute scripts that allow for their "dynamic" modification and (2) be acted upon without necessarily impacting other portions of a content manifestation environment. **[*51]** [14] (*Id*. at 111; *see also id.* at 106-11 (citations omitted).) Having provided a technical overview of HTML and DHTML, as they relate to the patents in suit, the Special Master turned to the specifications of the '493, '563, and '882 Patents to analyze the characteristics of a "layer." (*See id*. at 100-11 (discussing the HTML and DHTML standards which informed his recommended construction).)

In order to construe the disputed phrase, "a layer acts independently of other content within a particular **[*52]** HTML document," the Special Master first determined the acts a layer was capable of performing and then determined the scope of the term "independently" as intended by the patents in suit. According to the Special Master, the claim language and specifications of the patents in suit clearly indicate that the acts of a "layer" include: (1) scaling; (2) dragging; (3) resizing; (4) minimizing; (5) maximizing; (6) being made to pop up; (7) being closed; and (8) manifesting and refreshing content such as text, video or sound. (*Id*. at 114-15.) However, the Special Master indicated that it was unclear as to whether or not the acts of a layer included "refreshing or reloading content." (*Id*. at 115-17.) Next, upon consideration of the relevant intrinsic evidence and the acts a "layer" is capable of performing, the Special Master noted that "the word 'independent' in the context in which it is used appears to mean just that -- 'not dependent.'" (*Id*. at 117.) Accordingly, the Special Master determined that "the phrase 'a layer acts independently of other content' merely connotes that the acts of a layer are not subject to control by other content, or do not require or rely on other content." (*Id*.) **[*53]** Next, the Special Master determined whether DMODs

and TMODs "acted independently" as contemplated by the patents in suit.

The Special Master pointed out that there was little dispute over the behavior of DMODs which could be "moved independently ('freely') within the browser CME, *i.e*., without constraint by other content." (*Id*. at 118.) [15] However, the truly debatable issue was whether TMODs "acted independently." (*Id*.) As the Special Master pointed out, the parties agreed that "tiled" means "arranged to be adjacent and non-overlapping" (*Id*. at 119.) In light of the patents in suit, the Special Master proceeded to find that, as a verb, "tile" would be understood as follows by one skilled in the art: "'[i]n an environment with multiple windows, to rearrange and resize all open windows so that they appear fully on the screen without any overlap.'" (*Id*. (citation omitted).) In laymen's terms, window objects that remain tiled could be adjacent to each other but could not be placed or positioned so that they overlap each other. The next step was to determine the behavior of TMODs when they were moved.

The Special Master concluded that, according to the specifications of the patents in suit, TMODs can be defined "'much like a tiled type window provided within an operating system environment,'" such as "'Microsoft Windows.'" (*Id*. at 119-20 (citing '493 Patent col. 6, ll. 25-26, col. 9, ll. 1-6, col. 11, ll. 26-35).) This is significant because of the way in which windows could be "tiled" in Microsoft Windows. (*Id*. at 120.) Specifically, "in the Microsoft Windows environment, tiled windows may be tiled or untiled by the user, and also dragged about the screen." [16] (*Id*. (citation omitted).) This led the Special Master to find that the specifications of the patents in

---

[13] HTML and DHTML are programming languages used to develop web pages. In combination with other programs including JavaScript, HTML and DHTML can be used to create the windowed content manifestation environment claimed by the patents in suit.

[14] "Dynamic" modification includes but is not limited to user actions such as moving, resizing, closing and minimizing window objects within their content manifestation environments. In the context of the patents in suit, the patentees claim that dynamic modification can be done without triggering a "refresh." In essence, DHTML contributes to the ability of a user to manipulate a window object without causing the content manifestation to be reloaded or redrawn.

[15] Once again, in this context, "independently" means "not subject to control by other content, **[*54]** or . . . not requir[ing] or rely[ing] on other content." (R&R at 118.)

[16] The Special Master detailed how windows were tiled in the Microsoft Windows Operating System as follows:

> There seems to be no dispute over how Microsoft Windows worked at the time of invention. Mr. Goodman, for example, has explained that "[i]n Microsoft Windows you can place your cursor on a blank portion of the task bar (the bar with the 'Start' button), right click, and select 'Tile Windows Vertically.' If you run Excel, Word, and Adobe Acrobat applications, and select 'Tile Windows Vertically,' you will end up with a screen * * * showing Excel, Word, and Adobe Acrobat windows tiled across the screen. You can drag and resize any window independently of anything else on the screen." Goodman CC Decl. at P 26. That is, in the Microsoft Windows environment, tiled windows may be tiled or untiled by the user, and also dragged about the screen.

(R&R at 120.)

suit did not "require or even suggest" that TMODs snap into predetermined rows and columns. [17] (*Id.*) In essence TMODs could only behave as tiled windows in the Microsoft Windows operating system, if they were to "act independently of other content," since snapping would require that the movement of a window object be constrained by other content such as position information or other window objects in the same content manifestation environment. The Special [*55] Master then reinforced his conclusion by analyzing the specifications fo the patents in suit.

The Special Master found that according to the specifications of the '493, '563, and '882 Patents, one need only conclude that TMODs are "'arranged in <u>table fashion</u>,' [but] not that [they] . . . are <u>actually</u> arranged in a table or grid." (*Id.* at 122.) The Special Master reviewed the relevant portions of the specification, the relevant figures, such as Figure 2A of the '493 and '882 Patents, *supra* at 22, the relevant source code, such as the "module_draw.js" and "positioning_function.js" files, and questioned Simple's expert witness as to how the patents in suit *specifically* showed how TMODs could be made to snap into a grid formation. (*Id.* at 120-30.) Taking the foregoing evidence into account, the Special Master found that, at best, the ability of TMODs to

---

[17] The Special Master defined the term "snapping" as follows:

> Although the parties do not explicitly say what "snapping" is, they appear to have a common understanding of that term, namely, that automatic alignment into rows and columns, or at [*56] least with respect to other tiled elements, when moved or resized so that all of the elements remain tiled. None of the references at hand define "snapping" *per se*; nevertheless, it seems clear that "snapping" perhaps implies the existence of an invisible "table" or grid arrangement into which window objects are forced to avoid overlap with other windows when dragged about and imprecisely dropped by user. The MICROSOFT COMPUTER DICTIONARY (4th ed. 1999) defines "drag-and-drop" as a verb:
>
> > 2. [T]o perform operations in a graphical user interface by dragging objects on the screen with the mouse. For example, to delete a document, a user can drag the document icon across the screen and drop it on the trashcan icon (Macintosh OS) or in the Recycle Bin (Windows).

(R&R at 118 n. 55.) Indeed, this comports with Simple's understanding of the term as applied to TMODs. "According to Simple, '[b]y definition, tiled window objects cannot be 'freely moved' independently of other window objects,' but rather "snap" into a column and row of a table of window objects,' which sometimes"causes other window objects in a 'column' to be moved.'" (*Id.* at 86-87 (quoting Defs.' Mem. of Law in Supp. of Summ. [*57] J. on Claim Construction (Dkt. No. 365), at 23).)

snap was only implied. However, there was no direct indication or proof of this on the record. (*Id.* at 120-30.) Accordingly, the Special Master found that:

> Overall, . . . the specification does not *per se* disclose or require "snapping" by TMODs, whether in the glossary, description, figures or code. The specification only provides inferences, at best. Nor has Simple pointed to anything [*58] in the prosecution histories of the patents-in-suit that requires TMODs to "snap." In short, the glossary's requirement that a "layer" "act independently * * *" is not inconsistent with the specification's disclosure of TMODs.

(*Id.* at 130.) Since the Court has already discussed the Special Master's proposed construction of the term "content," it will not do so again. Building upon his analysis of the term content, the Special Master concluded that "[t]he phrase 'a layer acts independently of other content within a particular HTML document' means that the activity associated with a layer, such as moving or resizing, does not depend on other content within a particular HTML document." (*Id.* at 139-40.) The parties however, disagree, and propose their own constructions.

## B. The Parties' Objections

CA's "proposed construction would require the acts of the window object neither be affected by nor affect other content." (CA's Claim Construction Objections at 1.) Simple, for its part, attacks the Special Master's definition on various fronts. First, Simple asserts that the Special Master improperly imported a limitation from the specification into a claim term by incorporating the glossary definition [*59] of a "layer" into his construction of the term "window object." (Simple's Claim Construction Objections at 2.) Simple further contends that the Special Master improperly excluded a preferred embodiment of the claimed subject matter, TMODS, by (1) incorrectly broadening the definition of the term "content" and then (2) requiring that "the activity associated with a layer, such as moving or resizing, . . . not depend on other *content* within a particular HTML document." (*Id.* at 6 (emphasis added).)) In addition, Simple asserts that the Special Master failed to consider the acts of refreshing or reloading in reaching his determination. (*Id.* at 13.)

## C. Analysis

Since the parties have not objected to the Special Master's interpretation of "a particular HTML document" the Court need only interpret the phrase "a layer acts independently of

other content." Defining exactly what a "layer" is and how it may "act" form the crux of the matter. The Court's analysis of the phrase "a layer acts independently of other content within a particular HTML document" will entail the following steps: (1) defining the terms "window object" and "layer"; (2) identifying the "acts" which can be performed by or upon [*60] a "layer"; (3) defining the term "independently" in the context of the patents in suit; (4) defining the phrase "a layer acts independently of other content"; and (5) addressing the parties' objections and arguments.

### 1. The Patentees' Glossary Definitions of "window object" and "layer" Control

Federal Circuit precedent and the intrinsic evidence before the Court require that: (1) a "window object" be defined as a "Module or a Layer," and similarly (2) a "layer" be defined according to the glossaries in the '493, '563, and '882 Patents. *Phillips*, 415 F.3d at 1316; *CCS Fitness, Inc.*, 288 F.3d at 1366; *Durel Corp.*, 256 F.3d at 1303-04; *Sinorgchem*, 511 F.3d at 1136-39; *Abraxis Bioscience, Inc.*, 467 F.3d at 1376; *PC Connector Solutions LLC*, 406 F.3d at 1363; '493 Patent col. 5, l. 64 (stating that "A window object is a Module or a Layer."), col. 5, l. 65 - col. 6, l. 8 (defining a layer); '563 Patent col. 5, l. 50, col. 6, ll. 1-13; '882 Patent col. 5, l. 67, col. 5, ll. 51-61. Indeed, it is well established that a patentee's own lexicography will govern claim construction, when she has clearly set out to define a term. *E.g.*, *Phillips*, 415 F.3d at 1316. With identical glossaries in the '493, [*61] '563, and '882 Patents, it is abundantly clear that the patentees sought to provide their own specialized definitions for the terms "window object" and "layer."

The glossaries of the patents in suit fit well within the boundaries of instances where the Federal Circuit has found that a patentee's own lexicography will determine the meaning of a disputed term. For example, in *Sinorgchem*, the patent specification in question stated that a "'controlled amount' of protic material *is* an amount up to that which inhibits the reaction of aniline with nitrobenzene, e.g., up to about 4% H[2]O based on the volume of the reaction mixture when aniline is utilized as the solvent." 511 F.3d at 1136 (emphasis added). According to the Federal Circuit, setting the term apart in quotation marks and following it with the word "*is*" was enough to "clearly, deliberately, and precisely . . . [define] the term 'controlled amount' of protic material as 'an amount up to that which inhibits . . . , e.g., up to about 4% . . .'" and require that the patentee be bound to this definition. *Id.* (emphasis and bracketed text added). Similarly, in *Abraxis Bioscience, Inc.*, the Federal Circuit found that the patentee's lexicography [*62] trumped ordinary usage because a patent specification clearly defined the term "edetate" in the

following passage: "'By the term 'edetate' we mean ethylenediaminetetraacetic acid (EDTA) and derivatives thereof . . . .'" 467 F.3d at 1376 (citation omitted).

In the case at bar, the answer is obvious. The patentees have gone so far as to use a glossary to clearly define a window object as a "Module or a Layer" and then provide a separate definition for the term "layer." *E.g.*, '493 Patent col. 5, l. 64 - col. 6, l. 8. This level of clarity goes well beyond the quotation marks and the term "is" used in *Sinorgchem*. Accordingly, a window object must act as either a layer or module would. Having established that a window object is a "module or a layer," and that a "layer" will be understood as defined by the patentees' glossary, the Court will further inform its interpretation of the term "layer."

### 2. Identifying the "acts" of a "layer"

In order to construe the disputed phrase "a layer acts independently," the Court must first identify the qualities and "acts" of a "layer." In order to define the acts of a "layer," the Court will first identify exactly which "window objects" and embodiments fall [*63] under the scope of the term "layer." According to the specifications of the patents in suit, a layer can refer to a DMOD, TMOD, "Fixed Layer," or "Content Manifestation Layer" used to display information within a content manifestation environment in accordance with the patents in suit. *See, e.g.*, '493 Patent col. 5, l. 65 - col. 6, l. 8, col. 6, ll. 22-36. "Layers," as understood by the patents in suit, include DMODs and TMODs because a "Module" is simply a "layer" with a control section and content display section. *E.g.*, '493 Patent col. 6, ll. 13-21. Accordingly, the acts and properties of a "module" fall under the ambit of the term "layer." (*See generally* Markman Tr. at 74:3-15.) Consequently, a "layer" can, among other things, be: (1) scaled; (2) dragged; (3) minimized; (4) maximized; (5) restored; (6) made to-top up; (7) display content; or (8) made to display content or host a module based on user or module operations. *E.g.*, '493 Patent col. 5, l. 65 - col. 6, l. 8, col. 6, ll. 27-30, col. 10, ll. 33-51, col. 26, ll. 41-47. Having listed the acts of a layer, the Court will construe the term "independently" in the context of those actions.

### 3. "[I]ndependently" Cannot Be Interpreted [*64] in an Absolute Sense Because Actions in One Window Object Can Impact Other Window Objects in a Content Manifestation Environment

The intrinsic evidence before the Court makes it clear that a layer can be impacted by or affect other window objects, but need not have a "global" impact on every other element in a content manifestation environment provided in accordance with the '493, '563, and '882 Patents. Any definition of "acts

independently" can not require absolute autonomy on the part of all layers at all times since: (1) actions in one window object can cause a new layer to "pop-up"; (2) actions in one window object can lead directly to the display of information in another layer; and (3) certain layers are used to display information not destined for other window objects in a content manifestation environment. *E.g.*, '493 Patent col. 6, ll. 27-30, col. 10, ll. 33-52. For example, one embodiment of a "layer" is a "Content Manifestation Layer or CML." *E.g.*, '493 Patent col. 6, ll. 32-36. CMLs can be made to "pop-up" "based on operations occurring within a[nother] Module" in the same content manifestation environment, such as when a user clicks on a link or scrolls her mouse over a **[*65]** certain portion of an active module. *See id*. Another embodiment of a layer is a "Fixed layer or FL," which is a "static, always visible" layer used to display information not destined for other window objects within the same content manifestation environment. '493 Patent col.6, ll. 27-32, col. 10, ll. 33-52. For example, a FL, as described by the patents in suit, could possibly be made to display flight schedules, weather reports or other travel related information if a user were to scroll over the "BOOK A FLIGHT" link in item 203, the "TRAVEL" module, in Figure 2B, *supra* at 17. Accordingly, it is clear that one layer can be impacted by acts performed in another window object.

The specifications of the patents in suit also point out that when a module control is acted upon, it "need not have a global effect on the entirety of the CME in which [a] module . . . is displayed." *E.g.*, '493 Patent col. 8, ll. 46-48. Accordingly, the Court recognizes that a user can minimize, maximize, close, restore, scroll through, or request a help screen from one window object without affecting every other window object in a CME. The Court also recognizes that a user can move, minimize, maximize, resize, **[*66]** or otherwise perform the acts of a layer, without being constricted by or depending on other "content" in the same HTML document. Having identified the functions and properties of a layer according to the specifications of the '493, '563, and '882 Patents, the Court will define the phrase "a layer acts independently of other content within a particular HTML document."

### 4. "[A] layer acts independently of other content within a particular HTML document" Defined

The Court adopts the Special Master's recommendation and finds that the phrase "'a layer acts independently of other content within a particular HTML document' means that the activity associated with a layer, such as moving or resizing, does not depend on other content within a particular HTML document." (R&R at 139-40.) This definition is consistent with the Court's finding that the acts of a layer can be

performed regardless of the other content within a particular HTML document but may have an impact upon other content or window objects within a particular HTML document. (*See also id*. at 117 (stating "the phrase 'a layer acts independently of other content' merely connotes that the acts of a layer are not subject to control by **[*67]** other content, or do not require or rely on other content.").) [18] In short, the Special Master's recommended construction is fully supported by the evidence before the Court. Having defined the relevant phrase, the Court will address the parties' objections and arguments below.

### 5. CA's Argument Is Inconsistent with the Specifications of Patents in Suit

CA's assertion that the "acts of . . . [a] window object neither be affected by nor affect other content" is inconsistent with the specifications of the patents in suit. In light of the fact that the specifications of the '493, '563, and '882 Patents establish that a layer can be made to display content, host another window object or even pop-up based on user actions or merely because other window objects are active within **[*68]** a content manifestation environment, it is clear that a window object is affected by other content. *E.g.*, '493 Patent col. 5, l. 65 - col. 6, l. 8., col. 6, ll. 27-36, col. 9, ll. 39-43, col. 10, ll. 33-51, col. 26, ll. 41-47. However, it is critical to note that one can move, resize, scroll through, close, or otherwise act upon a layer regardless of the other content within a particular HTML document. In short, though a layer can be impacted by user actions upon other window objects in the same content manifestation environment, the acts of a layer cannot be constricted by other content in an HTML document. Having addressed CA's objection, the Court turns to the various issues raised by Simple.

### 6. The Special Master Correctly Applied the Glossary Definition of the Term Window Object as Required By the Specifications of Each Patent in Suit

Simple's argument that the Special Master improperly imported a limitation from the specification into a claim term by incorporating the glossary definition of a "layer" into his construction of the term "window object" is without merit.

---

[18] The Court also agrees with the Special Master's interpretation of the claim language and specifications of the '493, '563, and '882 Patents as to the acts which a layer can perform. These acts, as previously mentioned, include: (1) scaling; (2) dragging; (3) resizing; (4) minimizing; (5) maximizing; (6) being made to pop up; (7) being closed; (8) manifesting content such as text; and (9) playing sound. (R&R at 114-15.)

(*See* Simple's Claim Construction Objections at 2.) The '493, '563, and '882 Patents contain identical glossaries. [*69] Each glossary states that "[a] window object is a Module or a Layer." *E.g.*, '493 Patent col.5 l. 64. Additionally, a "module" is merely a "layer" with a control section and an associated content display section that can host other window objects. *E.g.*, '493 Patent col. 6, ll. 13-21. As such, any embodiment of a window object, as claimed by the patents in suit, must have the properties of a layer. Indeed, the Special Master would be wrong in not requiring that a window object act as a layer. *See, e.g., Phillips*, 415 F.3d at 1316; *CCS Fitness, Inc.*, 288 F.3d at 1366; *Durel Corp.*, 256 F.3d at 1303-04; *Sinorgchem*, 511 F.3d at 1136-39; *Abraxis Bioscience, Inc.*, 467 F.3d at 1376; *PC Connector Solutions LLC*, 406 F.3d at 1363. In yet another attempt to circumvent the cannons of claim construction and the plain language of the '493, '563, and '882 Patents, Simple argues that the term "layer" should not be interpreted consistently throughout any of the patents in suit.

### 7. The Term "Layer" Should Be Given the Same Meaning Regardless of Whether or Not it Is Capitalized

Simple's argument that the Court should ascribe a different definition to "Layer" when it is not capitalized finds no support in [*70] the intrinsic evidence before the Court. (*See* Simple's Claim Construction Objections at 2.) In fact, the patentees' glossary informs its definition of the term "Layer" by referring to it in an un-capitalized format. Specifically, the glossary provides that:

> A **Layer** is a WWW browser content display section produced within a content manifestation environment (CME) including, but not limited to, any object within an HTML document that may be scaled, dragged, or otherwise operated upon such as an IMG object, a SPAN object, a DIV object, a form element, etc. and which may be associated with program logic such as within a script, etc. A *layer* has its own properties including, but not limited to, a name, etc. within an HTML rendition model such as those defined by DHTML standards. Additionally, a *layer* acts independently of other content within a particular HTML document.

*E.g.*, '493 Patent col. 5, l. 65 - col. 6, l. 8 (emphasis added to identify each time the term "layer" is used). The Court finds it implausible that the patentees would choose to refer to a different meaning of the term "layer" in the very paragraph they were using to define the term. Indeed, the intrinsic evidence before the [*71] Court critically undermines Simple's argument. In short, the patentees have defined the term "layer" in a glossary within the patents in suit and this lexicography will govern.

If the Court were to apply Simple's rationale, one of ordinary skill in the art would be forced to guess whether the patentees meant for the term "layer" to have its specially defined meaning or its ordinary meaning in the art. For example, the capitalized term "Layer" is used four times in the specification of the '493 Patent. '493 Patent col. 5, ll. 64-66 ("A window object is a Module or a *Layer*. . . . A *Layer* is a WWW browser content display section"), col. 6, ll. 30-31 ("A Fixed *Layer* or FL is a *layer* having the same behavior as a FSR."); col. 6, l. 32 ("A Content Manifestation *Layer* or CML is a pop-up type *layer* much like a pop-up dialog box that can manifest . . . ."). The un-capitalized term "layer" is used 19 times, five of which correlate to instances where the term "layer" is used to help define other terms within the glossary of the '493 Patent. *See, e.g.*, '493 Patent col. 5, l. 65 - col. 6, l. 8 (quoted *supra*, at 50). As shown below, the glossary entry for the term "module" also contains a reference [*72] to the un-capitalized term "layer."

> A Module (also referred to herein as a Window Module) is a *layer* having (1) a control section, and (2) a related content display section which may be manifested within a CME. A module may be recursively referenced in that a particular module provided in accordance with the present invention may include other modules. In other words, the present invention makes it possible to have window objects within window objects.

*E.g.*, '493 Patent col. 6, ll. 13 - 21 (emphasis added). This pattern of usage is consistent with the '563 and '882 Patents as well. Needless to say, the Court will once again decline Simple's request to add uncertainty to the art of claim construction.

### 8. Since TMODs Are Not Explicitly Disclosed and Contradict the Unambiguous Language of the Patents in Suit, Certain Unproven Aspects of Their Behavior May Be Excluded when Determining the Scope of Patent Claim Language

Simple asserts that the Special Master's interpretation of "acts independently" excludes the embodiment shown above in Figure 2A, *supra* at 22, featuring TMODs. According to Simple, TMODs must "snap into a column and row of a table of window objects." (Highly Confidential Expert [*73] Report of Richard A. Belgard (Dkt. No. 366) ("**HC** Belgard Expert Report"), at ex. 36 P 101.) Simple's expert witness also asserted that this snapping action may cause "other window objects in a 'column' to be moved" so as to keep a tiled appearance. (*Id.*) However, in light of this expert report and the specifications of the patents in suit, the Court sees no way in which a window object can remain tiled **and**

act independently of other content in the same HTML document. Moreover, even if it were necessary for a TMOD to remain "tiled," the Court, like the Special Master, finds no express proof of this behavior in the record. The Court provides its rationale below.

When patent specifications disclose multiple embodiments, claims may be interpreted to exclude embodiments which are "inconsistent with unambiguous language in the patent's specification or prosecution history." *Sinorgchem*, 511 F.3d at 1138 (citing *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1326 (Fed. Cir. 2001); *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1347 (Fed. Cir. 2005)); *see also Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir.1999) (the designation of a particular [*74] embodiment as "preferred" does not itself broaden the claims beyond their support in the specification). Though the Court acknowledges that "'[a] patent claim *should* be construed to encompass at least one disclosed embodiment in the written description portion of the patent specification,'" it is undeniable that the patents in suit fail to disclose TMODs that *remain* tiled. *See Sinorgchem*, 511 F.3d at 1138 (citing *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1355 (Fed. Cir. 1998)) (emphasis added). Moreover, the Court has already construed the disputed claim terms to encompass a content manifestation environment featuring DMODs, one of the preferred embodiments described in the '493, '563, and '882 Patents.

The Federal Circuit's recent decision in *Sinorgchem* is highly analogous to the case at bar. At issue in *Sinorgchem*, was the definition of the term "controlled amount" as it pertained to the quantity of "protic material" necessary to inhibit a reaction of aniline with nitrobenzene. *Id.* at 1136. According to the patent at issue in *Sinorgchem*, a "'controlled amount' of protic material is an amount up to that which inhibits the reaction of aniline with nitrobenzene, e.g., up [*75] to about 4% H[2]O based on the volume of the reaction mixture when aniline is utilized as the solvent." *Id.* (quotations omitted). In a ruling that was vacated and remanded by the Federal Circuit, the United States International Trade Commission held this definition was not controlling for two reasons, the most relevant being that it was countered by an example of a "preferred" embodiment. However, the preferred embodiment was actually one of many disclosed "preferred" examples in two related patent specifications. The example in question related to a reaction of "aniline, nitrobenzene" and another compound under specified conditions, but failed to *explicitly* disclose the amount of water necessary to facilitate said reaction. *Id.* at 1139. Due to this omission, one of ordinary skill in the art would have to perform a calculation to determine the proper amount of water used in the reaction. *Id.* The Federal Circuit reasoned that this inadequately described

embodiment was inconsistent with the unambiguously defined term "controlled amount" and could thus be excluded from the scope of the claimed invention.

Simple's interpretation of how TMODs act is not directly shown or taught by the '493, [*76] '563, or '882 Patents and would run counter to the consistently stated definition of the terms "content" and "layer." Accordingly, the embodiment of a content manifestation environment featuring TMODs that remain "tiled" is inconsistent with the unambiguous language of the patents in suit and may be excluded when determining the claim scope of the patents in suit. Indeed, an analysis of the relevant intrinsic evidence and Simple's expert testimony only reinforces this finding.

The term "layer" can refer to both TMODs and DMODs.

> SPECIAL MASTER PETERSON: Now, let's look at this definition of layer: '… a layer acts independently of other content ….' A layer may be either a DMOD or a TMOD, right, or include a TMOD or a DMOD?
> THE WITNESS [Mr. Richard A. Belgard, Simple's expert witness]: Well, actually a layer is the primitive of DHTML that a TMOD or a DMOD can be constructed of.
> SPECIAL MASTER PETERSON: All right. Point being that a layer can refer to both?
> THE WITNESS: Correct.

Markman Tr. at 74:3-15; *see also, e.g.*, '493 Patent col. 6 ll 13-26. Moreover, the specifications of the patents in suit distinguish DMODs from TMODs by stating that, a TMOD must be "tiled" while a DMOD must be draggable [*77] and freely movable. *See, e.g.*, '493 Patent, col. 6, ll. 21-26, col. 10, ll. 17-32. Yet, there is no mention that TMODs must remain tiled after they are moved. In fact, the specifications of the patents in suit make no reference to modules that "snap" into a pre-aligned grid to remain tiled at all times. Moreover, as Mr. Belgard admits, the patents in suit fail to disclose the programming source code necessary to create an executable embodiment of the claimed subject matter featuring TMODs that remain "tiled." (Markman Tr. at 71:14 - 73:25, 83:24 - 84:11.) Indeed, for TMODs such as those described by Simple to exist, they would potentially have to be repositioned every time they were moved so as to remain adjacent while not overlapping other window objects. Yet, there is no express showing that the source code disclosed in the '493 Patent will even perform this repositioning, as evinced by the following excerpt from the *Markman* hearing.

> Q. [Questions posed by Mr Fram, CA's attorney, on cross examination] Before, you said there were missing parts of the code?
> A. [Answers provided by Mr. Belgard] Yes.

Q. And some of that missing parts of the code affects, as you understood it, the parts [*78] of the code concerning the TMODs that we were looking at; isn't that right?

A. Well, it concerns both. It concerns positioning of the window objects on the screen.

Q. So when something is moving one way or the other positioning, that's what -- that's part of the code that's missing?

A. Yes, some of that code is missing.

(*Id.* at 83:24 -84:11.) In fact, a detailed analysis of the source code referred to by Mr. Belgard, Simple's expert witness, merely *hints* that repositioning *may* occur. *E.g.*, '493 Patent cols. 41-48, 53-58; *see also* Markman Tr. at 71:10-14 ("[T]his is the outer JavaScript that draws the modules on the screen or helps to draw the modules on the screen, and it calls ancillary routines throughout. It's not -- It would be nice if it was fully contained here, but it's not." [19]) As Mr. Belgard, Simple's expert, admits, there are certain JavaScript functions and "routines" which are not disclosed by the '493 Patent but are necessary to position TMODs in a tiled format. (Markman Tr. at 71:10-14.) In short, there is nothing on the record which expressly shows that TMODs must remain tiled or snap into a grid of rows and columns when moved, as suggested by Simple.

The assumption that TMODs snap into place would directly contradict the definition of a layer which must act independently of other "content" in a particular HTML document. The '493, '563, and '882 Patents all state that "content" includes the positioning information of a window object. Ensuring that a TMOD did not overlap but remained adjacent to another window object would require that the act of moving one layer be constrained by the position information of another window object. In the case at bar, just as in *Sinorgchem*, an inadequately disclosed "preferred" embodiment must be excluded from the scope of a claimed invention. In sum, TMODs which remain tiled are not fully disclosed and run counter to repeated and clearly stated language found throughout the patents in suit.

Even assuming that [*80] the TMODs disclosed in the '493, '563, and '882 Patents could "snap" into position after being moved, this would contradict the definition of a layer which must act "independently of other content within a particular

HTML document." Indeed, other window objects would potentially have to be repositioned and the layer being moved would be constrained to snap into a specific location since something that is always "tiled" can be adjacent to but may not overlap other window objects. If TMODs were to snap, the independent acts of a layer would be limited to refreshing since resizing, minimizing, moving and maximizing functions would all be constrained by an invisible grid or the placement of other window objects. (**HC** Belgard Expert Report P 104.) However, the intrinsic evidence makes it clear that a layer can do more than be refreshed. In fact, the Special Master correctly points out that "the patentees consistently described refreshing content as something unnecessary and something that the layers did not cause." (R&R at 115.) In sum, Simple's argument that the Special Master's construction of the phrase "a layer acts independently of other content" is incorrect because it excludes a preferred [*81] embodiment of the patents in suit and is inconsistent with the evidence before the Court.

## D. The Court's Ruling on the Phrase "a layer acts independently of other content"

Having considered the intrinsic evidence, *Markman* hearing transcripts, expert witness reports and technical dictionaries associated with the '493, '563, and '882 Patents, in addition to the parties' objections and counter arguments, the Court concludes that the phrase "a layer acts independently of other content within a particular HTML document" means that the acts of a layer can be performed regardless of the other content within a particular HTML document but may have an impact upon other content or window objects within a particular HTML document. Accordingly, the Court adopts the Special Master's recommended construction of "a layer acts independently of other content within a particular HTML document" and interprets the phrase, as he does, to mean "that the activity associated with a layer, such as moving or resizing, does not depend on other content within a particular HTML document." (R&R at 139-40.) In sum, for a layer to act independently, its acts cannot be constricted by other content in an HTML document.

## IV.  [*82] "[C]ontinuously manifested"

The next contested term is "continuously manifested." At issue are the phrases: "said information to be dynamically and continuously manifested within said at least one window object," which appear in the '493 and '882 Patents, and "said information to be dynamically and continuously manifested within said at least one corresponding window object," which appears in the '563 Patent. *See* '493 Patent Cl. 5; '882 Patent

---

[19] In the testimony [*79] excerpt above, Mr. Belgard is referring to the JavaScript source code that is used to "draw modules" as they appear in the claimed content manifestation environment. (*See* Markman Tr. at 71:10-14.) However, as Belgard points out, the JavaScript included in the specification of the '493 Patent is incomplete because it does not disclose the source code necessary to implement TMODs that remain tiled.

Cl. 10; '563 Patent Cl. 10. The relevant claim language is provided below:

> 5. The system according to claim 1, wherein said associated content includes at least one address of a network content source that is configured to download information to said data processing system via said electronic data network, **said information to be dynamically and continuously manifested within said at least one window object** within said content manifestation environment.

'493 Patent Cl. 5.

> 10. The network client according to claim 6, wherein said content includes at least one address of a network content source that is configured to download information to said data processing system via said electronic data network, **said information to be dynamically and continuously [\*83] manifested within said at least one corresponding window object** within said content manifestation environment.

'563 Patent Cl. 10. In short, the Special Master's recommended construction of the phrase "continuously manifested" is at issue.

### A. The Special Master's Recommended Construction

The Special Master recommended that "'said information to be dynamically and **continuously manifested** within said * * * window object'" be interpreted to mean "that the display of information or content changes over time and . . . [that] information is **displayed without interruption** within 'said * * * window object' **while the 'content display section'** of the 'window object' **is visible**." (R&R at 143 (emphasis added).) The Special Master interpreted the relevant intrinsic evidence to mean that information is to be "manifested" within the content display sections found in window objects. (*Id*. at 142.) The Special Master then used a common dictionary definition of "manifest" as being "'readily perceived by the senses and especially by the sight.'" (*Id*. at 143 n.58. (using an Internet based dictionary to define the term "manifest").) Although the dictionary used by the Special Master did not explicitly limit [\*84] manifestation to visual perception, the Special Master chose to do so. (*Id*. at 143.)

> 'Manifest,' of course, simply means 'readily perceived by the senses and especially by the sight,' and in the context of the claim, the information is to be displayed, *i.e.*, visually manifested to the user. For the information to be displayed, the 'content display section' must be visible to the user. To meet that particular limitation of the claim, therefore, (1) the 'content display section' of the 'window object' must be visible, and (2) the information must be

displayed therein. Put another way, the information is to be manifested within the window object while the content display section is visible.

(*Id*. (footnotes omitted).) Based on this analysis, the Special Master required that information in a content display section be "visible to the user" in order for it to be manifested. (*Id*. at 142-43.) Having summarized the Special Master's recommended construction of "continuously manifested," the Court will summarize the parties' corresponding objections and counter arguments.

### B. Simple's Objection and CA's Counter Argument

Simple asserts that the Special Master "improperly limits the 'continuously manifested' [\*85] requirement on a durational basis to the period while the content display section is visible without any explicit support in the intrinsic record." (Simple's Claim Construction Objections at 15.) Simple goes on to argue that the proper definition of "continuously manifested" should be "displayed without interruption." (*Id*. at 16.) Conversely, CA argues that the Special Master's recommended construction is supported by (1) the plain meaning of the terms at issue and (2) the specifications of the patents in suit. (CA's Resp. to Simple's Objections to Claim Construction R&R (Dkt. No. 583) ("CA's Claim Construction Response"), at 16-17.) Having summarized the parties arguments, the Court will put forth its own analysis.

### C. Analysis

The Court's analysis of the phrase "continuously manifested" will entail the following steps: (1) constructing the term based upon a review of the claim language and the specifications of the patents in suit; (2) addressing the deficiencies in the Special Master's interpretation of the phrase; and (3) addressing the arguments raised by the parties. The Court will focus its analysis on whether the Special Master correctly emphasized the visual aspect of content [\*86] manifestation. Indeed, this issue lies at the heart of resolving Simple's objection.

### 1. The Intrinsic Evidence Before the Court Indicates That Manifestation Should Not be Limited to a User's Visual Perception

A step-by-step analysis of claim 5 of the '493 Patent indicates the following process: (1) a user on a client side network client receives content from a remote server system over the Internet; (2) this content includes the address of a network content source; (3) the network client accesses said address

and downloads information; and finally (4) said information or a portion thereof is continuously manifested within a window object. None of the relevant claim language makes any mention of whether or not information must be seen to be manifested. Accordingly, the Court must turn to the specifications of the patents in suit to determine whether or not information or content must be seen to be manifested.

The manifestation of information should not be confined to visual perception since: (1) user actions may lead to the manifestation of sound; (2) the parties do not dispute that window objects can manifest sound (*see* R&R at 115 (citation omitted)); and (3) window objects are equipped **[*87]** to manifest content which may extend beyond what can be shown at one specific moment. The specifications of the '493, '563, and '882 Patents state that the "manifestation of content is a broader concept than simple screen display." *E.g.*, '493 Patent col. 9, ll. 22-30. For example, a window object may display a hyper-link within its content display section, "to invite a user click to cause sound to be manifested." *Id*. Since neither party disputes this finding, it also follows that a window object can deliver sound as content. *See id*. Additionally, the specifications of the '493, '563, and '882 Patents all describe window objects equipped with a scrolling functionality that allows for the manifestation of content which may extend beyond the visible portion of a content display area. *E.g.*, '563 Patent col. 8, ll. 55 - 61 (specifically mentioning the use of "OCX files and systems to derive a customized WWW browser. . . [capable of supporting] an 'overflow:auto' CSS (cascading style sheet) property which applies to facilitate scroll bars, . . . to allow management of content that extends beyond a bottom edge of a visible area of a selected module"). In short, the specifications of the '493, **[*88]** '563, and '882 Patents clearly indicate that manifestation is more than what is seen.

## 2. "[C]ontinuously manifested" Defined

The Court interprets the phrase "continuously manifested" to mean: delivered without interruption. Accordingly, the phrase "said information to be dynamically and ***continuously manifested*** within said * * * window object" will be interpreted to mean that the display of information or content changes over time and that information is *delivered without interruption* within "said * * * window object." This construction is based on the fact that content need not be seen to be manifested. The patents in suit indicate that content is "any form of digital data." *See* '493 Patent col. 5, ll. 46-48; '563 Patent col. 5, ll. 32-34; '882 Patent col. 5, ll. 49-51. To assume that: (1) content cannot include audio as well as visual media and (2) that content must be seen to be delivered, would contradict the term's clearly established glossary definition as well as the scrolling functionality taught by the

patents in suit. Accordingly, the concept of content delivery as opposed to a mere visual representation is more appropriate in the context of the '493, '563, and '882 Patents.

## D. [*89] The Court's Ruling on the Term "continuously manifested"

Simple's objection is granted in part because the Special Master's construction seems to limit content manifestation to visual perception. The Special Master's application of the dictionary definition of "manifest" is countered by the patent specifications, which should be given greater weight in claim construction. *Phillips*, 415 F.3d at 1316, 1318. Nonetheless, instead of adopting Simple's proposed construction, the Court will use the term "delivered" because the specifications of the '493, '563, and '882 Patents indicate that the manifestation of content is more than what appears on screen. Indeed, content ***delivery*** better comports with this conception of manifestation than the visual emphasis placed on the term by the Special Master or the term "display," as suggested by Simple.

## V. "[C]ontrol section"

Claim 2 of the '563 and '882 Patents utilizes the term "control section." The term is also described in the specification of each patent in suit. *E.g.*, '493 Patent col. 8, ll. 25-47. Having placed the disputed term in context, the Court will summarize the Special Master's proposed construction as well as his rationale.

## A. The Special [*90] Master's Recommendation

Based on his analysis of the relevant claim language and portions of the specifications of the patents in suit, the Special Master recommended that a "control section" be defined as "a portion of a window module that includes at least one module control." (R&R at 152.) In essence, the Special Master found that the relevant claim language required that a "control section" have at least one module control, and that this interpretation was consistent with the specifications of the patents in suit, which mentioned or described "control sections." Although the Special Master found that: (1) DMODs "act like any other window such as those within a windows based operating system desktop environment"; (2) the patents in suit identify Windows 98 as an example of such a "windows based operating system desktop environment"; and (3) "the windows in Windows 98 could be dragged . . . by placing the cursor of a mouse on the control section of the window, depressing the mouse button, moving the mouse to drag the window to a different location on the screen, and

releasing the mouse button," he determined that it would be inappropriate to ascribe this functionality to control sections [*91] in the context of the patents in suit because the relevant claim language was silent regarding the matter. (*Id.* at 151-52.) Having summarized the Special Master's reasoning and recommended construction of the term "control section," the Court turns to CA's corresponding objection and Simple's counter arguments.

### B. CA's Objection and Simple's Counter Arguments

CA objects to the Special Master's recommended construction of "control section" because it obscures the fact that a user may place a cursor, controlled by a mouse, over the "control section" of a window object and then move said window object to a different location on screen by depressing the mouse button and moving said mouse. (*See* CA's Claim Construction Objections at 20.) For its part, Simple agrees with the Special Master's analysis and recommended construction and argues that it is consistent with the claim language and specifications of the '563 and '882 Patents. (Simple's Resp. to CA's Objections to the Claim Construction R&R (Dkt. No. 586) ("Simple's Reply to CA Objection"), at 16-17.) Simple further argues that CA's proposed construction ignores the relevant claim language of the '563 and '882 Patents which requires that [*92] a control section include at least one module control. (*Id.* at 17.) Having summarized the parties' objections and counter arguments, the Court will conduct its own analysis of the term "control section."

### C. Analysis

As the Special Master points out, a "control section" is not expressly defined by the intrinsic evidence found in the '493, '563, and '882 Patents, but claim 2 of the '563 and '882 Patents clearly states that a "'control section' is . . . a portion of a window object . . . associated with control of the window object." (R&R at 146.) Specifically, claim 2 of the '563 Patent states that a control section includes "a set of at least one *control* corresponding to a set of attributes which operate *to affect manifestation* of said at least one window object and at least a portion of said content within said content display section." *Id.; see also* '882 Patent Cl. 2. Indeed the real dispute between the parties is over "whether the 'control section' itself -- apart from the 'control' and 'attributes' -- may be used to control the 'window object.'" (R&R at 146.)

The Court's analysis of term "control section," will entail the following steps: (1) construing the relevant claim language; [*93] (2) analyzing the relevant portions of the specifications of the '563 and '882 Patents; (3) accounting for the knowledge

of one skilled in the art; and (4) addressing the deficiencies in the Special Master's proposed construction and the parties arguments.

### 1. The Patents in Suit Indicate That "control sections" Can Be Used to Move Window Objects

Claims 1 and 2 of the '563 and '882 Patents indicate that window objects can be moved and contain a control section. As shown by the excerpted claim language below, claim 1 of the '563 and '882 Patents indicates that a window object can be moved as a result of a "moving operation" performed on a controllable attribute. Specifically, claim 1 of the '563 Patent claims:

> 1. A network client . . . comprising:
> a content retrieval module . . . ; and
> a processing engine coupled to said content retrieval module configured to provide a content manifestation environment within the data processing system, to process said content to produce at least one corresponding window object . . . ,
>
> said at least one corresponding **window object** is **associated with a controllable attribute**, said controllable attribute **configured to permit said** at least one corresponding **window [*94] object to be controlled as a result of performing at least one of a moving operation**, a resizing operation, a minimizing operation, or a maximizing operation within said content manifestation environment.

'563 Patent Cl. 1 (emphasis added). Claim 1 of the '882 Patent claims:

> 1. A network client . . . comprising:
> a content retrieval module . . . ; and
>
> a processing engine . . . , to process said content to produce at least one window object within said content manifestation environment, said at least one **window object** is **associated with a controllable attribute**, said controllable attribute **configured to permit at least one window object to be controlled as a result of performing at least one of a moving operation**, a resizing operation, a minimizing operation, or a maximizing operation within said content manifestation environment.

'882 Patent Cl. 1 (emphasis added). Claim 2 of the '563 and '882 Patents "depends" from claim 1 of said patents. [20]

---

[20] The following may be of assistance in deciphering the meaning of the term "depends": 35 U.S.C. § 112 P 2 and 37 C.F.R. § 1.75(a) require that a patent's specification conclude with one or more claims. *See* Landis on the Mechanics of Patent Claim Drafting § 2:1.

Accordingly, the window object referenced in claim 2 of the '563 and '882 Patents can be movable. Claim 2 of the '563 and '882 Patents further refines window objects to include a content display section and a control section. As provided below, Claim  [*95] 2 of the '563 Patent claims:

> 2. The network client according to claim 1, wherein said processing engine is *further configured to process said content to produce a control section and a content display section within said at least one corresponding window object*, said content display section configured to manifest at least a portion of said content therein, *said control section including* a set of *at least one control* corresponding to a set of attributes which operate to affect manifestation of said at least one window object and at least a portion of said content within said content display section.

'563 Patent Cl. 2 (emphasis added). For its part, claim 2 of the '882 Patent claims:

> 2. The network client according to claim 1, wherein said processing engine being *further configured to process said content to produce a control section and a content display section within said at least one window object*, said content display section configured to at least a

---

There are three types of claims: (1) independent; (2) dependent; and (3) multiple dependent. *Id*. § 2:10. Since the '493, '563, and '882 Patents only have independent and dependent claims, the Court need not discuss multiple dependent claims.

An independent claim, is one that "stands alone, includes all its necessary limitations, and is not dependent upon and does not include limitations from any other claim to make it complete." *Id*. Independent claims are usually the broadest claims in a patent. *See generally id*.  [*97] In essence, they contain the fewest limitations and claim the most subject matter. *See generally id*.

Dependent claims depend from a single independent claim and incorporate an additional limitation. *See* 35 U.S.C. § 112 P 4. For example *independent claim* 1 Could read as follows:

> We Claim:

> 1. A car with four wheels, four doors, and an engine that runs on gasoline.

*Dependent claim* 2 would read:

> 2. The car *according to claim 1* wherein said engine also runs on electricity.

In actuality, claim 2 covers: A car with four wheels, four doors, and an engine that runs on gasoline *and electricity*. As one may already have deduced, a dependent claim includes *every limitation* found in the independent claim, from which it depends, and another limitation or limitations.

portion of said content therein, *said control section including a set of controls* corresponding to a set of attributes which operate to affect manifestation of said at least one window object and at least a portion of said content within  [*96] said content display section.

'882 Patent Cl. 2 (emphasis added). As shown above, claim 2 of the '563 and '882 Patents refers to a window object, which may be movable and contains a control section, which is distinct from its content display section. Having analyzed the claim language of the '563 and '882 Patents, the Court will turn to their specifications to further inform its construction of the term "control section."

According to the specifications of the '493, '563, and '882 Patents, "control sections" allow for the manipulation of modules through the use of "Module Controls." [21] The identical glossaries found in each of the patents in suit state that a module is a layer "having (1) a control section, and (2) a related content display section." *E.g.*, '563 Patent col. 6, ll. 1-4. The "control section" hosts "Module Controls," which "control objects . . [*98] . associated with screen icons." *E.g.*, '563 Patent col. 6, ll. 25-30. By reacting "to events, . . . [such as] mouse clicks, mouse-overs, double-clicks, etc," said objects allow a user to control certain attributes of a module, such as "minimization, maximization, closure, resizing, etc." *Id*. This description correlates with the ability of a "control" to affect the manifestation of a window object as specified in claim 2 of the '563 and '882 Patents. However, if the role of "control sections" were to end there, there would be no way in which a user would be able to move a module type window object such as a DMOD. This deficiency is critical since it is undisputed that certain embodiments of window objects, such as DMODs, are movable. As the following analysis of the relevant extrinsic evidence shows, control sections also allow users to move windows in windows based content manifestation environments.

## 2. A User Cannot Move a Module Without Utilizing its "control section"

When evaluating disputed claim  [*99] terms, it is critical to note that: (1) claim interpretation is performed "from the perspective of one of ordinary skill in the pertinent art at the time of filing"; (2) claims do not stand alone and must be read in light of their accompanying specifications; and (3) it is not improper to refine a claim term in light of consistent

---

[21] The operation of module controls in TMODS and DMODS is described above in § V.D, *supra*, entitled "DMOD's and TMOD's Are Used to Embody the Window Objects Critical to Facilitating a CME."

definitive remarks within a patent specification. *See Chamberlain Group, Inc*., 516 F.3d at 1335; *Computer Docking Station Corp*., 519 F.3d at 1374; *Markman*, 52 F.3d at 979; *Phillips*, 415 F.3d at 1314. In light of the specifications of the '563 and 882 Patents, one of ordinary skill in the art at the relevant time period would understand that control sections also allow users to move window objects. The patentees and CA agree, in accordance with the relevant intrinsic evidence, that window objects such as DMODs can be dragged and acted upon "like any other window such as those within a windows based operating system desktop environment." *See, e.g*., '563 Patent col. 7, l. 65 - col. 8, l. 18, col. 8, ll. 4-6; '882 Patent col. 8, ll. 25 - 46, col. 9, ll. 1-6; Decl. of Danny Goodman in Supp. of the Claim Construction Brief of CA (Dkt. No. 326) ("Goodman Claim Construction  [*100] Declaration"), at Attach. 22 P 28. CA's expert, Mr. Goodman, stated that Microsoft Windows, Apple Macintosh and "almost every windowed operating system environment" allow users to drag a window by placing a cursor over the title bar region, clicking and dragging. (Goodman Claim Construction Declaration P 28.) One of ordinary skill in the art would know this while interpreting the function of a control section within a window object.

Indeed, Figure 2B, *supra* at 17, in the '493 and '882 Patents as well as Figure 2, *supra* at 20, in the '563 Patent all display DMODs with titles imbedded into their control sections. '882 Patent fig. 2B, items 203 and 204, col. 8, ll. 25 - 56, col. 10, ll. 13-28; '563 Patent fig. 2, items 204, 206, 208 and 210 col. 9, l. 54 - col. 10, l2. In this context, one of ordinary skill in the art would understand that control sections are analogous to the title bar sections referred to by Mr. Goodman. In light of the undisputed facts that DMODs are movable and intended to act like windows in a "windows based operating system," the intrinsic evidence before the Court leads to the conclusion that control sections can be clicked on and dragged in order to move a window  [*101] object. Having analyzed the term control section in light of the intrinsic evidence before the Court as well as the knowledge of one skilled in the art, it is clear that a control section not only contains a module control, but must also enables a user to move a movable window object.

### 3. "[C]ontrol section" Defined

The Court defines a "control section" as a portion of a window object that contains a module control and enables user control. The Court finds that one of ordinary skill would interpret the intrinsic evidence found in the '493, '563, and '882 Patents to mean that control sections allow users to manipulate and control window objects. Necessarily included in this functionality is the ability to move a window object, which acts like a window in a standard operating system, such

as Windows 98. The ability to move a module window object cannot be separated from the definition of a control section. Having defined the term "control section," the Court will discuss the deficiencies in the definitions proposed by the Special Master and CA.

### 4. The Special Master Incorrectly Narrowed the Meaning of the term "control section"

In the context of defining a "control section," the Court disagrees  [*102] with the Special Master's overly narrow interpretation of claims 1 and 2 of the '563 and '882 Patents. Although it is irrefutable that the patentees intended for certain embodiments of modules to be movable, the Special Master stated that such a "method of control[, via the control section,] is simply not addressed in the claims or specification." (R&R at 152.) The Special Master rested his finding on the language of claims 1 and 2 of the '563 and '882 Patents. (*Id*. at 145-46, 151-52.) However, in doing so, the Special Master gave insufficient consideration to statements made consistently throughout the specifications of the patents in suit and ignored the knowledge of one skilled in the art. To that point, the Special Master does not seem to dispute that: (1) window objects are movable; (2) window objects can be and are meant to be moved like windows in the Windows 98 operating system; *e.g*., '882 Patent col. 9, ll. 1-6, (3) windows in Windows 98 operating system are moved by clicking on their "title bar regions" and dragging; (4) the control sections in the DMODs disclosed in the patents in suit are functionally similar to these title bar regions; (5) one skilled in the art would  [*103] know of the Windows 98 operating system; and (6) the patents in suit disclose no other way of moving DMODs, apart from the inherently known method of clicking on the control section and dragging. (*See generally* R&R at 151-52.) Accordingly, any construction of the term "control section" must also account for the user's ability to drag a DMOD type window object and the only way to move a DMOD would be by clicking on its "control section" and dragging.

### 5. The Court Agrees, in Part, with CA but Declines to Adopt Its Proposed Construction

Although the Court agrees with some of CA's arguments, it declines to adopt their recommended construction in its entirety. CA correctly points out that the Special Master's recommended construction of "control section" obscures the fact that a user may move a window object by placing a mouse over its "control section" and dragging. Indeed there is ample support for this view in the specifications of the patents in suit although it may not be explicitly stated in the language

of claim 2 of the '563 and '882 Patents. However, since CA's proposed construction does not explicitly state that a control section contains a module control, the Court will decline **[*104]** to adopt it.

## 6. Simple's Argument's Parallel the Special Master's Analysis and are Rejected for the Same Reasons

The thrust of Simple's response to CA's objection aligns with the Special Master's recommended construction of the term "control section." Accordingly, the Court rejects Simple's arguments for the same reasons it declines to adopt the Special Master's recommended construction of the term "control section." Having conducted its analysis, the Court will rule on the term "control section."

## D. The Court's Ruling on the Term "control section"

CA's objection is granted in part and the Court defines a "control section" as a portion of a window object that contains a module control and enables user control.

## VI. "[N]etwork client"

The term "network client . . . appears in all of the claims of the '563 [P]atent and in claims 1-15 of the '882 [P]atent." (R&R at 152.) The term also appears in the specifications of the patents in suit. *See, e.g.*, '493 Patent col. 8, ll. 7-13 (stating that the term "network client" includes web browsers); '563 Patent col. 4, ll. 26 - 27 (stating that the term "network client" includes customized web browsers). As further discussed below, the issue in construing **[*105]** the term "network client" turns on whether it can be defined as a web browser or a customized web browser.

## A. The Special Master's Recommendation

The Special Master laid the foundation for his analysis of the term "network client" with a thorough dissection of claim 6 of the '563 Patent. (R&R at 154-56.) He then determined that a "network client" in accordance with the '493, '563, and '882 Patents resides within a personal computer, receives content from the Internet and processes it to produce a content manifestation environment which contains a window object. (*Id.*) According to the Special Master, these functions are akin to those performed by a web browser that has been customized by the subject matter claimed in the '493, '563, and '882 Patents. Having summarized the Special Master's reasoning, the Court will explain his analysis of the relevant claim language in greater detail.

According to the Special Master, a "network client" is a web browser. Specifically, the relevant claim language starts out with a web browser and then customizes it to create a "customized web browser." (*Id.* at 158; *see also* '563 Patent Cl. 6.) In order to facilitate his analysis, the Special Master formatted **[*106]** claim 6 of the '563 Patent as shown below.

6. A network client configured [1] to operate within a data processing system and [2] to receive content from a remote server system [3] to facilitate a windowed content manifestation environment therein, comprising:

[A] a content retrieval module configured to receive content from a network server system via an electronic data network; and

[B] a processing engine [i] coupled to said content retrieval module [ii] configured [(a)] to instantiate a content manifestation environment within the data processing system, [(b)] to process said content to produce at least corresponding window object within said content manifestation environment,

[C] said at least one corresponding window object [i] associated with a set of at least one controllable attribute and [ii] configured to manifest at least a portion of said content therein,

[D] said set of at least one controllable attribute [i] configured to affect manifestation of said at least one corresponding window object by the network client within said content manifestation environment [ii] by permitting said at least one corresponding window object to be controlled as a result of performing at least one **[*107]** of [1] a moving operation, [2] a resizing operation, [3] a minimizing operation, or [4] a maximizing operation within said content manifestation environment without requiring said content manifestation environment to be refreshed.

(R&R at 154-55 (quoting '563 Patent Cl. 6 with the addition of clarifying text within brackets).) [22] According to the Special Master, claim 6 covers and starts out with a "network client," comprised of a "content retrieval module" coupled to a "processing engine," that is then configured to "perform three functions, namely, '[1] to operate within a data processing system and [2] to receive content from a remote server system [3] to facilitate a windowed content manifestation environment therein.'" (*Id.* at 155 (brackets in

---

[22] The bracketed text was added by the Special Master to: (1) help organize claim 6 into its base elements and (2) make an analysis of the relevant claim language easier to follow. As can be seen, the Special Master's reasoning directly parallels the relevant **[*109]** claim language because the focus of claim construction, as always, starts with the plain language of the claim. *Innova/Pure Water, Inc.*, 381 F.3d at 1115.

original).) The Special Master then pointed out that the "content retrieval module" is simply defined as being configured to receive content from a network system over an electronic data network. (*Id*.) Next, the Special Master described the "processing engine," as configured "'[(a)] to instantiate a content manifestation environment within the data processing system, [and (b)] to process said content to produce at least [*one*] corresponding **[\*108]** window object within said content manifestation environment.'" (*Id*. (brackets in original) (emphasized text added).)) According to the Special Master, claim 6 further provides that the window object must have at least one "control attribute" capable of affecting its manifestation ". . . within said content manifestation environment" via "the <u>network client</u> . . . ." (*Id*. at 156 (discussing '563 Patent Cl. 6).) In essence, the Special Master explained and examined each element of claim 6 of the '563 Patent to show that a network client is a web browser that is customized, as described by the claim language, to provide a windows based content manifestation environment according to the patents in suit. Having discussed the Special Master's analysis of the relevant claim language, the Court now turns to his analysis of the specifications of the patents in suit as well as the relevant objective extrinsic evidence. (*See id*. at 156-57.)

According to the Special Master, the specifications of the patents in suit and relevant objective extrinsic evidence indicate that the term "network client" be defined as a web browser. The Special Master found that "network client" is an open ended term, which according to the specifications of the patents in suit can include a web browser or a customized web browser. (*Id*. (citing '493 Patent col. 6, l. 53 - col. 7, l. 9).) According to the Special Master, the specifications of the '493, '563, and '882 Patents indicate that a web browser is just one example of a "network client." (*Id*.) The Special Master then concluded that the "patentees appear to have used the term 'network client' in the subject claims according to its ordinary and customary meaning in the context of client-server network architecture." (*Id*. at 157.)

As further support for his recommended construction, the Special Master used technical dictionaries to construe the term "network client." (*See id*. at 157-58 (citing Computer & Internet Dictionary (3d ed. 1999); Microsoft **[\*110]** Computer Dictionary (4th ed. 1999)).) Finding that the term "network client" was not "per se" defined, the Special Master construed the term by defining the words "network" and "client" separately, as shown below. (*Id*. at 157-58.)

A "network" is, for example, "a group of two or more computer systems linked together." *See* COMPUTER & INTERNET DICTIONARY at 374. *See also*

MICROSOFT COMPUTER DICTIONARY at 308 ("A group of computers and associated devices that are connected by communications facilities"). A "client" is "[t]he client part of a client-server [network] architecture," *e.g*., "an application that runs on a personal computer or workstation and relies on a server to perform some operations." *See* COMPUTER & INTERNET DICTIONARY at 94. *See also* MICROSOFT COMPUTER DICTIONARY at 88 ("3. On a local area network or the Internet, a computer that accesses shared network resources provided by another computer (called a *server*).").

The term "network client" *per se* thus appears to have a readily-discerned ordinary and customary meaning, and connotes a range of applications possible within the client-server network architecture. The term "network client" *per se* does not connote a "customized **[\*111]** WWW browser." Additional attributes and requirements of the "network client," though, are expressly set out in the claims. Those additional requirements may make the "network client" as defined by the claim language as a whole a "customized web browser."

(*Id*.) Consistent with his interpretation of the claim language and the specifications of the patents in suit, the Special Master found that a "network client" is best construed as a web browser that can be customized. Having detailed the Special Master's reasoning and recommended construction, the Court will summarize CA's objections and Simple's corresponding counter arguments.

## B. CA's Objections and Simple's Counter Arguments

According to CA, the relevant claim language and portions of the specifications indicate that a "network client" can only be a customized web browser. CA argues that: (1) the use of the term "network client" in the claim language of the '563 and '882 Patents indicate that it should be defined only as a "web browser designed to provide window objects without requiring the download of a software system for that purpose"; and (2) a "network client" is not a web browser because claims 1 and 6 of the '563 Patent merely **[\*112]** require that "content" be downloaded to enable a content manifestation environment featuring window objects, as opposed to the "software system" referred to in claim 1 of the '493 Patent. (*See* CA's Claim Construction Objections at 11-13.) According to CA, since the specifications of the '563 Patent consistently use the term "network client" to refer to a customized web browser, the Special Master's recommended construction has no basis in the '563 Patent. (*Id*. at 13-16.) CA

also objects to what it calls the Special Master's inappropriate use of extrinsic evidence when constructing the term "network client." (*Id.* at 16-17 ("Stringing Together Dictionary Definitions Cannot Trump The Consistent Teaching Of The Specification").)

CA also argues that "'network client' has a different meaning in the '882 patent than it does in the '563 [P]atent" because of "sloppy patent prosecution." (*Id.* at 17-19.) In "the first application that was filed in the prosecution of the '882 [P]atent, claims 1-13 were identical to claims 1-13 of the '493 [P]atent." (*Id.* at 18 (*comparing* '882 Prosecution History (Dkt. No. 366), Ex. 3 at SIM-007016-18 *with* '493 Patent, Cls. 1-13).) The first 13 claims of application [*113] number 09/843,130, which matured into the '882 Patent, were then canceled since they had already issued in the '493 Patent. (*Id.* (citing '882 Prosecution History at SIM-007244).) In their place, the patentees inserted claims that were "substantially identical to" those found in the '563 Patent, "as claims 1 through 15 of the '882 patent." (*Id.*) In light of this prosecution history, CA concluded that the Special Master incorrectly interpreted the term "network client" so as to preserve the validity of the '882 Patent, which failed to meet the written description requirement of 35 U.S.C. § 112 P 1. (*Id.* at 18.)

In response, Simple argues that the Special Master correctly construed a "network client" as a web browser. (Simple's Reply to CA's Objections at 12.) According to Simple, the Special Master's recommended construction was properly based on the claims of the '563 and '882 Patents, which "strongly imply that the customization of the 'network client' . . . [was] not an inherent feature." (*Id.* at 13 (citing *Phillips*, 415 F.3d at 1309-10 (for the proposition that the "claim language 'steel baffles' strongly implies baffles are not inherently made of steel")).) Simple further argues [*114] that the Special Master's proposed construction is supported by the specifications of the '563 and '882 Patents as well as relevant extrinsic evidence. (*Id.*) Finally, Simple argues that CA "did in fact agree that the 'network client' could be construed as a web browser." (*Id.* at 14 (quoting Markman Tr. at 230:8-19).) Having summarized the parties' objections and counter arguments, the Court will conduct its analysis of the disputed term.


### C. Analysis

The Court's analysis of the term "network client" will entail: (1) constructing the term based upon a review of the claim language and the specifications of the patents in suit and (2) addressing the arguments raised by the parties.

### 1. The Claim Language of the Patents in Suit Indicates That a "network client" is a Web Browser, Capable of Being Customized

Quite simply, the relevant claim language of the '563 and '882 Patents, starts out with a "network client" or web browser and then custom configures it to facilitate a windows based content manifestation environment. As such, concluding that a "network client" is already customized would make the associated claim language redundant. The Court's analysis of the relevant claim language leads [*115] to the same conclusion reached by the Special Master, namely that a "network client" is a web browser that can be customized according to the relevant claim language of the patents in suit. Accordingly, the Court adopts the Special Master's proposed construction of the term "network client" and directly incorporates his reasoning as it pertains to the intrinsic evidence before the Court. (*See generally* R&R at 156 ("With the foregoing in mind, it is difficult to see what further 'construction' of 'network client' is necessary.").) The Special Master correctly concluded that, though a "network client" should be construed as a web browser, a "network client" *as refined by the relevant claim language* becomes a customized web browser. (*Id.* at 158; *see also, e.g.*, '563 Patent Cl. 6.) In other words, a customized web browser is still a web browser. Having discussed the relevant claim language, the Court's analysis turns to the specifications of the patents in suit.


### 2. The Specifications of the Patents in Suit Indicate That the Term "network client" Should Be Broadly Construed as a Web Browser

According to the specifications of the patents in suit, a "network client" is broadly defined as a [*116] web browser. The specifications of the '493, '563, and '882 Patents use the open ended phrase "such as" when stating that a "network client" can be a web browser or a customized web browser. *Innova/Pure Water, Inc.*, 381 F.3d at 1117 ("claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction.") (internal quotations omitted). For example: (1) the '493 and '882 Patents provide: "Client system 108 is configured to operate in accordance with an operating system such as MICROSOFT WINDOWS 98 . . . which may be operated in accordance with a *network client application such as Internet Explorer* version 4.x, Netscape Communicator 4.x, etc." and (2) the '563 Patent describes "a *network client, such as a customized WWW browser client* or application, which is configured to operate within a data processing system and to receive content

from a remote server system to facilitate a windowed content manifestation environment." '493 Patent col. 8, ll. 7-13; '882 Patent col. 8, ll. 7-13; '563 Patent col. 4, ll., 24-30 (emphasis added). Accordingly, the specifications of the '493, [*117] '563, and '882 Patents indicate that the term "network client" should be defined as a web browser, which, as the patents in suit clearly indicate, can be customized.

The '493 and '882 Patents teach that a network client such as a web browser can be customized to provide the claimed invention. In the following excerpt, the '493 and '882 Patents list a WWW/web browser as an example of a network client that can use files downloaded over an electronic data network to facilitate a windows based content manifestation environment.

> Such files are generated in accordance with the present invention to facilitate a windows based content manifestation environment *or within network clients such as WWW browsers* that may be used to download the same and to display content therein.
> . . .
> At a client side . . . a client system 108 is outfitted with appropriate **network client software to access an electronic data network** . . . . Accordingly, client system 108 is configured to access and download HTML documents such as HTML documents and other related files 106 which may be generated and stored in data store 104.

'493 Patent col. 6, l. 60 - col. 7, l. 9 (emphasis added.); *see also* '563 Patent col. 4, ll. [*118] 24-30; '882 Patent col. 8, ll. 7 - 16. Indeed, as the '493 and '882 Patents go on to point out, the aforementioned HTML files are subsequently loaded onto the network client/web browser to "facilitate a windows based content manifestation environment." *E.g.*, '882 Patent col. 7, ll. 9-12 (stating "It is the HTML documents and the related files as discussed herein which facilitate a windows based content manifestation environment within a client system such as within client system 108."). Since the intrinsic evidence at hand is sufficient to define a "network client," the Court finds it unnecessary to refer to technical dictionaries in defining the term.

### 3. "[N]etwork client" Defined

The intrinsic evidence before the Court indicates that a "network client" is a web browser. This construction comports with: (1) the claim language of the patents in suit, which starts out with a web browser and then customizes it; (2) the portions of the specifications of the patents in suit which state that a network client can be a web browser or a customized web browser; and (3) the fact that a web browser,

whether customized, enhanced or reconfigured, is still a web browser. Having construed the term "network [*119] client," the Court turns to CA's objections.

### 4. CA's Proposed Construction of "network client" Ignores the Relevant Intrinsic Evidence

CA's objections to the Special Master's recommended construction of the term "network client" inappropriately focus on narrowly limiting a "network client" to the end product of the relevant claim language found in the '563 Patents and '882 Patents and ignoring the specifications of the '882 Patent. The Court has already stated that the relevant claim language of the '563 and '882 Patents starts out with a "network client" that is merely a conventional web browser and then proceeds to customize it according to claim elements therein. This point has been well discussed by the Special Master and need not be analyzed again.

CA seeks to improperly limit the construction of the term "network client" by selectively using language found in the specifications of the '563 Patent and ignoring the '493 and '882 Patents. (*See* CA's Claim Construction Objections at 13-16.) CA cites the following portion of the '563 Patent specification as proof that a network client must be a "customized WWW browser client." (*Id.* at 14.)

> Accordingly, the present invention solves the aforementioned [*120] problems to deliver the above-described benefits by providing a network client, *such as a customized WWW browser client*, which is configured to operate within a data processing system and to receive content from a remote server system to facilitate a windowed content manifestation environment (CME).

(*Id.* (citing '563 Patent col 4, ll. 24-30).) CA then argues that the specification of the '882 Patent, which directly contradicts its own proposed construction, should be ignored since it is merely the product of "sloppy" prosecution. (*Id.* at 17-18.) Both arguments fail to account for the fact that the phrase "such as" does not connote an exclusive relationship. Rather, the foregoing passage merely conveys that a customized WWW browser is one example of a network client. This is consistent with the finding that, a network client can be both a web browser and a customized web browser since a web browser remains a web browser even after it is customized. *See, e.g.*, '882 Patent col. 8, ll. 7-13. CA's argument, that the specifications of the '882 Patent should be ignored, fails if one were to construe a "network client" to be a web browser. This is because CA's argument that the '882 Patent [*121] is invalid and its specifications should be ignored hinges on construing a network client as a customized web browser. Accordingly, the Court is unpersuaded by CA's arguments.

The Court now turns to CA's objection to the Special Master's use of extrinsic evidence.

CA's assertion that the Special Master inappropriately applied extrinsic evidence when constructing the term "network client" is incorrect. (CA's Claim Construction Objections at 16-17.) Although the Special Master augmented his analysis with extrinsic evidence, he defined "network client" according to intrinsic evidence found in the '493, '563, and '882 Patents. Indeed, the Special Master indicated that, after his analysis of claim 6 of the '563 Patent, it was "difficult to see what further 'construction' of 'network client'" was necessary. (R&R at 156.) Having addressed the deficiencies in CA's objections, the Court will address Simple's counter arguments.

**5. Simple's Counter Arguments**

Simple correctly agrees with the Special Master's recommended construction of a "network client" as a web browser and seems to endorse much of his logic. However, Simple also argued that CA agreed with the Special Master "that the 'network client' **[*122]** could be construed as a web browser." (Simple's Reply to CA's Objections at 14 (quoting Markman Tr. at 230:8-19).) The Court is underwhelmed by this argument since reference to the Markman Transcript clearly shows that this was not the case. (Markman Tr. at 231-37.) Having addressed the parties' arguments, the Court will issue its ruling on the term "network client."

**D. The Court's Ruling on the Term "network client"**

CA's objection to the Special Master's recommended construction of the term "network client" is denied. Rather, the Court adopts the Special Master's recommended construction and rules that a "network client" is a web browser. The intrinsic evidence before the Court shows that the term "network client" includes a web browser as well as a customized web browser. *See, e.g.*, '493 Patent col. 8, ll. 7-13 (stating that the term "network client" includes web browsers); '563 Patent col. 4, ll. 26-27 (stating that the term "network client" includes customized web browsers). Specifically, the relevant claim language of the '563 and '882 Patents shows that a "network client" is a web browser capable of being customized to produce a content manifestation environment featuring window **[*123]** objects. *E.g.*, '882 Patent Cl. 1; '563 Patent Cls. 1, 6. Indeed, the entire purpose of claim 6 of the '563 Patent is to start out with a web browser, and then customize it.

**VII. "[S]olely contained within"**

"Solely contained within" is found in claim 1 of the '493 Patent and claim 16 of the '882 Patent. Claim 1 of the '493 Patent is representative and covers:

> 1. A system for facilitating a windowed content manifestation environment within a web browser, comprising:
>
> a server system . . . ; and
>
> a web browser client . . . coupled to said server system . . . having a content manifestation environment, said web browser client . . . to process said software system and said associated content to produce ***window objects solely contained within said content manifestation environment***, each window object of said window objects is associated with a set of controllable attributes and is . . . [configured] to . . . manifest at least a portion of said associated content therein, said controllable attributes configured to affect manifestation of said each window object by said web browser client within said content manifestation environment, wherein said each window object executes within and is directly **[*124]** controlled by said web browser client which operates within said data processing system, . . . .

'493 Patent Cl. 1 (emphasis added). Having placed the disputed term within the context of the patents in suit, the Court will discuss the Special Master's recommended construction, Simple's objection and CA's corresponding counter-arguments.

**A. The Special Master's Recommended Construction**

The Special Master recommended that "'window objects solely contained within said content manifestation environment' means that the window objects only appear inside the boundaries of the content manifestation environment." (R&R at 162.) The Special Master arrived at his conclusion in a three step process. First, he used a dictionary to define "within" as "inside." (*Id.* at 161.) Second, the Special Master used a dictionary to define "contain" as "'to keep within limits.'" (*Id.*) Finally, the Special Master interpreted the glossary definition of a content manifestation environment which stated that "a CME is a 'controllable WWW browser content display window,'" to conclude that "solely contained within" dealt with the visual appearance of a window object within the boundaries of a content manifestation environment. **[*125]** (*Id.*)

**B. Simple's Objection and CA's Counter Argument**

Simple argues that the "proper construction [of solely contained within] is [that] '. . . window objects are only kept

inside the boundaries of the content manifestation environment.'" (Simple's Claim Construction Objections at 17.) According to Simple's statements during the Markman hearings as well as its expert testimony, for a window object to be solely contained within a content manifestation environment: (1) a user must not be able to drag the entire window object out of the content manifestation environment and (2) no portion of the window object can be displayed outside the content manifestation environment. (Markman Tr. 23:2-23; **HC** Belgard Expert Report P 167 (referring to a representation of CA "Portal Components," p. 44 fig. 1).)

> SPECIAL MASTER PETERSON: . . . And the full phrase is . . . -- quote, "… to process said software system and said associated content to produce window objects solely contained within said content manifestation environment,…."
>
> MR. UNGERMAN: [on behalf of Simple] And that's as opposed to window objects which might move outside the content manifestation environment. That's the limitation that it's getting **[*126]** at.
>
> SPECIAL MASTER PETERSON: All right. Jumping to the bottom line, what you're saying is that that means you could not drag one of those windows outside the CME?
>
> MR. UNGERMAN: Correct, and still be within the limitations of the claim.
>
> SPECIAL MASTER PETERSON: So if a software system allowed you to drag a window outside the CME, that would take it outside the scope of the claim as you interpret it?
>
> MR. UNGERMAN: Right, Your Honor.
>
> SPECIAL MASTER PETERSON: Okay.

(Markman Tr. at 23:3-23.) For its part, CA argues that the Special Master correctly placed a visual emphasis on content manifestation. (CA's Claim Construction Response at 17-18 ("As the Special Master correctly concludes, so long as the window object does not appear outside the CME it does not violate the requirement of being 'solely contained within' it.").) Having summarized the Special Master's proposed construction of the term as well as the parties' corresponding objections and counter arguments, the Court will put forth its own analysis.

## C. Analysis

The Court's analysis of the disputed phrase "solely contained within" will focus on the 84 functional aspects of window objects within the context of the patents in suit and then **[*127]** address the deficiencies in the Special Master's proposed construction.

## 1. The Phrase "solely contained within" Should Be Construed so as to Comport with the Functional Aspects of Window Objects and the Claimed Content Manifestation Environment

The Court does not base its interpretation of "solely contained within" solely on visual parameters because window objects can deliver content without it being seen by a user. The Court takes care to note that a window object can be "solely contained within" a content manifestation environment even when part of it cannot be seen because: (1) window objects, particularly DMODs, "act like any other window such as those within a windows based operating system desktop environment" and (2) the specifications of the '493, '563, and '882 Patents clearly establish that content manifestation is more than what appears on screen. *See, e.g.*, '493 Patent col. 8, ll. 29-34, col. 9, ll. 7-20. Indeed, windows within a windows based operating system desktop environment can be moved partially out of the viewable display area but still be solely contained within a windows desktop operating environment. For example, even if one were to move a window object such that **[*128]** only its control section could be seen, the window object would still be contained solely within a content manifestation environment despite the fact that part of it was hidden. This is analogous to window objects equipped with scroll bars to "allow [for the] management of content that extends beyond a bottom edge of a visible area." *E.g.*, '493 Patent col. 9, ll. 7-20 (describing the scroll function in modules); *see also, e.g.*, '493 Patent fig. 1D. At this point, a working example may be in order.

Indeed, CA's own implementation of the source code disclosed in the '493 Patent shows that a window object can be solely contained within a content manifestation environment without being seen. (Supplemental Decl. of Danny Goodman in Supp. of CA's Objections to the Special Master's R&R as to Anticipation & Obviousness (Dkt. No. 620) ("Second Goodman Supplemental Anticipation and Obviousness Decl."), at 2-3.) CA's expert, Mr. Goodman, "was asked. . . to reconstruct the browser page of . . . the '493 Patent . . . from the source code . . . displayed within the patent's text." (*Id.* P 2.) Although certain typographical errors needed to be corrected and some source code was missing, such as the **[*129]** "d&d.js [file necessary] for dragging and dropping operations," Goodman was able to "reconstruct the rest of the HTML and JavaScript files to . . . load the page into Microsoft Internet Explorer 4." (*Id.*)

In addition to completing his reproduction, Goodman provided the Court with two screen illustrations. (*Id.* at 2-3.) The first screen illustration shows a content manifestation environment displaying "three window objects"

corresponding to the "News, Homepage, and Chat" functions. (*Id.* P 3.) Goodman's description of the first screen shot provides:

> 3. The following screen illustration shows the results of loading the reconstructed code into an Internet Explorer 4 browser window maximized to fill an 800x600 pixel screen, a very common screen resolution at the time of the patent filing. Because I did not have access to the image files referenced in the code, the browser displays a placeholder (white box with a red "x" and alternative text) where an image would have appeared. The titlebars of three window objects (News, Homepage, and Chat) can be seen in the initial view.

> 4. In this example, the browser window is maximized to fill the display screen. Even in this configuration, one of the **[*130]** window objects (the "Chat" window) is only partially visible.

> 5. When I clicked the unmaximize button of the browser window, the browser window reduced in size, as shown in the following screen illustration. This reduces the size of the browser display area.

(*Id.* PP 3-5.) A copy of the Screen illustration is shown below:



(*Id.* at 2.) As one can observe, certain window objects can only be partially seen. Even so, they are still solely contained within their content manifestation environment. Though Goodman's initial screen illustration was "maximized to fill an 800x600 pixel screen," his subsequent illustration showed the same web page, but in a web browser window that did not take up the entire screen. (*Id.* at 3.) Goodman observed that by reducing the size of the web browser window, the "News window" became only partially visible and the "Chat window" could not be seen at all. (*Id.* P 6 ("Upon reducing the browser window size, the News window is partially not visible. Additionally, the Chat window is now not visible at all.").) Goodman's second screen illustration is produced below.



Notably, Goodman does not claim that the "Chat window," which **[*131]** cannot be seen, is not "solely contained within" its content manifestation environment. This is because it is possible for one to scroll further down the web page in an Internet Explorer 4 web browser. Indeed, just as window objects can be equipped to manage "content that extends beyond a bottom edge of a visible area," the Internet Explorer 4 web browser can deliver content that extends beyond the bottom edge of its visible area. *See generally* '493 Patent col. 9, ll. 7-20 (describing the scroll function in module window objects); col. 2, ll. 18-23 (stating that prior art browsers had "scroll bars" which could be used to "scroll through a relatively large amount of text"). In short, merely because a window object is: (1) partially obscured by another window object; (2) in a portion of the web browser that the user must scroll to, to see; or (3) minimized so that only its control section can be seen, does not mean that it is not solely contained within its content manifestation environment. Goodman's screen illustrations serve as an excellent visualization of the Court's finding, that the term "solely contained within" should not be based solely on visual perception. Having analyzed **[*132]** the relevant intrinsic evidence and filings on record, the Court will define the term "solely contained within."

## 2. "[S]olely contained within" Defined

The Court interprets "solely contained within" to mean that a window object cannot be moved from or displayed, in whole or in part, outside a content manifestation environment. "Solely contained within" a content manifestation environment includes the following requirements: (1) the user cannot move a window object out of the content manifestation environment; (2) no portion of the window object can be displayed outside the content manifestation environment; and (3) though a portion of a window object may not be displayed or may be obscured or hidden, said window object is still solely contained within a content manifestation environment.

### 3. The Special Master's Recommended Construction Overemphasizes Visual Perception

In view of the foregoing analysis, the Court declines to adopt the Special Master's proposed construction of the term "solely contained within" [*133] because it focuses too much on a user's visual perception of a window object. As discussed above, a window object need not be seen to be within a content manifestation environment.

### D. The Court's Ruling on the Phrase "solely contained within"

The Court sustains, in part, Simple's objection to the Special Master's recommended construction of "solely contained within." The Court agrees with Simple, and finds that the phrase "solely contained within" should not be linked exclusively to the visual representation of a window object but adopts a more detailed construction of the term, which better comports with the behavior of window objects rather than adopting Simple's proposed construction. (*See* Simple's Claim Construction Objections at 16-17.)

### VIII. "[E]xecutes within"

The phrase "executes within" expressly appears in claims 1 and 2 of the '493 Patent, claim 7 of the '563 Patent, and claims 7 and 16 of the '882 Patent.

### A. The Special Master's Proposed Construction

The Special Master interpreted the phrase "[a] window object *executes within* . . . said web browser client" to mean "that the window object *runs inside* the [web browser] client." (R&R at 161-62 (emphasis added).) According to the [*134] Special Master, there was no issue over whether "within" meant "inside." (*Id.* at 161.) The Special Master then noted that the "phrase 'executes within,' . . . does not refer to where a window object appears on the web browser screen." (*Id.*) Rather, as the Special Master pointed out, the "phrase is recited in the context of a 'web browser client,' *e.g.*, 'wherein said each window object executes within and is directly controlled by said web browser client which operates within said data processing system' called for in claim 1 of the '493 [P]atent." (*Id.* at 161-62 (also citing '563 Patent Cl. 7 for the proposition that "'The network client according to claim 6, wherein said at least one corresponding window object executes within the network client.'").) This led the Special Master to construe the phrase "in the context of computers";

in other words, as it was commonly understood by one skilled in the art. (*Id.* at 162.) Citing from various technical dictionaries, the Special Master then concluded that "'[e]xecute,' in the context of computers, simply means 'run,' 'perform' or 'operate.'" (*Id.* (citing Computer & Internet Dictionary 200, 488 (3d ed. 1999); Microsoft Computer Dictionary [*135] 173 (4th ed. 1999))). In further clarifying his interpretation, the Special Master stated that "[e]ssentially, the web browser client causes, *i.e.*, processes some set of instructions or performs some action, the window object to be manifested within the CME." (*Id.* at 162.) This clarifying language was not however part of the Special Master's final construction of the phrase "executes within," rather it was included to add context. Having summarized the Special Master's proposed construction, the Court will discuss CA's objection and Simple's corresponding counter arguments.

### B. CA's Objection and Simple's Counter Argument

CA objects to the Special Master's definition because it may confuse a jury and instead recommends that his clarifying language also be adopted, "*verbatim.*" (CA's Claim Construction Objections at 19 (stating that the Special Master's "recommended construction -- 'the window object runs inside the client' -- may inadvertently obscure its meaning because a jury may be confused by how a 'window object' can be said to 'run inside the client.'"); CA International, Inc.'s Reply In Support of Objections To Special Master's Report and Recommendation Regarding Claim Construction [*136] (Dkt. No. 599) ("CA's Claim Construction Objections Reply"), at 9-10.) In affect, CA argues that rather than merely construing "executes within" as "runs inside the [web browser] client," the Special Master should have defined the phrase in greater detail and incorporated his clarifying language as follows: "'the web browser client causes, *i.e.*, processes some set of instructions or performs some action, the window object to be manifested within the CME.'" (CA's Claim Construction Objections Reply at 10 (citing R&R at 162).) For its part, Simple argues that the Special Master's proposed construction is clear and need not be altered as suggested by CA. (Simple's Reply to CA's Objection at 14-16.)

### C. Analysis

The Court's analysis of "executes within" will focus on the plain meaning of the term at the date of invention.

### 1. One Skilled in the Art at the Time the '493 Patent Was Filed Would Interpret "executes within" to Mean "Runs

Inside"

Since the relevant claim language does not indicate that the phrase "executes within" should be given a special meaning, the Court will define the phrase as it would be understood by one of ordinary skill in the art. In fact, the record lacks any evidence **[*137]** that the term "executes within" should be construed other than as it was by one skilled in the art, when the patents in suit were filed. *Symantec*, 522 F.3d at 1291 (stating that if a patent "specification does not reveal any special definition for… [a term, it must be construed] according to [its]… ordinary meaning").

As implied by the term "executes," the phrase "executes within" does not refer to where a window object appears on a web browser screen. Rather, the Court will turn to technical dictionaries to understand the plain meaning of the term since no special meaning has been indicated by the intrinsic evidence on record. As the Special Master observed, "'[e]xecute,' in the context of computers, simply means 'run,' 'perform' or 'operate.'" (R&R at 162, citing Computer & Internet Dictionary at 200 and 488 (defining 'execute' as '. . . RUN. *Execute* means to perform an action, as in executing a program or a command;' defining 'run as '1. To execute a program. 2. To operate.'); Microsoft Computer Dictionary at 173 (defining 'execute' as 'to perform an instruction).) Neither the parties nor the Special Master had any issue with construing the term "within" as inside. (*Id*. at 161.) **[*138]** Accordingly, a window object will not act as a separate application on the operating system, rather it will run inside a web browser. For example, a web browser hosting a single content manifestation environment with three window objects will count as one application level program if each window object executes within the web browser. However, if the window objects did not execute within the web browser, there would be at least four application level programs running, one of which would be the web browser while the other three would be the window objects running separately on the operating system, as opposed to executing within the web browser client.

**2. "[E]xecutes within" Defined**

In light of the foregoing analysis, the Court adopts the Special Master's interpretation of "executes within." Accordingly, the phrase "[a] window object *executes within* . . . said web browser client" means "that the window object *runs inside* the client." (R&R at 161-62 (emphasis added).)

**3. Since the Special Master Correctly Focused on the Functional Properties of Window Objects as They Would Be Understood by One Skilled in the Art, There is No Need to Incorporate His "Clarifying" Language**

Since the relevant **[*139]** claim language does not indicate that the term "executes within" should be given a special meaning, the Special Master was correct in defining the term as it would be understood by one of ordinary skill in the art. In addition, the Special Master correctly pointed out that the term "'executes within' does not refer to where a window object appears on the web browser screen." (*Id*. at 161.) Accordingly, the Court will adopt the Special Master's recommended construction of the phrase "executes within," without needlessly incorporating his "clarifying" language.

**D. The Court's Ruling on the Phrase "executes within"**

CA's objection is denied since the Special Master's proposed construction of "executes within" as "runs inside" is sufficiently clear when viewed in context of the relevant claim language.

**CONCLUSION**

In addition to the portions of the R&R which have not been objected to, the Court adopts the Special Master's construction of the following terms: (1) "window object"; (2) "a layer acts independently of other content within a particular HTML document"; (3) "network client"; and (4) "executes within." The Court declined to adopt the Special Master's proposed construction of the following **[*140]** terms: (1) "content"; (2) "continuously manifested"; (3) "control section"; and (4) "solely contained within." In sum, the disputed claim terms are defined as follows:

⊞ Go to table1

**SO ORDERED.**

Dated: Central Islip, New York

March 5, 2009

/s/

Denis R. Hurley

Senior District Judge

⊞ Go to table2

2009 U.S. Dist. LEXIS 25241, *140

**Table1** (Return to related document text)

| Term | Definition |
|---|---|
| window object | a module or a layer |
| a layer acts | the activity associated with a |
| independently of other | layer, such as moving or resizing, does not depend |
| content within a | on other content within a particular HTML document |
| particular HTML | |
| document | |
| content | any form of digital data stream that may be |
| | supplied or sent to a computing system such as a |
| | personal computer |
| continuously manifested | delivered without interruption |
| control section | a portion of a window object that contains a |
| | module control and enables user control |
| network client | web browser |
| solely contained within | a window object can not be moved from or |
| | displayed, in part or in whole, outside a content |
| | manifestation environment |
| xecutes within | the window object runs inside the client |

**Table1** (Return to related document text)

**Table2** (Return to related document text)

| | |
|---|---|
| INTRODUCTION | 2 |
| APPLICABLE LAW | 4 |
| I. Standard of Review | 4 |
| II. Claim Construction Standard | 4 |
| OVERVIEW OF PATENTS IN SUIT | 7 |
| I. Summary of the Technology at Issue | 7 |
| II. The Shared Prosecution History of the Patents in Suit | 11 |
| | 12 |
| III. [*141]  The Patents in Suit Share Many Similarities | |
| IV. Content Transfer Processes Utilized by the Patents in Suit | 12 |
| A. Window Objects Are a Critical Component of the | |
| Content Manifestation Environment Described by the | 13 |
| Patents in Suit | |
| B. How Windows Based Content Manifestation Environments | |
| Are Delivered to a User | 13 |
| V. Embodiments of the Claimed Content Manifestation Environment | 16 |
| A. Figure 2B, A Windows Based Content Manifestation | |
| Environment Featuring DMODs | 16 |
| B. Figure 2, a Preferred Embodiment of the | 19 |
| '563 Patent Featuring DMODs | |
| C. Figure 2A, a Windows Based CME Featuring TMODs | 21 |
| D. DMOD's and TMOD's Are Used to Embody the | |
| Window Objects Critical to Facilitating a CME | 22 |
| VI. Why the Patents in Suit Are Claimed to be an | 24 |
| Improvement Over Prior Art | |
| DISCUSSION | 25 |

2009 U.S. Dist. LEXIS 25241, *141

I. "[C]ontent"                                                                    26
A. The Special Master's Recommended Construction                                  26
B. The Parties' Objections                                                        27
C. Analysis                                                                       28
1. According to the Claim Language of the Patents
In Suit, the Term "content" Cannot Be Limited to
the Information Displayed on Screen                                               28
2. According to the Specifications of the Patents in
Suit, the Term "content" Cannot Be Limited to the
Information Displayed on Screen                                                   29
3. "[C]ontent" Defined                                                           30
4. The Special Master Unnecessarily Added Language

to the Patentees' Glossary [*142] Definition of "content"
and Then Incorrectly Modified His Definition of
"content" to Exclude Data Supplied By a User                                     31
5. CA's Arguments and Proposed Construction                                      34
6. Simple's Arguments                                                            34
D. The Court's Ruling on the Term "content"                                      35
II. "[W]indow object"                                                            36
III. "[A] layer acts independently of other
content within a particular HTML document"                                       36
A. The Special Master's Recommended Construction                                 37
B. The Parties' Objections                                                       43
C. Analysis                                                                       43
1. The Patentees' Glossary Definitions of "window
object" and "layer" Control                                                      44
2. Identifying the "acts" of a "layer"                                           45
3. "[I]ndependently" Cannot Be Interpreted in an
Absolute Sense Because Actions in One Window
Object Can Impact Other Window Objects in a
Content Manifestation Environment                                                46
4. "[A] layer acts independently of other content
within a particular HTML document" Defined                                       47
5. CA's Argument Is Inconsistent with the
Specifications of Patents in Suit                                                48
6. The Special Master Correctly Applied the Glossary
Definition of the Term Window Object as Required
By the Specifications of Each Patent in Suit                                     49
7. The Term "Layer" Should Be Given the Same
Meaning Regardless of Whether or Not It Is Capitalized .                         49
8. Since TMODs Are Not Explicitly Disclosed and

Contradict the Unambiguous Language of the [*143]
Patents in Suit, Certain Unproven Aspects of Their
Behavior May Be Excluded when Determining the
Scope of Patent Claim Language                                                   51
D. The Court's Ruling on the Phrase
"a layer acts independently                                                      56

of other content"

IV. "[C]ontinuously manifested"                                          57

A. The Special Master's Recommended Construction                         58

B. Simple's Objection and CA's Counter Argument                          59

C. Analysis                                                              59

1. The Intrinsic Evidence Before the Court Indicates That

Manifestation Should Not Be Limited to a User's Visual

Perception                                                               60

2. "[C]ontinuously manifested" Defined                                   61

D. The Court's Ruling on the Term "continuously manifested"              61

V. "[C]ontrol section"                                                   62

A. The Special Master's Recommendation                                   62

B. CA's Objection and Simple's Counter Arguments                         63

C. Analysis                                                              63

1. The Patents in Suit Indicate That "control sections"

Can Be Used to Move Window Objects .                                     64

2. A User Cannot Move a Module Without Utilizing

its "control section"                                                    67

3. "[C]ontrol section" Defined                                           69

4. The Special Master Incorrectly Narrowed the

Meaning of the term "control section"                                    69

5. The Court Agrees, in Part, with CA but

Declines to Adopt Its Proposed Construction                              70

6. Simple's Argument's Parallel the Special

Master's Analysis and are Rejected for the

Same Reasons                                                             70

D. The Court's Ruling on the Term "control section"                      71

VI. "[N]etwork client"                                                   71

                                                                         71

A. The Special [*144]  Master's Recommendation

B. CA's Objections and Simple's Counter Arguments                        75

C. Analysis                                                              77

1. The Claim Language of the Patents in Suit Indicates

That a "network client" is a Web Browser, Capable

of Being Customized                                                      77

2. The Specifications of the Patents in Suit Indicate

That the Term "network client" Should Be Broadly

Construed as a Web Browser                                               78

3. "[N]etwork client" Defined                                            79

4. CA's Proposed Construction of "network client"

Ignores the Relevant Intrinsic Evidence                                  80

5. Simple's Counter Arguments                                            81

D. The Court's Ruling on the Term "network client"                       82

VII. "[S]olely contained within"                                         82

A. The Special Master's Recommended Construction                         83

B. Simple's Objection and CA's Counter Argument                          83

C. Analysis                                                              84

1. The Phrase "solely contained within" Should Be

Construed so as to Comport with the Functional

Aspects of Window Objects and the Claimed

Content Manifestation Environment                                          85

2. "[S]olely contained within" Defined                                     89

3. The Special Master's Recommended Construction

Overemphasizes Visual Perception                                           89

D. The Court's Ruling on the Phrase

"solely contained within"

VIII. "[E]xecutes within"                                                  90

A. The Special Master's Proposed Construction                              90

B. CA's Objection and Simple's Counter Argument                            91

C. Analysis                                                                92

1. One Skilled in the Art at the Time the '493 Patent **[*145]**

Was Filed Would Interpret "executes within" to

Mean "Runs Inside"                                                         92

2. "[E]xecutes within" Defined                                             93

3. Since the Special Master Correctly Focused on the

Functional Properties of Window Objects as They

Would Be Understood by One Skilled in the Art,

There is No Need to Incorporate His "Clarifying"

Language                                                                   93

D. The Court's Ruling on the Phrase "executes within"                      94

CONCLUSION                                                                 94

**Table2** (Return to related document text)

---

2005 WL 1020892
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jonathan CARAFINO, et al., Plaintiffs,
v.
Bruce M. FORESTER, M.D., Defendant.

No. 03 Civ. 6258PKLDF.
|
April 29, 2005.

MEMORANDUM AND ORDER

FREEMAN, Magistrate J.

**\*1** In this matter, referred to me by the Honorable Peter K. Leisure for general pretrial supervision, defendant has disputed the fee sought by plaintiffs' expert psychiatrist, Dr. Robert Lloyd Goldstein, for his appearance at a deposition. Dr. Goldstein has sought the sum of $2,500 for allotting one-half day for his appearance, regardless of whether the deposition is concluded in a shorter time. Upon review of the correspondence submitted by counsel on this issue, and as stated at a telephone conference held today with counsel, plaintiffs' request that defendant compensate its expert at this level is denied, and the fee to be charged to defendant is reduced, as set forth below.

*DISCUSSION*

The first issue raised by defendant is the reasonableness of being charged a "flat fee" for Dr. Goldstein's appearance. On this issue, the Court agrees that defendant should not be required to pay a flat fee, but rather should compensate Dr. Goldstein on the basis of an hourly rate. *See Mannarino v. U.S.,* 218 F.R.D. 372, 375 (E .D.N.Y.2003)* ("Courts expect 'some reasonable relationship between the services rendered and the

remuneration to which an expert is entitled.... By its nature, a flat fee runs counter to this principle.") The Court also notes that the mere fact that the Office of the United States Attorney, in a different matter, apparently agreed to pay Dr. Goldstein the same flat fee he is requesting here does not render the proposed fee reasonable in the context of this case. *See id.* (noting that the fact that other clients of expert had "willing paid" the requested flat fee was unpersuasive; the fact "[t]hat other parties in other cases have not objected to [the expert's] billing scheme has no bearing on whether it is fair to plaintiff in this case").

The further issue raised by defendant is whether Dr. Goldstein's alternative requested fee of $500 per hour is a "reasonable fee for time spent in responding to discovery," under Rule 26(b)(4)(C) of the Federal Rules of Civil Procedure. While this may well be a reasonable hourly rate for, as counsel puts it, an "exceptionally credentialed expert psychiatrist" (*see* letter to the Court from Carmen S. Giordano, Esq., dated April 22, 2005 ("Pl. 4/22/05 Ltr.")), plaintiffs have made no showing to support the idea that Dr. Goldstein is, in fact, "exceptionally credentialed," or that the requested rate is reasonable in this market and this case. In short, plaintiffs have come forward with no evidence as to Dr. Goldstein's area of expertise, his actual education and training, the prevailing rates in the New York City market for other comparably respected experts, the nature and complexity of the subject matter at issue, or any other factor that might support the requested fee. *See* 6 James Wm. Moore et al., *Moore's Federal Practice,* ¶ 26.80[3] (3d ed.2004) (summarizing relevant factors to fee determination). On the contrary, plaintiffs have merely stated that, according to Dr. Goldstein himself, his rate is "standard for an expert in his field with even less experience than he has." (Pl. 4/22/05 Ltr.) This may be true, but, stated baldly, it is an insufficient basis for the Court to determine the reasonableness of the requested rate. *See The Mark Andrew of the Palm Beaches v. GMAC Commercial Mortgage Corp.,* 01 Civ. 1812(JGK) (MHD), 2003 U.S. Dist. LEXIS 13217, at *3 (S.D.N.Y. July 31, 2003) (holding that "[T]he party that seeks reimbursement bears the burden ... of demonstrating the reasonableness of the amounts claimed").

**\*2** Where the party seeking reimbursement fails to meet its burden of demonstrating the reasonableness of the amount sought, the Court may exercise its discretion to determine a reasonable fee. *Mannarino,* 218 F.R.D. at 374; *The Mark Andrews,* 2003 U.S. Dist. LEXIS, at *3 (reducing a requested expert fee where the expert had "fail[ed] to explain his hourly rate, much less justify it").

Here, given the absence of other information on which to basis a decision, the Court finds the rate charged by defendant's psychiatric expert, $350 per hour, to be reasonable. Accordingly, defendant shall compensate plaintiffs' expert for his appearance at the deposition, as well as reasonable travel time, at that $350 per hour rate. *See Magee v. Paul Revere Life Ins. Co.,* 172 F.R.D. 627, 646 (E.D.N.Y.1997) (concluding that $350 per hour fee sought by Dr. Goldstein in that case was unreasonable, and reducing fee to $250 per hour, which was what he had charged for a psychiatric examination of the plaintiff and, at that time, was more in line with expert rates sustained by other courts); *see also Royal Maccabees Life Ins. Co. v. Malachinski,* No. 96 C 6135, 2001 U.S. Dist. LEXIS 3362, at *51-54 (N.D.Ill. Mar. 19, 2001) (adopting recommendation of magistrate judge that, where plaintiff did not meet its burden in establishing the reasonableness of a claimed $600 hourly rate for a psychiatric expert, and where case law did not support such a rate, the rate charged to defendant should be reduced to $250 per hour).

Nonetheless, because plaintiffs may not have realized that the Court was seeking a further showing in support of the claimed fee, this ruling is without prejudice to plaintiffs to return to the Court with such a showing. If plaintiffs are able to demonstrate the reasonableness of the requested rate of $500 per hour, in light of the factors relevant to a proper analysis of the question (*see supra* ), the Court will reconsider this ruling. Any further submission by plaintiffs should be made promptly, so that, if requested to revisit its ruling, the Court will have the opportunity to do so prior to the scheduled deposition.

### *CONCLUSION*

For the reasons stated above, it is hereby ORDERED that defendant shall compensate Dr. Goldstein for his appearance at deposition, including reasonable travel time, at the rate of $350 per hour, without prejudice to plaintiffs to make a further showing to justify a higher hourly rate.

### All Citations

Not Reported in F.Supp.2d, 2005 WL 1020892

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3511071
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Anthony CONTE, Plaintiff(s),
v.
NEWSDAY, INC. et al., Defendants(s).

No. CV 06–4859(JFB)(ETB).
|
Aug. 10, 2011.

**Attorneys and Law Firms**

Anthony Conte, South Setauket, NY, pro se.

Andrew G. Celli, Jr., O. Andrew F. Wilson, Kennisha Anlee Austin, Zoe A. Salzman, Emery, Celli, Brinckerhoff & Abady LLP, Paul Shechtman, Daniel Victor Shapiro, Stillman, Friedman & Shechtman, P.C., New York, NY, Joseph O. Giaimo, Jade Lois Fuller, Giaimo & Vreeburg LLP, Kew Gardens, NY, Sanford Strenger, Anthony F. Prisco, Salamon, Gruber, Blaymore & Strenger, P.C., Roslyn Heights, NY, for Defendants.

Sam Martinez, Selden, NY, pro se.

Dennis Springer, Lindenhurst, NY, pro se.

*MEMORANDUM OPINION AND ORDER*

E. THOMAS BOYLE, United States Magistrate Judge.

**\*1** Before the Court is defendants' Motion for Discovery ("Motion") requesting "that the Court order the plaintiff Anthony Conte to allow [defendants] to take the depositions of his designated experts for a 'reasonable fee.' " (Motion at 1). For the reasons below, the Motion is granted in part.

*BACKGROUND*

This action, which has been pending since September 2006, alleges violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as well as various state law torts. Plaintiff served his amended expert report regarding damages on May 20, 2011. Defendants noticed the depositions of plaintiff's damages experts—Olga Danilytcheva–Averin and Bruce L. Pulchin—for July 27 and 28, 2011. (Motion at 1). Defendants offered to pay the experts in advance for 7 hours of deposition time and reasonable travel time, with any additional costs to be invoiced after the depositions. (*Id.*). Plaintiff countered, asking for an advance payment of $12,600, reflecting compensation for 16 hours of testimony, 16.8 hours of preparation, and 3.2 hours of travel time. (*Id.*) Defendants then offered to pay $3,850.00 in advance (reflecting compensation for 7 hours of deposition testimony, 3 hours of preparation, and 2 hours of travel time) and, if additional days of testimony were required, to make similar advance payments at the start of each day. (*Id.*). This offer was rejected. (*Id.*). Defendants claim plaintiff thereafter demanded payment of $25,850 (representing 32 hours of deposition testimony, 35.1 hours of preparation, and 6.4 hours of travel time). (*Id.*). Plaintiff's experts failed to appear for their scheduled depositions. (*See* Plaintiff's Letter Dated Aug. 5, 2011 re: Clarification ("Aug. 5 Letter") at 1).[1] Plaintiff asserts that the next time plaintiff's experts are available for deposition is September 19, 2011. (*See* Motion at 3; Aug. 5 Letter at 2).

[1]   The letter is actually dated August 2, 2011; however, as the docket reflects that it is dated August 5, 2011, the Court will refer to it as the August 5 Letter.

*DISCUSSION*

Federal Rule of Civil Procedure 26(b)(4)(A) allows a party to "depose any person who has been identified as an expert whose opinion may be presented at trial." Fed. R. Civ. Proc. 26(b)(4) (A). Federal Rule of Civil Procedure 26(b)(4)(E) states: "Unless manifest injustice would result, the court must require that the party seeking discovery ... pay the expert a reasonable fee for time spent responding to discovery under Rule 26(b)(4)(A) ...."[2] Fed. R. Civ. Proc. 26(b)(4)(E). "While a party may contract with any expert it chooses, the court will not automatically tax the opposing party with any unreasonable fees charged by the expert." *Reit v. Post Props., Inc.,* No. 09 Civ. 5455, 2010 WL 4537044, at \*2

(S.D.N.Y. Nov. 4, 2010) (internal quotation marks omitted); *see also Johnson v. Spirit Airlines,* No. CV 07–1874, 2008 WL 1995117, at *1 (E.D.N.Y. May 6, 2008) ("[I]t is the court's prerogative to balance one party's need to retain a competent expert with the need to protect the opposing party from being unfairly burdened with excessive ransoms which produce windfalls for the party's experts" (internal quotation marks omitted)).

2    The 2010 amendments to the Federal Rules of Civil Procedure renumbered Federal Rule of Civil Procedure 26(b)(4)(C) as Federal Rule of Civil Procedure 26(b)(4)(E). *See* Fed. R. Civ. Proc. 26 advisory committee's notes to 2010 amendments

**\*2** Courts consider the following factors in determining whether a requested expert fee is reasonable:

> (1) the witness' area of expertise; (2) the education and training that is required to provide the expert insight that is sought; (3) the prevailing rates for other comparably respected available experts; (4) the nature, quality and complexity of the discovery responses provided; (5) the cost of living in the particular geographic area; (6) any other factor likely to be of assistance to the court in balancing the interests implicated by Rule 26; (7) the fee actually being charged to the party who retained him; and (8) fees traditionally charged by the expert on related matters.

*Broushet v. Target Corp.,* ––– F.R.D. ––––, 2011 WL 1750753, at *1 (E.D.N.Y. Mar.3, 2011). Time spent in preparation and travel, as well as out-of-pocket expenditures, are generally compensable. *See Kreyn v. Gateway Target,* No. CV 05–3175, 2008 WL 2946061, at *1 (E.D.N.Y. July 31, 2008) (citing *Magee v. Paul Revere Life Ins. Co.,* 172 F.R.D. 627, 646 (E.D.N.Y.1997) and *Feliciano v. County of Suffolk,* 246 F.R.D. 134, 137 (E.D.N.Y.2007)). "The party seeking to be reimbursed bears the burden of demonstrating that the fee sought is reasonable." *Id.; see also Reit,* 2010 WL 4537044, at *2; *Garnier v. Ill. Tool Works, Inc.,* No. 04 CV 1825, 2006 WL 1085080, at *2 (E.D.N.Y. Apr. 24, 2006).

Although defendants have the right to depose plaintiff's experts at a "reasonable fee," to the extent that defendants' Motion asks the Court to set such a fee, it is premature. The rule and the case law makes it clear that the parties seeking court intervention to determine a reasonable fee for an expert deposition should do so retrospectively—that is, after the deposition has taken place. The rule clearly contemplates that a court order will be issued subsequent to the deposition, as it requires a court to order payment of a "reasonable fee for *time spent* in responding to discovery." Fed. R. Civ. Proc. 26(b)(4)(E). For this reason, "[t]he pertinent rule thus teaches that once [the expert] has actually 'spent' time responding to ... questions at the deposition, he may then bill ... for a 'reasonable' fee for that amount of 'time.' " *Johnson,* 2008 WL 1995117, at *1). Additionally, in determining the reasonableness of any fees demanded, the court should take into account, among other factors, "the nature, quality and complexity of the discovery responses provided." *Broushet,* 274 F.R.D. 432, 2011 WL 1750753, at *1; *see also Magee,* 172 F.R.D. at 645; *Mathis v. NYNEX,* 165 F.R.D. 23, 24 (E.D.N.Y.1996). It is speculative to make such a determination prospectively. Furthermore, the cases place the burden of demonstrating the reasonableness of any "reimbursement" sought on the party who hires the expert. *Broushet,* 2011 WL 1705753, at *1; *Reit,* 2010 WL 4537044, at *2; *Garnier,* 2006 WL 1085080, at *2. This, too, indicates that any order regarding fees should be deferred until after expert depositions have taken place.

**\*3** Even without this guidance from the text of the rule and the cases interpreting it, the Court is unable to determine a reasonable fee based on the information provided by the parties. No attempt has been made to justify the experts' apparent hourly rate of $350.00. (*See* Motion, Exh. 2, at 2 ("In case our testimony is required in this matter, the hourly rate in $350.00."). Nor, as noted above, can the Court determine in advance how much time will reasonably be expended in preparation for, traveling to, or attending the depositions.

Plaintiff asserts that he demanded payment in advance "out of fear that defendants would refuse to pay my experts their reasonable fees and that I might become liable for whatever they refused to pay." (Aug. 5 Letter at 1). Plaintiff forgets that he retained these experts and it is his responsibility to pay them. While the Federal Rules of Civil Procedure entitle plaintiff to reimbursement for "reasonable fees" in connection with his expert's depositions, defendants are under no obligation to pay fees charged by experts plaintiff has retained if those fees are found to be unreasonable. *See Reit,* 2010 WL 4537044, at *2 ("While a party may contract with any

expert it chooses, the court will not automatically tax the opposing party with any unreasonable fees charged by the expert."); *see also Lamere v. N.Y. State Office for the Aging,* 223 F.R.D. 85, 93 (N.D.N.Y.2004) ("The determination of a reasonable fee and for what services, including preparation, falls solely within [the court's] province."). Nor, as discussed above, does the rule entitle plaintiff to payment in advance. *See Fed. R. Civ. Proc.* 26(b)(4)(E) (entitling an expert to a reasonable fee for "time spent" responding to discovery); *Johnson,* 2008 WL 1995117, at *1 ("[The expert] therefore may not insist on advance payment ...."). Rather, if the parties cannot agree to reasonable reimbursement for plaintiff's experts following their depositions, either party may apply to the Court for such a determination.

*CONCLUSION*

For the foregoing reasons, plaintiff is afforded an additional opportunity to produce his expert witnesses for deposition at a mutually agreeable time on or before September 30, 2011, and expert discovery is extended for

this limited purpose. In the event that plaintiff fails to timley produce his experts, plaintiff will be precluded from offering such expert testimony at trial. There is no dispute that the expert witnesses are entitled to a "reasonable fee for the time spent responding" to defendants' discovery demands. Fed. R. Civ. Proc. 26(b)(4)(E). There are, however, no special circumstances involved here which would dictate that this determination be made before the depositions. The Court will make this determination following the depositions, on motion of any party, in the event that the parties are unable to reach an agreement. Defendants' Motion to conduct expert depositions at a reasonable fee is granted to the limited extent provided above, and without prejudice to the filing of a motion to set that fee following the completion of such depositions in the event that the parties are unable to reach an agreement.

**\*4 SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3511071

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2019 Thomson Reuters. No claim to original U.S. Government Works. 3

2018 WL 3970913
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Jean M. FLYNN, et al., Plaintiffs,
v.
DIRECTV, LLC, et al., Defendants.

No. 3:15-cv-01053 (JAM)
|
Signed 08/20/2018

**Attorneys and Law Firms**

Bruce E. Newman, Brown, Paindiris & Scott, LLP,
Bristol, CT, Shelly A. Leonard, Steven Bennett Blau,
Blau Leonard Law Group, LLC, Huntington, NY, for
Plaintiffs.

Andrew Z. Edelstein, John Nadolenco, Mayer Brown
LLP, Los Angeles, CA, Hans J. Germann, John E.
Muench, Kyle J. Steinmetz, Mayer Brown LLP, Chicago,
IL, Nicholas Norton Ouellette, Kurien Ouellette LLC,
West Hartford, CT, Christopher J. Belter, Daniel B. Moar,
Goldberg Segalla, LLP, Buffalo, NY, Scott S. Orenstein,
Troy A. Bataille, Goldberg Segalla LLP, Hartford, CT,
for Defendants.

**RULING DENYING PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

Jeffrey Alker Meyer, United States District Judge

**\*1** Plaintiffs are landlords who claim that defendants
installed satellite television equipment on their property
without their consent. On behalf of themselves and
thousands of allegedly similarly situated landlords
throughout Connecticut, they have sued defendants for
trespass and under the Connecticut Unfair Trade Practices
Act (CUTPA).

I have previously dismissed plaintiffs' class action
allegations as to their trespass claim. Plaintiffs now move
for class certification as to their CUTPA claim. I will
deny the motion for class certification on two grounds.
First, plaintiffs have not proposed a class for which all

members have an injury-in-fact that would allow them
constitutional standing to maintain a claim. Second,
plaintiffs have failed to show that common questions of
law or fact predominate over individual questions of law
or fact.

**BACKGROUND**

Defendant DIRECTV furnishes satellite-based television
programming by means of signals that it broadcasts
through the air to small satellite receptor "dishes" at
customers' locations. When a customer in Connecticut
signs up for service from DIRECTV, a technician from
defendant MasTec North America, Inc. (MasTec) goes to
the customer's location to install the DIRECTV satellite
dish. The installation ordinarily entails the drilling of
holes in the exterior walls or roof of the building where a
customer lives in order to affix the satellite dish.

Plaintiffs own a three-story multi-dwelling unit (MDU)
building that they lease to tenants in Waterbury,
Connecticut. They have filed this lawsuit on behalf of
themselves and a putative class of thousands of other
landlords in Connecticut alleging that defendants
wrongfully install satellite dishes on their property
without obtaining their written consent. According to
plaintiffs, defendants have a business practice that is
designed to allow them to install DIRECTV dishes for
tenant customers without obtaining landlords' consent.

When DIRECTV signs a tenant customer up to receive its
services, DIRECTV and MasTec have the customer sign a
work order agreement stating that the tenant has received
the landlord's permission or otherwise authorizes the
installation of the satellite dish on the property:

> Land Lord Permission: I confirm
> that I have been granted permission
> or authorize the DIRECTV Home
> Service Provider [MasTec] to
> install a DIRECTV Satellite
> System at the above mentioned
> address. I understand that a satellite
> dish may need to be permanently
> fixed to the structure and
> modifications, including the
> drilling of holes, may be necessary.

> In no event shall either the
> DIRECTV Home Service Provider
> or DIRECTV have any obligation
> to remove the system or accept any
> liability whatsoever for violations
> of my lease/rental agreement.

Doc. #97-10 at 3; Doc. #101-4 at 2. When the MasTec
technician arrives at the customer's location to do the
installation, the technician has the customer sign the work
order form on a hand-held electronic device stating that
the customer has permission from the landlord, and a
confirmation email with the above-quoted language is
then sent to the customer following the installation. Doc.
#97-3 at 27; #97-10 at 2-3.

**\*2** Neither DIRECTV nor MasTec directly contact the
landlord to obtain permission to install a DIRECTV
satellite dish. Technicians are told that "[y]ou do not need
to speak with or receive a signature from the landlord,"
and "[t]he customer is responsible for getting this
permission." Doc. #101-3 at 2.

Plaintiffs filed this lawsuit alleging a trespass claim and a
CUTPA claim. Two years ago, I denied defendants'
motion to dismiss the CUTPA claim, rejecting
defendants' argument that the CUTPA claim could not be
sustained in the absence of a business relationship
between plaintiffs and defendants. *See Flynn v.
DIRECTV, LLC*, 2016 WL 4467885, at \*2–5 (D. Conn.
2016).

I further granted in part and denied in part defendants'
motion to dismiss plaintiffs' class action allegations. As
to plaintiffs' trespass claim, I noted that any trespass
claim would be defeated by evidence of consent (whether
consent is viewed as an element of a trespass claim or a
defense) and that "[a]lthough some tenants might well
falsely certify that such consent has been granted (and
defendants may well count on some tenants doing so),
many tenants will doubtlessly seek and obtain the consent
of their landlords." *Id.* at \*6. Regardless whether a tenant
acted truthfully or not, "[b]ecause the issue of consent
will require an individual-by-individual consideration of
the interaction (if any) between tenant and landlord, the
issue of consent cannot be adjudicated on a class-wide
basis." *Ibid.*

As to the CUTPA claim, I concluded that it would be
premature at the bare pleadings stage to strike the class
action allegations. I concluded that "the CUTPA claim
differs from the trespass claim in a key respect," in that
regardless of individual consent "CUTPA forbids

business practices that violate public policy" and that the
fact "[t]hat some landlords may have consented to having
the dishes affixed to their property does not make the
alleged practice as a whole any more scrupulous or
proper, given the likelihood that many landlords will not
consent and still be victim to defendants' trespass." *Ibid.*
On the other hand, I voiced some doubt about whether
plaintiffs could ever define their class in a cognizable and
manageable way that would satisfy CUTPA's individual
"ascertainable loss" requirement, in view that if some
landlords in fact consented (even if not in writing but by
means of oral consent), then plaintiffs would be unable to
show on a class-wide basis that any such consenting
landlord class members suffered an ascertainable loss as
required for a CUTPA claim. *Id.* at \*6–7.
Notwithstanding these doubts, I decided that "plaintiffs
should have the opportunity to refine their proposed class
definition to address the concerns raised here." *Id.* at \*7.

The parties have conducted extensive discovery in the two
years since I issued that ruling, and plaintiffs now move
to certify a class under Fed. R. Civ. P. 23(b)(3) with the
following class definition:

> All persons and/or entities
> ("Landlords") that own and lease
> residential multiple dwelling units
> ("MDU's") in the State of
> Connecticut, upon which
> Defendants, by their agents,
> servants and/or employees have, on
> at least one occasion during the
> applicable statutory period, without
> first receiving prior written
> Landlord authorization and/or
> permission, installed DIRECTV
> satellite dish model Ka/Ku, on the
> roof of said MDU.

**\*3** Doc. #92-1 at 6.

## DISCUSSION

Rule 23 of the Federal Rules of Civil Procedure permits a
federal court to certify a class action by which named
plaintiffs may litigate claims on behalf of a class of
similarly situated aggrieved class members. "Class

actions under Rule 23 of the Federal Rules of Civil Procedure are an exception to the general rule that one person cannot litigate injuries on behalf of another." *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 93 (2d Cir. 2018).

In order for the Court to grant plaintiffs' motion to certify a class under Fed. R. Civ. P. 23(b)(3), plaintiffs must satisfy seven requirements. First, plaintiffs must satisfy the four threshold requirements of Rule 23(a)—numerosity, commonality, typicality, and adequate representation of the class. *See In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017). Next, plaintiffs must further satisfy two more requirements under Rule 23(b)(3)—predominance and superiority. *Ibid.* Lastly, plaintiffs must otherwise satisfy " 'an implied requirement of ascertainability in Rule 23,' which demands that a class be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.' " *Ibid.* (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) ).

It is axiomatic that the federal courts lack jurisdiction over a lawsuit unless a plaintiff alleges a concrete and particularized injury-in-fact that is fairly traceable to a defendant's wrongful conduct and redressable by a court order. *See, e.g., Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Crupar-Weinmann v. Paris Baguette Am., Inc.*, 861 F.3d 76, 79 (2d Cir. 2017). "The filing of suit as a class action does not relax this jurisdictional requirement." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006). Accordingly, as the Second Circuit has made clear, not only must the named plaintiff in a class action have individual standing to sue, but "no class may be certified that contains members lacking Article III standing." *Id.* at 264. While each member of a class is not required to submit evidence of personal standing, *id.* at 263, the class nonetheless "must ... be defined in such a way that anyone within it would have standing." *Id.* at 264. Of course, if the rule were otherwise, then class actions would become a means for courts to award money and relief to multitudes of class members who were never injured at all.[1]

[1]  Not to the contrary is the Second Circuit's recent decision in *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88 (2d Cir. 2018), in which the court of appeals concluded that constitutional standing analysis should not govern the consideration of certification for a multi-state class action involving claims brought under parallel state consumer protection laws. A principal issue presented in *Langan* was whether named plaintiffs from one State could press the claims of plaintiffs from other States whose claims of injury arose from alleged violations of different state laws. The court of appeals concluded that this issue should not be addressed by means of evaluating whether the named class plaintiff had "standing" to assert the claims of consumers from other States but whether the predominance requirement could be satisfied in light of any differences among the law of multiple States. The case before me now involves plaintiffs from one State and an issue—not discussed in *Langan*—concerning whether the class has been defined in a manner to include only persons who have suffered an injury-in-fact sufficient for constitutional standing.

**\*4** The problem for plaintiffs here is that their proposed class includes only those landlords who did not give *written* consent. As I explained in my prior ruling on defendants' motion to dismiss, Connecticut law allows for consent to be either oral or written in form. Consent may be given in any number of ways, and consent need not be written down, or even spoken. *See, e.g.*, Restatement (Second) of Torts, § 892 & com. b ("[Consent] need not ... be so manifested by words or affirmative action. It may equally be manifested by silence or inaction."). In view that a landlord may consent by means other than a formal writing, this means that plaintiffs' proposed class will necessarily include landlord members who have in fact validly consented to the installation of a DIRECTV satellite dish—that is, landlords who have not suffered any wrong or injury at all.[2]

[2]  To the extent that plaintiffs might re-craft the class definition to include landlords who neither gave written nor oral consent, this might redress the standing problem but expand the degree to which individual consent issues would need adjudication in derogation of the predominance requirement discussed below.

Even if I could overlook this problem that plaintiffs have defined their class to include members who have no standing, it is equally clear that plaintiffs cannot satisfy the predominance requirement for a class action. The predominance requirement provides that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). As the Second Circuit has recently explained, "[t]he predominance requirement is satisfied if 'resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof,' and 'these particular issues are more substantial than the issues subject only to individualized proof.' " *Langan*, 897 F.3d at 97 (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) ).

Here, there is no doubt that at least one element of plaintiffs' CUTPA claim—ascertainable loss—will be subject to individualized proof. Every CUTPA claim requires proof not only of an unfair business practice but also of an ascertainable loss of money or property. *See* Conn. Gen. Stat. § 42-110g(a); *Landmark Inv. Grp., LLC v. CALCO Const. & Dev. Co.*, 318 Conn. 847, 880 (2015). It follows that no landlord is an appropriate class member unless the landlord has suffered some ascertainable loss. *Cf. Neighborhood Builders, Inc. v. Town of Madison*, 294 Conn. 651, 663 (2010) (concluding under state law class action rules that "in order to certify a CUTPA claim for class action status, the representative plaintiffs must prove, in addition to the fact that the defendant engaged in unfair or deceptive acts or practices, that each putative class member has suffered an ascertainable loss as a result of the defendant's acts or practices").

Of course, the fact that one element of plaintiffs' claim will be subject to individualized proof does not necessarily resolve the predominance question, because a court must still step back to consider whether those elements of plaintiffs' claim that are subject to generalized proof are "more substantial" than the elements or issues that are subject only to individualized proof. *See, e.g., Roach*, 778 F.3d at 405. Here, there are aspects of plaintiffs' CUTPA claim that appear to be subject to common class-wide proof, namely defendants' use of a common form and practice to secure consent from a tenant for the installation of a DIRECTV dish on a landlord's property. Still, the ultimate wrongfulness (if any) of defendants' conduct turns on an inquiry about whether defendants could rely in good faith on tenants' representations about their landlord's consent. This in turn would rely heavily on individualized proof about what steps tenants took to obtain consent (as well as what restrictions may exist under individual lease agreements). Thus, not only would individualized proof be required to determine if there has been an ascertainable loss but also to determine whether defendants' practices are unfair at all.

**\*5** Accordingly, because of individualized issues of landlord consent, plaintiffs have not carried their burden to establish the predominance requirement. *See e.g., Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468–69 (6th Cir. 2017) (affirming district court's determination that predominance requirement not established for class certification of action under Telephone Consumer Protection Act involving alleged unsolicited faxes in light of individualized issue of consent to such faxes); *Ung v. Universal Acceptance Corp.*, 319 F.R.D. 537, 539 (D. Minn. 2017) (predominance requirement not established for class certification of action under Telephone Consumer Protection Act involving alleged marketing calls in light of individualized issue of consent to such calls). My conclusion is reinforced by defendants' arguments that individualized proof will also be required as to the terms of specific lease agreements and the amount of damages incurred from property to property. *See* Doc. #97 at 29–35.

### CONCLUSION

I have considered all of plaintiffs' remaining arguments and reject them for substantially the reasons set forth in defendants' briefing. Plaintiffs' motion for class certification (Doc. #92) is DENIED.

It is so ordered.

### All Citations

Slip Copy, 2018 WL 3970913

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 Caution
As of: June 17, 2019 7:26 PM Z

# Garcia v. Tyson Foods, Inc.

United States District Court for the District of Kansas

August 21, 2012, Decided

Case No. 06-2198-JTM

**Reporter**
890 F. Supp. 2d 1273 *; 2012 U.S. Dist. LEXIS 118965 **; 2012 WL 3594212

ADELINA GARCIA, ET. AL., Plaintiffs, vs. TYSON FOODS, INC. ET. AL., Defendants.

**Subsequent History:** Costs and fees proceeding at, Motion granted by, in part, Motion denied by, in part Garcia v. Tyson Foods, Inc., 2012 U.S. Dist. LEXIS 170177 (D. Kan., Nov. 29, 2012)

Affirmed by Garcia v. Tyson Foods, Inc., 2014 U.S. App. LEXIS 15917 (10th Cir. Kan., Aug. 19, 2014)

**Prior History:** Garcia v. Tyson Foods, Inc., 2011 U.S. Dist. LEXIS 52450 (D. Kan., May 13, 2011)

**Counsel: [**1]** For Adelina Garcia, Antonio Garcia, Jeronimo Vargas-Vera, Efrain Aguilar, Paulina Aguilar, Adelaida Aguirre, Jose R. Aguirre, Salvador Almanza, Miguel Amaya, Rogelio Andrade, Jesus Anguiano, Efigenia Arana, Jose R. Arana, Ramon Arana, Alma Armendariz, Jorge L. Banda Valadez, Delfino Barragan, Lucia Barragan, Ramon P. Barragan, Holga Benitez, Baltazar Bonilla, Maria Guadalupe Bonilla, Catalina Bustillos, Bernardo Calderon, Etelvina Calderon, Gloria Calzada De Carrillo, Manuel Calzadillas, Joaquin Camacho, Roberto Cano, Rosa M. Cano, Alberto Carrillo, Javier Carrvajal, Luis Castanon, Maria Rosario Castillo, Victor Castillo, David Castro, Cipriano Cerna, Flavio Chavez, Jose A. Chavez, Griselda Claro, Jesus Claro, Jose L. Contreras, Eliseo Perez Correa, Agustin Cruz, Flor Angela Cruz, Lorenzo Cruz, Socorro De Leon, Aurora Chavez De Montes, Javier Delgado, Jose N. Delgado, Liliana Martinez Delgado, Lorenzo Delgado, Gildardo Ramon Diaz, Rosa D. Diaz, Carmelo G. Diaz-Santamaria, Ana Duran, Edgar E. Duran, Abe Dyck, Elizabeth Dyck, Fernando H. Escalante, Marina Escalante, Candido Hernandez Escobedo, Carlos E. Espino, Francisco Estrada, Humberto Estrada, Maria Estrada, Aide B. Estrada Vital, **[**2]** Jesus Felix, Jose Flores, Juan Jose Flores, Tomasa Fraire, Erasmo Galan, Maricela Galan, Romualdo Galan, Gloria Galaviz, Rocio Galaviz, Ciro Galvez, Silvia Reyes Galvez, Agustin Garcia, Bertha Garcia, Humberto Perez Garcia, Luz E. Garcia, Mauro Garcia, Moises Garcia, Maria S. Gloria, Elia Goitia, Melquiades Gonzales, Juan M. Gonzalez, Maria T. Gonzalez, Miguel Lorenzo Gonzalez, Rosari Melendez Grande, Manuel Guerrero, Samuel Guevara, Angel R. Gutierrez, Eusebio Guzman, Juana Guzman, Leticia Guzman, Rosendo Guzman, Silvia Guzman, Elizabeth C. Hamilton, Herber Rufino Henriquez, Alberto Hernandez, Efren Hernandez, Elida Hernandez, Feliciano Hernandez, Fidel Hernandez, Guadalupe Hernandez, Guadalupe Hernandez, Jesus Hernandez, Jorge Hernandez, Maria Hernandez, Miguel Angel Hernandez, Rosa Hernandez, Wenceslao C. Hernandez, Wilfrido Hernandez, Adrian S. Herrada, Aida Herrada, Alfonso Herrada, Maria Guadalupe Herrada, Elizabeth Herrada De Cruz, Randy Hoskinson, Oscar Interiano, Martin H. Isco, Margarita Leanos, Pedro Leyva, Celsa Leyva De Garcia, Blanca E. Lira, Diana Lopez, Genaro Lopez, Ismael Lopez, Laura Lopez, Lauro Lopez, Margarito Lopez, Maria Del Carmen Lopez, Maria De La Luz Lopez, **[**3]** Maura Lopez, Miguel A. Lopez, Miguel Z. Lopez, Rodolfo Lopez, Modesto Loya, Jose A. Lujan, Manuela O. Garay De Lujan, Beatriz Madera, Monica Marmolejo, Feliciano Martinez, Fidel Martinez, Gandino Martinez, Leticia Martinez, Nestor Martinez, Rafaela Ortiz Martinez, Saturnino Martinez, Mario Maya, Domingo Martin Medina, Ramiro Mejia, Maria Dora Mendez, Rodolfo Mendez, Beatriz Mendoza, Irene E. Merino, Dionila Mezquita, Maria Molina, Maxio A. Molina, Sergio A. Monrreal-Rocha, Raul Monrroy, Alfonso Montano, Luis Monterroza, Adrian Morales, Francisca Magallanes Muniz, Alfonso Murcia, Carlos Murguia, Abraham Sosa, Individually and on behalf of a class of others similarly situated, Abel Navarrete, Alberto Tamayo, Individually and on behalf of a class of others similarly situated, Lorenzo Navarrete, Sonia Tamayo, Individually and on behalf of a class of others similarly situated, Ramon Navarrette, Alisia Nieto, Jose J. Terrazas, Individually and on behalf of a class of others similarly situated, Isaac Olguin, Maria Terrazas, Individually and on behalf of a class of others similarly situated, Javier Olguin, Mary Olguin, Albaro Torres, Individually and on behalf of a class of others similarly **[**4]** situated, Maria D. Olivas, Sang Thi Tran, Individually and on behalf of a class of others similarly situated, Lauro Ortega, Thanh Ngoc Tran, Individually and on behalf of a class of others similarly situated, Maria Rosa Ortega, Maricela Lares Ortega, Maria

890 F. Supp. 2d 1273, *1273; 2012 U.S. Dist. LEXIS 118965, **4

Urrutia, Individually and on behalf of a class of others similarly situated, Yolanda Ortega, Rolando Vaillant, Individually and on behalf of a class of others similarly situated, Francisco A. Ortez, Maria E. Valadez, Individually and on behalf of a class of others similarly situated, Manuel Osorio, Yasmin Valadez, Individually and on behalf of a class of others similarly situated, Jose Raul Palacios, Maria Angelina Palacios, Gilberto Armando Valencia, Individually and on behalf of a class of others similarly situated, Miguel Perales, Abraham Vallejo, Individually and on behalf of a class of others similarly situated, Bertha Perez, Gabriela Perez, Bertha Vallejo, Individually and on behalf of a class of others similarly situated, Jorge L. Perez, Mariana Vanegas, Individually and on behalf of a class of others similarly situated, Martha Perez, Gerardo C. Varela, Individually and on behalf of a class of others similarly situated, Jose [**5] Alejandro Pineda, Alejandro Ponce, Jose Vasquez, Individually and on behalf of a class of others similarly situated, Irma Ponce, Raymundo Vasquez, Individually and on behalf of a class of others similarly situated, Juan Ponce, Salvador Vasquez, Individually and on behalf of a class of others similarly situated, Jose Victor Prieto, Rosa Maria Velasco, Individually and on behalf of a class of others similarly situated, Eugene Prokopinski, Saul Velasco, Individually and on behalf of a class of others similarly situated, Juan Enrique Ramirez, Maria Ramirez, Nicolas Ramirez-Acosta, Jose Renteria, Alma Resendiz, Esteban Resendiz, Sandra Resendiz, Jose A. Reyes, Francisco J. Velazquez, Individually and on behalf of a class of others similarly situated, Jose A. Reyes, Irma G. Velazquez, Individually and on behalf of a class of others similarly situated, Miriam Del Carmen Reyes, Francisco Montes Rios, Reymundo Viana, Individually and on behalf of a class of others similarly situated, Salvador Alvarez Rivera, Jesus Villeda, Individually and on behalf of a class of others similarly situated, Jorge Robles, Santiago Villegas, Jr, Individually and on behalf of a class of others similarly situated, [**6] Luz M. Rocha, Sergio Zamora, Individually and on behalf of a class of others similarly situated, Guadalupe Rodriguez, Jose R. Rodriguez, Marina Rodriguez, Rafael Rodriguez, Rosa Rodriguez, Salvador Romero, Ruben N. Salas-Ortiz, Ricardo Saldana, Sixto Saldana, Candido Marino Sanchez, Rosa Maria Sanchez, Ramon Sandoval, Daniel Santacruz, Luis A. Santacruz, Joaquin Santoyo, Sofia E. Sauceda, Armando Serrano, Fernando Serrano, Sergio Serrano, Brenda Serrato, Rafael Solis, David S. Solorzano, Aaron Sosa, Plaintiffs: Adam T. Klein, Justin M. Swartz, Linda A. Neilan, LEAD ATTORNEYS, PRO HAC VICE, Outten & Golden LLP, New York, NY; Eric L. Dirks, George A. Hanson, Lee R. Anderson, LEAD ATTORNEYS, Stueve Siegel Hanson LLP - KC, Kansas City, MO; Peter J. Antosh, LEAD ATTORNEY, Garcia & Antosh, LLP, Dodge City, KS.

For Miguel Aguilera, Juana Almanza, Manuel Almanza, Benito Barragan, Maria Cerritos, Ismael Chairez, Sara Chavarria, Raquel Estrada, Ana R. Flores, Jose Huerta, Sophia Lamdero, Arnulfo Lira, Gabriela Lira, Julia Lopez, Manuel De Jesus Lopez, Maria A. Martinez, Maria Guadalupe Martinez, Mareial Morales, Estela Murguia, Armando Nunez, Michelle Ortega, Omar Ortega, Luis Ortiz, Rosalia [**7] Perez, Socorro Perez, Maria Perez-Serrano, Melania Pineda, Jose Ramirez, Peter Ramirez, Steven Ramirez, Diana Ramos, Blanca Salmeron, Felix Solozano, Vashon L. Telfair, Arturo Villanueva, Irineo Zepien, Carlos Acosta, Elias Murillo Avalos, Hugo Castruita, Alicia Munoz Hernandez, Francisco Huereque, Alicia Martinez, Jose G. Martinez, Pedro Neave, Catalina Alvarez de Nichols, Eduard Nichols, Maria del Carmen Perez, Maria Margarita Renova, Alicia Sanchez, Macario R. Farias, Primitivo Galvez, Maria Lourdes Gonzales, Gaspar Benito Lux, Enrique Munoz, Gregoria Ramirez, Salvador Sanchez, Aura Santacruz, Jose I. Valdez, Hector Garcia Valles, Jesus Aguilar, Maria A. Arreola, Federico G. Baltazar, Armando Castillo, Abigail Chairez, Maria Estrada Chairez, Patricia Correa, Angelica Maria Nunez Enriquez, Jose Anselmo Enriquez, Francisco Esquivel, Humberto Esquivel, Tomas Felix, Maria Flores, Samuel Gomez, Elizabeth Gonzales, Kristal Gonzalez, Ronald W. Harden, Teodolo Heredia, Mario Herrera, Rigoberto Jhonson, Jose De Jesus Liamas, Luis E. Lozano, Mario Chairez Mares, Eusebio Marroquin, Maria Noeli Montoya, Norma Naiera Morales, Hugo Ortega, Rosalba Ortega, Gonzalo Padilla, Mercedes Ramirez, Salvador [**8] Rojo, Rodolfo Rubalcava, Rosinda De Jesus Ucles, Iginio Cruz, Felipe Bravo, Charles Velazquez Baez, Reyna Lopez, Aurora Aldana, Eduardo F. Nolasco, Pedro Baltazar, Eddie Prieto, Jacimto Almaraz, Carlos Martinez, Maria Martinez, Josefina Garcia de Rodriguez, Filemon Rodriguez, Jose Martin Hernandez, Josh Lundblade, Nora Duran, Sandra M. Hernandez Alfaro, Fausto Vasquez, Jose Hernandez, Jorge Hinojosa, Severiona Hinojosa, Gilberto Guillen, Cruz P. Ramirez, Vidalina G. Galvan, Anthony Garcia, Ascencion Garcia, Javier Delgado, Jose Flores, Roberto Aguilar, Roberto Almeda, Blanca Benitez, David Chavez, Luis Alberto Santacruz Castaneda, Martin Facio, Federico Chavez, Aaron Findley, Antonio Hinojos, Maria Laguna Guerra, Joel Garcia Maeda, Jose Morales, Elizabeth Ontveros, Joel Ortega, Manuela Ortega, Juan Reyes, Pedro Reyes, Heladio Rivas, Carmelita Rosales, Federico Rosales, Alfredo Rutiaga, Reyna Salinas, Ramon Soto, Plaintiffs: Adam T. Klein, Justin M. Swartz, Linda A. Neilan, LEAD ATTORNEYS, PRO HAC VICE, Outten & Golden LLP, New York, NY; Peter J. Antosh, LEAD ATTORNEY, Garcia & Antosh, LLP, Dodge City, KS.

For Jose Arras, Maria Del Carmen, Elaine Romero, Carlos Mendias, Sabrina Garcia, [**9] Adam Murillo, Amalia

Case 3:14-cv-00956-JBA   Document 509   Filed 06/17/19   Page 127 of 183   Page 3 of 20

890 F. Supp. 2d 1273, *1273; 2012 U.S. Dist. LEXIS 118965, **9

Morales, Michael Libarra, Arturo Celis, Sonya Maribel Hernandez, Maria Gerrero, Wilfrido Ingles, Edelmira Velazzo, Sharon Smith, Ramon Perez, Cindy Cisneros, Dora Alicia Martinez, Plaintiffs: Adam T. Klein, Justin M. Swartz, Linda A. Neilan, LEAD ATTORNEYS, PRO HAC VICE, Outten & Golden LLP, New York, NY; George A. Hanson, LEAD ATTORNEY, Stueve Siegel Hanson LLP - KC, Kansas City, MO; Peter J. Antosh, LEAD ATTORNEY, Garcia & Antosh, LLP, Dodge City, KS.

For Amado Figueroa, Guadalupe Quesada, Patricia Anguiano, Jose Luis Barron Mendez, Maria Ponce, Leobardo Godinez Villalobos, J.R. Otero, Alvaro Torres, Fidel Reyes, Ismael Lopez, Plaintiffs: Adam T. Klein, Justin M. Swartz, Linda A. Neilan, LEAD ATTORNEYS, PRO HAC VICE, Outten & Golden LLP, New York, NY; George A. Hanson, LEAD ATTORNEY, Stueve Siegel Hanson LLP - KC, Kansas City, MO; Peter J. Antosh, LEAD ATTORNEY, Garcia & Antosh, LLP, Dodge City, KS.

For Maria R. Pena, Antonio G. Villegas, Isaac Adame, Calixto Aguilar, Rigoberto Arvizu, Rosa Barahoma, Isaac Bonilla, Javier Castellanos, Maria Castruita, Luis Orlando Coto, Felix Cruz, Higinio Cruz, Maria Cruz, Juan M. Calderon Dominquez, Jose Ines Sanchez Espinoza, [**10] Juan Figueroa, Victoriano Galvez, Maria E. Gomez, Elena Gonzalez, Robin E. Hernandez, Berta Herrera, Brenda Leija, Herlinda Leyva, Eduardo Lomelin, Noe Lopez, Aurelio Marquez, Barbaro Mendoza, Luisa Miguel, Florisela Nuncio, Gilberto Garcia Ponce, Cristina Renteria, Hermenegildo Resendez, Maria Elena Retana, Leocadio Roberto Rodriguez, Armando Rico, Maria Rodriguez, Maria Rucker, Blanca Salazar, Patrick Smith, Maria Solis, Atanacio Solorsano, Saul Lopez Satelo, Lidia Sotelo, Jose Acosta, Maria Guevara, Clara Ines Lopez, Ramiro Adame, Humberto Arrendondo, Martha A. Arrendondo, Claudia Cardona, Valentin Castro, Equileo Cisneros, Jesus Gaspar Escobedo, Maria Isabel Felix, Herminio Pino Graciano, Jose R. Guevara, Lorena Guevara, Alma Rose Hernandez, Carolina Hernandez, Emilio Landeros, Edgar Loza, Edmundo Navarrete, Antonio Puentes, Juan A. Puentes, Mayra Puentes, Joel Ramos, Edlfanio Reyes, Jose Wis Salas, Esequiel Salazar, Alma D. Velazaquez, Alfredo Aguilar, Rosa Aguilar, Josefina Alcantar, Juana Almanza, Ismael Alvarado, Caudelario Bonilla, Oscar A. Cabrera, Agustin Cervantes, Jose Cervantes, Maria Cervantes, Rosa M. Cervantes, Martin Chairez, Mario Fajardo, Martha Hernandez, Marco [**11] Huerta, Adelaido Leal, Ivonne J. Malone, Jesus Mendoza, Maria C. Morales, Juan Munoz, Limbo Adriana Perez, Josefina Prieto, Salbador Rascom, Lino Salas, Angel Seijas, Cristina Vargas, Ana Maria Astorga, Teresa Escovar, Manuel H. Gonzalez, Alicia Hernandez, Raul Hernandez, Ana Maria Jimenez, Maria Leon, Samuel Liberto, Rosa Macias, Javier Martinez, Jaime Monarrez, Ivan Montes, Juan Nunez, Antonio Quesada, Maria Rivera, Gabriel

Rodriguez, Jose Topete, Jose Vlloa, Robert Wilson, Miguel Lopez Zavala, Maria de la Luz Alejo, Asencion Barrios, Gloria Benitez, Adrian Martinez Bonilla, Martin Dominquez, Angelica I. Guaderrama, Salvador Holquin, Margarita Olivas, Celerino Pacheco, Martha Pena de Hernandez, Maria del Rocio Sotelo, Miguel Soto Rodriguez, Juvenal Sotelo, Elevteria Torres, Elias Velasco, Said Abid, Danny Alvidrez, Cesar Aquino, Juan Antonio Bonilla, Griselda Corado, Abdisalan Garad, Edin E. Gomez, David Hernandez, Esperanza Hernandez, Jose S. Lazarin, Inocente Lopez, Abdulkadir Mohamed Omar, Claudia Pena, Inocente Perez Sanchez, Rocio Perez, Jose Manuel Pineda, Ruben Robles, Margarita Romos Rojas, Russell Saucedo, Martha Sanchez, Araceli Alarcon, Benjamin Alvarez, Rosa M. Baltazar, [**12] Gildardo Barragan, Juan Chavez, Laquita Clark, Antonio Martinez, Antonio Martinez Cano, Juan Francisco Mendez, Richard Molina, Maria E. Montano, Juan F. Munoz, Gregorio Ortega, Maria Felix Ortega, Michell Pineda, Carmen Ramirez, Imelda Aniles, Jose Aranda, Adrian Arce, Luis Chavez, Gerardu Contreras, Jose L. Felix, Rafael G. Gallardo, Maria Gomez, Olga V. Gomez, Miguel Gonzalez, Maria Luisa Herrera, Florencia Coronado Jurado, Guadalupe Lopez, Telesforo Montelongo, Ernestine Magallanes Rios, Chris Morales, Frank Rivera, Javier Hernandez Rivera, Vilma Rubio, Federico A. Solis, Salvador Toquinto, Martin Alvarez, Plaintiffs: Peter J. Antosh, LEAD ATTORNEY, Garcia & Antosh, LLP, Dodge City, KS.

For Jose Valadez, Rafael Ruiz, Leopoldo Sanchez, Saul Rivera, Miguel Enriquez, Ricardo Martinez, Gloria Garcia, Jose Mineros, Ines Lopez, Pedro S. Hernandez, Alejandro Solorzano, Francisca Quintana, Cruz Guevara, Cristina Tucker, Pascual Barcenas, Miguel Cortez, Maria Elena Gomez, Roque Soto, Armando Aguirre, Jesus Alvarez, Galinda Banuelos, Leticia Cardemas, Maria Damian, Guillermo Dominquez, Carla Espino, Oscar Galvez, Bernabed Gramajo, Frank Guebanc, Francisco Guerrero, Antonia Hernandez, Leticia [**13] Hernandez, Marco Antonio Hernandez, Jose Martinez, Jose Luis Medina, Martha Maria Mendiola, Silvia Navar, David Ramirez, Maria I. Reyes, Francisco Rico, Juan Rico Rodriquez, Lawrence Steadham, Martin Terrazas, Jr., Bertha F. Trejo, Juan Virquez, Plaintiffs: George A. Hanson, LEAD ATTORNEY, Stueve Siegel Hanson LLP - KC, Kansas City, MO; Peter J. Antosh, LEAD ATTORNEY, Garcia & Antosh, LLP, Dodge City, KS.

For Marco Antonio Artega, Edith A. Barrera, Jose Ovidio Benitez, Jose L. Cortez Castro, Tony Cruz, Rosamaria Montes de Cortez, Carlos Dominguez, Eusebia Dominguez, Jose J. Herrera Galdamez, Obed Lira, Miguel Lopez, Vicente Marquez, Maria L. Montelongo, Aurora Ramos, Jesus Ramos, Lauro Rios, Felipe Robledo, Elida Salvador, Maria Solorzano, Manuel Sanchez, Debby G. Torres, Gonzalo Albarran, Jasinto Almaraz, Maria E. Almaraz, Maria Sara Alvarez, Rafael

890 F. Supp. 2d 1273, *1273; 2012 U.S. Dist. LEXIS 118965, **13

Aragomez, Juan Arreola, Jose R. Botello, Hector Castillo, San Juana Cavazos, Martin Cruz, Florina de Leon, Rolando de Leon, Abdon Garcia, Jose Gomez, Victor Hernandez, Noemi Holguin, Carlos Martin Leyva, Jose de Jesus Llamas Valle, Maria R. Pena, Bertha A. Rodriguez, Armandina Salazar, Leonardo Salazar, Guillermina Trejo, Julia E. Turcios, [**14] Tomas Valdivia, Francisco O. Yescas, Yadira Albarran, Clara M. Alvares, Obdulia Barcenas, Efrain De Leon, Mauricio Gallegos, Mauro I. Garcia, Jacinto Gonzalez-Calvario, Luis I. Gonzalez, Jose F. Guevara, Alejandro Lopez, Andres Lopez, Maria Lopez, Monica Lopez, Gladys Merino, Cristina Nungaray, Alejandra Nuno, Ricardo Pinto, Johan M. Pulido, Cristian Ramirez, Mauricio Ramirez, Sofia Reyes, Jose Gonzalez Rivera, Miguel Rivera, Andrea Rodriguez, Gerardo Ronquillo, Dominga Saldana, Rosa Saldivar, Diego Sanchez, Jesus Soriano, Leobardo Trejo, Oscar Vasquez, Jose Acosta, Martin Almaraz, Fernando Alvarado, Blanca L. Benitez, Erick Jose Campos, Jose Enriquez, Adelina Espino, German Ferman, J. Carmen Flores, Martha Franco, Carmen I. Gonzalez, Rosa Gonzalez, Victor Manuel Reyes, Manuela Rios, Martin Rios, Felipe Tena, Margarita Meza de Tena, Irma Vicente, Fabian Villatoro, Ernesto Alcantara, Elmer Lopez, Domingo Sierra, Jose Rodriguez, Delia Valenzucla, Darlene Acevedo, Josi Angel Amaya, Augustin Avila, Manuel Angel Balbaneda, Jose Barrera, Juan Pablo Canqles, Manuel Cisneros, Rafaela Cisneros, Hermila Corral, Luz Idalia Cruz, Castellano Dominguez, Crecenciano Garcia, Patricia Garcia, Juan [**15] Manuel Gonzalez, Antonio Hernandez, Israel Hernandez, Sophia Landero, Eric Ledesma, Guillermina Martinez, Ines Munoz, Maria Nunez, Jonathan Olson, Niller Pinto, Peter Ramirez, Roberto Ramirez, Jose R. Recinos, Jose Alberto Rodriguez, Maria Gonzalez Romero, Nancy Romero, Hector Saldivar, Simeon Saldivar, Eliseo R. Sandoval, Joaquin Santoya, Brenda Terrazas-Leyva, Jesus H. Terrazas, Maria L. Terrazas, Hector Valdez, Jesus Vallejo, Guadalupe Zuniga, Maria Bertha (Bazan) Curtis, Maria Gamez, Sulema Jimenez, John R. Juarez, Carlos Rolvera, Natalia Amaya, Jose Carmona, Maria Carmona, Sarafin Claro, Arcadio Figueroa, Juana Fuentes, Ramon Gomez, Nicolas Gutierrez, Maria G. Guzman, Maria Guzman, Adrian Hernandez, Armando Hernandez, Ramon Hernandez, Teresa Hernandez, Jose M. Hernandez-Torres, Adrian Leon, Estevan Luna, Jose Luna, Erica Judith Majalca, Rosa Markotte, Felipe Medina, Juan Medina, Consuelo Molina Meza, Ampara Nunez, Maria Ontiveros, Maria Carmen Perez, Juan Moreno, Filiberto Sanchez, Sergio Vera, Saul Sanchez, Rosa Velasquez, Yenny Ventura, Maximino Vividor, Maria Cristina Zaragoza, Maria Hernandez Adame, Raul Aguirre, Cecilia Chavez, Evangelina Cruz, Jose A. Cruz, Alicia Delgado, [**16] William A. Ducos, Adan Ferrel, Etelvina Garcia, Joel Garcia, Rocenda Gouz, Rocenda Goux, Jesus Guevara, Antonia Hernandez, Manuela C. Hernandez, Wesceslao Hernandez, Fernando Leos, Doralia Lira, Vidal Madera, Rosa Majalia, Rosalva Martinez, Javier Morales, Anatolio Nunez, Daniel Nunez, Martimiana Nunez, Atenojenes Melgarejo Ramos, Ruben Rayas, Maria C. Rincons, Cipriana Rodriguez, Eduardo Rodriguez, Jose J. Rodriguez, Ernest de la Rosa, Jose Hernan Sandobal, Juana Seijas, Leobardo Trejo, Ronaldo Vaillant, Alberto Gonzales, Roxanne Gayle Guebara, Benita Lozano, Maribel Renteria, Renee D. Cannon, Robert R. Krumme, Connie J. Masenthin, Dorinda Snyder, Plaintiffs: Peter J. Antosh, LEAD ATTORNEY, Garcia & Antosh, LLP, Dodge City, KS.

For Mawlid Taakilo, Galicano Alea, Dexter Bell, Edward Franklin, Bonita Hayes, Willie Randal, Ron Soth, Maryan Abdille, Estiban Aguilera, Julio Alfaro, Jerome Allen, Robert Alonzo, Mohamed Arale, Kenneth Arndt, Allan Arthur, Trinidad Arzate, James Aubert, Pablo Avalos-Quiroz, Aliou Ba, Joseph Barrett, Benjamin Bartee, Clinton Baysinger, Anthony Beckstrom, Teodoro Bonilla, Rodney Borg, Roy Bouse, Anthony Bowen, Melissa Bowen, Samuel Brachle, Shad Bremer, Harold [**17] Buckbee, Cid Buell, Diane Burger, Mario Butler, Carl Bynum, John Calaman, Roy Carson, Angel Casillas, De La Cruz Castaneda, Juan Castaneda, Jerry Cervantes, Richard Cervantes, Rochelle Chambers, Mario Cojon, Nathaniel Collins, Daniel Cox, Arthur Criqui, Lola Cummings, Deeqa Dahir, Plaintiffs: George A. Hanson, LEAD ATTORNEY, Stueve Siegel Hanson LLP - KC, Kansas City, MO; Peter J. Antosh, LEAD ATTORNEY, Garcia & Antosh, LLP, Dodge City, KS.

For Jeremy Davis, Pedro Deloera, Matthew Denner, George Dennis, Yusuf Mohamed Diini, Juana Duran, Aaron Elder, Tony Ferguson, Anthony Fuller, Mary Gamez, Martin Garcia, Sabino Garcia, Charles Garner, Estela Garza, Jesus Garza, Cristina Gonzalez, Mario Gonzalez, Ruben Gonzalez, John Green, Octavia Green, John Hall, William Harrell, Ashley Harvey, Thomas Hebb, Alejandro R. Hernandez, Eduardo Hernandez, Juan Hernandez, Randal Hippen, Harold Hodge, Jonathon Hohn, Brandon Igwe, Joseph Jimerson, Geral Johnson, Paul Johnson, Viola Johnson, Sharilyn Jones, Jeffrey Keating, Marcus Kindle, Tarah Kluth, David Koester, Christopher Lesslie, Janeth Linares, De Vallejo Lopez, Ricardo Lopez, Rodrick Love, Dolores Magee, Candida Martinez, Juan Martinez, Madeleine [**18] Matthews, Valerie Mayo, Daniel Miller, Abdi Moalim, Marcel Moliovan, Monicke Moore, Shaun Moore, Maria Mora, Dianna Morales, Juan Morelos, Juan Moreles, Dung Nguyen, Nadine Nunnelee, Nelson Orellana-Quijada, Maria Ortega, Victor Ortega, Christopher Palomino, Billie Pendleton, Adrian Perkins, David Ponce, Keldrick Pratt, Candelaria Ramirez, Joel Reese, Lucia Reyes, Joseph Rhine, Robert Richardson, Felipe Rivera, Anna Rodriguez, Dellareece Rogers, Josephine Romero, Jose Rondon, Jose Ruiz, Simon Salcedo, Nazario Saldana, Perez Obed Saldivar, Delia Salinas, De Mapula Sandoval, Flor Sandoval, Robert Santoni,

Case 3:14-cv-00956-JBA    Document 509    Filed 06/17/19    Page 129 of 183    Page 5 of 20

890 F. Supp. 2d 1273, *1273; 2012 U.S. Dist. LEXIS 118965, **18

Jose Santoyo, Taina Santoyo, Fauzi Sheekh, Gary Shepard, Carol Sisson, Jeffery Sisson, Brandon Smith, Kenneth Smith, Jr, Keith Smith, Kenneth Smith, Lori Solis, Kerby Southward, Charles Speer, Michael Srader, Joseph Sullivan, Gary Tapp, Marcos Tellez, Ada Theel, Anthony Thomas, Troy Torrence, Rigoberto Torres, Alejandrina Trevino, Garcia Trevino, Rodolfo Trevino, Sean Uk, Lilia Ultreras, Javier Vasquez, Frank Vigil, Elfego Villa, Kenneth Walstrom, George Warner, Maurice Warner, Jesse Weaver, Mark Weingartner, William Weingartner, Brandon Welch, Andre White, Randell Williams, JR Wilson, [**19] Nick Wolfe, Brian Yowell, Abdisalan Adan, Nuur Aden, Aniceto Avila, Tom Boone, Howard Boston, Felix Castillo, Ramos Nativida Castillo, Rufino Castro, Chi Chau, Martin Chavez-Duran, Chhoukrath Chhay, Cecilio Chiapa, Shyla Cooper, Maria Delgado, Maria Esparza, Juan Gamez-Guerra, David Garcia, Demetrius Green, Marian Guled, Jacob Guitierrez, Enrique Guzman, Theresa Hansen, Rosalva Hernandez, Torres Pablo Hernandez, De Hermosillo Huaracha, George Hunter, Jeff Irvin, Chi Le, Dung Le, Hieu Le, Manh Le, Trinh Le, Aaron Lee, Donald Leonard, Jose Lopez, Luis Maes, Hassan Mahamed, Delia Martinez, Jose Martinez, Jose Martinez, Jr, Cesar Medina, Ortega Ismael Mendoza, Donald Meyers, Nathan Meyers, Hussein Mohamed, Victor Mora, Antonette Nelson, Thuy Nguyen, Touch Nou, Plaintiff: George A. Hanson, LEAD ATTORNEY, Stueve Siegel Hanson LLP - KC, Kansas City, MO; Peter J. Antosh, LEAD ATTORNEY, Garcia & Antosh, LLP, Dodge City, KS.

For Ayala Prudencio, Plaintiff: Peter J. Antosh, LEAD ATTORNEY, Garcia & Antosh, LLP, Dodge City, KS.

For Patricia Garcia, Plaintiff: George A. Hanson, LEAD ATTORNEY, Stueve Siegel Hanson LLP - KC, Kansas City, MO.

For Blanca Rangel, Raquel Salamanca-Galvez, Jessie Salinas, [**20] Alfredo Sandoval, Aki Stimatze, Tomas Roman, Jackie Stocks, Marcelo Tarango, Melanie Taylor, Chad Tuttle, Celia Vasquez, Richard Ward, Abdulaziz Warsame, Ali Warsame, Mohamed Warsame, Chaifa Xayasing, Scott Xayasing, Farhiyo Yusuf, Loretta Zamora, Jose Zepeda, Jeffrey Zorn, Ernie Ayala, Marylou Barajas, Terrance Battles, Bobby Beverly, Brenna Beyer, Dee Cooper, Jose Cruz, Roberto Garza, Obdulio Guardado, Jermyn Harrell, Deldrick Harrison, Juan Herrera, Joseph Jensen, Gregory Johnson, Sandra Kessler, Stanley Kessler, Blanca Landaverde, Bertha Lopez, Monserrato Lopez, Sandra Malave Torres, Transito Martinez, Linda Nguyen, Evan Noble, April Paw, Fredric Petersen, Jason Raff, Gabriel Ramirez, Christina Schmitt, Jason Schmitt, Mariela Solorio, Robert Stuart, Santa Vasquez, Ta-Tunc Vaxter-Franklin, Marcos Villegas, Dionysius Wallace, Janice Wilcoxson, Joann Aldrete, Yolanda Blanco, Obdulia Calvario, Miguel Contreras, Andre Cox, Rodolfo

Esparza, Agustin Guzman-Cabrera, Matthew Marrs, Leopoldo Martinez, Lamar Means, Jr Raul Munoz, Loan Nguyen, Tiet Nguyen, Jaquin Rios, John Rodriguez, Alma Rosa Rojo, Jason Rojo, Koster Rojo, Orlando Rojo, Robert Smith, Jr Antonio Vasquez, Jr Robert Zavala, [**21] Elias Zuniga, Julene Acuna, Silvia Aguirre, Hassan Ahmed, Leopoldo Araiza, Donald Babb, Mares de Rosa Benitez, Curtis Benjamin, Gustavo Blanco, Richard Bolen, Kevin Campbell, Erica Caudillo, Edgar Correa, Mervin Davis, Maria de la Cruz, Rosa Espino Gomez, Michael Everett, John Baldomino, Mohamud Farah, Omar Farah, Loren Flaharty, Jose Flores, Gordon Furness, Philip Gallas, Ha Gee, Socorro Gonzalez, Rodney Greene, Luis Guitierrez, Adolfo Guzman, Jama Hassan, Anagil Hernandez, Xavius Hill, Lynn Hunter, Morayma Jaquez, Delmy Landaverde, Porfirio Landaverde, Refugio Mares, Nola McGill, Cleophas McKinnie, Fernandez Mendez, Carol Miller, Gilberto Olivarez, Tecumskeh Oliver, Abdulkadir Omar, Vickie Pegel, Jose Robles, Maria Rodriguez, Valentin Rodriguez, Krsna Rosalez, Juana Sandoval, Jovan Rivas, Mark Seidler, Joseph Simon, Andrew Smith, Jarom Smith, Rick Smith, David Tran, Bernardo Trevino, Ruiz Royce Varela, Maria Vasquez, Francisco Villa-Leon, Bryan Walstrom, Annie Williams, Mohamed Adan, Hamdi Ahmed, Marquez Fernan Bautista, David Bilas, Alisha Chituck, Gary Davies, Magdalena Diaz, Juan Estrada, Gloria Gallegos, Raul Garcia Penate, Joshua Hedgepath, Dewayne Holcomb, Shamhad Ibrahim, [**22] Maria Interial, G Izaguirre, Jose Izaguirre, Rosalinda Izaguirre, David Martinez-Lara, Herbi Mohamoud, Jose Ochoa, David Ortega, Maria Rojas, Angel Romero, Elisa Romero, Olga Romero, Rodolfo Sosa, Perry Steele, Ja Tin, Samuel Villegas, Bruce Willingham, Lawrence Barranca, Juan Bustos, Alfredo Carrillo, Lidia Carrillo, Plaintiffs: George A. Hanson, LEAD ATTORNEY, Stueve Siegel Hanson LLP - KC, Kansas City, MO; Peter J. Antosh, LEAD ATTORNEY, Garcia & Antosh, LLP, Dodge City, KS.

For Tiffany Ellmore, Concepcion Ornelas, Mario Padilla, Veronica Urbina, Plaintiffs: Eric L. Dirks, LEAD ATTORNEY, Stueve Siegel Hanson LLP - KC, Kansas City, MO; George A. Hanson, LEAD ATTORNEY, Stueve Siegel Hanson LLP - KC, Kansas City, MO; Peter J. Antosh, LEAD ATTORNEY, Garcia & Antosh, LLP, Dodge City, KS.

For Santos Castillo, James Coble, Michael Curwich, Jesus Escareno, Darren Fergel, Ronette Garcia, Esther Gonzalez, Jose Gutierrez, Saul Izaguirre, Ali Jama, Dana Leens, Darrell Marshall, Heriberto Martinez, Lucecita Muniz, Hector Olivas, Maria Palacios, Mary Reber-Charboneau, Plaintiffs: Lindsey Rodriguez, Mayte Ruiz, Nathaniel Terrell, Ali Abdinasir, Luis Briceno, Joaquin Caballero, Alfredo Cisneros, [**23] Misael Garcia, David Guillermo, Gregorio Lopez, Emilo Rodriguez, Gregory Stewart, Eduardo Zaragoza, Rafael Arrendondo, Corey Bristol, David McGill, Albert Palacios, Nadia

Case 3:14-cv-00956-JBA   Document 509   Filed 06/17/19   Page 130 of 183

Page 6 of 20

890 F. Supp. 2d 1273, *1273; 2012 U.S. Dist. LEXIS 118965, **23

Rodriguez, Scott Schoenfeld, Carlos Valenzuela, Alinur Mohamud, Rose Oaks, Adonis Williams, Jorge Alcaraz, Juana Alcaraz, Ruben Guardado, Rosa Molina, Severo Pachacano, Dawn Walker, Norma Zepeda, Aristeo Anaya, Cesar Burgueno-Vargas, Apolonio Camarillo, Maria Chan, Alma Cruz, Abdullahi Geesood, Lorena Godinez, Delfina Gomez, JR Hanners, Cindy Hicok, Jose Ibarra, Maria Ibarra, Qorane Jimale, Kenneth Knittle, Rodolfo Lopez-Zavala, Suad Jama, Abdirahman Mohamud, Alvin Naeve, Luis Saenz-Martinez, Trone Scott, Abdulkadir Yussuf, Alicia Mendoza, Osman Ali, Tony De La Rosa Jr., Joe Harrell III, Dujuan Sims, Kathleen Thomas, James Lovaglio, Mayolo Arevalo, Christina De Santiago, Luis Huertas, Anthony Kirk, Jose Martinez, Cynarra Nauls, Ronald Nelson, Ler Say, Alex Sierra, Deivy Valle, Mary Van Gorden, Dennis Burton, Alvin Carter, Juan Castillo, Andres Desantiago, Phuong Do, Brenda Garcia, Jose Giron, Thanh Le, James Parks, Fancisco Ramos, Duuha Ahmed, Hashi Ali, Hanad Guled, Abdirizak Kulane, Antonia Lira, Irma Lopez-Vasquez, **[**24]** Daniel Mitchell, Abshir Mohamed, Raul Monroy, Abdirashid Omar, Federico Rodriguez, Rafael Rodriguez De Cruz, Rodney Shepherd, Juan Torres, Carlos Zamorano, Debra Vanderman, Tiffany Ellmore, Victorino Aguirre, Ardo Ahmed, Jorge Ayala, Jose Ayala, Ana Bautista, Sierra Clariett, Maria De Leon, Luis Garcia, Santos Guzman, Joana Loza, Maria Perez, Rene Reyna, Luis Rodriguez, Iris Soto, Michael Terriquez, Jesse Thacker, Claribel Axume, Luz Barrera, Ana Guzman, Nery Rabanales, Jose Anguiano, Ana M Bejar, George A. Hanson, LEAD ATTORNEY, Stueve Siegel Hanson LLP - KC, Kansas City, MO; Peter J. Antosh, LEAD ATTORNEY, Garcia & Antosh, LLP, Dodge City, KS.

For Cristina Renteria, Plaintiff: George A. Hanson, LEAD ATTORNEY, Stueve Siegel Hanson LLP - KC, Kansas City, MO.

For Fernando Monjaras, Luis Ortiz, Olivia Rodriguez, Ruben Rodriguez, Alfredo Villarreal, Clarence Wilson, Alejandra Delgado, Jada Market, Farhan Omar, Victor Oseguera, Plaintiffs: Eric L. Dirks, George A. Hanson, LEAD ATTORNEYS, Stueve Siegel Hanson LLP - KC, Kansas City, MO; Peter J. Antosh, LEAD ATTORNEY, Garcia & Antosh, LLP, Dodge City, KS.

For Tyson Foods, Inc., Tyson Fresh Meats, Inc., Defendants: Craig S. O'Dear, Robert J. **[**25]** Hoffman, Terence J. Thum, LEAD ATTORNEYS, Bryan Cave LLP - KC, Kansas City, MO; Evangeline C. Paschal, Michael J. Mueller, LEAD ATTORNEYS, PRO HAC VICE, Hunton & Williams LLP - DC, Washington, DC; Emily Burkhardt Vicente, PRO HAC VICE, Hunton & Williams LLP - LA.

**Judges:** J. THOMAS MARTEN, JUDGE.

Opinion by: J. THOMAS MARTEN

# Opinion

**[*1277]** MEMORANDUM AND ORDER

Presently before the court are the following motions: plaintiffs' Post-Trial Motions to Alter or Amend the Judgment Regarding Liquidated Damages, Interest, and the Final Class Definition (Dkt. No. 1055); defendants' Motion for Remittitur to Receive Credit for "Sunshine Time" (Dkt. No. 1056); and defendants' Motion for Judgment as a Matter of Law (Dkt. No. 1058). As detailed below, the court denies the defendants' Motions and grants the plaintiffs' Motion.

## I. Background

This case has a lengthy procedural history spanning over six years, which needs a brief review. Adelina Garcia and other past and present employees of defendants Tyson Foods, Inc. and Tyson Fresh Meats, Inc., (collectively Tyson) filed a class action and collective action lawsuit on May 15, 2006, alleging violations of the Fair Labor Standards Act (FLSA) and the Kansas Worker Protection Act (KWPA) against **[**26]** Tyson at its Finney County and Emporia, Kansas **[*1278]** plants. In February 2007, Judge John W. Lungstrum denied defendants' Motion for Partial Summary Judgment. *See* Dkt. No. 599. Tyson filed a motion to amend the court's summary judgment order, which was denied, and Tyson appealed. On August 19, 2008, the Tenth Circuit dismissed Tyson's appeal. Thereafter, on February 12, 2009, this court granted plaintiffs' motion for class certification and conditional collective action certification. *See* Dkt. No. 741.

Both parties filed summary judgment motions, which the court granted in part and denied in part. *See* Dkt. No. 952. The case was then reassigned to the undersigned, and the case proceeded to trial. *See* Dkt. No. 964. On February 10, 2011, the court held a hearing on Tyson's Motion to Bifurcate (Dkt. No. 951), which the court granted.[1] The court held an *in limine* conference, granting and denying several of the parties' requests and taking some under advisement. The matter went to trial on March 2, 2011, and the jury returned a verdict on March 16. Specifically, the jury found that Tyson failed to compensate plaintiffs for time spent during the continuous

---

[1] The court bifurcated the trial by plant, with Finney County being tried first. The parties also agreed to try the liquidated damages and statute of limitations (willfulness) issues to the court. But the willfulness issue was ultimately submitted to the jury.

workday for pre-and post-shift activities; **[**27]** that Tyson willfully violated the FLSA; and that Tyson violated the KWPA. The jury awarded $166,345.00 for pre- and post-shift violations of the FLSA and awarded $366,666.00 for violations of the KWPA. The court denied Tyson's initial motion for a directed verdict on March 16, and entered judgment in favor of the plaintiffs on March 17. Dkt. No. 1046.

## II. Tyson's Motion for Judgment as a Matter of Law

### A. Legal Standard

Courts grant judgment as a matter of law under Fed. R. Civ. P. 50(b) only "cautiously and sparingly." *Zuchel v. City & County of Denver*, 997 F.2d 730, 734 (10th Cir. 1993) (quotations omitted). Granting judgment as a matter of law is improper "'[u]nless the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion.'" *Crumpacker v. Kan. Dep't of Human Res.*, 474 F.3d 747, 751 (10th Cir. 2007) (quoting *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557 (10th Cir. 1996)). **[**28]** When considering the motion, a court may not weigh the evidence, consider the credibility of the witnesses, or substitute its judgment for that of the jury. *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 891 (10th Cir. 2006). The court must view the record in the light most favorable to the nonmoving party, and affirm the verdict if it contains evidence upon which the jury could properly return a verdict for the nonmoving party. *See Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 914 (10th Cir. 2004). The court, however, should enter judgment as a matter of law in favor of the moving party when "there is no legally sufficient evidentiary basis for a reasonable jury to find for the issue against that party." *Sims*, 469 F.3d at 891.

### B. Legal Conclusions

Tyson argues this court must grant its Motion for two reasons. First, that plaintiffs failed to submit adequate proof for purposes of the FLSA collective action and the Rule 23 class action. Second, Tyson contends plaintiffs did not prove it acted willfully under the FLSA. Tyson moves the court to grant it judgment as a matter of law on these issues or, in the alternative, **[*1279]** to decertify the FLSA collective action and the Rule 23 class action. **[**29]** The court will analyze each argument in turn.

#### 1. Collective and Class Action Viability

There are two separate standards for determining whether a court has properly certified a collective action under the FLSA and a class action under Rule 23. "To maintain a collective action under the FLSA, plaintiffs must demonstrate that they are similarly situated." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 952 (11th Cir. 2007) (quotations omitted); *see also* 29 U.S.C. § 216(b) ("An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."). Plaintiffs need only show their positions are similar, not identical, to the positions held by the rest of the collective class members. *Grayson v. K Mart Corp.*., 79 F.3d 1086, 1096 (11th Cir. 1996); *Chabrier v. Wilmington Fin., Inc.*, No. 06-4176, 2006 U.S. Dist. LEXIS 90756, 2006 WL 3742774, at *3 (E.D. Pa. Dec. 13, 2006). Plaintiffs must, however, demonstrate a reasonable basis for their claim of class-wide treatment. *See Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358, 362 (M.D. Ala. 1999).

The **[**30]** Tenth Circuit uses a two-step approach in determining whether plaintiffs are "similarly situated" under § 216(b). *See Thiessen v. General Elec. Capital Corp.*., 267 F.3d 1095, 1102-03 (10th Cir. 2001). Under *Thiessen*, the court makes an initial determination of "similarly situated" at the "notice stage" and another at the conclusion of discovery. *Id.* The standard at the conclusion of discovery is a stricter standard than that at the notice stage. *Id.* Because this case is at the post-trial motion stage, this court must evaluate whether the plaintiffs were similarly situated using the stricter standard. Under this standard, the court evaluates several factors including, (1) the disparate factual and employment settings of the individual plaintiffs, (2) the defenses available to defendants which appear to be individual to each plaintiff, and (3) fairness and procedural considerations. *Id.* at 1103; *see also Ruehl v. Viacom, Inc.*, 500 F.3d 375, 388 n.17 (3d Cir. 2007) ("A representative (but not exhaustive or mandatory) list of relevant factors includes whether the plaintiffs are employed in the same corporate department, division and location; advanced similar claims of age discrimination; **[**31]** sought substantially the same form of relief; and had similar salaries and circumstances of employment."). The court must also consider whether the plaintiffs can show that the defendant has a common policy or plan in violation of the FLSA. *O'Brien v. Ed Donnelly Enters., Inc.*, No. 04-CV-00085, 2006 U.S. Dist. LEXIS 86895, 2006 WL 3483956, at *3 (S.D. Ohio Nov. 30, 2006).

The requirements for class treatment under Fed. R. Civ. P. 23 are more stringent than those under 29 U.S.C. § 216(b). *See, e.g., Vaughan v. Mortgage Source, L.L.C.*, No. 08-4737, 2010 U.S. Dist. LEXIS 36615, 2010 WL 1528521, at *4 (E.D.N.Y.

Case 3:14-cv-00956-JBA   Document 509   Filed 06/17/19   Page 132 of 183

Page 8 of 20

890 F. Supp. 2d 1273, *1279; 2012 U.S. Dist. LEXIS 118965, **31

Apr. 14, 2010) (stating "courts have repeatedly stated that Section 216(b)'s 'similarly situated' requirement is considerably less stringent than the requirements for class certification under Rule 23."). The prerequisites for class certification include Fed. R. Civ. P. 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation. In addition, Fed. R. Civ. P. 23(b)(3) requires predominance and superiority—that is, common questions must predominate over individual issues and class resolution must be superior to other methods of adjudication. *Amchem Prods.,* **[*1280]** *Inc. v. Windsor*, 521 U.S. 591, 613-15, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).

This court **[**32]** conditionally certified plaintiffs' FLSA collective action and Rule 23 class action on February 12, 2009. *See* Dkt. No. 741. Nevertheless, Fed. R. Civ. P. 23(c)(1)(C) permits the court to alter or amend class certification before final judgment. *See Briggs v. Anderson*, 796 F.2d 1009, 1017-19 (8th Cir. 1986); *Key v. Gillette Co.*, 782 F.2d 5, 6-7 (1st Cir. 1986). A decision to decertify after a trial on the merits must take into account the possible unfairness to the defendant. Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, 7AA Federal Practice & Procedure § 1785.4 (3d ed. 2005) ("If the class has lost on the merits, this result may be inappropriate when the opponent has devoted the time and resources necessary to defend a class suit and now finds that only the named plaintiffs are bound and the same issues may have to be retried. Similarly, if the class prevailed, then decertification wrongly may deprive them of the fruits of their victory."). Because the class prevailed at trial here, the court must carefully weigh its decision to decertify as it may wrongly deprive plaintiffs of the fruits of their victory. *See id.*

**2. The Plaintiffs Are Similarly Situated**

*a. Tyson Had a Common* **[**33]** *Policy or Plan*

First, it is clear that Tyson had a common policy or plan of paying all class members on gang time and paying them K code. And the K code was based on average estimated amounts of time that it takes to don and doff the sanitary and safety equipment. Tyson does not dispute this. Rather Tyson contends the plaintiffs are not similarly situated because of their disparate employment settings.

*b. Employment Setting*

There are factual differences among the plaintiffs: they wore various combinations of sanitary and safety equipment; they spent varying amounts of time donning and doffing such items; they worked in different areas and departments at the plant with different specific duties; they used different knives or equipment; and they had different pre- and post-shift routines. But they also had important similarities: all plaintiffs worked at the Finney County, Kansas plant; all plaintiffs were required to don and doff some combination of sanitary and safety equipment; all plaintiffs were paid on gang time and were paid K code. The similarities between the plaintiffs outweigh the differences. Further, the similarly situated requirement does not require proof that each employee **[**34]** performed identical jobs, or that each employee wore the same equipment. *See Tucker v. Labor Leasing, Inc.*, 872 F. Supp. 941, 947 (M.D. Fla. 1994). More importantly, Tyson had a company-wide policy of paying the plaintiffs on gang time and K code. *See Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp.2d 870, 899 (N.D. Iowa 2008) (holding that the "tie that binds" all the plaintiffs was the gang time compensation system). While it is true that the employees vary to some degree in the equipment they are required to don and doff, the jury found that the plaintiffs spent at least some uncompensated time performing donning and doffing during the limitations period.

Tyson cites *Lugo v. Farmer's Pride, Inc.*, 737 F. Supp.2d 291 (E.D. Pa. 2010), in which the court granted a defendant's motion to decertify an FLSA collective action in a donning and doffing case. Tyson contends this court should grant its motion for judgment as a matter of law or decertify the class for the reasons stated in *Lugo*. **[*1281]** The *Lugo* court decertified the class for many reasons:

> First, while plaintiffs bear some general similarities to one another, the evidence indicates that plaintiffs worked in different positions and departments **[**35]** and on different shifts at defendant's plant, and that these positions and departments varied not only as to the PPE required and worn, but also as to the schedules followed and the amount of time provided for donning-and-doffing activities before and after the shifts and meal periods. Furthermore, the time study prepared by plaintiffs' expert, Dr. Kenneth Mericle, indicated significant variation among workers regarding the amount of time necessary to perform these tasks.

*Id.* at 303-04. Although *Lugo* is a donning and doffing case, the plaintiffs did not identify a policy or plan that applied to the whole class, such as the gang time and K code payments here. The plaintiffs' principal argument in *Lugo* was not that the defendant's pay policy was unlawful as written, but that it was unlawfully applied. *Id.* at 304-05. The court found there was no evidence of a uniform policy to support the plaintiffs' claim that the defendant was not following its compensation system. *Id.* at 310 ("While plaintiffs have offered evidence suggesting defendant's compensation system may not have

Case 3:14-cv-00956-JBA   Document 509   Filed 06/17/19   Page 133 of 183

Page 9 of 20

890 F. Supp. 2d 1273, *1281; 2012 U.S. Dist. LEXIS 118965, **35

been followed as written at times, the Court finds this evidence fails to demonstrate a single 'decision, policy or [**36] plan' on behalf of defendant to not compensate for donning and doffing activities."). The court also identified several inconsistencies in testimony, which undermined the credibility of the representative evidence as applicable to other class members. *Id.* at 310-11. Because the *Lugo* court did not involve a policy or plan similar to Tyson's gang time and K code, its application to this case is limited. The employment settings here weigh in favor of collective action treatment.

### c. Defenses Available

The second factor the court looks at is whether there are individual defenses that make collective action treatment improper. This factor clearly weighs in plaintiffs' favor. All the defenses presented to the court and to the jury have been adjudicated on a class-wide basis and are not individualized defenses. At summary judgement, the court considered whether the donning and doffing activities were integral and indispensable to the work performed by the plaintiffs, whether that time was *de minimis*, and whether liquidated damages and a three-year statute of limitations was appropriate for the class. The court denied summary judgment on these issues and the jury ultimately decided them (except [**37] liquidated damages), all on a class-wide basis. Thus, the court's treatment of the defenses in this case favors collective action treatment.

### d. Procedural and Fairness Considerations

Last, procedural and fairness considerations also weigh in plaintiffs' favor. The FLSA's collective action has an important remedial purpose: "(1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000) (citing *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989)). Throughout the six-year litigation history of this case, numerous Tyson employees have been able to recover unpaid wages that would likely not have been possible if each employee had filed individually. Further, this court has been able to efficiently [*1282] adjudicate several common issues of law and fact throughout the course of this case. Accordingly, the procedural and fairness considerations weigh heavily against granting Tyson's Motion.

### e. Conclusion

All the *Thiessen* similarly-situated factors weigh in plaintiffs' favor. [**38] The plaintiffs have identified a common policy that applies to all plaintiffs and the factual similarities between the plaintiffs outweigh the differences. And there are no individual defenses that weigh against collective action treatment. Last, procedural and fairness grounds weigh in plaintiffs' favor. Accordingly, the court will not decertify the FLSA collective action.

### 3. Certification Under Rule 23 Was Appropriate

Tyson contends this court should decertify the Rule 23 class action because "there is no reason to assume that, because one employee reasonably required more than K Code time for compensable donning and doffing and walking activities, employees in different positions would take the same reasonable time to don/doff, much less that their walking times would be the same." Dkt. No. 1059, pgs. 7-8. To support its argument, Tyson cites the Eleventh Circuit's opinion in *Babineau v. Fed. Express Corp.* 576 F.3d 1183 (11th Cir. 2009). In *Babineau*, a putative class of FedEx employees sued the company seeking pay for time worked prior to and after each shift and during break periods. *Id.* at 1185-86. Each employee had a scheduled start and finish time each day but, for a variety of [**39] reasons, many employees arrived early or left late. *Id.* at 1187-88. Additionally, not all employees worked during the break periods, and the company specifically prohibited employees from working during the rest breaks. *Id.* at 1188-89. The district court denied certification finding that there was no uniform way to determine how much time each employee worked before and after their shift or at the break periods because the testimony of several plaintiffs indicated each worked different amounts of time on any given day. *Id.* at 1191. The Eleventh Circuit affirmed the district court's denial of class certification. *Id.* at 1195.

By analogy, Tyson seeks to apply *Babineau* to this case. *Babineau*, however, is not as persuasive as Tyson would have it. First, the plaintiffs in *Babineau* did not identify a single policy or plan that applied to all plaintiffs, such as the gang time and K code here. And the court stated that even if the defendant did have a policy requiring employees to arrive early and stay late, the district court did not err in finding that this policy "would not predominate over individualized issues." *Id.* at 1193. Second, the Eleventh Circuit did not hold that class certification [**40] would never be appropriate in situations in which employees may have worked different amounts of time. The court merely held that the district court did not abuse its discretion in denying class certification—a much more narrow holding. *See id.* at 1195 (holding that "we find that the district court's denial of class certification was

Case 3:14-cv-00956-JBA Document 509 Filed 06/17/19 Page 134 of 183 Page 10 of 20

890 F. Supp. 2d 1273, *1282; 2012 U.S. Dist. LEXIS 118965, **40

not an abuse of discretion"). In addition, the plaintiffs in *Babineau* were not required to perform certain functions before and after each shift such as donning and doffing, unlike the plaintiffs in this case. Thus, the dissimilarities to this case limit *Babineau's* persuasive value. *See Burch v. QWEST Comm's Int'l, Inc.*, 677 F. Supp.2d 1101, 1128 (D. Minn. 2009) (limiting *Babineau's* application "[b]ecause the alleged uncompensated activity consists of almost identical actions by employees, regardless of geographic location or particular supervisors").

 [*1283] For substantially the same reasons that this court sustained the jury's verdict as to the collective action members, the court also finds that certification of the Rule 23 class was appropriate. First, the commonality requirement is met because the employees were paid on gang time and paid K code, notwithstanding [**41] the factual differences in safety and sanitary equipment worn by each employee. Second, plaintiffs have proved typicality because the plaintiffs' overall legal theory that Tyson's gang time and K code time is unlawful, or resulted in undercompensation, applies to all employees. Tyson does not challenge the adequacy or numerosity requirements.

The plaintiffs have also met the "predominance" and "superiority" components of Rule 23(b)(3). This Rule specifically lists four factors relevant to the court's determination of predominance and superiority:

 (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
 (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
 (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
 (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3)(A)-(D). First, the court does not believe that the individual plaintiffs have an interest in proceeding individually; in fact, they have made the decision not to do so. Individual suits would be costly and less likely to result in a significant [**42] remedy. The advantages of proceeding as a class are apparent—all class members have been able to adjudicate their claims in one trial. The second and third factors are largely irrelevant at this stage because the case has already been tried. And the fourth factor is also a nonissue because the court did not have difficulties managing this class action. The plaintiffs have established predominance because they proved to the jury that they were not paid for all the work they performed under the gang time system and that the K code was insufficient to cover donning and doffing. To do so, they were required to prove that they performed work which was unpaid—the donning and doffing activities.

Although, as noted previously, not all employees wear the same equipment or require the same amount of time to don and doff that equipment, these individual differences are not so significant that they predominate. Plaintiffs have also established superiority because the class action tried to the jury was superior to individual lawsuits filed by five thousand class members. It would have been more burdensome on the class members and the court to try these FLSA violations individually. *See Valentino v. Carter-Wallace*, 97 F.3d 1227, 1234 (9th Cir. 1996) [**43] ("Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation."). Accordingly, the court will not decertify the Rule 23 class.

**4. Representative Evidence**

Next, Tyson argues that even if the plaintiffs are similarly situated, they failed to present sufficient representative testimony supporting the jury's finding that Tyson owed each plaintiff additional compensation. Specifically, Tyson complains the five testifying plaintiffs did not provide sufficient testimony to sustain their burden. The plaintiffs contend they presented sufficient class-wide proof and that there is no requirement that a certain amount or percentage of the class testify in order to recover. Further, they contend Dr. Radwin's time study stands in [*1284] proxy for the thousands of plaintiffs who could have testified in court.

The use of representative evidence is well accepted for determining liability in FLSA cases. *See Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946). The burden originally is on the employees to demonstrate with sufficient evidence that the employees have, in fact, performed work for which they [**44] were improperly compensated, and to produce sufficient evidence to show the amount and extent of that work "as a matter of just and reasonable inference." *Id*. at 687. As the Tenth Circuit stated in *Metzler v. IBP, Inc*., "[w]hen the employer has failed to record compensable time and the employees have proved that they actually performed the work in question, the plaintiffs need only produce evidence sufficient to support a reasonable inference of the amount and extent of that work." 127 F.3d 959, 965 (10th Cir. 1997) (citing *Mt. Clemens*, 328 U.S. at 687); *see also Reich v. Southern New England Telecomms*., 121 F.3d 58, 66-67 (2d Cir. 1997). "'The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee[s'] evidence.'" *Metzler*, 127 F.3d at 965-66 (quoting *Mt. Clemens*, 328 U.S. at 687-88).

*a. Plaintiffs' Burden*

Case 3:14-cv-00956-JBA   Document 509   Filed 06/17/19   Page 135 of 183   Page 11 of 20

890 F. Supp. 2d 1273, *1284; 2012 U.S. Dist. LEXIS 118965, **44

The burden is on the plaintiffs to demonstrate with sufficient evidence that the employees have, in fact, performed work for which they were improperly compensated, and to produce sufficient evidence to show the amount and extent of that work, [**45] as a matter of just and reasonable inference. *Mt. Clemens*, 328 U.S. at 687. Employee testimony, documentary evidence, and expert testimony are appropriate methods of making a prima facie showing of a pattern or practice of unpaid time and wages. *See Castillo v. Givens*, 704 F.2d 181, 195 (5th Cir. 1983) (holding "plaintiffs met their burden of proof by demonstrating that they performed work and were not compensated . . . " where 13 plaintiffs testified regarding the hours they and members of their families worked and plaintiffs' statistics expert testified and calculated a minimum and maximum number of hours each plaintiff worked), *overruled on other grounds by Mclaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988).

Tyson primarily contends the plaintiffs did not meet their burden because the testimony of five plaintiffs was insufficient. In support, Tyson cites several cases in which it contends testimony from more than five plaintiffs was required. *See, e.g., Donovan v. Bel-Loc Diner, Inc..*, 780 F.2d 1113, 1115-16 (4th Cir. 1985) (22 of 98 plaintiffs testified); Donovan v. Burger King Corp., 672 F.2d 221, 225 (1st Cir. 1982) (6 employees testified out of 246); *McLaughlin v. DialAmerica Mktg., Inc.*, 716 F. Supp. 812, 825-26 (D.N.J. 1989) [**46] (43 of 393 testified). But these courts did not hold that a specific number of plaintiffs were required to testify. And Tyson concedes neither the FLSA nor Rule 23 require that a certain amount of plaintiffs in a collective or class action testify in order for the class to prevail at trial. Testimony from the plaintiffs is not the only type of representative evidence.

In addition to the employee testimony, the plaintiffs introduced Dr. Radwin's time study, in which he measured the reasonable amount of time that employees spend donning and doffing during various times of the day. The study was conducted by [*1285] six videographers and Dr. Radwin's assistant Tom Yen in May 2010 over the course of three days. During those three days, the videographers sampled a number of employees to get a representative sample of different employees in different areas of the plant at different shifts and different departments. The videographers randomly selected certain employees at the beginning of each shift and began recording when the employee donned the first piece of equipment and stopped recording when the employee donned the last piece of equipment. Similarly, they recorded employees at the end of the [**47] shift from the time the employee doffed the first piece of equipment until the employee doffed the last piece of equipment. They recorded donning and doffing at the meal period in the same manner.

The time study also took into account the time spent by the sample employees in which they were not donning or doffing. For example, each time an employee went to the restroom while donning or doffing, or when an employee would sit and wait, the videographers measured that time, but subtracted it out of the total time. In all, Dr. Radwin and his colleagues videotaped 43 employees on the processing side, 26 preshift and 17 postshift. They also videotaped 24 slaughter employees, 13 preshift and 11 postshift. Based on these samples, Dr. Radwin averaged the pre- and post-shift times to calculate his estimate of times for the class. Dr. Radwin testified that his study was conducted within a confidence interval of 95—that is "if I did this study over and over again, 95 out of a hundred times I would expect to get an average between that interval." Dkt. No. 1018, pg. 145.

Dr. Radwin's time study bolsters the testimony of the five testifying plaintiffs and was used by the plaintiffs as a substitute [**48] for calling all or a substantial number of the plaintiffs to testify. As Dr. Radwin testified in response to a question of why he did not conduct a study of all the employees:

> Well, for one thing, it's not possible to follow everybody, there is just too many people to follow. And you don't need to. You can sample, and if you do it in a proper way, you can get a very good estimate within the boundaries of what we need to estimate to know how much time it takes.

Dkt. No. 1018, pg. 107. This court agrees. It was unnecessary for the time study to measure all employee plaintiffs' donning and doffing time. The representative sample presented, as testified to by Dr. Radwin, a sufficient evidentiary basis for the jury to decide the case. Therefore, this court will not upset that finding.

The plaintiffs also presented damages testimony from Dr. Baggett, their damages expert. Dr. Baggett determined, from Tyson's records, the weeks that an employee was paid on gang time and paid K code. Then he took Dr. Radwin's averaged donning and doffing numbers, subtracted from that number the K code Tyson had already paid to each plaintiff, and calculated damages for each plaintiff.

The evidence submitted by [**49] the plaintiffs—five testifying witness and expert testimony from Dr. Radwin and Dr. Baggett—was sufficient to allow the jury to award damages for violations of the FLSA and the KWPA. While the testimony of the five plaintiffs alone likely would not have been sufficient to sustain the jury's verdict, when coupled with the evidence of the time study conducted by Dr. Radwin, and the damages figures calculated by Dr. Baggett, the evidence presented was sufficient to show the amount and extent of that work, as a matter of just and reasonable

inference. Accordingly, the plaintiffs met their initial burden.

[*1286] To be clear, Dr. Radwin's time study, and the numbers produced by Dr. Baggett are not completely without issues. The recorded times for each employee tested varied, that is, employee donning and doffing time was not uniform throughout the sample. And each employee's first act of donning and last act of doffing occurred at different times and at different locations in the plant. Tyson contends this "wide variation in individual outcomes" cannot possibly be representative of the class as a whole. But these differences do not undermine the representative value of the evidence. In fact, Tyson [**50] could not reasonably expect that the donning and doffing times or locations of donning and doffing would be the same for all employees. This is precisely why Dr. Radwin sought to determine "average times" and not the "actual time" it took every employee to don and doff their equipment. In order to meet their burden, the plaintiffs were required to present "evidence sufficient to show the amount and extent of that work, as a matter of just and reasonable inference." *See Mt. Clemens*, 328 U.S. at 687. They have done so.

### b. Tyson's Rebuttal

Because the plaintiffs have shown that they performed unpaid work and provided evidence as to the amount of unpaid work, the burden shifts to Tyson to produce "evidence of the precise amount of work performed or evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee[s], even though the result be only approximate." *Mt. Clemens*, 328 U.S. at 687-88. "The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with [**51] the requirements of [29 U.S.C. § 211(c)]." *Metzler*, 127 F.3d at 966 (quoting *Mt. Clemens*, 328 U.S. at 688).

Tyson has not produced evidence of the precise amount of work performed by the plaintiffs to negative the reasonableness of the jury's award. As noted above, the plaintiffs submitted evidence through representative testimony of five plaintiffs, Dr. Radwin's time study, and the testimony of their damages expert Dr. Baggett. This evidence was sufficient to show the amount and extent of the work performed. Tyson has failed to rebut the evidence by showing the precise amount of work performed. Because Tyson does not record the compensable time worked by its employees, it cannot complain that the damages lack precision. *See Metzler*, 127 F.3d at 966. Accordingly, the plaintiffs presented

sufficient representative evidence to support the jury's verdict, and Tyson's Motion is denied.

### C. Willfulness

The FLSA adopts a two-year statute of limitations in actions for unpaid wages, unless the employer acted willfully, in which case the limitations period is three years. *See* 29 U.S.C. § 255(a) (2006). The employee has the burden of proving the employer acted willfully. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988). [**52] To show willfulness, the plaintiffs must prove "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Id.* at 133; *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1283 (10th Cir. 2006); *Reich v. Monfort*, 144 F.3d 1329, 1334 (10th Cir. 1998). An employer's action is not willful when the employer acts reasonably or unreasonably, so long as it did not act recklessly. [*1287] *Mclaughlin*, 486 U.S. at 135 n.13. Mere negligence is generally not enough to sustain a finding of willfulness. *Nelson v. Waste Management of Alameda County, Inc.*, 33 F. App'x 273, 274 (9th Cir. 2002). But "[f]or § 255's extension to obtain, an employer need not knowingly have violated the FLSA; rather, the three-year term can apply where an employer disregarded the very 'possibility' that it was violating the statute . . . although we will not presume that conduct was willful in the absence of evidence." *Alvarez*, 339 F.3d at 908-09 (citing *Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 356 (5th Cir.1990)) (internal quotations omitted).

Here, the court submitted the willfulness issue to the jury, and the jury found that Tyson willfully violated the FLSA.[2] [**53] For the following reasons, the court finds that the plaintiffs established sufficient facts on the willfulness issue, and the court will not disturb the jury's verdict.

To fully understand the willfulness issue, this court must analyze what Tyson (formerly IBP) knew regarding its compliance with the FLSA. The United States Department of Labor began investigating a number of IBP's beef and pork processing plants in 1987. The DOL took the position that the time spent donning and doffing protective gear and clothing and walking to and from the workstation was compensable. Trial Transcript, Dkt. No. 1031, pg. 44-46. In 1988, the DOL filed a lawsuit known as *Reich v. IBP*, in the District of Kansas. The lawsuit covered a number of plants, including the one in Finney County. *Id.* at 140-42. The trial was bifurcated

---

[2] The jury also awarded the plaintiffs damages based on Tyson's violations of the KWPA. But the jury found that Tyson did not willfully violate the KWPA.

Case 3:14-cv-00956-JBA   Document 509   Filed 06/17/19   Page 137 of 183   Page 13 of 20

890 F. Supp. 2d 1273, *1287; 2012 U.S. Dist. LEXIS 118965, **53

between a liability phase and a damages phase. After a trial to the court in 1993, Judge Earl E. O'Connor found the following activities compensable: time spent walking from the knife room to the work station and back to the knife [**54] room; time spent waiting in the knife room; time spent donning personal protective gear unique to the production job of individual employees; time spent cleaning knives and unique personal protective gear. *Reich v. IBP, Inc.*, 820 F. Supp. 1315, 1322-27 (D. Kan. 1993). He also found these activities noncompensable: clothes changing time and walking time related to obtaining sanitary outer garments. *Id.* The Tenth Circuit affirmed the district court's findings. *Reich v. IBP, Inc.*, 38 F.3d 1123, 1127-28 (10th Cir. 1994). The case proceeded to its damages phase with a bench trial in July 1995. The district court found that the employees were entitled to compensation for the reasonable time necessary to complete the compensable activities. *Reich v. IBP, Inc.*, No. 88-2171, 1996 U.S. Dist. LEXIS 3709, 1996 WL 137817, at *3-6 (D. Kan. Mar. 21, 1996) (holding that "fourteen minutes is the total average reasonable time involved for all compensable pre-shift and post-shift activities"). The court also permanently enjoined IBP from future violations of the FLSA. 1996 U.S. Dist. LEXIS 3709, [WL] at *8-9. Additionally, IBP was ordered "to record and compensate for time spent in compensable activities under its present working conditions," and to "implement [**55] recordkeeping practices sufficient to record the time spent by each employee in performing pre-shift and post shift activities found to be compensable under the act." *Id.* IBP appealed this decision, and the Tenth Circuit affirmed. *Metzler v. IBP, Inc.*, 127 F.3d 959, 966 (10th Cir. 1997).

After IBP's last appeal in 1997, it still disputed how much it was required to pay under *Reich*. As a result, in April 1998 [*1288] the DOL filed another suit against IBP alleging it was wrongfully withholding compensation from workers. *See Herman v. IBP, Inc.*, No. 98-2163 (D. Kan. Apr. 10, 1998). In 1998, IBP began a time study of the pre- and post-shift activities as they related to unique, personal protective equipment that the *Reich* court found to be compensable. IBP determined that it took four minutes per day to perform such activities. The DOL sent an independent time-study expert, Dr. Fernandez, to conduct its own time study. The DOL came up with similar compensable time figures. IBP began paying four minutes per day for donning and doffing activities performed by employees in knife-wielding departments, which was called "K code" time in 1998. Eventually the DOL agreed that four minutes per day was sufficient [**56] to pay employees for back pay from October 1994 to 1999 even though four minutes was less than the amount of time the Reich court found that IBP owed. Thereafter, the DOL Solicitor's Office sent IBP a letter stating that "IBP may continue its current practice with respect to recording and compensating pre and post shift compensable activities until such time as the Department announces its position with respect to recordkeeping in the industry." Trial Transcript, Dkt. No. 1031, pg. 68-69. Tyson understood that the DOL was not giving its blessing to IBP's K code payment system, but was saying that it could use K code until the DOL announced its opinion on the matter. On July 16, 1999, the court dismissed *Herman v. IBP*, in accordance with a joint stipulation submitted by the parties.

Tyson acquired IBP in 2001, and continued the practice of paying four minutes of K code. The DOL announced its position on recordkeeping in an opinion letter on January 15, 2001. In that opinion, the DOL stated that "in order to comply with the FLSA and its implementing regulation . . . [a] company must record and pay for each employee's actual hours of work. Including compensable time spent putting on, taking [**57] off, cleaning his or her protective equipment, clothing or gear." Trial Transcript, Dkt. No. 1031, pg. 71-72. Tyson's Senior Vice President of Human Resources, Kenneth Kimbro, testified that Tyson knew that this was the DOL's position, and admitted that he personally lobbied the DOL for that opinion, albeit a part of the opinion relating to unions. Yet he also testified that he was not aware of the opinion letter until 2005 or 2006. Regardless, he agreed that Tyson did not comply with the opinion letter in 2001 or in 2005. On redirect, Mr. Kimbro testified as follows:

> Q. When it suits your company's purpose, it will follow the DOL, right? And when it doesn't suit your company's purpose, you ignore it, right?
> A. I think [when] we believe we're right we do, and when we believe they are wrong, we challenge it.
> Q. Okay. So you get to choose when the Department of Labor is right and wrong, right? That's what you are saying?
> A. I believe so.
> Q. So you get to selectively decide which part of the Department's labor guidance you want to follow and which part you just want to ignore, that's your choice, that's what you say?
> A. I believe so.

Trial Transcript, Dkt. No. 1031, pg. 229 (alterations added).

In [**58] 1998, employees at IBP's Pasco, Washington, plant filed suit to recover unpaid wages for donning and doffing related activities, including walking to and from workstations. The trial court found, among other things, that the time spent donning and doffing protective gear pre and post-shift [*1289] was work and required compensation under the FLSA. *Alvarez v. IBP, Inc.*, No. CT-98-5005, 2001 U.S. Dist. LEXIS 25344, 2001 WL 34897841, at *13-14 (E.D. Wash. Sept. 14, 2001). It also found that time spent walking to and from the locker room and work station, time spent donning

Case 3:14-cv-00956-JBA   Document 509   Filed 06/17/19   Page 138 of 183
Page 14 of 20

890 F. Supp. 2d 1273, *1289; 2012 U.S. Dist. LEXIS 118965, **58

and doffing at the meal and rest break, and time devoted to waiting for, preparing, handling, replacing, and washing equipment was compensable. *Id.* The Ninth Circuit agreed with the district court and held that "'donning and doffing' and 'waiting and walking' constitute compensable work activities except for the *de minimis* time associated with the donning and doffing of non-unique protective gear." *Alvarez v. IBP, Inc.*, 339 F.3d 894, 904 (9th Cir. 2003). Tyson appealed this decision to the Supreme Court. On November 8, 2005, the Court held that pre-shift walking time is compensable as part of the continuous workday if it occurs after the first principal **[**59]** activity of the day, and post-shift walking time is compensable if it occurs before the last principal activity of the day. After this ruling, Tyson conducted more time studies. Effective January 2007, Tyson authorized seven minutes of K code, which it began to pay in August 2007. Tyson also back paid its employees from January 2007. From the Supreme Court's decision in November 2005 to January 2007 Tyson knew that it was required to pay for compensable walking time at Finney County but it did not do so. According to Mr. Kimbro, the company was focused on determining how much more K code to add for walking time and to start paying that amount on a forward basis.

Tyson contends that the jury's verdict on willfulness cannot stand because Tyson has complied with the *Reich* injunction and with the Supreme Court's decision in *Alvarez*. Tyson contends that its interpretation of *Reich* did not mandate that it record and pay for actual time spent donning and doffing, rather it believes it can pay for the reasonable time spent doing those things, i.e., K code. The plaintiffs argue that Tyson has acted willfully by not recording and paying for actual time spent performing the donning and doffing **[**60]** activities. They argue that the *Reich* injunction required Tyson to record actual time and that the DOL explicitly informed Tyson that it needed to record and pay for actual time. And because Tyson has refused to pay actual time but instead has adopted the K code or "reasonable time" payments it has willfully violated the FLSA.

The plaintiffs have produced sufficient evidence that Tyson knew or showed reckless disregard that its pay practices were prohibited by statute. First, this court issued a permanent injunction against Tyson over 15 years ago restraining it from future violations of the FLSA. That injunction also required Tyson to record and to pay employees for time spent on compensable activities. In response, Tyson conducted time studies and began paying its employees in knife wielding departments four minutes per day for donning and doffing activities. Although less than the amount of time the court found Tyson owed, the DOL settled its lawsuit with Tyson. Yet, as the Ninth Circuit stated in *Alvarez*, "IBP's four-minute compliance plan, moreover, merely embodies an effort to

overcome a settlement impasse," thus, the DOL did not approve Tyson's method of paying K code rather **[**61]** than actual time. *See* 339 F.3d at 908. In fact, on January 15, 2001, the DOL explicitly announced in an opinion letter that Tyson must record and pay for each employee's actual hours of work. Although Mr. Kimbro repeatedly denied knowing about the letter until 2005, Tyson did not change its pay practice in 2005. And the jury also had sufficient grounds for questioning the credibility of Mr. Kimbro's testimony on this matter, especially in light of his admission that **[*1290]** Tyson follows DOL opinion statements when they are in Tyson's favor, but challenges the DOL or refuses to comply with DOL interpretations when they are not in Tyson's favor.

It is true that the courts and not the DOL are the final interpreters of the FLSA. The pertinent regulation provides that "[t]he ultimate decisions on interpretations of the act are made by the courts. The Administrator must determine in the first instance the positions he will take in the enforcement of the Act. The regulations in this part seek to inform the public of such positions. It should thus provide a 'practical guide for employers as to how the office representing the public interest in its enforcement will seek to apply it.'" 29 C.F.R. § 785.2 **[**62]** (quoting *Skidmore v. Swift*, 323 U.S. 134, 138, 65 S. Ct. 161, 89 L. Ed. 124 (1944)). But Tyson's admittedly cavalier attitude regarding the DOL's 2001 opinion letter is pertinent to the willfulness issue.

After *Alvarez*, Tyson again conducted time studies. At the conclusion of these studies, it determined it needed to add between one and three minutes of K code to each employee's pay per day. As a result, Tyson decided to increase its K code by three minutes in January 2007, but it did not make any back payments for time worked before January 2007. It is clear at this point that Tyson either knew or should have known that the K code minutes it added in response to *Alvarez* should have been paid to its employees before January 2007. Mr. Kimbro testified that Tyson was concerned with making the payments on a forward basis and did not consider paying before January 2007. The plaintiffs need not prove that Tyson knew it was in violation of the law, it is sufficient that Tyson "showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *See McLaughlin*, 486 U.S. at 133. Tyson cannot avoid a finding of willfulness simply by hiding behind its admission that it was only thinking about compliance **[**63]** going forward. And from Mr. Kimbro's testimony alone the jury had sufficient evidence to conclude that Tyson knew or recklessly disregarded the possibility that it had not paid sufficient compensation to its employees under the FLSA during the limitations period.

As stated by another court "[t]hese defendants [Tyson and

IBP], individually or collectively, have now been litigating this same issue for decades, reflecting what can only be described as a deeply-entrenched resistance to changing their compensation practices to comply with the requirements of the FLSA." *Jordan v. IBP, Inc., & Tyson Foods, Inc.*, 542 F. Supp.2d 790, 794 (M.D. Tenn. 2008) (alterations added); *see also* Trial Transcript, Dkt. No. 1031, pgs. 105-06. The jury in this case had ample evidence from which to agree with the sentiment expressed by the court in *Jordan*. And, for the reasons stated above, the jury had a sufficient evidentiary basis for concluding that Tyson willfully violated the FLSA. Accordingly, Tyson's Motion for Judgment as a Matter of Law is denied.

### III. Tyson's Motion to Alter Judgment to Receive Credit for Sunshine Time

In this Motion, Tyson seeks a remittitur (a reduction) in damages for "sunshine [**64] time" paid to the plaintiffs. Sunshine time was a form of compensation paid to slaughter employees representing the difference between the amount of time scheduled for a shift and the amount of time in which it took to complete the work for the day. For example, if the shift was scheduled to last 7 hours and 56 minutes yet the employees finished the work in 7 hours and [*1291] 40 minutes, the employees were paid for the entire scheduled shift. The parties agree that allowing an offset for sunshine time would reduce plaintiffs' damages by $67,507.

#### A. Legal Standard

Ordinarily a motion for remittitur is appropriate when the jury erred in awarding damages. *Arnold v. Riddell, Inc.*, 882 F. Supp. 979, 995 (D. Kan. 1995). Whether or not to grant a remittitur motion is within the sound discretion of the trial court. *Aerotech Res., Inc. v. Dodson Aviation, Inc.*, 191 F. Supp.2d 1209, 1223 (D. Kan. 2002). The court, however, may not substitute its judgment for that of the jury. *Goico v. Boeing Co.*, 358 F. Supp.2d 1028, 1030 (D. Kan. 2005). "'[A]bsent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause [**65] invaded the trial, the jury's determination of the damages is considered inviolate.'" *Id.* (quoting *Fitzgerald v. Mountain States tel. & Tel. Co.*, 68 F.3d 1257, 1266 (10th Cir. 1995) ((citing *Malandris v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981))). In this case, application and possible reduction of damages based on sunshine time was not submitted to the jury; both parties agreed the court would make this determination. Thus, the normal standards for remittitur do not apply.

#### B. Analysis

Section 207(h) is the only provision in the FLSA that addresses offsets. *See* 29 U.S.C. § 207(h). This section provides:

(h) Extra compensation creditable toward overtime compensation

(1) Except as provided in paragraph (2), sums excluded from the regular rate pursuant to subsection (e) shall not be creditable toward wages required under section 6 or overtime compensation required under this section.

(2) Extra compensation paid as described in paragraphs (5), (6), and (7) of subsection (e) of this section shall be creditable toward overtime compensation payable pursuant to this section.

*Id.* § 207(h)(1)-(2). According to paragraphs (h)(1) and (2), sums excluded from [**66] the regular rate of pay may not be used as offsets except the three exceptions found in subsection (e). The three types of compensation eligible for offsets in subsection (e) are: (5) regular time and a half overtime for hours worked in excess of 8 in one day or in excess of the maximum workweek applicable to the employee; (6) premium pay for days worked on weekends or holidays; and (7) premium pay provided under an employment contract or collective-bargaining agreement. *Id.* § 207(e)(5)-(7).[3] Both parties disagree as [*1292] to the

---

[3] Section 207(e)(5)-(7) provides:

(5) extra compensation provided by a premium rate paid for certain hours worked by the employee in any day or workweek because such hours are hours worked [**67] in excess of eight in a day or in excess of the maximum workweek applicable to such employee under subsection (a) of this section or in excess of the employee's normal working hours or regular working hours, as the case may be;

(6) extra compensation provided by a premium rate paid for work by the employee on Saturdays, Sundays, holidays, or regular days of rest, or on the sixth or seventh day of the workweek, where such premium rate is not less than one and one-half times the rate established in good faith for like work performed in nonovertime hours on other days;

(7) extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract or collective-bargaining agreement, for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday (not exceeding eight hours) or workweek (not exceeding the maximum workweek applicable to such employee under subsection (a) of this section, where such premium rate is not less than one and one-half times the rate established in good faith by the contract or agreement for like work performed during such workday or

Case 3:14-cv-00956-JBA   Document 509   Filed 06/17/19   Page 140 of 183

Page 16 of 20

890 F. Supp. 2d 1273, *1292; 2012 U.S. Dist. LEXIS 118965, **67

correct reading of the statute. According to Tyson, the statute does not apply to bar offsets for sunshine payments because it paid sunshine time as part of the regular rate, thus, falling outside the realm of subsection (h)(1). Because the statute does not specifically bar an offset for sunshine pay, Tyson contends it is available. Plaintiffs, on the other hand, read subsection (h)(2) as providing the only three instances in which compensation may be offset against wages not paid.

To be clear, the **[\*\*68]** plain language of the statute does not explicitly support either party's position. Unlike Tyson contends, the statute does not provide that amounts included in the regular rate are eligible as an offset unless otherwise excluded. Likewise, contrary to plaintiffs' position, the statute does not provide that only in the three instances listed in subsection (e) may a defendant be eligible for an offset. Rather, the statute establishes the three instances in which payments excluded from the regular rate are nonetheless eligible for an offset.

This court must determine whether the sunshine pay here, indisputably paid as part of the regular rate, is eligible for an offset; a situation not addressed by § 207(h). The only court of appeals to have ruled on a similar issue held that § 207(h) did not apply. *See Singer v. City of Waco, Tex.*, 324 F.3d 813, 827 (5th Cir. 2003). In *Singer*, the court held amounts paid in excess of overtime compensation due under the FLSA were properly offset against plaintiffs' damages because the excess payments were part of the plaintiffs' regular rate of pay. *Id.* at 828. In reaching that conclusion, the Fifth Circuit determined that § 207(h) "does not apply in this **[\*\*69]** case [because] . . . [t]hat provision refers to payments that are *not included* in determining the regular rate of pay." *Id.* (emphasis in original). Tyson cites two other cases which have cited *Singer* and agreed with its holding that § 207(h) is inapplicable to situations in which an offset is sought for an amount included in the regular rate of pay. *See Monroe Firefighters Ass'n v. City of Monroe*, No. 06-CV-1092, 2009 U.S. Dist. LEXIS 27698, 2009 WL 916272, at \*11-12 (W.D. La. Mar. 31, 2009); *Solis v. Tyson Foods, Inc.*, No. 2:02-CV-1174-VEH (attached as Ex. B. to Dkt. No. 1057). In *Solis*, the defendants sought a jury instruction entitling it to an offset for extra compensation it alleged it paid at the meal period and rest breaks. Citing *Singer*, the court found the extra compensation was included as part of the regular rate, thus, § 207(h) did not apply. *See* Dkt. No. 1057, Ex. B. Pg. 5. Ultimately, the court refused to allow the offset instruction, but only because defendants failed to present any evidence as to the amount of over-compensation or the amount of over-compensated time.

Plaintiffs cite *Alvarez v. IBP, Inc.*, and a DOL regulation to support their position that the sunshine payments should not be used **[\*\*70]** to offset their damages. *See Alvarez v. IBP, Inc.*, No. CT-98-5005, 2001 U.S. Dist. LEXIS 25344, 2001 WL 34897841, at \*24 (E.D. Wash. Sept. 14, 2001), *reversed on other grounds by Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003); 29 C.F.R. § 778.207. The *Alvarez* court briefly addressed the issue of sunshine payment offsets and concluded:

> IBP has sought to treat Sunshine payments as an offset. The Court finds that these Sunshine payments are in the **[\*1293]** nature of incentive pay, *i.e.*, a reward for working more efficiently and at greater speeds. In effect, IBP has been making these payments to slaughter division employees for their production floor performance during their work shift. Sunshine pay is not payment for off-the-clock work, nor is it the type of premium pay that could offset overtime pay obligations under U.S.C. § 207(h). Similarly, Sunshine pay is not compensation for MWA off-the-clock work and does not offset MWA damages.

2001 U.S. Dist. LEXIS 25344, 2001 WL 34897841, at \*24. While not dispositive, this case clearly supports plaintiffs' position.

The DOL regulation plaintiffs cite also provides support for their position:

> (a) Overtime premiums are those defined by the statute. The various types of contract premium rates which provide extra **[\*\*71]** compensation qualifying as overtime premiums to be excluded from the regular rate (under section 7(e)(5), (6), and (7) and credited toward statutory overtime pay requirements (under section 7(h)) have been described in §§ 778.201 through 778.206. The plain wording of the statute makes it clear that extra compensation provided by premium rates other than those described cannot be treated as overtime premiums. Wherever such other premiums are paid, they must be included in the employee's regular rate before statutory overtime compensation is computed; no part of such premiums may be credited toward statutory overtime pay.

> (b) Nonovertime premiums. The Act requires the inclusion in the regular rate of such extra premiums as nightshift differentials (whether they take the form of a percent of the base rate or an addition of so many cents per hour) and premiums paid for hazardous, arduous or dirty work. It also requires inclusion of any extra compensation which is paid as an incentive for the rapid performance of work, and since any extra compensation

---

workweek;

*Id.*

Case 3:14-cv-00956-JBA   Document 509   Filed 06/17/19   Page 141 of 183   Page 17 of 20

890 F. Supp. 2d 1273, *1293; 2012 U.S. Dist. LEXIS 118965, **71

in order to qualify as an overtime premium must be provided by a premium rate per hour, except in the special case of pieceworkers as discussed [**72] in § 778.418, lump sum premiums which are paid without regard to the number of hours worked are not overtime premiums and must be included in the regular rate. For example, where an employer pays 8 hours' pay for a particular job whether it is performed in 8 hours or in less time, the extra premium of 2 hours' pay received by an employee who completes the job in 6 hours must be included in his regular rate. Similarly, where an employer pays for 8 hours at premium rates for a job performed during the overtime hours whether it is completed in 8 hours or less, no part of the premium paid qualifies as overtime premium under sections 7(e)(5), (6), or (7).

29 C.F.R. § 778.207. Plaintiffs contend the language "extra compensation which is paid as an incentive for the rapid performance of work" refers to sunshine pay. Under the regulation, such pay is included in the regular rate. Plaintiffs then point to the portion of subsection (a) which provides "[t]he plain wording of the statute makes it clear that extra compensation provided by premium rates other than those described cannot be treated as overtime premiums. Wherever such other premiums are paid, they must be included in the employee's [**73] regular rate before statutory overtime compensation is computed; *no part of such premiums may be credited toward statutory overtime pay*." 29 C.F.R. § 778.207(a) (emphasis added). Plaintiffs argue the sunshine payments do not qualify for an offset because it is extra compensation, other than that described in § 207(e)(5)-(7), which may not be credited [*1294] toward statutory overtime pay. Although not cited by plaintiffs, another section of the regulations strengthens this interpretation. *See* 29 C.F.R. § 778.201(c). This section provides: "Section 7(h) [§ 207(h)] of the Act specifically states that the extra compensation provided by these three types of payments may be credited toward overtime compensation due under section 7(a) for work in excess of the applicable maximum hours standard. *No other types of remuneration for employment may be so credited*." *Id.* (emphasis added).

This court finds the sunshine payments at issue are incentive payments for rapid performance of work that must and are calculated as part of the regular rate. Because such payments are included in the regular rate and they do not fall under the exceptions listed subsection (e)(5)-(7), § 207(h) does not apply. This does [**74] not mean, however, that the payments are automatically creditable against plaintiffs' damages award simply because they are part of the regular rate and not covered by § 207(h). All three of the cases Tyson relies on for that proposition, *Singer, Monroe Firefighters*,

and *Solis*, involved extra compensation not akin to the sunshine payments here. *Singer*, 324 F.3d at 826 (involving faulty overtime calculations resulting in overpayments in which firefighters worked 96 hours); *Monroe Firefighters*, 2009 U.S. Dist. LEXIS 27698, 2009 WL 916272, at *10 (involving an extra lump sum payment for 6.5 hours at half the regular rate and longevity payments paid to firefighters after their 23rd year of employment); *Solis*, No. 2:02-CV-1174 (involving extra compensated minutes received at lunch and rest breaks).

The DOL's regulations are not binding on this issue. *See* 29 C.F.R. § 775.1 ("Advisory interpretations announced by the Administrator serve only to indicate the construction of the law which will guide the Administrator in the performance of his administrative duties . . . ."); 29 C.F.R. § 778.1 ("This Part 778 constitutes the official interpretation of the Department of Labor with respect to the meaning and application of [**75] the maximum hours and overtime pay requirements contained in section 7 of the Act. It is the purpose of this bulletin to make available in one place the interpretations of these provisions which will guide the Secretary of Labor and the Administrator in the performance of their duties under the Act unless and until they are otherwise directed by authoritative decisions of the courts or conclude, upon reexamination of an interpretation, that it is incorrect."); 29 C.F.R. § 785.2 ("The ultimate decisions on interpretations of the act are made by the courts."). But because 29 C.F.R. §§ 778.201 and 778.207 are interpretative regulations, this court should defer to them to the extent they have the power to persuade. *Fowler v. Incor*, 279 F. App'x 590, 598 (10th Cir. 2008) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 138, 65 S. Ct. 161, 89 L. Ed. 124 (1944)).

Nothing in the FLSA expressly permits Tyson to offset the amount it paid in sunshine payments against plaintiffs' recovery. The regulations indicate such sunshine payments should not be offset against plaintiffs' damages. Because the payments are not the type Congress expressly authorized to be used for offset treatment, this court finds the regulations persuasive [**76] and holds Tyson's sunshine payments may not be offset against plaintiffs' damages. Therefore, Tyson's Motion is denied.

## IV. Plaintiffs' Motion to Alter or Amend Judgment

Plaintiffs move this court for (1) an award of liquidated damages, (2) an award of pre-judgment interest, (3) an award of post-judgment interest, and (4) clarification [*1295] of the class definition. The court will address each request in turn.

Case 3:14-cv-00956-JBA   Document 509   Filed 06/17/19   Page 142 of 183

Page 18 of 20

890 F. Supp. 2d 1273, *1295; 2012 U.S. Dist. LEXIS 118965, **76

## A. Liquidated Damages

An employer may avoid paying liquidated damages for violating the FLSA "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938." 29 U.S.C. § 260 (2006). "'[L]iquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA.'" *Jordan v. United States Postal Serv..*, 379 F.3d 1196, 1202 (10th Cir. 2004) (quoting *Herman v. RSR Sec. Servs. Ltd*., 172 F.3d 132, 142 (2d Cir. 1999)). While the employer must prove subjective good faith, it must also prove [**77**] that its actions were objectively reasonable. *Overly v. Black & Veatch Corp*., No. 05-2161, 2006 U.S. Dist. LEXIS 34665, 2006 WL 1517761, at *3 (D. Kan. May 25, 2006). If the employer meets that burden the court retains discretion whether to award liquidated damages. *Greene v. Safeway Stores, Inc*., 210 F.3d 1237, 1245 (10th Cir. 2000). But the Tenth Circuit has adhered to a different rule when a jury has determined that the defendant willfully violated the FLSA. *Brinkman v. Dep't of Corrections of Kan*., 21 F.3d 370, 372-73 (10th Cir. 1994). "The same willfulness standard for the statute of limitations issue applies to the liquidated damages issue." *Id* at 373. Thus, the court is prohibited from reaching a contrary result as to liquidated damages. *Id*. at 372-73 ("We have held that when fact issues central to a claim are decided by a jury upon evidence that would justify its conclusion, the Seventh Amendment right to a jury trial prohibits the district court from reaching a contrary conclusion.").

Here, recognizing *Brinkman's* holding, the parties have agreed this court must award liquidated damages in the full amount of the FLSA award, or $166,345.00. Tyson filed its motion for remittitur seeking to reduce the liquidated [**78**] damages award to $153,638.00. However, as noted above, the court denied defendants' Motion. And the court denied Tyson's Motion for Judgment as a Matter of Law on the willfulness issue. Therefore, the court grants plaintiffs' Motion and awards liquidated damages to plaintiffs in the amount of $166,345.00.

## B. Pre-Judgment Interest

The parties agree that the plaintiffs are entitled to pre-judgment interest on the KWPA claim. Further, the parties agree it is appropriate to apply a 10% per annum interest

rate.[4] Plaintiffs calculated the interest by taking the KWPA award, $336,666, and dividing it by the number of months in the class period, which equals $3,699.63 per month. The 10% interest rate is then applied to the $3,699.63 resulting in a prejudgment interest of $116,538.23. Tyson sought to reduce this amount through its Remittitur Motion, but the court denied the Motion. Therefore, the court grants plaintiffs' Motion for pre-judgment interest and awards them $116,538.23.

## C. Post-Judgment Interest

In plaintiffs' initial brief (Dkt. No. 1055), plaintiffs sought post-judgment interest at [***1296**] ten percent per annum running from the date the court entered judgment. The parties have since conferred and agreed that 28 U.S.C. § 1961 governs the award of post-judgment interest. This statute provides, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." This court entered judgment on March 17, 2011. The weekly average in the preceding week, as provided by the parties, was 0.252%. Thus, pursuant to § 1961, this court amends judgment to provide for post-judgment interest running from March 17, 2011, to the date of payment at the rate of 0.252%.

## D. Modification of Class Definition

Last, [****80**] plaintiffs move the court to amend the final Rule 23 class definition to the following:

> All current and former hourly employees of Defendants who worked at the Finney County facility from May 15, 2003, to December 31, 2010, who were paid on a "Gang Time" basis and paid for their donning and doffing activities on an "average time" basis using K-code.

Dkt. No. 1055, pg. 3. Essentially, plaintiffs seek to remove any reference to the Emporia claims and employees because the trial was bifurcated, the Emporia trial yet to take place. They also seek to include only employees who were paid gang time and K code. Plaintiffs' request to amend the class

---

[4] "At the discretion of the presiding officer, interest, as provided under K.S.A. 16-201, and amendments thereto, may be assessed on wage claims found to be due and owing from the date the wages were due as defined in [****79**] K.S.A. 44-314, and amendments thereto." KAN. STAT. ANN. § 44-323(a). Kan. Stat. Ann. § 16-201 provides that the interest rate shall be ten percent per annum.

Case 3:14-cv-00956-JBA   Document 509   Filed 06/17/19   Page 143 of 183   Page 19 of 20

890 F. Supp. 2d 1273, *1296; 2012 U.S. Dist. LEXIS 118965, **79

definition to exclude Emporia class members is granted. The court bifurcated the trial in this matter and tried the Finney County facility first. Dkt. No. 976. All evidence at trial only pertained to the Finney County facility, and no facts were presented as to the Emporia facility. Tyson does not appear to dispute this modification but it does object to plaintiffs' attempt to modify the class to include only employees paid on gang time and paid K code.

Plaintiffs moved for class certification on October 15, 2008. Judge Lungstrum certified this case **[**81]** as a class and collective action on February 12, 2009, and defined the class as:

> All current and former hourly employees of Defendants who worked at the Holcomb or Emporia facilities from May 15, 2003 to the present and who performed off-the-clock activities during one or more workweeks, including but not limited to donning, doffing, washing and walking and who were paid on a "Gang Time" basis and/or paid for their donning and doffing activities on an "average time" basis during one or more of those workweeks.

Dkt. No. 741, pg. 7. This initial class covered all employees paid on gang time "and/or" paid K code for donning and doffing activities. As explained in plaintiffs' brief, all individuals who were paid K code were also paid on gang time. But not all individuals paid on gang time were paid K code. Asserting that only individuals paid both gang time and K code were tried to the jury, plaintiffs believe individuals paid only gang time should not have their potential claims adjudicated in this trial because they were not subject to the K code payments that were central to liability and damages in this case. Said another way, plaintiffs seek to remove the "or" in the original class **[**82]** certification definition and leave the "and." This and/or distinction amounts to approximately 2,057 employees reducing the original class size of 7,187.

**[*1297]** Tyson objects to plaintiffs' requested modification for several reasons. First and foremost, it argues that the class as originally defined by Judge Lungstrum and as provided in the Pretrial Order was the class tried to the jury. And it would be unfair to allow plaintiffs to remove over 2,000 class members at this late date. Second, Tyson takes issue with the time period in which plaintiffs first sought to formally narrow the class definition, arguing this also should preclude a modification.

Fed. R. Civ. P. 23(c)(1)(A) grants the district court wide discretion in the initial certification of a class.[5] *See DG ex rel.*

*Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010) ("Recognizing the considerable discretion the district court enjoys in this area, we defer to the district court's certification ruling if it applies the proper Rule 23 standard and its 'decision falls within the bounds of rationally available choices given the facts and law involved in the matter at hand.'") (quoting *Vallario v. Vandehey*, 554 F.3d 1259, 1264 (10th Cir. 2009)). **[**83]** This discretion continues throughout the course of the litigation as Fed. R. Civ. P. 23(c)(1)(C) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." *See id.* at 1201. This broad discretion to modify or decertify a class extends after a trial on the merits in a given case. *See Forehand v. Fla. State Hosp. at Chattahoochee*, 89 F.3d 1562, 1566-67 (11th Cir. 1996); *Stastny v. Southern Bell Tel. and Tel. Co.*, 628 F.2d 267, 275-76 (4th Cir. 1980); *see also* 7AA CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1785.4 (3d ed. 2005) ("Courts have modified or decertified classes at the outset of pretrial, the completion of discovery, after summary judgment in favor of plaintiff class's injunctive claims, but before awarding damages, at the close of plaintiff class's case-in-chief, and at the completion of the trial on the merits."). The Eleventh Circuit in *Perryman v. Johnson Products Co., Inc.*, facing a similar situation, held the district court did not abuse its discretion when it reduced the size of the class prior to a decision on the merits but after trial. 698 F.2d 1138, 1148 (11th Cir. 1983). **[**84]** In finding so the court stated:

> The defendant has failed to cite any case in which a trial court was held to have abused its discretion by reducing the size of a class prior to a decision on the merits where all members of the recertified class were also members of the original class. The prejudice, if any, suffered by [defendant] as a result of the recertification of the plaintiff class was not severe enough to compel our interference with the trial court's duty to facilitate the fair and expeditious utilization of the class action mechanism.

*Id.* at 1147-48. Tyson cites two cases for the proposition that a court may not alter the class definition after trial. *See Garrett v. City of Hamtramck*, 503 F.2d 1236, 1244 (6th Cir. 1974); *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 310 (6th Cir. 1975). Neither of these cases, however, provide support for defendants' position. In *Garrett*, the Sixth Circuit held that the district court abused its discretion by enlarging the class definition to include individuals not represented in the action. 503 F.2d at 1245-46. By enlarging the class size the court found defendants had been prejudiced because they had no

---

[5] Fed. R. Civ. P. 23(c)(1)(A) provides: "At an early practicable time after a person sues or is sued as a class representative, the court must

determine by order whether to certify the action as a class action."

890 F. Supp. 2d 1273, *1297; 2012 U.S. Dist. LEXIS 118965, **84

opportunity to argue against including **[\*\*85]** such individuals. *Id.* at 1246. Similarly, in *Detroit Edison Co.*, the court found the district court **[\*1298]** erred by enlarging the plaintiff class in its decision on the merits to include previously excluded persons and persons likely not represented by the class as defined before and during trial. 515 F.2d at 310-11.

Here, the plaintiffs do not seek to enlarge the class definition to persons not previously contemplated as members of the class. On the contrary, plaintiffs are seeking to narrow the class. As such, any persuasive authority the *Garrett* and *Detroit Edison Co.* cases may have is limited. Tyson has not and cannot provide authority showing a court may not narrow class definition after trial.

Given this broad discretion the court finds it appropriate to modify the plaintiffs' Rule 23 class to encompass only those employees who were paid on gang time and paid K code. Plaintiffs' damages expert, Dr. Baggett, based his damages methodology on employees who received both gang time and **[\*\*86]** K code. While Dr. Baggett may have studied and calculated damages for all 7,187 class members, it is clear that plaintiffs only sought to prove damages for those paid both gang time and K code. This is further bolstered by plaintiffs' representative testimony.

It is true that the initial Class Certification Order and the Pretrial Order defined the class to include gang time "and/or" K-code employees. It is also true, as Tyson contends, that the Pretrial Order binds counsel to the issues of fact and law to be decided. *See R.L. Drilling Contractors, Inc. v. Schramm, Inc.*, 835 F.2d 1306, 1308 (10th Cir. 1987). Yet, as noted above, this court's discretion to modify the class definition under Fed. R. Civ. P. 23(c)(1)(C) is paramount and does not dissipate merely because the initial Class Certification Order and the Pretrial Order contained a slightly different class. Tyson cannot show prejudice as a result of narrowing the class definition.

Last, Tyson contends this court should not alter the class because plaintiffs did not try to amend the class definition prior to trial or before the conclusion of trial. In fact, Tyson contends the first time they became aware of plaintiffs' intention **[\*\*87]** was during opening statements. It is true plaintiffs did not seek to formally narrow the class definition prior to trial, but it is disingenuous of Tyson to assert they were totally unaware of the class definition plaintiffs intended to try. Tyson became aware of plaintiffs' methodology in figuring damages when Dr. Baggett finished his initial report in August 2010. Thereafter, Dr. Baggett was not able to complete his report until late February 2011, because Tyson provided him with the final data necessary around January 26,

2011. Additionally, defense counsel acknowledged in an email on February 28, 2011, that the "Rule 23 class contains 5,130 persons who are claiming non-zero damages." Dkt. No. 1065, Ex. C. Even more, once the issue of final class definition arose during trial, plaintiffs prepared to file a motion immediately. Before doing so, plaintiffs sent a copy of the proposed order to defense counsel in an effort to reach agreement. In response defense counsel requested plaintiffs delay filing the motion until they could consult with their client. In an act of professional courtesy, plaintiffs did not file the motion before trial had concluded. Thus, it is abundantly clear **[\*\*88]** that although plaintiff did not move for formal amendment, Tyson knew the class plaintiffs sought to try before the trial and throughout it.

In sum, this court finds it has discretion to modify the class definition to reflect the class presented at trial. Further, the court finds Tyson will not be prejudiced by this decision. Therefore, the final Rule 23 class shall be defined as follows:

> **[\*1299]** All current and former hourly employees of Defendants who worked at the Finney County facility from May 15, 2003, to December 31, 2010, who were paid on a "Gang Time" basis and paid for their donning and doffing activities on an "average time" basis using K-code.

The court grants plaintiffs' Motion to Modify the Class Definition.

IT IS ACCORDINGLY ORDERED this 21st day of August 2012, that plaintiffs' Post-Trial Motion to Alter or Amend the Judgment Regarding Liquidated Damages, Interest, and the Final Class Definition (Dkt. No. 1055) is granted.

IT IS FURTHER ORDERED that Tyson's Motion for Remittitur to Receive Credit for "Sunshine Time" (Dkt. No. 1056) is denied.

IT IS FURTHER ORDERED that Tyson's Motion for Judgment as a Matter of Law (Dkt. No. 1058) is denied.

/s/ J. Thomas Marten

J. THOMAS MARTEN, JUDGE **[\*\*89]**

**End of Document**

2008 WL 1995117
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Pansy JOHNSON, Plaintiff,
v.
SPIRIT AIRLINES, INC., Defendant.

No. CV 07-1874(FB)(JO).
|
May 6, 2008.

**Attorneys and Law Firms**

Nicole S. Weiser, Jaimee Lynn Nardiello, Martin J. Weiser, Weiser & Associates, P.C., New York, NY, for Plaintiff.

Marguerite D. Peck, Alison D. Metzler, Downing & Peck P.C., New York, NY, for Defendant.

**ORDER**

JAMES ORENSTEIN, United States Magistrate Judge.

*1 Defendant Spirit Airlines, Inc. ("Spirit") seeks an order pursuant to Fed. R. Civ. P 26(b)(4)(C) limiting the compensation rate of the expert witness Dr. Richard Seldes ("Dr.Seldes"), a treating physician of the plaintiff. Docket Entry ("DE") 37. Dr. Seldes initially demanded a flat fee payment of $7,500 to provide testimony. His request was later reduced to $2,500. The plaintiff responded to Spirit's motion by asserting that Dr. Seldes's fee is reasonable in relation to his expertise and qualifications, and requested that the court set Dr. Seldes's fee at $1,000 per hour. DE 38. That response is inadequate: Dr. Seldes's fee may represent his usual practice, but it is not a reasonable amount that he can impose on the defendant in the form of a flat fee, before

the deposition has taken place. On that basis, I deny Spirit's motion as premature until Dr. Seldes has performed the work for which he seeks reimbursement.

"Compensating an expert for his time spent in deposition is mandatory under [Federal Rule of Civil Procedure 26(b)(4)(C) ] to 'avoid the unfairness of requiring one party to provide expensive discovery for another party's benefit without reimbursement.' " *Garnier v. Illinois Tool Works, Inc.,* 2006 WL 1085080, *2 (E.D.N.Y. April 24, 2006) (citing *Magee v. Paul Revere Life Ins. Co.,* 172 F.R.D. 627, 646 (E.D.N.Y.1997)). However, it is the court's prerogative to balance one party's need to retain a competent expert with the need to "protect the opposing party from being unfairly burdened by excessive ransoms which produce windfalls for the party's experts." *Id.* (internal quotations omitted).

Absent manifest injustice-a circumstance that no party has argued is present in this case-I must require Spirit to "pay the expert a *reasonable* fee for *time spent* in responding to discovery[.]" Fed.R.Civ.P. 26(b)(4)(C)(i) (emphasis added). The pertinent rule thus teaches that once Dr. Seldes has actually "spent" time responding to Spirit's questions at the deposition, he may then bill Spirit for a "reasonable" fee for that amount of "time." Dr. Seldes therefore may not insist on advance payment, and may not set a flat fee before he knows what he will be called upon to do; he may instead charge only a reasonable hourly fee. I will not predict in advance what reasonable hourly fee Dr. Seldes may choose to request, but should a dispute arise, I will of course defer to the persuasive authority of cases such as the *Garnier* decision cited above and the precedent on which it in turn relied. *See id.* at *3-*4 (describing a range of reasonable hourly rates below $500).

For the reasons set forth above, I deny defendant Spirit's motion as premature until Dr. Seldes has performed the work for which he seeks reimbursement.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 1995117

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

⚠️ Caution
As of: June 17, 2019 7:28 PM Z

# Mark Andrew of the Palm Beaches, Ltd. v. GMAC Commer. Mortg. Corp.

United States District Court for the Southern District of New York

July 29, 2003, Decided ; July 31, 2003, Filed

01 Civ. 1812 (JGK) (MHD)

**Reporter**
2003 U.S. Dist. LEXIS 13217 *; 2003 WL 21767633

THE MARK ANDREW OF THE PALM BEACHES et al., Plaintiffs, -against- GMAC COMMERCIAL MORTGAGE CORPORATION, Defendant.

**Prior History:** Mark Andrew of the Palm Beaches, Ltd. v. GMAC Commer. Mortg. Corp., 265 F. Supp. 2d 366, 2003 U.S. Dist. LEXIS 11528 (S.D.N.Y., 2003)

**Disposition:** [*1] Plaintiff's motion for expert witness fees and expenses granted.

## Case Summary

### Procedural Posture
Following the completion of pre-trial discovery, plaintiffs moved for an award of fees and expenses for the deposition testimony of their two designated expert witnesses.

### Overview
The first expert offered no information to demonstrate that his hourly rate was common in his field of expertise, and the court reduced his hourly rate to $ 200. The court saw no basis for charging defendant for time spent by the expert's employees in talking to him or performing cryptically described research. Apart from the six-hour deposition time, the court saw no reasonable basis for crediting him with more than 20 hours of preparation time. The expert's expenses were vastly overstated, at least as a measure of what defendant should be expected to bear. The court reduced the air fair, disallowed hotel charges for more than one night, and reduced the hotel rate to $ 200. The other expert also failed to justify her hourly rate and the court only allowed for deposition time plus 20 hours of preparation time. The court disallowed charges for more than a one-night hotel stay and reduced the rate to $ 200.

### Outcome
The court granted plaintiffs' motion, in part, and awarded a significantly reduced amount for fees and expenses related to the deposition testimony of two expert witnesses.

**Counsel:** For The Mark Andrew of the Palm Beaches, Ltd, The Mark Andrew Operating Company, Inc, Green Fields & White Doors, Inc, PLAINTIFFS: J Joseph Bainton, Andrew H Beatty, Bainton, McCarthy & Siegel, LLC, New York, NY USA.

For The Mark Andrew of the Palm Beaches, Ltd, The Mark Andrew Operating Company, Inc, Flagler Life Care, Inc, Loretta Gardner, Robert C Gardner, Green Fields & White Doors, Inc, PLAINTIFFS: Willie E Gary, F Shields McManus, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, Stuart, FL USA.

For Green Fields & White Doors, Inc, PLAINTIFF: Ethan D Siegel, Bainton, McCarthy & Siegel, LLC, New York, NY USA.

For GMAC Commercial Mortgage Corporation, DEFENDANT: Steven S Rand, Zeichner Ellman & Krause LLP, New York, NY USA.

**Judges:** MICHAEL H. DOLINGER, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** MICHAEL H. DOLINGER

## Opinion

*MEMORANDUM & ORDER*

MICHAEL H. DOLINGER

UNITED STATES MAGISTRATE JUDGE:

Following the completion of pre-trial discovery, plaintiffs moved for an award of fees and expenses for the deposition testimony of their two designated expert witnesses. **[*2]** Plaintiffs sought a payment of $ 25,942.98 for Mr. Scott Muldavin and $ 29,645.61 for Ms. J. Sabrina Bires. Defendant opposed the motion, urging either denial of the motion or an order directing payment of only $ 4,207.50 for Mr.

Muldavin's time and $ 3,657.50 for Ms. Bires's time. We conclude that plaintiffs are entitled to payments of $ 6,060.00 and $ 6,213.50, respectively, for these two witnesses. [1]

Fed. R. Civ. P. 26(b)(4)(C) provides in pertinent part that "unless manifest injustice would result, [] the court" must require the discovering party "to pay the expert a reasonable fee for time spent in responding to discovery under this subdivision [*3] …" The courts have interpreted this provision to cover reasonable expenses as well as fees. *See, e.g., Bonner v. American Airlines, Inc.,*1997 U.S. Dist. LEXIS 20836, 1997 WL 802894, *1 (S.D.N.Y. Dec. 31, 1997) (citing cases). The party that seeks reimbursement bears the burden, however, of demonstrating the reasonableness of the amounts claimed. *See, e.g., New York v. Solvent Chemical Co.,* 210 F.R.D. 462, 468 (W.D.N.Y. 2002).

Mr. Muldavin prepared a report outlining purported business opportunities of which plaintiffs were allegedly deprived because of defendant's actions in refusing a loan. He invoiced plaintiffs for 75.25 hours spent by five individuals in connection with his deposition.

As for the hourly rates, he bills himself and three others at $ 275.00 per hour and one other person at $ 95.00 per hour. He offers no information, however, to demonstrate that these hourly rates are common in the particular field in which he exercises his expertise.

Finally, he adds a variety of miscellaneous expenses to his bill. These include an unexplained three-percent "administrative charge" totaling $ 604.31, and charges for travel expenses that amount to $ 3,125.96.

We have reviewed [*4] Mr. Muldavin's submission and see no basis for charging defendant for time spent by his various employees in talking to him or performing cryptically described research. As for his own time, apart from the six-hour deposition, we see no reasonable basis for crediting him with more than twenty hours of preparation.

Mr. Muldavin fails to explain his hourly rate, much less justify it, and plaintiffs' legal submissions are equally unhelpful. All that they do is to cite a handful of cases upholding various hourly rates of specialists in other categories. (*See* Pltffs' Reply at 4). This says nothing about whether the charges that Mr. Muldavin has billed are reasonable given his expertise. *See generally Solvent Chemicals,* 210 F.R.D. at 468 (summarizing factual matters pertinent to reasonableness of fee). In view of the absence of clear support for the rate sought, we reduce it to $ 200.00 per hour for his twenty-six hours of compensable time.

Finally, Mr. Muldavin's expense charges are vastly overstated, at least as a measure of what defendant should be expected to bear. Plaintiffs chose to hire an expert who is based in California to testify in a case pending in New [*5] York, and now seek compensation for an airfare bill in excess of $ 1,800.00, as well as for three nights of lodging at the Waldorf Astoria. Although we agree that the reasonable expense of travel may be charged, this is not reasonable. For example, the cost of a roundtrip between Oakland and New York on Jet Blue is currently $ 268.00, with additional charges of as much as $ 17.00. *See, e.g.,* http://www.jetblueairways.com (site accessed by court on July 28, 2003). Assuming that such an inexpensive ticket may not have been available when Mr. Muldavin came to New York, we still see no reason to charge defendant for more that $ 400.00. [2] As for hotel charges, we equally fail to see why defendants should be required to reimburse Mr. Muldavin for more than one night and for a room charge in excess of $ 200.00. Additional charges of $ 60.00 for dinner and breakfast and $ 200.00 for taxi fares may also be imposed on defendant. The remaining billing expenses are neither explained nor justified by or on behalf of Mr. Muldavin and hence are not deemed compensable.

[*6] As for Ms. Bires, she charged plaintiff for 69 hours in connection with her deposition, including 42.5 hours of preparation, 19.5 hours of travel time between San Francisco and New York and seven hours for the deposition itself. She bills her services at $ 400.00 per hour, but does not explain, much less justify, this figure. Ms. Bires's expenses include three nights at an apparently expensive New York hotel, associated room charges, meals and cab fares.

The hours charged are overstated. First, we see no reason to burden defendant with more that the time for the deposition and preparation time of twenty hours. The travel time -- which is found in a claim of nearly 20 hours -- should not be separately billable for two reasons. First, plaintiff chose a West Coast expert and should not be reimbursed for the time spent in her traveling here, and in any case there was no reason why she could not have used at least some of her time

---

[1] We note that in the interim the District Court has granted summary judgment in favor of defendant. The *Mark Andrew of the Palm Beaches, Ltd. v. GMAC Commercial Mortgage Corp.,*265 F. Supp. 2d 366, 2003 U.S. Dist. LEXIS 11528, 2003 WL 21554347 (S.D.N.Y. July 3, 2003). We see no need to address the effect, if any, of that ruling on the actual payment of expert fees and expenses between the parties.

[2] We note in this regard that Ms. Bires was able to obtain a ticket for a roundtrip between San Francisco and New York for only $ 353.50.

on the flight to prepare. [3] With regard to the hourly rate, in the absence of any compelling justification for the $ 400.00 figure, we reduce it to $ 200.00.

 [*7]  As for the claimed expenses, the airfare is reasonable, as are the cab fares. The hotel charges are not defensible since there was no reason for more than a one-night stay, and room rates of $ 425.00 and $ 350.00 are excessive. We uphold a charge of $ 200.00 for the hotel. An added charge of $ 60.00 for two meals is also proper.

In view of the foregoing, we determine that the following are properly compensable to plaintiffs for the depositions of the two expert witnesses:

*Mr. Muldavin*

Fees: $ 200.00 x 26 hours = $ 5,200.00

Go to table1

*Ms. Bires*

Fees: $ 200.00 x 27 hours = $ 5,400.00

Go to table2

The total payable for these two witnesses is therefore $ 6,060.00 (for Mr. Muldavin) and $ 6,213.50 (for Ms. Bires), or a total of $ 12,273.50.

Dated: July 29, 2003

MICHAEL H. DOLINGER

UNITED       STATES       MAGISTRATE       JUDGE

_____

[3] We recognize that courts have awarded travel time for experts. *See Frederick v. Columbia University,* 212 F.R.D. 176, 177 (S.D.N.Y. 2003); *Magee v. Paul Revere Life Ins. Co.,* 172 F.R.D. 627, 646 (E.D.N.Y. 1997). We are aware of no precedent, however, that supports the forced payment for travel time of nearly twenty hours without any showing that equally skilled local experts are unavailable.

2003 U.S. Dist. LEXIS 13217, *7

**Table1** ([Return to related document text](#))

| | | | |
|---|---|---|---|
| Expenses: | hotel | $ 200.00 | |
| | airfare | $ 400.00 | |
| | meals | $ 60.00 | |
| | cabs | $ 200.00 | |
| | | $ 860.00 | |

**Table1** ([Return to related document text](#))

---

**Table2** ([Return to related document text](#))

| | | | |
|---|---|---|---|
| Expenses: | hotel | $ 200.00 | |
| | airfare | $ 353.50 | |
| | meals | $ 60.00 | |
| | cans | $ 200.00 | |
| | | $ 813.50 | |

**Table2** ([Return to related document text](#))

---

**End of Document**

1997 WL 299423
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

NEW YORK CITY DEPARTMENT OF FINANCE,
and the City of New York, Plaintiffs,
v.
TWIN RIVERS, INC., American National Bank
and Trust Company of Chicago, as Trustee, Realty
Growth Investors, Inc., and American Invsco
Corp., Defendants.

No. 95 CIV. 1389 HB HBP.
|
June 5, 1997.

*OPINION AND ORDER*

PITMAN, United States Magistrate Judge:

I. *Introduction*
**\*1** Plaintiffs, creditors in the instant action, move to dismiss certain affirmative defenses of defendant Realty Growth Investors, Inc. ("RGI"), a guarantor, pursuant to the "law of the case" doctrine. Defendant RGI opposes dismissal of its affirmative defenses on the grounds that (1) the law of the case doctrine is inapplicable; and that (2) in this case, plaintiffs carry the burden of proof on the affirmative defenses. For the reasons set forth below, plaintiffs' motion is granted in part and denied in part.

II. *Procedural History*[1]

[1]   The Honorable Harold Baer, United States District Judge, has set forth the complete history of this case in two opinions published at 920 F.Supp. 50 (S.D.N.Y.1996) and 929 F.Supp. 172 (S.D.N.Y.1996), familiarity with which is assumed.

Plaintiffs, New York City Department of Finance and the City of New York, brought this suit to collect on notes for the payment of taxes, signed by defendants Twin Rivers, Inc. and American National Bank and Trust Company, the principal obligors. Defendants RGI and American Invesco Corporation (AIC) are guarantors (collectively, the "Guarantor Defendants") of the notes.

The Guarantor Defendants moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) on the grounds that plaintiffs had not exhausted their remedies and failed to exercise due diligence against their principal obligors prior to commencing the action. Judge Baer dismissed the claims against AIC, finding that although plaintiffs had not satisfied the exhaustion clause of the AIC Guaranty Contract, *New York City Department of Finance v. Twin Rivers, Inc.,* 920 F.Supp. 50, 54 (S.D.N.Y.1996); 929 F.Supp. 172, 174 (S.D.N.Y.1996), but denied RGI's motion to dismiss, because under the RGI Guaranty contract "plaintiff[s] can prove a set of facts entitling it to relief," *New York City Department of Finance v. Twin Rivers, Inc., supra,* 920 F.Supp. at 54.

Plaintiffs now move to dismiss defendant RGI's affirmative defenses—plaintiffs' failure to exhaust its remedies and exercise due diligence against the principal obligors—pursuant to the "law of the case" doctrine.

III. *Analysis*
The Court of Appeals for the Second Circuit recently articulated the law of the case doctrine in *Pescatore v. Pan American World Airways. Inc.,* 97 F.3d 1, 7–8 (2d Cir.1996):

The law of the case doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' " *DiLaura v. Power Auth.,* 982 F.2d 73, 76 (2d Cir.1992) (*quoting In re PCH Assocs.,* 949 F.2d 585, 592 (2d Cir.1991)); *see also NLRB v. Coca–Cola Bottling Co.,* 55 F.3d 74, 77–78 (2d Cir.1995). The doctrine is "admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Virgin Atlantic Airways, Ltd. v. National Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.), *cert. denied,* 506 U.S. 820, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992); *see also Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) (law of the case doctrine "does

not limit the tribunal's power").

**\*2** Courts generally depart from the law of the case when there is a change in controlling law, when new evidence becomes available, to correct a clear error, or prevent manifest injustice. *DiLaura v. Power Authority, supra,* 982 F.2d at 76. The law of the case doctrine, however, is limited to issues actually determined. *Ouern v. Jordon,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). "Questions that have not been decided do not become the law of the case merely because they could have been decided." 18 Charles A. Wright, et al., *Federal Practice & Procedure* § 4478 at 789 (1981); *Bonnie & Company Fashions, Inc., v. Bankers Trust Company,* 955 F.Supp. 203, 209 (S.D.N.Y.1997).

In order to determine the applicability of the law of the case doctrine, it is first necessary to determine the precise nature of the prior ruling in this matter. Judge Baer's prior ruling was made on a motion to dismiss for failure to state a claim, and, thus, the scope of the Court's inquiry was necessarily limited to questions of law. *See* 5A Charles A. Wright, et al., *Federal Practice & Procedure,* § 1357 at 303 (2d ed.1990).

With respect to the exhaustion defense, the Court considered the language of the RGI guaranty and concluded that the exhaustion requirement would be waived if certain conditions were met. 920 F.Supp. at 53–54. In their answer, defendants denied having knowledge or information sufficient to form a belief as to the truth of plaintiffs' allegations that the conditions excusing exhaustion had occurred (RGI Answer at ¶ 2), and no party submitted any evidentiary material on the motion to dismiss relevant to the issue of whether or not the conditions that would excuse exhaustion had, in fact, occurred.

Given the foregoing facts, the only reasonable construction of Judge Baer's opinion is that there are issues of fact concerning the exhaustion defense that preclude dismissal of the complaint as a matter of law. Specifically, there are issues of fact as to whether the conditions that would excuse exhaustion have occurred.

*See, e.g.* Amended Joint Pretrial Order at Section V, Para. 6. Accordingly, these issues of fact preclude dismissal of the exhaustion defense.

Turning to the due diligence defense, Judge Baer interpreted RGI's guarantee as waiving the due diligence requirement. After quoting the relevant provision of RGI's guarantee[2], Judge Baer concluded that "The language in this provision clearly and unambiguously excuses the [obligee] from the due diligence requirement." 920 F.Supp. at 54. Since interpretation of the clear and unambiguous terms of a contract is a question of law committed to the Court alone, *Hartford Accident & Indemnity Co. v. Wesolowski,* 33 N.Y.2d 169, 172, 305 N.E.2d 907, 909, 350 N.Y.S.2d 895, 898 (1973); J. Calamari & J. Perillo, *Contracts* § 3–14 (3d Ed.1987); *see Markman v. Westview Instruments, Inc.,* 517 U.S. 370, —— n. 7, 116 S.Ct. 1384, 1392 n. 7, 134 L.Ed.2d 577 (1996), there is no reason not to give binding effect to Judge Baer's interpretation of RGI's guarantee.

2   Although RGI's guarantee was not annexed to the Complaint, both plaintiffs and RGI submitted identical copies of the guarantee in connection with the motion to dismiss. Thus, it appears there has never been any issue as to the authenticity or terms of RGI's guarantee.

**\*3** Accordingly, since there are disputed issues of fact relevant to the exhaustion of remedies defense, plaintiffs' motion to strike that defense is denied. Plaintiffs' motion to dismiss the defense of failure to exercise due diligence in pursuing payment from the primary debtors is granted because Judge Baer has previously interpreted RGI's guarantee as precluding the assertion of this defense as a matter of law. Dated: New York, New York

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1997 WL 299423

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 4537044
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial
enhancements.**

United States District Court,
S.D. New York.

Glenn REIT, Plaintiff,
v.
POST PROPERTIES, INC., et al., Defendants.

No. 09 Civ. 5455(RMB)(KNF).
|
Nov. 4, 2010.

## MEMORANDUM and ORDER

KEVIN NATHANIEL FOX, United States Magistrate
Judge.

\*1 In this personal injury action, the plaintiff deposed Dr.
Martin Barschi, a board certified orthopaedic surgeon,
and Dr. William B. Head Jr., a board certified neurologist,
to probe the opinion testimony each is expected to offer,
on behalf of the defendants, at the trial of this action.
Prior to the deposition, the plaintiff served Dr. Head with
a subpoena, pursuant to Rule 45, accompanied by a
"Rider," seeking documents to be produced at his
deposition. Dr. Head produced his appointment book, data
related to his work in the past two years and billing
records limited to work he performed as an expert.

Before the Court is the defendants' application, made
pursuant to Fed.R.Civ.P. 26(b)(4)(C), for the Court to fix
a reasonable amount that the plaintiff must compensate
the defendants' expert witnesses, for responding to the
plaintiff's discovery demands. The defendants request
that Dr. Barschi be paid $2,960, which includes: (1)
$1,100 for two hours of deposition testimony, at an hourly
rate of $550; (2) $1,200 for three hours preparation time
for his deposition, at an hourly rate of $400; (3) $600 for
three hours of travel time, at an hourly rate of $200; and
(4) $60 to compensate him for mileage, tolls and parking

fees. With respect to Dr. Head's deposition scheduled for
March 12, 2010, but cancelled by the plaintiff on March
11, 2010, due to a medical emergency of the attorney
scheduled to conduct the deposition, the defendants
request that Dr. Head be paid $6,842.02, which includes:
(1) $3,850 for seven hours of reserved deposition
testimony time, at an hourly rate of $550; (2) $2,000 for
five hours preparation time for his deposition, at an hourly
rate of $400; (3) $547.50 in fees for copying two years of
appointment pages and billing summaries (730 pages, at a
rate of $0.75 per page); and (4) $444.52, an administrative
fee, for "twenty-one hours for three employees to comply
with subpoena (collection of billing summaries, redacting
all treating patients names from two years of schedules
and printing sheets for two years)." Additionally, the
defendants request that Dr. Head be paid $2,387.50 for
the April 23, 2010 deposition, which includes: (5)
$2,018.50 for three and two-thirds hours of deposition
time, at an hourly rate of $550; (6) $108 in additional
copying fees (144 pages, at a rate of $0.75 per page); (7)
$100 for one-half hour of travel time, at an hourly rate of
$200; and (8) $161 for round trip car service fare.

The plaintiff contends the defendants' requests are
unreasonable and proposes to pay Dr. Barschi $962.50,
which includes: (a) $400 for two hours of deposition time,
at an hourly rate of $200; (b) $262.50 for one and
one-half hours of preparation time, at an hourly rate of
$175; and (c) $300 for travel time, at an hourly rate of
$100 per hour. The plaintiff proposes to pay Dr. Head
$1,289.60, which includes: (a) $900 for three hours of
deposition time, at an hourly rate of $300; (b) $375 for
one and one-half hours of preparation time, at an hourly
rate of $250; and (c) $14.60 in copying fees for 730
pages, at a rate of $0.02 per page.

### *Legal Standard*
\*2 The Federal Rules of Civil Procedure provide that "[a]
party may depose any person who has been identified as
an expert whose opinions may be presented at trial."
Fed.R.Civ.P. 26(b)(4)(A). "Unless manifest injustice
would result, the court must require that the party seeking
discovery: (i) pay the expert a reasonable fee for time
spent in responding to discovery under Rule 26(b)(4) (A)
or (B)." Fed.R.Civ.P. 26(b)(4)(C). "The determination of
a reasonable fee and for what services, including
preparation, falls solely withing [the court's] province."
*Lamere v. N.Y. State Office for the Aging,* 223 F.R.D. 85,
93 (N.D.N.Y.2004); *see* 8A CHARLES ALAN WRIGHT
& ARTHUR R. MILLER, FEDERAL PRACTICE AND

PROCEDURE § 2034 (3d ed.2010). In determining the reasonableness of an expert witness's fees, courts consider the following factors: (1) the witness's field of expertise; (2) the education and training required to provide the expert insight which is sought; (3) the prevailing rates of other comparably respected available experts; (4) the nature, quality and complexity of the discovery responses provided; (5) the fee actually charged to the party who retained the expert; (6) fees traditionally charged by the expert on related matters; and (7) any other factor likely to assist the court in balancing the interests implicated by Rule 26. *See e .g., Feliciano v. County of Suffolk,* 246 F.R.D. 134, 136 (E.D.N.Y.2007); *Frederick v. Columbia Univ.,* 212 F.R.D. 176, 177 (S.D.N.Y.2003); *Edin v. Paul Revere Life Ins. Co.,* 188 F.R.D. 543, 546 (D.Ariz.1999); *Jochims v. Isuzu Motors, Ltd.,* 141 F.R.D. 493, 495–96 (S.D.Iowa 1992).[1] "The district courts in the Second Circuit have consistently held that time spent by an expert preparing for a deposition is compensable under Rule 26(b)(4) (C)," and that "time spent traveling to and from the deposition, and the expenses incurred during travel, so long as they are reasonable, are compensable under Rule 26(b)(4)(C)." *New York v. Solvent Chem. Co.,* 210 F.R.D. 462, 471–72 (W.D.N.Y.2002). "The general rule ... is that compensation for travel time should be half the regular hourly amount charged." *Mannarino v. United States,* 218 F.R.D. 372, 377 (E.D.N.Y.2003).

[1]     Some courts also consider "the cost of living in [a] particular geographic area." *See e.g., Goldwater v. Postmaster Gen. of the U.S.,* 136 F.R.D. 337, 340 (D.Conn.1991); *Coleman v. Dydula,* 190 F.R.D. 320, 324 (W.D.N.Y.1999); *Marin v. United States,* No. 06 Civ. 552, 2008 WL 5351935, at *1 (S.D.N.Y. Dec. 22, 2008); *Casiano v. Target Stores,* No. CV 2006–6286, 2008 WL 3930558, at *1 (E.D.N.Y. Aug.21, 2008). However, like the Iowa district court, the Court "does not believe that the cost of living in a particular geographic area is directly relevant to a reasonable fee and, in any event, this factor is frequently, at least indirectly, calibrated into prevailing market rates." *Jochims,* 141 F.R.D. at 496.

"While a party may contract with any expert it chooses, the court will not automatically tax the opposing party with any unreasonable fees charged by the expert." *Grady v. Jefferson County Bd. of County Comm'rs,* 249 F.R.D. 657, 662 (D.Colo.2008) (quoting *Kernke v. Menninger Clinic, Inc.,* No. 00–2263–GTV, 2002 WL 334901, at *1 (D.Kan.2002)) (alteration omitted). In determining reasonable fees, courts must keep in mind that "the underlying purpose of Rule 26(b)(4)(C) is to compensate experts for their time spent participating in litigation and to prevent one party from unfairly obtaining the benefit of

the opposing party's expert work free from cost." *Goldwater,* 136 F.R.D. at 339 (citing *United States v. City of Twin Falls. Idaho,* 806 F.2d 862, 879 (9th Cir.1986)). "The party seeking reimbursement of deposition fees bears the burden of proving reasonableness. If the parties provide little evidence to support their interpretation of a reasonable rate, the court may use its discretion to determine a reasonable fee." *Solvent Chem. Co.,* 210 F.R.D. at 468 (citation omitted).

### *Dr. Barschi*

**\*3** In support of their application for Dr. Barschi's fees, the defendants submitted a copy of his curriculum vitae indicating: he is a graduate of New York Medical College, New York, New York; he is licensed to practice in New York State, he received his internship training at Cedars–Sinai Medical Center, Los Angeles, California, and residency training in orthopedic surgery at Montefiore Hospital Medical Center, Bronx, New York, and in general surgery at Cedars–Sinai Medical Center. Dr. Barschi is certified by the American Board of Independent Medical Examiners and the American Board of Orthopedic Surgery, and he is a fellow of various organizations pertaining to surgery, orthopedic surgery and sports medicine. Dr. Barschi's hospital appointments include Montefiore Hospital Medical Center and Albert Einstein College of Medicine in the Bronx, New York, White Plains Hospital Center and St. Agnes Hospital in White Plains, New York, and New York Medical College in Valhalla, New York. Dr. Barschi is a member of various professional organizations and currently holds an appointment as Chief Medical Officer, Scarsdale Public School District. The defendants contend that Dr. Barschi charged them $1,100 for the plaintiff's independent medical examination and that he typically charges $800 per hour for related matters. They assert:

In conferring with other comparably respected orthopedic surgeons regarding depositions [sic] fees, we were advised the following:

1. Dr. Alan Zimmerman, Lido Beach, NY: $500.00 an hour for deposition testimony;

2. Dr. Robert Orlandi, Bronx, NY: $600.00 an hour for deposition testimony; and

3. Dr. Frank Hudak, Queens, NY: $800.00 an hour for deposition testimony.

The plaintiff contends the defendants failed to offer any

proof regarding "the amount they charge others for similar work," and they offer merely their counsel's representation respecting the fees charged by three orthopedists, "with nothing ... to establish that these other doctors are comparable to the defendants' experts or that the rates they charge are 'prevailing.'" Additionally, the plaintiff maintains that, contrary to the defendants' assertion that Dr. Barschi charged them $1,100 for the plaintiff's independent medical examination, resulting in a five-page report, and that he usually charges $800 per hour for unspecified "related matters," Dr. Barschi testified at his deposition that he is paid between $500 and $600 for an independent medical examination and about $250 per hour for reviewing records. Moreover, Dr. Barschi testified that his usual fee for performing an independent medical examination includes reviewing all the records, conducting the examination and writing a report, which means that his usual $500 to $600 fee for an independent medical examination falls into the $200 per hour range. According to the plaintiff, since Dr. Barschi's usual hourly rate appears to be in the vicinity of $200, that is what he should be paid for his deposition time. Additionally, the plaintiff requests that Dr. Barschi not be paid for his preparation time "because of his transparent effort to exaggerate the charge," and his travel time "should be billed at no more than $100 per hour." The plaintiff proposes $962.50 as a reasonable fee to compensate Dr. Barschi.

**\*4** In its August 19, 2010 order, the Court informed the defendants that their submissions regarding reasonable experts' fees, through which they identified three orthopedic surgeons and two neurologists whose fees for deposition testimony, the defendants maintain, establish the reasonableness of Dr. Barschi's fees, lacked data about the education, training and experience of those identified specialists and did not state the hourly rates that each charges for preparing to give deposition testimony. The Court cautioned the defendants that, absent this information, its ability to assess fully whether the identified specialists are appropriate comparators is limited and directed them to supplement their submissions with competent evidence addressing these matters. In response, the defendants failed to provide the Court with any evidence requested in the Court's order. Instead, the defendants reiterated the assertions from their previous submissions, adding a list of the plaintiff's alleged injuries: concussion, central annular tear C5, C6, C6–7 disc herniation, C6–C7, C4–C5, C3–C4 narrowing, dizziness and nausea, and, in addition, *inter alia,* difficulty sleeping, slurring and stuttering speech, blurry vision, extreme sensitivity to sound, daily headaches, violent emotional swings, pain in the neck, numbness in his head and balance problems. The defendants contend

that Dr. Barschi testified he performs surgeries, primarily arthroscopies of the knee and shoulder and open and closed fracture reductions. He also treats patients with neck and back problems, but does not perform surgeries in those areas, although he assists neurosurgeons who operate on such patients.

### *(1) Dr. Barschi's Field of Expertise*
According to Dr. Barschi's testimony, he is an orthopedic surgeon specializing primarily in surgeries that "have to do with arthroscopies of the knees and shoulder" and, secondarily, fracture surgeries. All the plaintiff's alleged injuries, enumerated by the defendants in their submissions, appear to concern the plaintiff's neck and head. The defendants do not explain, by competent evidence, the connection between the witness's expertise in knee, shoulder and fracture orthopedic surgery and the plaintiff's alleged neck and head injuries, in light of the fact that no allegations appear to have been made and no evidence submitted to the Court that the plaintiff suffered knee or shoulder injuries or had any fractures. Thus, it is not readily apparent, based on the parties' submissions on this motion, how Dr. Barschi's field of expertise is relevant to the plaintiff's injuries or what it is the defendants sought to elicit from Dr. Barschi.

### *(2) Education and Training Required to Provide the Insight Sought*
Although Dr. Barschi indicated in his report that he examined the plaintiff "for an orthopedic independent medical evaluation," the defendants failed to provide the Court any evidence of what particular insight was sought that occasioned their retaining Dr. Barschi. Therefore, absent that information, the Court is not able to assess the education and training required to provide that insight.

### *(3) Prevailing Rates of Other Comparably Respected Available Experts*
**\*5** While the defendants assert that Dr. Zimmerman, Dr. Orlandi and Dr. Hudak are comparably respected orthopedic surgeons, charging hourly rates of $500, $600 and $800, respectively, for deposition testimony, they failed to submit any evidence in support of those

assertions, as they were instructed to do by the Court's August 19, 2010 order. The defendants did not make citation to any case law to demonstrate what the prevailing rates of other comparably respected available experts are in this or any other judicial district. The defendants cite only two cases, in which the courts held $400 per hour for preparation time and $550 per hour for deposition time to be reasonable fees for a neuroradiologist and a neurologist, who is the head of the stroke service at New York Presbyterian Hospital, *see Marin,* 2008 WL 5351935, at *3, and $375 per hour to be a reasonable fee for deposition time for an expert in toxicology and medical toxicology, see Frederick. 212 F.R.D. at 177. However, these cases do not establish the prevailing rates of experts comparable in their area of expertise to Dr. Barschi, namely orthopedic surgery, with a speciality in knee and shoulder arthroscopy and closed and open fracture reductions. Consequently, absent any information on prevailing rates of other comparably available experts, this factor weights against the defendants.

### (4) The Nature, Quality and Complexity of the Discovery Responses Provided

The deposition transcript pages submitted by the defendants to the Court, namely page Nos. 18–20, contain only colloquy concerning Dr. Barschi's specialty. The transcript page Nos. 33–40, submitted by the plaintiff, contain colloquy about Dr. Barschi's rates. The defendants failed to provide any other evidence to the Court that would explain the nature, quality and complexity of the discovery provided by Dr. Barschi through his deposition. With respect to this factor, the defendants direct the Court's attention, erroneously, to the plaintiff's alleged injuries. However, the plaintiff's allegations alone do not explain what questions were put to Dr. Barschi or the nature, quality or complexity of Dr. Barschi's responses.

### (5) The Fee Actually Charged to the Party Who Retained the Expert

The defendants state that Dr. Barschi charged them a flat fee of $1,100 for an independent medical examination of the plaintiff, resulting in a five-page report.

### (6) Fees Traditionally Charged by the Expert on Related Matters

Dr. Barschi testified that he charges an average of $400 for an initial worker's compensation independent medical examination, which includes reviewing a patient's history and medical reports, conducting an examination and writing a report. He also testified, at his deposition, that he usually charges between $500 and $600 for conducting an independent medical examination for a law firm or for a third-party agency, and that his general hourly rate for reviewing records is $250. Therefore, it would appear that the $1,100 fee Dr. Barschi charged the defendants, for an independent medical examination of the plaintiff, was in excess of what he usually charges for an independent medical evaluation. Notwithstanding this unexplained discrepancy, the defendants failed to indicate the number of occasions on which Dr. Barschi has been compensated for preparing for, and providing deposition testimony on, related matters or at what rate. The mere assertion that "[w]e have been informed by Dr. Barschi that he typically charges $800.00 per hour for related matters," without more, does not suffice to support the reasonableness of the fees charged.

### (7) Any Other Factor Likely To Assist the Court in Balancing the Interests Implicated by Rule 26

**\*6** The information provided by the defendants is scant and lacks any evidentiary support for their request that Dr. Barschi be compensated at the amount they urge. The Court finds that the reasonable hourly rate for Dr. Barschi's deposition testimony is $250, *see Hose v. Chicago & N. Western Transp. Co.,* 154 F.R.D. 222, 227 (S.D.Iowa 1994) (expert neurologist's "participation in a deposition more closely parallels his work reviewing medial records ... than his work performing neurological testing."); and that his $250 hourly fee for reviewing medical records in preparation for his deposition is reasonable. *See Packer v. SN Servicing Corp.,* 243 F.R.D. 39, 44 (D.Conn.2007) (finding that $300 per hour rate charged for both preparation and deposition time was reasonable). In light of the Court's finding that a $250 hourly rate is a reasonable fee for Dr. Barschi's deposition testimony, his reasonable hourly travel time rate is $125. *See Mannarino,* 218 F.R.D. at 377. Dr. Barschi's "auto expenses" of $60, which include the mileage, bridge tolls and parking garage charge are reasonable.

The defendants have failed to meet their burden of showing the reasonableness of Dr. Barschi's request for $2,960. Accordingly, the Court finds that $1,685 is a reasonable fee for Dr. Barschi, which includes: (a) two hours of deposition testimony, at an hourly rate of $250;

(b) three hours preparation time, at an hourly rate of $250;
(c) three hours travel time, at an hourly rate of $125; and
(d) $60 in travel expenses.

### *Dr. Head*

In support of their application for Dr. Head's fees, the defendants submitted a copy of his curriculum vitae indicating: he received his medical degree at the University of Southern California; his internship training was at St. Vincent's Hospital in Staten Island, New York; his residency training in psychiatry was at Columbia Presbyterian Medical Center, New York, New York and his neurology residency training at Mt. Sinai Hospital in New York, New York. Dr. Head is affiliated with Beth Israel Medical Center in New York City and Hospital of the Good Samaritan in California. He is certified by the American Board of Psychiatry and Neurology[2] and licensed to practice in New York, New Jersey, California and Massachusetts. He also serves as a medical arbitrator for the New York City Board of Education and as an impartial specialist for the New York State Worker's Compensation Board. The defendants contend Dr. Head charged them $2,575 for an independent medial examination of the plaintiff, and they "have been informed by Dr. Head that he typically charges $800 per hour for related matters if conducted in his office." They assert:

[2]     Dr. Head's invoices dated March 25, 2010, and May 4, 2010, indicate in their headings that, in addition to being certified in psychiatry and neurology, he is also "UCNS Certified in Behavioral Neurology and Neuropsychiatry." However, this information does not appear in Dr. Head's curriculum vitae.

In conferring with other comparably respected neurologists regarding depositions

[sic] fees, we were advised the following:

1. Dr. Paul Slotwiner, Brooklyn, NY: $500.00 p/hr for deposition testimony; and

2. Dr. Murthy Vishnubhakat, Manhasset, NY: $625.00 p/hr for deposition testimony.

**\*7** The plaintiff contends a discrepancy exists between Dr. Head's testimony that he charges $1,100 for a neurological independent medical examination and the $2,575 that he charged the defendants, for the independent medical examination of the plaintiff.

Similarly, Dr. Head seeks $400 per hour for preparation time, but he testified that "his usual charge for record review is just $300." The plaintiff argues that Dr. Head's administrative and copying fees are problematic. For example, he charged the plaintiff for his employees' time spent redacting patients' names from the records, although the documents produced at his deposition were not redacted. Similarly, since the documents produced were computer printouts, it is unclear to the plaintiff why Dr. Head also charged for making copies of those documents. Furthermore, the plaintiff contends, Dr. Head offered no explanation of how he arrived at the administrative fee of $444.52 for 21 hours' work, and, according to the plaintiff, given that the administrative fee includes charges for redacting that was never done, those fees should be disallowed.

In its August 19, 2010 order mentioned above, the Court directed the defendants to supplement their submissions with competent evidence about the education, training and experience of the two neurologists identified as other comparably respected experts. The defendants failed to comply with the Court's order. Instead, they contend that Dr. Head testified that, according to the American Board of Psychiatry and Neurology, he is one of only 465 individuals in the United States who are independently certified in both fields. They maintain that Dr. Head testified to charging a $750 hourly fee for giving deposition testimony, $1,300 for performing a neuropsychiatric evaluation, $1,100 for performing a psychiatric evaluation, $1,000 for performing a neurological evaluation and a $450 hourly fee for reviewing medical records.

### *(1) Dr. Head's Field of Expertise*

According to his testimony, Dr. Head is certified in both psychiatry and neurology. Dr. Head's expertise in neurology appears to be directly relevant to the neurological examination of the plaintiff, in light of the plaintiff's alleged injuries to his neck and head.

### *(2) Education and Training Required to Provide the Insight Sought*

The defendants did not explain what particular insight they sought when they retained Dr. Head. However, it appears from Dr. Head's report that the plaintiff's treatment history, for the alleged injuries, shows

continuous treatment with the plaintiff's neurologist. Therefore, it is reasonable to infer that the defendants sought to have an independent medical examination conducted, by their own neurologist, in order to obtain their own insight into the plaintiff's condition. Dr. Head's education and training in neurology, but not his education and training in psychiatry, appears to be appropriate for performing a neurological examination of the plaintiff.

*(3) Prevailing Rates of Other Comparably Respected Available Experts*

**\*8** Although the defendants asserted that Dr. Slotwiner and Dr. Vishnubhakat are comparably respected neurologists, charging hourly rates of $500 and $625, respectively, for deposition testimony, they failed to submit any evidence in support of those assertions, as they were instructed to do through the Court's August 19, 2010 order. Absent this information, the Court is not able to assess fully whether the identified experts are comparably respected available experts. The defendants did not make citation to any case law to demonstrate what the prevailing rates of other comparably respected available neurologists are in this or any other judicial district. This factor weighs against the defendants.

*(4) The Nature, Quality and Complexity of the Discovery Responses*

The deposition transcript pages submitted by the defendants to the Court, namely page Nos. 20, 21, 82, 99, 100 and 115, contain only colloquy concerning Dr. Head's qualifications and rates. The defendants failed to provide any other evidence to the Court that would explain the nature, quality and complexity of the discovery provided by Dr. Head through his deposition. Therefore, it is impossible for the Court to ascertain the nature, quality and complexity of the discovery Dr. Head provided based solely on the submitted transcript excerpts.

*(5) The Fee Actually Charged to the Party Who Retained the Expert*

The defendants state that Dr. Head charged them $2,575 for an independent medical examination of the plaintiff,

resulting in a nineteen-page report.

*(6) Fees Traditionally Charged by the Expert on Related Matters*

Although Dr. Head testified that he usually charges an hourly rate of $750 for deposition testimony and $450 for reviewing medical records, the defendants provided no evidence indicating the number of occasions on which Dr. Head prepared for and provided deposition testimony on related matters and at what rate. Dr. Head also failed to explain why he usually charges substantially more for deposition testimony than for reviewing medical records.

*(7) Any Other Factor Likely To Assist the Court in Balancing the Interests Implicated by Rule 26*

The defendants have not explained why Dr. Head charged copying fees, as the documents in question sought in response to the plaintiff's subpoena, pursuant to Rule 45, and in connection with Rule 26(b)(4) of the Federal Rules of Civil Procedure, were computer printouts. They also failed to explain why Dr. Head charged an administrative fee for his employees' redaction of patients' names from the documents produced, given the plaintiff states that "Dr. Head called his office from the deposition room to complain to his staff that they had not redacted as instructed," and the defendants admit that the documents produced "were inadvertently not redacted by his office." Most importantly, the defendants fail to make citation to any case law for the proposition that Rule 26(b)(4)(C) "preparation time" includes copying fees or administrative fees associated with the time an expert's employees spend collecting documents sought in connection with the expert's deposition.

**\*9** Rule 26 requires that a disclosure of the identity of any expert witness that may be used at trial must be accompanied by a written report, which, among other things, must contain: "(v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case." Fed.R.Civ.P. 26(a)(2)(B). "[T]he time spent collecting documents within the scope of documents required to be produced pursuant to Fed.R.Civ.P. 26(a)(2)(B) in connection with an expert's report should not be compensated." *Packer,* 243 F.R.D. at 43–44.

Federal Rule of Civil Procedure 34 provides that, "[a]s

provided in Rule 45, a nonparty may be compelled to produce documents and tangible things or to permit an inspection." Fed.R.Civ.P. 34(c). Thus, a subpoena *duces tecum,* pursuant to Rule 45, is an appropriate discovery mechanism against a nonparty expert witness. *See, e.g., Expeditors Int'l of Washington, Inc. v. Vastera, Inc.,* No. 04 C 0321, 2004 WL 406999, at *3 (N.D.Ill. Feb.26, 2004).* "Under Federal Rule of Civil Procedure 45, the party issuing a subpoena is not required to bear the subpoenaed nonparty's cost of compliance. Rather, '[a] nonparty can be required to bear some or all of the expenses where the equities of the particular case demand it.' " *In re World Trade Center Disaster Site Litig.,* No. 21 MC 100, 2010 WL 3582921, at *1 (S.D.N.Y. Sept.14, 2010) (citation omitted). Courts consider the following factors when determining each party's share of the compliance cost: "(1) whether the nonparty has an interest in the outcome of the case; (2) whether the nonparty can more readily bear the costs; and (3) whether the litigation is of public importance." *Id.* "The public interest in litigation is a factor that typically requires the nonparty to absorb costs." *Id.* at *2.

At the time the plaintiff served his Rule 45 subpoena on Dr. Head, no report had been produced to the plaintiff, as required by Rule 26(a)(2)(B). Since the documents sought by subpoena are required to be produced pursuant to Rule 26, costs and expenses in connection with them are not compensable. *See Packer,* 243 F.R.D. at 43–44. Moreover, it appears that the plaintiff determined to issue the subpoena to Dr. Head because the defendants failed to comply timely with Rule 26(a)(2)(B), by submitting Dr. Head's report accompanied by the documents required by Rule 26. Dr. Head has no interest in the outcome of this litigation and given the procedural posture of this case, as a nonparty expert witness, no reason has been proffered by the defendants why he cannot more readily bear the cost associated with complying with the subpoena. Although there does not appear to be any public interest in this litigation, the remaining factors do not support imposing Dr. Head's copying and administrative fees on the plaintiff.

**\*10** Dr. Head charged for three and two-thirds hours of deposition time. The plaintiff contends Dr. Head should be paid for three hours of deposition time. The defendants failed to submit competent evidence, such as the transcript pages indicating the deposition's starting and ending time, to support Dr. Head's request for compensation for three and two-thirds hours of deposition time. In light of the conflicting claims on this issue, the Court finds that Dr. Head should be paid for three hours of deposition time. Additionally, Dr. Head charged \$3,850 for seven hours of time "reserved" for the March

12, 2010 deposition that was cancelled at "5:45p.m. on March 11," because "the attorney who had prepared to depose Dr. Head had a medical emergency that afternoon." The defendants failed to make citation to any case law that supports their request that Dr. Head be compensated for his "reserved" time. They also failed to submit any evidence to show how Dr. Head's scheduling of patients was affected by this cancellation or that he was unavailable to do any other work on March 12, 2010. *See Itar–Tass Russian News Agency v. Russian Kurier, Inc.,* No. 95 Civ. 2144, 1996 WL 490700, at *1 (S.D.N.Y. Aug. 28, 1996) (quoting *McHale v. Westcott,* 893 F.Supp. 143, 151 (N.D.N.Y.1995)). Absent any evidence that manifest injustice would result from failing to pay Dr. Head for the time he "reserved" for the March 12, 2010 deposition, the Court finds that charge to be unreasonable.

As they failed to submit evidence in support of their request for Dr. Head's fees, the defendants did not meet their burden of showing that Dr. Head's requested fees are reasonable. Although Dr. Head appears to be a qualified expert certified in both psychiatry and neurology, his qualification in psychiatry is irrelevant in this case, because Dr. Head conducted no psychiatric examination of the plaintiff. Additionally, while Dr. Head appears to be a qualified expert, his curriculum vitae and his testimony do not reveal that he is a preeminent expert in the field of neurology, that he possesses unique knowledge or training that other experts in this field do not possess, or that he was required to testify on a highly technical or unusual area of expertise. *See, e.g., Casiano,* 2008 WL 3930558, at *2 (finding a \$400 hourly fee for deposition testimony reasonable for an orthopedist who "does not have exceptional qualifications nor is he being required to testify on an unusual or highly technical area of expertise."); *Hose,* 154 F.R.D. at 227 (reducing expert neurologist's deposition testimony fee from \$800 hourly to \$400). Therefore, the Court finds that \$400 is a reasonable hourly fee for Dr. Head's preparation time as well as his deposition time. Thus, the reasonable fee for Dr. Head's travel time of one-half hour is \$100. *See Mannarino,* 218 F.R.D. at 377.

Dr. Head charged for the cost of round trip car service use, \$161, without explaining from where he was traveling when he went to the deposition conducted in the plaintiff's counsel's office, in Brooklyn, New York. Dr. Head's curriculum vitae heading indicates his New York, New York, address, and his New Jersey address, under the rubric "Addresses," and his mailing address, in Staten Island, New York. Dr. Head's invoices indicate that he receives correspondence in all three locations listed in his curriculum vitae. Thus, what Dr. Head's travel route on the deposition day was, is not clear. The Court finds that

Dr. Head's request for $161 in travel expenses, without more, is not reasonable and will be disallowed, for lack of detailed travel information.

**\*11** Accordingly, Dr. Head's reasonable fee is $3,300, which includes: (a) three hours of deposition testimony, at a $400 hourly rate; (b) five hours preparation time, at a $400 hourly rate; and (3) $100 for one-half hour of travel time.

## CONCLUSION

For the foregoing reasons, the Court finds that the defendants failed to meet their burden of demonstrating that the expert fees requested by Dr. Barschi and Dr. Head are reasonable. The Court finds that the reasonable fees the plaintiff must pay, pursuant to Fed.R.Civ.P. 26(b)(4)(c), are: (1) $1,685 for Dr. Barschi; and (2) $3,300 for Dr. Head.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 4537044

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 Positive

As of: June 17, 2019 7:27 PM Z

# Strauch v. Computer Scis. Corp.

United States District Court for the District of Connecticut

June 9, 2015, Decided; June 9, 2015, Filed

Civil No. 3:14cv956 (JBA)

**Reporter**

2015 U.S. Dist. LEXIS 76995 *; 2015 WL 3727804

JOSEPH STRAUCH and TIMOTHY COLBY, on behalf of themselves and all those similarly situated, Plaintiffs, v. COMPUTER SCIENCES CORPORATION, Defendant.

**Prior History:** Strauch v. Computer Scis. Corp., 2015 U.S. Dist. LEXIS 516 (D. Conn., Jan. 6, 2015)

**Counsel:** **[\*1]** For Joseph Strauch, on behalf of himself and all those similarly situated, Timothy Colby, on behalf of himself and all those similarly situated, Plaintiff: Andrew Lah, Michael Caesar, Todd F. Jackson, LEAD ATTORNEYS, PRO HAC VICE, Lewis, Feinberg, Lee, Renaker & Jackson, P.C.-CA, Oakland, CA; Daniel M. Hutchinson, Kelly M. Dermody, LEAD ATTORNEYS, PRO HAC VICE, Lieff, Cabraser, Heimann & Bernstein, San Francisco, CA; Jahan C. Sagafi, LEAD ATTORNEY, PRO HAC VICE, Outten & Golden LLP - CA, San Francisco, CA; Lin Y. Chan, LEAD ATTORNEY, PRO HAC VICE, Lieff, Cabraser, Heimann & Bernstein - CA, San Francisco, CA; Michael N Litrownik, LEAD ATTORNEY, Outten & Golden-NY, New York, NY; Michael J. Scimone, LEAD ATTORNEY, PRO HAC VICE, Outten & Golden-NY, New York, NY; Sudarsana Srinivasan, LEAD ATTORNEY, PRO HAC VICE, Lieff Cabraser Heimann & Berstein, LLP - NY, New York, NY; Karen Baldwin Kravetz, Susman, Duffy & Segaloff, PC, New Haven, CT.

For Stephen King, Hassell D. Stacy, Christian G. Rothrock, Grover C. Boone, Sr., Stephan A. Cheney, Brandon Kimas, Chris Lamer, Pierre J. Wills, Shaun King, Kevin Perry, Scott Schneeberg, Timothy J. Clark, Joe A. Williams, Marlon Haynes, Jason M. Nice, Anthony **[\*2]** C. Fantetti, Raymond Pierce, Richard Conway, Cheri L. Johnson, Gigy S. Kunnath, Thomas W. Laughlin, Rocky Burns, Isaac Owusu, Anita Soule, David L. Brunmeier, Frank T. King, Chad W. Malone, Joseph H. Marshall, Dennis Farkas, Samuel Fleming, Angela Brown, Nash Jasmine, Plaintiffs: Karen Baldwin Kravetz, Susman, Duffy & Segaloff, PC, New Haven, CT.

For Computer Sciences Corp, Defendant: Brett M. Anders, LEAD ATTORNEY, PRO HAC VICE, Jackson Lewis P.C., Morristown, NJ; Cary G. Palmer, LEAD ATTORNEY, PRO

HAC VICE, Jackson Lewis P.C. - CA, Sacramento, CA; Nathan W. Austin, LEAD ATTORNEY, PRO HAC VICE, Jackson Lewis, P.C. - Sacramento, CA, Sacramento, CA; David R. Golder, David C. Salazar-Austin, Kristi Rich Winters, William Joseph Anthony, Jackson Lewis - P.C. Htfd, CT, Hartford, CT.

**Judges:** Janet Bond Arterton, United States District Judge.

**Opinion by:** Janet Bond Arterton

# Opinion

## RULING GRANTING PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

Plaintiffs, current and former Computer Sciences Corporation ("CSC") System Administrators, bring this action alleging that CSC misclassified them as exempt employees under the Fair Labor Standards Act ("FLSA") and state law. Plaintiffs seek [Doc. # 152] conditional certification **[\*3]** of a collective action under 29 U.S.C. § 216, consisting of "[a]ll persons who were, are, or will be employed by CSC nationwide from July 1, 2011 to the present as Associate Professional System Administrators, Professional System Administrators, or Senior Professional System Administrators, who earned less than $100,000 annually, and who were classified as exempt from the overtime pay requirements of the FLSA." (Pls.' Mem. Supp. Mot. for Conditional Cert. [Doc. # 154] at 1.) For the reasons that follow, Plaintiffs' Motion [Doc. # 152] for Conditional Certification is granted.

### I. Background

CSC employs about 72,000 individuals to provide information technology services to clients in more than 70 countries. (Def.'s Opp'n to Mot. for Conditional Cert. [Doc. # 160] at 4.) Because the company is so large, in 2006 it created a

company-wide job structure to categorize all of its jobs and enable "people to understand the kinds of responsibilities that they are going to be doing . . . [and] what their title is." (Josephson Dep., Ex. 11 to Salazar-Austin Decl. [Doc. # 161] & Ex. E to Sagafi Decl. [Doc. # 155] at 71.) In the process, CSC reviewed all of its job titles to ensure they accurately described the work being [*4] done by employees, and where they did not, CSC created new job titles. As Heidi Josephson, a principal in CSC's Compensation group, explained, "We did want to use . . . titles so that we could say this was an apple and this was an apple," at a level of generality that "describes the frequent, important duties and responsibilities to help us differentiate between a database administrator and a programmer and a project manager. . . . [A]t a position level things might be a little different, but it helped describe the predominant work performed." (Id, at 134-35.) By the end of the process, CSC had grouped its employees into over 1500 job titles, categorized into families, disciplines, functions, and job series. (Id. at 15-16.)

One such job series is that of System Administrator ("SA"), which encompasses five job titles (i.e. levels): Associate Professional, Professional, Senior Professional, Advisor and Principal. (Opp'n at 4.) According to CSC's Job Description Summary Report, Associate Professional SAs "[i]nstall[], investigate[] and resolve[] matters of significance with computer software and hardware equipment"; Professional SAs "[i]nstall[], investigate[] and resolve[] routine and complex matters of significance with computer [*5] software and hardware equipment"; and Senior Professional SAs "[p]rovide[] support for moderately complex and technical and team management activities related to system and database administration." (SA Job Summaries, Ex. F to Sagafi Decl.; see also Job Comparison Report, Ex. N to Sagafi Decl.) All SAs, regardless of job title, fall within the Technology Family, Systems Services Discipline, Systems Administration Function, and System Administrator Job Series (see Job Tree, Ex. G to Sagafi Decl.), and all SAs are classified by CSC as exempt from the FLSA's overtime protections (Opp'n at 3).

SAs "serve CSC's internal, commercial and governmental clients," including the U.S. Armed Forces, the Department of Defense, United Technologies Corporation, General Dynamics, and Boeing. (Id. at 11, 14.) Their salaries range from about $35,000 to $100,000 a year, although most make between $60,000 and $80,000 annually. (See Salary Table, Ex. 8 to Salazar-Austin Decl.) No SAs supervise or manage other employees. (Josephson Dep. at 80.)

Plaintiffs seek conditional certification of a collective action including SAs from the bottom three levels of the SA hierarchy (Associate Professional, Professional, and Senior Professional [*6] SAs). (Mem. Supp. at 1.) Defendant objects

only to certification of Senior Professional SAs. (Opp'n at 3.)

## II. Discussion

### A. Conditional Certification

The FLSA provides employees with a right to sue on behalf of themselves and "other employees similarly situated" for claimed violations of the FLSA; such a joint, or "collective," action requires potential plaintiffs to "opt in" to the suit in order to benefit from any judgment. 29 U.S.C. § 216(b). As both parties recognize, confronted with a purported collective action alleging an FLSA violation, "[c]ourts typically undertake a two-stage review in determining whether a suit may proceed as a collective action under the FLSA. As a first step the court examines pleadings and affidavits, and if the court finds that proposed class members are similarly situated, the class is conditionally certified; potential class members are then notified and given an opportunity to opt-in to the action." Cuzco v. Orion Builders, Inc., 477 F. Supp. 2d 628, 632 (S.D.N.Y. 2007). "The second step of the certification analysis occurs upon completion of discovery. A court, often prompted by a motion for decertification by the defendant, will examine all evidence then in the record to determine whether there is a sufficient basis to conclude that the proposed [*7] class members are similarly situated." Id. If it is determined that they are, the case will proceed to trial; if it is determined they are not, the class is decertified and only the individual claims of the purported class representatives (here, Mr. Strauch and Mr. Colby) proceed.

At the initial collective action assessment, before discovery is completed, class representatives must satisfy only a "minimal burden to show that [they are] similarly situated to the potential class," which requires "a modest factual showing sufficient to demonstrate that [they] and potential plaintiffs together were victims of a common policy or plan that violated the law." Cuzco, 477 F. Supp. 2d at 632-33; see Velasquez v. Digital Page, Inc., No. CY 11-3892 (LDW) (AKT), 2014 U.S. Dist. LEXIS 68538, 2014 WL 2048425, at *8 (E.D.N.Y. May 19, 2014) ("Courts do not require proof of an actual FLSA violation, but rather that a 'factual nexus' exists between the plaintiffs situation and the situation of other potential plaintiffs." (internal quotation marks omitted)). "The standard of proof remains low because the purpose of this first stage is merely to determine whether 'similarly situated' plaintiffs do in fact exist." Id.

Defendant here contends that because some discovery has taken place, the more stringent second tier standard [*8] is applicable. (See Opp'n at 15 n.69.) The out-of-circuit cases

cited by Defendant, however, are contrary to "the overwhelming case law in this Circuit" which "clearly holds that a heightened standard is not appropriate during the first stage of the conditional certification process and should only be applied once the entirety of discovery has been *completed*." *Amador v. Morgan Stanley & Co. LLC*, No. 11 CIV. 4326 (RJS), 2013 U.S. Dist. LEXIS 19103, 2013 WL 494020, at *4 (S.D.N.Y. Feb. 7, 2013) (internal quotation marks omitted) (emphasis in original) (collecting cases). Discovery has not been completed in this case, and the Court will therefore apply the more lenient first stage standard.

Plaintiffs argue, on the basis of CSC's job structure as well as depositions and affidavits from twenty-six named and opt-in plaintiffs, that a factual nexus exists between Mr. Colby and Mr. Strauch's job duties and those of other CSC SAs. With regard to CSC's job structure, Plaintiffs contend that CSC's "system, with its emphasis on giving each worker the proper job title to reflect her core job duties, provides unusually strong evidence that individuals in a given Job Series—like the System Administrators here—are similarly situated." (Mem. Supp. at 8.) Defendant objects that "[a]lthough Plaintiffs make much of the 'Job Family[,]' 'Discipline,' [*9] 'Function' and 'Job Series' designations that CSC uses, in reality these designations are simply tools used by Human Resources to organize the tens of thousands of individuals CSC employs. . . . Grouping them together in this way in no way enables CSC, or anyone else, to determine whether one pocket of System Administrators . . . is performing duties similar to another pocket of . . . System Administrators." (Opp'n at 9-10.)

This argument, however, falters in light of CSC's own witness's testimony. Ms. Josephson stated that the job titles were created in such a way as to "describe the predominant work performed" by the individuals with each title (Josephson Dep. at 135), including "the typical nature and level of duties and responsibilities and the central functions that are done on the job" (*id.* at 76). Indeed, Ms. Josephson specifically affirmed that the job structure "ensured that each particular job description grouped employees who did similar work," "no matter where the job was geographically." (*Id.* at 50.) Notwithstanding Defendant's assertions to the contrary, Ms. Josephson's statement that the 2006 job restructuring was "just [an attempt] to categorize things to help navigate through the job [*10] descriptions," does not support the conclusion that CSC's job tree has no bearing on whether SAs are similarly situated individuals. Rather, the Court concludes that while by no means dispositive, the fact that CSC grouped Senior Professional SAs into the same family, discipline, function, and job series as Associate and Professional SAs is some evidence of a factual nexus between individuals in these groups.

Plaintiffs offer additional support for their claim that Senior Professional SAs are similarly situated to other SAs in the form of depositions of the named plaintiffs and declarations by 24 opt-in plaintiffs [Doc. # 156], eight of whom are or were Senior Professional SAs. Although the details of their accounts vary, the majority of opt-in plaintiffs state in their declarations that their main job duties consisted of building and/or installing, maintaining, supporting, upgrading, configuring, and troubleshooting servers and/or software according to specifications set by CSC or the client, in accordance with strict procedures and/or checklists. Named plaintiffs Mr. Colby and Mr. Strauch similarly testified that they built, ran, configured, maintained, and performed troubleshooting [*11] on servers, and installed and upgraded operating systems and system software according to a strict set of parameters.

Defendant responds however that these accounts are at odds with CSC's SA job descriptions, and as a result, they undercut Plaintiffs' "entire class theory, which explicitly relies on the alleged 'consistency and uniformity' with which CSC manages its System Administrators." (Opp'n at 17.) Moreover, Defendant argues, citing *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003), "Plaintiffs' disavowal of the job descriptions leaves the Court with no class-wide mechanism for determining whether the Senior Professionals are 'similarly situated' to the lower levels of the System Administrator position." (Opp'n at 18.)

However, unlike the plaintiff in *Mike*, Plaintiffs here "did not completely disavow the [job] description[s]—[their] testimony was more to clarify the tasks and responsibilities listed and the time [they] spent performing each." *Neary v. Metro. Prop. & Cas. Ins. Co.*, 517 F. Supp. 2d 606, 621 (D. Conn. 2007). A plaintiff's claim that "he and all putative class members were injured by the same . . . policy—designation as exempt from the FLSA . . . — . . . is sufficient to meet the lenient first-tier collective action standard" and a holding "to the contrary would preclude certification of a collection action [*12] in any FLSA case where the defendant was asserting an . . . exemption defense." *Id.* at 621-22; *see Austin v. CUNA Mut. Ins. Soc.*, 232 F.R.D. 601, 606 (W.D. Wis. 2006) ("Defendant's arguments about the predominance of individualized inquiries and the dissimilarities between plaintiff and other employees are properly raised after the parties have conducted discovery and can present a more detailed factual record for the court to review."); *White v. MPW Industrial Servs., Inc.*, 236 F.R.D. 363, 373 (E.D. Tenn. 2006) ("[A] defendant's assertion of the potential applicability of an exemption should not be permitted to overcome an otherwise adequate threshold showing by the plaintiff. . . . Several courts have stated . . . that disparate factual and employment settings of the individual plaintiffs should be

considered at the second stage of analysis." (internal citations omitted)).

Nor is the Court persuaded by Defendant's contention that "[t]he Senior Professionals' dramatically different pay scale precludes them from being similarly situated to the rest of the putative class." (Opp'n at 21.) *Colon v. Major Perry Street Corp.*, No. 12 Civ. 3788 (JPO), 2013 U.S. Dist. LEXIS 93021, 2013 WL 3328223, at * 7 (S.D.N.Y. July 2, 2013), cited by Defendant in support of this argument, does not stand for the proposition that "groups separated by [a significant] disparity [in compensation] *cannot* be subject to the same policy and do not share any sort of factual nexus," as Defendant claims. **[*13]** (Opp'n at 21 (internal quotation marks omitted) (emphasis added).) Rather, the *Colon* court stated only that the "markedly different pay scales" of two groups was one factor among several factors—not present here—that led it to conclude the groups were not similarly situated. 2013 U.S. Dist. LEXIS 93021, 2013 WL 3328223, at * 7.

After reviewing the declarations of the opt-in plaintiffs, the depositions of the named plaintiffs, and the parties' well-drafted and thorough briefs and attached exhibits, the Court concludes that Plaintiffs have met their "minimal burden" of demonstrating that they and the "potential plaintiffs together were victims of a common policy or plan that violated the law," *Cuzco*, 477 F. Supp. 2d at 632-33, such that conditional certification is appropriate. The Court thus turns to the parties' disputes regarding the effectuation of notice to potential opt-in plaintiffs which have been refined by the parties' joint submission [Doc. # 167] on issues remaining in dispute after counsels' diligent conferencing.

**B. Timing of Notice(s)**

"Because trial court involvement in the notice process is inevitable in cases with numerous plaintiffs where written consent is required by statute, it lies within the discretion of a district court to begin its involvement **[*14]** early, at the point of the initial notice, rather than at some later time." *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 171, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989). "When exercising [their] broad discretion to craft appropriate notices in individual cases, District Courts consider the overarching policies of the collective suit provisions and whether the notice provides accurate and timely notice concerning the pendency of the collective action so that an individual receiving the notice can make an informed decision about whether to participate." *Velasquez*, 2014 U.S. Dist. LEXIS 68538, 2014 WL 2048425, at *9 (internal quotation marks and brackets omitted).

The parties here dispute the amount of time potential plaintiffs should be given to opt-in to the collective action. Plaintiff seeks a notice period of 90 days while Defendant seeks a period of 45 days. Courts in this Circuit "routinely restrict the opt-in period to sixty days," 2014 U.S. Dist. LEXIS 68538, [WL] at *12 (collecting cases), and generally only grant 90-day opt-in periods "where the period is agreed upon between the parties or special circumstances require an extended opt-in period," *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 452 (S.D.N.Y. 2011). As Plaintiffs have not represented that any special circumstances exist here, the notice which will be mailed (not emailed) should be modified to direct opt-in plaintiffs to submit their consent forms within sixty days of **[*15]** the date of the notice. The Court will entertain untimely motions to join on a showing of good cause for the delay.

The parties additionally disagree about whether or not Plaintiffs may send out a reminder notice 21 days before the end of the notice period. Defendant, citing primarily out-of-circuit cases, objects to a reminder notice on the grounds that Plaintiffs have failed to provide a reason for the notice in this case and because "a second Notice inherently suggests to the recipient that he or she did something wrong when they chose to disregard the first Notice." (Opp'n at 32-33.) However, "[g]iven that notice under the FLSA is intended to inform as many potential plaintiffs as possible of the collective action and their right to opt-in," the Court finds that a Court-approved reminder notice is appropriate and may be executed by mail and/or email to non-responding putative class members. *Chhab v. Darden Rests., Inc.*, No. 11 Civ. 8345 (NRB), 2013 U.S. Dist. LEXIS 135926, 2013 WL 5308004, at *16 (S.D.N.Y. Sept. 20, 2013); *see Morris v. Lettire Constr., Corp.*, 896 F. Supp. 2d 265, 274 (S.D.N.Y. 2012) (same).

**C. Disclosure Request**

Plaintiffs seek a Court order requiring Defendant to produce "the names, all known addresses, all known email addresses, all known telephone numbers including non-work numbers, and Social Security numbers of all Collective Members." (Notice of Mot. for Conditional **[*16]** Cert. [Doc. # 152] at 2.) Defendant objects, asserting that "[a]ny information beyond employee name and last known address is unwarranted and intrusive, and could encourage improper and unauthorized contact." (Opp'n at 31.) The Court disagrees. "'Disclosure of the names, addresses, telephone numbers and email addresses of putative class members is commonplace in this [Circuit] because such information is essential to identifying and notifying potential opt-in plaintiffs.'" *Robles v. Liberty Rest. Supply, Corp.*, No. 12-cv-5021 (FB) (VMS),

2013 U.S. Dist. LEXIS 177922, 2013 WL 6684954, at *11 (E.D.N.Y. Dec. 18, 2013) (quoting *Melgadejo v. S & D Fruits & Vegetables Inc.*, No. 12 Civ. 6852 (RA) (HBP), 2013 U.S. Dist. LEXIS 159932, 2013 WL 5951189, at * 7 (S.D.N.Y. Nov. 7, 2013)); *see Puglisi v. TD Bank, N.A.*, 998 F. Supp. 2d 95, 102 (E.D.N.Y. 2014) ("In regard to requests for 'names, last known addresses, telephone numbers (both home and mobile), e-mail addresses, and dates of employment,' courts 'often grant this kind of request in connection with a conditional certification of an FLSA collective action.'" (quoting *Raniere v. Citigroup, Inc.*, 827 F. Supp. 2d 294, 327 (S.D.N.Y. 2011))); *Ack v. Manhattan Beer Distribs., Inc.*, No. 11 Civ. 5582 (CBA) (SMG), 2012 U.S. Dist. LEXIS 67883, 2012 WL 1710985, at *6 (E.D.N.Y. May 15, 2012) (ordering production of names, addresses, telephone numbers, and email addresses).

However, Plaintiffs have offered no reason why Defendant should be required to produce *all known* addresses, email addresses, and phone numbers, as opposed to only *last-known* addresses, [**17**] email addresses, and phone numbers. Nor have Plaintiffs demonstrated a need for social security numbers, which have been recognized by courts to be a particularly sensitive form of identification that should not be ordered to be produced absent a showing of necessity. *See Velasquez*, 2014 U.S. Dist. LEXIS 68538, 2014 WL 2048425, at *15 ("With regard to . . . social security numbers, however, courts typically decline to allow discover in the first instance."); *Whitehorn*, 767 F. Supp. 2d at 448 ("While courts often decline to allow discovery of social security numbers due to privacy concerns, it is generally accepted that such discovery is permitted where Plaintiff can demonstrate that names and contact information are insufficient to effectuate notice."). Similarly, since Plaintiffs' counsel will not be conducting "out reach" other than by the procedures outlined here, there is no need shown for telephonic information except for opt-in plaintiffs who can themselves provide such information to Plaintiffs' counsel.

As such, Defendant is ordered to provide Plaintiffs, in Microsoft Excel or comparable format, with a list of the names, last known addresses, known email addresses, and dates of employment of all potential collective action members employed by it during the relevant time [**18**] period. The list is to be furnished within 21 days of the entry of this Order and is to be treated by the parties as confidential. If Plaintiffs are unable to effectuate notice on some potential opt-in plaintiffs with the information that is produced, they may renew their application for additional individual employee information.

**D. Third-Party Administrator**

Finally, Defendant seeks an order requiring that the notice to potential opt-in plaintiffs be issued by a third-party administrator, rather than by Plaintiffs. (Opp'n at 28.) Defendant claims such a step is "necessary" "given the aggressive recruitment tactics already employed by Plaintiffs and their counsel." (*Id.*) Defendant stops short of accusing Plaintiffs' counsel of impropriety but asserts that Plaintiffs' "overzealous recruitment efforts" demonstrate the "potential for abuse." (*Id.* at 29, 30.)

The Court sees no need for a third-party administrator at this stage. Unlike in *Ruggles v. Wellpoint, Inc.*, 591 F. Supp. 2d 150, 164 (N.D.N.Y. 2008), cited by Defendants, there is no record of abuse or misleading statements by Plaintiffs' counsel here, and "[t]he bulk of the district courts in this Circuit" do not require the use of third-party administrators, *Hernandez v. Merrill Lynch & Co.*, No. 11 CIV. 8472 (KBF), 2012 U.S. Dist. LEXIS 49822, 2012 WL 1193836, at *7 (S.D.N.Y. Apr. 6, 2012). *See Pippins v. KPMG LLP*, No. 11 CIV. 0377 (CM) (JLC), 2012 U.S. Dist. LEXIS 949, 2012 WL 19379, at *15 (S.D.N.Y. Jan. 3, 2012) (rejecting request [**19**] for third-party administrator); Diaz v. Scores Holding Co., No. 07 CIV. 8718 (RMB), 2008 U.S. Dist. LEXIS 38248, 2008 WL 7863502, at *5 n.2 (S.D.N.Y. May 9, 2008) (same). Defendant's request for a third-party administrator is therefore denied.

**III. Conclusion**

For the foregoing reasons, Plaintiffs' Motion [Doc. # 152] for Conditional Certification is GRANTED.

The Court Orders the following:

> 1. Within **21 days** of the entry of this Order, Defendant shall provide Plaintiffs, in Microsoft Excel or comparable format, with a list of the names, last known addresses, email addresses, and dates of employment of all potential collective action members employed by CSC during the relevant time period.
> 2. Notice shall be sent by first class mail to all persons who were, are, or will be employed by CSC nationwide from July 1, 2011[*] to the present as Associate Professional System Administrators, Professional System Administrators, or Senior Professional System Administrators, who earned less than $100,000 annually, and who were classified as exempt from the overtime pay requirements of the FLSA.

---

[*] Any issues of equitable tolling are deferred until the opt-in period closes to permit development of an appropriate record on which to base the Court's determination.

3. Potential opt-in plaintiffs will have 60 days from the date of the notice to submit their consent forms, electronically or in writing.

4. Plaintiffs' counsel may send a Court-approved reminder notice, by first class mail and/or email, to potential **[*20]** opt-in plaintiffs who have not yet opted in 21 days before the opt-in period closes. Plaintiffs shall submit their proposed reminder notice to the Court by June 23, 2015 and Defendant may file letter comments by June 29, 2015.

IT IS SO ORDERED.

/s/ Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 9th day of June, 2015.

# EXHIBIT C

DocuSign Envelope ID: 745FE0D7-A7A5-4BCC-9CBA-1C184903A7C7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOSEPH STRAUCH and TIMOTHY COLBY, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> COMPUTER SCIENCES CORPORATION, <br><br> Defendant. | No. 14 Civ. 956 (JBA) |

## CONFIDENTIALITY AGREEMENT

I, <u>Jimil Patel</u>, have been informed by counsel that in my role as expert or in my role assisting Plaintiffs' expert pursuant to Dkt. 487, whichever the case may be, I may participate in conversations with Defendant Computer Sciences Corporation ("CSC") employees and agents, and interface with CSC time keeping and employee information systems, which I have been informed may contain highly confidential information, including but not limited to confidential business information, confidential proprietary systems and information, confidential trade secrets, and confidential employee and other personal data and information. Given the difficulties of designating specific information transmitted orally or viewed in CSC's time keeping and employee information systems as confidential, I have been informed that I am to treat any such conversations with CSC employees as confidential and any information obtained by viewing CSC's systems as similarly confidential and proprietary.

I hereby agree that I will hold all conversations with CSC as confidential subject to the exceptions set forth in Section (d) of Judge Arterton's Standing Protective Order (Dkt No.4).

(Attached hereto as Exhibit 1.)   I further agree not to use any such information learned from conversations with CSC employees or agents, or any information viewed from my accessing or interfacing with CSC systems for any purpose other than this litigation pursuant to the Court's order under Dkt 487.

DocuSigned by:

*Jimil Patel*                              2/8/2019

4CFDEE7E533C474

[Name]

4844-7303-3095, v. 1

DocuSign Envelope ID: 745FE0DZ-A7A5-4BCC-9CBA-1C184903A7C7

# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**STANDING PROTECTIVE ORDER**
**Effective April 20, 2010**

It is hereby ordered by the Court that the following shall apply to information, documents and excerpts from documents supplied by the parties to each other as initial disclosure and in response to discovery requests:

(a) Counsel for any party may designate any document or information contained in a document as confidential if counsel determines, in good faith, that such designation is necessary to protect the interests of the client. Information and documents designated by a party as confidential will be labeled "CONFIDENTIAL — PRODUCED PURSUANT TO PROTECTIVE ORDER." "Confidential" information or documents may be referred to collectively as "confidential information."

(b) Unless ordered by the Court, or otherwise provided for herein, the confidential information disclosed will be held and used by the person receiving such information solely for use in connection with the action, in which this Order issued.

(c) In the event a party challenges another party's confidential designation, counsel shall make a good faith effort to resolve the dispute in accordance with Rule 37(a)(2)of the Local Rules of the District Court for the District of Connecticut, and in the absence of a resolution, the challenging party may thereafter seek resolution by the Court. Nothing in this Protective Order operates to create an admission by any party that confidential information disclosed in this case is relevant or admissible. Each party specifically reserves the right to object to the use or admissibility of all confidential information disclosed, in accordance with applicable law and Court rules.

(d) Information or documents designated as "Confidential" shall not be disclosed to any person, except:
(1) The requesting party and counsel of record;
(2) Employees of such counsel assigned to and necessary to assist in the litigation;
(3) Consultants or experts to the extent deemed necessary by counsel;
(4) Any person from whom testimony is taken or is to be taken in these actions, except that such a person may only be shown that confidential information during and in preparation for his/her testimony and may not retain the confidential information; and
(5) The Court or the jury at trial or as exhibits to motions.

(e) Prior to disclosing or displaying the confidential information to any person,

counsel shall:

(1) inform the person of the confidential nature of the information or documents; and

(2) inform the person that this Court has enjoined the use of the information or documents by him/her for any purpose other than this litigation and has enjoined the disclosure of that information or documents to any other person.

(f) The confidential information may be displayed to and discussed with the persons identified in Paragraphs (d)(3) and (4) only on the condition that, prior to any such display or discussion, each such person shall be asked to sign an agreement to be bound by this Order in the form attached hereto as Exhibit A. In the event such person refuses to sign an agreement in the form attached as Exhibit A, the party desiring to disclose the confidential information may seek appropriate relief from the Court.

(g) For the purpose of Paragraphs (d)(4) and (5), any documents which become part of an official judicial proceeding or which are filed with the Court are public documents, and such documents will be sealed by the Court only upon motion and in accordance with applicable law, including Rule 5(e) of the Local Rules of this Court. This Protective Order does not provide for the automatic sealing of any documents.

(h) At the conclusion of litigation, the confidential information and any copies thereof shall be promptly (and in no event later than forty–five (45) days after entry of final judgment) returned to the producing party or certified as destroyed.

(i) The foregoing is entirely without prejudice to the right of any party to apply to the Court for any further Protective Order relating to confidential information; or to object to the production of documents or information; or to apply to the Court for an order compelling production of documents or information; or for modification of this Order; or to seek any other relief from the Court.

**Parties and counsel are advised that their claimed need for a more restrictive protective order does not relieve them from compliance with discovery requests in a timely fashion. It is counsel's responsibility to timely move for further protection based on confidentiality, if needed. If the Court has not ruled on any such motion when discovery is due, then the documents shall be produced by the deadline for "attorneys eyes" only, pending decision by the Court. If exceptional circumstances exist in which production in this form would be irreparably prejudicial, counsel shall immediately advise the Court by letter.**

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Effective April 20, 2010

Rev. 7-1-13

DocuSign Envelope ID: 745FE0D7-A7A5-4BCC-9CBA-1C184903A7C7

**EXHIBIT A**

I have been informed by counsel that certain documents or information to be disclosed to me in connection with the matter entitled _____

_____ have been designated as confidential. I have been informed that any such documents or information labeled "CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER" are confidential by Order of the Court.

I hereby agree that I will not disclose any information contained in such documents to any other person. I further agree not to use any such information for any purpose other than this litigation.

_____ DATED: _____

*Signed in the presence of:*

_____
(Attorney)

Rev. 7-1-13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

---

JOSEPH STRAUCH and TIMOTHY COLBY,
individually and on behalf of all others similarly
situated,

              Plaintiffs,

    v.

COMPUTER SCIENCES CORPORATION,

              Defendant.

No. 14 Civ. 956 (JBA)

---

## CONFIDENTIALITY AGREEMENT

I, <u>Dan Regard</u>, have been informed by counsel that in my role as expert or in my role assisting Plaintiffs' expert pursuant to Dkt. 487, whichever the case may be, I may participate in conversations with Defendant Computer Sciences Corporation ("CSC") employees and agents, and interface with CSC time keeping and employee information systems, which I have been informed may contain highly confidential information, including but not limited to confidential business information, confidential proprietary systems and information, confidential trade secrets, and confidential employee and other personal data and information. Given the difficulties of designating specific information transmitted orally or viewed in CSC's time keeping and employee information systems as confidential, I have been informed that I am to treat any such conversations with CSC employees as confidential and any information obtained by viewing CSC's systems as similarly confidential and proprietary.

I hereby agree that I will hold all conversations with CSC as confidential subject to the exceptions set forth in Section (d) of Judge Arterton's Standing Protective Order (Dkt No.4).

DocuSign Envelope ID: 5DB31ACB-07CA-4F96-9C26-9D56D8389F95

(Attached hereto as Exhibit 1.)  I further agree not to use any such information learned from conversations with CSC employees or agents, or any information viewed from my accessing or interfacing with CSC systems for any purpose other than this litigation pursuant to the Court's order under Dkt 487.

DocuSigned by:

2D784E93F0564EA...                    2/8/2019

[Name]

4844-7303-3095, v. 1

# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**STANDING PROTECTIVE ORDER**
**Effective April 20, 2010**

It is hereby ordered by the Court that the following shall apply to information, documents and excerpts from documents supplied by the parties to each other as initial disclosure and in response to discovery requests:

(a) Counsel for any party may designate any document or information contained in a document as confidential if counsel determines, in good faith, that such designation is necessary to protect the interests of the client. Information and documents designated by a party as confidential will be labeled "CONFIDENTIAL — PRODUCED PURSUANT TO PROTECTIVE ORDER." "Confidential" information or documents may be referred to collectively as "confidential information."

(b) Unless ordered by the Court, or otherwise provided for herein, the confidential information disclosed will be held and used by the person receiving such information solely for use in connection with the action, in which this Order issued.

(c) In the event a party challenges another party's confidential designation, counsel shall make a good faith effort to resolve the dispute in accordance with Rule 37(a)(2)of the Local Rules of the District Court for the District of Connecticut, and in the absence of a resolution, the challenging party may thereafter seek resolution by the Court. Nothing in this Protective Order operates to create an admission by any party that confidential information disclosed in this case is relevant or admissible. Each party specifically reserves the right to object to the use or admissibility of all confidential information disclosed, in accordance with applicable law and Court rules.

(d) Information or documents designated as "Confidential" shall not be disclosed to any person, except:
(1) The requesting party and counsel of record;
(2) Employees of such counsel assigned to and necessary to assist in the litigation;
(3) Consultants or experts to the extent deemed necessary by counsel;
(4) Any person from whom testimony is taken or is to be taken in these actions, except that such a person may only be shown that confidential information during and in preparation for his/her testimony and may not retain the confidential information; and
(5) The Court or the jury at trial or as exhibits to motions.

(e) Prior to disclosing or displaying the confidential information to any person,

Rev. 7-1-13

counsel shall:

> (1) inform the person of the confidential nature of the information or documents; and
>
> (2) inform the person that this Court has enjoined the use of the information or documents by him/her for any purpose other than this litigation and has enjoined the disclosure of that information or documents to any other person.

(f) The confidential information may be displayed to and discussed with the persons identified in Paragraphs (d)(3) and (4) only on the condition that, prior to any such display or discussion, each such person shall be asked to sign an agreement to be bound by this Order in the form attached hereto as Exhibit A. In the event such person refuses to sign an agreement in the form attached as Exhibit A, the party desiring to disclose the confidential information  may seek appropriate relief from the Court.

(g) For the purpose of Paragraphs (d)(4) and (5), any documents which become part of an official judicial proceeding or which are filed with the Court are public documents, and such documents will be sealed by the Court only upon motion and in accordance with applicable law, including Rule 5(e) of the Local Rules of this Court. This Protective Order does not provide for the automatic sealing of any documents.

(h) At the conclusion of litigation, the confidential information and any copies thereof shall be promptly (and in no event later than forty–five (45) days after entry of final judgment) returned to the producing party or certified as destroyed.

(i) The foregoing is entirely without prejudice to the right of any party to apply to the Court for any further Protective Order relating to confidential information; or to object to the production of documents or information; or to apply to the Court for an order compelling production of documents or information; or for modification of this Order; or to seek any other relief from the Court.

**Parties and counsel are advised that their claimed need for a more restrictive protective order does not relieve them from compliance with discovery requests in a timely fashion. It is counsel's responsibility to timely move for further protection based on confidentiality, if needed. If the Court has not ruled on any such motion when discovery is due, then the documents shall be produced by the deadline for "attorneys eyes" only, pending decision by the Court. If exceptional circumstances exist in which production in this form would be irreparably prejudicial, counsel shall immediately advise the Court by letter.**

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Effective April 20, 2010

Rev. 7-1-13

# EXHIBIT A

I have been informed by counsel that certain documents or information to be disclosed to me in connection with the matter entitled _____

_____ have been designated as confidential. I have been informed that any such documents or information labeled "CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER" are confidential by Order of the Court.

I hereby agree that I will not disclose any information contained in such documents to any other person. I further agree not to use any such information for any purpose other than this litigation.

_____ DATED: _____

*Signed in the presence of:*

_____
(Attorney)

Rev. 7-1-13