**OUTTEN & GOLDEN LLP**
Jahan C. Sagafi*
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800

Darnley D. Stewart*
Michael J. Scimone*
Michael N. Litrownik (ct 28845)
Jared Goldman *
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000

**SUSMAN, DUFFY & SEGALOFF, P.C.**
Karen B. Kravetz (ct 19665)
P.O. Box 1684
New Haven, CT 06507
Telephone: (203) 624-9830

*Attorneys for Plaintiffs and the Classes and Collective*

**FEINBERG JACKSON WORTHMAN & WASOW**
Todd Jackson*
Darin Ranahan*
Genevieve Casey*
383 4th Street, Suite 201
Oakland, CA 94607
Telephone: (510) 269-7998

**LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
Daniel M. Hutchinson*
Lin Y. Chan*
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

*admitted *pro hac vice*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSEPH STRAUCH, TIMOTHY COLBY, CHARLES TURNER, and VERNON CARRE, on behalf of themselves and all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COMPUTER SCIENCES CORPORATION,<br><br>Defendant. | No.: 3:14-cv-956 (JBA)<br><br>**DECLARATION OF JAHAN C. SAGAFI IN SUPPORT OF CLASS COUNSEL'S POST-TRIAL MOTION FOR ATTORNEYS' FEES AND COSTS** |

I, JAHAN C. SAGAFI, declare as follows:

1.      I am a partner at Outten & Golden LLP ("O&G"), attorneys for Plaintiffs, the
Classes, and the FLSA collective.  I make these statements based on personal knowledge and
would so testify if called as a witness.

2.      This Declaration is submitted in support of Class Counsel's Post-Trial Motion for
Attorneys' Fees and Costs.

3.      I am a member in good standing of the bar of the State of California; the United
States District Courts for the Northern, Central, Eastern, and Southern Districts of California;
and the United States Courts of Appeals for the First, Second, Ninth, and Eleventh Circuits.  I am
admitted *Pro Hac Vice* before this Court.

4.      O&G, together with Feinberg, Jackson, Worthman & Wasow, LLP ("FJWW"),
Lieff Cabraser Heimann & Bernstein, LLP ("LCHB"), and Susman, Duffy & Segaloff, P.C.
("Susman Duffy"), comprise Class Counsel ("Class Counsel") responsible for prosecuting this
matter.

### Outten & Golden LLP

5.      Outten & Golden is the largest firm in the country that exclusively represents
individuals (not companies) in employment matters.  O&G is a 70+ attorney firm with offices in
New York, San Francisco, Chicago, and Washington, D.C., representing plaintiffs in a wide
variety of employment matters, including individual and class action litigation involving wage
and hour, discrimination, and harassment claims, as well as contract and severance negotiations.
In addition to taking contingency fee matters, O&G maintains a substantial practice of hourly
work for paying clients and often receives fee awards in the cases it handles, giving O&G a solid
foundation of resources from which to take on class action matters such as this one.

6.      **Outten & Golden's experience advocating for workers' rights.**  O&G has represented plaintiffs in hundreds of class and collective actions asserting employment rights on behalf of workers around the country.  *See, e.g.*, *Garret v. Urban Outfitters, Inc.*, No. 17 Civ. 7826, ECF No. 56 at 10 (S.D.N.Y. Mar. 13, 2019) ("The Court has previously recognized the experience and expertise of the Outten & Golden LLP firm in the area of employment law, which was demonstrated again in this action."); *Zamora v. Lyft, Inc.*, No. 16 Civ. 02558, ECF No. 103 at 6 (N.D. Cal. Sept. 26, 2018) (O&G attorneys "have capably and effectively represented the Settlement Class Members' interests" and praising "their outstanding work on this case."); *Zorrilla v. Carlson Rests. Inc.*, No. 14 Civ. 2740, 2017 WL 5004848, at *3 (S.D.N.Y. Oct. 26, 2017) (O&G attorneys "have significant experience in both prosecuting and settling wage and hour and discrimination class actions."); *Lillehagen v. Alorica*, No. 13 Civ. 0092, ECF No. 262 (C.D. Cal. May 31, 2016) (O&G attorneys "have . . . extensive experience and expertise in prosecuting wage-and-hour class actions and collective actions."); *Galeener v. Source*, No. 13 Civ. 4960, ECF No. 131 (N.D. Cal. Mar. 13, 2015) (same); *Ballinger v. Advance Magazine Publishers, Inc.*, No. 13 Civ. 4036, 2014 WL 7495092, at *7 (S.D.N.Y. Dec. 29, 2014) (appointing O&G as class counsel, explaining that "[b]ased on the firm's performance before me in this and other cases and its work in the foregoing and other cases, I have no question that it will prosecute the interests of the class vigorously"); *Perez v. Allstate Ins. Co.*, No. 11 Civ. 1812, 2014 WL 4635745, at *25 (E.D.N.Y. Sept. 16, 2014) (appointing O&G as class counsel and noting that "O & G has the requisite experience in handling class actions . . . , are well versed in the applicable law, and have the resources necessary to represent the NYLL Class fairly and adequately"); *Easterling v. Connecticut, Dep't of Correction*, No. 08 Civ. 826, 2013 WL 12291474, at *3 (D. Conn. Sept. 10, 2013) (O&G attorneys "are nationally recognized

employment class action litigators."); *Yuzary v. HSBC Bank USA, N.A.*, No. 12 Civ. 3693, 2013 WL 1832181, at *4 (S.D.N.Y. Oct. 2, 2013) (appointing O&G as class counsel, finding that O&G attorneys "have substantial experience prosecuting and settling employment class actions, including wage and hour class actions[,] and are well-versed in wage and hour and class action law"); *Johnson v. Brennan*, No. 10 Civ. 4712, 2011 WL 1872405, at *2 (S.D.N.Y. May 17, 2011) (same); *Capsolas v. Pasta Res., Inc.*, No. 10 Civ. 5595, 2012 WL 1656920, at *2 (S.D.N.Y. May 9, 2012) (O&G attorneys "have years of experience prosecuting and settling wage and hour class actions, and are well-versed in wage and hour law and in class action law"); *Alli v. Boston Mkt. Corp.*, No. 10 Civ. 4, 2011 WL 6156938, at *2 (D. Conn. Dec. 9, 2011) (O&G counsel are "qualified and experienced in the issues raised in" wage and hour overtime litigation); *McMahon v. Olivier Cheng Catering & Events, LLC*, No. 08 Civ. 8713, 2010 WL 2399328 at *6 (S.D.N.Y. Mar. 3, 2010) (O&G "are experienced employment lawyers with good reputations among the employment law bar . . . [and] have prosecuted and favorably settled many employment law class actions, including wage and hour class actions"); *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008) (O&G lawyers have "an established record of competent and successful prosecution of large wage and hour class actions, and the attorneys working on the case are likewise competent and experienced in the area").

7.     Law360 listed Outten & Golden as one of a handful of firms in the employment law category of its nationwide "Practice Group of the Year" list for 2016, 2017, and 2018.  O&G was one of the two plaintiffs' firms nationwide so recognized in 2016 and 2018, and it was the only plaintiffs' firm so recognized in 2017.

8.     Outten & Golden is one of a limited number of class action firms able to effectively prosecute large, national class actions requiring a large outlay of up-front costs.  *See*

*Easterling v. Connecticut, Dep't of Correction*, No. 08 Civ. 826, 2013 WL 12291474, at *3 (D.

Conn. Sept. 10, 2013) ("Outten & Golden's resources played a significant role in Plaintiffs'

counsel's ability to pursue this litigation without compensation over the past eight years.");

*Gonzalez v. Pritzker*, No. 10 Civ. 3105, 2016 WL 5395905, at *4 (S.D.N.Y. Sept. 20, 2016)

(same in case involving hundreds of thousands of class members).

9.     **Outten & Golden's Clients in this District.**   In this district, clients regularly pay

O&G's customary rates.  From 2018 through August 2019, O&G represented over 75

Connecticut clients who agreed to pay O&G's customary rates out of pocket, on a non-

contingent basis.

**My Background and Experience**

10.     **Education.**  I graduated *magna cum laude* from Harvard College in 1994, where I

concentrated in Social Studies.  I graduated from Harvard Law School in 2001 and throughout

my practice have specialized in class actions, with a focus on employment class actions.

11.     **Clerkship.**  For the first year after I graduated from law school, I clerked for the

Honorable William W Schwarzer of the United States District Court for the Northern District of

California.

12.     **Lieff Cabraser.**  Immediately thereafter, in 2002, I joined Lieff, Cabraser,

Heimann & Bernstein, LLP, where I became a partner in January 2008.  My practice consisted

primarily of representing class members in employment class actions (including wage and hour,

employment discrimination, and other employment-related disputes), as well as significant work

representing plaintiffs in consumer class actions and appeals of consumer and product liability

cases in the Ninth Circuit and other appellate courts.

13.   **Outten & Golden.**  In fall 2013, I left Lieff Cabraser to help open O&G's San Francisco office.  Here, my practice has consisted almost exclusively of representing workers in employment class actions (including wage and hour, employment discrimination, and other employment-related disputes).

14.   **Current employment cases.**  Currently, in addition to this matter, I represent plaintiffs asserting employment claims in representative actions in the United States District Court for the Northern District of California; the United States District Court for the District of Arizona; and California state courts.

    a.   Ongoing wage and hour class actions.  Currently, I represent plaintiffs and proposed class members asserting wage and hour claims in several class and collective action cases, including:  *Whitworth v. SolarCity Corp.*, No. 16 Civ. 1540 (N.D. Cal.) (off-the-clock and meal break claims on behalf of installers); *Chen v. Morgan Stanley Smith Barney LLC*, 30-2014-00724866-CU-OE-CJC (Orange Co. Super. Ct.) (PAGA claims on behalf of Financial Advisors regarding reimbursement of business expenses); *Beilke v. Uber Technologies, Inc.*, No. CGC-17-560916 (San Francisco Co. Super. Ct.) (claims by drivers for miscalculation of fees contractually owed); *Olson v. Lyft, Inc.*, CGC-18-566788 (San Francisco Co. Super. Ct.) (PAGA claims on behalf of Lyft drivers).

    b.   Ongoing discrimination class actions.  Currently, I represent plaintiffs and proposed class members asserting employment discrimination claims in several class and collective action cases, including:  *Rabin v. PricewaterhouseCoopers LLP*, No. 16 Civ. 2276 (N.D. Cal.) (nationwide age discrimination class action on behalf of applicants for introductory accountant positions); *Borrego v. Raley's Family of Fine Stores*, 34-2015-00177687 (Sacramento Co. Super. Ct.) (pregnancy discrimination).

15.     **Past employment class actions.**  During my career, I have represented plaintiff

classes and collectives in many employment class actions.

a.     <u>Past wage and hour class actions on behalf of computer technical support</u>

<u>workers.</u>  Over the past 15 years, I have represented computer technical support worker classes

in ten wage and hour class and collective actions besides this one:  *Benedict v. Hewlett-Packard*

*Co.*, 314 F.R.D. 457 (N.D. Cal. 2016) (case dismissed after Rule 23 class certification denied and

FLSA collective decertified); *Buccellato v. AT&T, Inc.*, No. 10 Civ. 463 (N.D. Cal.) ($12.5

million settlement of overtime misclassification claims for technical support workers in 2011);

*Sherrill v. Premera Blue Cross*, No. 10 Civ. 590 (W.D. Wash.) ($1.45 million settlement in 2011

for 133 class members in overtime misclassification case); *Higazi v. Cadence Design Systems,*

*Inc.*, No. 07 Civ. 2813 (N.D. Cal.) ($7.7 million settlement of overtime misclassification claims

for technical support workers in 2008); *Rosenburg v. Int'l Bus. Machines Corp.*, No. 06 Civ. 430

(N.D. Cal.) ($65 million settlement in 2007 for overtime misclassification claims for technical

support workers); *Lewis v. Wells Fargo & Co.*, No. 08 Civ. 2670 (N.D. Cal.) ($6.72 million

settlement for overtime misclassification claims for technical support workers in 2011); *Danieli*

*v. Int'l Bus. Machines Corp.*, No. 08 Civ. 3688 (S.D.N.Y.) ($7.5 million settlement of overtime

misclassification claims in 2010); *Clarke v JPMorgan Chase Bank, N.A.*, No. 08 Civ. 2400, 2010

WL 1379778 (S.D.N.Y. Mar. 26, 2010) (case dismissed after summary judgment granted for

defendant); *Gerlach v. Wells Fargo & Co.*, No. 05 Civ. 585 (N.D. Cal.) ($12.8 million settlement

in 2007 for overtime misclassification claims for business systems consultants); *Giannetto v.*

*CSC Corp.*, No. 03 Civ. 8201 (C.D. Cal.) ($24.0 million settlement in 2005 for overtime

misclassification claims).

    b. <u>Other past wage and hour class actions.</u> In the past, I have successfully represented plaintiff classes in other wage and hour class and/or collective actions, including: *Godhigh v Savers*, No. 16 Civ. 2874 (N.D. Cal.) ($750,000 settlement for overtime misclassification claims of retail store assistant managers in 2018); *Wolf v. Permanente Medical Group, Inc.*, No. 17 Civ. 05345 (N.D. Cal.) ($2,950,000 settlement for off-the-clock claims of telephone service representatives in 2018); *Zamora v. Lyft, Inc.*, No. 16 Civ. 02558 (N.D. Cal.) ($1,950,000 settlement for claims of drivers asserting that Lyft used deceptive language in explaining how Prime Time Premiums would be paid to drivers; Lyft eliminated the challenged language during the litigation); *Walton v. AT&T Servs., Inc.*, No. 15 Civ. 03653 (N.D. Cal.) ($2,750,000 settlement for overtime misclassification claims of deliverers and designers of corporate trainings in 2018); *Armstrong v. Concentrix Corp.*, No. 16 Civ. 05363 (N.D. Cal.) ($320,000 settlement for off-the-clock claims of at-home customer service representatives in 2018); *Brown v. Permanente Medical Group, Inc.*, No. 16 Civ. 05272 (N.D. Cal.) ($6,255,000 settlement for off-the-clock claims of advice nurses in 2017); *Zajonc v. Morgan Stanley & Co. LLC*, No. 14 Civ. 5563 (N.D. Cal.) ($5,995,000 settlement as part of multi-case settlement) (Final Analyst trainee off-the-clock wage and hour claims); *Zaborowski v. MHN Gov't Servs.*, No. 12 Civ. 5102 (N.D. Cal.) (FLSA conditional collective action certification granted; arbitration motion defeated and affirmed on appeal, 601 F. App'x 461 (9th Cir. 2014); settled on nationwide class basis for over $12.7 million) (military base counselor independent contractor misclassification claims); *Adams v. Inter-Con Security Services, Inc.*, No. 06 Civ. 5428 (N.D. Cal.) ($4 million settlement of wage and hour off-the-clock work class and collective action on behalf of security officers in 2008); *Bush v. GlobalTranz Enterprises, Inc.*, No. 15 Civ. 0536 (D. Ariz.) ($640,000 settlement for inside salespeople's misclassification claims); *Lillehagen v.*

*Alorica, Inc.*, No. 13 Civ. 92 (C.D. Cal.) (nationwide class action settlement) (call center worker off-the-clock claims); *In re Farmers Ins. Group Claims Reps. Overtime Litigation*, MDL Docket No. 1439 (D. Or.) ($8 million settlement of overtime misclassification class and collective action on behalf of insurance claims adjusters in 2010); *Barnett v. Wal-Mart*, No. 01-2-24553-8 (King Cty. Sup. Ct.) ($35 million settlement of wage and hour off-the-clock class action in 2009).

16.     **Appellate work.**  In addition, I have represented plaintiffs in various appeals.

a.     <u>Representation of plaintiffs.</u>  I have represented plaintiffs at oral argument in *Marsh v. J. Alexander's LLC*, No. 15-15791 (9th Cir. en banc 2018) (validity of DOL's 20% rule from Field Operations Handbook, interpreting 29 C.F.R. § 531.56e (dual jobs regulation)); *Guess?, Inc. v. Russell*, No. 15-56870 (9th Cir. 2017) (delegation of class arbitrability to the arbitrator); *Zaborowski v. MHN Government Services, Inc.*, No. 13-15671 (9th Cir. 2014) (unconscionability analysis of arbitration clause); *Taragan v. Nissan North America, Inc.*, No. 11-15664 (9th Cir. 2012) (consumer deception regarding defective automobile design); *Degelmann v. Advanced Medical Optics Inc.*, No. 10-15222 (9th Cir. 2011-12) (medical device preemption); *Integon Corp. v. Gordon*, No. 1D05-3187 (Fla. 1st DCA 2007) (class certification of consumer claims asserting insurance pricing deception).

b.     <u>Amicus briefing.</u>  I have also volunteered to write amicus briefs in the Ninth Circuit and other appellate courts, including:

- *HomeAway.com v. City of Santa Monica*, No. 18-55367 (9th Cir. 2018) (limitations on Communications Decency Act immunity)
- *New Prime, Inc. v. Oliveira*, No. 17-340 (S. Ct. 2018) (limitations on applicability of FAA to employment cases)
- *Mohamed v. Uber Technologies, Inc.*, No. 15-16178, 15-16181, 15-16250 (9th Cir. 2016) (challenging unconscionability and unfairness in arbitration agreement)
- *Meyer v. Kalanick*, No. 16-2750 (2d Cir. 2016) (internet contract formation)
- *Williams v. Superior Court*, No. S227228 (Cal. S.Ct. 2015) (plaintiffs' right to classwide discovery in PAGA representative action)
- *Braun v. Wal-Mart Stores, Inc.*, No. 32 EAP 2012 (Pa. S. Ct. 2013) (plaintiffs' class

action trial victory upheld by Pennsylvania's highest court)

- *Mazza v. American Honda Motor Co.*, No. 09-55376 (9th Cir. 2012) (consumer class action choice-of-law issues)
- *Duran v. U.S. Bank National Ass'n.*, No. S200923 (Cal. S.Ct. 2012) (use of representative testimony to prove workers' wage and hour claims)
- *DeLodder v. Aerotek, Inc.*, No. 10-56755 (9th Cir. 2011) (Rule 23 class certification of overtime misclassification case)
- *Russell v. Wells Fargo & Co.*, No. 07-cv-03993 (N.D. Cal. 2009) (limitations on fluctuating workweek method of calculating damages in overtime misclassification cases)
- *Gutierrez v. Johnson & Johnson*, No. 07-8025 (3rd Cir. 2007) (employment discrimination class action)
- *Ledbetter v. The Goodyear Tire & Rubber Co.*, No. 05-1074 (U.S. S. Ct. 2006) (employment discrimination)
- *Dukes v. Wal-Mart Stores, Inc.*, Nos. 04-16688 & 04-16720 (9th Cir. 2005) (employment discrimination class action)

17.    **Community involvement.**  In addition to being an active litigator, I have been

involved in many educational and legal groups.

a.    Those include the following nonprofits:

- Legal Aid at Work:  Board of Directors (2019-present)
- Alliance for Justice ("AFJ"):  Board of Directors (2014-present)
- American Constitution Society ("ACS") Bay Area Lawyer Chapter:  Chair of the Executive Board (2009-11) and member of the Advisory Board (2014-present)
- The Berkeley Center on Comparative Equality and Anti-Discrimination Law (2019-present)
- Public Advocates, Inc. (Board of Governors, 2012-15)
- the American Civil Liberties Union ("ACLU") of Northern California:  Board of Directors (2006-11), Chair of the Legal Committee (2010-11), Vice Chair of the Board (2010-11), and member of the Board's Executive Committee (2009-11)

b.    Those include the following bar groups:

- The Civil Local Rules Attorney Advisory Committee for the Northern District of California (2020-22) (appointed by Chief Judge Hamilton)
- The American Bar Association ("ABA"):  Labor & Employment Law ("LEL") Section
- The State Bar of California:   Litigation Section Executive Committee (2006-07), CACI Civil Jury Instructions committee (2004-07), and Administrative of Justice Committee (2004-07)
- The Bar Association of San Francisco ("BASF") Judicial Evaluations Committee member (2013-15) and volunteer attorney fee dispute arbitrator (2009-15)
- The National Employment Lawyers Association ("NELA"):  frequent speaker

- The American Association for Justice ("AAJ"):  Co-Chair of the Wage and Hour Litigation Group (2016-present) and frequent speaker
- The Consumer Attorneys of California ("CAOC")

18.     **Articles, speeches, and presentations.**  I regularly write articles and give speeches and presentations at conferences, primarily on employment law and representative action issues.

19.     **Awards.**  I have also received various awards, including the following:

- Top 100 lawyers in all fields in Northern California (*Super Lawyers*) (2015-19)
- Top 75 Labor & Employment Lawyers in California (*The Daily Journal*) (2015-18)
- 500 Leading Plaintiff Employment Lawyers in the United States (*Lawdragon*) (2018-19)
- California "Super Lawyer" (*Super Lawyers*) (2014-19)
- Northern California "Rising Star" (*Super Lawyers*) (2009-11)
- "Top 20 California Lawyers Under 40" (*The Daily Journal*) (2011)
- Community Justice Award (Centro Legal de la Raza) (2008) (for my work on behalf of the class in the *Gonzalez v. Abercrombie & Fitch Stores, Inc.* race and gender discrimination class action, described above)

## Background and Qualifications of Other O&G Attorneys and Staff

20.     **DARNLEY D. STEWART** is Counsel at Outten & Golden LLP, in the New York office, after retiring as a partner in July 2018.  She represents employees in litigation and negotiation in all areas of employment law, including executive and professional contracts and compensation, whistleblowing, discrimination based on disability, race, gender and pregnancy, and discrimination class actions.

Before joining the firm, Ms. Stewart was a partner at Bernstein Litowitz Berger & Grossmann LLP (1999 - 2007) and a named partner at Giskan Solotaroff Anderson & Stewart LLP (2008 - 2015).  She was the first female President of the Executive Board of the New York affiliate of the National Employment Lawyers Association ("NELA/NY") and served in that capacity between 2008 and 2014.  She is also the Vice-President of the Board of Workplace

Fairness and serves on the Advisory Board of New York University's Center for Labor and Employment Law.

Ms. Stewart has had substantial success in the courtroom prosecuting class and individual discrimination claims.  In 2011, she obtained a plaintiff's verdict at trial in two different cases. In the first, *Castro v. City of New York, et al*, Ms. Stewart was lead trial counsel in an individual retaliation case brought against the City of New York, which resulted in a plaintiff's verdict of $400,000, including punitive damages of $50,000 against each of the two named defendants.  In *McMillan v. Millennium Broadway Hotel*, an individual race discrimination case, Ms. Stewart obtained a plaintiff's verdict of $1.125 million, including a punitive damages award of $1 million.

Ms. Stewart has also prosecuted class action impact cases against several large companies, including Ford Motor Company, Gerber, Coastal Corporation, First Union Bank, National Car Rental, General Motors, Nissan, Toyota, and Bank of America.  In connection with her work on *Coleman, et al. v. General Motors Acceptance Corporation*, Ms. Stewart was named as a finalist for "Trial Lawyer of the Year" in 2004 by the Trial Lawyers for Public Justice.  She has also been named as one of the leading 500 plaintiffs' lawyers in the country and one of America's top 1000 litigators by Lawdragon magazine.  In addition, Ms. Stewart was selected for inclusion in several lists including: New York Super Lawyers for 2006 - 2017, one of the New York Area's Best Lawyers for 2011 - 2018, and a Best Lawyer in America for 2009-2019. Ms. Stewart was named Best Lawyers "Lawyer of the year" in 2013 and 2018 for Employment Law - Individuals.

Ms. Stewart received her B.A. from Princeton University in 1984 and her J.D. from Northeastern University School of Law in 1990.  After law school, Ms. Stewart clerked for the Hon. R. Ammi Cutter and the Hon. Mel L. Greenberg on the Massachusetts Court of Appeals.

21.     **DANIEL S. STROMBERG** is eDiscovery Counsel at Outten & Golden LLP. He is head of O&G's eDiscovery Practice Area, where he advises clients and case teams on discovery strategies, best practices, protocols and technologies, and oversees discovery collections, managed review, and productions.  Mr. Stromberg frequently speaks on eDiscovery issues from a plaintiff's perspective, and teaches electronic discovery at the University of Virginia.

Mr. Stromberg negotiates eDiscovery agreements and helps manage discovery strategy and processes in cases in all areas of employment law, including wage and hour and discrimination class actions.  His practice particularly focuses on the use of technology to effectively advocate for sufficient and defensible discovery.  Before joining Outten & Golden LLP, Mr. Stromberg worked as Director of Discovery Technology at a boutique discovery firm, and as a Senior E-Discovery Consultant with a leading eDiscovery technology provider.

Mr. Stromberg earned his B.A., *cum laude*, from the University of Rochester and his J.D. from The George Washington University Law School.  He is admitted to practice in Virginia and the District of Columbia, and is a member of The Sedona Conference Working Group for Electronic Document Retention and Production.

22.     **MICHAEL J. SCIMONE** is Counsel at O&G and is also one of the lawyers primarily responsible for prosecuting Plaintiffs' claims.  He received a Juris Doctor degree from the City University of New York School of Law in 2009, where he participated in workers' rights litigation through the Immigrant and Refugee Rights Clinic and was a member of the New

York City Law Review.  He has been a member in good standing of the bar of the State of New York since 2010.  Since joining O&G in 2009 as an associate, Mr. Scimone has worked on multiple employment class action cases, including *Perez v. Allstate Ins. Co.*, No. 11 Civ. 1812, 2019 WL 1568398, at *2 (E.D.N.Y. Mar. 29, 2019) ($3.95 million pre-trial settlement on behalf of no-fault insurance adjusters in overtime misclassification case); *Przytula, et al. v. Bed Bath & Beyond, Inc.*, No. 17 Civ. 5124, ECF No. 123 (N.D. Ill. Jan. 29, 2019) ($8.5 million settlement on behalf of assistant managers); *Jacob v. Duane Reade, Inc.*, No. 11 Civ. 160, 2017 WL 1968383 (S.D.N.Y. May 5, 2017) ($13.5 million pre-trial settlement on behalf of assistant managers); *Douglin, et al. v. Greatbanc Trust Co., Inc.*, No. 14 Civ. 620, ECF No. 103 (S.D.N.Y. April 24, 2017) ($4.75 million settlement in ERISA litigation alleging breach of fiduciary duty); and *Murphy, et al. v. LenderLive Network, Inc.*, No. 13 Civ. 3135, ECF No. 169 (D. Colo. Sept. 2, 2015) ($2.4 million pretrial settlement on behalf of mortgage underwriters in overtime misclassification case).  Mr. Scimone has been selected as a Rising Star by Super Lawyers for 2015 through 2018.  He is an active member of the Sedona Conference's Working Group 1 and has participated in drafting Sedona publications on electronic discovery and civil procedure.

23.     **JENNIFER L. LIU** was an Associate with O&G from October 2009 to January 2015.  In 2015, she founded The Liu Law Firm, P.C., where she represents individuals in litigation and negotiation in all areas of employment law.  Prior to joining O&G, she received her JD/MBA from Stanford Law School and the Stanford Graduate School of Business in 2008 and served as a law clerk to the Honorable John G. Koeltl in the Southern District of New York.  Ms. Liu was admitted to the bar of the State of New York in 2010, and the bar of the State of California in 2011.  Ms. Liu is also admitted to the bars of the United States District Courts for

14

the Southern and Eastern Districts of New York, the Northern, Central, and Southern Districts of California, and the Eastern District of Michigan.  Ms. Liu is a member in good standing of each of these bars.

24.     **MICHAEL N. LITROWNIK** is an associate at Outten & Golden LLP in New York and a member of the firm's Class Action Practice Group.  Mr. Litrownik focuses his practice on class action wage theft, civil rights, and employment discrimination matters.  Mr. Litrownik has served as trial counsel in both individual and class action cases.  Mr. Litrownik also serves as a co-chair of the firm's Legal Resistance Task Force, which is dedicated to protecting the workplace rights of the people and communities targeted by the actions and policies of the Trump Administration through advocacy, litigation, and education.

Before joining the firm in 2013, he represented consumers, workers, and victims of police misconduct in individual and class action litigation at Bromberg Law Office, P.C.

Mr. Litrownik obtained his B.A. from the University of Rochester in 2004, and his J.D. from Washington University School of Law in 2010, where he served as a Senior Editor on Washington University Law Review.  During law school, he served as a clinical fellow for the U.S. House Oversight Committee and a summer fellow for the Legal Services Center of Harvard Law School.

25.     **ELIZABETH V. STORK** is an associate at Outten & Golden LLP in New York, where she represents employees in class actions asserting discrimination claims and claims for lost minimum wages and overtime.  She is a member of the firm's Class Action Practice Group.  Prior to joining the firm in 2015, Ms. Stork worked as a litigation associate at Cleary Gottlieb Steen & Hamilton LLP and then as a law clerk for the Honorable Claire C. Cecchi in the U.S. District Court for the District of New Jersey in Newark.

Ms. Stork received her B.A. from the University of Virginia in 2007, with High

Distinction, and her J.D. from Harvard Law School in 2013.  During law school, Ms. Stork was a

member of the General Board of the Harvard Civil Rights-Civil Liberties Law Review and the

Executive Board of the Harvard Prison Legal Assistance Project.

26.     **JARED W. GOLDMAN** is an Associate at O&G in New York and a member of

the firm's Class Action Practice Group.  Prior to joining the firm in September 2017, Mr.

Goldman clerked for the Honorable Robert M. Levy, United States Magistrate Judge for the

Eastern District of New York.  Mr. Goldman received his J.D., *summa cum laude*, from

Brooklyn Law School in 2015.  He was selected by the Brooklyn Law faculty to receive the

Arthur Gluckman Memorial Prize at commencement, in recognition of his character and

academic achievement.  During law school, Mr. Goldman interned for the Danish Refugee

Council in Dushanbe, Tajikistan, where he worked on behalf of asylum seekers, and served as an

Articles Editor for the Journal of Law and Policy.  He received his B.A., *cum laude*, from New

York University in 2009.  Mr. Goldman is admitted to practice in New York only and is admitted

to the United States District Courts for the Southern District of New York and the Eastern

District of New York.

27.     **MARCO A. LOPEZ** was a Contract Attorney at O&G.  Marco received his B.A.

from Stanford University, and his J.D., *magna cum laude*, from Harvard Law School in 2009.

28.     **TANESHA SHAFER-ARATA** was a Contract Attorney at O&G.  Before

joining O&G in September 2015, Ms. Shafer worked as a contract attorney at several plaintiffs'

side litigation firms beginning in January 2012.  Ms. Schafer received her J.D. from Santa Clara

University School of Law in 2011 and is admitted to practice in California.

16

29.     **ASHLEY PELLOUCHOUD** was a Contract Attorney at O&G in 2015.  She received her B.A. from California State University in 2005 and her J.D. from Golden Gate University School of Law in 2012.  Prior to working with O&G, she served as a Graduate Fellow at the Environmental Law & Justice Clinic in San Francisco, where she represented low-income clients in civil rights cases, and mentored law student clinicians.

30.     **MORGAN MARSHALL-CLARK** was a Contract Attorney at O&G.  Prior to joining O&G in 2014, she was COO and General Counsel for an equestrian startup, World Equestrian Directory.  She also consulted for a legal startup, Alt Legal (formally Plainlegal), was the Business Manager for DK-USA Sporthorse, LLC, and a Research Associate/Consultant for Indepth Research Corp.  Ms. Marshall-Clark received her B.A. from the University of North Carolina at Chapel Hill in 2005, and her J.D. from New York Law School in 2012.

31.     <u>The Contract Attorney Position at O&G.</u>  Contract attorneys at Outten & Golden are treated as employees, not independent contractors, entitling them to employment benefits, including overtime pay, meal and rest breaks under California law, health, dental, and vision benefits, 401k contributions, and pre-tax commuter benefits.  They are also considered for hire as partner-track associates.  In fact, two Outten & Golden contract attorneys have converted to associate status.

32.     Information regarding other O&G attorneys who performed less than 100 hours of work on this matter is attached hereto as **Exhibit A**.

33.     Information regarding O&G staff members who performed work on this matter is attached hereto as **Exhibit B**.

17

**Litigation Risk**

34.     As experienced wage and hour class action litigators, Class Counsel face

significant risks in litigating workers' rights cases, including risk of defeat at class certification,

summary judgment, decertification, trial, and appeal.  These risks are certainly present in

technical support worker misclassification cases like this one.  For example, in *Clarke v

JPMorgan Chase Bank, N.A.*, No. 08 Civ. 2400, 2010 WL 1379778 (S.D.N.Y. Mar. 26, 2010), the

plaintiffs, represented by Outten & Golden LLP and Lieff, Cabraser, Heimann & Bernstein LLP,

asserted misclassification claims on behalf of a putative class and collective of JP Morgan

technical support workers.  The *Clarke* court denied plaintiffs' motion for conditional certification

and granted summary judgment in favor of the defendant.  Similarly, in *Benedict v. Hewlett-

Packard Co.*, 314 F.R.D. 457 (N.D. Cal. 2016), the plaintiffs, represented by Lieff, Cabraser,

Heimann & Bernstein LLP and Outten & Golden LLP, asserted misclassification claims on behalf

of Hewlett-Packard technical support workers.  The Court denied plaintiffs' class certification

motion and subsequently decertified the FLSA collective.  *See* 2016 WL 3742342 (N.D. Cal. July

13, 2016).  The plaintiffs did not proceed after that loss, and recovered nothing.  In *Benedict*,

O&G alone spent over $1,900,000 in time and $115,000 in costs without reimbursement.

35.     O&G has spent millions of dollars of time asserting workers' rights claims in

class and collective actions that resulted in no payment for our time.  We take on difficult cases

like this one because we believe that they are important.  We take seriously our responsibility to

push the law in a direction favorable for employees, and continue to do so despite, unfortunately,

having suffered several major (and very expensive) losses in wage and hour cases over the years.

Like this case, we believed that each of these cases was meritorious despite the risks.  For

example, in *Pippins v. KPMG LLP*, No. 11 Civ. 377, 2012 WL 6968332 (S.D.N.Y. Nov. 30,

2012), a professional exemption case on behalf of junior auditors on which O&G was counsel, we

lost on summary judgment and lost on appeal after O&G spent $2,298,699.45 in lodestar.

Similarly, in *Saleem v. Corporate Transportation Group., Ltd.*, No. 15 Civ. 88, 2017 WL

1337227 (2d Cir. Apr. 12, 2017), the Second Circuit upheld a grant of summary judgment to the

employer in an independent contractor misclassification case where O&G invested $1,841,427.75

in lodestar and spent $133,007.80 in out-of-pocket costs.

### The Rarity of Class Action Trials

36.     Trials in large wage and hour class actions are rare.  Plaintiffs' research has

identified only a handful of large class or collective action wage & hour cases that proceeded to a

jury trial within the last ten years.  None of these involved the Computer Employee Exemption.

The only significant case of this kind that proceeded to a jury verdict in this district, *Perkins v. S.*

*New England Tel. Co.*, No. 07 Civ. 967 (JCH), (D. Conn. 2011), was prosecuted by Sanford,

Wittels & Heisler, LLP, which is based in New York City and Washington, D.C.

### Discovery Conducted by Class Counsel in this Litigation

37.     Throughout discovery in this matter, our firms, which have worked together in the

past, took appropriate steps to avoid duplication of effort.  For example, to leverage firm

resources efficiently, we shared databases and discovery technology.  We used conference calls

and email to communicate and form strategy, with few in-person meetings; indeed, some

members of our team met in person for the first time in the month prior to trial.  Those

conference calls were agenda-driven and focused on allocating work among the team so that

each task was assigned to specific team members, without overstaffing.  To facilitate the process

of gathering information, making decisions, and communicating assignments, we opted to

include people who were doing the work, rather than limiting calls to decisionmakers, to avoid

the need to spend time sending information up the chain of command and in turn "cascading" a decision to multiple people, which invariably results in miscommunications and the need to duplicate work when it varies from the team's expectation.  Tasks assigned through this process were given to the lowest billing professional able to effectively do the work, as reflected in **Exhibits C** and **D**, which summarizes how categories of work were assigned among the team.

38.     As discussed in paragraph 15.a. above, I have represented computer technical support workers in ten actions prior to this one, and Todd Jackson and other members of the Class Counsel team also has extensive experience representing such workers.  The ten class and collective actions asserting overtime misclassification claims on behalf of technical support workers that I have played a significant or lead role in are:

- *Giannetto, et al v. Computer Sciences Corp Corporation*, No. 03 Civ. 8201 (C.D. Cal.) (while at LCHB; with Todd Jackson)
- *Gerlach v. Wells Fargo & Co.*, No. 05 Civ. 585 (N.D. Cal.) (while at LCHB; with Todd Jackson)
- *Rosenburg, et al v. International Business Machines Corporation*, No. 06 Civ. 430 (N.D. Cal.) (while at LCHB; with Todd Jackson and O&G)
- *Higazi v. Cadence Design Systems, Inc.*, No. 07 Civ. 2813 (N.D. Cal.) (while at LCHB)
- *Danieli v. International Business Machines Corp.*, 08 Civ. 3688 (S.D.N.Y.) (while at LCHB; with Todd Jackson and O&G)
- *Clarke et al v. J.P. Morgan Chase & Co.,* No. 08 Civ. 2400 (S.D.N.Y.) (while at LCHB; with O&G)
- *Lewis et al v. Wells Fargo & Co.*, No. 08 Civ. 2670 (N.D. Cal.) (while at LCHB)
- *Sherrill v. Premera Blue Cross et al*, No. 10 Civ. 590 (W.D. Wash.) (while at LCHB)
- *Buccellato v.  AT&T, Inc.*, No. 10 Civ. 463 (N.D. Cal.) (while at O&G)
- *Benedict v. Hewlett-Packard Company*, No. 13 Civ. 119 (N.D. Cal.) (while at LCHB and O&G)

39.     Based on that experience, I understand that outsourcing firms like CSC typically classify their workers among a range of job titles and roles, which often track both the skills held by particular employees and the particular kinds of systems on which they work.  Accordingly, we approached this case by attempting to focus initial discovery on CSC's job titling system, to

better define the appropriate contours of the class and collective. This approach avoided hundreds of hours of work that would otherwise have been required, and helped narrow the proposed class and collective to better meet the requirements of similarity and commonality among SAs, to support class and collective treatment. In addition to formal discovery, we conducted hundreds of interviews with potential class members, many of whom were *Giannetto* class members, to learn more about the current structure of CSC's job titling system. As a result of those interviews, we obtained over seventy declarations that we used to support our motion to conditionally certify the FLSA collective.

40.     Another component of this strategy was to pursue targeted depositions related to CSC's job-titling system and testimony of corporate representatives who understood the titling process, the job duties, and limitations on the discretion of putative class members. This began with a deposition noticed pursuant to Fed. R. Civ. P. 30(b)(6), covering several topics. Although CSC designated witnesses for certain topics early in the litigation, it claimed for nearly a year that it was unable to identify a witness for other topics, such as the metrics used to measure SAs' performance and ensure that they are performing work within time limits established by CSC's contracts with its customers. No witness was designated for the first five months of the litigation, and CSC claimed it was unable to designate a witness for other topics for a further six months.

41.     In response to this refusal, Plaintiffs noticed a series of fact witnesses identified from CSC documents, interviews, research on CSC decision makers, prior depositions, and class member interviews, moving from one witness to the next until a witness with the relevant knowledge was identified. On August 18, 2015, Plaintiffs took the deposition of CSC's 30(b)(6) designee Scott Creasy. One of our chief purposes in deposing Mr. Creasy was to gain

information regarding CSC's Master Services Agreements ("MSAs") with its clients, and specific Service Level Agreements ("SLAs") incorporated therein which delineated the work CSC (and System Administrator class members) was contractually obligated to perform and the constraints under which they operated.  During the deposition, Mr. Creasy testified that CSC's Delivery Assurance Department, managed by Brian Fillebrown, was responsible for monitoring compliance with SLAs.  *See* **Exhibit E** (Creasy Tr.) 160:21-163:21.

42.     Several days later, Plaintiffs noticed Mr. Fillebrown' s deposition, which took place on October 8, 2015.  During the deposition, Mr. Fillebrown consistently testified that Frank Cebula, CSC's Director of Global Infrastructure Services, was far more knowledgeable regarding SLA content and compliance review with respect to outsourcing accounts.  *See* **Exhibit F** (Fillebrown Tr.) at 32:12-33:11 (Cebula focuses on accounts providing run and maintain services); 104:6-13 (If anybody knows more about account management for outsourcing accounts, it's Cebula), 119:17-21 (Cebula responsible for training delivery assurance teams on outsourcing accounts), 139:6-140:3 & 141:5-8 (Cebula more familiar with meaning of industry standard terms on review matrix used to measure compliance with SLAs for outsourcing contracts).

43.     On December 3, 2015, Plaintiffs noticed Mr. Cebula's deposition, which was conducted on March 1, 2016.  Mr. Cebula provided testimony as to the MSA and SLA information we had been seeking for over six months.  *See* **Exhibit G** (Cebula Tr.) at 62:3-66:6 (discussing SLA metrics including mean time to repair, mean time to respond, and uptime percentage), 85:5-86:3 (failure to meet metrics specified in SLAs could result in financial penalties for CSC); 80:11-20 (contracts prescribe escalation provisions); 96:22-97:17 (SLAs include metrics for performance of root cause analysis).

44.     This and similar disputes over document discovery, where CSC delayed production, claiming an inability to understand our requests, resulted in our spending hundreds of hours on discovery-related tasks such as meeting and conferring with CSC, drafting correspondence to identify deficiencies in CSC's production and explain their positions, and charting new strategies to circumvent obstacles that they met throughout the discovery process. These hours are summarized in **Exhibits H**, **I**, and **J**, which show the categories of tasks that Class Counsel performed in various stages of litigation.

**Discovery Sought by CSC in this Litigation**

45.     Throughout this litigation, CSC took positions in discovery that sought to maximize the amount of individualized discovery they were allowed to take from members of the FLSA collective.  As of December 2014, 70 people had opted in to this litigation.  CSC moved at that time to compel discovery responses from all 70 of these plaintiffs.

46.     Plaintiffs responded to this proposal by making a counter-proposal to CSC that would permit it to take discovery from a sample of the collective, in the interest of proportionality.  Judge Margolis, partially granting and partially denying CSC's motion, adopted Plaintiffs' proposal, but left the parties to negotiate the scope of that sample as the collective grew.

47.     In a footnote, Judge Margolis prominently cited and praised the "delightfully colorful" language in *O'Toole v. Sears Roebuck & Co.*, No. 11 Civ. 4611, 2014 WL 1388660 (N.D. Ill. Apr. 10, 2014).  Judge Margolis did not explain which language in the order she found "delightful," but a prominent passage in the case strongly chides lawyers for failing to compromise, thereby wasting judicial resources.  I read Judge Margolis's pointed comment about this case as a judicial suggestion that the parties in this case should work harder to seek

23

agreement about the scope of discovery.  Although our team had tried to reach compromises with CSC throughout the litigation, we continued to do so, and worked harder to do so, based on our understanding of Judge Margolis's suggestion.

48.     In May 2015, CSC requested extremely broad discovery that would have included over 125 depositions, including those of the class representatives, any declarants supporting Plaintiffs' efforts (of whom there were 24 at the time), and up to 100 additional Opt-in Plaintiffs.

49.     We made a counter-proposal that recognized CSC's expressed need to depose a large percentage of the collective, suggesting a sliding-scale approach that would allow CSC a total of 40 depositions.  We expected CSC to make a counter-proposal, perhaps including a number of depositions somewhere between 40 and 125.

50.     Instead, CSC sought Judge Margolis's intervention, and moved to compel additional depositions.  Judge Margolis ruled on CSC's request by adopting a sliding-scale approach similar in structure to the one we had proposed, but which allowed CSC up to 60 depositions in addition to the named Plaintiffs.  Judge Margolis's order also addressed disputes that had arisen about the logistics of the depositions, including their length and location.  We had proposed to schedule the locations in "clusters" by geography, so that it would be easier to defend several of them together and limit travel expense.  CSC had refused to agree to this proposal, which Judge Margolis adopted.

51.     Despite pushing for more than 125 depositions and objecting to Judge Margolis's order limiting it to 60 depositions, CSC took only 37 opt-in depositions in the course of discovery, not taking the remaining 23 depositions for which it had sought the Court's intervention.

52.     CSC used three of those depositions at trial.  It also cited the remaining depositions in its opposition to class certification.  To respond to CSC's arguments about that testimony, our team was forced to spend many hours reviewing the cited testimony, reviewing other parts of the depositions to see whether the testimony was rebutted, clarified, or placed in context elsewhere, and demonstrate in their brief, plaintiff by plaintiff, that CSC's arguments were either unfounded or unpersuasive.

53.     During the same timeframe, CSC sought interlocutory review of the class certification order pursuant to Fed. R. Civ. P. 23(f) on July 14, 2017.  We spent substantial time opposing this petition, which itself consisted of substantive briefing on the reasons why interlocutory review was needed.  These hours are included in the "Research/Drafting Pleadings and Motions" category of the chart set forth in **Exhibit H** hereto.  CSC's petition was denied on November 21, 2017.

**Trial**

54.     Before trial, CSC provided Plaintiffs with a list of proposed witnesses that included 69 people, and a 19-page exhibit list with over 700 documents.  It argued in its Trial Memo that the trial would last 25-30 days.  Although CSC only called seven witnesses at trial (three by live testimony, four by deposition), our team had to prepare for the possibility that CSC would call more witnesses and introduce the documents it had listed, which required us to spend many hours preparing to cross-examine those witnesses.  We prepared cross-examinations for witnesses CSC listed, but did not call, including two witnesses CSC had listed the day before but cancelled on the last day of trial, after we had spent dozens of hours preparing a comprehensive cross-examination for those witnesses.  This work was especially burdensome because it

occurred simultaneously with motions *in limine* by both parties, objections to proposed jury instructions, and other work needed to prepare the case for trial.

55.     At trial, Plaintiffs called ten witnesses.  Preparation for their testimony began weeks in advance through multiple conference calls and continued with a minimum of two in-person sessions per witness closer to trial, on site in New Haven.  Each in-person session was approximately three to four hours in length, which was necessary to explain to witnesses unaccustomed to litigation what they could expect on direct- and cross-examination, to understand their role, and to respond to their questions about the consequences of testifying. This preparation also required us to review dozens of documents for each witness, including their personnel files, disciplinary records, and performance evaluations, so that they would know what to expect on cross-examination.

56.     Many witnesses traveled from outside New Haven for the trial.  To limit the amount of time that each witness needed to lose from work and other personal obligations, we tried to complete all preparation close to each witness's testimony.  Nearly all of the client preparation occurred over the course of seven days, which overlapped with the opening days of trial.  Witness preparation involved a total of over 60 hours of live work with Class Counsel's clients.

57.     Simultaneously, our team worked on their opening statement and extended cross-examinations of Heidi Josephson and Timothy Bartl, whom they called during their case-in-chief, and continued briefing jury instructions and dispositive motions throughout the trial.  This required the participation of multiple attorneys, who needed to be knowledgeable about Plaintiffs' theory of the case and actively engaged in the trial so that they could effectively coordinate their work.

**Special Master process**

58.    In January 2019, the Court appointed D. Charles Stohler as Special Master to oversee the comprehensive extraction and audit of CSC's timekeeping and Human Resources Information Systems data.  Additional information regarding the Special Master process is included in the Declaration of Todd Jackson in Support of Class Counsel's Motion for Attorneys' Fees and Costs.

59.    Returning to reasonably trustworthy datasets sufficient to reliably calculate damages required hundreds of hours of our team's time, in addition to time spent by CSC data personnel, forensic experts, and the Special Master.

**Plaintiffs' Settlement efforts**

60.    Plaintiffs extended numerous settlement invitations to CSC both prior to and during this litigation.   On March 6, 2014, approximately four months before filing the action, Plaintiffs wrote CSC to request a discussion about informal resolution, expressing a hope of "reaching an early resolution of these claims before a great deal of time and expense is incurred," and encouraging CSC "to avoid costly litigation."  **Exhibit K** (March 6, 2014 letter from J. Sagafi to W. Deckelman, CSC's General Counsel).  Plaintiffs received no response to this letter.

61.    In summer 2015, our team again proposed mediation to CSC.  We proposed various mediators to CSC with various dates, and CSC agreed to mediate with Hunter R. Hughes III on December 8, 2015.  No settlement was reached during the mediation.

62.    During the first half of 2016, we requested that CSC produce additional information to assist in negotiations, periodically urging CSC to respond to our overtures.  The parties exchanged settlement demands and offers.  The case did not settle despite the substantial

time we spent between May 2015 and April 2016 – the period in which the parties conducted thousands of hours of class certification and merits discovery – attempting to resolve the case.

63.     In May 2017, our team explored additional mediators to attempt to break the settlement discussions logjam.  In their July 14, 2017 status report, Plaintiffs noted: "Plaintiffs are willing to attend a mediation with CSC at any date in July or August."  In the days leading up to that filing, we had provided CSC with the text of a joint status report including the statement, "The parties propose a deadline of _____ for their next mediation session and propose using _____ as the mediator," expecting CSC to fill in the blanks, but CSC would not agree to choose a mediator or set a mediation deadline.

64.     We continued to ask CSC to agree to mediation throughout the leadup to trial, for example asking for a response in July 2017 and again in September 2017.

65.     In October, CSC agreed to a November 7, 2017 mediation in Atlanta with Mr. Hughes.  CSC then proposed that the mediation be postponed, so we agreed to move the mediation to November 21, 2017; at the same time, CSC proposed to delay the start of trial. Two business days before the November 21 mediation, CSC canceled the mediation.  We were unable to successfully engage in productive dialogue with CSC about settlement until after trial.

66.     In April 2019, we again approached CSC about mediation.  The parties agreed to mediate with Mr. Hughes in Atlanta on May 29, 2019.  Plaintiffs proposed exchanging mediation briefs; CSC declined.

67.     Since that time, Plaintiffs have continued to contact CSC directly and through Mr. Hughes in an effort to keep settlement discussions alive, with limited success.

68.     Plaintiffs remain open to settlement discussions.

**Class Counsel's Ongoing Responsibilities to Class Members**

69.     Since the December 2017 trial, our team has spent dozens of hours regularly updating their clients about the status of the case and its post-trial proceedings and responding to their inquiries.  Although the Class members have shown enormous patience throughout this period, we have received over 230 communications from clients seeking more information about the case and when they can hope to see a recovery.

70.     We anticipate that our work on behalf of the Class will continue, including opposing CSC's anticipated appeal.

**O&G's lodestar**

71.     As of today, my firm has expended 12,066.7 hours on this matter for which we seek recovery, with work still continuing.  The firm's total lodestar for these hours amounts to $5,574,548.50.

72.     O&G ordinarily and regularly bills clients on an hourly fee basis, based on each attorney's standard hourly rate.  O&G's rates range from $550 to $1,200 per partner's hour, $650 to $900 per counsel's hour, $290 to $600 per associate's hour, $250 per law clerk's hour, and $240 to $285 per paralegal's hour.  My current hourly rate is $900 per hour.  The firm's clients regularly accept and pay O&G's hourly rates, and we have no shortage of hourly work; thus, when O&G attorneys work on contingent matters, like this one, they come at an opportunity cost because those hours cannot be spent on matters where the payment of fees is guaranteed.

73.     These rates are my firm's current billing rates and are supported by our extensive and specialized experience in these types of cases and our recognized expertise.  Our rate structure has been approved by other courts and has been paid to our firm by hourly-paying clients.

29

74.     I have personal knowledge of the hourly rates charged by other attorneys with comparable experience as well as the attorneys within the firm who worked on this matter. Based on that information, I believe that these rates are fully consistent with rates of attorneys specializing in complex litigation around the country.  Based on the information I have, I believe the rates charged by O&G for its partner and non-partner attorney time are reasonable and appropriate fees for those with comparable expertise, experience, and qualifications.

**Class Counsel's costs**

75.     O&G maintains records regarding litigation expenses incurred on each case.  I have reviewed the records of litigation expenses incurred in this matter.  According to our records, our firm has incurred approximately $399,081.05 in costs as of today.  This amount includes costs attributable to telephonic conferences, copies, travel, and expenses associated with the preparation, research, and filing of the papers in this matter.  O&G typically charges these types of expenses to our clients, including those who pay out of pocket.  To date, we have not received any reimbursement for the monies expended to cover these costs.  In addition, LCHB has incurred $107,114.50 in out-of-pocket costs, FJWW has incurred $28,180.99 in out-of-pocket costs, and Susman, Duffy & Segaloff, P.C. has incurred $825.00 in out-of-pocket costs. Taken together, Class Counsel's outlay of litigation-related expenses totals $535,201.54.

**Class Counsel's lodestar**

76.     Total Lodestar amount.  Class Counsel's Total Lodestar in this matter is $10,682,429.50.  This Total Lodestar Amount reflects time actually spent by Class Counsel consistent with their customary billing rates.

30

77.   <u>Detailed Time Entries.</u>  In connection with this application, Class Counsel have undertaken a thorough audit of their time entries and, in addition to usual billing judgment associated with reviewed time entries, have excised the following:

a.   <u>Complete elimination of all time billed by certain timekeepers.</u>  All of Class Counsel except Susman Duffy have eliminated entries by timekeepers who billed fewer than 10 hours total, even though those attorneys and staff have contributed meaningfully to the case by lending expertise that enabled efficient use of case resources, providing legal insight that make legal research more efficient, stepping in to assist with filings, consult on discrete topics such as electronic discovery efficiencies, and lend other assistance.   This cooperative work was often necessary when other team members were unavailable (e.g., due to conflicting assignments, parental leave, or other obligations) or when specialized skill or knowledge was helpful.  In addition, LCHB has eliminated all entries for additional timekeepers.

b.   <u>Elimination of time entries with insufficient detail.</u>  In addition, we have eliminated time entries with insufficient detail to allow a reader to understand what useful work was being performed.

c.   Attached hereto as **Exhibit Q** is a report showing all Detailed Time data.

78.   <u>Reduced Lodestar amount.</u>  In connection with this application, we have proposed additional reductions, as follows:

d.   We have reduced all travel time by 50%.

e.   We have eliminated all time spent on depositions of individuals who only worked in the Senior Professional SA job title%.

f.   The resulting amount is the "Reduced Lodestar" (i.e., all Detailed Time data minus these reductions).

**Demonstratives**

79.     In connection with this application, we have prepared several tables and charts to assist the Court in its review of the time entries.  These exhibits reflect the Detailed Time data. To provide the Court with useful metrics concerning our expenditure of time, **Exhibits C**, **D**, **H**, and **I** categorize Class Counsel's time entries into the following categories:

a.     Investigation, Factual Research, and Class Member Correspondence
b.     Written Discovery
c.     Depositions
d.     Document Review
e.     Legal Research and Writing, Drafting Pleadings, and Briefing Non-Discovery Motions
f.     Litigation Strategy and Case Management
g.     Court Conferences and Appearances
h.     Settlement
i.     Travel
j.     Special Master Damages
k.     Trial

80.     We have made our best effort to categorize each of the approximately 22,000 time entries consistently among these categories.  This process requires certain judgment calls and is necessarily imperfect because of overlap between categories, so it is likely that there is slight variation and even instances where one could reasonably argue that a particular time entry should be in a different category.

81.     In total, the classes and collective in this case comprise 911 System Administrators.  258 of those SAs, or 28.3% of the total, are members of the California class. 182 of the SAs, or 20% of the total, are members of the Connecticut class.  The remaining 471 Plaintiffs, comprising 51.7% of the total, are members of the FLSA collective who are not members of either class.

**Exhibits**

82.      Attached hereto as **Exhibit A** is a listing of O&G attorneys who performed less than 100 hours of work on this matter, containing biographical information.

83.      Attached hereto as **Exhibit B** is a listing of O&G staff members who performed work on this matter, containing biographical information.

84.      Attached hereto as **Exhibit C** is Class Counsel's **Lodestar by Seniority of Timekeeper Report.**

85.      Attached hereto as **Exhibit D** is Class Counsel's **Lodestar by Seniority of Timekeeper Graph.**

86.      Attached hereto as **Exhibit E** is a true and correct copy of excerpts from the deposition of Scott Creasy, taken in this matter.

87.      Attached hereto as **Exhibit F** is a true and correct copy of excerpts from the deposition of Brian Fillebrown, taken in this matter.

88.      Attached hereto as **Exhibit G** is a true and correct copy of excerpts from the deposition of Frank Cebula, taken in this matter.

89.      Attached hereto as **Exhibit H** is Class Counsel's **Hours Worked, by Phase of Litigation Report.**

90.      Attached hereto as **Exhibit I** is Class Counsel's **Lodestar, by Phase of Litigation Report**.

91.      Attached hereto as **Exhibit J** is Class Counsel's **Hours Worked, by Phase of Litigation Graph**.

92.      Attached hereto as **Exhibit K** is a true and correct copy of a March 6, 2014 letter sent from J. Sagafi to W. Deckelman, CSC's General Counsel

93.     Attached hereto as **Exhibit L** is a true and correct copy of excerpts from the April 1, 2015 hearing before this Court.

94.  Attached hereto as **Exhibit M** is a true and correct copy of the Court's order in *Roseman v. Bloomberg L.P.*, No. 14 Civ. 2657, ECF Nos. 540; 533 at 22; 337 at 8 (S.D.N.Y.)

95.     Attached hereto as **Exhibit N** is Class Counsel's **Lodestar Summary Report**, which shows the hours and lodestar recorded by each timekeeper, with their position, year of law school graduation, and hourly billing rate

96.     Attached hereto as **Exhibit O** is Class Counsel's **Cost Summary Report**.

97.     Attached hereto as **Exhibit P** is Class Counsel's **Detailed Cost Report**.

98.     Attached hereto as **Exhibit Q** are Class Counsel's **Detailed Time Entries**.

I declare under penalty of perjury, under 28 U.S.C. § 1746, that the foregoing is true and correct.


Dated:  September 18, 2019
        Oakland, California                           _____

                                                           Jahan C. Sagafi