**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOSEPH STRAUCH et al, individually and on behalf of all others similarly situated | : | |
| Plaintiffs, | : | CIVIL ACTION NO.: |
| v. | : | 3:14-cv-956 (JBA) |
| COMPUTER SCIENCES CORPORATION, | : | |
| Defendant. | : | October 10, 2019 |

**REPORT AND RECOMMENDATION**

## I. INTRODUCTION

In the Ruling on Report and Recommendation of Special Master, the Court addressed Defendant's objection to the Special Master's recommendations related to the role of Plaintiff's expert and their fees:

> The Court's January 18, 2019 Order directed Defendant to 'provide all needed access to Plaintiffs' forensic expert, whose fees and costs are to be borne by Defendant, to enable him or her to adequately audit the Defendant's data restoration and retrieval process.' ([Doc. # 487] at 1). The original Order of Appointment did not expressly discuss the Special Master's authority to adjudicate any dispute over Plaintiffs' expert fees, because the Court did not contemplate that such ancillary litigation would result. Given the Special Master's deep familiarity with the subject matter at hand, the Court hereby amends the Order of Appointment to authorize the Special Master to determine the reasonableness of Plaintiffs' expert's fees and costs pursuant to Rule 53(a)(1)(C), with both parties retaining their rights under Rule 53 to challenge any resulting Report and Recommendation issued by the Special Master. Because Rule 53 requires that any amendments to an order of appointment be made 'after notice to the parties and an opportunity to be heard[,]'Fed. R. Civ. P. 53((b)(4), the parties shall have seven days to file any objections to this amendment.

(Doc. # 514 at 9). The parties did not object to the amendment to the Order of Appointment.

The only issue addressed in this Report and Recommendation is the reasonableness of Plaintiffs' expert fees and costs. The Special Master convened the parties for a conference on August 20, 2019 to establish a schedule for addressing the expert fees and costs issue. The parties submitted simultaneous briefs on September 4, 2019 and reply briefs on September 18, 2019. The Special Master held a brief conference call on September 24, 2019 to address questions and clarify issues. Plaintiffs submitted an additional Declaration of one of the individuals on Plaintiffs' expert's staff on September 27, 2019. Defendant did not respond to the additional Declaration.

## II. PRIOR REPORT AND RECOMMENDATION

In the initial Report and Recommendation ("R&R I," Doc. # 503), the Special Master summarized the role of Plaintiffs' expert:

> The Court's Order requires Defendant to "provide all needed access to Plaintiffs' forensic expert to enable him or her to adequately audit Defendant's data restoration and retrieval process." (Doc. # 487). Plaintiffs hired expert Daniel Regard and Intelligent Discovery Solutions, Inc. ("iDS"). Working with Mr. Regard were Jimil Patel, Molly Adams, Eddie Siu, Alex Antonov and Nina Cortiella. Defendant identified in-house subject matter experts, principally Stephanie McFarlane . . . . Most of the conference calls listed above included Plaintiffs' expert, and the Special Master often spoke directly with the individual expert(s). . . . (Doc. # 503 at 5).
>
> Plaintiffs' expert iDS expended significant effort throughout this process, often outside of business hours and on weekends, because of the aggressive deadlines, the several different systems used by Defendant during the relevant period, the unavailability of Defendant's personnel who provided the original data, and the location of counsel in a different time zone. Daniel Regard, Jimil Patel and other iDS personnel spent numerous documented hours on Skype and conference calls auditing the data. Approximately one month into the Special Master process, Mr. Regard sent to the Special Master a six-page detailed summary of the difficulties in auditing the data exchanged to date. (Exhibit 4). In relevant part, Mr. Regard summarized the issues which made this data retrieval exercise challenging and time-consuming:
>
> 1. None of the original data extractions were properly documented (we do not know today what was done then).

2. None of the original data extractions were properly audited.
3. None of the people who performed the original data extractions are working on the new extractions.
4. The current "class-list" was derived from the damages spreadsheet, which, in turn, was derived from the CSC-produced 2017 hourly data.
5. It is not clear what list or method was used to extract the 2017 hourly data.
6. It is not clear if or how the original substitute employee numbering system was relied upon or impacted the original data extractions but we know that this system ultimately created data integrity issues and has since been abandoned.

Mr. Regard's Report summarizes many additional issues that were found for the first time in this Special Master process. (Doc. # 503 at 8-9).

Defendant objected to the Plaintiffs' expert being involved in the damages calculation process. This prompted the Special Master to decide in the April 2, 2019 Summary of the Call:

> The expert's involvement in the class list process is appropriate and part of the data extraction and retrieval process. However, that is not true for the damages calculations process, as Plaintiffs' counsel agrees. Thus, Plaintiffs' expert should ensure that its invoices clearly itemize their services and do not seek reimbursement from Defendant for any work in the damages calculations phase. (Doc. # 503 at 9)

Plaintiffs' expert submitted four invoices: one dated March 26, 2019 for services through February 28, 2019 in the amount of $41,122.50; one dated May 8, 2019 for services through March 31, 2019 in the amount of $82,884.00; one dated May 28, 2019 for services through April 30, 2019 in the amount of $75,615.00; and one dated August 7, 2019 for services through May 31, 2019 in the amount of $30,229.50.[1] The invoices total $229,851.00 Plaintiffs' expert has not received payment for any of their services.

Defendant never objected to the hiring of iDS or Mr. Regard nor did it object to the invoices until late May. The first time Plaintiffs' expert's fees and costs were raised was during a conference call with the Special Master on May 21, 2019.

[1] The Special Master had not seen the fourth invoice dated August 7, 2019 at the time R&R I was issued.

In the R&R I the Special Master further found:

> The Special Master notes that this process is unique in that the Court required the Defendant to pay for the services of Plaintiffs' expert, much of which were performed under the oversight of the Special Master. (Doc. #s 487, 493). The Special Master has had hours of direct involvement with Plaintiffs' expert(s) and has seen many e-mails, reports and supporting documentation prepared by iDS during the data retrieval and exchange process. The invoices reflect that work and do not charge for services on the damages calculations. There is no question the iDS expert(s) must be paid because their work has been critical to verifying the data restored and produced during this process. They have not exceeded the role expected by the Court of "essentially accompanying the surgeons in the operating room and seeing what they're doing and being able to recount for the Court whether the process is one that has reasonable reliability. The forensic expert is, in other words, something like an auditor." (Doc. # 493, p.41).

Although Defendant continues to challenge that Plaintiffs' expert exceeded the role the Court intended and impermissibly worked on damages issues, this Report and Recommendation ("R&R II") does not address those points. The scope of the expert's authority and their role in this process already have been decided and accepted by the Court; it is the law of the case. (Doc. # 514 at 9). This R&R II is limited to determining the reasonableness of the expert's fees and costs.

## III. PARTIES' POSITIONS

### A. Plaintiffs

Plaintiffs submit that Defendant should pay iDS the full amount of $229,851 because iDS efficiently and carefully performed the work the Court ordered it to do; did so at appropriate hourly rates; and never exceeded the scope of the work required by the Court or the Special Master. Plaintiffs repeatedly emphasize that the Court's order for Defendant to pay Plaintiffs' expert results from Defendant's <u>own</u> failure to produce accurate data or to disclose its data errors before January 2019. They submit the Special Master process worked and allowed the parties to agree on the damage amount to the penny, which the Court has ordered.

Plaintiffs argue that the extensive effort and hours spent by counsel, Plaintiffs' expert, Defendant's in-house personnel and the Special Master resulted from numerous factors including those summarized by Mr. Regard (infra. at 3.); many issues that arose for the first time in the Special Master process; and Defendant's lack of cooperation and repeated refusal to provide necessary data or access so that the experts could properly audit the process.

Plaintiffs' support the rates charged by the individuals working for iDS by providing evidence of the factors usually used by courts to determine the reasonableness of experts' fees. See *Silberman v. Innovation Luggage, Inc.*, 2002 WL 1870383 (S.D.N.Y. 2002). This includes the curricula vitae of the individuals involved, highlighting their training and expertise; the breadth of iDS' practice and its ability to handle this complex multi-state assignment; evidence of other engagements and rates received; and evidence of the rates of comparable vendors. Plaintiffs also respond with specific examples to counter Defendant's claims of block billing, vague entries, or duplication of effort.

**B. Defendant**

Defendant claims that Plaintiffs have not met their burden of establishing the reasonableness of the expert's rates and fees. It argues that the invoices show the overstaffing of the case and include billing practices, such as block billing and vague entries, that make it impossible to determine how time was spent. Defendant also challenges staffing inefficiencies and administrative tasks for which they claim the Company should not be responsible. It also claims that iDS did not have the necessary expertise to do the HRIS-related functions using the SAP (P42 and P44) and Workday systems. Defendant agrees it will pay for the expert's reasonable fees, but not a blank check. It claims it is entitled to a proper assessment of what is reasonable.

Defendant cites the same basic factors as Plaintiffs for what courts in the Second Circuit use to determine the reasonableness of an expert's fees. *Cottrell v. Bunn-O-Matic Corp.*, 2014 WL 1584455 (D. Conn. 2014). It contends that the rates are excessive and not consistent with the local Connecticut market. It challenges specific entries related to damages, administrative time and duplicative or unnecessary work.

## IV. ANALYSIS

In addition to reviewing the parties' submissions, responses, relevant exhibits, and the relevant legal standard,[2] the Special Master analyzed each of the four invoices in detail. The Special Master recommends that revisions be made to the amounts charged based on this detailed review and personal knowledge of the work done. The Special Master also has cross-checked the invoices against the work done by iDS during the various phases of the four-month process by reviewing the status call summaries and the numerous e-mails, reports, and spreadsheets done by the individual consultants at iDS. These recommended revisions result in reductions to the total amounts charged in the hours and/or rates for each of the individual consultants. The total amount due iDS should be $204,093.28. The revisions and calculations are summarized on Attachment A.

[2] Both parties cite the applicable Second Circuit standard for determining the reasonableness of an expert's fee: (1) the witness's area of expertise; (2) the education and training that is required to provide the expert insight which is sought; (3) the prevailing rates of other comparably respected available experts; (4) the complexity of the discovery responses provided; (5) the cost of living in the particular geographic area; and (6) any other factor likely to be of assistance to the court in balancing the interests implicated by Rule 26. *Cottrell v. Bunn-O-Matic Corp.*, 2014 WL 1584455 (D. Conn. 2014). (citations omitted). In addition, courts look to (1) the fee actually being charged to the party who retained the expert; and (2) fees traditionally charged by the expert on related matters. *Conte v. Newsday, Inc.*, 2012 WL 37545, at *2 (E.D.N.Y. 2012); *see Silberman v. Innovation Luggage, Inc.*, 2002 WL 1870383 (S.D.N.Y. 2002).

### A. The Special Master's Findings

1. As set forth in Report and Recommendation I, there is no question that the iDS personnel worked diligently and often on nights and weekends to meet the aggressive deadlines set by the Court and the Special Master. The Special Master strongly emphasizes that iDS did not exceed their role as auditors nor were they involved in the damages calculations. The challenge by Defendant that there were references to work on damages on two February entries by Mr. Patel at the onset of the project are de minimis and do not violate the Special Master's direction that there should be no billing by iDS for damages matters. Those entries were reasonable background for the project and happened well before the Special Master emphasized that damages were not part of iDS' role.

2. Plaintiffs are correct in asserting that the reason for this entire Special Master process was because of Defendant's error. Had the Company properly documented its procedures in producing the original class list, much of the work done by Plaintiffs' experts (and by counsel and the Special Master) might have been unnecessary. The Report prepared by Mr. Regard on March 1, 2019 (quoted above at 3) summarizes the key failings during the production of the relevant data. Much iDS work was necessary to recreate the reasonably reliable data working with the current CSC personnel.

3. The Special Master agrees with Plaintiffs that this process was more extensive than originally expected because of the pattern of new issues and challenges that arose during this process. Although it was not a surprise that new matters arose, many matters were raised by Defendant that should have been raised much earlier in the litigation. For example, the parties and the Special Master spent much time and effort on whether to exclude employees from the class list who worked for legal entities other than Defendant (the called "non-CSC entities"), particularly

the subsidiary entitled Covansys. That issue was not raised either before or during the trial, yet during this Special Master process, it was vigorously debated and required significant additional effort on both sides. Ultimately it led to briefing and a detailed decision by the Special Master, which was confirmed by the Court. (Doc. # 514 at 3). The Court noted Defendant's lateness in raising this issue including that it was never raised in any of the *three* motions to decertify the class.

Defendant also challenged the inclusion of employees who worked at non-U.S. CSC entities. This forced the parties and the experts to do additional analyses, including of the GDPR Privacy Standards in the European Union. Likewise, the parties devoted attention to the applicability of the FLSA Highly Compensated Employee exemption, which Defendant ultimately withdrew. These examples, as well as several others, show that many of Defendant's own actions served to lengthen this process and created additional work for counsel and their expert(s).

4. The amount of expert time required was compounded by Defendant's decision not to hire its own expert, but rather to use a series of in-house CSC "experts." However, on numerous occasions, those in-house experts had limited availability because they were doing their full-time jobs. This served to delay the process and undoubtably added to the time spent by Plaintiffs' experts in the communication process. Equally as important, Defendant did not make available anyone who was familiar with the prior data production process, so it is not surprising that Plaintiffs' expert's efforts often were not immediately successful.

5. Defendant argues that Plaintiffs had knowledge of the appropriate systems but hired the wrong expert, or should have hired another expert to handle the SAP systems, including P42, P44 or Workday systems. When Plaintiffs' were required to hire an expert for this job, they considered firms with the necessary breadth to handle the complexity of the several systems

involved. Doing so required a larger firm such as iDS, which is located near the CSC headquarters in Virginia. Defendant's argument that Plaintiffs' should have hired a local Connecticut firm is unpersuasive given the fact that the class and collective involved approximately 1,000 employees and included California and Connecticut class members.

6. Finally, it bears noting that, on balance, Defendant derived a benefit from the Special Master process because the "reasonably reliable" data led to the agreed-upon damages amount, which likely was substantially less than the damages amount would have been had inferences been necessary. *Anderson v. Mt. Clemons Pottery Co.*, 328 U.S. 680, 687-88 (1946). Plaintiffs' Status Report on Damages filed before the Appointment of the Special Master on January 16, 2019 states that the difference in the parties respective damages calculations stood at "approximately $15 Million for CSC and $31 Million for Plaintiffs." (Doc. # 485 at 3.); see Defendant's Status Report. (Doc. # 484).

**B. Review of Amounts Charged for Individual iDS Consultants**

The Special Master has completed a detailed review of the invoices and recommends that the amounts charged for each individual iDS consultant be revised as follows:

1. Daniel Regard

As the CEO and Founder of iDS, Mr. Regard's role in this process was appropriate. He participated in the initial conferences to establish the scope and outline of the project. The hours charged by Mr. Regard reflect justified oversight including assigning the right personnel and participating at key times. Plaintiffs' have submitted evidence supporting the request for the $700 hourly rate, including Mr. Regard's own declaration about his rates and other contracts done by iDS. In a recent anti-trust litigation in Philadelphia, in February 2019, the court approved a rate of

$650 per hour for Mr. Regard as a Special Discovery Master. That rate is appropriate here. The amount charged for him should be 79.9 hours times $650 or $51,935.

2. Jimil Patel

Mr. Patel did the majority of the work on this assignment and capably responded to many different tasks, including requests and questions directly from the Special Master. Defendant claims that Mr. Patel's work often involved strategy or similar matters that should be reduced because it was duplicative of others. Mr. Patel's billing entries are very detailed although there are some entries that reflect internal conferences to "catch up" or "follow up" with others or for "transition" or vacation reasons. These are discussed in more detail below and reductions recommended in the corresponding entries of other consultants.

There are two entries for February 20 and 21, 2019 where Mr. Patel's regular rate of $335 was mistakenly entered at $285. Plaintiffs' have not sought to increase the amount charged for these entries.

Mr. Patel's rate appears to be competitive based on his level of experience and the services he performed. The Special Master recommends that Mr. Patel's hours be reduced by 5% to reflect the internal work with others on the iDS staff. Mr. Patel's total hours submitted of 338.2 hours should be reduced to 321.3. The amount charged for him should be 321.3 hours times $335 for a total of $107,635.50.

3. Molly Adams

Ms. Adams' work appears to be more in the nature of an assistant providing support functions, and the rate charged for her should be reduced by 25%. For example, her entry for February 27, 2019 is "learning back-end and task nuances from Jimil." Similarly, on March 5, 6 and 7 2019, her entries reflect "assisting Jimil" in various tasks. See entry of March 25, 2019

where she charged two hours to attend "Data Extraction meeting to serve as Jimil's backup." Ms. Adams also charges for her participation in the Special Master calls and internal conferences. (e.g., March 1, March 5, March 6, April 2). Although Ms. Adams likely was performing important support functions, the Special Master does not recall Ms. Adams speaking more than once, if at all, during the conferences.

The majority of Ms. Adams' total hours were on support functions, such as assistance or back up, and her rate should be reduced as a result. She did not appear to provide the same level of expertise and services compared to her iDS colleagues whose rates are very similar. ($335 is the rate submitted for both Mr. Patel and Mr. Siu.) The amount charged for her should be 34.5 times $247.50 for a total of $8538.75.

4. Eddie Siu

Mr. Siu provided what appears to be "backroom" functions. Typical entries have him "loading data." See e.g., March 28, 29 and 30, 2019. The charges for those three days alone exceed 13 hours. See also the charges for 14.4 hours in the entries for April 1 and 2. He submitted a total of 59.9 hours in an eight-day period from March 27, 2019 until April 4, 2019. Mr. Siu's functions were necessary, but the nature of his work, based on the tasks detailed, justifies a reduction in his rate of 15% when compared to the work of the lead consultants and the data supplied by Plaintiffs on rates of other firms. The amount charged for Mr. Siu should be 59.9 times $284.75 for a total of $17,056.53.

5. Alexandre Antonov

Mr. Antonov began working with iDS in 2019, and he first appears on the invoices in this case for time worked in April. Many of his entries appear to be internal. For example, on April 2, 2019, his entry is "kick-off conference call"; on April 16, 18, 22, 23 and 26, 2019, the entries state

"conference call with J. Patel to transition matter for vacation coverage." These internal calls total 7 hours and should be removed from his total hours submitted. In addition, Mr. Antonov's hourly rate is $450, which is higher than the other consultants, apparently based on his experience at other companies. Although he has more than 20 years' experience, the work detailed in these invoices and the evidence he offers in the Declaration he filed on September 27, 2019 do not support an hourly rate of $450. Given that he was apparently doing the work that would have been done by Mr. Patel but for Mr. Patel's vacation, the appropriate rate for Mr. Antonov is $335 per hour. Defendant should not pay more because of iDS' convenience. The amount charged for Mr. Antonov should be 63.5 less 7 hours; 56.5 hours times $335 equals $18,927.50.

6. Other Consultants

The work of consultants Bill Tober and Nina Cortiella should be disregarded and removed from the invoices.

The Summary of the reductions in hours and rates is on Attachment A. These amounts should be paid immediately.

## V. CONCLUSION

Based on the above analysis, the Special Master recommends that the Court order the payment of fees and costs to Plaintiffs' expert, iDiscovery Solutions, Inc., in the total amount of $204,093.28. These amounts should be paid within 14 days of any Order by the Court adopting this Report and Recommendation given the delay since the services were rendered.

Pursuant to the Court's orders, any objections by the parties to this Report and Recommendation II must be filed with the Court within seven days of the filing of this Report and

Recommendation, with any responses filed within seven days of the filing of the objection. The failure to file a timely objection shall constitute a waiver of any objection. (Doc. # 501).

Respectfully submitted,

D. Charles Stohler
Special Master
Carmody Torrance Sandak & Hennessey LLP
195 Church Street, P.O. Box 1950
New Haven, CT 06509-1950
(203) 777-5501
Email: cstohler@carmodylaw.com
Federal Bar # ct07816

**CERTIFICATION**

I hereby certify a copy of the foregoing was filed electronically on the above date. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

D. Charles Stohler