UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____
                                        :
Joseph Strauch and Timothy Colby,       :
on behalf of themselves and all those   :
similarly situated                      :     CIVIL NO.: 3:14-cv-956 (JBA)
                    Plaintiffs,         :
v.                                      :
                                        :
Computer Sciences Corporation           :
                    Defendant.          :     October 16, 2019
_____:

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PROTECTIVE ORDER AND TO SUBMIT DETAILED TIME AND
EXPENSE RECORDS UNDER SEAL**

## I.    INTRODUCTION

Defendant Computer Sciences Corporation ("CSC") respectfully objects to Plaintiffs'
Motion for Protective Order and to Submit Detailed Time and Expense Records Under Seal
("Pls.' Mot."). Plaintiffs' counsel's vague time records are not protected by attorney-client
privilege or the work-product doctrine, and the public has a strong interest in access to these
documents. To the extent that the Court finds any time entries to be privileged because the entries
are specific enough to demonstrate actual attorney strategy, Plaintiffs can simply redact such
entries rather than requiring a protective order or filing under seal. Accordingly, Plaintiffs' motion
must be denied.

## II.    ARGUMENT

### A.  There is Not a Clear and Compelling Reason To File The Time Records Under Seal.

Plaintiffs' motion has a high burden that they cannot meet. The party seeking the sealing
of records must make "a particularized showing of good cause as to why the court should depart
from the strong presumption against sealing any court records to public inspection." *Suntoke v.*

*PSEG Power Conn., LLC*, No. 3:06-CV-01520(JCH), 2007 U.S. Dist. LEXIS 35888, at *1 (D. Conn. May 16, 2007)[1]; *see also Gardner v. Univ. of Conn. Health Ctr.*, No. 3:12-CV-1168 (CSH), 2013 U.S. Dist. LEXIS 163784, *8 n.4 (D. Conn. Nov. 18, 2013) (noting that judicial documents subject to this presumption include "those filed in support of motions"). Thereafter, the Court must make "particularized findings demonstrating that the sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons." D. Conn. L. R. Civ. P. 5(e)(3). In making such findings, the Court "must carefully and skeptically review sealing requests to insure that there is really an extraordinary circumstance or compelling need." *Video Software Dealers Ass'n v. Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir. 1994). As discussed below, there is not a clear and compelling reason to seal Class Counsel's time records.

### 1.   The Public Has a Strong Interest in Access to Records in a Class Action.

The public's interest in access to the documents at issue supports a denial of Plaintiffs' motion to file under seal. "Rooted in both the common law and the First Amendment, there is a strong and well-established presumption of public access to judicial documents . . . ." *CSL Silicones, Inc. v. Midsun Grp., Inc.*, No. 3:14-CV-1897 (CSH), 2017 U.S. Dist. LEXIS 189918, at *2 (D. Conn. 2017). The Court should honor this "strong" presumption against sealing court records absent "existence of extraordinary circumstances or a compelling need to seal from public view." *Suntoke*, 2007 U.S. Dist. LEXIS 35888, at *2–3; *see also United States SEC v. Ahmed*, No. 3:15cv675 (JBA), 2017 U.S. Dist. LEXIS 213773, at *4–5 (D. Conn. Sept. 19, 2017) (denying motion to seal where party failed to identify why the information was confidential and "why this information must be kept from the public despite the presumption of access").

---

[1] Copies of all unreported cases are attached as <u>Exhibit 1</u>.

This presumption is especially strong in the class action context, as in *In re Check Point Software Techs. Ltd. Secs. Litig.,* No. 03 Civ. 6594, 2007 U.S. Dist. LEXIS 45579, at *4–5 (S.D.N.Y. 2007), the court rejected a motion to file time records under seal, citing the "public interest in the fair administration of class actions [which] is better served if these documents are available for public inspection and scrutiny." *See also Andrews v. Blick Art Materials, LLC*, 286 F. Supp. 3d 365, 387 (E.D.N.Y. 2017) (indicating that the presumption of public access demands less weight in the case of an injunction, which is akin to an individual settlement, than in the context of multidistrict class actions "involving thousands of claimants and millions of dollars"); *Schwab v. Philip Morris USA, Inc.*, 228 F.R.D. 165, 168 (E.D.N.Y. 2005) ("The courts discourage unnecessary sealing particularly in a matter of public interest such as a national class action."). In light of the generally applicable presumption against sealing court documents and the enhanced public interest in access to class action records, Plaintiffs' motion to submit detailed time and expense records under seal should be denied.

### 2. Class Counsel's Vague Time Records Are Not Protected By Attorney-Client Privilege or The Work-Product Doctrine, Nor Are They Confidential Business Communications.

"The Second Circuit has 'consistently held that, absent special circumstances, client identity and fee information are not privileged. . . . While consultation with an attorney, and payment of a fee, may be necessary to obtain legal advice, their disclosure does not inhibit the ordinary communication necessary for an attorney to act effectively, justly, and expeditiously.'" *Bernstein v. Mafcote, Inc.*, 43 F. Supp. 3d 109, 114 (D. Conn. 2014) (quoting *In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d 238, 247–48 (2d Cir. 1985)). Thus, time records do not fall within the attorney-client privilege "unless they 'reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as

researching particular areas of law . . . .'" *Id.* (quoting *Bria v. United States*, No. 3:00CV1156(CFD), 2002 U.S. Dist. LEXIS 7306, at *16–17 (D. Conn. Mar. 20, 2002)).

The attorney-client privilege is invoked by showing: "(1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *United States v. Construction Prods. Research*, 73 F.3d 464, 473 (2d Cir. 1996). Although courts have sealed materials, or portions thereof, containing attorney work-product, confidential settlement negotiations, as well as material subject to the attorney-client privilege, the Plaintiffs have not made a particularized showing that such justifications are applicable here. *See Travelers Indem. Co. v. Excalibur Reinsurance Corp.*, No. 3:11 - CV- 1209 (CSH), 2012 U.S. Dist. LEXIS 200282, at *31 (D. Conn. May 10, 2012). Despite Class Counsel's self-serving allegations that the time records at issue are "detailed" and contain "prevalent" attorney-client communications, the records are not "detailed" at all. The records are comprised of exceedingly vague entries that are not privileged.

For comparison purposes, the Second Circuit found that a time entry stating "Calls with B. Hopkins" was not privileged, as it was not detailed and failed to provide information about strategy or other legal services. *DiBella v. Hopkins*, 403 F.3d 102, 120 (2d Cir. 2005). The following entries have also been found to be non-privileged: "Research re National Labor Relations Act" and "correspondence 're employment issues and reduction in force.'" *Bernstein*, 43 F. Supp. 3d at 115. An overwhelming number of Class Counsel's time entries strongly resemble these non-privileged entries. Some of the many examples include:

1. "Internet witness research; draft complaint; prepare for team meeting." (Time entry 7999).[2]
2. "Telephone conference with potential client." (Time entry 8015).
3. "Legal research for class certification." (Time entry 4616).

---

[2] See Docket Entry No. 522 for all time entries cited herein, as they are part of Exhibit Q to Declaration of Jahan C. Sagafi, which was filed as a sealed document.

4. "Class cert drafting and research" (Time entry 411).
5. "Settlement Research and Calls" (Time entry 581).
6. "Class member inquiry." (Time entry 5118).
7. "continue research for opp to mot to decertify" (Time entry 1018).
8. "Damages research" (Time entry 1232).
9. "CSC appeal strategy" (Time entry 1578).
10. "Plan for next steps after hearing" (Time entry 1543).
11. "Research and edit fee petition." (Time entry 22207).

Attorney-client communications cannot be discerned from these nondescript time entries, which solely contain a generic description of the services provided. These are the same services that anyone viewing the docket and the various filings would be able to discern. For example, viewing the docket would show that Plaintiffs' counsel filed a motion for class certification, and one would further assume to file that motion Plaintiffs would need to conduct "[l]egal research for class certification" and perform "[c]lass cert drafting and research." Perhaps the entries are intentionally vague, as Class Counsel knew that the time records would be produced if Plaintiffs ultimately prevailed or were required to produce these records pursuant to a settlement.

Moreover, Plaintiffs' concern that the time records contain communications with "class members who requested that their identities not be shared with Defendant" is baseless. (Pls.' Mot., p. 4.) Indeed, Plaintiffs fail to offer any evidence that class members do not want their identities shared with Defendant. Furthermore, CSC assumes that Class Counsel informed their clients that such a request is an impossibility since their identities have been shared with Defendant and Defendant has produced their information to Class Counsel through this litigation. In addition, not only have class members' identities been shared with the Defendant but their identities have been shared with the public pursuant to Plaintiffs' case filings, including but not limited to opt-in consent forms filed with the Court. *See, e.g.*, Docket Entry Nos. 7, 8, 10, 11, 17, 19, 181, 206, 219, 221, 222, 230, 231. Finally, as stated above, "absent special circumstances, client identity and fee information are not privileged." *In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d 238, 247

(2d Cir. 1986); *see also Rahman v. Smith & Wollensky Rest. Group, Inc.*, No. 06 Civ. 6198 (LAK) (JCF), 2007 U.S. Dist. LEXIS 37642, at *34 (S.D.N.Y. May 24, 2007) (noting that even if there is an attorney-client relationship between plaintiff's counsel and defendant's employees (potential class members), their identities are not protected by attorney-client privilege). No such special circumstances exist here. Since the class members' identities have already been divulged to Defendant and to the public by Class Counsel, Plaintiffs' justification is a bit absurd. Such information is non-privileged and should not be sealed. To the extent Class Counsel or Class Members truly have any concern about their identities in the time records, Class Counsel could request that this Court allow Plaintiffs to redact their names from the billing records.

Similarly, Class Counsel's time entries do not disclose work product. Invocation of the work-product doctrine requires showing "the documents were prepared principally or exclusively to assist in anticipated or ongoing litigation." *Construction Prods. Research*, 73 F.3d at 473. Although time records by definition exist because of litigation, they do not qualify for work-product immunity where they do not reveal attorneys' mental processes. *See Anthropologie, Inc. v. Forever 21*, No. 07 Civ. 7873 (RJS) (MHD), 2009 U.S. Dist. LEXIS 61005, at *3–4 n.2 (S.D.N.Y. Apr. 20, 2009); *see also Forgione v. AC & R Advertising, Inc.*, 147 F.R.D. 30, 33 n.3 (S.D.N.Y. 1993) ("A cursory *in camera* review of counsel's time records did not make manifest to me that a fee application . . . would necessarily reveal work product."). Class Counsel's time entries, including those excerpted above, do not reveal attorneys' mental processes and are therefore not entitled to protection under the work-product doctrine.

Finally, Plaintiffs also allege in a conclusory statement that the time records are "confidential business records." (Pls.' Mot., p. 5.)  Confidential business information includes trade secrets, confidential research, and other internal business documents. *See CSL Silicones, Inc. v. Midsun Grp., Inc.*, No. 3:14-CV-1897 (CSH), 2017 U.S. Dist. LEXIS 189918, at *8 (D. Conn.

2017); *see also Travelers Indem. Co. v. Excalibur Reinsurance Corp.*, No. 3:11-CV-1209 (CSH), 2013 U.S. Dist. LEXIS 110400, at *64 n.31 (finding materials contain "proprietary business information" where they "clearly relate to non-parties whose privacy need not be pierced"). "[C]onclusory statements that documents contain confidential business information are a far cry from the 'particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection' that is required to justify keeping the information under seal." *United States v. Wells Fargo Bank N.A.*, No. 12-CV-7527 (JMF), 2015 U.S. Dist. LEXIS 84602, at *14 (S.D.N.Y. June 30, 2015) (quoting *Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616, 630 (S.D.N.Y. 2011)). Here, Plaintiffs' lone conclusory statement fails to sufficiently allege that the time records constitute confidential business information and that denial of the motion to seal will cause serious injury. Moreover, the time records simply do not constitute confidential business records. Attorneys' time records are by nature prepared for a third party and are not analogous to trade secrets or similar internal documents.

For the foregoing reasons, there exists no compelling reason justifying a departure from the strong presumption in favor of public access to court records. Class Counsel's vague time entries are not protected under the attorney-client privilege or work-product doctrine, nor as confidential business information. In like cases, courts have denied requests to file under seal. *See In re September 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 133 (S.D.N.Y. 2007) (finding justice does not require filing time records under seal where the sample of records reviewed by the court did not reveal privileged information); *see also United States SEC v. Ahmed*, No. 3:15cv675 (JBA), 2017 U.S. Dist. LEXIS 213773, at *4–5 (D. Conn. Sept. 19, 2017) (denying motion to seal where party failed to identify why the information was confidential and thus failed to overcome presumption of access); *Mento v. Donahoe*, No. 08-CV-74S, 2012 U.S. Dist. LEXIS 19197, at *3– 4 (W.D.N.Y. Feb. 14, 2012) (denying motion to seal where Defendant alleged redaction of

hundreds of pages was impractical without making any redaction attempt); *Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616, 632 (S.D.N.Y. 2011) (ordering link to internal URL address unsealed due to failure to show injury that would result if the information were unsealed); *AT&T Corp. v. Community Network Servs.*, 1998 U.S. Dist. LEXIS 16010, at *1–2 (S.D.N.Y. 1998) (finding counsel's position that time records are privileged and should be filed under seal to be "entirely untenable," as the records lacked undisclosed legal analysis or attorney-client communications). Accordingly, Plaintiffs' motion to submit detailed time and expense records under seal should be denied.

### B. Plaintiffs' Request to Seal the Records in Their Entirety Should Be Denied Because It Is Not a "Narrowly Tailored" Approach.

Local Rule 5(e)(3) requires a court make particularized findings that the sealing of documents is "narrowly tailored" to serve clear and compelling reasons. A court must "consider[] whether the requested order is no broader than necessary." *Suntoke*, 2007 U.S. Dist. LEXIS 35888, at *2. Unsurprisingly, "'blanket sealing' is generally disfavored." *Gardner*, No. 3:12-CV-1168 (CSH), 2013 U.S. Dist. LEXIS 163784, at *10 n.5 (D. Conn. Nov. 18, 2013); *see also Ahmed*, 2017 U.S. Dist. LEXIS 213773, at *4 n.1 (noting that requests to seal documents in their entirety have "been viewed with disfavor in this district"); *Travelers Indem. Co. v. Excalibur Reinsurance Corp.*, No. 3:11-CV-1209 (CSH), 2012 U.S. Dist. LEXIS 200282, at *31 (D. Conn. May 10, 2012) (sealing portions of exhibits and specific language therein). Therefore, if this Court finds that there are any time entries specific enough to be considered attorney-client communication or work-product pursuant to the law, and that an order to seal is appropriate, such an order should be "narrowly tailored" to solely privileged time entries, rather than the time records in their entirety. However, as noted in the next section, the Court should instead pursue the even more narrowly tailored solution of redaction.

**C. Should The Court Find That Any Of The Time Entries Are Privileged, Those Select Few Entries Should Be Redacted.**

Given the strong presumption in favor of public access to court records, particularly in the class action context, if this Court finds that any of the time entries are privileged, it should require redaction of those select entries instead of granting Plaintiffs' motion. *See Excellent Home Care Servs., LLC v. FGA, Inc.*, No. 13 CV 5390 (ILG) (CLP), 2017 U.S. Dist. LEXIS 176017, at *18–19 (E.D.N.Y. Oct. 23, 2017) (finding no good cause to file time records under seal where the confidential entries had been redacted); *In re Check Point Software Techs. Ltd. Secs. Litig.,* No. 03 Civ. 6594, 2007 U.S. Dist. LEXIS 45579, at *5 (S.D.N.Y. 2007) (denying motion to file under seal, but permitting counsel to redact any portions of the documents that reveal work product); *see also Bernstein v. Mafcote, Inc.*, 43 F. Supp. 3d 109, 114 (D. Conn. 2014) (requiring plaintiff to return time records to defendant to redact two billing entries subject to the attorney-client privilege); *Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, No. 08 Civ. 1533 (BSJ) (JCF), 2011 U.S. Dist. LEXIS 67766, at *11 (S.D.N.Y. 2011) ("[T]o the extent that time records do contain privileged information, they may be redacted."). "The redaction may remove detailed information about the specific legal services rendered, litigation strategy, or to the extent they reveal the motive of the client in seeking legal representation or client confidences, but should retain the 'general purpose of work performed[,]' and who performed the service." *Mohr v. Sec. Credit Servs., LLC*, 141 F. Supp. 3d 179, 185–86 (N.D.N.Y. 2015).

Plaintiffs' argument that redaction is overly burdensome and impractical lacks merit. This case is unlike *Travelers Indemnity* cited by Plaintiffs, wherein the documents contained such a volume of confidential information that redaction was impractical. *Travelers Indem. Co. v. Excalibur Reinsurance Corp.*, No. 3:11-CV-1209 (CSH), 2013 U.S. Dist. LEXIS 110400, at *28 (D. Conn. 2013); *see also EEOC v. Kelly Drye & Warren, LLP*, No. 10 Civ. 655 (LTS)(MHD),

2012 U.S. Dist. LEXIS 28724, at *12 (S.D.N.Y. Mar. 2, 2012) ("[W]holesale sealing of the Judicial Documents is unnecessary, particularly in light of the EEOC's agreement to the continued redaction of all information that implicates the attorney-client privilege."); *Mento v. Donahoe*, No. 08-CV-74S, 2012 U.S. Dist. LEXIS 19197, at *3–4 (W.D.N.Y. Feb. 14, 2012) (denying motion to seal where Defendant alleged redaction of hundreds of pages was "impractical" without making any attempt to redact). Here, none of Class Counsel's time entries are privileged or otherwise protected. At most, this Court might find a mere fraction of the time records to be privileged. Thus, this is not the "rare situation" in which the Court should seal the records in total rather than simply requiring redaction, a much less restrictive option. *Travelers Indem. Co.*, 2013 U.S. Dist. LEXIS 110400, at *29. That Plaintiffs had almost one hundred billers on the file, overbilled this matter with vague entries, and amassed an absurd lodestar should not serve as a defense that the effort to review the records is too great.

In *Plainville Bd. of Educ. v. R.N.*, No. 3:09CV241 (RNC), 2009 U.S. Dist. LEXIS 54197, at *2, *2 n.2 (D. Conn. June 26, 2009), the court held that sealing an entire administrative record was not narrowly tailored because the confidential information therein could be redacted, despite plaintiff's argument that it could take up to 100 hours to redact. *Id.* at *2 n.2. Here, redaction would take far less time than the plaintiff in *Plainville Board of Education* alleged, as Plaintiffs' time records consist of 743 pages. This may sound like a daunting number of documents to a layperson, but those in the legal profession regularly read this quantity of documents. For instance, in *Gross v. Lunduski*, 304 F.R.D. 136, 152–53 (W.D.N.Y. 2014), the court estimated that its in-camera review of 135 pages took a mere 30-45 minutes and that review of hundreds of personnel file documents should solely take 3.5 to 5 hours. Moreover, upon a review of the time records, it is apparent that this should not be an excessively time-consuming task given that all, or at the very least a healthy majority, of the entries are not privileged. *Compare Nash v. Life Ins. Co.*, No.

- 10 -

08cv893 WQH (RBB), 2010 U.S. Dist. LEXIS 50089, at *4 (S.D. Cal. May 18, 2010) (holding that despite the burdensomeness, "[t]he work of redacting [4,500 pages] is not a 'compelling reason' to override the public's right of access to court records."), *and United States v. Chevron Corp.*, No. C-94-1885 SBA, 1996 U.S. Dist. LEXIS 4154, at *14–15 (N.D. Cal. Mar. 13, 1996) (finding redaction of 2,000 pages is not unduly burdensome if they contain privileged and non-privileged information), *amended by* 1996 U.S. Dist. LEXIS 8646 (N.D. Cal. May 30, 1996), *with Vietnam Veterans v. Dep't of Homeland Sec.*, 8 F. Supp. 3d 188, 203–04 (D. Conn. 2014) (requiring FOIA to review and redact 26,000 packets that each contain 50 pages is "unreasonably burdensome").

Furthermore, requesting that a party seeking over thirteen million dollars in legal fees redact their time records, which they chose not to redact prior to submitting to this Court, is not impractical. *See* D. Conn. L. R. Civ. P. 5(e)(3) (listing methods for filing documents when seeking an order to file under seal, including e-filing redacted version as a public document); *see also Lyda v. Fremantlemedia N. Am.*, No. 10cv4773-DAB-FM, 2016 U.S. Dist. LEXIS 90469, at *16 (S.D.N.Y. July 11, 2016) (filing redacted time records initially). Class Counsel's time records reflect that Christopher Truong already spent around thirty-four hours in August and September 2019 reviewing the time entries. Such a task is not reasonable even if Mr. Truong spent one hour on it, let alone thirty-four, as it is not legal work and should not have been submitted as a recoverable fee. *Rahman v. Smith & Wollensky Rest. Group, Inc.*, No. 06 Civ. 6198 (LAK) (JCF), 2009 U.S. Dist. LEXIS 3510, at *27 (S.D.N.Y. Jan. 7, 2009) ("[O]nly legal work is compensable."). Of course, like most of Plaintiffs' fee entries, Mr. Truong's entries are vague, and it is unclear what he was doing for thirty-four hours. Several representative examples include:

1. "Reformat and edit fee app review sheet." (Time entry 21940).
2. "Continue with updates to fee app time entries." (Time entries 21961, 21967).
3. "Continue with review of fee app time entries." (Time entries 22006, 22016, 22032).

4. "Review time entries re fee app project per JWG and MJS." (Time entries 22094, 22139). There are also about fifteen hours' worth of similar time entries by other timekeepers during this period, such as the following.

1. "Fee review project." (Time entry 21994).
2. "Review fee app entries." (Time entry 21995).
3. "Review Fee App Entries for Accuracy." (Time entry 22031).
4. "Review fee entries." (Time entry 22079).

Putting aside the vagueness of these entries and that they do not constitute legal work, Mr. Truong and the other timekeepers could have proactively redacted any privileged entries during this nearly ***fifty-hour*** project if Class Counsel were legitimately concerned about the burdensomeness of redaction.

Consequently, if the Court finds any entries should be kept private, redaction will best balance Class Counsel's concern about revelation of purportedly privileged materials with the public interest in access to these records. Therefore, in the alternative, the Court should order redaction of any privileged time entries rather than permitting filing of the entirety of the time records under seal or granting a protective order.

**D.  The Motion for Protective Order Should Also Be Denied For Lack of Good Cause.**

Federal Rule of Civil Procedure 26(c) states: "The court may, for good cause, issue an order to protect a party . . . from annoyance, embarrassment, oppression, or undue burden or expense, including . . . limiting the scope of disclosure . . . to certain matters." Good cause is established by showing that "disclosure will result in a 'clearly defined and serious injury.'" *Bernstein v. Mafcote, Inc.*, 43 F. Supp. 3d 109, 113 (D. Conn. 2014). "To meet the good-cause standard under Rule 26(c), 'the moving party must establish "particular and specific facts" rather than "conclusory assertions," that justify the imposition of a protective order.'" *Giugliano v. FS2*

*Capital Partners, LLC*, No. CV 14-7240 (ADS) (AKT), 2016 U.S. Dist. LEXIS 45925, at *8-9 (E.D.N.Y. Mar. 31, 2016) (citation omitted).

For the same reasons established above in the context of sealing the time records, Plaintiffs have not provided sufficient good cause to justify a protective order. The time records are not protected by attorney-client privilege or the work-product doctrine as alleged by Plaintiffs, therefore, their disclosure and use will not result in "serious injury" or any injury whatsoever.

Furthermore, use of the less restrictive alternative of redaction negates the need for a protective order. *See United States v. Smith*, 985 F. Supp. 2d 506, 546 (S.D.N.Y. 2013) (acknowledging that redaction is a less restrictive alternative to a protective order). A blanket protective order fits the scenario where "it would be virtually impossible . . . to conduct a page-by-page, document-by-document review to single out those portions of the [documents] that must be shielded from the public . . . ." *Id.* at 545–46 (S.D.N.Y. 2013). In contrast, despite Plaintiffs' bald allegation that redaction would be burdensome and impractical, here Plaintiffs can easily isolate any privileged material from the time records as discussed above. *Id.*

Accordingly, the Court should deny Plaintiffs' Motion for Protective Order.

## III.   <u>CONCLUSION</u>

CSC respectfully requests that this Court deny Plaintiffs' Motion for Protective Order and to Submit Detailed Time and Expense Records Under Seal. Alternatively, CSC requests that the Court order Plaintiffs to redact any privileged time entries.

Respectfully submitted,
DEFENDANT,
COMPUTER SCIENCES CORPORATION

By its attorneys,

*/s/ William J. Anthony*
Jackson Lewis P.C.
William J. Anthony (ct 17865)
Kristi Rich Winters (ct 28066)
18 Corporate Woods Boulevard, 3rd floor
Albany, New York 12211
Telephone: 518-434-1300
Fax: 518-427-5956
Anthonyw@jacksonlewis.com
Kristi.Winters@jacksonlewis.com

David R. Golder (ct 27941)
David C. Salazar-Austin (ct 25564)
Alexa M. Farmer (ct30052)
90 Statehouse Square, 8th Floor
Hartford, CT  06103
Tel: (860) 522-0404
Fax: (860) 247-1330
golderd@jacksonlewis.com
salazard@jacksonlewis.com

Brett M. Anders*
220 Headquarters Plaza
East Tower, 7th Floor
Morristown, NJ 07960
Tel: (973) 538-6890
andersb@jacksonlewis.com

Cary G. Palmer*
Nathan W. Austin*
801 K Street, Suite 2300
Sacramento, CA 95814
Tel: (916) 341-0404
palmerc@jacksonlewis.com
AustinN@jacksonlewis.com

* *pro hac vice*

- 14 -

## CERTIFICATION OF SERVICE

I hereby certify that on October 16, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


*/s/ William J. Anthony*
William J. Anthony

EXHIBIT 1

# Anthropologie, Inc. v. Forever 21, Inc.

United States District Court for the Southern District of New York

April 20, 2009, Decided; April 20, 2009, Filed

07 Civ. 7873 (RJS) (MHD)

**Reporter**
2009 U.S. Dist. LEXIS 61005 *

ANTHROPOLOGIE, INC., Plaintiff, -against- FOREVER 21, INC., DO WON CHANG, JIN SOOK CHANG, ONE CLOTHING, INC., ORIGINAL INC., SALT & PEPPER, STEPS OF CA, UNO TEXTILE, and CONCORD VENTURE, Defendants.

**Subsequent History:** Costs and fees proceeding at, Application denied by, in part Anthropologie, Inc. v. Forever 21, Inc., 2009 U.S. Dist. LEXIS 41623 (S.D.N.Y., May 15, 2009)

**Prior History:** Anthropologie, Inc. v. Forever 21, Inc., 2009 U.S. Dist. LEXIS 66009 (S.D.N.Y., Mar. 17, 2009)

**Counsel:** [*1] For Anthropologie, Inc., Plaintiff: Gregory Paul Gulia, Vanessa C. Hew, LEAD ATTORNEYS, Duane Morris, LLP (NYC), New York, NY.

For Forever 21, Inc., One Clothing, Inc., Original Inc., Salt & Pepper, Steps of CA, Uno Textile, Do Won Chang, Jin Sook Chang, Defendants: Robert L. Powley, LEAD ATTORNEY, David J. Lorenz, Hewson Chen, James Martin Gibson, Powley & Gibson, P.C., New York, NY.

**Judges:** MICHAEL H. DOLINGER, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** MICHAEL H. DOLINGER

# Opinion

MEMORANDUM & ORDER

MICHAEL H. DOLINGER

UNITED STATES MAGISTRATE JUDGE:

With the authorization of the court, plaintiff has applied for an award of motion expenses, including attorney's fees, in connection with the earlier denial of a motion by defendants

for a protective order preventing the depositions of defendants Do Won Chang and Jin Sook Chang, the two principals of defendant Forever 21, Inc. Plaintiff seeks an award of fees and disbursements in excess of $ 55,000.00. Defendants oppose, contending that the amount sought is grossly excessive. They also complain that plaintiff has redacted their copies of the time records to eliminate all references to the services rendered by plaintiff's counsel.

We focus here on the time-record deletions, [*2] which plaintiff asserts are covered by the attorney-client privilege. This position is indefensible. The privilege covers communications between counsel and client undertaken in confidence for the purpose of providing or rendering the provision of legal advice or other legal services by the attorney. *See, e.g., In re County of Erie*, 473 F.3d 413, 418-19 (2d Cir. 2007); *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996). [1] Descriptions in attorney time records of the basic tasks fulfilled by a lawyer -- in this case, for example, the preparation of a letter to the court and the preparation of an affidavit and memorandum of law filed with the court and served on defendants -- do not ordinarily disclose the substance of attorney-client communications undertaken for the purpose of rendering services. Moreover, the records themselves, even if sent to the client as part of an invoice, are communicated to him not to provide legal advice or services but rather to obtain payment for services. Hence, such billing records are not presumptively covered by the privilege. *See, e.g., Rahman v. Smith & Wollensky Rest. Group, Inc*., 2008 U.S. Dist. LEXIS 20167, 2008 WL 696807, at *3 & n.1 (S.D.N.Y. Mar. 14, 2008) [*3] ; *In re Sept. 11th Liab. Ins. Coverage Litig*., 243 F.R.D. 114, 133 (S.D.N.Y. 2007); *105 St. Assocs., LLC v. Greenwich Ins. Co*., 2006 U.S. Dist. LEXIS 81717, 2006 WL 3230292, at *6-7 (S.D.N.Y. Nov. 7, 2006); *see also DiBella v. Hopkins*, 403 F.3d 102, 120 (2d Cir. 2005) (applying New York law).

---

[1] Since the claims in this case arise, in whole or in part, under federal law, the privilege issues are governed by federal law as well. Fed. R. Evid. 501; *see, e.g., von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987).

2009 U.S. Dist. LEXIS 61005, *3

In this case plaintiff does not seek to justify its deletions of the entries for which it asks compensation, and our review of them reflects a complete absence of any basis for those edits. They simply summarize the sort of attorney activities that one might expect in response to a discovery motion and do not disclose, either directly or indirectly, confidential client communications. [2] Under these circumstances, defendants are entitled to see the unredacted time records pertaining to the work for which a fee request is being made, [3] which are to be produced to them by April 24, 2009. Defendants may, if they wish, supplement their opposition to plaintiff's fee application by April 27, 2009.

Dated: New York, New York

April 20, 2009

/s/ Michael H. Dolinger

MICHAEL H. DOLINGER

UNITED STATES MAGISTRATE JUDGE

---

End of Document

---

[2] An argument **[*4]** might perhaps be formulated that the time records generated in a litigation setting constitute work product in a literal sense, since they were created because of litigation. *See generally United States v. Adlman*, 134 F.3d 1194, 1202-03 (2d Cir. 1996) (work product rule governs documents created because of litigation). To the extent that the document does not reflect in any meaningful sense the attorney's mental processes -- and that is certainly the case with these time records, which are far less revealing in that sense than the letter, affidavits and memorandum of law served by counsel on defendants -- defendants may readily satisfy the standards of Rule 26(b)(3) for overcoming potential work-product immunity, since those records of work actually performed are essential for meaningfully assessing the merits of a fee application. *See generally id*. at 1203.

[3] The time records submitted by plaintiff also contain numerous entries pertaining to work done on other aspects of the case. Plaintiff is certainly free to delete these from the copy provided to defendants.

# AT&T Corp. v. Community Network Servs.

United States District Court for the Southern District of New York

October 9, 1998, Decided ; October 13, 1998, Filed

97 Civ. 316 (BSJ) (MHD)

**Reporter**
1998 U.S. Dist. LEXIS 16010 *

AT & T CORP., Plaintiff, -against- COMMUNITY NETWORK SERVICES, INC., et al., Defendants.

**Counsel:** **[*1]** For AT&T CORP., plaintiff: Alan M. Unger, Steven M. Bierman, Sidley & Austin, New York, NY.

For AT&T CORP. counter-defendant: Alan M. Unger, Steven M. Bierman, Sidley & Austin, New York, NY.

For COMMUNITY NETWORK SERVICES, INC., MICROTEL COMMUNICATIONS CORP., YOUNGER FACES, INC., counter-claimants: Michael S. Krome, Esq., Woodbury, NY.

**Judges:** MICHAEL H. DOLINGER, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** MICHAEL H. DOLINGER

# Opinion

## *MEMORANDUM AND ORDER*

MICHAEL H. DOLINGER

UNITED STATES MAGISTRATE JUDGE:

In applying for an award of attorney's fees and other expenses, plaintiff initially submitted an attorney's affidavit with no accompanying time-record documentation. The submission was in violation of well-settled requirements in this circuit, and accordingly the court directed that plaintiff supplement its submission with contemporaneous time records.

Plaintiff's counsel has now provided a set of such records to the court, but has declined to serve a copy on defendants, purporting to invoke the attorney-client privilege and work-product rule. Counsel further asks that this documentation not be filed or else be filed under seal.

Plaintiff's position on this matter is **[*2]** entirely untenable. Our review of the time records discloses that they contain no attorney-client communications and that they do not reveal any hitherto undisclosed legal analysis by counsel or others. They simply reflect the amount of time spent by counsel on a series of discrete tasks related to the lawsuit. Moreover, even if this information could, by some highly creative reasoning, be deemed to constitute marginal work-product, defendants have an evident need for access to it if they are to respond intelligently to this fee application. In this regard, plaintiff's proffer of a chart showing gross totals is not an adequate substitute.

Not surprisingly, we note that service of such time records on opposing counsel is routinely required on fee applications of this sort, since the information disclosed is not privileged and is required for the litigation of the fee application. Accordingly, plaintiff is ordered to serve on defendants' attorney a copy of all materials provided to the court in support of its current application. Such service is to be accomplished by October 14, 1998. Defendants may serve responding papers by October 19, 1998. Reply papers, if any, are due by October **[*3]** 21, 1998.

**DATED: New York, New York**

**October 9, 1998**

**SO ORDERED.**

**MICHAEL H. DOLINGER**

**UNITED STATES MAGISTRATE JUDGE**

# Bria v. United States

United States District Court for the District of Connecticut

March 20, 2002, Decided

Civil No. 3:00CV1156(CFD)(Lead Case), Misc. No. 3:01MC21(CFD)(Member case)

**Reporter**
2002 U.S. Dist. LEXIS 7306 *; 89 A.F.T.R.2d (RIA) 2002-2141

ROSEMARIE D. BRIA, [1] Plaintiff, v. UNITED STATES OF AMERICA, Defendant. UNITED STATES OF AMERICA, Petitioner, v. BRYON W. HARMON and ROBERT M. LANE, Respondents, ROSEMARIE BRIA, Intervenor.

**Disposition:** [*1] United States' Motion for Enforcement of Internal Revenue Service Summonses granted in part, denied in part.

# Case Summary

### Procedural Posture

Petitioner United States moved to enforce Internal Revenue Service (IRS) administrative summonses served on respondents, intervenor executrix's former attorneys, in an investigation of a federal estate tax return that the executrix had filed regarding the estate of her deceased mother.

### Overview

One of the attorneys had prepared (but not filed) a federal estate tax return. The IRS was investigating whether the return that was filed understated the value of the estate. The executrix claimed attorney-client privilege with respect to certain questions and documents. The government contended that the attorneys' responses to questions fell under the tax return and crime-fraud exceptions to the attorney-client privilege. That the attorneys did not file the estate tax return at issue did not prevent the application of the tax return exception. It was clear that the attorneys were retained, at least in part, for the purpose of filing estate tax returns, and it was likely that some of their communications related to filing such returns. The court found that responses to those questions regarding joint bank accounts, relating to information that a client could reasonably expect to be included in an estate tax return, were not protected by the

privilege. The government did not satisfy its burden to show probable cause of a fraud or crime for application of the crime-fraud exception. Some (but not all) of the documents at issue were protected by the attorney-client privilege.

### Outcome

The court granted the government's motion for enforcement of IRS' summonses in part, and denied it in part.

**Counsel:** For ROSEMARIE BRIA, plaintiff: E. Gates Garrity-Rokous, Wiggin & Dana, New Haven, CT. David B. Fein, Suzanne Ellen Wachsstock, Wiggin & Dana, Stamford, CT.

For USA, defendant: David X. Sullivan, U.S. Attorney's Office, New Haven, CT. John V. Cardone, U.S. Department of Justice, Tax Division, Washington, DC. Lara E. Ewens, U.S. Department Of Justice, Tax Division, Washington, DC.

For BRYON W. HARMON, consolidated defendant: Robert J. Cathcart, Shipman & Goodwin, Hartford, CT.

**Judges:** Christopher F. Droney, United States District Judge.

**Opinion by:** Christopher F. Droney

# Opinion

### RULING ON UNITED STATES' MOTION FOR ENFORCEMENT OF INTERNAL REVENUE SERVICE SUMMONSES

I. *Introduction and Background*

On December 10, 1999 and January 6, 2000, the United States of America served summonses on Attorneys Robert Lane ("Lane") and Bryon Harmon ("Harmon") in connection with an Internal Revenue Service ("IRS") investigation into an estate tax return filed by Rosemarie D. Bria ("Ms. Bria"). In 1997, Ms. Bria and her brother, Dr. William F. Bria ("Dr. Bria"), had [*2] been named co-executors of their mother's

---

[1] This case was originally captioned Jane Doe v. United States of America. However, the Amended Petition to Quash [Doc. # 36] substituted Rosemarie D. Bria's name for that of Jane Doe. The Clerk is directed to make this change.

2002 U.S. Dist. LEXIS 7306, *2

estate, [2] and Ms. Bria retained Attorney Lane to handle certain legal matters arising from their mother's death and her responsibilities as co-executrix. [3] Harmon, an attorney in Lane's firm, also worked on those matters. Attorney Harmon prepared a Form 706, or federal estate tax return, though Ms. Bria terminated the firm's representation before the return actually was filed. The IRS is investigating whether Ms. Bria understated the value of the estate on the return that was eventually submitted to the IRS. [4] In January and May 2000, Lane and Harmon answered some of the government's questions and produced certain documents in response to the summonses served upon them, but they invoked the attorney-client privilege with respect to some of the documents and testimony sought by the government.

[*3] The instant action consists of two consolidated cases, *Bria v. United States*, 3:00CV56(CFD) (lead case) and *United States v. Harmon*, 3:01MC21(CFD) (member case). In the latter-and the one at issue here-the government seeks to enforce the IRS summonses served on Lane and Harmon. Ms. Bria has intervened in this action. She also moved to quash an IRS subpoena in the lead case, *Bria v. United States*, which has since been resolved by the stipulation of the parties. [5] That stipulation also pertained to this case in that it permitted Ms. Bria's counsel to attend an interview of Lane and Harmon and object to any questions on the basis of attorney-client privilege. In addition, it provided that Ms. Bria's counsel would prepare a privilege log listing the documents as to which they claimed attorney-client privilege and would turn over all other responsive documents.

[*4] Ms. Bria's counsel have produced most of the responsive documents, but they continue to object to the production of several documents on the basis of attorney-client privilege. They also have asserted the attorney-client privilege in response some of the questions posed by the IRS agent and government attorney during the interviews of Lane

---

[2] Rosemarie Bria's mother was Dorothy Bria, the decedent.

[3] The Court assumes that Dr. Bria may also be considered a client of Attorneys Lane and Harmon given that he was co-executor, although the parties have not addressed this issue.

[4] Presumably, the motivation for understating the value of Dorothy Bria's estate would be that Ms. Bria was a beneficiary of Dorothy's estate under her will and would benefit from reduced taxes on that estate.

[5] *Bria v. United States* concerned a subpoena served on the Connecticut Bar Association by the IRS to obtain documents concerning a fee dispute between Ms. Bria and Lane and Harmon following the termination by Ms. Bria of those attorneys on the Dorothy Bria estate matters. As mentioned, Lane and Harmon were discharged before the final estate tax return was filed.

and Harmon, which were held on August 1, 2001. In the motion that is currently pending [Doc. # 39], the government seeks to enforce the summonses to the extent that they pertain to eighteen unproduced documents and to compel the testimony of Attorneys Lane and Harmon concerning the subjects foreclosed by the objections of Ms. Bria's counsel. For the following reasons, the motion for enforcement is granted in part and denied in part.

II. *Discussion*

The current dispute essentially involves three legal issues: (1) whether the tax return exception to the attorney-client privilege applies to the testimony and documents at issue; (2) whether the crime-fraud exception to the attorney-client privilege applies to certain testimony; and (3) whether Harmon's testimony concerning Ms. Bria's reasons for terminating Lane and him is privileged.

A. [*5] *Applicable law*

"To invoke the attorney-client privilege, a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *United States v. Construction Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996). [6] The attorney-client privilege applies to confidential communications, not to facts underlying those communications. *Upjohn Co. v. United States*, 449 U.S. 383, 395-96, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981). The party claiming the benefit of the attorney-client privilege has the burden of establishing all the essential elements. *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987).

"There can, of course, be no [*6] question that the giving of tax advice and the preparation of tax returns . . . are basically matters sufficiently within the professional competence of an attorney to make them prima facie subject to the attorney-client privilege." *Colton*, 306 F.2d at 637. *See also In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1037 (2d Cir. 1984) ("Tax advice rendered by an attorney is legal advice within the ambit of the privilege."). A tax attorney cannot assert a blanket claim of privilege for documents relating to the representation of a client, however, because much of the information transmitted to an attorney by a client is not intended to be confidential, but instead is given for transmittal by the attorney to others, for example, for inclusion in a tax return. 306 F.2d at 638. "But [when] the tax

---

[6] Questions of privilege in a federal income tax investigation are matters of federal law. *Colton v. United States*, 306 F.2d 633, 636 (2d Cir. 1962).

preparer . . . was also the taxpayers' lawyer, . . . it cannot be assumed that everything transmitted to him by the taxpayer was intended to assist him in his tax-preparation function and thus might be conveyed to the IRS, rather than in his legal-representation function." *United States v. Frederick*, 182 F.3d 496, 501 (7th Cir. 1999). [*7]

B. *Testimony*

At Lane and Harmon's interviews, Ms. Bria's counsel asserted attorney-client privilege with respect to the following topics: (1) twelve joint bank accounts, valued at $ 407,000, held by the decedent but not listed on the estate tax return that was ultimately filed; (2) a mortgage for property in Cos Cob, Connecticut held by the decedent that also was not listed on the estate tax return; [7] and (3) Ms. Bria's termination of Lane and Harmon's representation. The government argues that questioning on these matters is not foreclosed because the attorneys' responses would not be privileged. Specifically, the government contends that their responses fall under the tax return and crime-fraud exceptions to the attorney-client privilege.

As an initial matter, Ms. Bria's counsel contend that the fact that Attorneys Lane and Harmon did not actually file the estate tax return at issue prevents the application of the tax return exception. The [*8] fact that certain information was never transmitted to a third party, however, does not necessarily prevent the application of the exception. "If the client transmitted the information so that it might be used on the tax return, such a transmission destroys any expectation of confidentiality which might have otherwise existed." *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983) (reaching this conclusion in a case where an attorney argued that certain information transmitted to him by his client, but not actually used in the tax return at issue, was protected by attorney-client privilege). [8] The relevant inquiry thus is whether the client-in this case, Ms. Bria-conveyed the information to be used on the return.

[*9] Ms. Bria's counsel also argue that she retained Lane and Harmon to give advice relating to the probating of Dorothy Bria's estate, rather than for the purpose of filing estate tax returns. Bria has submitted an affidavit in which she states that she did not retain Lane and Harmon for the principal purpose of filing estate tax returns and that she had the expectation that any communication to Lane and Harmon would be confidential. *See* Pet.'s Memo. Opp'n Mot. Enforcement Summons, Ex. A. Letters from Lane and Harmon to Ms. Bria, however, indicate that the attorneys were working on the estate's tax returns and that they requested certain information about the joint bank accounts and mortgage for that purpose. *See* Exs. Support United States' Mot. Enforcement IRS Summonses, Exs. 3-5. Moreover, even Ms. Bria's affidavit did not contend that the preparation of the estate tax return was not within the scope of the legal work to be performed by Lane and Harmon. Thus, it is clear that Lane and Harmon were retained, at least in part, for the purpose of filing estate tax returns, and it is likely that some of their communication related to filing such returns. As a result, the Court will [*10] look to specific questions to determine whether the attorneys' responses will violate the attorney-client privilege. [9]

1. *Joint Bank Accounts*

The Court concludes that certain responses to questions regarding the joint bank accounts will not violate the attorney-client privilege. [10] Two relate to Ms. Bria's communication of information to Attorneys Lane and Harmon regarding contributions to the accounts (Lane, 47:2-3; Harmon, 25:23-25). This is the type of information that a client could reasonably expect to be included in an estate tax return and transmitted to others. Therefore, these communications are excepted from the attorney-client privilege. Another [*11] question to Attorney Harmon concerned his basis for preparing a draft return listing the $ 405,000 in the bank accounts as an asset of the estate (Harmon, 30:15-17). To the extent that Harmon's response is based on information received from Ms. Bria about the contents of the accounts, it

---

[7] This mortgage also is referred to as the Conlin mortgage.

[8] The Court notes that Ms. Bria's counsel also mention the work-product privilege as a basis for their objections to production of many of the documents at issue. However, pursuant to the Stipulation and Agreement of approved by this Court on May 23, 2001, Ms. Bria's counsel were permitted to compile a privilege log for the purpose of asserting attorney-client privilege. *See* Stipulation & Agreement [Doc. # 37] P4. The Court leaves it to the parties to determine whether additional objections may be based on an assertion of work product privilege; the instant ruling is limited to the Court's determination of the applicability of the attorney-client privilege.

[9] The transcripts from the testimony of Attorneys Lane and Harmon at their IRS interviews are attached to the government's motion for enforcement as Exhibits 1 and 2. In referring to excerpts from the transcripts, the court will indicate which lawyer was being questioned, and the page and line number where the question is found (e.g. Lane, 6:20-23).

[10] As to the government's question regarding how Attorney Lane knew about the joint bank accounts (Lane, 43:19-20), the question was answered and the Court need not rule further. This is also true with respect to the government's question to Attorney Harmon as to his determination of whether the joint bank accounts should be included in the estate tax return (Harmon, 26:9-10).

also will be permitted because the information could reasonably have been expected to be included on the estate tax return. Finally, Harmon may respond to the question regarding his initial determination of whether the joint bank accounts should be included as an asset to the decedent on the draft estate tax return (Harmon, 27:11-13). Again, to the extent that it is based on information received from Ms. Bria, that information is of the type that would be included on the estate tax return. In addition, the Court notes that Attorney Harmon was performing an accounting function when making these calculations, and it is clear that "for the privilege to apply, . . . the attorney must be acting in his capacity as a professional legal adviser at the time the information was transferred." *Lawless*, 709 F.2d at 487 (noting that the preparation of a tax return is primarily an accounting service). [*12]

On the other hand, the government may not ask Harmon about any advice that Ms. Bria requested about how joint bank accounts are treated (Lane, 47:11-12). Any such question was a confidential communication between a lawyer and client.

The government also argues that it should be permitted to inquire into the joint bank accounts on the basis of the crime-fraud exception to the attorney-client privilege. This exception provides that the attorney-client privilege cannot be used to protect "client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1038. [*13] The government speculates that "Bria could have told [Lane and Harmon] who put the money in the accounts and asked how she could otherwise avoid paying tax." Memo. Support. United States' Mot. Enforcement of IRS Subpoenas, at 13.

A party wishing to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime. This is a two-step process. First, the proposed factual basis must strike "a prudent person" as constituting "a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir. 1994) (quoting *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1039 (2d Cir. 1984)). Once there is a showing of a factual basis, the decision whether to engage in an in camera review of the evidence lies in the discretion of the district court. *United States v. Zolin*, 491 U.S. 554, 563, 105 L. Ed. 2d 469, 109 S. Ct. 2619 (1989). [*14]

Second, if and when there has been an in camera review, the district court exercises its discretion again to determine whether the facts are such that the exception applies.

*United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997). Here, the government only speculates as to crimes or fraud that may have been committed by Ms. Bria, and therefore has not satisfied its burden of showing probable cause that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime. Therefore, the crime-fraud exception to the attorney-client privilege does not apply based on the government's showing.

*2. Mortgage*

Many of the questions posed to Lane and Harmon regarding the Conlin mortgage call for privileged responses. First, the question about "give and take" between Attorney Lane and Ms. Bria or Dr. Bria regarding the value of the mortgage requires a privileged response (Lane, 53:4-7). This question implicates conversations between a lawyer and his client that likely went beyond the transmittal of information for tax return purposes. Similarly, the government may not inquire into any conversation that Lane had with [*15] Ms. Bria about how to "handle" the mortgage after speaking with the person who valued the mortgage (Lane, 55:16-19). Such a conversation likely included legal advice, as well as communications from Ms. Bria that she intended to keep confidential. The government also may not inquire into Harmon's determination of the value of the mortgage, (Harmon, 65:7-9), because the question was asked in the specific context of the probate inventory--not the estate tax return--and Harmon was acting in his capacity as a lawyer with respect to that document. Harmon's responses to the questions regarding Ms. Bria's reaction to the draft 706 Form (Harmon, 58:3-4) and Ms. Bria's understanding of whether the asset would be included in the tax return (Harmon, 128:22-129:2) concern privileged matters because Harmon's response likely would be based on confidential communications from Ms. Bria. Two of the questions relating to what Ms. Bria may have said about the value of the property with respect to the amount of the note and whether it was uncollectible call for a response based upon confidential communications that are privileged. (Harmon, 74:15-16, 19-22). Finally, any response to the government's question [*16] of whether Harmon communicated to Ms. Bria that the mortgage would be worthless is privileged (Harmon, 85:6-7).

Lane and Harmon may answer questions about the following topics, as their responses would not be privileged: (1) what Ms. Bria and Dr. Bria may have said about the value of the property with respect to the amount of the note (Harmon, 75:20-22); and (2) how the value of the mortgage for the draft

706 was communicated to Ms. Bria (Harmon, 56:25).

3. *Dismissal of Lane and Harmon*

As a general rule, absent special circumstances, a client's identity and fee information are not privileged. *See Gerald B. Lefcourt, P.C. v. United States*, 125 F.3d 79, 86 (2d Cir. 1997); *Vingelli v. United States*, 992 F.2d 449, 452 (2d Cir. 1993); *Colton*, 306 F.2d at 636. Similarly, "the attorney-client privilege does not extend to billing records and expense reports." *Chaudhry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir. 1999). However, "correspondence, bills, ledgers, statements, and time records which also reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, [*17] such as researching particular areas of law, fall within the privilege." *Clarke v. American Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992); *see also Baker v. Dorfman*, 2001 U.S. Dist. LEXIS 378, No. 99 Civ. 9385(DLC), 2001 WL 55437, at *2 (S.D.N.Y. Jan. 23, 2001) ("The attorney-client privilege protects confidential client information that is contained in legal bills, but fee statements that do not contain detailed accounts of the legal services rendered are not protected from disclosure." (internal quotation omitted)).

The government seeks to question Harmon about why Ms. Bria terminated Lane and him and to ask about the nature of the fee dispute that was apparently involved (Harmon, 43:17-19; 52:2-3). As explained above, information about fees and billing records are generally not covered by the attorney-client privilege. However, where the reason for the termination and the resulting dispute could invite responses which refer to the attorney's legal advice to the client, their strategy, and the client's motive in seeking representation in the first place, they may be privileged. *Cf. Clark*, 974 F.2d at 129. Given that this is likely that this is the [*18] case here, the questions proposed by the IRS require a privileged response.

C. *Documents*

Ms. Bria's counsel have claimed privilege with respect to the production of the following documents sought by the government and listed on the privilege log: 12, 14, 16, 17, 20, 21, 25, 26, 28, 34, 35, 36, 40, 42, 44, 45, 48, and 49. *See* Exs. Support United States' Mot. Enforcement IRS Summonses, Ex. 5. The Court has reviewed the privilege log and the government's responses, and it has examined the disputed documents *in camera* as well.

The following disputed documents are protected by attorney-client privilege:

Document 12, Lane's October 14, 1997 letter to Ms. Bria and Dr. Bria, reflects communication from a client that was not intended to be conveyed to a third party.

Document 14, a letter from Lane to Ms. Bria and Dr. Bria dated June 16, 1997, contains tax advice concerning estate administration matters and thus is protected by the attorney-client privilege. Its attachment, an order of the Connecticut Court of Probate appointing Ms. Bria and Dr. Bria executors of their mother's estate, is not covered by the privilege, as it was not intended to be kept confidential.

Document [*19] 20 reflects confidential communication from Ms. Bria to her attorneys.

Document 21, Harmon's "Miscellaneous Notes," is privileged because it contains confidential communications from Ms. Bria.

Documents 25 and 26, both of which are notes written by Lane, contain tax advice that reaches beyond the mere preparation of estate tax returns.

Document 28, Lane's notes from a telephone call with Ms. Bria, includes her confidential communications to her attorneys and are privileged.

Documents 35 and 36 contain confidential communications from Ms. Bria about matters that relate to legal advice on estate administration rather than estate tax returns and thus are privileged.

Document 40, which contains Harmon's notes regarding the value of the mortgage, is privileged because it reflects discussions based on confidential communications from Ms. Bria.

Documents 42, 44, and 45, which contain Harmon's notes for a meeting with Ms. Bria, relate to legal advice on estate administration matters and thus are privileged.

Similarly, Document 48, Harmon's notes of a telephone call with Ms. Bria, relates to legal advice on estate administration matters and are privileged.

Document 49 contains information [*20] similar to that in Document 48 and thus is privileged.

The other disputed documents are not privileged:

Documents 16 and 17, copies of Harmon's October 2, 1997 memorandum to file, contain information that was gathered from discussions with third parties, and thus the privilege does not apply.

Document 34, Lane's "to do" list, also does not reflect tax advice or confidential communication from a client, and consequently is not privileged.

III. *Conclusion*

2002 U.S. Dist. LEXIS 7306, *20

For the foregoing reasons, the United States' Motion for Enforcement of Internal Revenue Service Summonses [Doc. # 39] is GRANTED IN PART, DENIED IN PART as set forth in this opinion.

SO ORDERED this 20th day of March, 2002, at Hartford, Connecticut.

Christopher F. Droney

United States District Judge

---

End of Document

# CSL Silicones, Inc. v. Midsun Grp., Inc.

United States District Court for the District of Connecticut

July 12, 2017, Decided; July 12, 2017, Filed

Civil Action No. 3:14-CV-1897 (CSH)

**Reporter**

2017 U.S. Dist. LEXIS 189918 *

CSL SILICONES, INC., Plaintiff/Counterdefendant, v. MIDSUN GROUP INC., Defendant/Counterclaimant.

**Prior History:** CSL Silicones Inc. v. Midsun Grp. Inc., 170 F. Supp. 3d 304, 2016 U.S. Dist. LEXIS 32991 (D. Conn., Mar. 15, 2016)

**Counsel:  [*1]** For CSL Silicones, Inc, Plaintiff, Counter Defendant: John T. Winemiller, LEAD ATTORNEY, PRO HAC VICE, Merchant & Gould P.C., Knoxville, TN; Michael A. Erbele, Tchao-Hou J. Thao, LEAD ATTORNEYSS, PRO HAC VICE, Merchant & Gould, Minneapolis, MN; Michael J. Rye, LEAD ATTORNEY, Cantor Colburn LLP - Htfd, Hartford, CT; Rachel K. Zimmerman, LEAD ATTORNEY, PRO HAC VICE, Merchant & Gould, P.C., Denver, CO.

For Midsun Group Inc, Defendant, Counter Claimant: Cara C. Morris, LEAD ATTORNEY, PRO HAC VICE, Law Offices of Cara Morris, PL, Palm Beach Gardens, CT; Joseph R. Carvalko, Jr., Law Firm of Joseph R. Carvalko, Milford, CT.

**Judges:** CHARLES S. HAIGHT, JR., Senior United States District Judge.

**Opinion by:** CHARLES S. HAIGHT, JR.

# Opinion

**RULING ON MOTIONS TO SEAL [Docs. 159, 162, 165, 169, 174, 177, 179, 182, 189, 192, 194]**

**HAIGHT, Senior District Judge**:

# I. INTRODUCTION

Plaintiff CSL Silicones, Inc. ("CSL") brings this action against Defendant Midsun Group Inc. ("Midsun") in connection with Defendant's allegedly improper use of two of Plaintiff's trademarks. The parties have both filed several

motions for partial summary judgment, oppositions to such motions, and replies, each with exhibits and other evidence in support. CSL has **[*2]** also filed a motion to exclude Midsun's expert's testimony. With nearly every motion, the parties have also filed to seal and redact certain material.[1] In all, eleven such motions to seal have been filed by the parties.

This Ruling addresses those motions to seal and resolves each of them.

# II. DISCUSSION

## A. Standard for Sealing and Directions for Further Submissions

Rooted in both the common law and the First Amendment, there is a strong and well-established presumption of public access to judicial documents and proceedings. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20,123-24 (2d Cir. 2006). The public's right of access to court documents may, however, be surmounted by a party's showing that sealing the documents will further other substantial interests, such as to preserve higher values. *Id.* at 124 (citing *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)); *see also Principal Nat'l Life Ins. Co. v. Coassin*, No. 3:13-cv-1520, 2015 U.S. Dist. LEXIS 70355, 2015 WL 3466111, at *1 (D. Conn. June 1, 2015). The public's right of access is not absolute. Consequently, court documents may be sealed: but only if "specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 13-14, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986) (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510, 104 S. Ct. 819, 78 L.

---

[1] The Court previously referred several other motions to seal to Magistrate Judge Merriam. Doc. 129. A telephone conference was held and such motions were denied as moot because the parties agreed that the information could be filed publicly. Doc. 139.

2017 U.S. Dist. LEXIS 189918, *2

Ed. 2d 629 (1984)).[2] "It thus follows that 'a judge must carefully and skeptically review sealing requests to insure that there really [*3] is an extraordinary circumstance or compelling need.'" *Travelers Indem. Co. v. Excalibur Reinsurance Corp.*, No. 3:11-CV-1209, 2013 U.S. Dist. LEXIS 110400, 2013 WL 4012772, at *3 (D. Conn. Aug. 5, 2013) (quoting *Video Software Dealers Assoc. v. Orion Pictures, Corp.*, 21 F.3d 24, 27 (2d Cir. 1994)).

In this District, Rule 5(e)(3) of the Local Rules of Civil Procedure dictates that a court may grant a request to seal documents only after making "particularized findings that sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons." D. Conn. L. R. Civ. P. 5(e)(3). "No document shall be sealed merely by stipulation of the parties" and "[a] confidentiality order or protective order entered by the Court to govern discovery shall not qualify as an order to seal documents for purposes of this rule." *Id; see also Suntoke v. PSEG Power Conn., LLC*, No. 06-CV-1520, 2007 U.S. Dist. LEXIS 35888, 2007 WL 1455847, at *1 (D. Conn. May 16, 2007) ("[T]he parties' agreement to seal or limit disclosure of documents on file is not a sufficient basis for granting such an order." (citing *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995) ("*Amodeo II*")). Relatedly, the blanket sealing of an entire case is disfavored both under local rule and common law. *See* D. Conn. L. R. Civ. P. 5(e)(2) ("Except as permitted or required by federal law, no civil case shall be sealed in its entirety."); *Suntoke*, 2007 U.S. Dist. LEXIS 35888, 2007 WL 1455847, at *1 ("A blanket sealing order such as that apparently requested would rarely, if ever, be appropriate."). In addition, the blanket sealing of entire documents or all documents within a [*4] case is also generally disfavored. *See Doctor's Assoc. Inc. v. QIP Holders LLC*, No. 3:06-cv-1710, 2007 U.S. Dist. LEXIS 70029, 2007 WL 2782516, at *1 (D. Conn. Sept. 24, 2007) ("The presumption that documents should not be sealed necessitates the court's watchful eye when blanket sealing provisions are proposed." (collecting cases)).

Each of the motions to seal requests that the Court seal certain information which has been designated as "confidential" or "confidential, attorney's eyes only information" (hereinafter "AEO") in the Stipulated Protective Order [Doc. 50] (the "SPO") in this case.[3] The SPO states that a producing party

may designate as "confidential" materials "not readily known or available to the public," including "technical information such as product design and manufacturing techniques or processing information and any other information that would qualify as Confidential pursuant to Rule 26 of the Federal Rules of Civil Procedure." Doc. 50 ¶ 3. The parties may designate as AEO any information which contains or discloses "highly commercially sensitive, confidential or proprietary information," and includes "trade secrets, research and development information, customer lists, sales leads, sales, cost, and pricing information (whether actual or protected); or information within the definition [*5] of trade secret as set forth in Section 1(4) of the Uniform Trade Secret Act." *Id.* ¶ 4. Pursuant to the SPO, parties must "seek leave of the Court to file any document or thing incorporating [confidential or AEO] information under seal." *Id.* ¶ 12. The parties have appropriately attempted to comply with this directive through each of the motions to seal.

The parties' designation of information as confidential and/or AEO under a stipulated protective order shows an admirable level of cooperation to protect their confidential, sensitive information. As such, the Court's entry of that protective order, in some instances, may establish a general, strong presumption against access to documents falling under the order where there has been reasonable reliance upon that order. *See Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 295-97 (2d Cir. 1979) ("Unless a valid Rule 26(c) protective order is to be fully and fairly enforceable, witnesses relying upon such orders will be inhibited from giving essential testimony in civil litigation."). That is not the case here. Such a presumption "applies where a court has already considered each document in the first instance according to a 'good cause' standard' and is not appropriate in cases with stipulated protective orders that grant parties [*6] 'open-ended and unilateral deference' to protect whichever discovery materials they choose." *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 255 F.R.D. 308, 321 (D. Conn. 2009) (quoting *Fournier v. McCann Erickson*, 242 F. Supp. 2d 318, 342 (S.D.N.Y. 2003)); *see also* D. Conn. L. R. Civ. P. 5(e)(3) ("A confidentiality order or protective order entered by the Court to govern discovery shall not qualify as an order to seal documents for purposes of this rule.").

In the case at bar, the Court has approved the stipulated protective order in principle, and has thus approved the categories of confidential information described therein. However, it has examined no documents designated as

---

[2] This expresses the standard pursuant to a First Amendment analysis. *See id.* The common law standard provides that documents may be kept under seal to accommodate "countervailing factors." *See Lugosch*, 435 F.3d at 124 ("Notwithstanding the presumption of access under . . . the common law . . . , the documents may be kept under seal if 'countervailing factors' . . . so demand.").

[3] The parties jointly filed the SPO and the Court subsequently denied Midsun's Renewed Motion for Protective Order, [Doc. 81], as the SPO obviated any need for further protection of the parties' information.

confidential or AEO. Until this point, only the parties were responsible for making these determinations. Thus, the presumption from *Martindell* is unavailable to these litigants and the Court must examine each of the judicial documents to be sealed independently.[4] *See* D. Conn. L. R. Civ. P. 5(e)(3) ("No document shall be sealed merely by stipulation of the parties" and a protective order "does not qualify as an order to seal"); *SEC v. TheStreet.Com*, 273 F.3d 222, 231 (2d Cir. 2001) ("While *Martindell* established a general and strong presumption against access to documents sealed under protective order when there was reasonable reliance upon such an order, . . . we have held more recently in *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("*Amodeo I*") that a subspecies of sealed documents in civil cases—so-called **[*7]** 'judicial documents'—deserve a presumption in favor of access.").[5]

As is relevant to these motions, confidential "commercial information" of a business—including **[*8]** trade secrets, confidential research, internal business documents and information about a business's operations—has been recognized repeatedly as a proper subject for sealing. *See* Fed. R. Civ. P. 26(c)(1)(G); *Louis Vuitton Malletier S.A. v. Sunny*

---

[4] "Judicial documents," entitled to a presumption of public access, are "item[s] filed [with the court that are] relevant to the performance of the judicial function and useful in the judicial process." TheStreet.Com, 273 F.3d at 231(quoting *Amodeo I*, 44 F.3d at 145). Such documents include motion papers and evidence filed in support of such papers.

[5] As Judge Underhill of this District explained more fully in *In re (EPDM) Antitrust Litig.*, 255 F.R.D. at 322:

> In the absence of the requisite good cause showing, it cannot be presumed that every piece of discovery filed under the Order is actually worthy of such a high level of protection. *Lugosch*, 435 F.3d at 126 ("[T]he mere existence of a confidentiality order says nothing about whether complete reliance on the order to avoid disclosure was reasonable."). These types of orders are certainly necessary to expedite the discovery process in large multi-district class action litigations—to require parties to make a document-by-document showing of good cause would be an inefficient use of judicial resources. *Schiller v. City of New York*, [No. 04 Civ. 7921, 7922 (KMK) (JCF),] 2007 U.S. Dist. LEXIS 4285, 2007 WL 136149, at * 19 (S.D.N.Y. 2007). However, to automatically apply *Martindell*'s strong presumption against modification to all protective orders would permanently shield stipulated, all-encompassing orders from ever receiving the type of court review contemplated by Rule 26(c). *See Fournier*, 242 F. Supp. 2d at 343-44 (vacating the protective order for trial in part because "the Court has never had an opportunity to consider arguments concerning each specific document" and therefore had no basis to keep the documents sealed "indefinitely").

*Merch. Corp.* 97 F. Supp. 3d 485, 511 (S.D.N.Y. 2015) (redactions of "confidential business information," including "internal business documents," "investigative reports," and "information about [] business operations" held "justified"). Notably, "[f]inancial records of a wholly owned business . . . and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." *Amodeo II*, 71 F.3d at 1051. However, "conclusory statements that documents contain confidential business information are a far cry from the 'particular and specific demonstration of factshowing that disclosure would result in an injury sufficiently serious to warrant protection' that is required to justify keeping the information under seal." *United States v. Wells Fargo Bank, N.A.*, No. 12-CV-7527, 2007 U.S. Dist. LEXIS 4285, 2015 WL 3999074, at *4 (S.D.N.Y. June 30, 2015) (quoting *Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616, 630 (S.D.N.Y. 2011)). Similarly, although it is true that the "[p]otential damage from release of trade secrets is a legitimate basis for sealing documents" the "party seeking to preclude disclosure of trade secrets has the burden to show that the information in fact constitutes a trade secret, that disclosure would harm movant's competitive **[*9]** position and that the asserted harm outweighs the presumption of public access." *Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc.*, 26 F. Supp. 2d 606, 612-13 (S.D.N.Y. 1998).

With this legal framework in mind, the Court will examine the eleven pending motions to seal, the various redactions requested, and the parties' proffered reasons for sealing. With few exceptions, the parties have failed to demonstrate to this Court that the proffered documents require sealing and that clear and compelling reasons support such sealing. *See* D. Conn. L. R. Civ. P. 5(e)(3). The motions to seal generally consist of only a page or two and do not include many, if any, supporting citations or a separate memorandum of law. The parties repeatedly rely solely on the fact that the information has been designated as confidential or AEO under the Protective Order. As explained *supra*, this alone is not a sufficient justification for sealing the information. *See* D. Conn. L. R. Civ. P. 5(e)(3) ("No document shall be sealed merely by stipulation of the parties" and a protective order "does not qualify as an order to seal").

As a result, the Court will deny each of the motions to seal without prejudice to refiling of the motions for the reasons discussed in the following Parts of this Ruling. The documents will continue to be sealed until the deadline **[*10]** to refile passes. At that point, the Court will unseal the documents as appropriate or require the parties to file the unredacted versions forthwith. Because the parties seek to seal much of the same information across each of the eleven motions, the Court believes that, in the interest of efficiency, the parties should each file one omnibus motion describing

the information it seeks to have sealed and the compelling reasons for such sealing with support as appropriate. To the extent that, for example, Midsun is seeking to protect information that CSL has refused to de-designate, CSL must explain the reasons such information is to remain sealed to the Court and provide any changes to Midsun's redactions. The parties should attach all relevant documents with the appropriate redactions sought to its omnibus motion. The parties do not need to refile the sealed materials as those materials are already available to the Court.[6] The parties are directed to file their omnibus motions on or before August 25, 2017. To the extent that either party objects to the other's omnibus motion to seal, such objections must be filed on or before September 11, 2017.

The Court reminds the parties that the **[*11]** Protective Order expressly provides that the parties will meet and confer regarding removing confidential or AEO designations where appropriate. *See* Doc. 50 ¶ 14. The parties should do so again prior to filing any omnibus motion and make a good faith effort to determine what, if any, information should remain sealed. This Ruling gives counsel sufficient time to do that.

## B. Motions Related to Midsun's Partial Summary Judgment Motion (Counts V and VI)

### 1. *Midsun's Motion to Seal [Doc. 159]*

Midsun has filed a motion for leave to file under seal certain documents related to its motion for partial summary judgment as to Counts V and VI of CSL's Complaint. Doc. 159. Midsun attached to its motion to seal redacted versions of these documents including its: (1) Memorandum in Support, (2) Local Rule 56(a)(1) Statement, and (3) Exhibit 3 attached to its Local Rule 56(a)(1). *Id.* at 1. The redactions in Midsun's brief and the Local Rule 56(a)(1) Statement relate to the deposition testimony of Faisal Huda, which primarily concerns decisions made and actions taken by CSL's former President and CSL's founder during the period 1994-1999. Exhibit 3 contains CSL's sales information from 2004.

Midsun states that it is filing this information under seal solely because CSL **[*12]** has refused to de-designate it and that Midsun does not in fact believe it should be filed under seal. Doc. 159 at 2. For its part, CSL has not filed any response or indicated why this information must be sealed. In general, the redacted information does not appear to be commercially sensitive or to contain sensitive business

operation information. However, certain information, particularly in Exhibit 3, may be confidential or commercially sensitive as it relates to CSL's customers, sales, and financials. This may require at least some redaction of Exhibit 3.

Without any input from CSL has to the sensitivity of this information, which CSL initially designated as confidential or AEO, the Court cannot fully evaluate whether it should be sealed. Given the potentially harmful effects if this information is sensitive and should be sealed, the Court will allow CSL the opportunity to explain the clear and compelling reasons for doing so in the manner described by this Court earlier in this Ruling. Thus, Midsun's motion to seal is denied without prejudice to allowing CSL to explain its reasons for sealing the material requested.

### 2. *CSL's Motion to File Under Seal [Doc. 174]*

CSL filed a motion **[*13]** for leave to seal certain materials filed in opposition to Midsun's motion for partial summary judgment as to Counts V and VI of CSL's Complaint. Doc. 174. CSL has separately filed publicly redacted versions of these documents including its: (1) Memorandum in Opposition, (2) Local Rule 56(a)(2) Statement, and (3) supporting Exhibits 2-3, 5, 7, 9-14, 18-19, 22-29, 31, 33-34 attached to its Local Rule 56(a)(2) Statement. Doc. 176. In support, CSL asserts that these documents contain excerpts of, or are documents, that have been designated confidential or AEO under the Protective Order. Doc. 174 at 1. CSL asserts that the documents include confidential business information of both CSL and Midsun as well as a third party Gaco Western LLC and sealing is necessary to prevent improper disclosure. *Id.* at 1-2.

The Court is aware that, as CSL has conclusorily asserted, some of this information may be confidential business information or commercially sensitive information that may in fact require sealing. However, CSL has not consistently applied the redactions or fully and adequately explained why these redactions are necessary. For example, in its Local Rule 56(a)(2) Statement in responding to Midsun's ¶ 16 quotation of Faisal Huda's testimony (which Midsun **[*14]** sought to redact on account of CSL's designation and is described *supra*), CSL expressly summarizes, quotes, and cites the testimony in its response. The quoted portions recited in CSL's response are not redacted, but oddly enough, are completely redacted in the exhibit that contains the excerpts of the deposition testimony, Ex. 31.[7] This cannot be

---

[6] The parties, however, must ensure that it is clear to the Court what exhibits correspond to which of the parties' filings and to which sealed documents so that the Court may easily compare the sealed and redacted documents.

[7] This is not the only example. CSL also quotes from Exhibit 5 in its brief, Doc. 176, at page 15 without any redaction, but has completely redacted that exhibit in its filings.

reconciled. In addition, Midsun appears to have already filed publicly some of the documents CSL seeks to withhold and seal entirely. *See, e.g.*, Doc. 159 Exs. 6, 8. In short, it is not clear to the Court what compelling interest remains to protect this information based on the contradictions in CSL's own filings or the un-objected to public filings by Midsun.

Furthermore, some of the redactions made by CSL appear to be made solely because of designations Midsun made to the deposition testimony of some of its witnesses, such as its President Vojtila. It is not immediately apparent to the Court that these designations require sealing of the testimony and the use of that testimony in CSL's brief.[8] The same is true for several other exhibits that are also excerpts of deposition testimony from other witnesses, including Exs. 7, 19, 23, and 24. In [*15] fact, Midsun appears to have already had this realization and filed some excerpts, including some of those CSL wishes to seal, publicly. *See, e.g.*, Doc. 159 Ex. 5. In addition, CSL seeks to seal the entirety of certain exhibits, including Exs. 24 and 27. As explained *supra*, the sealing of an entire document is generally disfavored especially without any compelling reason expressed for doing so as CSL has failed to so express here. *See Doctor's Assoc. Inc*, 2007 U.S. Dist. LEXIS 70029, 2007 WL 2782516, at *1. Again, Midsun has already filed, at least some portions of these exhibits, publicly and CSL has not objected to that filing. *See, e.g.*, Doc. 159 Ex. 14.

However, it is also clear to the Court that several exhibits likely should be sealed in order to protect confidential business information, including exhibits that consist of presumably confidential reports of tests regarding certain CSL or Midsun products and apparent sales lists from both CSL and Midsun. Yet again, such redactions have been made to in effect seal the entirety of the document. This approach, as noted repeatedly, is generally disfavored. Given this as well as CSL's apparent contradictions and conclusory assertions, the Court will require more to approve of sealing this information. [*16] *See Wells Fargo Bank, N.A.*, 2007 U.S. Dist. LEXIS 4285, 2015 WL 299074, at *4 (requiring parties to file briefs explaining why material should remain sealed after parties offered only conclusory statements that the documents contain confidential business information).

Thus, CSL's motion is denied without prejudice to refiling. CSL must explain the clear and compelling reasons for sealing the information it seeks to have sealed and reconcile the contradictions in its own filings as well as with those

documents already filed publicly by Midsun. CSL must do so in the manner described by this Court earlier in this Ruling.

## C. Motions Related to Midsun's Motion for Partial Summary Judgment (Count I)

### 1. *Midsun's Motion to File Under Seal [Doc. 162]*

Midsun has also filed a motion to seal documents related to its motion for partial summary judgment as to Count I of CSL's Complaint. Doc. 162. Attached to its motion to seal, Midsun has filed publicly a redacted version of its (1) Memorandum in Support, (2) a Local Rule 56(a)(1) Statement, and (3) Exhibits 13-14 and 23, which are attached to its Local Rule 56(a)(1) Statement. Doc. 162. The redactions in Exhibit 14, the brief, and the Local Rule 56(a)(1) Statement relate to the same deposition testimony of Faisal Huda sought to be sealed by Midsun's [Doc. 159] motion to seal, [*17] which concerns decisions made and actions taken by CSL's former President and CSL's founder during the period 1994-1999. There are additional redactions to these same documents related to Faisal Huda's testimony regarding CSL's decision in 2005 to withdraw its Petition to Cancel Midsun's MIDSUN 570 trademark that was then pending at the U.S. Patent and Trademark Office. The redactions to Exhibit 13, CSL's "Minutes of Meeting" document, are from January 4, 2000. The redactions to Exhibit 23, which is the same document described in Midsun's [Doc. 159] motion to seal, relates to CSL's sales information from 2004.

Midsun, again, states that it is filing this information under seal solely because CSL has refused to de-designate it and that Midsun does not in fact believe it should be filed under seal. Doc. 162 at 2. For its part, CSL has not filed any response or indicated why this information must be sealed. The redactions, for the most part, concern the same exact information that was the subject of Midsun's first motion to seal. Again, in general, the redacted information does not appear to be commercially sensitive or to contain sensitive business operation information.

However, without [*18] any input from CSL has to the sensitivity of this information, which CSL initially designated as confidential or AEO the Court cannot fully evaluate whether it should be sealed. The Court will allow CSL the opportunity to explain the clear and compelling reasons for doing so in the manner described by this Court earlier in this Ruling. Thus, Midsun's motion to seal is denied without prejudice to allowing CSL to explain its reasons for sealing the material requested.

### 2. *CSL's Motion to Seal [Doc. 179]*

CSL also filed a motion for leave to seal certain materials

---

[8] Indeed, this was apparently not even clear to CSL who filed Exhibit 15, additional excerpts of Vojtila's testimony, not under seal or with any redaction but then redacted such exact testimony from its brief, *see* Doc. 176 at 23-24.

filed in opposition to Midsun's motion for partial summary judgment as to Count I of its Complaint. Doc. 179. In a separate filing, CSL filed redacted versions of the documents it seeks to seal: (1) its Memorandum in Opposition, (2) its Local Rule 56(a)(2) Statement, and (3) supporting Exhibits 2-3, 5, 7, 9-14, 19-20, 23, 25, 27-29, 31, 33-34, 39 and 42 attached to its Local Rule 56(a)(2) Statement. Doc. 181. In support, CSL asserts that these documents contain excerpts of documents, or are documents, that have been designated confidential or AEO under the Protective Order. Doc. 179 at 1. CSL asserts that the documents include confidential business information of both [*19] CSL and Midsun as well as a third party Gaco Western LLC and sealing is necessary to prevent improper disclosure. *Id.* at 1-2.

Much of the information sought to be sealed by CSL is similar to or exactly the same as the information and documents sought to be sealed by CSL in its [Doc. 174] motion discussed *supra* in Part II(B)(2) of this Ruling. The Court reaches the same conclusions with regard to this information. Certain of these redactions are either irreconcilable with portions made by public by CSL or Midsun (and not objected to by CSL) or do not appear to be justified in the first instance. Although other redactions may ultimately be justified and necessary to protect confidential business information, CSL has not adequately provided the reasons for such sealing, and furthermore, has not justified the sealing of entire documents it requests.

Thus, CSL's motion to seal is again denied without prejudice to refiling. CSL must explain the clear and compelling reasons for sealing the information it seeks to have sealed and reconcile the contradictions in its own filings as well as with those documents already filed publicly by Midsun. CSL must do so in the manner described by this Court earlier [*20] in this Ruling.

3. *Midsun's Motion to Seal [Doc. 192]*

As part of its reply briefing in support of its motion for partial summary judgment, Midsun seeks to file under seal its (1) Reply Memorandum and (2) Exhibit A, which contains confidential sales data. Midsun asserts that the information redacted was previously designated by Midsun or CSL as confidential or AEO. Doc. 192. The information appears to relate to the deposition of Faisal Huda and Midsun's sales data. The Court notes that this sales data appears to be similar to that which CSL has sought to seal and Midsun apparently objects to that sealing. *See, e.g.*, Doc. 159 at 2.

Again, Midsun has failed to adequately explain the clear and compelling reasons for filing information under seal. Midsun only offers that the information has been designated confidential or AEO and conclusory assertions to support the

sealing of the information. Thus, Midsun's motion to seal is again denied without prejudice to refiling. Midsun and/or CSL must explain the clear and compelling reasons for sealing the information it seeks to have sealed. The parties must do so in the manner described by this Court earlier in this Ruling.

**D. Motions Related to CSL's [*21] Motion to Exclude Midsun's Expert**

1. *CSL's Motion to Seal [Doc. 165]*

CSL has filed a motion to for leave to file under seal documents related to its motion to exclude Carl Fusco, Midsun's expert. Doc. 165. CSL has separately filed redacted versions of these documents: (1) its Memorandum in Support and (2) Exhibit 3 filed with its motion, which contains excerpts from the deposition testimony of Fusco. Doc. 168. CSL asserts that at the time its motion was filed, Midsun had not yet had an opportunity to designate portions of the transcript of Fusco's deposition as confidential or AEO as provided under the SPO. Doc. 165 at 1.

The redactions made by CSL were done out of an abundance of caution given that Midsun had not had a chance to review and designate Fusco's deposition testimony. At first glance, the Court does not believe that any of this testimony requires sealing or refers to any information that would require such protection. However, in order to provide Midsun the same opportunity as CSL with regards to the other motions, CSL's motion will be denied without prejudice to Midsun having the opportunity to explain the clear and compelling reasons justifying the sealing of the information [*22] in these documents. Midsun must do so in the manner described by this Court earlier in this Ruling.

2. *Midsun's Motion for Leave to File Under Seal [Doc. 177]*

Midsun has also filed a motion for leave to file under seal documents containing certain information filed in opposition to CSL's motion to exclude Fusco. Doc. 177. Midsun has filed redacted versions of the documents containing this information: (1) its Memorandum in Opposition to CSL's motion and (2) Exhibits 1, 3, 4, 12, and 15 attached to Midsun's brief. *Id.* Midsun states that such information has been marked confidential or AEO, including Fusco's deposition testimony, and that even though CSL has produced some of these documents and not filed them under seal, Midsun has not waived its right to keep such documents confidential. *Id.* at 1-2.

Midsun asserts that Fusco's expert report, Ex. 3, "contains or refers to confidential information concerning facts relied upon and opinions offered concerning absence of the likelihood of

confusion relating to the marks at issue." Doc. 177 at 2. Midsun also asserts that Fusco's "Sample Frame," Ex. 4, contains names and associated titles and companies obtained from the source used for the survey and this [*23] information is not publicly available. *Id.* According to Midsun, the additional redacted exhibits consist of emails between Faisal Huda and LAPP employees, Ex.12, information from INMR, Ex. 15, and a CSL produced market study previously marked confidential or AEO by CSL.[9] *Id.*

The Court agrees that certain information obtained from the non-public source[10] and certain information listed in CSL's and Midsun's own customer lists may be protected as confidential and redacted. But Midsun has redacted much more than necessary to protect such information. For example, on page 12 of its brief, Doc. 177 Ex. A, Midsun has redacted Fusco's descriptions of his potential sources and his conclusions related to those sources. Such opinions do not appear to be confidential or require sealing by the Court. Indeed, the majority of the redactions relate to Fusco's methods, verifications, and conclusions. In fact, Midsun has redacted Fusco's entire expert report, a report that CSL filed publicly with its motion. *See* Doc. 168 Ex. 1. The Court sees no reason why Fusco's expert report should not be filed publicly. Midsun has not offered any justification for this beyond conclusory assertions. It does not appear [*24] to be confidential business or commercial information that requires sealing and being kept from the public. At the very least, Midsun has failed to explain at all why the *entire* document must be sealed. The same is true for the information offered by CSL's expert and discussed in Midsun's brief. In addition, among other things, some of the redacted information in the brief includes portions of Exhibit 15, which appears to be an advertisement in a publicly published magazine, as well as the method by which Fusco's survey was conducted and part of a quote from a public Second Circuit decision (*see* page 24 of the brief, Doc. 177 Ex. A). Such information clearly does not require sealing.

Midsun's redactions appear to be entirely too broad and not narrowly tailored to any compelling interest. As a result, the Court must deny Midsun's motion for leave to seal without

prejudice to refiling a proper motion with narrowly tailored redactions. The Court appreciates that with some of these redactions Midsun was attempting to protect CSL's information by redacting the entirety of the exhibit and the portions of its brief related to the exhibit because CSL has not de-designated the documents pursuant [*25] to the SPO. Thus, Midsun's motion will be denied without prejudice to the parties each having the opportunity to explain the clear and compelling reasons justifying the sealing of the information requested. The parties must do so in the manner described by this Court earlier in this Ruling.

### 3. *CSL's Motion for Leave to File Under Seal [Doc. 189]*

CSL also filed a motion for leave to file under seal certain information in its Reply Memorandum in support of its motion to exclude Fusco and to seal information in Exhibits 1 and 3 attached to that briefing. Doc. 189. CSL states that the redactions in these documents are to seal information that has been designated confidential or AEO by either CSL or Midsun and consist of excerpts from deposition transcripts from the depositions of Tremaglio and Vojtila. *Id.* at 1. CSL has separately publicly filed redacted versions of these documents. Doc. 191.

The Court, having reviewed the redactions related to the deposition transcripts, fails to understand what compelling reason could justify their redaction. The testimony is used as additional support in the briefing for points already made by CSL that it has not sought to have redacted. It is also testimony that [*26] has, at least to some extent, been filed publicly by Midsun. CSL also redacted part of its reply briefing that related to correspondence that is the subject of a number of other motions to seal. Thus, CSL's motion will be denied without prejudice to the parties having the opportunity to explain the clear and compelling reasons justifying the sealing of the information in these documents. The parties must do so in the manner described by this Court earlier in this Ruling.

### E. Motions Related to CSL's Motion for Partial Summary Judgment

#### 1. *CSL's Motion to Seal [Doc. 169]*

CSL filed a motion for leave to seal certain information filed in support of its motion for partial summary judgment. Doc. 169. CSL has separately filed publicly redacted versions of these documents including its: (1) Memorandum in Support; (2) Local Rule 56(a)(1) Statement; (3) supporting Exhibits 1-3, 5-7, 9-15, 24-25, 28-29 and 33-36 attached to its Local Rule 56(a)(1) Statement. Doc. 172. In support, CSL asserts that these documents contain excerpts of documents, or are

---

[9] This appears to be Exhibit 5, an exhibit that Midsun has not expressly listed as needed to be filed under seal but described as such by Midsun in an effort to protect CSL's designation of the document. However, CSL has filed already filed that document publicly, Doc. 168 Ex. 1. Thus, Exhibit 5 clearly does not need to be sealed.

[10] It is unclear to the Court why it would be necessary to redact the name of the source of the information given it is a media company that simply publishes a periodical with an industry-wide database. If there is some reason to protect this source, then Midsun must explain its reasoning to the Court.

documents, that have been designated confidential or AEO under the Protective Order. Doc. 169 at 1. CSL asserts that the documents include confidential business information of both CSL and [*27] Midsun or that Midsun has not yet had an opportunity to designate certain deposition testimony and sealing is necessary to prevent improper disclosure. *Id.* at 1-2.

Much of the information sought to be sealed by CSL is similar to or exactly the same as the information and documents sought to be sealed by CSL in its [Doc. 174] motion or its [Doc. 179] motion discussed *supra* in Parts II(B)(2) and II(C)(2) of this Ruling. Again, the Court reaches the same conclusions with regard to the information CSL seeks to redact related to its motion for partial summary judgment. Certain of these redactions are either irreconcilable with portions made public by CSL or Midsun (and not objected to by CSL) or do not appear to be justified in the first instance. Although other redactions may ultimately be justified and necessary to protect confidential business information, CSL has not adequately provided the reasons for such sealing, and furthermore, has not justified the sealing (in whole or in part) of the documents it requests.

Thus, CSL's motion will be denied without prejudice to the parties having the opportunity to explain the clear and compelling reasons justifying the sealing of the information in these [*28] documents. The parties must do so in the manner described by this Court earlier in this Ruling.

### 2. *Midsun's Motion to Seal [Doc. 182]*

Midsun has also filed a motion to seal certain information in documents related to its opposition to CSL's partial summary judgment motion. Doc. 182. Midsun has attached to its motion to seal redacted versions of its: (1) Memorandum in Opposition, (2) Local Rule 56(a)(2) Statement, and (3) Exhibits 33, 44, 46-47, and 55 attached to its Local Rule 56(a)(2) Statement. *Id.* Midsun asserts that the redactions to its brief relate to confidential or AEO information previously considered as so designated by either party. *Id.* at 1-2. The redactions to Midsun's Local Rule 56(a)(2) Statement incorporates language from a document produced by CSL that CSL considered confidential, which Midsun does not believe is confidential. *Id.* at 2. This document is from INMR, Exhibit 46, and does not appear to be confidential. Other redactions relate to the same testimony of Faisal Huda that Midsun does not consider to be confidential but which CSL will not de-designate and has sought to redact in its motions to seal. The exhibits to be sealed in whole or part include the excerpts of Faisal Huda's deposition testimony, the same CSL history sales document [*29] that has been the subject of other motions to seal described in this Ruling, and communications between CSL and a potential customer. CSL has not filed any response to Midsun's motion or indicated why some of this information, to the extent it is considered CSL's information, must be sealed.

The redactions, for the most part, concern the same exact information that are the subject of the other motions before this Court and are done by Midsun in order to protect information designated confidential or AEO by CSL. Again, in general, the redacted information does not appear to be commercially sensitive or to contain sensitive business operation information. However, without any input from CSL has to the sensitivity of this information, which CSL initially designated as confidential or AEO, the Court cannot fully evaluate whether it should be sealed. Thus, Midsun's motion will be denied without prejudice to the parties having the opportunity to explain the clear and compelling reasons justifying the sealing of the information in these documents. The parties must do so in the manner described by this Court earlier in this Ruling.

### 3. *CSL's Motion to Seal [Doc. 194]*

CSL has filed a motion to [*30] seal certain portions of its Reply Memorandum in support of its motion to for partial summary judgment that contain information from deposition transcripts that have been designated as AEO. Doc. 194 at 1. CSL again relies solely on this designation to support the need to redact the information. This is not sufficient. Thus, CSL's motion will be denied without prejudice to the parties having the opportunity to explain the clear and compelling reasons justifying the sealing of the information in these documents. The parties must do so in the manner described by this Court earlier in this Ruling

### III. <u>CONCLUSION</u>

For the foregoing reasons, each of the eleven motions to seal currently pending before the Court [Docs. 159, 162, 165, 169, 174, 177, 179, 182, 189, 192, 194] is DENIED WITHOUT PREJUDICE to refiling the motions, in compliance with this Ruling.

The documents filed under seal will remain under seal until August 25, 2017 at which time the parties must file or renew the motions to seal as instructed by the Court. The Court directs each party to file an omnibus motion, on or before August 25, 2017, that clearly describes and adequately addresses all of the confidential information the [*31] party seeks to seal. If no such motions to seal are filed, then the Court will order the parties to file the documents publicly. Any opposition to the omnibus motions must be filed on or before September 11, 2017.

The Court reminds the parties of Local Rule 5(e)(4), which

2017 U.S. Dist. LEXIS 189918, *31

provides the procedures for filing a motion to seal and allows parties to file memorandum or supporting documents also under seal as needed. In addition, as expressed throughout this Ruling, any motions to seal must adequately explain the compelling reasons that require sealing the information sought to be sealed by each party. The parties must also resolve the numerous inconsistencies in the redactions sought and the information that has already been made publicly available.

**It is SO ORDERED**.

**Dated: New Haven, Connecticut**

**July 12, 2017**

*/s/ Charles S. Haight Jr.*

**CHARLES S. HAIGHT, JR.**

**Senior United States District Judge**

---

**End of Document**

# EEOC v. Kelley Drye & Warren, LLP

United States District Court for the Southern District of New York

March 2, 2012, Decided; March 2, 2012, Filed

No. 10 Civ. 655 (LTS)(MHD)

**Reporter**
2012 U.S. Dist. LEXIS 28724 *; 2012 WL 691545

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff, -v- KELLEY DRYE & WARREN LLP, Defendant.

**Prior History:** Eeoc v. Kelley Drye & Warren, 2011 U.S. Dist. LEXIS 80673 (S.D.N.Y., July 25, 2011).

## Case Summary

**Overview**
In an EEOC discrimination action against an employer, certain documents that were filed under seal in connection with a partial summary judgment motion were unsealed because there was a strong presumption of public access to judicial documents under the First Amendment, and the employer failed to show that higher values overcame the presumption.

**Outcome**
Certain documents were to be unsealed.

**Counsel:** [*1] For Equal Employment Opportunity Commission, Plaintiff: Elizabeth Anne Grossman, LEAD ATTORNEY, Judy Ann Keenan, U.S. Equal Employment Opportunity Commission, New York, NY; Jeffrey Charles Burstein, LEAD ATTORNEY, Equal Employment Opportunity Commission, Newark, NJ.

For Kelley Drye & Warren, LLP, Defendant: Bettina Barasch Plevan, LEAD ATTORNEY, Proskauer Rose LLP (NY), New York, NY; Joseph C. O'Keefe, Jr, LEAD ATTORNEY, Proskauer Rose LLP (Newark), Newark, NJ.

**Judges:** LAURA TAYLOR SWAIN, United States District Judge.

**Opinion by:** LAURA TAYLOR SWAIN

## Opinion

### MEMORANDUM ORDER

The Equal Employment Opportunity Commission ("EEOC") brought this age discrimination action against Kelley Drye & Warren ("Kelley Drye" or "Firm") on behalf of Eugene T. D'Ablemont, a partner in Kelley Drye's New York office, and other unnamed individuals. On March 29, 2011, the parties entered into a stipulation allowing documents to be filed under seal in connection with EEOC's motion for partial summary judgment, which the Court so-ordered. (Stipulation and Order for the Filing Under Seal of Documents Marked "Confidential", Mar. 29, 2011, ECF No. 37.) EEOC filed its motion on May 30, 2011 (Motion for Partial Summary Judgment to dismiss Nineteenth [*2] Affirmative Defense, Mar. 30, 2011, ECF No. 38), and the Court issued its decision on July 25, 2011. (Memorandum Order, July 25, 2011, ECF No. 70.) Before the Court is parties' Joint Memorandum of Law responding to this Court's Order directing the parties to show cause as to why the documents submitted in connection with EEOC's summary judgment motion should not be unsealed and/or unredacted. The Court has reviewed carefully the parties' submission and, for the following reasons, a subset of the documents at issue is to be unsealed.

### DISCUSSION

There is a strong presumption of public access to judicial documents and proceedings that is rooted in both the common law and the First Amendment. See Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119-120 (2d Cir. 2006). Under the common law, the Court must determine the weight of the presumption of access and "balance competing considerations against it." United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995). The First Amendment presumption of public access may be overcome "if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Lugosch, 435 F.3d at 120 [*3] (quoting In re New York Times Co., 828 F.2d 110, 116). While both the common law and the First Amendment provide a presumption of public access, "[t]he common law does not afford as much

2012 U.S. Dist. LEXIS 28724, *3

substantive protection to the interests [in access to judicial documents] as does the First Amendment," Lugosch, 435 F.3d at 124 (citing Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir. 1988)).

To determine whether the First Amendment presumption of access attaches to sealed documents, a reviewing court must first determine whether the documents are judicial documents. Lugosch, 435 F.3d at 120. A document is a judicial document when it passes either prong of the "logic and experience" test, which asks whether the document has "historically been open to the press and general public," Hartford Courant, 380 F.3d 83, 92 (quoting Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986)), or whether "public access plays a significant positive role in the functioning of the particular process in question." Id. Alternatively, a document is deemed "judicial" if the document is "derived from or [is] a necessary corollary of the capacity to attend the relevant proceedings." Lugosch, 435 F.3d at 120 [*4] (quoting Hartford Courant, 380 F.3d at 93).

Once a document is classified as a judicial document, the First Amendment presumption of access may still be overcome by a showing that the requested sealing is narrowly tailored to preserve "higher values." Lugosch, 435 F.3d at 120 (quoting In re N.Y. Times Co., 828 F.2d 110, 116 (2d Cir. 1987). Although the term has not been comprehensively defined, courts have identified particular examples of "higher values." See e.g., Lugosch, 435 F.3d at 125 (the attorney-client privilege); United States v. Aref, 533 F.3d 72, 83 (2d Cir. 2008) (national security); United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995) (law enforcement interests and the privacy of innocent third parties); Pal v. N.Y. Univ., No. 06 Civ. 5892(PAC)(FM), 2010 U.S. Dist. LEXIS 53353, 2010 WL 2158283, at *1 (S.D.N.Y. May 27, 2010) (sensitive patient information). The party seeking to maintain the judicial documents under seal bears the burden of showing that higher values overcome the presumption of public access. DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 826 (2d Cir. 1997).

Kelley Drye argues that the documents at issue are not judicial documents because they were not filed in connection [*5] with a dispositive motion for summary judgment but rather, are sealed discovery documents attached to a non-dispositive motion. See Kamakana v. City & County of Honolulu, 447 F.3d 1172, 1179-80 (9th Cir. 2006) (finding an exception to the presumption of access to judicial records for sealed discovery documents attached to nondispositive motions)[1]. Kelley Drye's premise is erroneous - the

documents under seal were filed in connection with a dispositive summary judgment motion, and the Second Circuit in Lugosch has held that "there exists a qualified First Amendment right of access to documents submitted to the court in connection with a summary judgment motion." 435 F.3d 110, 124. However, not all of the documents filed under seal in the instant action are automatically deemed judicial documents. Rather, the judicial documents are only those upon which the Court relied in deciding the EEOC's motion for partial summary judgment.

The motion for partial summary judgment addressed Kelley Drye's [*6] nineteenth affirmative defense, which sought a setoff of any damages to which D'Ablemont may be entitled based on 1) payments to him by third parties; 2) allegedly excessive client development funds provided to him; and 3) the value of certain legal services he received from Kelley Drye. In determining this motion, the Court relied on the following documents (the "Judicial Documents"): relevant provisions of the Kelley Drye Partnership Agreement (Declaration of Eugene T. D'Ablemont, Exh. A (hereinafter "D'Ablemont Decl."); Declaration of John M. Callagy, Exh. A (hereinafter "Callagy Decl.")); copies of two retainer agreements between Kelley Drye partners and their clients (D'Ablemont Decl., Exh. B); a memorandum, dated December 14, 2000, from D'Ablemont to the firm, requesting a bonus in addition to direct compensation from clients (D'Ablemont Decl., Exh. C); agreements between Kelley Drye and other partners, indicating that these partners could receive direct payments from clients in addition to receiving compensation from Kelley Drye (D'Ablemont Decl., Exhs. D - H); a memorandum, dated February 22, 2000, from the firm to D'Ablemont, explaining that it was not firm policy to allow [*7] a partner to retain direct compensation from clients and still receive additional compensation from the firm (Callagy Decl., Exh. B); a memorandum, dated March 12, 2001, from D'Ablemont to the firm, arguing that he should receive a bonus payment from the firm in addition to direct compensation from clients (D'Ablemont Decl., Exh. I); the firm's Client Development Allowances policy (Reply Declaration of Eugene D'Ablemont, Exh. 5) (hereinafter "D'Ablemont Reply Decl.); a memorandum from D'Ablemont to the firm regarding his client development allowance for the year 2000 (D'Ablemont Reply Decl., Exh. 6); an accounting of D'Ablemont's client development allowances for the years 2007 to 2009 (D'Ablemont Reply Decl., Exh. 7); excerpts from manuals setting forth the firm's policy of providing partners limited legal services for free (Callagy Decl., Exhs. E - F); and a memorandum, dated July 18, 2008, from the firm to D'Ablemont, agreeing to write off the bill for legal services

---

[1] Kamakana confirmed that "the strong presumption of access to judicial records applies fully to dispositive pleadings, including

motions for summary judgment and related attachments." 447 F.3d at 1179.

provided to one of Mr. D'Ablemont's relatives. (D'Ablemont Decl., Exh. L; Callagy Decl., Exh. I.)

The other documents filed under seal but not relied upon are not "derived from or a necessary corollary of the capacity [*8] to attend the relevant proceedings," and are therefore not judicial documents to which the First Amendment presumption of access attaches. See Lugosch, 435 F.3d at 120 (quoting Hartford Courant, 380 F.3d at 93).

As the party seeking to maintain the Judicial Documents under seal, Kelley Drye bears the burden of demonstrating what "higher values" overcome the presumption of public access and justify sealing. DiRussa, 121 F.3d at 826. Kelley Drye argues that confidential firm documents should remain sealed because disclosure of such information could leave Kelley Drye at a competitive disadvantage. While "courts may deny access to records that are 'sources of business information that might harm a litigant's competitive standing,'" In re Parmalat Securities Litigation, 258 F.R.D. 236, 244 (quoting Nixon v. Warner Communications, Inc., 435 U.S. 589, 598, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978)), the party seeking to keep documents under seal "must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection; broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test." Id.

Kelley Drye claims [*9] that the release of its confidential material will put it at an economic disadvantage in the competitive legal market, as other firms would be able to approach Kelley Drye clients, seek to recruit Kelley Drye lawyers, copy Kelley Drye policies, and embark on arrangements with their clients and partners similar to the arrangements Kelley Drye has in place. Although business information need not be a "trade secret" in order to remain sealed or redacted, it is helpful to consider trade secret law "in determining whether information is sufficiently valuable and secret to afford an actual or potential economic advantage over others." Id. at 245 (internal quotations omitted). Courts routinely apply the following six factors when determining the existence of a trade secret:

"(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; [*10] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

Id. Other than the conclusory allegation that the material under seal is "highly confidential," Kelley Drye has failed to provide facts sufficient to establish that the Judicial Documents satisfy these six factors. Rather, most of the Judicial Documents are either specific to Mr. D'Ablemont's situation (and consequently unlikely to place Kelley Drye at a broad competitive disadvantage), or formulaic recitations of firm policies and procedures that can hardly be unique in the legal industry. See id. at 248 (denying motion to seal when defendants made "only vague and conclusory showings of the economic value of the information contained in any particular document" and failed to "demonstrate that the disclosure of any of the . . . documents at issue would reveal information that is not commonly known in the trade and that would cause a specific and significant harm to [defendants]"); cf. GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D., P.C., 769 F. Supp. 2d 630, 649-50 (S.D.N.Y. 2011) (granting defendant's motion to seal when documents contained "highly proprietary material concerning [*11] the defendants' marketing strategies, product development, costs and budgeting."); D'Amour v. Ohrenstein & Brown, LLP, No. 601418/2006, 17 Misc. 3d 1130[A], 851 N.Y.S.2d 68, 2007 NY Slip Op 52207[U], 2007 WL 4126386, at *21 (S.D.N.Y. Aug. 13, 2007) (finding good cause to seal a law firm's "income tax returns, financial statements and reports, and firm agreements and memoranda" particularly because "the tax returns include[d] schedules pertaining to [the firm's] individual partners, some of whom are no longer associated with [the firm] and are not parties to this litigation."). Kelley Drye has proffered no evidence that the Judicial Documents it wishes to maintain under seal are of such a highly proprietary or personal nature.

Kelley Drye has not made " a particular and specific demonstration of fact" that the disclosure of any of the Judicial Documents would "result in an injury sufficiently serious to warrant protection," Parmalat, 258 F.R.D. at 244, and so has failed to establish that its concerns of competitive disadvantage rise to the level of "higher values" sufficient to overcome the First Amendment presumption of access.

Kelley Drye also argues that the protection of client communications and names is a "higher value" that outweighs the presumption [*12] of access. The preservation of attorney-client confidentiality is a well-recognized exception to the presumption of access. See, e.g., The Diversified Group, Inc. v. Daugerdas, 217 F.R.D. 152, 162 (S.D.N.Y. 2003) (preserving the confidentiality of attorney-client communication is "precisely the kind of countervailing concern that is capable of overriding the general preference for public access to judicial records") (internal quotations

omitted). However, any request for sealing must be narrowly tailored to achieve the higher aim of preserving the higher value at issue. Lugosch, 435 F.3d at 120, 124. Accordingly, while the Court agrees that any client information in the Judicial Documents should remain confidential, wholesale sealing of the Judicial Documents is unnecessary, particularly in light of the EEOC's agreement to the continued redaction of all information that implicates the attorney-client privilege.

CONCLUSION

For the foregoing reasons, the Court finds that Kelley Drye has not shown cause as to why certain documents submitted in this action under seal should remain under seal. Kelley Drye is hereby directed to file on the ECF system, under a cover sheet bearing the case caption [*13] and labeled "Documents Filed Pursuant to March 2, 2012 Order of the Court," copies of the following documents, redacted only to the extent necessary to conceal client names and other client-identifying information implicating the attorney-client privilege: Exhibits A through I, and L attached to the Declaration of Eugene T. D'Ablemont (docket entry no. 43); Exhibits A, B, E, F, and I attached to the Declaration of John M. Callagy (docket entry no. 54); and Exhibits 5 through 7 attached to the Reply Declaration of Eugene T. D'Ablemont (docket entry no. 60). The documents must be filed by March 19, 2012.

Dated: New York, New York

March 2, 2012

/s/ Laura Taylor Swain

LAURA TAYLOR SWAIN

United States District Judge

# Excellent Home Care Servs., LLC v. FGA, Inc.

United States District Court for the Eastern District of New York

October 23, 2017, Decided; October 24, 2017, Filed

13 CV 5390 (ILG) (CLP)

**Reporter**

2017 U.S. Dist. LEXIS 176017 *; 2017 WL 4838306

EXCELLENT HOME CARE SERVICES, LLC, Plaintiff, -against- FGA, INC., Defendant.

**Prior History:** Excellent Home Care Servs., LLC v. FGA, Inc., 2014 U.S. Dist. LEXIS 21427 (E.D.N.Y., Feb. 19, 2014)

**Counsel:** **[*1]** For Excellent Home Care Services, LLC, Plaintiff: Barry Roy Feerst, LEAD ATTORNEY, Alham Usman, Marc Illish, Barry R. Feerst and Associates, Brooklyn, NY.

For FGA, Inc., Defendant: Jura C. Zibas, LEAD ATTORNEY, Wilson Elser, New York, NY; David Scott Sheiffer, Wilson, Elser Etc, New York, NY; Jonathan Ellis Meer, Wilson Elser Moskowitz Ederlman & Dicker LLP, New York, NY.

**Judges:** Cheryl L. Pollak, United States Magistrate Judge.

**Opinion by:** Cheryl L. Pollak

# Opinion

## ORDER

**POLLAK**, United States Magistrate Judge:

On June 5, 2017, this Court issued an Order imposing sanctions in the form of attorney's fees and costs upon plaintiff Excellent Home Care Services, LLC ("Excellent Home") (the "Sanctions Order"). This Sanctions Order was based on plaintiff's repeated failure to cure certain deficiencies in its discovery responses and its failure to comply with an Order of this Court issued on June 16, 2016, directing plaintiff to produce certain documents located in plaintiff's warehouse. On August 31, 2017, following plaintiff's appeal to the district court, the district court affirmed the Sanctions Order. Presently pending before this Court is defendant FGA's application for reasonable attorney's fees and costs incurred in **[*2]** connection with the filing of the Rule 37 motion for sanctions. In a separate application, FGA continues to complain that despite the clear orders of this Court, Excellent Home still has not produced a single document from the warehouse.

## DISCUSSION

As explained in its earlier Sanctions Order, Excellent Home, a home health care provider, entered into an agreement with FGA, in which FGA agreed to maintain, process and transmit to insurance companies and government regulators certain patient billing data generated by Excellent Home for reimbursement. (Am. Compl.[1] ¶¶ 2, 4, 7). Plaintiff alleges that defendant FGA breached the agreement by: 1) "[f]ailing to timely and or properly transmit claims on behalf of [plaintiff], thereby resulting in denials of payment to [plaintiff];" 2) "[f]ailing to monitor claims and denials;" and 3) "[f]ailing to recognize that [plaintiff's] claims were being denied and that such claims were not resubmitted to the Carrier." (Id. ¶ 10). Plaintiff claims that it suffered damages of $7,000,000 on account of this breach of contract. (Id. ¶ 21).

On January 20, 2017, defendant filed a letter seeking sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedures based on plaintiff's "continuing failure to cure specific deficiencies in its **[*3]** document production despite substantial efforts to voluntarily have [plaintiff] cure these deficiencies." (1/20/17 Def.'s Ltr.[2] at 1).[3] Specifically, defendant complained that plaintiff had: 1) failed to reference specific documents responsive to defendant's Document

---

[1] Citations to "Am. Compl." refer to the Verified Amended Complaint, filed on September 24, 2014.

[2] Citations to "1/20/17 Def.'s Ltr." refer to defendant's letter, filed on January 20, 2017.

[3] Also on January 24, 2017, plaintiff filed a letter seeking to have the Court disqualify defendant's counsel on the grounds that defendant's counsel had previously represented plaintiff in a state court action, and thus had a conflict of interest. (1/24/17 Pl.'s Ltr. at 1). That motion was denied in an Order dated September 29, 2017.

Requests 19 through 24; 2) failed to produce so-called "warehouse documents" that the Court previously Ordered plaintiff to produce; and 3) failed to provide specific responses to interrogatories seeking itemized computations of plaintiff's damages claims.

In its Sanctions Order, the Court found that plaintiff had failed to identify the documents responsive to Requests 19-24, and had failed to Bates stamp the electronically stored information. (Sanctions Order at 17). With respect to the warehouse documents, this Court had previously directed plaintiff to "produce (1) Bates stamped copies of documents in warehouse . . . within 30 days." (6/16/2016 Minute Entry[4]). As of June 5, 2017, this Order, issued almost one year earlier on June 16, 2016, had been ignored. (2/6/17 Def.'s Ltr., Ex. F). Even though defendant indicated that it was only "interested in the documentation that supports the claims asserted by plaintiff (id. Ex. [*4] Q at 1), plaintiff took the position that it was up to defendant to review the 22,000 patient files that were stored in the warehouse. (1/27/17 Pl.'s Ltr. at 2 n.1). Not only had the Court Ordered plaintiff to produce the documents, but plaintiff conceded that it had not produced the documents, nor had plaintiff sought reconsideration of the Order or explained to the Court that the documents were irrelevant and burdensome to produce. Thus, the Court found that plaintiff had violated its discovery obligations and this Court's June 16, 2016 Order by failing to produce any documents from its warehouse that are relevant either to its damages calculations or to defendant's document requests. (Sanctions Order at 20-21). Accordingly, in its Sanctions Order, the Court ordered plaintiff to produce documents from the warehouse by July 20, 2017. (Id.) The Court also recommended sanctions in the form of attorneys' fees to be awarded to defendant's counsel based upon plaintiff's violation of Rule 37 of the Federal Rules of Civil Procedure. (Id. at 25). The Court also indicated that further noncompliance may result in a recommendation of further sanctions, such as an order of preclusion or adverse inference. (Id. at 21).

In an Order dated August 30, 2017, the [*5] Honorable I. Leo Glasser affirmed this Court's Sanctions Order.

A. FGA's Request for Attorneys' Fees

In its application dated July 7, 2017, FGA requests an award of $13,969.70 in connection with its efforts to secure Excellent Home's compliance with its discovery obligations and with this Court's prior Orders.

On July 21, 2017, plaintiff filed a motion for an extension of

time to file its response to defendant's request for attorney's fees. In light of the amount of time these discovery issues have been ongoing, the Court denied this extension on the same day. The Court confirmed that plaintiff had until July 28, 2017 to file its response.

After hearing nothing from plaintiff regarding defendant's fee requests for almost two months, on September 18, 2017, this Court sua sponte set a hard deadline of September 22, 2017 for a response. Plaintiff still chose not to respond, nor did plaintiff request another extension. Accordingly, this Court proceeds to consider defendant's fee request.

Of the total $13,969.70 sought by defendant, $13,894.50 represents 51.1 hours in attorneys' fees expended in connection with defendant's Rule 37 motion for sanctions. The remaining $75.20 represents court costs and [*6] disbursements.

In accordance with New York State Ass'n for Retarded Children. Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983), defendant's counsel has submitted the Declarations of Jonathan E. Meer, Esq. ("Meer Decl."), and David S. Sheiffer, Esq. ("Scheiffer Decl."), along with contemporaneous billing records,[5] setting forth the dates and amount of time during which services were rendered, the hourly rate at which the services were charged, along with the name of the attorney performing the work and a description of services performed. (See Meer Decl., Ex. A).

In determining whether a fee request is "reasonable," courts employ the "lodestar" method, multiplying the number of hours reasonably spent by counsel on the matter by a reasonable hourly rate. See Perdue v. Kenny A., 559 U.S. 542, 546, 551-52, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010); Millea v. Metro-North R.R. Co., 658 F.3d 154, 166 (2d Cir. 2011); Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 183 (2d Cir. 2008); Cowan v. Ernest Codelia. P.C., No. 98 CV 5548, 2001 U.S. Dist. LEXIS 185, 2001 WL 30501, at *7 (S.D.N.Y. Jan. 12, 2001), aff'd, 50 F. App'x 36 (2d Cir. 2002). Although there is a "strong presumption that this amount represents a reasonable fee," the resulting lodestar figure may be adjusted based on certain other factors. Cowan v. Ernest Codelia. P.C., 2001 U.S. Dist. LEXIS 185, 2001 WL 30501 at *7; Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999).

1) Reasonable Hourly Rate

In determining a reasonable fee, the Court is afforded considerable discretion in determining reasonable hourly

---

[4] Citations to "6/16/2016 Minute Entry" refer to the Minute Entry for Telephone Conference proceeding held on 6/16/2016, ECF No. 62.

[5] Defendant FGA submitted a motion to file these billing records under seal. That motion is addressed below.

rates, in part based on its experience and an understanding of the course of the litigation. See, e.g., Matusick v. Erie Cty. Water Auth., 757 F.3d 31, 64 (2d Cir. 2014) (explaining that "[w]e afford a district court considerable discretion in determining what constitutes reasonable [*7] attorney's fees in a given case, mindful of the court's 'superior understanding of the litigation'") (quoting Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 151 (2d Cir. 2008)); Chen v. JP Standard Constr. Corp., No. 14 CV 1086, 2016 U.S. Dist. LEXIS 36464, 2016 WL 2909966, at *15 (E.D.N.Y. Mar. 18, 2016), report and recommendation adopted, 2016 U.S. Dist. LEXIS 63007, 2016 WL 2758272 (E.D.N.Y. May 12, 2016) (observing that the "[c]ourt can and should exercise broad discretion in determining a reasonable fee award").

To calculate the presumptively reasonable fee, a court must first determine a reasonable hourly rate for the legal services performed. See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County, of Albany, 522 F.3d at 183. In Arbor Hill, the Second Circuit adopted the following factors to guide the court's inquiry as to what constitutes a reasonable hourly rate:

> 1) the time and labor required; 2) the novelty and difficulty of the questions; 3) the level of skill required to perform the legal service properly; 4) the preclusion of employment by the attorney due to acceptance of the case; 5) the attorney's customary hourly rate; 6) whether the fee is fixed or contingent; 7) the time limitations imposed by the client or the circumstances; 8) the amount involved in the case and the results obtained; 9) the experience, reputation, and ability of the attorneys; 10) the "undesirability" of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases[.]

Id. at 187 n.3 (citation omitted). [*8] A number of courts within the Second Circuit have applied these factors when awarding attorney's fees. See, e.g., Manzo v. Sovereign Motor Cars, Ltd., No. 08 CV 1229, 2010 U.S. Dist. LEXIS 46036, 2010 WL 1930237, at *7 (E.D.N.Y. May 11, 2010); Adorno v. Port Auth. of New York & New Jersey, 685 F. Supp. 2d 507, 511 (S.D.N.Y. 2010); Cruz v. Henry Modell & Co., Inc., No. 05 CV 1450, 2008 U.S. Dist. LEXIS 25339, 2008 WL 905351, at *3 (E.D.N.Y. Mar. 31, 2008).

Courts are also instructed to balance:

> the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively . . ., the timing demands of the case, whether the attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether the

attorney might have initially acted pro bono . . ., and other returns (such as reputation, etc.) the attorney might expect from the representation

Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d at 184; see also Heng Chan v. Sung Yue Tung Corp., No. 03 CV 6048, 2007 U.S. Dist. LEXIS 33883, 2007 WL 1373118, at *2 (S.D.N.Y. May 8, 2007).

In this case, plaintiffs were represented by the firm of Wilson, Elser, Moskowitz, Edelman & Dicker LLP (the "Firm"). In moving for fees, defendant seeks an hourly rate of $275 per hour for David Sheiffer, a partner with the Firm, admitted to practice in 1987, and Jonathan Meer, also a partner with the Firm, admitted to practice in 2007. (Sheiffer Decl. ¶¶ 4, 6; Meer Decl. ¶¶ 4, 6).

Based on the Court's knowledge of the rates generally charged in this district by partners, Mr. Sheiffer's [*9] and Mr. Meer's requested rate of $275 per hour is consistent with or lower than the rates generally awarded to partners in this district. See, e.g., Hall v. ProSource Techs., LLC, No. 14 CV 2502, 2016 U.S. Dist. LEXIS 53791, 2016 WL 1555128, at *12 (E.D.N.Y. Apr. 11, 2016) (holding that a partner with twelve years of experience in litigating FLSA and NYLL wage and hour lawsuits should be awarded an hourly rate of $450); Bosoro v. American Comprehensive Healthcare Med. Grp., No. 14 CV 1099, 2015 U.S. Dist. LEXIS 129465, 2015 WL 5676679, at *9 (E.D.N.Y. Aug. 31, 2015), report and recommendation adopted, 2015 U.S. Dist. LEXIS 129367, 2015 WL 5686481 (E.D.N.Y. Sept. 25, 2015) (stating that "prevailing hourly rates in the Eastern District of New York [are] between $350 and $400 for law firm partners"); Bodon v. Domino's Pizza, LLC, No. 09 CV 2941, 2015 U.S. Dist. LEXIS 82039, 2015 WL 3889577, at *8 (E.D.N.Y. June 4, 2015), report and recommendation adopted sub nom. Bodon v. Domino's Pizza, Inc., No. 09 CV 2941, 2015 U.S. Dist. LEXIS 81879, 2015 WL 3902405 (E.D.N.Y. June 24, 2015) (holding that "recent cases have held that partners are generally entitled to recover $300 to $450 per hour"); Hui Luo v. L&S Acupuncture, P.C., No. 14 CV 1003, 2015 U.S. Dist. LEXIS 56236, 2015 WL 1954468, at *2 (E.D.N.Y. Apr. 29, 2015) (observing that the prevailing hourly rates for partners in this district ranges from $300 to $400), aff'd, 649 Fed. Appx. 1, 2016 WL 2848646 (2d Cir. 2016); Griffin v. Astro Moving & Storage Co. Inc., No. 11 CV 1844, 2015 U.S. Dist. LEXIS 43326, 2015 WL 1476415, at *8 (E.D.N.Y. Mar. 31, 2015) (collecting cases and awarding a partner at a law firm with 27 years of employment litigation experience an hourly rate of $400 after a jury trial); Leser v. U.S. Bank Nat. Ass'n, No. 09 CV 2362, 2013 U.S. Dist. LEXIS 67468, 2013 WL 1952306, at *10 (E.D.N.Y. May 10, 2013) (awarding $425 per hour in straightforward commercial

litigation to lead partner with 28 years of experience ); Ferrara v. CMR Contracting LLC, 848 F. Supp. 2d 304, 313 (E.D.N.Y. 2012) (observing that "[i]n recent years, courts in this district have approved hourly fee rates in the range of $200 to $450 partners, $100 to $300 for associates [*10] and $70 to $100 paralegal assistants"); Toussie v. County of Suffolk, No. 01 CV 6716, 2011 U.S. Dist. LEXIS 58179, 2011 WL 2173870, at *2 (E.D.N.Y. May 31, 2011) (approving fees at the rate of $450 per hour for a partner with 34 years' experience).

In this case, plaintiff has not filed any opposition to defendant's fee request. Thus, the Court has not only considered the rates found reasonable in other cases, but has also considered the time and effort needed on the part of counsel based in part on plaintiff's own conduct. Based on these factors, the Court finds that the hourly rate of $275 for Mr. Sheiffer and Mr. Meer is reasonable.

2) Reasonable Number of Hours Billed

In awarding attorney's fees, it is necessary for the Court to determine the reasonableness of the number of hours expended by counsel on the case. See, e.g., LaBarbera v. Empire State Trucking, Inc., No. 07 CV 669, 2008 U.S. Dist. LEXIS 125161, 2008 WL 746490, at *4-5 (E.D.N.Y. Feb. 26, 2007). In reviewing a fee application, the court "should exclude excessive, redundant or otherwise unnecessary hours." Bliven v. Hunt, 579 F.3d 204, 213 (2d Cir. 2009) (quoting Hensley v. Eckerhart, 461 U.S. 424, 433-35, 440, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)). If the court finds "that some of the time was not reasonably necessary . . . it should reduce the time for which compensation is awarded accordingly." Louis Vuitton Malletier, S.A. v. LY USA, Inc., 676 F.3d 83, 111 (2d Cir. 2012); see also Struthers v. City of New York, No. 12 CV 242, 2013 U.S. Dist. LEXIS 137773, 2013 WL 5407221, at *8-9 (E.D.N.Y. Sept. 25, 2013) (reducing fees because the fees requested for responding to motion papers were "excessive"); Jemine v. Dennis, 901 F. Supp. 2d 365, 393 (E.D.N.Y. 2012) (reducing requested fees by 10% because the "quality and complexity of the submissions and calculations" [*11] did not reflect the hours expended); Ehrlich v. Royal Oak Fin. Servs., No. 12 CV 3551, 2012 U.S. Dist. LEXIS 159815, 2012 WL 5438942, at *3-4 (E.D.N.Y. Nov. 7, 2012) (reducing attorneys' fees because the attorney's litigation of the suit made apparent his "lack of experience" and for duplicative entries); Quinn v. Nassau Cnty. Police Dep't., 75 F. Supp. 2d 74, 78 (E.D.N.Y. 1999) (reducing one attorney's fees by 20% and another's by 30% for unnecessary and redundant time); American Lung Ass'n v. Reilly, 144 F.R.D. 622, 627 (E.D.N.Y. 1992) (finding that the "use of so many lawyers for relatively straightforward legal tasks was excessive and led to duplication of work," and deducting 40% of plaintiffs' lawyer's hours).

Rather than itemizing individual entries as excessive, the court may make an "across-the-board reduction, or percentage cut, in the amount of hours." T.S. Haulers, Inc. v. Cardinale, No. 09 CV 451, 2011 U.S. Dist. LEXIS 9578, 2011 WL 344759, at *3 (E.D.N.Y. Jan. 31, 2011) (citing Green v. City of New York, 403 F. App'x 626, 630 (2d Cir. 2010)). Similarly, courts routinely apply across-the-board reductions for vague entries. See, e.g., Kirsch v. Fleet St. Ltd., 148 F.3d 149, 173 (2d Cir. 1998) (affirming district court's 20% reduction in attorneys' fees for "vagueness, inconsistencies, and other deficiencies in the billing records"); Moore v. Diversified Collection Servs., Inc., No. 07 CV 397, 2013 U.S. Dist. LEXIS 56246, 2013 WL 1622949, at *4 (E.D.N.Y. Mar. 19, 2013) (reducing attorney's fees by 10% due to the "vagueness and incompleteness" of some of the entries); Tucker v. Mukasey, No. 03 CV 3106, 2008 U.S. Dist. LEXIS 48687, 2008 WL 2544504, at *2 (S.D.N.Y. June 20, 2008) (reducing fees by 30% in part because although some entries were detailed, others were vaguely worded or inconsistent); Marisol A. ex rel. Forbes v. Giuliani, 111 F. Supp. 2d 381, 396-97 (S.D.N.Y. 2000) (concluding that "the vagueness of some of the time records prevents the Court from determining why plaintiffs were required [*12] to expend so many hours on these tasks" and accounting for this factor by reducing fees by 15%); Cabrera v. Fischler, 814 F. Supp. 269, 290 (E.D.N.Y. 1993) (reducing fees by 30% for vague entries with insufficient descriptions of work performed), rev'd in part & remanded on other grounds, 24 F.3d 372 (2d Cir. 1994), cert. denied, 513 U.S. 876, 115 S. Ct. 205, 130 L. Ed. 2d 135 (1994).

As noted above, defendant's counsel has submitted contemporaneous billing records, setting forth the dates and amount of time during which services were rendered, the hourly rate at which the services were charged, and the names of the individuals who provided these services, along with a description of the work performed. In total, Mr. Meer billed 31.6 hours of work, and Mr. Sheiffer billed 19.5 hours. (Meer Decl. ¶ 6, Ex. 1; Sheiffer Decl. ¶ 6). The records indicate that between January 17, 2017 and January 27, 2017, while FGA's counsel was preparing the motion for sanctions, reviewing Excellent Home's opposition papers, and preparing FGA's reply, counsel expended a total of 12.7 hours. (Meer Decl., Ex. 1). The Court finds this amount to be reasonable.

FGA's counsel also prepared for and attended the January 30, 2017 Show Cause hearing set by this Court, which plaintiff's counsel failed to attend. Indeed, when the Court contacted plaintiff's [*13] counsel, who had been listed as counsel of record since the beginning of the case, counsel indicated that he had no knowledge of the matter. Thus, the Court finds that FGA is entitled to be reimbursed for the ten hours of wasted time spent by its counsel in preparation for a hearing that did

not occur as scheduled due to plaintiff's counsel's failure to appear. (Id.)

Thereafter, between January 31 and March 23, 2017, defendant's counsel prepared a supplemental motion for sanctions as directed by this Court at the January 30, 2017 conference. This amounted to 28.2 hours spent preparing defendant's submission and reviewing plaintiff's response. (Id.)

The Court notes that plaintiff was given ample opportunity to cure its defective discovery and simply ignored the requests from defendant and the Orders from this Court. Had it complied, the number of hours spent by defendant in an effort to obtain discovery would not have been as high. Since plaintiff has not challenged the reasonableness of the hours expended and based on the Court's own review of the billing records, the Court finds no reason to reduce the requested fees based on any concern that counsel inflated the number of hours or [*14] that there was a duplication of hours. Accordingly, the Court Orders plaintiff to reimburse defendant FGA for $13,894.50 in attorneys' fees as a sanction for plaintiff's failure to comply with its discovery obligations and with this Court's prior Orders.

FGA also seeks $75.20 in court costs and disbursements incurred in connection with the efforts to obtain discovery in this case. According to the invoices attached to the Meer Declaration, counsel for defendant incurred $73.40 in Pacer Service Center costs between December 12, 2016 and March 23, 2017. In addition, counsel seeks $1.80 in Pacer Service Center costs incurred on July 28, 2016 and August 12, 2016. (Id.) Since counsel has failed to explain why these expenses, which were incurred before the motion to compel was filed, should be subject to reimbursement in connection with this sanctions order, the Court awards only $73.40 as the reimbursable amount for costs.

Accordingly, the Court awards FGA $13,967.90 in fees and costs incurred with the sanction Order of June 5, 2017.

B. FGA's Renewed Motion to Compel

By letter dated August 21, 2017, defendant FGA complains that plaintiff, despite the clear orders from this Court, has still [*15] failed to provide a single Bates stamped "warehouse document." (Def.'s 8/21/17 Ltr[6] at 1). According to defendant, rather than producing the 22,000 relevant documents that plaintiff admitted in its July 16, 2016 letter, plaintiff is now taking the position that there are "no relevant warehouse documents." (Id. at 2). Defendant represents that

plaintiff has simply provided Bates stamped "lists" of 33,000 patient claims, which at times provide the claimed reasons and amounts of the bills, but which are duplicative in many instances and which lack confirmation that Excellent Home was actually entitled to collect on these claims. (Id.) Defendant argues that plaintiff should not be allowed to raise "spurious objections, or claim such documents are in FGA's possession," given that the records that FGA has received indicate clearly that plaintiff has access to documents that should have been produced. (Id.) Indeed, defendant questions whether plaintiff actually reviewed its own records. (Id.)

Defendant also complains that despite this Court's Orders, plaintiff still has not provided an itemization of its damages calculations. (Id.) According to FGA, plaintiff has not produced a "single document demonstrating [*16] it has any of the necessary supporting evidence required to have obtained payment for the billings it contends FGA failed to correctly handle." (Id.) Although plaintiff provided a list of 30,000 patient billing records, defendant contends that it is unclear which of these 30,000 patients are at issue in this case. (Id.) Defendant contends that under the holdings in Cine Forty Second Street Theater Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062 (2d Cir. 1979) and National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 642, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1979), the appropriate sanction for plaintiffs continued failure to comply with its discovery obligations and this Court's Orders is entry of a preclusion order barring any evidence of damages, or "outright dismissal." (Id. at 3, 4).

In its Sanction Order, this Court Ordered plaintiff to provide the warehouse documents that plaintiff claims establish defendant's liability and/or damages. (Sanctions Order at 20-21, 25). The plaintiff was also explicitly Ordered to provide an itemized computation of damages. (Id.) Although plaintiff has had two months to respond to defendant's motion to preclude or dismiss, plaintiff has not filed any response to the defendant's August 21, 2017 letter.

Accordingly, because the sanction sought by defendant is case dispositive, the Court Orders plaintiff to Show Cause by November 10, 2017 why the case should [*17] not be dismissed, or an order of preclusion entered, based on plaintiff's continued violations of this Court's Orders and its discovery obligations under Rule 37 of the Federal Rules of Civil Procedure.

C. FGA's Motion to File Documents Under Seal

On June 30, 2017, FGA filed a motion for leave to file its attorney declarations and billing records under seal. According to FGA, these billing records and entries "include

---

[6] Citations to "Def.'s 8/21/17 Ltr" refers to the defendant's letter motion, dated August 21, 2017.

confidential information." (6/30/17 Mot.[7] at 1).

Pursuant to Federal Rule of Civil Procedure 26(c), the Court may issue a protective Order allowing documents to be filed under seal upon a showing of good cause. In re "Agent Orange" Prod. Liability Litig., 821 F.2d 139, 145 (2d Cir. 1987). "Ordinarily, good cause exists 'when a party shows that disclosure will result in a clearly defined, specific and serious injury." In re Terrorist Attacks on Sept. 11, 2001, 454 F. Supp. 2d 220, 221 (S.D.N.Y. 2006) (quoting Shingara v. Skiles, 420 F.3d 301, 306 (3d Cir. 2005)).

There is a longstanding tradition in the judicial system of maintaining public access to judicial records, which creates a "presumption of access" to the public. Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110 (2d Cir. 2006). In Lugosch v. Pyramid Co. of Onondaga, the Second Circuit specified several factors that weigh in favor of granting public access to a document: 1) the document must be "judicial," meaning "'the item filed must be relevant to the performance of the judicial function and useful in the judicial process,'" [*18] id. at 119 (citing United States v. Amodeo, 44 F.3d 141, 145 (2d Cir. 1995)); 2) the court must determine the relevance of the material at issue to a proper adjudication of the case, id. at 119; and 3) the court must balance these considerations against countervailing factors including "the danger of impairing law enforcement or judicial efficiency" and "the privacy interests of those resisting disclosure." Id. at 120.

The Court finds that FGA has not met its burden of demonstrating "good cause" for filing its billing records under seal. First, FGA has redacted all of the billing entries that do not relate to the motions at issue in this opinion. (Meer Decl., Ex. 1). Furthermore, FGA has redacted certain confidential information within the billing entries for amounts it requests. (Id.) Having reviewed the billing records provided by FGA, the Court has found no examples of documents which might reveal attorney-client communications. If these documents, in their un-redacted form, ever did reveal attorney-client communications, the redactions already made by FGA's counsel are sufficient to solve this issue.

Balancing the fact that FGA's billing entries are already redacted so as to not reveal any potentially privileged communications, with the public's right of access to information, [*19] the Court denies FGA's request to file its billing records and attorney affidavits under seal. Accordingly, the Court Orders that FGA re-submit these records and affidavits on the public docket.

CONCLUSION

Having reviewed both the billing records and the time spent litigating this sanctions motion, the Court finds that the number of hours billed by FGA's counsel is not excessive. Thus, in light of the rates and hours discussed above, the Court awards $13,967.90 in fees and costs. Additionally, the Court Orders plaintiff to Show Cause by November 10, 2017 why the case should not be dismissed, or an order of preclusion entered, based on plaintiff's continued violations of this Court's Orders and its discovery obligations under Rule 37 of the Federal Rules of Civil Procedure. Finally, the Court denies FGA's motion to file its billing records under seal and Orders that FGA re-submit these records and attorney affidavits on the public docket.

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED**.

Dated: Brooklyn, New York

October 23, 2017

/s/ Cheryl Pollak

Cheryl L. Pollak

United States Magistrate Judge

Eastern District of New York

End of Document

---

[7] Citations to "6/30/17 Mot." refer to FGA's Motion for Leave to File Under Seal, filed on June 30, 2017.

# Gardner v. Univ. of Conn. Health Ctr.

United States District Court for the District of Connecticut

November 18, 2013, Decided; November 18, 2013, Filed

3:12 - CV- 1168 (CSH)

**Reporter**

2013 U.S. Dist. LEXIS 163784 *; 2013 WL 6073430

ERIN GARDNER, Plaintiff, v. UNIVERSITY OF CONNECTICUT HEALTH CENTER, Defendant.

**Subsequent History:** Summary judgment granted by Gardner v. Univ. of Conn. Health Ctr., 2016 U.S. Dist. LEXIS 118919 (D. Conn., Sept. 1, 2016)

**Counsel:** [*1] For Erin Gardner, Plaintiff: Thomas W. Bucci, LEAD ATTORNEY, Willinger, Willinger & Bucci, Bridgeport, CT.

For University of Connecticut Health Center, Defendant: Carolyn Ennis, LEAD ATTORNEY, Office of the Attorney General, Employment Rights Department, Hartford, CT.

**Judges:** Charles S. Haight, Jr., Senior United States District Judge.

**Opinion by:** Charles S. Haigh, Jr.

# Opinion

**RULING ON JOINT MOTION FOR PROTECTIVE ORDER**

**HAIGHT, Senior District Judge:**

## I. INTRODUCTION

Plaintiff brings this action seeking relief and damages for the alleged unlawful termination of her employment as a clinical social worker by the State of Connecticut, University of Connecticut Health Center, Correctional Managed Health Care ("UCHC"). [1] Specifically, plaintiff alleges that she has had a seizure disorder since 1999, "suffered a partial seizure during the course of her working hours" at York Correctional Institute on June 21, 2012, was subsequently determined to be "not . . . physically fit for duty" by UCHC, and discharged for her disability on June 28, 2012. Doc. 1 ("Complaint"), ¶¶ 15, 22-36. Plaintiff brings this action for discriminatory termination pursuant to the Rehabilitation Act, 29 U.S.C. §§ 791, 794, and 794a, et seq. [2] Doc. 1, [*2] ¶ 1.

Pending before the Court is the parties' "Joint Motion for Protective Order" [Doc. 25], seeking the Court's entry of a stipulated "Joint Protective Order" [Doc. 25-1] pursuant to Fed. R. Civ. P. 26(c). In particular, the proposed protective order limits disclosure of "all disks . . . which show or depict any inmate and any part of the inside or outside of a Connecticut Correctional Institution." The order then limits those to whom the disks may be shown (*i.e.*, counsel of record and their staff; experts, investigators and consultants retained by counsel; this Court; any court reporter in the proceedings of this action; plaintiff in the presence of her counsel; and [*3] witnesses at deposition). Doc. 25-1, ¶ 1(a)-(g). The order mandates notice of, and agreement to be bound by, the order with respect to "any person to whom the disks are to be disclosed." *Id.*, ¶ 2. In addition, the order prohibits copying of the disks "without prior written approval of the Court." *Id.*, ¶ 3.

## II. DISCUSSION

The scope of discovery in a federal action is well-defined and intentionally broad. Absent a court order limiting its permissible range, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). In this context,

---

[1] While employed by UCHC, plaintiff was assigned to the York Correctional Institution, a high-security facility in Niantic, Connecticut. Her partial seizure on June 21, 2012 occurred in the hallway of Building 4 at that facility. Doc. 1, ¶ 22.

[2] Due to plaintiff's federal claim, the Court has "federal question" subject matter jurisdiction over this action. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

relevance is viewed broadly in that "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id. See also Sedona Corp. v. Open Solutions, Inc.*, 249 F.R.D. 19, 21 (D.Conn. 2008); *Allied-Signal, Inc. v. Allegheny Ludlum Corp.*, 132 F.R.D. 134, 136 (D. Conn. 1990). Relevancy thus creates a broad vista for discovery, *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1988), such that a trial becomes "less a game of blind man's buff and more a fair contest with the basic issues and **[\*4]** facts disclosed to the fullest practicable extent," *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682, 78 S. Ct. 983, 2 L. Ed. 2d 1077 (1958).

Despite this liberal construction of relevance in discovery, pursuant to Federal Rule of Civil Procedure 26(c), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Moreover, parties are encouraged "to jointly propose a protective order to ensure that any potentially privileged [or confidential] materials that may be disclosed between the parties during discovery are not publicly revealed unless they are eventually filed with the Court." *Giordano v. United States*, No. 3:11cv9 (MRK), 2011 U.S. Dist. LEXIS 27910, 2011 WL 1831578, at * 4 (D.Conn. Mar. 17, 2011). For example, protective orders may be useful in protecting materials such as, *inter alia*, trade secrets; proprietary or confidential research, development, and commercial information; medical records; information implicating the reputational interests of third parties; and information which, if disclosed, could negatively impact public health and safety.

In general, a protective order may only be issued upon a finding of "good **[\*5]** cause," which calls for a sound basis or legitimate need to limit discovery of the subject information. Fed. R. Civ. P. 26(c). The burden is on the party seeking the order to demonstrate good cause for its issuance. *Uniroyal Chem. Co. Inc. v. Syngenta Crop Prot.*, 224 F.R.D. 53, 56 (D. Conn. 2004). *See also In re "Agent Orange" Prod. Liab. Litig.*, 821 F.2d 139, 145 (2d Cir. 1987), *cert. denied sub nom. Dow Chem. Co. v. Ryan*, 484 U.S. 953, 108 S. Ct. 344, 98 L. Ed. 2d 370 (1987). *See also generally* 10A Fed. Proc., L. Ed. § 26:279. "Good cause" may be established upon a showing that "disclosure will work a clearly defined and very serious injury" to the party seeking protection. *Uniroyal Chem. Co.*, 224 F.R.D. at 56.

In the case at bar, I find that on the face of the jointly proposed protective order, disclosure of images or materials on disks "which show or depict any inmate and any part of the inside or outside of a Connecticut Correctional Institution" may include images which would potentially result in "serious

injury" to the subject inmates and prison. In particular, if disseminated to the public, such images may unduly invade the privacy of inmates and/or impair prison security. *See, e.g., Houchins v. KQED, Inc.*, 438 U.S. 1, 5 n.2, 98 S. Ct. 2588, 57 L. Ed. 2d 553 (1978) **[\*6]** ("Inmates in jails, prisons, or mental institutions retain certain fundamental rights of privacy; they are not like animals in a zoo to be filmed and photographed at will by the public or by media reporters"); *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992) ("prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy"); *Thornburgh v. Abbott*, 490 U.S. 401, 415, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989) (maintaining prison security is an undeniably significant penological interest); *Duamutef v. Hollins*, 297 F.3d 108, 113 (2d Cir. 2002) (recognizing the "paramount importance of exercising caution in matters of prison security").

Federal courts have repeatedly found good cause to limit discovery or disclosure of information implicating the safety and security of prisons. *See, e.g., Matson v. Hrabe,* No. 11-3192-RDR, 2013 U.S. Dist. LEXIS 117654, 2013 WL 4483000, at *5 (D.Kan. Aug. 20, 2013) ("The Court agrees that information relating to other inmates and their housing assignments could potentially create security concerns . . . . In fact, '[p]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.'") (quoting *Verdecia v. Adams,* 327 F.3d 1171, 1175 (10th Cir.2003)); **[\*7]** *Cooper v. Sely,* No. 1:11-cv-00544-AWI-MJS (PC), 2013 U.S. Dist. LEXIS 5470, 2013 WL 146428, at *3 (E.D. Cal. Jan. 14, 2013) ("Where otherwise discoverable information would pose a threat to the safety and security of the prison or infringe upon a protected privacy interest, a need may arise for the Court to balance interests in determining whether disclosure should occur."); *Biscoe v. Garcia*, No. CV11-943-PHX-ROS (LOA), 2012 U.S. Dist. LEXIS 109646, 2012 WL 3228820, at *1 (D. Ariz. Aug. 6, 2012) ("Discovery in prisoner cases raises unique challenges. For example, where otherwise discoverable information would pose a threat to the safety and security of the prison or infringe upon a protected privacy interest, a need may arise for the Court to balance interests in determining whether disclosure should occur.") (internal quotations and citation omitted); *Robinson v. Adams*, No. 1:08-cv-01380-AWI-BAM PC, 2012 U.S. Dist. LEXIS 36028, 2012 WL 912746, at *2-3 (E.D.Cal. Mar.16, 2012) (issuing protective order regarding documents containing information which implicated the safety and security of the prison). [3]

---

[3] Also with respect to law enforcement, federal common law recognizes "a qualified executive privilege designed 'to prevent disclosure of law enforcement techniques and procedures, **[\*8]** to

In sum, upon review of the parties' proposed terms, the Court will approve and enter their "Joint Protective Order" as set forth at Doc. 25-1. There is good cause for the parties to protect information during discovery which has the potential to negatively impact inmate privacy and/or prison security.

Nonetheless, the parties are reminded that this protective order protects the referenced disks for purposes of discovery and does not determine admissibility at trial and/or serve to override the strong presumption of public access to judicial documents and proceedings. [4] As the parties have acknowledged, Doc. 25-1, ¶ 6, if either party "fil[es] the disks with the court and/or mov[es] for their introduction into evidence," the disks' contents will be accessible to the public unless the parties, if so advised, make a proper **[*9]** motion to seal them.

Furthermore, the fact that the parties have stipulated to a court-approved protective order will not be dispositive on the issue of whether designated materials should be sealed. D. Conn. L. Civ. R. 5(e)(3) ("No document shall be sealed merely by stipulation of the parties. A confidentiality order or protective order entered by the Court to govern discovery shall not qualify as an order to seal documents for purposes of this rule."). *See, e.g., Vassiliades v. Israely*, 714 F. Supp. 604, 606 (D. Conn. 1989) ("neither the parties' agreement to keep the related matter confidential nor the consent of defendants to the instant motion can bind the Court to order a sealing that is otherwise impermissible"); *Landmark Amer. Ins. Co. v. Magoo's II, Inc.*, No. 3:07-CV-327 (MRK), 2007 U.S. Dist. LEXIS 75887, 2007 WL 3023265, at *1 (D. Conn. Oct. 12, 2007) **[*10]** ("parties' agreement to seal or limit disclosure of documents on file is not a sufficient basis for granting such an order" to seal); *Doctor's Assoc. Inc. v. QIP Holders LLC*, No. 3:06-CV-1710 (VLB), 2007 U.S. Dist. LEXIS 70029, 2007 WL 2782516, at *1 (D. Conn. Sept. 24, 2007) ("An agreement by parties to an action to seal or limit disclosure of documents on file is not a sufficient basis for granting such an order [to seal].").

---

preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.'" *El Badrawi v. Dep't of Homeland Sec.*, 258 F.R.D. 198, 203 (D.Conn. 2009) (quoting *In re Dep't of Investigation*, 856 F.2d 481, 484 (2d Cir.1988)).

[4] The Second Circuit has defined a judicial document as an item which is "relevant to the performance of the judicial function and useful in the judicial process." *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir.1995). Such documents include, for example, those filed in support of motions and/or presented to the court as exhibits at an oral argument, hearing or trial.

Rather, in order for the Court to grant such a motion to seal, the moving party must demonstrate that "sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons." D. Conn. L. Civ. R. 5(e)(3). In addition, a motion to seal shall be accompanied by a supporting written memorandum of law. *Id.* 7(a)(1), 5(e). [5]

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS the parties' "Joint Motion for Protective Order" [Doc. 25] and APPROVES and ENTERS the proposed "Joint Protective Order" [Doc. 25-1].

It **[*11]** is SO ORDERED.

Dated: New Haven, Connecticut

November 18, 2013

*/s/ Charles S. Haight, Jr.*

Charles S. Haight, Jr.

Senior United States District Judge

## JOINT PROTECTIVE ORDER

    1) The use of all disks provided by defense counsel to plaintiff's counsel, his staff or experts which show or depict any inmate and any part of the inside or outside of a Connecticut Correctional Institution ("disks") shall consist of and be limited to disclosure to:

        a) Counsel of record for the named plaintiff and defendants;

        b) The paralegal, clerical and secretarial staffs employed by counsel referenced in section a above;

        c) Experts, investigators, and consultants retained by counsel in connection with any litigation arising from this incident;

        d) This Court;

        e) Any court reporter present in his or her official

---

[5] The parties are reminded that "blanket sealing" is generally disfavored. Doctor's Assoc. Inc., 2007 U.S. Dist. LEXIS 70029, 2007 WL 2782516, at *1. In moving to seal, they must specify the particular portions of the disks to be sealed and the corresponding reasons for sealing them.

capacity at any hearing, deposition or other proceeding in this action;

f) The plaintiff while she is in the presence of her counsel, Attorney Thomas Bucci

g) Witnesses at deposition and trial.

2) That any person to whom the disks are to be disclosed subject to the Protective Order shall be informed of the contents of the Protective Order prior to said disclosure and shall agree in writing, or by statement recorded [*12] in a written transcript of proceedings, to be bound by its terms.

3) Plaintiff, her attorneys, agents, employees, and/or experts are expressly prohibited from copying said disks without prior written approval of the Court and all copies of the disks shall be returned to defense counsel at the conclusion of the case;

4) Any party may seek a modification of the Protective Order based upon a showing of good cause that the modification is necessary to further this pending court proceeding only. In the event such a motion is made, the identity of any person to whom disclosure of information is sought shall be included within the motion, along with the reason or reasons that disclosure of protected information is necessary to advance this litigation. Such disclosure of identity may be made to the court in camera.

5) Nothing in this Protective Order waives any party's right to object to the admissibility of the disks at trial in this or any other proceeding.

6) Prior to filing said disks with the court and/or moving for their introduction into evidence, both parties will jointly request that the disks be filed under seal.

By Order of the Court this 18th day of November, 2013

BY: /s/ Charles S. Haight, Jr. [*13]

Senior United States District Court Judge

PLAINTIFF,

ERIN GARDNER

By: /s/ Thomas W. Bucci

Thomas W. Bucci

WILLINGER, WILLINGER

& BUCCI, P.C.

855 Main Street

Bridgeport, CT 06604

Tel: (203) 366-3939

Fax: (203) 337-4588

Email: thomasbucci@earthlink.net

Federal Bar # ct07805

DEFENDANT,

UNIVERSITY OF CONNECTICUT

HEALTH CENTER

By: /s/ Carolyn Ennis

Carolyn Ennis

Assistant Attorney General

55 Elm Street, P. O. Box 120

Hartford, CT 06141-0120

Tel.: 860-808-5340

Fax: 860-808-5383

E-mail: Carolyn.Ennis@ct.gov

Federal Bar # ct28485

**End of Document**

# Gary Friedrich Enters., LLC v. Marvel Enters., Inc.

United States District Court for the Southern District of New York

June 21, 2011, Decided; June 21, 2011, Filed

08 Civ. 1533 (BSJ) (JCF)

**Reporter**
2011 U.S. Dist. LEXIS 67766 *; 2011 WL 2623458

GARY FRIEDRICH ENTERPRISES, LLC and GARY FRIEDRICH, Plaintiffs, -against- MARVEL ENTERPRISES, INC., et al., Defendants.

**Subsequent History:** Claim dismissed by Gary Friedrich Enters., LLC v. Marvel Enters., 2011 U.S. Dist. LEXIS 81570 (S.D.N.Y., July 26, 2011)

**Prior History:** Gary Friedrich Enters., LLC v. Marvel Enters., 2011 U.S. Dist. LEXIS 54154 (S.D.N.Y., May 20, 2011)

**Counsel:** [*1] For Gary Friedrich Enterprises, LLC., Plaintiff, Counter Defendant: Charles Kramer, Joseph D. Schneider, LEAD ATTORNEYS, Riezman Berger, P.C., St. Louis, MO; Daniel N. Bloom, LEAD ATTORNEY, Riezman & Blitz, St. Louis, MO; Dawn Kamadulski O'Leary, PRO HAC VICE, Eric W. Evans, J. Thomas Long, LEAD ATTORNEYS, Roth Evans P.C., Granite City, IL; Nelson L. Mitten, LEAD ATTORNEY, Reizman Berger, P.C., St. Louis, IL; Leonard Frederick Lesser, Simon Lesser P.C., New York, NY.

For Gary Friedrich, Plaintiff, Counter Defendant: Charles Kramer, Joseph D. Schneider, LEAD ATTORNEYS, Riezman Berger, P.C., St. Louis, MO; Daniel N. Bloom, LEAD ATTORNEY, Riezman & Blitz, St. Louis, MO; Dawn Kamadulski O'Leary, PRO HAC VICE, Eric W. Evans, J. Thomas Long, LEAD ATTORNEYS, Roth Evans P.C., Granite City, IL; Leonard Frederick Lesser, Simon Lesser P.C., New York, NY.

For Marvel Enterprises, Inc., a Delaware corporation, Defendant: David Fleischer, LEAD ATTORNEY, Haynes and Boone, LLP (NY), New York, NY.

For Marvel Entertainment, Inc., a Delaware corporation, Marvel Studios, Inc., a Delaware corporation, Marvel Characters, Inc., a Delaware corporation, Hasbro, Inc., a Rhode Island Corporation, Take Two Interactive [*2] Software, Inc., a Delaware corporation, Columbia Pictures Industries, Inc., a Delaware corporation, Crystal Sky Pictures, a California Corporation, Relativity Media L.L.C., a California Corporation, Michael De Luca Productions, Inc., a California Corporation, Sony Pictures Entertainment, Inc., a Delaware corporation, Defendants: David Fleischer, LEAD ATTORNEY, Haynes and Boone, LLP (NY), New York, NY; Jodi Aileen Kleinick, LEAD ATTORNEY, Paul, Hastings, Janofsky & Walker LLP (NYC), New York, NY.

For Columbia Tri-Star Motion Picture Group, a joint venture, MVL International C.V., Marvel Characters B.V., Marvel Entertainment, LLC, Marvel International Character Holdings, Inc., Marvel Worldwide, Inc., Defendants: David Fleischer, Haynes and Boone, LLP (NY), New York, NY.

For RC2 Corporation, Defendant: Charles Francis Gfeller, LEAD ATTORNEY, Seiger Gfeller Laurie LLP, West Hartford, CT; William Louis Hurlock, LEAD ATTORNEY, Seiger Gfeller Laurie LLP, New York, NJ.

For The Walt Disney Company, All Defendants: James W. Quinn, Randi Wolkenbreit Singer, LEAD ATTORNEYS, Weil, Gotshal & Manges LLP (NYC), New York, NY.

For Marvel Characters, Inc., a Delaware corporation, Counter Claimant: David [*3] Fleischer, LEAD ATTORNEY, Haynes and Boone, LLP (NY), New York, NY; Jodi Aileen Kleinick, LEAD ATTORNEY, Paul, Hastings, Janofsky & Walker LLP (NYC), New York, NY.

**Judges:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** JAMES C. FRANCIS IV

# Opinion

MEMORANDUM AND ORDER

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

The plaintiffs, Gary Friedrich Enterprises, LLC and its

principal, Gary Friedrich, allege that the defendants in this action violated the Copyright Act by creating and distributing the movie "Ghost Rider" and related merchandise using characters and story elements developed by Mr. Friedrich. Two discovery motions are currently pending. The plaintiffs have moved pursuant to Rule 37 of the Federal Rules of Civil Procedure for an order compelling defendants Columbia Pictures Industries, Columbia Tri-Star Motion Picture Group, and Sony Pictures Entertainment, Inc. to produce all tapes and other documents relating to "Sin and Salvation: The Comic Book Origin of Ghost Rider" ("Sin & Salvation"), a documentary that was included as a bonus feature on the DVD release of the Ghost Rider movie. (Memorandum in Support of Motion to Compel ("Pl. Memo.") at 1-2). The defendants have moved for an order **[*4]** compelling the plaintiffs to produce time records for legal services performed on their behalf for a period prior to the filing of the complaint in this action. For the reasons discussed below, the plaintiffs' motion is denied and the defendants' motion is granted.

## "Sin & Salvation"

The documentary Sin & Salvation describes how the Ghost Rider movie evolved from the comic books that included the same characters and plot lines. (Pl. Memo. at 1). Among other things, the documentary includes interviews with persons who describe Gary Friedrich's role in creating the characters that appeared in the first publication featuring Ghost Rider, a comic book known as Marvel Spotlight #5. (Pl. Memo. at 1-2). The defendants do not dispute the relevance of the requested information and, indeed, they agreed to produce it. However, upon conducting a search, they were able to locate only a limited number of responsive materials, which they produced to the plaintiffs. (Letter of Sarah Jacobson dated April 21, 2011, attached as Exh. G to Reply in Support of Plaintiffs' Motion to Compel ("Pl. Reply")). Film relating to certain interviews was missing, and the defendants represented that they had "exhausted **[*5]** all avenues trying to locate this footage . . . ." (E-mail from Eric Evans to David Fleischer dated April 21, 2011, attached as Exh. F to Pl. Reply).

The burden is on the party seeking to compel discovery to cast doubt on the responding party's assertion that it does not have the requested information. See Chatman v. Felker, No. CIV S-03-2415, 2010 U.S. Dist. LEXIS 19622, 2010 WL 785839, at *1 (E.D. Cal. March 4, 2010); Guantanamera Cigar Co. v. Corporacion Habanos, S.A., 263 F.R.D. 1, 7 (D.D.C. 2009); Equal Rights Center v. Post Properties, Inc., 246 F.R.D. 29, 32 (D.D.C. 2007); see also Golden Trade, S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 525 n.7 (S.D.N.Y. 1992). Accordingly, when counsel represent that they have conducted a reasonable search and have not uncovered all requested documents, it is up to the requesting party to show that the search was inadequate. Here, the plaintiffs have failed to do so. They have proffered no evidence that the steps taken by the defendants were in any way insufficient. The plaintiffs' motion is therefore denied.

## Attorney Time Records

The defendants seek to compel the production of time records showing work performed by attorneys for the plaintiffs prior to April 4, 2007, the **[*6]** date that this lawsuit was commenced. The plaintiffs oppose the motion on the grounds that (1) the document request was untimely because no response was required until after the discovery deadline, (2) the request seeks irrelevant material, and (3) the information sought is privileged. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Compel ("Pl. Opp. Memo.") at 5-10). None of these objections has merit.

The defendants served the plaintiffs with the request at issue on April 14, 2011. (Defendants' Second Document Request ("Doc Request"), attached as Exh. 1 to Pl. Opp. Memo.). Pursuant to Rule 34(b)(2)(A) of the Federal Rules of Civil Procedure, the defendants were required to respond thirty days thereafter, on May 14, 2011. However, because May 14 fell on a Saturday, the defendants indicated in the request that the plaintiffs could respond by May 16, the following Monday. (Doc. Request at 1-2). The plaintiffs argue that the request was untimely because the scheduling order in place required all discovery to be completed by May 15. (Pl. Opp. Memo. at 5-6). This contention, however, fails to account for Rule 6 of the Federal Rules of Civil Procedure, which "appl[ies] **[*7]** in computing any time period specified in . . . any local rule or court order . . . ." Fed. R. Civ. P. 6(a). Under Rule 6, "if the last day [of the period established by a court order] is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday." Fed. R. Civ. P. 6(a)(1)(C). Thus, by operation of the rule, discovery did not close until May 16, and the defendants' discovery request was therefore timely.

Furthermore, the defendants' request seeks relevant information. Generally, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense[.]" Fed. R. Civ. P. 26(b)(1). "Although not unlimited, relevance, for purposes of discovery, is an extremely broad concept." Condit v. Dunne, 225 F.R.D. 100, 105 (S.D.N.Y. 2004); see also Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978); Convolve, Inc. v. Compaq Computer

Corp., 223 F.R.D. 162, 167 (S.D.N.Y. 2004). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). The burden [*8] of demonstrating relevance is on the party seeking discovery. See, e.g., Mandell v. Maxon Co., No. 06 Civ. 460, 2007 U.S. Dist. LEXIS 99237, 2007 WL 3022552, at *1 (S.D.N.Y. Oct. 16, 2007).

Here, the defendants have met that burden. They have raised defenses to the plaintiffs' copyright claims based on the statute of limitations and laches. With respect to both defenses, it is critical to determine when the plaintiffs knew or had reason to know of the injury upon which their claim is based. See Kwan v. Schlein, 634 F.3d 224, 228 (2d Cir. 2011) (holding that claim based on dispute over ownership of copyright accrues "when 'a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right'" (quoting Stone v. Williams, 970 F.2d 1043, 1048 (2d Cir. 1992)); Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 163 (2d Cir. 2003) (holding in copyright case that "'[a] cause of action accrues when a plaintiff knows or has reason to know of the injury upon which the claim is premised'" (quoting Merchant v. Levy, 92 F.3d 51, 56 (2d Cir. 1996)); Coach, Inc. v. Kmart Corporations, 756 F. Supp. 2d 421, 427 (S.D.N.Y. 2010) ("Laches 'bars a claim when a defendant has suffered prejudice [*9] because of a plaintiff's unreasonable and inexcusable delay in bringing the claim.'" (quoting Legislator 1357 Ltd. v. Metro-Goldwyn-Mayer, Inc., 452 F. Supp. 2d 382, 391 (S.D.N.Y. 2006)); Mason v. Jamie Music Publishing Co., 658 F. Supp. 2d 571, 587 (S.D.N.Y. 2009) ("The essential elements of the equitable doctrine of laches 'are unreasonable delay by a plaintiff and resulting harm to the defendant.'" (quoting Eyal R.D. Corp. v. Jewelex New York, Ltd., 576 F. Supp. 2d 626, 644 (S.D.N.Y. 2008)).[1]

The information sought is germane to that question. For example, any contention that Mr. Friedrich had reason to know of his potential claims only shortly before filing the complaint would be undermined by a showing that he had

[1] The parties dispute whether the laches defense is available in a copyright action. (Pl. Opp. Memo. at 9; Reply Memorandum of Law in Further Support of Defendants' Motion to Compel at 4-5 & n.3). This is an issue that has divided the district courts in this circuit and has created a split among the circuits; the Second Circuit has not yet ruled on it. See Price v. Fox Entertainment Group, Inc., No. 05 Civ. 5259, 2007 U.S. Dist. LEXIS 6081, 2007 WL 241387, at *2 & n.32 (S.D.N.Y. Jan. 26, 2007) (citing disparate rulings); Legislator 1357 Ltd., 452 F. Supp. 2d at 392-93 (same). The question need not be decided now, however, since the requested discovery would be relevant to the statute of limitations defense even if the defense [*10] of laches is not available.

long before engaged in extensive consultation with counsel about his rights.

Finally, the attorney-client privilege does not categorically bar the disclosure of attorney time records and billing statements under the law of the jurisdictions where legal services were performed in connection with the issues here -- New York, Missouri, and Illinois -- billing records are not privileged where they do not reveal otherwise privileged information. See, e.g., DiBella v. Hopkins, 403 F.3d 102, 120 (2d Cir. 2005) ("In New York, attorney time records and billing statements are not privileged when they do not contain detailed accounts of the legal services rendered."); Baryo v. Philip Morris USA, Inc., No. 05-1182-CV, 2007 U.S. Dist. LEXIS 51717, 2007 WL 2084111, at *4 (W.D. Mo. July 17, 2007) (finding billing statements not privileged under Missouri law where entries do not "'advise, analyze, or discuss privileged communications'" (quoting Tipton v. Barton, 747 S.W.2d 325, 332 (Mo. Ct. App. 1988)); [*11] Northern Trust Co. v. MS Securities Services, Inc., No. 05 C 3370, 2007 U.S. Dist. LEXIS 100626, 2007 WL 1628361, at *1 (N.D. Ill. May 3, 2007) (finding "nothing protectable" about billing statements). Of course, to the extent that time records do contain privileged information, they may be redacted. See 105 Street Associates, LLC v. Greenwich Insurance Co., No. 05 Civ. 9938, 2006 U.S. Dist. LEXIS 81717, 2006 WL 3230292, at *6-7 (S.D.N.Y. Nov. 7, 2006).

Conclusion

For the reasons set forth above, the plaintiffs' motion to compel (Docket no. 101) is denied. The defendants' motion to compel (Docket no. 142) is granted, and the plaintiffs shall produce the requested records by June 30, 2011, redacting any privileged information.

SO ORDERED.

/s/ James C. Francis IV

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

June 21, 2011

# Giugliano v. FS2 Capital Partners, LLC

United States District Court for the Eastern District of New York

March 31, 2016, Decided; March 31, 2016, Filed

CV 14-7240 (ADS) (AKT)

**Reporter**
2016 U.S. Dist. LEXIS 45925 *

RALPH GIUGLIANO, Plaintiff, - against - FS$^2$ CAPITAL PARTNERS, LLC, LANCE MURPHY, BILL WOLFE, AND JOHN SHAIN, Defendants.

**Prior History:** Giugliano v. FS2 Capital Partners, LLC, 2015 U.S. Dist. LEXIS 118679 (E.D.N.Y., Sept. 1, 2015)

**Counsel:** **[*1]** For Ralph Giugliano, Plaintiff: Saul D. Zabell, LEAD ATTORNEY, Zabell & Associates, P.C., Bohemia, NY.

For FS2 Capital Partners, LLC, Lance Murphy, Bill Wolfe, John Shain, in their individual capacity, Defendants: Mary Ellen O'Laughlin, LEAD ATTORNEY, PRO HAC VICE, Klehr Harrison Harvey Branzburg LLP, Philadelphia, PA; Paige Melanie Willan, LEAD ATTORNEY, Carianne Torrissi, Klehr Harrison Harvey Branzburg LLP, Philadelphia, PA; William A. Harvey, Klehr Harrison Harvey, Philadelphia, PA.

**Judges:** A. KATHLEEN TOMLINSON, United States Magistrate Judge.

**Opinion by:** A. KATHLEEN TOMLINSON

# Opinion

## MEMORANDUM AND ORDER

### A. KATHLEEN TOMLINSON, Magistrate Judge:

### I. PRELIMINARY STATEMENT

Plaintiff Ralph Giugliano ("Giugliano" or "Plaintiff") brings this age discrimination and retaliation action against his former employer, Defendant FS$^2$ Capital Partners, LLC ("Defendant" or "FS$^2$"), alleging violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), the New York State Human Rights Law, N.Y.

Exec. L. § 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL"). *See generally* Compl. [DE 1].[1] Presently before the Court is Plaintiff's letter motion seeking (1) to quash the *subpoena duces tecum* and *subpoena ad testificandum [*2]* (collectively, the "Subpoena") issued by FS$^2$ to Dividend Capital Securities, LLC ("Dividend"), a company Plaintiff worked for after his employment with FS$^2$ ended; and (2) a protective order precluding the use of information obtained from the Subpoena and barring Defendant from serving additional subpoenas on Dividend. *See* Pl.'s Mot. [DE 51]. FS$^2$ opposes the motion. *See* Def.'s Opp'n [DE 52]. For the reasons set forth in this Memorandum and Order, Plaintiff's motion is GRANTED, in part, and DENIED, in part.

## II. RELEVANT BACKGROUND

Plaintiff was formerly employed by FS$^2$ as a Regional Sales Director. Compl. ¶ 32. Plaintiff alleges that, during the course of his employment, FS$^2$ (1) intentionally discriminated against him on the basis of his age, and (2) retaliated against him for filing a charge of discrimination with the Equal Employment Opportunity Commission, in violation of the ADEA, the NYSHRL, and the NYCHRL. *See id.* ¶¶ 61-100. According to Plaintiff, around June 10, 2014, he was "constructively terminated" from his position with FS$^2$ as a result of the Defendant's discriminatory and retaliatory conduct. *See id.* ¶¶

_____

[1] Plaintiff originally brought this action against three individual defendants in addition to FS$^2$. *See* Compl. On February 23, 2015, Defendants moved to dismiss the Complaint in its entirety. *See* DE 18. While the instant discovery motion was pending, Judge Spatt (1) granted Defendants' motion to dismiss, in part, as to Plaintiff's causes of action for unpaid wages, breach of contract, conversion, and unjust enrichment; and (2) denied the motion, in part, as to Plaintiff's causes of action under the ADEA, the NYSHRL, and the NYCHRL against FS$^2$. *See* DE 53. As a result of Judge Spatt's decision on the motion, the three individual defendants have been dismissed from this case. *See id.*; *see [*3] also* Answer [DE 54] (Answer to the Complaint filed on behalf of FS$^2$ only).

2016 U.S. Dist. LEXIS 45925, *3

63, 65, 72, 79, 98. Plaintiff seeks damages in this litigation for "past and future earnings, bonuses, [and] other employment benefits . . . in an amount to be determined at trial." *Id.* ¶¶ 67, 74, 81, 87.

Not long after his employment with FS[2] ended, Plaintiff worked for Dividend from approximately June 2014 to August 2015. *See* Pl.'s Mot. at 3. On July 29, 2015, FS[2] served Plaintiff's counsel with a notice and a copy of the Subpoena Defendant intended to serve on Dividend. *See* DE 51-1. The Subpoena directs [*4] a corporate representative of Dividend to appear for a deposition to testify as to the following topics:

1. All matters relating to the recruitment and hiring of Giugliano by Dividend.
2. Giugliano's employment with Dividend, including his compensation.
3. Any communications between Dividend and Giugliano concerning FS[2].
4. Any communications between Dividend and Giugliano concerning the instant litigation; and
5. The content of any documents produced in response to th[e] Subpoena.

*See id.* The Subpoena further directs Dividend's corporate representative to bring to the deposition all documents and materials from December 1, 2013 to the present which concern: (1) Dividend's recruitment and hiring of Plaintiff; (2) Plaintiff's compensation while employed by Dividend; (3) the termination of Plaintiff's employment with Dividend; (4) communications between Dividend and Plaintiff concerning FS[2]; and (5) the instant litigation. *See id.*

Before FS[2] completed service of the Subpoena on Dividend, Plaintiff filed this motion to quash. *See* Def.'s Opp'n at 1 n.1. According to counsel for FS[2], she has "refrained from serving the Subpoena, and ha[s] not received any information in response to the Subpoena." *Id.*

## III. [*5] LEGAL STANDARDS

Under Rule 45 of the Federal Rules of Civil Procedure, any party may serve a subpoena commanding a non-party to, as relevant here, "attend and testify[, and/or] produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control[.]" Fed. R. Civ. P. 45(a)(1)(A)(iii)). Rule 45 further provides that "[o]n timely motion, the issuing court must quash or modify a subpoena that . . . requires disclosure of privileged or other protected matter, if no exception or waiver applies; or subjects a person to undue burden." *Id.* (c)(3)(A)(iii)-(iv). "The decision whether to quash or modify a subpoena is committed to the sound direction of the trial court." *Libaire v. Kaplan*,

760 F. Supp. 2d 288, 291 (E.D.N.Y. 2011) (citations omitted); *see In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 68 (2d Cir. 2003); *John Wiley & Sons, Inc. v. Doe Nos. 1-30*, 284 F.R.D. 185, 189 (S.D.N.Y. 2012) ("A determination to grant or deny . . . a motion to quash a subpoena is discretionary."); *Solomon v. Nassau Cnty.*, 274 F.R.D. 455, 460 (E.D.N.Y. 2011) ("Motions to quash subpoenas under the Rules are 'entrusted to the sound discretion of the district court.'") (quoting *In re Fitch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003)).

"A subpoena issued to a non-party pursuant to Rule 45 is subject to Rule 26(b)(1)'s overriding relevance requirement." *Warnke v. CVS Corp.*, 265 F.R.D. 64, 66 (E.D.N.Y. 2010) (internal quotation marks omitted); *see, e.g., In re Refco Sec. Litig.*, 759 F. Supp. 2d 342, 345 (S.D.N.Y. 2011) ("Subpoenas issued under Rule 45 are subject to the relevance requirement of Rule 26(b)(1)"); *Ford Motor Credit Co. v. Meehan*, No. CV 05-4807, 2008 U.S. Dist. LEXIS 53192, 2008 WL 2746373, at *4 (E.D.N.Y. July 11, 2008). "In response to a motion to quash a subpoena, the party [*6] issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings." *Libaire*, 760 F. Supp. 2d at 291 (quoting *Kingsway Fin. Servs., Inc. v. Pricewaterhouse—Coopers LLP*, No. 03-CV-5560, 2008 U.S. Dist. LEXIS 77018, 2008 WL 4452134, at *4 (S.D.N.Y. Oct. 2, 2008)); *see, e.g., AP Links, LLC v. Russ*, 299 F.R.D. 7, 11 (E.D.N.Y. 2014) (quoting *Night Hawk Ltd. v. Briarpatch Ltd.*, 03-CV-1382, 2003 U.S. Dist. LEXIS 23179, 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003)); *Crosby v. City of New York*, 269 F.R.D. 267, 282 (S.D.N.Y. 2010). Relevance in this context "'has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any issue that is or may be in the case.'" *AP Links*, 299 F.R.D. at 11 (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978)) (citing *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 114 (2d Cir. 1992) (noting that the scope of discovery under Rule 26(b) is "very broad")); *see, e.g., Warnke*, 265 F.R.D. at 66; *see also Barrett v. City of New York*, 237 F.R.D. 39, 40 (E.D.N.Y. 2006) (recognizing that the information sought pursuant to Rule 26 "need not be admissible at trial to be discoverable").[2]

---

[2] While the Plaintiff's motion to quash was pending, Rule 26(b)(1) was amended to allow discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely [*7] benefit." Fed. R.

"Once the party issuing **[*8]** the subpoena has demonstrated the relevance of the requested [information], the party seeking to quash the subpoena bears the burden of demonstrating that the subpoena is over-broad, duplicative, or unduly burdensome." *AP Links*, 299 F.R.D. at 11 (quoting *Kingsway Fin. Servs.*, 2008 U.S Dist. LEXIS 77018, 2008 WL 4452134, at *4) (internal quotation marks omitted); *see Libaire*, 760 F. Supp. 2d at 291 (quoting *Corbett v. eHome Credit Corp.*, No. 10—CV—26, 2010 U.S. Dist. LEXIS 77712, 2010 WL 3023870, at *3 (E.D.N.Y. Aug. 2, 2010)); *accord John Wiley & Sons, Inc.*, 284 F.R.D. at 189 (burden on motion to quash is borne by the moving party); *Ford Motor Credit Co.*, 2008 U.S. Dist. LEXIS 53192, 2008 WL 2746373, at *5 (same). "Whether a subpoena imposes an 'undue burden depends on such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.'" *Libaire*, 760 F. Supp. 2d at 293-94 (quoting *Ebbert v. Nassau Cty.*, No. 05-CV-5445, 2007 U.S. Dist. LEXIS 15159, 2007 WL 674725, at *4 (E.D.N.Y. Mar. 5, 2007)); *accord Crespo v. Beauton*, No. 15-CV-412, 2016 U.S. Dist. LEXIS 15495, 2016 WL 259637, at *2 (D. Conn. Jan. 21, 2016) (quoting *Travelers Indemnity Co. v. Metropolitan Life Ins. Co.*, 228 F.R.D. 111, 113 (D. Conn. 2005)).

---

Civ. P. 26(b)(1). As explained in the Advisory Committee's Note to the December 2015 amendment, "the provision for discovery of relevant but inadmissible information that appears 'reasonably calculated to lead to the discovery of admissible evidence'" has now been eliminated. Fed. R. Civ. P. 26 advisory committee's note. However, "[u]nder the amended Rule, 'relevance is still to be construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim or defense.'" *Henry v. Morgan's Hotel Grp., Inc.*, No. 15-CV-1789, 2016 U.S. Dist. LEXIS 8406, 2016 WL 303114, at *3 (S.D.N.Y. Jan. 25, 2016) (quoting *State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14—CV—9792, 2015 U.S. Dist. LEXIS 162164, 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015)) (internal quotation marks and alteration omitted); *accord Bagley v. Yale Univ.*, No. 13-CV-1890, 2015 U.S. Dist. LEXIS 166759, 2015 WL 8750901, at *7 (D. Conn. Dec. 14, 2015). As courts in this Circuit have observed, "the amended Rule is intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production of relevant information." *Henry*, 2016 U.S. Dist. LEXIS 8406, 2016 WL 303114, *3 (S.D.N.Y. 2016); *accord Augustyniak v. Lowe's Home Ctr., LLC*, No. 14-CV-00488-JJM, 2016 U.S. Dist. LEXIS 15112, 2016 WL 462346, at *5 (W.D.N.Y. Feb. 8, 2016). Particularly, in the context of a motion to quash a subpoena, "the Court should consider both the nature of information sought and whether its production is 'proportional to the needs of the case.'" *Henry*, 2016 U.S. Dist. LEXIS 8406, 2016 WL 303114, at *3 (quoting Fed. R. Civ. P. 26(b)(1)).

Moreover, under Rule 26(c), the "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . forbidding the disclosure or discovery." Fed. R. Civ. P. 26(c)(1)(A). "The burden of showing good cause for the issuance of a protective order falls on the party seeking the order." *Torcasio v. New Canaan Bd. of Ed.*, No. 15-CV-53, 2016 U.S. Dist. LEXIS 8683, 2016 WL 312102, at *2 (D. Conn. Jan. 26, 2016) (citing *Brown v. Astoria Fed. Sav. & Loan Ass'n*, 444 F. App'x 504, 505 (2d Cir. 2011) (summary order)). To meet the good-cause standard under Rule 26(c), "the moving party must establish 'particular and specific facts' rather than 'conclusory **[*9]** assertions,' that justify the imposition of a protective order." *Coggins v. Cty. of Nassau*, No. 07-CV-3624, 2014 U.S. Dist. LEXIS 15001, 2014 WL 495646, at *2 (E.D.N.Y. Feb. 6, 2014) (quoting *Rofail v. United States*, 227 F.R.D. 53, 54-55 (E.D.N.Y. 2005)); *see, e.g., Torcasio*, 2016 U.S. Dist. LEXIS 8683, 2016 WL 312102, at *2 ("To establish good cause under Rule 26(c), courts require a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.") (internal quotation marks omitted). Ultimately, the trial court has "broad discretion" in determining whether to enter a protective order pursuant to Rule 26(c). *See, e.g., Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 26, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984) ("The unique character of the discovery process requires that the trial court have substantial latitude to fashion protective orders."); *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 391 (2d Cir. 1981) (stating that a district court has "broad discretion to determine whether an order should be entered protecting a party from disclosure of information claimed to be privileged or confidential").

## IV. DISCUSSION

### A. Motion to Quash

#### 1. *The Parties' Contentions*

Plaintiff seeks a complete nullification of the Subpoena on the grounds that the testimony and documents FS² seeks from Dividend are "irrelevant" to this case. Pl.'s Mot. at 3. In particular, Plaintiff contends that the information requested in the Subpoena is not related to the "subject matter" of this litigation — *i.e.*, Defendant's alleged discriminatory and retaliatory conduct — and instead **[*10]** "concerns a period *after* the cessation of Plaintiff's employment with the

corporate Defendant." *Id.* (emphasis in original).[3] Plaintiff further asserts that, "[a]ssuming *arguendo* that this Court concludes that the information is relevant," the Subpoena should still be quashed because it is overbroad, unduly burdensome, and seeks information which is "at most [of] *de minimis* value to Defendant[]." *Id.* According to Plaintiff, allowing FS[2] to serve the Subpoena on Dividend would "significantly intrude[] upon his privacy interest" and could injure his "professional reputation," making it more difficult for him to secure future employment. *Id.* Plaintiff also points out that "the scope of the Subpoena spans a period of time greater than Plaintiff's employment with Dividend." *Id.* Ultimately, Plaintiff asserts that, because his deposition has not yet been taken and "discovery is still ongoing, the Subpoena is at minimum premature." *Id.*

In response, FS[2] asserts that the testimony and documents sought in the Subpoena are relevant to Plaintiff's claim of constructive discharge and are necessary to support the defense "that Plaintiff voluntarily resigned from his position at FS[2] because he received a job offer from Dividend." Def.'s Opp'n at 2. FS[2] further maintains that the Subpoena is "appropriately tailored" to seek "relevant documents and information concerning Dividend's recruitment of Plaintiff, including documents for the period preceding Plaintiff's alleged constructive discharge." *Id.* FS[2] points out that, although it has "sought an itemization of damages allegedly incurred by Plaintiff, he has responded only that those damages are 'to be determined at trial.'" *Id.* at 1 (citing Plaintiff's Response to Defendants' First Set of Interrogatories, annexed to Def.'s Opp'n as Ex. A, at 4-5). Plaintiff also has not produced his federal and state tax returns and has instead provided FS[2] with "only five pages of W-2s related to certain years of his employment with FS[2] and a previous [*12] employer, but no W-2 for 2014 and nothing related to his employment with Dividend." *Id.* "Nor has Plaintiff produced any documentation . . . about the process by which Plaintiff was hired at Dividend, or about any statements Plaintiff made to Dividend about his employment with FS2." *Id.* Meanwhile, FS[2] notes that Plaintiff has certified in an affidavit that he has produced all relevant documents in his possession. *Id.* (citing Affidavit of Ralph Giugliano ("Giugliano Aff."), annexed to Def.'s Opp'n as Ex. D, ¶¶ 4-5). Accordingly, FS[2] asserts that "[i]n light of the

dearth of information Plaintiff produced in discovery concerning the employment that he commenced immediately following his alleged constructive termination, relevant both to that allegation and to his purported damages, Defendant[] determined it was necessary to issue the Subpoena to Dividend to discover relevant documents and information." *Id.* at 1-2.

## 2. Application

As a threshold matter, it is undisputed that, as Plaintiff states in his motion, he has standing to move to quash the Subpoena directed to Dividend. "Generally, standing to quash a non-party subpoena exists where the plaintiff asserts a legitimate privacy interest in the information [*13] sought." *Warnke*, 265 F.R.D. at 66 (citing *Ireh v. Nassau Univ. Med. Center*, No. 06-CV-09, 2008 U.S. Dist. LEXIS 76583, 2008 WL 4283344, at *3 (E.D.N.Y. Sept. 17, 2008); *Mirkin v. Winston Res., LLC*, No. 07-CV-02734, 2008 U.S. Dist. LEXIS 91492, 2008 WL 4861840, at *1 (S.D.N.Y. Nov. 10, 2008)). "Here, Plaintiff has a legitimate privacy interest in information regarding his subsequent employment and therefore has standing to bring the instant motion." *Warnke*, 265 F.R.D. at 66.

Turning to the merits of the motion, as noted above, the party seeking enforcement of the Subpoena carries the initial burden to establish both relevance and materiality as to the allegations and claims at issue. *See, e.g.*, *id.*; *Night Hawk Ltd.*, 2003 U.S. Dist. LEXIS 23179, 2003 WL 23018833, at *8. Here, FS[2] asserts that the information sought in the Subpoena is relevant to Plaintiff's claim that he was constructively discharged from FS[2], as well as FS[2]'s defense that Plaintiff voluntarily left FS[2] for a position with Dividend. *See* Def.'s Opp'n at 2-3. There is no question that FS[2] is permitted to explore Plaintiff's alleged constructive discharge, since Plaintiff put that claim in issue, and to pursue a defense to that claim based on Plaintiff's subsequent employment with Dividend, which appears to have begun almost immediately after his employment with FS[2] ended. The Court further notes that, although Plaintiff has not yet been deposed, Plaintiff has not provided any documentation concerning when and how he was hired by Dividend or the salary he was paid while he worked [*14] there — information that is relevant not only to the constructive discharge claim but also to Plaintiff's duty to mitigate his damages.

In light of these considerations, the Court concludes that FS[2] has met its burden of demonstrating that certain information it seeks in the Subpoena is relevant and material to Plaintiff's constructive discharge claim, FS[2]'s defenses to that claim, and Plaintiff's alleged damages. In particular, the Court finds that

---

[3] Plaintiff also asserts that the information sought in the Subpoena is not relevant to his "claims relating to violations of New York Labor Law and breach of contract as pertaining to Plaintiff's assigned geographic sales territory and commissions." Pl.'s Mot. at 3. However, [*11] Plaintiff's causes of action for unpaid wages under the New York Labor Law and breach of contract have been dismissed from this action. *See* DE 53.

the document requests regarding: (1) Dividend's recruitment and hiring of Plaintiff (Document Request No. 1); (2) Plaintiff's compensation while employed by Dividend (Document Request No. 2); and (3) communications between Dividend and Plaintiff concerning FS[2] (Document Request No. 4), could to lead to information which bears on these issues. The Court reaches the same conclusion with respect to the deposition topics regarding: (1) Dividend's recruitment and hiring of Plaintiff (Deposition Topic No. 1); (2) Plaintiff's employment with Dividend and his compensation while employed there (Deposition Topic No. 2); (3) communications between Plaintiff and Dividend concerning FS[2] (Deposition Topic No. 3); and (4) the contents of documents produced **[*15]** in response to the Subpoena (Deposition Topic No. 5).

However, FS[2] has not met its burden of demonstrating the relevance of the deposition topic regarding communications between Dividend and Plaintiff about this action (Deposition Topic No. 4), or the document requests regarding (1) the termination of Plaintiff's employment with Dividend (Document Request No. 3), and (2) the instant litigation (Document Request No. 5). The Court finds that the information sought by these demands is irrelevant to both the constructive discharge claim and FS[2]'s asserted defense to that claim. The Court further notes that Document Request No. 4 — which directs Dividend to provide all communications between it and Plaintiff during the relevant time period — adequately encompasses any potentially relevant information sought by both Deposition Topic No. 4 and Document Request No. 5 such that Dividend should not be compelled to respond to these requests, which are overbroad and seek information to which the Court finds FS[2] has no entitlement. Accordingly, Plaintiff's motion to quash is GRANTED, in part, with respect to Deposition Topic No. 4, Document Request No. 3, and Document Request No. 5, and the Subpoena **[*16]** shall be modified to remove those requests.

Having addressed relevance, the Court now considers whether Plaintiff has met his burden of demonstrating that the Subpoena should be quashed because it "is over-broad, duplicative, or unduly burdensome." *AP Links*, 299 F.R.D. at 11; *see During v. City Univ. of New York*, No. 05-CV-6992, 2006 U.S. Dist. LEXIS 53684, 2006 WL 2192843, at *2 (S.D.N.Y. Aug. 1, 2006) ("Only if a matter is relevant and potentially discoverable must a court then consider whether additional Rule 26 limitations on discovery apply.").

Plaintiff first argues that the timeframe of December 1, 2013 to the present for FS[2]'s document requests is overbroad because it "spans a period of time greater than Plaintiff's employment with Dividend," which Plaintiff states "lasted from approximately June 2014 to March 2015." Pl.'s Mot. at 3.

The Court finds that the December 1, 2013 start date is appropriately tailored to allow FS[2] to discover information concerning any alleged recruitment and hiring of Plaintiff by Dividend — a process which may have begun before he began working for Dividend in June 2014 — as well as Plaintiff's communications with Dividend about FS[2]. However, the Court concludes that, without a finite end date, the timeframe for the document requests is overbroad. Accordingly, Plaintiff's motion to quash is GRANTED, in **[*17]** part, to the extent that the timeframe for the document requests shall be modified to December 1, 2013 to April 30, 2015.

The motion to quash is also GRANTED, in part, with respect to Deposition Topic No. 2, which the Court finds is overbroad as written. The Court is limiting this topic solely to two issues: (1) Plaintiffs' compensation at Dividend, and (2) whether Plaintiff ever brought any internal or external complaints of age discrimination while employed by Dividend. As to Deposition Topic No. 5, the questioning is limited to the documents produced in response to the Court's directives. The Subpoena is therefore modified to this extent as well.

Plaintiff also generally argues that the Subpoena directed to his former employer is unduly burdensome because it "intrudes upon his privacy interest" and could potentially injure his professional reputation. Pl.'s Mot. at 3. Citing *Warnke*, Plaintiff notes that courts in the Second Circuit have recognized "the direct negative effect that disclosures of disputes with past employers can have on present employment" and have therefore required defendants to "obtain the information from less intrusive means where possible," such as through documents **[*18]** in the plaintiff's possession or through the plaintiff's deposition. *Id.* (quoting *Warnke*, 265 F.R.D. at 69).

Plaintiff is correct that issues of privacy and the potential impact on a plaintiff's employment prospects are factors which courts consider in deciding whether to quash a subpoena directed to a former employer. *See, e.g., Warnke*, 265 F.R.D. at 66 (stating that "Plaintiff has a legitimate privacy interest in information regarding his subsequent employment"); *Gambale v. Deutsche Bank AG*, No. 02-CV-4791, 2003 U.S. Dist. LEXIS 27412, 2003 WL 115221, at *2 (S.D.N.Y. Jan. 10, 2003) (granting motion to quash because the Rule 45 subpoenas served on executive search firms with which plaintiff worked before and after her termination because such discovery "would subject plaintiff to necessary annoyance and embarrassment within the meaning of Rule 26(c)"). However, having considered Plaintiff's privacy concerns in light of the circumstances here, the Court finds that "the burden imposed on Plaintiff by Defendant's

subpoena is slight and do[e]s not outweigh Defendant's right to obtain the information sought." *Mirkin*, 2008 U.S. Dist. LEXIS 91492, 2008 WL 4861840, at *1. Notably, the fact that Plaintiff (1) has raised a constructive termination claim in this litigation, and (2) started working for Dividend so soon after he left FS², diminish the weight afforded to his stated privacy interests. These factors also serve to differentiate [*19] this case from *Warnke* and other cases Plaintiff has relied on to demonstrate undue burden.

This case is also distinguishable from *Warnke* in other key respects. First, unlike *Warnke*, where the plaintiff was "currently employed by two companies the defendant sought to subpoena," Plaintiff no longer works for Dividend. 265 F.R.D. at 69; *see Mirkin*, 2008 U.S. Dist. LEXIS 91492, 2008 WL 4861840, at *1 (denying motion to quash and noting that the plaintiff "s no longer employed" by the employer subpoenaed by the defendant). Second, the universe of documents and information at issue here is not as broad as in *Warnke*, and, as discussed above, FS² has met its burden of establishing the relevance of certain categories of information it seeks. 265 F.R.D. at 66-67, 69-70 (quashing subpoena which sought plaintiff's employment applications, resumes, personnel files, payroll records, and offers of employment to support a mitigation defense). Third, by the time the defendant sought to subpoena plaintiff's employers in *Warnke*, the plaintiff had already produced some of the information sought in the subpoenas — specifically, "copies of his income tax returns for the years 2005 through 2008 and copies of his 2009 pay stub from both of his current employers." 265 F.R.D. at 70. In light of that fact, this Court stated in *Warnke [*20]* that the defendant was not entitled to obtain information from the plaintiff's payroll records directly from the plaintiff's employers, "but rather, must obtain the information from less intrusive means **where possible." *Id.*** (emphasis supplied). By contrast, here, Plaintiff has not produced any tax returns or W-2s related his employment with Dividend, nor has he produced any documents regarding the hiring or recruitment process or his communications to Dividend about FS². *See* Def.'s Opp'n at 1. And, according to Plaintiff's affidavit, he has already produced all documents in his possession which are responsive to FS²'s demands. *See* Giugliano Aff. ¶¶ 4-5.

In sum, the progress of discovery so far demonstrates to the Court that, unlike in *Warnke*, it is not reasonably possible for FS² to obtain the information it seeks "from less intrusive means." 265 F.R.D. at 70. Rather, as FS² states in its opposition, it "ha[s] no choice but to seek discovery of relevant materials from Dividend via the Subpoena." Def.'s Opp'n at 3. The Court also sees no reason to postpone enforcement of the Subpoena until after Plaintiff's deposition since Plaintiff has indication that he simply does not have the

information FS² seeks. **[*21]** Accordingly, Plaintiff's motion to quash is GRANTED, in part, to the extent set forth above, and is otherwise DENIED.

The Court also briefly addresses here Defendant's statements regarding the itemization of damages it has sought unsuccessfully from Plaintiff. *See* Def.'s Opp'n at 1. The Court has reviewed Plaintiff's response to Interrogatory No. 3 and finds the response to be deficient and in contravention of the Federal Rules. The Court first points out that Plaintiff had an obligation to set forth the categories of damages sought and the estimated calculation of each of those categories in his Rule 26(a) Initial Disclosures. All litigants are aware that damages estimates and calculations are often fluid at the outset of litigation and are subject to adjustment as information becomes known during the discovery phase of the case. However, that does not relieve a plaintiff from providing the best estimate of the client's damages based on information vetted with the client at intake and throughout the course of the litigation. The Court has no way of knowing what information Plaintiff provided in his Rule 26(a) Initial Disclosures because no one has provided a copy of those disclosures to the Court. However, **[*22]** as to the chart provided in response to Defendant's Interrogatory No. 3, the response of "To be determined at trial" is unacceptable. There is no reasonable basis why Plaintiff cannot provide his best estimate of the backpay he seeks as damages, nor his best estimate of the compensatory damages/emotional damages he seeks, nor the estimated amount of unpaid commissions, as well as eligible accrued vacation and sick time that was not used. As to front pay, Plaintiff is certainly in a position to give an estimate of what he will ask the Court to award going forward for a specific period of time calculated on annual wages. As to attorney's fees and expenses, the Court will not require further information *at this time*. In the event the parties enter into settlement discussions, that issue may become more pressing. However, as to any costs/expenses Plaintiff has incurred in the case, the Plaintiff is in a position to provide a finite number that has been expended in this case to date and he is directed to do so, understanding that such numbers will need to be supplemented as the litigation proceeds and further expenses are incurred. Therefore, the Court is directing that Plaintiff supplement **[*23]** his responses to Interrogatory No. 3 within 14 days of the entry of this Order and in conformance with the directive given here.

## B. Motion for a Protective Order

Plaintiff also asks the Court to impose a protective order which precludes FS² from using information it obtained from the Subpoena and bars FS² from serving additional subpoenas on Dividend. *See* Pl.'s Mot. at 1. In response, FS² asserts that

this request for relief is moot because FS² has "refrained from serving the Subpoena, and ha[s] not received any information in response to the Subpoena." Def.'s Opp'n at 1 n.1. The Court accepts the representations of FS²'s counsel as officer of the Court. Therefore, the application for a protective order is DENIED AS MOOT.

## V. CONCLUSION

For the reasons set forth in this Memorandum and Order, Plaintiff's motion is GRANTED, in part, and DENIED, in part. Specifically, the motion to quash the Subpoena is GRANTED, to the extent that the Subpoena is hereby modified as discussed above, and is otherwise DENIED. Further, Plaintiff's motion for a protective order is DENIED AS MOOT.

FS² must effect service of the modified Subpoena on Dividend by April 14, 2016. Thereafter, if FS² elects to depose Dividend's [*24] corporate representative, that deposition must be completed within 30 days, namely, by May 11, 2016.

**SO ORDERED**.

Dated: Central Islip, New York

March 31, 2016

/s/ A. Kathleen Tomlinson

A. KATHLEEN TOMLINSON

U.S. Magistrate Judge

---

**End of Document**

# In re Check Point Software Techs. Ltd. Secs. Litig.

United States District Court for the Southern District of New York

June 20, 2007, Decided; June 20, 2007, Filed

No. 03 Civ. 6594

**Reporter**
2007 U.S. Dist. LEXIS 45579 *; 2007 WL 1827113

IN RE CHECK POINT SOFTWARE TECHNOLOGIES LTD. SECURITIES LITIGATION

**Prior History:** In re Check Point Software Techs. Sec. Litig., 2006 U.S. Dist. LEXIS 24317 (S.D.N.Y., Apr. 25, 2006)

**Counsel:** [*1] For Bryant Strickland, individually, Bryant Strickland on behalf of all others similarly situated, Plaintiffs: Samuel Howard Rudman, LEAD ATTORNEY, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP (LIs), Melville, NY.

For Daniel Parquette, Plaintiff: Kirk e. Chapman, Lili R. Sabo, LEAD ATTORNEYS, Milberg Weiss Bershad & Schulman LLP (NYC), New York, NY.

For Rebecca Krangel, individually and on behalf of all others similarly situated., Consolidated Plaintiff: Catherine A. Torell, LEAD ATTORNEY, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York, NY.

For John Feith, individually and on behalf of all others similarly situated, Consolidated Plaintiff: Menachem E. Lifshitz, LEAD ATTORNEY, Bernstein Liebhard & Lifshitz, LLP, New York, NY.

For Anthony Cassani, Consolidated Plaintiff: David Avi Rosenfeld, Russell James Gunman, Samuel Howard Rudman, LEAD ATTORNEYS, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP (LIs), Melville, NY.

For Check Point Software Technologies, Ltd., Gil Shwed, Jerry Ungerman, Eyal Desheh, Defendants: Andrew Scott Weinstein, LEAD ATTORNEY, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY; Brad Scott Karp, Bruce Birenboim, Daniel Jonathan Kramer, [*2] LEAD ATTORNEYS, Paul, Weiss, Rifkind, Wharton & Garrison LLP (NY), New York, NY.

For Irwin Federman, Alex Vieux, Defendants: Andrew Scott Weinstein, LEAD ATTORNEY, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY; Brad Scott Karp, LEAD ATTORNEY, Daniel Jonathan Kramer, Paul, Weiss, Rifkind, Wharton & Garrison LLP (NY), New York, NY.

For Ronald Di Sandro, Movant: Christopher J. Keller, Jonathan M. Plasse, LEAD ATTORNEYS, Labaton Rudoff & Sucharow LLP, New York, NY.

For Jay Stegmann, Lead Plaintiff: Kirk e. Chapman, Lili R. Sabo, LEAD ATTORNEYS, Milberg Weiss Bershad & Schulman LLP (NYC), New York, NY.

For Daniel E. Offutt, Consolidated Plaintiff: Aaron Lee Brody, Jules Brody, LEAD ATTORNEYS, Stull Stull & Brody, New York, NY.

For Peter Fusco, individually and on behalf of all others similarly situated, Rod Sherman, individually and on behalf of all others similarly situated., Consolidated Plaintiffs: Frederick Taylor Isquith, Sr, LEAD ATTORNEY, Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York, NY.

For David Brittenham, individually and on behalf of all others similarly situated., Michael Malone, individually and on behalf of all others similarly situated., Consolidated [*3] Plaintiffs: Peter Edward Seidman, Steven G. Schulman, LEAD ATTORNEYS, Milberg Weiss Bershad & Schulman LLP (NYC), New York, NY.

For John H. Cottrell, individually and on behalf of all others similarly situated., Consolidated Plaintiff: John G. Emerson, Jr., LEAD ATTORNEY, Emerson, Poynter, L.L.P., Little Rock, AR; Peter Edward Seidman, Steven G. Schulman, LEAD ATTORNEYS, Milberg Weiss Bershad & Schulman LLP (NYC), New York, NY. Scott E. Poynter, LEAD ATTORNEY, Emerson Poynter LLP, Little Rock, AR.

For Raymond J. Upright, individually and on behalf of all others similarly situated., Sandra Upright, individually and on behalf of all others similarly situated., Consolidated Plaintiffs: Christopher J. Keller, Jonathan M. Plasse, LEAD ATTORNEYS, Labaton Rudoff & Sucharow LLP, New York, NY.

For Gary McLaughlin, Consolidated Plaintiff: David Avi Rosenfeld, Russell James Gunman, Samuel Howard Rudman, LEAD ATTORNEYS, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP (LIs), Melville, NY; Karen H. Riebel, LEAD ATTORNEY, Lockridge, Grindal, Nauen,

2007 U.S. Dist. LEXIS 45579, *3

P.L.L.P., Minneapolis, MN; Richard A. Lockridge, LEAD ATTORNEY, Lockridge, Grindal, Nauen, Minneapolis, MN.

**Judges:** Hon. Richard M. Berman, U.S.D.J.

**Opinion by:** Richard M. Berman **[*4]**

# Opinion

## DECISION AND ORDER

In connection with Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, dated May 30, 2007, the Court directed Lead Counsel to submit detailed "[d]ocumentary evidence of attorneys' fees and costs (sought to be reimbursed) incurred through May 22, 2007, based upon the 'lodestar' methodology . . . ." (Order, dated June 11, 2007, at 1.) On or about June 18, 2007, Lead Counsel submitted (supplemental) affidavits from David Kessler and Kirk E. Chapman, dated June 14, 2007 and June 17, 2007, respectively, along with an application to file those affidavits and all exhibits attached thereto *in camera* and under seal. (*See* Notice of Motion, dated June 18, 2007, at 1 ("[A]ffidavits contain [the] firms' expense records and reflect attorney work product.").)

Having reviewed the time records, the Court finds that Lead Counsel has "not demonstrated that 'justice requires' filing such records under seal" *In re September 11th Liab. Ins. Coverage Cases,* No. 03 Civ. 0332, 243 F.R.D. 114, 2007 U.S. Dist. LEXIS 43734, 2007 WL 1739666, at *19 (S.D.N.Y. June 18, 2007) (Hellerstein, J.) (citing Fed. R. Civ. P. 26(c)). The public interest in the fair administration of class actions is better served **[*5]** if these documents are available for public inspection and scrutiny. Lead Counsel's application for approximately $ 3.35 million (plus interest) in fees and expenses cannot properly be assessed absent analysis of, among other things, over 550 billable hours for "fact research," "investigation," and "damages"; over 300 billable hours regarding the filing of the initial complaint, amended complaint, and second amended complaint; approximately 400 billable hours for work associated with drafting and filing oppositions to two motions to dismiss filed by defendant Check Point Software Technologies, Ltd.; and nearly 275 billable hours associated with "document review" and "discovery." (*See* Supplemental Kessler Aff., Ex. 2; Supplemental Chapman Aff., Ex. 2.)

*Order*

Lead Counsel's application to file the supplemental affidavits and exhibits *in camera* and under seal is therefore denied

provided however that Lead Counsel may redact appropriate portions of the supplemental exhibits that may reveal attorney work product and file the redacted versions with the Court on or before June 27, 2007 (noon). *See, e.g., Healey v. Chelsea Res. Ltd.,* 133 F.R.D. 449, 458 n.6 (S.D.N.Y. 1990), *rev'd* **[*6]** *on other grounds,* 947 F.2d 611 (2d Cir. 1991).

Dated: New York

June 20, 2007

**Hon. Richard M. Berman, U.S.D.J.**

---

**End of Document**

# Lyda v. Fremantlemedia N. Am.

United States District Court for the Southern District of New York

July 11, 2016, Decided; July 11, 2016, Filed

10cv4773-DAB-FM

**Reporter**

2016 U.S. Dist. LEXIS 90469 *

EDWIN LYDA, Plaintiff, - against - FREMANTLEMEDIA NORTH AMERICA, Defendant.

**Subsequent History:** Adopted by, Costs and fees proceeding at Lyda v. Fremantlemedia N. Am., Inc., 2016 U.S. Dist. LEXIS 118148 (S.D.N.Y., Aug. 31, 2016)

**Prior History:** Lyda v. FremantleMedia North Am., Inc., 2011 U.S. Dist. LEXIS 77540 (S.D.N.Y., July 14, 2011)

**Counsel:** [*1] For Edwin Lyda, Plaintiff: David Fink, LEAD ATTORNEY, Fink & Johnson, Houston, TX.

For Fremantlemedia North America, Defendant: Theresa M. Gillis, LEAD ATTORNEY, Howrey LLP (NYC), New York, NY; Charles Deforest Manice, Morgan Lewis & Bockius, LLP (NY), New York, NY; Jason C. White, Morgan, Lewis & Bockius LLP (Chicago), Chicago, IL.

**Judges:** FRANK MAAS, United States Magistrate Judge.

**Opinion by:** FRANK MAAS

# Opinion

## REPORT AND RECOMMENDATION TO THE HONORABLE DEBORAH A. BATTS[*]

**FRANK MAAS**, United States Magistrate Judge.

Plaintiff Edwin Lyda ("Lyda") commenced this patent infringement action on June 18, 2010, against defendant Fremantlemedia North America ("Fremantle"). (ECF No. 1 ("Complaint" or "Compl.")). On October 23, 2013, having dismissed all of Lyda's claims and granted Fremantle's motion for attorneys' fees, Your Honor referred the case to me for an inquest. (ECF No. 43). For the reasons set forth below, I now

recommend that $118,705.09 be awarded to Fremantle as reasonable attorneys' fees and costs.

## I. Background

Lyda initially filed this action on June 18, 2010, alleging patent infringement under [*2] 35 U.S.C. §§ 271 and 281. (Compl.). After filing a first amended complaint on September 13, 2010, (ECF No. 2 ("FAC")), Lyda effected service on September 14, 2010, (ECF No. 3). Lyda's pleadings alleged that he was the sole owner of two United States patents: the "243 Patent," relating to a "Response Apparatus Method and System;" and the "506 Patent," relating to a "Method and Apparatus for Response System." (FAC ¶¶ 3-5). Lyda further alleged that Fremantle substantially controls production of the television program American Idol and infringed his patents by, among other things, "utiliz[ing] 'dress rehearsals' to test its electrical systems such as audience voting both in the theater, and outside the theater along with its computer processing for compiling votes as well [as] other electrical system functions anticipated for conducting a major show on television before a live audience." (Id. ¶¶ 7-8).

In lieu of an answer, Fremantle filed a motion to dismiss for failure to state a claim on October 5, 2010. (ECF No. 11). Your Honor granted that motion on July 14, 2011, with leave for Lyda to file a second amended complaint. (ECF No. 22). After Lyda filed such a complaint on July 27, 2011, (ECF No. 23), Fremantle filed a second motion to [*3] dismiss for failure to state a claim on August 8, 2011, (ECF No. 24). On March 8, 2012, Your Honor granted the motion and dismissed Lyda's claims with prejudice. (ECF No. 27).

On April 3, 2012, Fremantle filed a motion for attorneys' fees pursuant to 28 U.S.C. § 1927 and 35 U.S.C. § 285, (ECF No. 32), which Your Honor granted over Lyda's opposition, (ECF No. 34), on August 9, 2012, (ECF No. 36). After also denying two motions by Lyda for reconsideration of the order of dismissal with prejudice, (see ECF Nos. 28, 36, 38, 42), Your Honor referred this matter to me for an inquest as to attorneys' fees on October 23, 2013, (ECF No. 43). Thereafter, I directed Fremantle to serve and file its inquest papers by

---

[*] This Report and Recommendation was prepared with the assistance of Maybeline Saharig, a student at Seton Hall Law School.

December 9, 2013, and Lyda to serve and file any opposition papers by December 23, 2013. (ECF No. 45). My order cautioned that, "[i]f no request for a hearing is made by any party, I shall make my report and recommendation on the basis of the papers submitted to me without any oral argument." (Id. at 2). Although Fremantle timely filed its inquest papers, (ECF Nos. 46-48), Lyda has neither responded nor had any other communication with the Court.

II. Discussion

Fremantle seeks to recover attorneys' fees and costs in the total **[*4]** amount of $166,638. (ECF No. 47 (Def.'s Inquest Mem. ("Def.'s Mem.")) at 2). Of this amount, Fremantle attributes $165,356 to attorneys' fees (including paralegal and filing clerk fees) and $1,282 to costs. (Id. at 4; see also infra note 6).

A. Reasonable Attorneys' Fees

Pursuant to 35 U.S.C. § 285, in "exceptional" circumstances, a court may award reasonable attorneys' fees to the prevailing party. Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366, 1379 (Fed. Cir. 2008) (citing Beckman Instruments, Inc. v. LKB Produkter AB, 892 F.2d 1547, 1551 (Fed. Cir. 1989)). Your Honor previously found that this case is "exceptional" because, among other factors, the question of infringement was not a close one, the litigation was objectively baseless, and Lyda knew of the deficiencies in his claims as early as August of 2010 yet continued to prosecute them for several years. (See ECF No. 36 at 4-5). Accordingly, Fremantle is entitled to its reasonable attorneys' fees.

To determine the amount of attorneys' fees to which a party is entitled, a court must calculate the "presumptively reasonable fee," often referred to as the "lodestar." Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 522 F.3d 182, 183, 189-90 (2d Cir. 2008). That amount is "the rate a paying client would be willing to pay . . . bear[ing] in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." Id. at 190; see also Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 552, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010) (noting that the lodestar method is "objective, **[*5]** . . . cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predicable results") (internal quotation marks omitted). Courts calculate the presumptively reasonable fee by multiplying the reasonable number of hours that the case requires by the reasonable hourly rates. Millea v. Metro-N. R.R. Co., 658 F.3d 154, 166 (2d Cir. 2011).

1. Reasonable Hourly Rate

In assessing the reasonableness of an attorney's hourly rate, the Court must consider whether "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience[,] and reputation." I.B. v. N.Y.C. Dep't of Educ., 336 F.3d 79, 80, 63 Fed. Appx. 21 (2d Cir. 2003) (quoting Blum v. Stenson, 465 U.S. 886, 895 n.11, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)). In doing so, the Court may rely on its own knowledge of private firm hourly rates. Miele v. N.Y. State Teamsters Conference Pension & Ret. Fund, 831 F.2d 407, 409 (2d Cir. 1987).

Fremantle is currently represented in this action by Morgan, Lewis & Bockius LLP ("Morgan Lewis"), an international law firm with twenty-eight offices and more than 2,000 legal professionals. See Morgan Lewis, About Us, http://www.morganlewis.com/our-firm/about-us (last visited June 27, 2016). Earlier in their representation of Fremantle, several of the Morgan Lewis attorneys were affiliated with Howrey LLP, a now-defunct law firm.[1] (Def.'s Mem. at 4). Fremantle seeks to recover fees for a total of two partners and five associates, as well as **[*6]** paralegals and filing clerks. (See ECF No. 48 (Decl. of Charles D. Manice, Esq., dated Dec. 9, 2013 ("Manice Decl.")), Ex. 3 (Attorney Hours Worked Spreadsheet ("Spreadsheet"))).

The most highly compensated attorney for whom Fremantle seeks to recover fees is Theresa M. Gillis, a partner with more than forty years of experience practicing intellectual property law. (Manice Decl., Ex. 4 ("Attorney Bios") at 2-4). Fremantle seeks to be reimbursed for Ms. Gillis' time at the rate of $765 per hour. (Spreadsheet at 2). The other partner for whom Fremantle seeks to recover attorneys' fees is Jason C. White. Mr. White has more than fifteen years of experience litigating intellectual property matters. (Attorney Bios at 5-6). Fremantle seeks to be reimbursed for his time at the rate of $605 per hour. (Spreadsheet at 2-5). The five associates for whom Fremantle seeks attorneys' fees are Mansi H. Shah, Charles D. Manice, Scott D. Sherwin, David N. Patariu, and William Chang. (Spreadsheet at 2-5; Attorney Bios at 7-15). Fremantle seeks to be reimbursed for these associates' work at varying rates at varying times, ranging from $290 to $550 per hour. (Spreadsheet at 2-5). In addition to the fees of the partners and associates, Fremantle also **[*7]** seeks to recover paralegal fees at rates between $245 and $260 per hour and filing clerk fees at the rate of $240 per hour. (Id.).

In assessing the reasonableness of the hourly rates charged by Fremantle's counsel, the Court may consider the prevailing market rates "for similar services by lawyers of reasonably comparable skill, experience[,] and reputation." I.B., 336 F.3d

---

[1] The Court is aware that Howrey LLP was a large, well-regarded firm with expertise in the intellectual property area.

at 80. The Court also may factor into its determination "the difficulty of the questions involved[,] the skill required to handle the problem[,] the time and labor required[,] the lawyer's experience, ability and reputation[,] the customary fee charged by the Bar for similar services[,] and the amount involved." F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1263 (2d Cir. 1987) (quoting In re Schaich, 55 A.D.2d 914, 391 N.Y.S.2d 135, 136 (2d Dep't 1977)). The rates that counsel actually charged are, of course, also evidence of what might constitute a reasonable fee. See Crescent Publ'g Grp. v. Playboy Enters., Inc., 246 F.3d 142, 151 (2d Cir. 2001). Nevertheless, the issue ultimately is not what well-heeled clients might be willing to pay, but the "hourly rate at which a client who wished to pay no more than necessary would be willing to compensate his attorney" for the services that Morgan Lewis provided. Arbor Hill, 522 F.3d at 192.

Assessed in this manner, I find that the hourly billing rates of some of the attorneys in this matter require downward adjustment. [*8] First, the rate of $765 per hour that Fremantle seeks to recover for Ms. Gillis' five hours of work in 2010 is excessive. (See Spreadsheet at 2). According to the 2011 AIPLA Report of the Economic Survey ("AIPLA Survey"),[2] the nationwide average rate in 2010[3] of a partner with more than thirty-five years of experience was $524 per hour, the median was $550, and the seventy-fifth percentile was $653. (Manice Decl., Ex. 1 ("2011 AIPLA Excerpts") at 4). The 2011 AIPLA Survey also shows that these rates varied according to the location of the private firm, with rates in New York being among the highest in comparison to other metropolitan areas nationwide. (Id.). By this metric, according to the 2011 AIPLA Survey, the average rate of an intellectual property partner at a private law firm in the New York metropolitan area was $557 per hour, the median was $590, and the seventy-fifth percentile was $675. (Id.). Considering

Ms. Gillis' forty years of experience in the field, as well as the higher average rates in New York, I find that it is reasonable to award Fremantle attorneys' fees for work performed by Ms. Gillis at the rate of $675 per hour, the seventy-fifth percentile rate reported for partners in the [*9] New York metropolitan area in 2010. I note that I previously have found a similar rate appropriate for such an experienced intellectual property partner. See, e.g., OZ Mgm't, 2010 U.S. Dist. LEXIS 138873, 2010 WL 5538552, at *3 ($657 hourly rate for chairman of firm's intellectual property practice with more than twenty years of experience deemed reasonable).

The rate of $605 per hour requested by Fremantle for the work performed by Mr. White between 2010 and 2013 is also somewhat excessive. (See Spreadsheet at 2-5). Mr. White graduated from law school in 1996; thus, [*10] when he began working on this case at its inception in 2010, he had approximately fourteen years of experience. (Attorney Bios at 5-6). According to the 2011 AIPLA Survey, the nationwide average rate in 2010 of a partner with less than fifteen years of experience was $383, the median was $360, and the seventy-fifth percentile was $425. (2011 AIPLA Excerpts at 4). In Oz Mgm't, however, I awarded a partner five years Mr. White's junior a discounted billing rate of $459 per hour for work performed in 2009 and 2010. See 2010 U.S. Dist. LEXIS 138873, 2010 WL 5538552, at *4. Moreover, that partner was at a New York City firm considerably smaller than Morgan Lewis. I therefore find that an hourly rate of $500 for Mr. White is reasonable for the work that he performed in 2010 and 2011. Although the 2013 AIPLA shows that rates increased modestly in 2012, (see Manice Decl., Ex. 2 ("2013 AIPLA Excerpts") at 4), I consider this rate also to be reasonable for work performed by Mr. White in 2012 and 2013. See also Ritchie v. Gano, 756 F. Supp. 2d 581, 583 (S.D.N.Y. 2010) (rates of "$475 to $525 per hour for two partners with over twenty years of experience . . . are reasonable in light of the rates normally charged for [copyright and trademark infringement] work in this district"); Malletier v. Artex Creative Int'l Corp., 687 F. Supp. 2d 347, 360-61 (S.D.N.Y. 2010) (hourly rates between [*11] $475 and $540 deemed "reasonable in light of [attorney's] approximately twenty-four years' experience in the practice of law and the fact that he practices intellectual property law at a large Manhattan law firm"); Yurman Designs, Inc. v. PAJ, Inc., 125 F. Supp. 2d 54, 58 (S.D.N.Y. 2000) (awarding $520.69 per hour for intellectual property partner's time).

Turning to the associates' rates, Fremantle first requests reimbursement for Ms. Shah's work from 2010 to 2013. (See Spreadsheet at 2-5). According to Fremantle, Ms. Shah billed at a rate of $420 per hour in 2010, but at the rate of $370 per hour in succeeding years. (Id.). This anomaly is apparently attributable to the transfer of Fremantle's business and

---

[2] The AIPLA Survey examines the economic aspects of intellectual property law, including the average hourly billing rates of partners and associates in private law firms. 2013 Report of the Economic Survey, American Intellectual Prop. Law Ass'n, http://www.aipla.org/learningcenter/library/books/econsurvey/2013EconomicSurvey/Pages/default.aspx (last visited June 27, 2016). Courts frequently refers to AIPLA surveys when determining attorneys' reasonable hourly rates in cases involving intellectual property claims. See, e.g., OZ Mgm't LP v. Ozdeal Inv. Consultants, Inc., No. 09 Civ. 8665 (JGK) (FM), 2010 U.S. Dist. LEXIS 138873, 2010 WL 5538552, at *3 (S.D.N.Y. Dec. 6, 2010); Takeda Chem. Indus. Ltd. v. Mylan Labs., Inc., Nos. 03 Civ. 8253 (DLC), 04 Civ. 1966 (DLC), 2007 U.S. Dist. LEXIS 19614, 2007 WL 840368, at *3 (S.D.N.Y. Mar. 21, 2007).

[3] The 2011 AIPLA Survey reports the hourly billing rates that partners and associates in private law firms earned in 2010.

attorneys from Howrey LLP to Morgan Lewis. Ms. Shah graduated from law school in 2006; thus, when she started working on the case in 2010, she had approximately four years of experience. (Attorney Bios at 9-10). Fremantle has only furnished the Court with excerpts from the AIPLA Surveys for 2011 and 2013. According to the 2011 AIPLA Survey, the nationwide average rate in 2010 of an associate with less than five years of experience was $264, the median was $250, and the seventy-fifth percentile was $325. (2011 AIPLA Excerpts at 5). According to the 2013 AIPLA Survey, the [*12] nationwide average rate in 2012 of an associate with 5-6 years of experience was $330, the median was $310, and the seventy-fifth percentile was $394. (2013 AIPLA Excerpts at 5). Based on these numbers, I find that a blended rate of $360 is appropriate for all of the work that Ms. Shah performed.

Next, Fremantle requests reimbursement for Mr. Manice's work from 2010 to 2013. (See Spreadsheet at 2-5). According to Fremantle, Mr. Manice billed at a rate of $395 per hour in 2010, $450 per hour in 2011 and 2012, and $550 per hour in 2013. (Id.). Since Mr. Manice graduated from law school in 2007, when he started working on the case in 2010, he had approximately three years of experience. (Attorney Bios at 11). He, of course, became more experienced as this case lingered on. By 2012, according to the 2013 AIPLA Survey, the nationwide average billing rates for an associate with 5-6 years of intellectual property experience was $330, the median was $310, and the seventy-fifth percentile was $394. (2013 AIPLA Excerpts at 5). I note, however, that Mr. Manice is an associate in Morgan Lewis' general litigation practice, and not an intellectual property specialist. (Attorney Bios at 11.). Thus, I find that a blended [*13] rate of $360 per hour is reasonable for all of Mr. Manice's work.

Next, Fremantle requests reimbursement for Mr. Sherwin's work during 2011 and 2012 at a rate of $350 per hour. (See Spreadsheet at 3-4). Mr. Sherwin graduated from law school in 2007, the same year as Mr. Manice. Mr. Sherwin, however, has extensive patent experience and an undergraduate engineering degree. (Attorney Bios at 12-13). The $350 per hour that Fremantle seeks for his time therefore is eminently reasonable.

Fremantle also seeks reimbursement for Mr. Patariu's work during 2011 and 2012 at a rate of $290 per hour. (Spreadsheet at 3-4). Mr. Patariu graduated from law school in 2009. (Attorney Bios at 14-15). Thus, when he started working on the case in 2011, he had only about two years of experience. Nevertheless, even in 2012, the nationwide seventy-fifth percentile rate for an associate with less than five years of intellectual property experience was $317. (2013 AIPLA Excerpts at 5). Since Mr. Patariu's experience fell within this

range for the duration of his work on this case, Fremantle's requested hourly rate of $290 for Mr. Patariu's work is reasonable.

The last associate for whom Fremantle requests reimbursement is Mr. Chang, who was billed [*14] at a rate of $335 per hour. (Spreadsheet at 4). Mr. Chang graduated from law school in 2005; thus, when he worked on this case in 2012, he had approximately seven years of experience. (Attorney Bios at 7-8). Mr. Chang was an "appellate associate" at Morgan Lewis, not an attorney specializing in intellectual property law. (Id.). Although the AIPLA average rates therefore are not directly applicable, according to the 2013 AIPLA Survey, the nationwide median rate in 2012 for an associate with seven years of experience was $325 and the nationwide seventy-fifth percentile rate was $400. (2013 AIPLA Excerpts at 5). Viewed through that lens, I find that Fremantle's requested hourly rate of $335 for Mr. Chang's services is reasonable.

Fremantle also seeks to be reimbursed for a relatively small number of hours of paralegal time from 2010 through 2012 and filing clerk time from 2011 through 2013. (Spreadsheet at 2-5). The paralegal time was billed at $245 per hour in 2010 and $260 per hour in 2011 and 2012; the filing clerk time was billed at $240 per hour. (Id.). Fremantle has not provided any information regarding the paralegals' backgrounds, nor has it attempted to otherwise justify their hourly billing rates. As Judge John [*15] F. Keenan noted in a recent decision, a "[r]eview of contemporaneous cases in the Southern District of New York . . . suggests that paralegal fees range between $100 and $280." Tabatznik v. Turner, No. 14 Civ. 8135 (JFK), 2016 U.S. Dist. LEXIS 42972, 2016 WL 1267792, at *12 (S.D.N.Y. Mar. 30, 2016) (citing Doe v. Unum Life Ins. Co. of Am., No. 12 Civ. 9327 (LAK) (AJP), 2016 U.S. Dist. LEXIS 10706, 2016 WL 335867, at *6 (S.D.N.Y. Jan. 28, 2016) (approving $200 paralegal rate); Tackney v. WB Imico Lexington Fee, LLC, No. 10 Civ. 2734 (PGG), 2015 U.S. Dist. LEXIS 32001, 2015 WL 1190096, at *5 (S.D.N.Y. Mar. 16, 2015) (approving $135 paralegal rate); Genger v. Genger, No. 14 Civ. 5683 (KBF), 2015 U.S. Dist. LEXIS 28813, 2015 U.S. Dist. LEXIS 28813, 2015 WL 1011718, at *3 (S.D.N.Y. Mar. 9, 2015) (approving $260-280 paralegal rates even though they "might reflect some degree of largesse"); Sprint Commc'ns Co. v. Chong, No. 13 Civ. 3846 (RA), 2014 U.S. Dist. LEXIS 96320, 2014 WL 6611484, at *8 (S.D.N.Y. Nov. 21, 2014) (approving $180-205 paralegal rates); Berrian v. City of N.Y., No. 13 Civ. 1719 (DLC) (DF), 2014 U.S. Dist. LEXIS 104255, 2014 WL 6611356, at *7 (S.D.N.Y. July 28, 2014) (approving $100 paralegal rate)). Within this range, I find that an hourly billing rate of $180 per hour is reasonable.

Finally, I note that Fremantle seeks to recover for 1.9 hours of

"filing clerk" time. (See Def.'s Mem. at 4; Spreadsheet at 3-5). The actual invoices indicate that this time was expended by someone described as an "administrative paralegal," (see Manice Decl., Ex. 5 ("Invoices") at 25, 32, 38, 46, 53, 63, 93), and that the time charges for individuals described as filing and docket clerks are not time for which Fremantle seeks to recover, (see id. at 32, 46). The administrative paralegal's time should also be allowed at an hourly rate of $180.

In sum, the following table details the requested rates and the hourly rates which I find **[*16]** to be reasonable for all of the timekeepers:

Go to table1

2. Hours Reasonably Expended

Having assessed the reasonableness of Fremantle's requested hourly rates for attorneys, paralegals, and filing clerks, I now turn to the reasonableness of the hours expended by Fremantle's counsel.

To enable a court to determine the reasonableness of the hours expended, a party seeking an award of attorneys' fees must submit contemporaneous time records indicating the number of hours expended and the nature of the work done. See Lewis v. Coughlin, 801 F.2d 570, 577 (2d Cir. 1986); Puglisi v. Underhill Park Taxpayer Ass'n, 964 F. Supp. 811, 817 (S.D.N.Y. 1997). In keeping with this requirement, Fremantle initially furnished the Court with redacted copies of its counsel's contemporaneous time records. (See Invoices). Subsequently, at my request, Fremantle provided unredacted copies of these time records for in camera review.

Fremantle seeks reimbursement for a total of 71.25 partner hours and 314.85 associate hours,[4] for a total of 386.1 hours of attorney **[*17]** time. (Def.'s Mem. at 4; see also Spreadsheet at 2-5). In addition, Fremantle seeks reimbursement for a total of 10.45 hours of paralegal time and 1.9 hours of filing clerk time.[5] (Id.). Having reviewed both Fremantle's explanation of these hours in its inquest

---

[4] In its inquest memorandum, Fremantle appears to have inadvertently double-counted 0.2 hours of 2013 filing clerk time as both associate time and filing clerk time. (Compare Def.'s Mem. at 4, with Spreadsheet at 5). The total associate hours claimed therefore is 314.85, not 315.05 as Fremantle suggests.

[5] I calculated the total of 1.9 hours of filing clerk time by adding the hours in each relevant year in the spreadsheet provided by Fremantle. (See Spreadsheet at 3-5). Although Fremantle separately accounted for filing clerk time in this spreadsheet, in its inquest memorandum, this time was folded into an "other costs/fees" category. See also infra note 6.

memorandum, (Def.'s Mem. at 5), and the unredacted time records, I find that the number of hours expended in this case was excessive in certain respects. For example, in 2012, after Fremantle's second motion to dismiss had been granted but before the firm's inquest preparations had begun, (see ECF Nos. 27, 43), Morgan Lewis attorneys worked on this matter for 170 hours (28.2 partner hours and 141.8 associate hours). (see Def.'s Mem. at 5). According to Fremantle's inquest memorandum, these 170 hours were devoted to: (a) responding to Lyda's two motions for reconsideration, (see Def.'s Mem. at 4), which Fremantle did through relatively brief memoranda containing duplicative text, (see ECF Nos. 30, 39); and (b) the preparation and filing of reply papers regarding Fremantle's motion for attorneys' fees, (see Def.'s Mem. at 4), which again were brief, (see ECF No. 35). Given the relatively straightforward nature of both these tasks, I find that 170 **[*18]** hours is an excessive amount of time. Similarly, in 2011, Morgan Lewis attorneys worked on this matter for 92.8 hours (12.8 partner hours and 80 associate hours) that appear to have been devoted almost entirely to preparing and filing Fremantle's second motion to dismiss and related reply papers. (See Def.'s Mem. at 5). Lyda's claims, however, had already been dismissed once, and, by Fremantle's own admission, his second amended complaint was not substantially different from its predecessor. (See ECF No. 24 at 3).

In light of these and similar billing concerns, I find **[*19]** that it is appropriate to reduce all of Morgan Lewis' time charges by twenty percent. See In re "Agent Orange" Product Liab. Litig., 818 F.2d 226, 237 (2d Cir. 1987) ("[A]n across-the-board percentage cut[] in hours [is] a practical means of trimming fat from a fee application[.]") (quotation marks and citation omitted); Days Inn Worldwide, Inc. v. Amar Hotels, Inc., No. 05 Civ. 10100 (KMW) (KNF), 2008 U.S. Dist. LEXIS 37328, 2008 WL 2485407, at *10 (S.D.N.Y. June 18, 2008) (reducing attorneys' fee by seventy-five percent when "a substantial amount of work performed . . . was redundant and unnecessarily duplicative"); Lide v. Abbott House, No. 05 Civ. 3790 (SAS), 2008 U.S. Dist. LEXIS 13826, 2008 WL 495304, at *1-2 (S.D.N.Y. Feb. 25, 2008) (reducing attorney fee award by thirty percent for various reasons, including "excessive and unnecessary hours spent on indisputably straightforward tasks").

After making this adjustment, Fremantle is entitled to recover a total of $117,936 as its reasonable attorneys' fees in this case. The following chart explains how this amount was determined:

Go to table2

B. Costs

In addition to attorneys' fees, Fremantle seeks to recover $1,282 in costs from 2010 through 2012. (See Spreadsheet at 2-4).[6] However, Fremantle has provided invoices totaling only $809.09. (See Invoices at 8, 13, 17, 26, 33, 47, 54, 64, 71, 95). These invoices reflect expenditures for court filing fees, reproduction, computer-assisted research, and postage. (Id.). For the remaining $472.91 claimed, Fremantle has provided no supporting documentation of the charges other than their amounts and the months incurred. (See Spreadsheet at 2-4). It therefore is impossible to determine what these charges were for and whether they are reimbursable. Furthermore, I decline to award the $40 in documented costs attributable to Mr. White's pro hac vice admission, because it was Fremantle's choice to retain non-local counsel. See Access 4 All, Inc. v. 135 W. Sunrise Realty Corp., No. 06 Civ. 5487 (AKT), 2008 U.S. Dist. LEXIS 91674, 2008 WL 4453221, at *11 (E.D.N.Y. Sept. 30, 2008) ("It is within the Court's discretion whether to award attorney's fees for a pro hac vice motion."); Harty v. Par Builders, Inc., No. 12 Civ. 2246 (CS), 2016 U.S. Dist. LEXIS 18520, 2016 WL 616397, at *5 (S.D.N.Y. Feb. 16, 2016) (declining to award pro hac vice costs because "the decision not to use counsel already admitted in this District was entirely up to [the p]laintiff, and [the d]efendant need not pay for that choice"). Fremantle consequently is entitled only to costs in the amount of $769.09. [*21]

III. Conclusion

For the forgoing reasons, I recommend that Fremantle be awarded attorneys' fees in the amount of $117,936, plus costs in the amount of $769.09, for a total of $118,705.09.

IV. Notice of Procedure For Filing Objections to This Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts, to my chambers at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b) (1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to

Judge Batts. Failure to file these [*22] timely objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

Dated: New York, New York

July 11, 2016

/s/ Frank Maas

FRANK MAAS

United          States          Magistrate          Judge

---

[6] In its inquest papers, Fremantle requests a total of $1,738 in "other costs/fees," (see Def.'s Mem. at 4), which, upon closer examination, represents the sum of the "filing clerk" columns and the "other fees" columns in the supporting spreadsheet, (see Spreadsheet at 2-5). In the alternative, subtracting the $456 attributable to filing clerk fees, (see id.), from $1,738 also yields $1,282 in requested costs.

2016 U.S. Dist. LEXIS 90469, *22

**Table1** ([Return to related document text](#))

| Timekeeper | Requested Rate | Adjusted Rate |
|---|---|---|
| Ms. Gillis (partner) | $765 | $675 |
| Mr. White (partner) | $605 | $500 |
| Ms. Shah (associate) | $420/$370 | $360 |
| Mr. Manice (associate) | $395/$450/$550 | $360 |
| Mr. Sherwin (associate) | $350 | $350 |
| Mr. Patariu (associate) | $290 | $290 |
| Mr. Chang (associate) | $335 | $335 |
| Paralegals | $245/$260 | $180 |
| Filing clerks | $240 | $180 |

**Table1** ([Return to related document text](#))

**Table2** ([Return to related document text](#))

| Timekeeper | Hours | Adjusted Rate | Total | Adjusted Total |
|---|---|---|---|---|
| Ms. Gillis (partner) | 5 | $675 | $3,375 | $2,700.00 |
| Mr. White (partner) | 66.25 | $500 | $33,125 | $26,500.00 |
| Ms. Shah (associate) | 189.4 | $360 | $68,184 | $54,547.20 |
| Mr. Manice (associate) | 47.55 | $360 | $17,118 | $13,694.40 |
| Mr. Sherwin (associate) | 10.4 | $350 | $3,640 | $2,912.00 |
| Mr. Patariu (associate) | 64.3 | $290 | $18,647 | $14,917.60 |
| Mr. Chang (associate) | 3.2 | $335 | $1,072 | $857.60 |
| Paralegals | [*20] 10.65 | $180 | $1,917 | $1,533.60 |
| Filing clerks | 1.9 | $180 | $342 | $273.60 |
| **TOTAL** | | | $147,420 | $117,936.00 |

**Table2** ([Return to related document text](#))

**End of Document**

# Mento v. Donahoe

United States District Court for the Western District of New York

February 14, 2012, Decided; February 15, 2012, Filed

08-CV-74S

**Reporter**

2012 U.S. Dist. LEXIS 19197 *

THERESE M. MENTO, Plaintiff, v. PATRICK R. DONAHOE, POSTMASTER GENERAL, Defendant.

**Subsequent History:** Summary judgment granted, in part, summary judgment denied, in part by Mento v. Potter, 2012 U.S. Dist. LEXIS 73319 (W.D.N.Y., May 21, 2012)

**Prior History:** Mento v. Potter, 2011 U.S. Dist. LEXIS 77455 (W.D.N.Y., July 18, 2011)

**Counsel:** [*1] For Therese M. Mento, Plaintiff: Josephine A. Greco, LEAD ATTORNEY, Duane D. Schoonmaker, Greco Trapp, PLLC, Buffalo, NY.

For John E. Potter, Postmaster General, Defendant: Lynn S. Edelman, LEAD ATTORNEY, Michael S. Cerrone, LEAD ATTORNEY, U.S. Attorney's Office, Buffalo, NY.

**Judges:** WILLIAM M. SKRETNY, Chief United States District Judge.

**Opinion by:** WILLIAM M. SKRETNY

# Opinion

### ORDER

1. On February 13, 2012, Defendant filed a Motion to Seal Document. (Docket No. 74.) Specifically, Defendant requests permission to file his Motion for Summary Judgment, consisting of a 42-page Declaration, 27 Exhibits to that Declaration, a 29-page Statement of Undisputed Facts, and a 24-page Memorandum of Law, under seal.

2. Defendant's Motion to Seal Document is premised on the belief that redacting the private information contained in these documents would be impractical, and filing it under seal is necessary to comply with a Protective Order, dated August 13, 2009, signed by the Honorable Hugh B. Scott, United States Magistrate Judge. (Docket No. 22.)

3. Judge Scott's "Confidentiality Agreement and Protective Order" states that the parties have stipulated and agreed that "Defendant will not disclose to the public or to other employees, [*2] any and all information obtained by Defendant concerning Plaintiff's medical condition and/or psychological condition and/or financial circumstances, including but not limited to, medical, psychiatric, psychological and/or counseling records, employment records, personnel records, and financial records." (Docket No. 22, ¶ 1.) However, the order goes on to state that "[n]othing contained in this Agreement and Order . . . shall operate as an admission by the parties that any particular document or information is, or is not, confidential." (Docket No. 22, ¶ 6.) Further, "[n]othing in this Agreement and Order shall affect the admissibility, or non-admissibility, of documents or other evidence at trial." (Docket No. 22, ¶ 7.) Indeed, documents designated as confidential by either party may still be offered into evidence in open court, unless an appropriate protective order is first sought. (Id.)

4. Local Rule 5.3(a) provides that there is a presumption in favor of making documents accessible to the public. This presumption is only overcome upon a "substantial showing" that restricting access is necessary. "In most cases, a judge must carefully and skeptically review sealing requests to insure [*3] that there really is an extraordinary circumstance or compelling need." In re Orion Pictures Corp., 21 F.3d 24, 27 (2d Cir. 1994). This typically involves a careful review of each document a party wishes to file under seal. See City of Hartford v. Chase, 942 F.2d 130, 137 (2d Cir. 1991) (Pratt, J., concurring) (observing that without careful document-by-document review, "a sealing order represents little more than an imprimatur reflexively placed on determinations that have been made by the parties"). A blanket sealing order is rarely, if ever appropriate. Rossi v. West Bd. of Educ., No. 3:03CV1247, 2005 U.S. Dist. LEXIS 6086, 2005 WL 839661, at *1 (D. Conn. Apr. 8, 2005).

5. In the present case, Defendant has only stated that redacting the private information in the documents sought to be sealed would be "impractical." Defendant has made no effort to

2012 U.S. Dist. LEXIS 19197, *3

identify specific documents to be sealed, but has instead proposed to seal every document attached to his Motion for Summary Judgment. No attempt to redact any of the voluminous submissions has been made. Moreover, Judge Scott's Order in no way precludes admission of any of the information contained in these exhibits at open trial.

6. Given what this Court can only **[*4]** describe as a blanket attempt to seal hundreds of pages worth of documents without any attempt having been made at differentiating between those that should be sealed and those that can be safely redacted, this Court finds that Defendant's motion should be denied.

Accordingly, IT HEREBY IS ORDERED, that Defendant's Motion to Seal Document (Docket No. 74) is DENIED.

SO ORDERED.

Dated: February 14, 2012

Buffalo, New York

/s/ William M. Skretny

WILLIAM M. SKRETNY

Chief Judge

United States District Court

---

**End of Document**

# Nash v. Life Ins. Co.

United States District Court for the Southern District of California

May 18, 2010, Decided; May 18, 2010, Filed

CASE NO. 08cv893 WQH (RBB)

**Reporter**
2010 U.S. Dist. LEXIS 50089 *; 2010 WL 2044935

TODD NASH, Plaintiff, vs. LIFE INSURANCE COMPANY OF NORTH AMERICA, an Illinois corporation; LONG TERM DISABILITY INSURANCE PLAN FOR ADMINISTAFF OF TEXAS INC. AND PARTICIPATING COMPANIES a group of welfare benefits plans under ERISA, Defendants.

**Subsequent History:** Findings of fact/conclusions of law at Nash v. Life Ins. Co. of N. Am., 2010 U.S. Dist. LEXIS 134024 (S.D. Cal., Dec. 9, 2010)

**Counsel:** **[*1]** For Todd Nash, an individual, Plaintiff: Susan Lee Horner, LEAD ATTORNEY, Miller Monson Peshel Polacek and Hoshaw, San Diego, CA.

For Life Insurance Company of North America, an Illinois corporation, Group Long Term Disability Insurance Plan for Administaff of Texas Inc. and Participating Companies, a group of welfare benefits plan under ERISA, Defendants: Russell H. Birner, LEAD ATTORNEY, Wilson Elser Moskowitz Edeman & Dicker, Los Angeles, CA.

**Judges:** WILLIAM Q. HAYES, UNITED STATES DISTRICT JUDGE.

**Opinion by:** WILLIAM Q. HAYES

# Opinion

## ORDER

HAYES, Judge:

The matter before the Court is the Joint Motion to Manually File Unredacted Administrative Record Under Seal. (Doc. # 51). The parties contend redacting social security numbers, dates of birth, the names of minor children, and financial account numbers from the administrative record is "impracticable" because the record is "approximately 4,500 pages" long. *Id.* at 2.

Pursuant to Federal Rule of Civil Procedure 5.2(a),

> Unless the court orders otherwise, in an electronic or paper filing with the court that contains an individual's social-security number, taxpayer-identification number, or birth date, the name of an individual known to be a minor, or a financial-account **[*2]** number, a party or nonparty making the filing may include only:
> (1) the last four digits of the social-security number and taxpayer-identification number;
> (2) the year of the individual's birth;
> (3) the minor's initials; and
> (4) the last four digits of the financial-account number.

Pursuant to Federal Rule of Civil Procedure 5.2(d), a court "may order that a filing be made under seal without redaction." However, even if a court orders an undredacted version filed under seal, it may subsequently "order the person who made the filing to file a redacted version for the public record." *Id.*

"Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents.'" *Kamakana v. City and County of Honolulu,* 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Communs., Inc.,* 435 U.S. 589, 597, & n.7, 98 S. Ct. 1306, 55 L. Ed. 2d 570 & n.7 (1978)). Except for documents that are traditionally kept secret, there is "a strong presumption in favor of access to court records." *Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1135 (9th Cir. 2003); *see also Kamakana,* 447 F.3d at 1178-79. "A party seeking to seal a judicial record then bears the burden of overcoming **[*3]** this strong presumption by meeting the compelling reasons standard. That is, the party must articulate compelling reasons supported by specific factual findings, . . . that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process." *Kamakana,* 447 F.3d at 1178-79 (citations and quotation marks omitted). The presumed right to access to court proceedings and documents can be overcome "only be an overriding right or interest

2010 U.S. Dist. LEXIS 50089, *3

'based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Oregonian Publishing Co. v. United States District Court,* 920 F.2d 1462, 1465 (9th Cir. 1990) (quoting *Press-Enterprise Co. v. Superior Court,* 464 U.S. 501, 510, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1985)).

In order to seal the administrative record in this case, as opposed to simply redacting the portions which must be redacted pursuant to Federal Rule of Civil Procedure 5.2(a), the parties must satisfy the "compelling reason" standard established by *Foltz* and *Kamakana. See Foltz,* 331 F.3d at 1135; *Kamakana,* 447 F.3d at 1178-79. The parties' motion is solely based on the difficulty of redacting **[*4]** 4,500 pages of documents, a task which they contend is "impracticable." The work of redacting these documents is not a "compelling reason" to override the public's right of access to court records. While it may be burdensome for the parties to comply with Federal Rule of Civil Procedure 5.2, the Court finds that any burden to the parties does not overcome the "strong presumption in favor of access to court records." *See Kamakana,* 447 F.3d at 1178-79.

**IT IS HEREBY ORDERED THAT** the Joint Motion to Manually File Unredacted Administrative Record Under Seal is **DENIED.** (Doc. # 51).

DATED: 5/18/10

/s/ William Q. Hayes

WILLIAM Q. HAYES

UNITED STATES DISTRICT JUDGE

---

**End of Document**

# Plainville Bd. of Educ. v. R.N.

United States District Court for the District of Connecticut

June 26, 2009, Decided; June 26, 2009, Filed

CASE NO. 3:09CV241 (RNC)

**Reporter**
2009 U.S. Dist. LEXIS 54197 *; 2009 WL 1870866

PLAINVILLE BOARD OF ED., Plaintiff, v. R.N., Defendant.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part Plainville Bd. of Educ. v. R.N., 2009 U.S. Dist. LEXIS 61693 (D. Conn., July 10, 2009)

**Counsel:** [*1] For Plainville Bd of Ed, Plaintiff, Counter Defendant: Joshua L. Jackson, Nicole Alexandra Bernabo, LEAD ATTORNEYS, Robinson & Cole-Htfd, Hartford, CT; Linda L. Morkan, LEAD ATTORNEY, Robinson & Cole, Hartford, CT.

For R. N., by his Mrs. HS & next friends, Mr. & Mrs. H., Defendant, Counter Claimant: Piper A. Paul, LEAD ATTORNEY, Law Office of Piper A. Paul, LLC, Norwalk, CT.

**Judges:** Donna F. Martinez, United States Magistrate Judge.

**Opinion by:** Donna F. Martinez

# Opinion

## RULING ON EMERGENCY MOTIONS TO SEAL

This is an action brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400, *et seq.*, regarding a public school student with disabilities. The court has previously granted leave for the student and his parents to be referred to by fictional names in order to protect the student's privacy. Pending before the court are the plaintiff's Emergency Motion to Seal Administrative Record (doc. # 18) and Emergency Motion to Seal Supplemental Exhibits A-H (doc. # 19).

The parties' summary judgment motions are due soon. The plaintiff school board, in preparation for filing its motion, seeks leave to file the administrative record under seal. [1] It estimates that "over 95% of the Administrative Record- [*2] consisting of thousands of pages of documents-- contains the name and/or other personal information of the Defendant, R.N., which would enable the public to ascertain R.N.'s identity." (Def's Mem., doc. # 1702 at 2.) In addition, the administrative record includes confidential health information. The plaintiff argues that its obligation to protect the confidentiality of the records, combined with the burden and cost of redacting these thousands of pages, justifies sealing them. [2] The defendant, whose records are at issue, opposes sealing, arguing that the records should instead be redacted. The parties appear to be in agreement as to which information requires protection.

Local Rule 5(e)(3) provides that an order sealing a judicial document "shall include particularized findings demonstrating that sealing is [*3] supported by clear and compelling reasons and is narrowly tailored to serve those reasons." See also Lugosch v. Pyramid Co., 435 F.3d 110, 124 (2d Cir. 2006)(because of the presumption of public access to legal documents, sealing orders to protect competing interests such as privacy of medical records must be "narrowly tailored" to achieve those aims). The plaintiff does not meet its burden of providing clear and compelling reasons for sealing. The court recognizes the defendant's privacy interest in maintaining his anonymity and in preserving the confidentiality of his medical records, and the plaintiff's obligation to protect those privacy interests. However, in the absence of clear and compelling reasons for sealing the entire record, such sealing is not the "narrowly tailored" approach required by the local rule or the Second Circuit. Therefore, the plaintiff is ordered to redact the record.

---

[1] Pursuant to the IDEA statute, in this type of action, the court "shall receive the records of the administrative proceedings." 20 U.S.C. § 1415(i)(2)(C)(i).

[2] The plaintiff contends that it could take as much as 100 hours to fully and accurately redact the record. It also points to the risk that sensitive information might inadvertently be overlooked during the redaction process.

2009 U.S. Dist. LEXIS 54197, *3

The plaintiff also moves to seal several documents that were attached as exhibits to its Motion to Submit Additional Evidence (doc. # 16). The documents were partially redacted, but it was later discovered that some confidential information was not redacted. The exhibits at issue are relatively [*4] short, and they have been sealed by the clerk's office on a temporary basis.

The motion is granted in part and denied in part. The exhibits to doc. # 16 shall remain sealed. However, if leave is granted for the documents to be filed in support of the plaintiff's Motion for Summary Judgment, the plaintiff shall not file them under seal but shall instead fully redact them.

SO ORDERED at Hartford, Connecticut this 26th day of June, 2009.

/s/

Donna F. Martinez

United States Magistrate Judge

---

# Rahman v. Smith & Wollensky Rest. Group, Inc.

United States District Court for the Southern District of New York

May 24, 2007, Decided ; May 24, 2007, Filed

06 Civ. 6198 (LAK) (JCF)

**Reporter**
2007 U.S. Dist. LEXIS 37642 *; 2007 WL 1521117

MOHAMMED MUHIBUR RAHMAN, individually and on behalf of all others similarly situated, Plaintiff, -against- THE SMITH & WOLLENSKY RESTAURANT GROUP, INC., SMITH & WOLLENSKY OPERATING CORP., and PARK AVENUE CAFE, Defendants.

**Subsequent History:** Costs and fees proceeding at, Sanctions allowed by Rahman v. Smith & Wollensky Rest. Group, Inc., 2008 U.S. Dist. LEXIS 741 (S.D.N.Y., Jan. 7, 2008)

# Case Summary

## Procedural Posture

Plaintiff worked as a waiter for defendant restaurant group. Plaintiff brought a class action, alleging defendants discriminated against Muslim employees and employees of South Asian descent. In a discovery dispute, plaintiff moved for sanctions a second time, alleging that defendants did not comply with the court's order. Plaintiff sought an order precluding defendants from contesting liability. Defendants in turn filed a motion to compel.

## Overview

Defendants' revised responses indicated that they had withheld a number of documents on the basis of privilege despite the fact that the court previously found that the defendants had waived all objections to the plaintiff's requests. Nevertheless, defendants claimed, without citing case law, that assertions of privilege were not "objections" and therefore had not been waived. The court found this argument meritless, noting that it was well established that failure to provide a privilege log in a timely manner could result in waiver of objections on the basis of privilege. Having waived any objections, defendants were required to produce all responsive documents by December 20, 2006. They failed to do so, and defendants now had to be precluded from contesting liability. Because no class had been certified, defendants were precluded from contesting liability only with respect to plaintiff's individual claims. Although defendants' liability for plaintiff's claims were no longer at issue, the

documents sought by the plaintiff, including documents withheld on the basis of privilege, still had to be produced insofar as they were relevant to damages or class certification.

**Outcome**
Plaintiff's motion was granted, and defendants were precluded from contesting liability with respect to plaintiff's individual claims. The documents requested by plaintiff needed to be produced only insofar as they were relevant to damages or class certification. Defendants' motion to compel was granted in part and denied in part.

**Counsel: [*1]** For Mohammed Muhibur Rahman, individually and on behalf of all others similarly situated, Plaintiff: Krishnan Shanker Chittur, LEAD ATTORNEY, Chittur & associates, P.C., New York, NY.

For The Smith & Wollensky Restaurant Group, Inc., Smith & Wollensky Operating Corp., Park Avenue Cafe, Defendants: Christina L. Feege, LEAD ATTORNEY, Elena Paraskevas-Thandani, Littler Mendelson, P.C., New York, NY.

**Judges:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** JAMES C. FRANCIS IV

# Opinion

*MEMORANDUM AND ORDER*

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

The plaintiff in this putative class action, Mohammed Muhibur Rahman, alleges that the defendants discriminated against him and other similarly situated employees on the basis of race, color, religion, and national origin. At issue here are a number of discovery disputes. The plaintiff claims that the defendants did not comply with an order entered by the

Honorable Lewis A. Kaplan, U.S.D.J., on December 13, 2006 (the "Order"), and has moved to preclude them from contesting liability. For the reasons set forth below, the plaintiff's motion is granted, and the defendants are precluded from contesting liability with respect [*2] to Mr. Rahman's individual claims. Accordingly, the defendants are not required to produce documents that are relevant only to those claims, but are required to produce documents that are relevant to damages or class certification. The defendants in turn have moved to compel the plaintiff to respond to interrogatories and to produce requested documents. Their motion is granted in part and denied in part.

*Background*

Defendant Smith & Wollensky Restaurant Group owns and operates sixteen restaurants in major cities across the United States, including defendant Park Avenue Cafe, a restaurant in New York City. [1] (Complaint, PP 5-6). Mr. Rahman, who worked as a waiter at Park Avenue Cafe from 1998 until his termination in 2005, brings this action on behalf of a purported class comprised of "all past, present, and future employees of defendants that are Muslims, non-whites, and/or of South Asian descent." (Complaint, PP 9, 23). The Complaint, filed on August 15, 2006, alleges that the defendants discriminated against Muslim employees and employees of South Asian descent "with respect to job assignment, compensation and other terms or conditions of employment, and/or by creating [*3] a racially-hostile and abusive climate, and/or unlawfully or discriminatorily terminating employees on false pretenses." (Complaint, P 21).

The defendants filed their Answer on September 29, 2006. The plaintiff served document requests on October 19, 2006. (Affirmation of Krishnan Chittur dated Dec. 26, 2006 ("Chittur 12/26/06 Aff."), P 4). At that time, the defendants had not made their Rule 26(a)(1) initial disclosures. [2] (Chittur 12/26/06 Aff., P 3). The defendants did not respond to the plaintiff's document requests, and on November 27, 2006 the plaintiff moved to compel the defendants to respond and to make their initial disclosures. (Chittur 12/26/06 Aff., P 5). On December 1, 2006, the Court ordered the defendants to make Rule 26(a)(1) disclosures and to produce the requested documents on or before December 8, 2006.

[*4]   The defendants responded to the plaintiff's document

---

[1] Defendant Smith & Wollensky Operating Corp. operates Smith & Wollensky Restaurant Group. (Complaint, P 4).

[2] Rule 26(a) requires parties to produce certain information without awaiting a discovery request.

---

requests on December 8, 2006. (Order at 1). The plaintiff then made a motion for sanctions pursuant to Rule 37, alleging that the defendants had failed to provide a privilege log and had improperly asserted objections to the requests despite having been ordered to produce all responsive documents. In its Order dated December 13, 2006, the Court agreed:

> The defendants' failure to respond to plaintiff's document request, which was served on October 19, within thirty days waived all objections to the request. . . . That is why the December 1 order required production of the requested documents, not simply the service of a response to the document request. Accordingly, plaintiff's motion is granted to the extent that defendants shall produce all of the documents requested by plaintiff no later than December 20, 2006 absent [which] defendants shall be precluded from contesting liability in this action.

(Order at 2).

On December 28, 2006, the defendants served their Rule 26(a) mandatory disclosures, and on December 20, 2006 served "Revised Responses" to the plaintiff's document requests. (Defendants' Rule 26(a) Initial [*5] Disclosures, attached as Exh. D to Affirmation of Christina L. Feege dated Jan. 4, 2007 ("Feege 1/4/07 Aff."); Defendants' Revised Responses to Plaintiff's First Set of Requests for Documents ("Revised Responses"), attached to Chittur 12/26/06 Aff.). In their Revised Responses, the defendants asserted numerous objections and indicated that, with the exception of documents they considered to be privileged, responsive documents had been produced or would be produced by December 29, 2006. (Revised Responses at 1-9). The plaintiff filed the instant motion for sanctions on December 26, 2006, alleging that the defendants had once again improperly asserted objections and had failed to produce all responsive documents. The plaintiff asks that, consistent with the language of the Order, the defendants be precluded from contesting liability in this action.

The defendants served their first set of document requests and interrogatories on January 18, 2007. (Declaration of Christina L. Feege dated March 13, 2007 ("Feege 3/13/07 Decl."), P 5). The plaintiff objected to a number of the defendants' document requests and interrogatories, and on March 13, 2007, the defendants filed a motion to compel.

[*6]   On January 25, 2007, the plaintiff served a second set of document requests, requests for admissions, and notices of Rule 30(b)(6) depositions. (Letter of Krishnan Chittur dated March 30, 2007 ("Chittur 3/30/07 Letter") at 1). On March 30, 2007, Mr. Rahman submitted a letter to the Court contending that the defendants had failed to adequately respond to these requests and had improperly objected to the

noticed depositions. (Chittur 3/30/07 Letter at 1-2). The letter does not seek any specific relief aside from the sanctions sought in the plaintiff's earlier motion.

*Discussion*

A. *Plaintiff's Motion for Sanctions*

1. *Waiver*

The defendants' Revised Responses indicate that they have withheld a number of documents on the basis of privilege despite the fact that the Court previously found that the defendants had waived all objections to the plaintiff's requests. The Order clearly states that "[t]he defendants' failure to respond to plaintiff's document request, which was served on October 19, within thirty days waived all objections to the request." (Order at 2). The Court cited *Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs.*, No. 02 Civ. 9151, 2003 U.S. Dist. LEXIS 19247, 2003 WL 22455224 (S.D.N.Y. Oct. 28, 2003), **[*7]** which states:

Given the absence of a valid explanation for the defendant's failure to serve its objections in a timely manner, . . . a finding of waiver is appropriate. Any other result would ignore the time limits set forth in the Federal Rules of Civil Procedure, contribute further to the delay in resolving cases and effectively turn Article V of the Federal Rules of Civil Procedure from a structure of well-defined rights and obligations to a system of suggested, but non-binding, guidelines.

2003 U.S. Dist. LEXIS 19247, [WL] at *1.

The defendants nevertheless claim, without citing case law, that assertions of privilege are not "objections" and therefore have not been waived. (Feege 1/4/07 Aff., P 5). This argument lacks merit. It is well established that failure to provide a privilege log in a timely manner may result in waiver of objections on the basis of privilege. *See, e.g., Lopez v. City of New York*, No. 05-CV-3624, 2007 U.S. Dist. LEXIS 19694, 2007 WL 869590, at *3 (E.D.N.Y. March 20, 2007) (collecting cases); *FG Hemisphere Assocs., L.L.C. v. Republique du Congo*, No. 01 Civ. 8700, 2005 U.S. Dist. LEXIS 3523, 2005 WL 545218, at *6 (S.D.N.Y. March 8, 2005) (collecting cases).

**[*8]** Having waived any objections, the defendants were required to produce all responsive documents by December 20, 2006. They failed to do so, and must now be precluded from contesting liability. Because no class has been certified, the defendants are precluded from contesting liability only with respect to Mr. Rahman's individual claims. Although the defendants' liability for Mr. Rahman's claims is no longer at issue, the documents sought by the plaintiff, including

documents withheld on the basis of privilege, must still be produced insofar as they are relevant to damages or class certification.

The plaintiff maintains that the defendants have thus far refused to produce discovery relevant to the class claims. (Chittur 3/30/07 Letter at 1-2). The defendants contend that the plaintiff cannot succeed in obtaining certification of the proposed class. (Letter of Christina L. Feege dated April 4, 2007 ("Feege 4/4/07 Letter") at 2-3). However, the defendants may not refuse to produce discovery relevant to class certification on that basis. In order to obtain certification of the class, the plaintiff must demonstrate, pursuant to Rule 23(a) of the Federal Rules of Civil Procedure **[*9]**, that

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Pre-certification discovery is often necessary in order to provide the court with sufficient information to determine whether certification is appropriate. *See Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571 (2d Cir. 1982) ("[T]here can be no doubt that it is proper for a district court, prior to certification of a class, to allow discovery and to conduct hearings to determine whether the prerequisites of Rule 23 are satisfied."); *Calabrese v. CSC Holdings, Inc.*, No. 02-CV-5171, 2007 U.S. Dist. LEXIS 16059, 2007 WL 749690, at *5 (March 7, 2007) (citing *In re Initial Public Offering Securities Litigation*, 472 F.3d 24, 41 (2d Cir. 2006)) (noting that before deciding whether to certify class, "district court is required to be sure that enough pre-certification discovery is provided so that it is satisfied **[*10]** that each Rule 23 requirement has been met"). "The discovery permitted must be sufficiently broad in order that the plaintiffs have a realistic opportunity to meet [the Rule 23(a)] requirements; at the same time, the defendant must be protected from discovery which is overly burdensome, irrelevant, or which invades privileged or confidential areas." *National Organization for Women, Farmington Valley Chapter v. Sperry*, 88 F.R.D. 272, 276-77 (D. Conn. 1980).

By contrast, pre-certification discovery on the merits of the class claims is generally inappropriate. *See Calabrese*, 2007 U>S. Dist. LEXIS 16059, [WL] at *5 (noting that discovery should be limited so that Rule 23 hearing does not "'extend into a protracted mini-trial of substantial portions of the underlying litigation'" (quoting *In re Initial Public Offering*, 471 F.3d at 41)). Barring other objections, the defendants must therefore produce requested discovery to the extent that

it is relevant to the issue of class certification but not insofar as it relates to the merits of the class claims.

2. *Adequacy of Production*

a. *Documents Relied Upon in Preparing Answer*

The plaintiff's **[*11]** Request No. 1 seeks documents upon which the defendants relied in preparing the Answer. (Revised Responses at 4). The defendants interpreted this request to mean documents actually reviewed by counsel in preparing the Answer, and they claim to have produced documents responsive to the request. (Feege 1/4/07 Aff., P 7; Revised Responses at 4; Letter of Christina L. Feege dated Dec. 26, 2006, attached as Exh. C to Feege 1/4/07 Aff., at 1). The plaintiff, on the other hand, contends that this is a "comprehensive" request for all documents supporting the denials and affirmative defenses raised in the Answer, and complains that the defendants have not produced all such documents. (Chittur 12/26/06 Aff., P 22; Reply Affirmation of Krishnan Chittur dated Jan. 8, 2007 ("Chittur 1/8/07 Aff."), P 7).

The defendants' interpretation of this request was reasonable. In any case, the plaintiff has now served the defendants with a second set of discovery requests seeking information that, according to the defendants, did not fall within the scope of the plaintiff's previous requests. (Chittur 3/30/07 Letter at 1). This second set of requests includes a request for all documents "relevant to the allegations **[*12]** set forth in the Answer in this action including without limitation documents that allegedly refute, confirm or are otherwise material in any way to any of the allegations in the Answer according to Defendants." (Plaintiff's Second Set of Requests for Documents, attached as Exh. A to Chittur 3/30/07 Letter, Request No. 2). Accordingly, since the plaintiff has clarified the previous request, the parties' dispute over the meaning of Request No. 1 is no longer material.

b. *Documents Concerning Plaintiff*

Request No. 4 seeks "[d]ocuments concerning Plaintiff." (Revised Responses at 5). The defendants state that they have produced responsive documents, with the exception of certain documents withheld on the basis of privilege. (Revised Responses at 5; Feege 1/4/07 Aff., P 11). As explained above, the defendants must turn over all documents responsive to this request that have previously been withheld on the basis of privilege, but only to the extent that they are relevant to damages or class certification. The plaintiff contends that the defendants have produced only a few W-2 forms, pay stubs,

and "Table Assignment" sheets. [3] (Affirmation of Mohammed Muhibur Rahman dated Dec. 26, 2006, PP **[*13]** 3-4). In their response to the plaintiff's motion, the defendants claim that they are searching for tip reports and documents related to table assignments. (Feege 1/4/07 Aff., PP 10-11). The defendants do not address the plaintiff's contention that they have produced only a limited number of W-2 forms. To the extent that they have not already done so, the defendants must produce tip reports, payroll records, W-2 forms, and documents related to table assignments, all of which are relevant to the issue of damages, within two weeks of the date of this order.

c. *Prior Complaints of Discrimination*

Request No. 8 seeks "[d]ocuments concerning allegations or complaints of discrimination made to Defendants, including **[*14]** any response or action taken by Defendants regarding such complaints or allegations." (Revised Responses at 6). The plaintiff contends that while the defendants have produced some responsive documents, a number of documents are missing. (Chittur 12/26/06 Aff., PP 18-20, 25). In their opposition to the plaintiff's motion, the defendants claim that they have now produced all responsive documents, including those specified by the plaintiff in his motion, with the exception of certain documents withheld on the basis of privilege. (Feege 1/4/07 Aff., PP 3-16). For the reasons stated above, those documents, which are relevant to whether there are "questions of law or fact common to the class," Fed. R. Civ. P. 23(a), must also be produced.

d. *Statements Made By Other Employees*

Request No. 9 seeks "[d]ocuments concerning the affidavits or statements taken from any employees of the Park Avenue Cafe after the commencement of this lawsuit, including without limitation any correspondence concerning such affidavits or statements." (Revised Responses at 7). The defendants objected to this request on the basis of attorney-client privilege and work product **[*15]** immunity, but did not indicate that any responsive documents had been withheld. (Revised Responses at 7). For the reasons set forth above, these assertions of privilege have been waived. However, these documents are not relevant to damages or class certification, and need not be produced.

e. *Documents Concerning Plaintiff's Manager*

---

[3] The plaintiff also claims the defendants have not produced all documents related to his internal complaints of discrimination and harassment. Since the defendants are now precluded from contesting liability with respect to Mr. Rahman's individual claims, these documents are no longer relevant.

2007 U.S. Dist. LEXIS 37642, *15

Request No. 10 seeks "[d]ocuments concerning Plaintiff's manager at the Park Avenue Cafe including, without limitation, personnel records, performance reviews, any complaints or allegations of discrimination, harassment or abuse against such manager, and all other employment related documents." (Revised Responses at 7). The defendants have stated that they will produce such documents with respect to two Park Avenue Cafe managers. (Feege 1/4/07 Aff., P 18). The plaintiff has indicated, however, that he seeks documents related to "all of those individuals who were responsible for managing or supervising" the plaintiff. (Feege 1/4/07 Aff., P 18). Because such documents are not relevant to damages or to class certification, no further documents need be produced at this time.

f. *Documents Submitted to the EEOC*

Request No. 11 seeks documents submitted **[*16]** to the Equal Employment Opportunity Commission (the "EEOC") by the defendants. (Revised Responses at 8). Although the defendants have produced a number of responsive documents, the plaintiff complains that they have not produced a list of Park Avenue Cafe employees that was apparently submitted to the EEOC. (Feege 1/4/07 Aff., P 19; Chittur 12/26/06 Aff., P 29; Chittur 1/8/07 Aff., P 18). This list is relevant to Rule 23(a)'s requirement that the class be "so numerous that joinder of all members is impracticable," and must therefore be produced if it exists.

g. *Corporate Structure*

Request No. 12 seeks documents concerning the defendants' "corporate structure," while Request No. 13 seeks documents concerning the "management, ownership and operational control of restaurants within [t]he Smith & Wollensky Restaurant Group including without limitation [t]he Park Avenue Cafe." (Revised Responses at 8). In response to Request No. 12, the defendants stated that they "have not prepared an organizational chart outlining the corporate structure or relation among the various Defendants." (Revised Responses at 8). The defendants did produce two pages of information from the Smith & Wollensky **[*17]** Restaurant Group website as well as its 2005 annual report. [4] (Feege 1/4/07 Aff., P 20; Chittur 12/26/06 Aff., P 30). In response to Request No. 13, the defendants stated that the request was too vague to permit the defendants to determine what was sought. (Revised Responses at 8-9).

The plaintiff contends that the two documents produced by the defendants in response to Request No. 12 "fail to elucidate issues of control, decision-making, and ownership between the various corporate entities." (Chittur 1/8/07 Aff., P 8). It is difficult to believe, and the defendants do not actually claim, that they have no documents responsive to this request other than the ones already produced. With respect to Request No. 13, the plaintiff has clarified **[*18]** his request by stating that he seeks documents, such as "job descriptions, employment contracts, internal memos, or intra-corporate communications delineating hierarchy and responsibilities," that reveal "each manager's responsibilities and accountability." (Chittur 1/8/07 Aff., P 10). The defendants assert that they "would readily have provided [this] information" if they had understood the plaintiff's request at the time that they received it. (Feege 1/4/07 Aff., P 22).

Because the documents sought in Requests Nos. 12 and 13 are relevant to the issue of whether there are questions of law and fact common to the class, any responsive documents that have not yet been produced must be produced within two weeks of the date of this order.

B. *Defendants' Motion to Compel*

As noted above, the plaintiff has objected to a number of the defendants' interrogatories and document requests. The defendants now seek an order compelling the plaintiff to respond to the interrogatories and to produce the requested documents.

1. *Plaintiff's Tax Returns*

The defendants have served document requests seeking (1) the plaintiff's W-2 forms from January 2000 onward; (2) the plaintiff's federal **[*19]** and state income tax returns from 1998 onward; and (3) documents concerning any audit of the plaintiff's finances conducted by the Internal Revenue Service or any state or local tax authority since 1998. (Defendants' First Request for the Production of Documents ("Def. Req."), attached as Exh. C to Feege 3/13/07 Decl., Requests Nos. 60-62). The plaintiff objects to these requests and has not produced any responsive documents. (Plaintiff's Responses to Defendants' Requests for Production of Documents, attached as Exh. F to Feege 3/13/07 Decl., PP 60-62; Feege 3/13/07 Decl., P 10).

Courts have been reluctant to require disclosure of tax returns because of both "the private nature of the sensitive information contained therein" and "the public interest in encouraging the filing by taxpayers of complete and accurate returns." *Smith v. Bader*, 83 F.R.D. 437, 438 (S.D.N.Y. 1979). Disclosure is appropriate "only if, on balance, the federal policy of liberal discovery outweighs the policy of maintaining the confidentiality of tax returns." *Hazeldine v.*

---

[4] The defendants also offered to respond to an interrogatory regarding the defendants' corporate structure and management. (Feege 1/4/07 Aff., P 20). However, the plaintiff is not limited to interrogatories, and may seek discovery in the form of documents if he so chooses.

*Beverage Media*, No. 94 Civ. 3466, 1997 U.S. Dist. LEXIS 8971, 1997 WL 362229, at \*4 (S.D.N.Y. June 27, 1997); *accord Raba v. Suozzi*, No. CV 06-1109, 2007 U.S. Dist. LEXIS 1567, 2007 WL 81932, **[\*20]** at \*1 (E.D.N.Y. Jan. 9, 2007). Accordingly, a court will order disclosure when (1) the returns are relevant to the subject matter of the action and (2) there is "'a compelling need for the returns because the information contained therein is not otherwise readily available.'" [5] *Id.* (quoting *Securities & Exchange Commission v. Cymaticolor Corp.*, 106 F.R.D. 545, 547 (S.D.N.Y. 1985)); *accord Raba*, 2007 U.S. Dist. LEXIS 1567, [WL] at \*1. "While the party seeking disclosure of the tax returns bears the burden of establishing relevance, the party resisting disclosure should bear the burden of establishing alternative sources for the information." *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 119 F.R.D. 625, 627 (S.D.N.Y. 1988).

 **[\*21]** As an initial matter, W-2 forms are not the equivalent of tax returns; they are "prepared by a third party to document yearly income, and [are] not confidential" to the plaintiff. *Burger v. Litton Indus.*, No. 91 Civ. 0918, 1994 U.S. Dist. LEXIS 17015, 1994 WL 669505, at \*2 (S.D.N.Y. Nov. 29, 1994). Unsurprisingly, it appears that the defendants already have the plaintiff's W-2 forms for the years during which they employed him. (Declaration of Christina L. Feege dated March 16, 2007 ("Feege 3/16/07 Decl."), P 1; Chittur 3/15/07 Aff., P 8). W-2 forms for the time period following the termination of his employment at the Park Avenue Cafe are also relevant, since they would reveal information regarding mitigation of damages. However, the plaintiff states that he did not obtain other employment after being fired by the defendants. (Chittur 3/15/07 Aff., P 14). Presumably, then, no such W-2 forms exist.

As noted above, the defendants also seek the plaintiff's tax returns, contending that they are "probative of [his] claim for back pay and his obligation to mitigate damages." (Feege 3/13/07 Decl., P 10). With respect to mitigation, because the plaintiff has not worked since being terminated **[\*22]** from the Park Avenue Cafe, his tax returns will not reveal any information relevant to mitigation.

With respect to back pay, the defendants claim that the plaintiff's W-2 forms, which indicate that he earned between $900 and $6,000 each year, do not reflect his actual earnings. (Feege 3/16/07 Decl., P 1). There appears to be some basis for this suspicion. For instance, the plaintiff has submitted to the Court a handwritten form produced by the defendants. (Form 8027 Worksheet, attached as Exh. A to Chittur 3/15/07 Aff.). This form was apparently used to assist the defendants in filling out IRS Form 8027 ("Employer's Annual Information Return of Tip Income and Allocated Tips") for Mr. Rahman. Presumably in order to discourage tipped employees from under-reporting their tip income, the IRS requires employers to calculate eight percent of their gross receipts from food or beverage operations and, if that amount is greater than the total tips reported to the employer by its tipped employees, the difference must be allocated among tipped employees for tax purposes. The allocated amount must then be entered in the box labeled "Allocated Tips" on each employee's W-2 form. On the form submitted **[\*23]** by the plaintiff, the amount of tips allocated to Mr. Rahman for tax purposes for that year is $51,016. [6] (Form 8027 Worksheet). Thus, one would assume that Mr. Rahman's income from tips would be approximately that amount, absent unusual circumstances. However, the form also indicates that the plaintiff reported no tip earnings to his employer. Thus no tip earnings were shown on his W-2.

The amount of Mr. Rahman's actual earnings during the period in question is plainly relevant to the issue of back pay. Given that the form submitted by the plaintiff shows a wide discrepancy between the tip amount allocated to Mr. Rahman for tax purposes ($51,016) and the amount that he reported to his employer ($0), it is possible that the plaintiff's tax returns will provide more accurate information than his W-2 forms regarding his income from the Park Avenue Cafe. The plaintiff has not suggested any means (aside from a deposition) by which the defendants could obtain that information. Therefore, **[\*24]** the defendants are entitled to production of Mr. Rahman's tax returns for the years during which he worked at the Park Avenue Cafe. The defendants state that they have agreed to treat the tax returns as confidential and to permit the plaintiff to redact "all information other than his reported earnings from employment." (Feege 3/16/07 Decl., P 1). The plaintiff must produce the requested tax returns subject to these conditions.

Finally, the defendants seek all documents related to tax audits conducted by the IRS or other tax authorities. However, in their motion to compel, the defendants do not elaborate on their reasons for seeking this information. Without a further explanation of relevance, it is inappropriate

---

[5] Despite the reluctance of courts to order disclosure, most have found that tax returns are not privileged. *See, e.g., Raba*, 2007 U.S. Dist. LEXIS 1567, [WL] at \*1; *Brassco, Inc. v. Klipo*, No. 99 Civ. 3014, 2004 U.S. Dist. LEXIS 11164, 2004 WL 1385816, at \*3 (S.D.N.Y. June 21, 2004). Certainly, they are not absolutely privileged. However, the test for determining whether disclosure is necessary "is characterized by virtually the same features as tests for [] qualified privileges." *Gattegno v. Pricewaterhousecoopers, LLP*, 205 F.R.D. 70, 72 (D. Conn. 2001) (finding qualified privilege for tax returns).

[6] The form is undated.

to order production of these documents.

2. *Credentials of Class Counsel*

The defendants served several document requests seeking documents regarding the past experience of plaintiff's counsel with respect to employment discrimination class actions. (Def. Req. Nos. 8, 55, 56). The defendants also served related interrogatories. Interrogatory No. 13 asks the plaintiff to identify "past class actions that Plaintiff's counsel have handled that have resulted in a successful [*25] jury trial result or an approved settlement on behalf of class members in any past matter that involved allegations of employment discrimination." (Defendants' First Set of Interrogatories to Plaintiff ("Def. Int."), attached as Exh. D to Feege 3/13/07 Decl., No. 13). [7] Interrogatory No. 14 asks the plaintiff to identify "all past cases in which Plaintiff's counsel have unsuccessfully sought class certification or has [sic] represented one or more clients in a matter that involved allegations of employment discrimination and that resulted in dismissal of the case or an adverse decision through a motion for summary judgment." (Def. Int. No. 14).

[*26] As mentioned above, Rule 23(a) requires a district court to determine, prior to certifying a class action, whether, among other things, "the representative parties will fairly and adequately protect the interests of the class." As part of this inquiry, the court must determine whether class counsel is "'qualified, experienced, and generally able' to conduct the litigation." *In re Drexel Burnham Lambert Group*, 960 F.2d 285, 291 (2d Cir. 1992) (quoting *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968)); *see also*

_____

[7] The defendants served two sets of interrogatories. One is labeled "Defendants' First Set of Interrogatories to Plaintiff," and the other is labeled "Defendant Park Avenue Cafe's First Set of Interrogatories to Plaintiff." I will refer to the former as "Def. Int." and to the latter as "PAC Int."

The plaintiff points out that when parties "are acting in unison and are represented by the same counsel, they may be treated as one party for purposes of the interrogatory limits." *Gucci Am., Inc. v. Exclusive Imps. Int'l*, No. 99 Civ. 11490, 2002 U.S. Dist. LEXIS 14837, 2002 WL 1870293, at *5 (S.D.N.Y. Aug. 13, 2002). He contends that the defendants' interrogatories, when combined, exceed the twenty-five permitted by Rule 33(a) of the Federal Rules of Civil Procedure, and that they should therefore be stricken altogether. (Chittur 3/15/07 Aff., P 4). However, the decision to consider multiple parties as one for the purposes of Rule 33(a) is within the discretion of the court. *See In re Independent Energy Holdings Securities Litigation*, No. 00 Civ. 6689, 2003 WL 42010, at *1 (S.D.N.Y. Jan. 6, 2003); Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2168.1 at 261 (2d ed. 1994). I decline to strike the defendants' interrogatories on this ground and will address the plaintiff's specific objections in turn.

*Kingsepp v. Wesleyan University*, 142 F.R.D. 597, 599 (S.D.N.Y. 1991) (court must "'scrutinize the character, competence and quality of counsel retained' by the plaintiff" (quoting *Smith v. Josten's American Yearbook Co.*, 78 F.R.D. 154, 163 (D. Kan. 1978)). The court "may examine class counsel's conduct in both: (1) prior litigations, and (2) the putative class action before the court." *Kingsepp*, 142 F.R.D. at 599 (citation omitted). Accordingly, the defendants claim that they are entitled to discovery regarding plaintiff's counsel's past experience with class action litigation.

[*27] The plaintiff contends that the defendants "cite no case -- and we found none -- permitting such attorney discovery." (Chittur 3/15/07 Aff., P 27). However, the plaintiff provides no cases that *prohibit* this kind of discovery, and indeed such discovery was in fact conducted in one of the cases that he cites. *See Ockerman v. King & Spalding*, No. 1:85-CV-2958, 1988 U.S. Dist. LEXIS 9898, 1988 WL 39937, at *4 (N.D. Ga. March 31, 1988) (rejecting defendants' claim that plaintiffs had been "less than forthright" in their responses to discovery requests "concerning how many other class actions [plaintiff's] counsel are involved in"). The plaintiff also cites *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U.A.*, 657 F.2d 890 (7th Cir. 1981) for the proposition that

> [w]hen it comes . . . to determining whether 'the representative parties will fairly and adequately protect the interests of the class,' or the plaintiff's ability to finance the litigation, [reliance upon information provided by defendants] is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house.

*Id.* at 895. However, [*28] as another court more recently noted,

> although *Eggleston* expressed skepticism as to the benevolence of a defendant who challenges an application for class counsel, it did not hold that a defendant is not allowed discovery for making such a challenge. To the contrary, *Eggleston* expressly acknowledged that courts must allow a degree of pre-certification discovery "to aid making the necessary class determinations."

*Stock v. Integrated Health Plan, Inc.*, F.R.D. , 241 F.R.D. 618, 2007 U.S. Dist. LEXIS 18194, 2007 WL 790032, at *4 (S.D. Ind. March 15, 2007) (internal citations omitted) (quoting *Eggleston*, 657 F.2d at 895)(finding that district court has "broad discretion to allow discovery bearing on adequacy of representation").

Given that the Court must consider the qualifications of plaintiff's counsel in determining whether the class should be

certified, it is appropriate for the defendants to obtain some discovery regarding prior class actions in which plaintiff's counsel have been involved. However, this information is more appropriately sought through interrogatories than through document requests. Accordingly, the plaintiff need not produce the [**29] requested documents but must respond to Interrogatory No. 13 and Interrogatory No. 14 within two weeks of the date of this order.

### 3. *Plaintiff's Involvement in Prior Litigation*

The defendants have requested "[a]ll documents concerning any lawsuits [other than this one] that Plaintiff has been involved in, either as a party, witness or as a third party." (Def. Req. No. 37). The defendants contend that the plaintiff may "have claimed emotional injuries in other lawsuits" and that those lawsuits may therefore "reveal that any alleged emotional injuries [resulting from the defendants' actions] were caused by other events." (Feege 3/13/07 Decl., P 9). Mr. Rahman asserts that he has never been a party to any other lawsuit. (Chittur 3/15/07 Aff., P 29). His participation as a witness or third party in previous litigation is wholly irrelevant, and the defendants are entitled to no further response from the plaintiff.

The defendants also seek "documents concerning Plaintiff's eviction from his apartment in 2005 or 2006." (Def. Req. No. 73). They claim that such documents are relevant because "Plaintiff has informed Defendant that Plaintiff's eviction and related consequential damages [**30] constitute part of the damages claimed in this matter." (Feege 3/13/07 Decl., P 9). The plaintiff does not address this request in his opposition to the defendants' motion to compel. It appears, based upon the defendants' representations, that documents concerning the plaintiff's eviction are relevant to the issue of damages. They must therefore be produced.

### 4. *Efforts to Obtain Employment*

Defendant Park Avenue Cafe served interrogatories asking the plaintiff to identify employers with whom he sought employment after being terminated by the Park Avenue Cafe, as well as any periods following his termination during which he was unable to work, and to identify any related documents. (PAC Int. Nos. 22-23). This information is plainly relevant to the plaintiff's attempts to mitigate damages.

The plaintiff has not objected to these interrogatories; he states that he has "already answered [them] to the best of his recollection" and will produce related documents to the extent that they exist. (Chittur 3/15/07 Aff., P 25). Mr. Rahman's response to Interrogatory No. 22 states that he sought employment at "[s]everal restaurants in New York" as well as the New York City Health and [**31] Hospitals Corporation. (Plaintiff's Combined Responses to Interrogatories from (a)

Park Avenue Cafe and (b) Other Defendants ("Pl. Resp."), attached as Exh. G to Feege 3/13/07 Decl., at 9). His response to Interrogatory No. 23 indicates that there were no periods during which he was unavailable for work after his termination. (Pl. Resp. at 9). There appears to be no reason for the Court to compel any further response from the plaintiff.

### 5. *Communications with Defendants' Employees*

The defendants served an interrogatory asking the plaintiff to identify "any and all contacts or communications (either verbal or written)" between the plaintiff or his attorney and "any of the defendants' employees or agents . . . regarding the allegations which are at issue in this matter." (Def. Int. No. 4). The interrogatory also asks the plaintiff to identify all of the defendants' employees or agents with whom he or his attorney has communicated. (Def. Int. No. 4).

The plaintiff first contends that this information is subject to the attorney-client privilege. [8] As an initial matter, the privilege, which requires an attorney-client communication, is plainly inapplicable to communications between [**32] the plaintiff and the defendants' employees. In order to demonstrate that the attorney-client privilege applies to communications between plaintiff's counsel and potential class members, Mr. Rahman must show "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007) (citing *United States v. Construction Products Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996)). "The burden of establishing the existence of the attorney-client privilege, in all of its elements, rests with the party asserting it." *United States v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO*, 119 F.3d 210, 214 (2d Cir. 1997) (citing *Schwimmer*, 892 F.2d at 244).

[**33] Certification under Rule 23(c) "makes the Class the attorney's client for all practical purposes." *Van Gemert v. Boeing Co.*, 590 F.2d 433, 440 n.15 (2d Cir. 1978) (finding attorney-client relationship between absentee class members and class counsel after certification and trial). On the other

---

8 The plaintiff also asserts, without explanation, that the "joint defense privilege," also known as the "common interest rule," should apply. This rule "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989) (citing *United States v. Bay State Ambulance and Hospital Rental Service, Inc.*, 874 F.2d 20, 28 (1st Cir. 1989)). There is no indication that this privilege is applicable.

hand, "[w]hile lead counsel owes a generalized duty to unnamed class members [prior to certification], the existence of such a fiduciary duty does not create an inviolate attorney-client relationship with each and every member of the putative class." *In re McKesson HBOC, Inc. Securities Litigation*, 126 F. Supp. 2d 1239, 1245 (N.D. Cal. 2000). Although courts have, under certain circumstances, found an attorney-client relationship between class counsel and potential class members, "[t]here is no bright line rule as to whether putative class members are considered clients for the purposes of determining whether a communication is privileged." *Gates v. Rohm and Haas Co.*, Civ. A. No. 06-1743, 2006 U.S. Dist. LEXIS 85562, 2006 WL 3420591, at *2 (E.D. Pa. Nov. 22, 2006). The critical question is whether potential class members "reasonably believed that they were consulting [*34] counsel in their capacity as lawyers." *Vodak v. City of Chi.*, No. 03 C 2463, 2004 U.S. Dist. LEXIS 532, 2004 WL 783051, at *3 (N.D. Ill. Jan. 16, 2004). Here, the plaintiff has made no effort to demonstrate that any communications between plaintiff's counsel and potential class members were made within the context of an attorney-client relationship or were made for the purpose of obtaining or providing legal advice. Accordingly, he has not met his burden of establishing that the privilege should apply.

Moreover, "absent special circumstances," the identity of an attorney's client is not privileged. *In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d 238, 247 (2d Cir. 1986); *accord Lefcourt v. United States*, 125 F.3d 79, 86 (2d Cir. 1997). Therefore, even assuming that Mr. Rahman can establish an attorney-client relationship between plaintiff's counsel and any of the defendants' employees, those employees' identities are not protected by the privilege. Mr. Rahman nevertheless asserts that the court should not require him to identify any such employees because of the possibility that the defendants will retaliate against them. (Chittur 3/15/07 Aff., PP 39-41). [*35] Although he does not say as much, the plaintiff appears to seek a protective order pursuant to Rule 26(c) barring disclosure of the identities of employees with whom he or his counsel has spoken. However, the mere spectre of retaliation, without more, does not establish good cause for such an order.

Mr. Rahman next asserts, without explanation, that these communications are protected by work product immunity. This doctrine, which was first recognized by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947), is codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure. In order for the work product doctrine to apply, three requirements must be met: "'First, the material must be a document or tangible thing. Second, it must be prepared in anticipation of litigation. Third, it must be prepared by or for a party or its

representative.'" *FDIC v. Wachovia Ins. Servs.*, 241 F.R.D. 104, 106 (D. Conn. 2007) (quoting *Cornelius v. CONRAIL*, 169 F.R.D. 250, 253 (N.D.N.Y. 1996)). If these requirements are met, [*36] the material is "discoverable only upon a showing of substantial need of the materials and inability, without undue hardship, to obtain their substantial equivalent elsewhere." *United States v. Adlman*, 134 F.3d 1194, 1194-95 (2d Cir. 1998).

Written communications between the defendants' employees and the plaintiff or his counsel might well be subject to work product immunity. However, as the plaintiff himself acknowledges (Chittur 3/15/07 Aff., P 37), the interrogatory does not ask the plaintiff to produce such documents or to state their contents; it merely asks him to identify them. [9] "It is settled law . . . that the work product concept furnishes no shield against discovery, by interrogatories or deposition, of . . . the existence or nonexistence of documents, even though the documents themselves may not be subject to discovery." *Board of Education of Evanston Township High School District No. 202 v. Admiral Heating and Ventilating, Inc.*, 104 F.R.D. 23, 32 (N.D. Ill. 1984) (quotation marks and citation omitted). Furthermore, the identities of persons with whom the plaintiff or his counsel have communicated are not protected by work product immunity. [*37]

Accordingly, the plaintiff must respond to Interrogatory No. 4 within two weeks of the date of this order.

### 6. *Prior Statements of Witnesses*

Defendants' Interrogatory No. 10 asks the plaintiff to provide "any prior statement within the meaning of Rule 801(d)(1) of the Federal Rules of Evidence that Plaintiff[] claim[s] could be used in support of [his] allegations in this action" as well as the identity of the speaker, the date the statement was made, the identity of any person who heard the statement (or saw it if it was written down), and the circumstances under which the statement was made. [10] (Def. Int. No. 10). This interrogatory [*38] is impermissible under Local Rule 33.3, which provides in relevant part that

> (a) Unless ordered by the court, at the commencement of discovery, interrogatories will be limited to those seeking names of witnesses with knowledge of information

---

[9] The interrogatory also asks the plaintiff to identify any oral communications between himself or his counsel and any of the defendants' employees or agents. Presumably, the defendants simply seek the identity of any employee with whom the plaintiff or his counsel has communicated orally about the allegations at issue in this case.

[10] that certain prior statements of witnesses are not hearsay and are therefore admissible at trial.

relevant to the subject matter of the action, the computation of each category of damage alleged, and the existence, custodian, location and general description of relevant documents, including pertinent insurance agreements, and other physical evidence, or information of a similar nature.

(b) During discovery, interrogatories other than those seeking information described in paragraph (a) may only be served (1) if they are a more practical method of obtaining the information sought than a request for production or a deposition, or (2) if ordered by the court.

Interrogatory No. 10 asks the plaintiff to describe the substance of, and the circumstances surrounding, any relevant prior statements made by persons who might be witnesses in this action. This information is more appropriately sought through a document request or deposition. Accordingly, the plaintiff need not respond.

 [*39]  7. *Remaining Objections*

The plaintiff also objects to Park Avenue Cafe's Interrogatories Nos. 1-18 and to the remaining defendants' Interrogatories Nos. 3, 5, and 7. (Chittur 3/15/07 Aff., PP 20-24, 32-35). Park Avenue Cafe's Interrogatories Nos. 1-18 seek Rule 801(d)(1) of the Federal Rules of Evidence provides information relevant only to Mr. Rahman's individual claims. Because the information that they seek is not relevant to the issues of damages or class certification, the plaintiff need not answer them. The remaining interrogatories (Def. Int. Nos. 3, 5, 7) are beyond the scope of Local Rule 33.3. For example, one asks the plaintiff to

identify the complete factual basis in support of any allegation that any policy(ies), practice(s), or procedure(s) of Defendants, were applied in a discriminatory manner (based on race, national origin or adherence to the Muslim religion) to any employee of any Defendant, including, but not limited to: the identity of the policy, practice, or procedure in question; the identity of the individual(s) involved in the alleged discriminatory application of the policy and the employees negatively impacted **[*40]** by such alleged discriminatory application.

(Def. Int. No. 3). Depositions and document demands are more practical means of obtaining this sort of information. [11] Accordingly, the plaintiff need not answer these interrogatories.

C. *Plaintiff's March 30 Letter*

On March 30, 2007, the plaintiff submitted a letter purporting to supplement his earlier motion for sanctions. In it, he claims that the defendants (1) "unilaterally continue to refuse any class discovery" and (2) have refused to produce witnesses noticed by the plaintiff for depositions pursuant to Rule 30(b)(6). (Chittur 3/30/07 Letter at 2). It is not clear what relief the plaintiff seeks, and neither issue has been properly briefed by the parties. **[*41]** To the extent that the plaintiff believes that he has received inadequate responses to his second document request or has been improperly prevented from deposing witnesses, he should confer with defendants' counsel and, if necessary, being the issue to the Court in the form of a motion to compel.

*Conclusion*

For the reasons stated above, the plaintiff's motion is granted, and the defendants are precluded from contesting liability with respect to Mr. Rahman's individual claims. Accordingly, the documents requested by the plaintiff need be produced only insofar as they are relevant to damages or class certification. The defendants' motion is granted in part and denied in part. The parties shall produce documents and respond to interrogatories as set forth above within two weeks of the date of this order.

SO ORDERED.

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

May 24, 2007

---

**End of Document**

---

[11] To the extent that this inquiry might be viewed as a contention interrogatory, it is equally improper as it would require the plaintiff to regurgitate evidence previously provided in discovery. *See Convolve, Inc. v. Compaq Computer Corp.*, 223 F.R.D. 162, 173 (S.D.N.Y. 2004).

# Rahman v. Smith & Wollensky Rest. Group, Inc.

United States District Court for the Southern District of New York

January 7, 2009, Decided

06 Civ. 6198 (LAK) (JCF)

**Reporter**
2009 U.S. Dist. LEXIS 3510 *; 2009 WL 72441

MOHAMMED MUHIBUR RAHMAN, individually and on behalf of all others similarly situated, Plaintiff, - against - THE SMITH & WOLLENSKY RESTAURANT GROUP, INC., SMITH & WOLLENSKY OPERATING CORP., and PARK AVENUE CAFE, Defendants.

**Subsequent History:** Motion denied by, Sanctions disallowed by Rahman v. Smith & Wollensky Rest. Group, Inc., 2009 U.S. Dist. LEXIS 30275 (S.D.N.Y., Mar. 18, 2009)

**Prior History:** Rahman v. Smith & Wollensky Rest. Group, Inc., 2008 U.S. Dist. LEXIS 61785 (S.D.N.Y., Aug. 14, 2008)

## Case Summary

### Procedural Posture

In an employment discrimination suit, the court ruled on plaintiff employee's motion for an order compelling discovery with respect to certain requests for admission and document demands. The court found the employee's motion was largely unfounded and awarded costs and attorneys' fees to defendants. The employee moved for, inter alia, reconsideration. Defendants moved for, inter alia, additional time to depose the employee.

### Overview

A motion for reconsideration was not intended as a vehicle for repetition of arguments that had been considered fully. Here, essentially all of the legal and factual issues raised by the employee were considered and decided in full by the court's decision. To the extent that the employee merely rehashed old arguments, no reconsideration was warranted. With respect to the production of guest checks, the court found that the employee utterly failed to show that defendants had any previous obligation to produce guest checks. Because there was no indication that defendants had a previous obligation to produce guest checks, they were not to be faulted for their failure to do so. The employee was not entitled to IRS Form 8027 (IRS Tip Reports). The forms could not be used to demonstrate disparities in pay between individual employees

and were immaterial to the employee's case. Defendants were entitled to additional time to depose the employee. The class complaint alleged a variety of discriminatory employment practices and the employee was the currently the only identified class member. The employee was defendants' best source of information concerning members of the putative class.

### Outcome

The employee's motion for reconsideration was denied. Defendants were granted additional time to take the employee's deposition. The employee's counsel was to pay defendants $ 80,230.44 for fees and costs.

**Counsel: [*1]** For Mohammed Muhibur Rahman, individually and on behalf of all others similarly situated, Plaintiff: Krishnan Shanker Chittur, LEAD ATTORNEY, Audrey Strutinskiy, Chittur & Associates, P.C., New York, NY; Himanshu Rajan Sharma, Law Offices of H. Rajan Sharma Esq., Edison, NJ.

For The Smith & Wollensky Restaurant Group, Inc., Smith & Wollensky Operating Corp., Park Avenue Cafe, Defendants: Christina L. Feege, LEAD ATTORNEY, Elena Paraskevas-Thadani, Littler Mendelson, P.C. (NYC), New York, NY; Gregory Bertram Reilly, III, LEAD ATTORNEY, Littler Mendelson, P.C. (Newark), Newark, NJ.

**Judges:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** JAMES C. FRANCIS IV

## Opinion

*MEMORANDUM AND ORDER*

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Discovery disputes have pervaded this employment discrimination suit. On August 14, 2008, I denied, in most respects, a motion by the plaintiff seeking sanctions and an order compelling discovery with respect to certain requests for admission and document demands. Finding that the plaintiff's motion was largely unfounded, I awarded costs and attorneys' fees to the defendants pursuant to Rule 37 of the Federal Rules of Civil Procedure. Since then, motions and letter applications [*2] from both parties have snowballed, raising various discovery issues more or less related to my August order. This decision endeavors to resolve all such outstanding disputes between the parties.

A. *Plaintiff's Motion for Reconsideration of the August Order*

The plaintiff seeks reconsideration of several aspects of the August 14, 2008 order, familiarity with which is assumed. *See Rahman v. Smith & Wollensky Restaurant Group, Inc.*, No. 06 Civ. 6198, 2008 U.S. Dist. LEXIS 61785, 2008 WL 3823958 (S.D.N.Y. Aug. 14, 2008). To prevail, he "must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion." *Eisemann v. Greene*, 204 F.3d 393, 395 (2d Cir. 2000) (quotation marks omitted); *accord* Local Civil Rule 6.3 (authorizing motion for reconsideration when there are "matters or controlling decisions which . . . the court has overlooked"). "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atlantic Airways, Ltd. v. National Mediation Board*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quotation marks omitted). Absent [*3] these compelling circumstances, however, motions for reconsideration are typically denied. *Wells Fargo Financial, Inc. v. Fernandez*, No. 98 Civ. 6635, 2001 U.S. Dist. LEXIS 4120, 2001 WL 345226, at *1 (S.D.N.Y. April 9, 2001).

Specifically, the plaintiff argues that I (1) overlooked several grounds necessitating further production of so-called "Table Assignment Sheets" by the defendants, (2) erroneously denied all relief concerning the plaintiff's requests for admission, (3) "inexplicably limited corporate relationship discovery," and (4) wrongly granted attorneys' fees and costs to the defendants. (Plaintiff's Objections to the Memorandum and Order of Magistrate Judge Francis IV of August 14, 2008 ("Pl. Reconsideration Memo.")). However, "a motion for reconsideration is not intended as a vehicle for repetition of arguments that have been considered fully." *Pfizer, Inc. v. Stryker Corp.*, No. 02 Civ. 8613, 2005 U.S. Dist. LEXIS 250, 2005 WL 44383, at *1 (S.D.N.Y. Jan. 10, 2005) (citing *Caleb & Co. v. E.I. DuPont De Nemours & Co.*, 624 F. Supp. 747, 748 (S.D.N.Y. 1985)); *accord Wells Fargo Financial*, 2001 U.S. Dist. LEXIS 4120, 2001 WL 345226, at *1 ("Local Rule 6.3 is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have [*4] been considered fully by the Court."). Essentially all of the legal and factual issues raised by the plaintiff were considered and decided in full by the August 14 decision. [1] To the extent that the plaintiff merely rehashes old arguments, no reconsideration is warranted.

One of the plaintiff's assertions, however, necessitates further attention. Relying on defendants' representation that they produced all documents in their possession and control reflecting [*5] table assignments, I concluded that documents related to table assignments had been produced and based part of my decision on this predicate. *Rahman*, 2008 U.S. Dist. LEXIS 61785, 2008 WL 3823958, at *3 (citing Declaration of Christina Feege dated June 26, 2008, P 13 & Exh. C). Pointing to new documents recently produced by the defendants, the plaintiff now claims that the defendants had not in fact produced all responsive documents in their possession at the time of the August 14 order. (Letter of Krishnan S. Chittur dated Sept. 9, 2008 ("Chittur 9/9/08 Letter") at 2-3; Pl. Reply Memo. at 5-7).

In September and October 2008, the defendants produced over one hundred thousand guest checks, which show the waiter's name, table assignment, and tip amount. [2] (Letter of Elena Paraskevas-Thadani dated Sept. 4, 2008, attached as Exh. 2 to Affirmation of Andrey Strutinskiy dated Oct. 17, 2008 ("Strutinskiy Aff."); Defendants' Responses to Plaintiff's Third Set of Requests for Documents ("Def. Response to 3rd Doc. Req."), attached as Exh. 1 to Strutinskiy Aff., at 4). Their production was triggered by the August 14 decision, which ordered the defendants to produce all payroll and tip data documents post-dating the period [*6] of Mr. Rahman's

---

[1] The plaintiff argues at great length that the defendants had a legal obligation to preserve Table Assignment Sheets and therefore cannot justify their failure to retain these documents. (Pl. Reconsideration Memo. at 11-17; Plaintiff's Reply Memorandum of Law in Further Support of Motion for Reconsideration and in Furtherance of Judge Kaplan's Order of September 12, 2008 ("Pl. Reply Memo.") at 7-9). This particular issue, however, was squarely addressed in the August 14 order. *Rahman*, 2008 U.S. Dist. LEXIS 61785, 2008 WL 3823958, at *3. The plaintiff cannot use this reconsideration motion to advance new legal theories he failed to articulate during the first go-round. *See Chamberlin v. Principi*, No. 02 Civ. 8357, 2006 U.S. Dist. LEXIS 10254, 2006 WL 647785, at *1 (S.D.N.Y. March 15, 2006).

[2] Like many computerized restaurant checks, the guest checks from Park Avenue Cafe display the corresponding table number in the top right-hand corner of the check, presumably to minimize confusion when restaurant staff serve multiple tables.

employment. [3] *See Rahman*, 2008 U.S. Dist. LEXIS 61785, 2008 WL 3823958, at *3; (Declaration of Elena Paraskevas-Thadani dated Oct. 10, 2008 ("Paraskevas-Thadani 10/10/08 Decl."), P 4).

The defendants provide ample support for their contention that they had no obligation to produce guest checks prior to the August 14 decision. The plaintiff's first document request did not ask for any information pertaining to table assignments or tipping. (Defendants' Revised Responses to Plaintiff's First Set of Requests for Documents, attached as Exh. A to Declaration of Christina Feege dated Oct. 9, 2008 ("Feege Decl.")). Although the plaintiff did not expressly request guest checks in his second request for documents, he did request "all **[*7]** documents concerning . . . compensation . . . paid at restaurants owned, controlled, operated or otherwise affiliated with Defendants broken down by employee-name and/or job assignment . . . ." (Defendant's Responses to Plaintiff's Second Set of Requests for Documents ("Def. Response to 2nd Doc. Req."), attached as Exh. B to Feege Decl., at 14). The defendants initially objected to this request as vague and unduly broad, but then entered into an agreement with the plaintiff to narrow the scope of the production. (Feege Decl., PP 5-6; Def. Response to 2nd Doc. Req. at 15). According to the defendants, they produced all agreed-upon documents to the plaintiff in March and April 2007, including certain tip reports, labor reports, table assignment reports, and payroll information. (Feege Decl., P 6 & Exh. C). Indeed, there is no indication that the plaintiff complained about guest checks at any time before the instant dispute. [4] (Paraskevas-Thadani 10/10/08 Decl., P 5).

The plaintiff, by contrast, utterly fails to show that the defendants had any previous obligation to produce guest checks. Instead, the plaintiff makes a semantic argument, claiming that production of the guest checks now proves that the defendants' previous representation that they had produced "all documents in their possession and control reflecting table assignments" was false. (Chittur 9/9/08 Letter at 2-3; Pl. Reply Memo. at 3). However, the defendants presumably meant that they had produced all *responsive* documents

concerning table assignments. As there is no indication that the defendants had a previous obligation to produce guest checks, they will not be faulted for their failure to do so.

Therefore, the plaintiff's motion for reconsideration is denied in full.

## B. *IRS Tip Reports*

The plaintiff also seeks IRS Form 8027 (the "IRS Tip Reports") and related documents. [5] (Letter of Krishnan Chittur dated Oct. 9, 2008 ("Chittur 10/9/08 Letter"), at 1-2). All restaurants file an IRS Tip Report annually with information about its gross receipts. [6] **[*9]** Although these forms contain data on the restaurant's direct and indirect tips, such information is provided on an aggregated basis only. IRS Form 8027 (2008). Therefore, the forms cannot be used to demonstrate disparities in pay between individual employees and are immaterial to the plaintiff's case. As the plaintiff has failed to explain the importance of the IRS Tip Reports, his request is denied.

In addition to IRS Tip Reports, the plaintiff claims that he is entitled to documents underlying the reports, namely certain worksheets showing annual tips for each tipped employee. (Letter of Krishnan Chittur dated Oct. 14, 2008 ("Chittur 10/14/08 Letter")). To illustrate, the plaintiff's counsel attached a handwritten worksheet showing Mr. Rahman's tip information from 2001 and insinuated that the defendants possessed additional similar worksheets. (Chittur 10/14/08 Letter at 1 & Exh. A). In fact, however, Mr. Rahman obtained this worksheet from the IRS, not from the defendants. (Transcript of Deposition of Mohammed Muhibur Rahman, attached as Exh. B to Letter of Gregory B. Reilly dated Oct. 16, 2008 ("Reilly 10/16/08 Letter"), at 275-77). As the defendants have made clear, their tip records are computerized and have already been produced to the plaintiff. (Reilly 10/16/08 Letter at 3). The plaintiff is therefore entitled

---

[3] Although the order specifically required production of documents created after Mr. Rahman's termination in March 2005, the guest checks that were produced range from January 2002 to September 2008. (Def. Response to 3rd Doc. Req. at 4).

[4] It is indisputable that Mr. Rahman was aware of the information contained on guest checks. As a former waiter at the Park Avenue Cafe, Mr. Rahman handled guest checks on a daily basis. In addition, he annexed a guest check **[*8]** to his Equal Employment Opportunity Commission charge. (EEOC Charge, Document A, attached as Exh. B to Paraskevas-Thadani 10/10/08 Decl.).

[5] On October 14, 2008, the plaintiff subpoenaed BDO Seidman, LLP, the defendants' accountants, seeking the IRS Tip Reports and underlying documents. (Subpoena Issued to BDO Seidman, LLP, attached to Letter of Elena Paraskevas-Thadani dated Oct. 22, 2008 ("Paraskevas-Thadani 10/22/08 Letter")). Apparently, however, BDO Seidman, LLP has no responsive documents. (Letter of Krishnan Chittur dated Oct. 31, 2008; Letter of Gregory B. Reilly dated Nov. 12, 2008). Any request to the accountants is therefore moot.

[6] According to the IRS website: "Form 8027 is used by large food or beverage establishments . . . to make annual reports to the IRS on receipts from food or beverage operations and tips reported by employees." IRS, Instructions for Form 8027, *http://www.irs.gov/instructions/i8027/ch01.html* **[*10]** (last visited Jan. 6, 2009).

to no further discovery on the matter.

C. *Additional Time to Depose Plaintiff*

The defendants deposed Mr. Rahman for five and one-half hours on October 1, 2008. The first deposition was stopped earlier than the standard seven hours in order **[*11]** to accommodate Mr. Rahman's observance of Ramadan. (Transcript of Deposition of Mohammed Muhibur Rahman, attached as Exh. B to Letter of Gregory B. Reilly dated Oct. 8, 2008 ("Reilly 10/8/08 Letter"), at 321-25). Arguing that more time is needed to depose Mr. Rahman sufficiently, the defendants now seek a continuation of his deposition. (Reilly 10/8/08 Letter at 2). According to the defendants, there are several areas they need to explore in further detail, including the grounds for Mr. Rahman's belief that table assignments were made in a discriminatory manner and his alleged damages and mitigation efforts. (Reilly 10/8/08 Letter at 2). The plaintiff objects, primarily because the defendants "wasted" time during the first deposition by starting late and initiating multiple breaks. (Letter of Krishnan S. Chittur dated Oct. 9, 2008 ("Chittur 10/9/08 Letter") at 3).

Rule 30(d)(1) of the Federal Rules of Civil Procedure provides a "default rule" limiting each deposition to seven hours in one day. *Arista Records LLC v. Lime Group LLC*, No. 06 Civ. 5936, 2008 U.S. Dist. LEXIS 31269, 2008 WL 1752254, at *1 (S.D.N.Y. April 16, 2008). Only time spent actually taking the deposition, not breaks, counts toward the seven hours. **[*12]** *Condit v. Dunne*, 225 F.R.D. 100, 112 (S.D.N.Y. 2004) (citing Fed. R. Civ. P. 30(d) advisory committee's note to 2000 Amendment). Although courts enjoy broad discretion in regulating the deposition process under Rule 26(b)(2)(A), courts must allow additional time when necessary for the deponent to be fairly examined. Fed. R. Civ. P. 30(d)(1).

Mr. Rahman is the named plaintiff in this putative class action, bringing suit on behalf of himself and a class of Muslims, non-white persons, and persons of South Asian descent who are or have been employed by the Park Avenue Cafe. (Amended Class Action Complaint, P 9). The complaint alleges a variety of discriminatory employment practices, a hostile work environment, and unlawful retaliation, and demands compensatory and punitive damages. The litigation is still in its pre-certification phase, and Mr. Rahman is currently the only identified class member. Thus, Mr. Rahman is the defendants' best source of information concerning members of the putative class, the nature of their claims, and the scope of their possible damages. In this context, it is unsurprising that the defendants need additional time to examine him. Furthermore, despite the plaintiff's **[*13]** allegations, the deposition transcript gives no indication that defendants' counsel were inefficient during the first deposition or otherwise acted in bad faith. Under these circumstances, additional time for Mr. Rahman's deposition is appropriate.

The plaintiff is therefore ordered to make Mr. Rahman available for six additional hours of deposition. The deposition must be completed by January 30, 2009.

D. *Rule 30(b)(6) Witness*

On October 22, 2008, the plaintiff deposed Kevin Dillon, who was selected by the defendants as their corporate designee. *See* Fed. R. Civ. P. 30(b) (6) (requiring corporate designee to appear on corporation's behalf when corporation receives deposition request). Alleging that Mr. Dillon was "totally unprepared and ill-informed," the plaintiff now seeks sanctions. (Letter of Krishnan S. Chittur dated Oct. 27, 2008 ("Chittur 10/27/08 Letter") at 1-3). The defendants concede that, although Mr. Dillon was prepared to speak on certain topics, he could not testify concerning every matter of interest to the plaintiff. [7] (Letter of Gregory B. Reilly dated Oct. 29, 2008 ("Reilly 10/29/08 Letter") at 2). The defendants, however, have made a good faith effort to remedy the **[*14]** deficiencies in Mr. Dillon's testimony: they have offered to produce additional witnesses and have proposed dates to continue the Rule 30(b)(6) deposition. (Reilly 10/29/08 Letter at 2). Accordingly, sanctions are not appropriate.

The defendants shall designate additional corporate representatives and make them available for deposition. Again, the depositions must be completed by January 30, 2009.

E. *Plaintiff's Request for Discovery Extension*

In early October, the plaintiff requested a ninety day extension of the discovery deadline to review the guest checks and other recently-submitted documents. (Chittur 10/9/08 Letter at 3). By now, the plaintiff has had sufficient time to review all documents produced by the defendants in September and October of 2008. Thus, all fact discovery must be completed by January 30, 2009.

F. *Defendants' Motion for Fees and Costs* After determining **[*15]** that the plaintiff's motion for sanctions and to compel discovery was largely unfounded, I awarded the defendants partial costs incurred in connection with defending the

---

[7] The plaintiff's Rule 30(b)(6) notice identified several subject matters of interest, ranging from corporate discrimination policies to documentation practices to information about the defendants' corporate control and management. (Notice of Deposition dated Oct. 3, 2008, attached as Exh. A to Reilly 10/29/08 Letter).

plaintiff's motion, including attorneys' fees. [8] *Rahman*, 2008 U.S. Dist. LEXIS 61785, 2008 WL 3823958, at *4. The defendants submitted an application for fees and costs on September 5, 2008. When I subsequently agreed to address the plaintiff's motion for reconsideration, I determined that if the defendants prevailed, they could add related fees and costs to their pending fee application. Therefore, the defendants currently seek fees and costs incurred in connection with (1) defending against the plaintiff's original motion for sanctions and to compel discovery, (2) opposing the plaintiff's later Rule 72 objections to the August 14 decision, [9] (3) opposing the plaintiff's current motion for reconsideration of the August 14 decision, and (4) preparing their fee application.

In fashioning their fee request, the defendants relied primarily on the lodestar method: they multiplied the number of hours expended by each attorney and paralegal by the appropriate hourly rate. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983). Then, they added costs incurred for electronic legal research and postage. The defendants applied a twenty percent discount to the award sought for opposing the plaintiff's sanctions motion, representing the partial success they achieved in the August 14 decision. All other requested awards represent the full amount of fees and costs incurred. In [*17] total, the defendants seek $ 81,749.44. (Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Attorneys' Fees ("Def. Att'y Fee Reply") at 9).

Although the plaintiff has challenged numerous other aspects of the defendants' requested award, he has not challenged the defendants' hourly rates. In any event, the requested rates are reasonable. The defendants are represented by Littler Mendelson, the largest labor and employment firm in the country. (Reilly Decl., P 3). The defendants' fee request is based on the following hourly rates of Littler Mendelson attorneys: $ 535.00 per hour for A. Michael Weber, the founder of the firm's New York office who has practiced labor and employment law for over thirty-five years; $ 440.00 per hour for Gregory B. Reilly, a Harvard Law graduate with twenty years of litigation and employment law experience; $ 440.00 per hour for Christina Feege, the former lead attorney on the case who practiced with the firm for eleven years; [10] and $ 350.00 per hour for Elena Paraskevas-Thadani, an associate with eleven years of litigation experience. (Def. Att'y Fee Memo. at 5-6; Reilly Decl. at 2-3). In addition, the defendants seek paralegal [*18] fees at $ 160.00 per hour. (Def. Att'y Fee Memo. at 5). These rates are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984); *see also Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany*, 522 F.3d 182, 191 (2d Cir. 2008).

The plaintiff objects to (1) the number of attorney hours billed and the manner in which these hours were recorded, (2) the twenty percent discount used to calculate the defendants' award on the sanctions motion, (3) hours billed [*19] for paralegal work, and (4) costs associated with computerized legal research. (Memorandum of Law in Opposition to Defendants' Motion for Attorneys' Fees and Costs Pursuant to the Court's Order of August 14, 2008 ("Pl. Att'y Fee Memo.")).

1. *Attorney Hours Billed*

The plaintiff contends that the defendants have failed to adequately justify the "excessive" amount of hours they billed. (Pl. Att'y Fee Memo. at 4, 8-10). Specifically, according to the plaintiff, the defendants' time entries "suffer from a veritable plague of block-billing problems and vagueness issues." (Pl. Att'y Fee Memo. at 8). Although various tasks are aggregated within each time entry (so-called "block billing"), the defendants counter that their entries sufficiently identify the billing attorney, date, hours expended, and nature of the work performed. (Def. Att'y Fee Reply at 5). Furthermore, the defendants argue, "the Court must look at the big picture presented by the fee application." (Def. Att'y Fee Reply at 5 (quoting *Rodriguez v. McLoughlin*, 84 F. Supp. 2d 417, 425 (S.D.N.Y. 1999))).

---

[8] The parties were instructed to "attempt to agree on the appropriate amount of an award." *Rahman*, 2008 U.S. Dist. LEXIS 61785, 2008 WL 3823958, at *4. Accordingly, on August 28, 2008, the defendants sent a letter to the plaintiff seeking an award of $ 38,222.74, representing total compensable attorneys' [*16] fees and costs at a 20% discount. (Declaration of Gregory Reilly dated Sept. 5, 2008 ("Reilly Decl."), P 2 & Exh. A). The plaintiff never responded, and the defendants brought a formal motion for attorneys' fees and costs.

[9] In addition to bringing a motion for reconsideration before me, the plaintiff filed objections to the August 14 decision with The Honorable Lewis A. Kaplan, U.S.D.J., pursuant to Rule 72 of the Federal Rules of Civil Procedure. Judge Kaplan overruled these objections, finding that the plaintiff failed to identify any material error of law or fact. (Order dated Sept. 17, 2008).

[10] Although she has left Little Mendelson for an in-house counsel position, Ms. Feege was retained by the firm as a consultant to assist with the defendants' opposition to the plaintiff's sanctions motion. (Defendants' Memorandum of Law in Support of Defendants' Motion for Attorneys' Fees and Costs Pursuant to the Court's August 14, 2008 Order Awarding Such Relief to Defendants ("Def. Att'y Fee Memo.") at 6 n.4). In total, the defendants only bill for 2.7 hours of her time. (Chart of Fees and Costs, attached as Exh. A to Declaration of Elena Paraskevas-Thadani dated Oct. 17, 2008, at 15).

To determine the number of compensable hours, a court "must initially look to the amount of time spent on each category of tasks, [*20] as documented by contemporaneous time records" of each attorney. *Kuper v. Empire Blue Cross & Blue Shield*, No. 99 Civ. 1190, 2003 U.S. Dist. LEXIS 27728, 2003 WL 23350111, at *11 (S.D.N.Y. Dec. 18, 2003). In calculating the number of reasonable hours, the court may rely on its own familiarity with the case and the evidentiary submissions and arguments of the parties. *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992). Although block billing can make it more difficult to determine precisely how much time was spent on each task, the practice is tolerable "as long as all of the work recorded in one entry is compensable." *See Ursa Minor Ltd. v. Aon Financial Products, Inc.*, No. 00 Civ. 2474, 2001 U.S. Dist. LEXIS 7455, 2001 WL 1842042, at *6 (S.D.N.Y. May 30, 2001). "To the extent, however, that compensable and non-compensable tasks are included in the same entry, it must be presumed that the bulk of the time was devoted to non-compensable work." *Id.* Likewise, "[i]f the court concludes that portions of the expended time were not reasonably necessary to achieve the successful result obtained by the movant, it should reduce the time for which compensation is awarded." *Kuper*, 2003 U.S. Dist. LEXIS 27728, 2003 WL 23350111, at *11.

The defendants logged 116.7 hours of attorney [*21] and paralegal time defending against the plaintiff's motion for sanctions and to compel discovery. (Chart of Fees and Costs at 1-5, 15). This time was spent in part preparing two memoranda of law (a total of twenty-four pages) and three supporting declarations to refute the plaintiff's claims. (Def. Att'y Fee Memo. at 8). The defendants note that many of the plaintiff's claims were "scattered and vague," requiring them to "sift through almost three years of discovery, correspondence and communiques." (Def. Att'y Fee Memo. at 8). Indeed, although the defendants' time entries do not allow for precise calculation, they apparently spent ten to twenty hours reviewing the case file and previous correspondence and just as many hours discussing the plaintiff's factual allegations with Christina Feege, former lead attorney on the case. (Chart of Fees and Costs at 1-5).

Given the diverse factual allegations raised by the plaintiff in his sanctions motion and the extensive history of this case, I agree that the defendants had no choice but to spend significant hours on factual development. Similarly, the defendants' lengthy memorandum and supporting documents were a proportionate response to the [*22] plaintiff's equally lengthy motion papers.[11] Finally, the defendants' time entries reflect only compensable tasks. (Chart of Fees and Costs at 1-

5). In sum, the defendants spent a reasonable number of hours defending against the plaintiff's motion for sanctions and for an order compelling discovery. Given the reasonableness of their total hours, it is unnecessary for the defendants to identify with precision the amount of hours allocated to each individual task. Therefore, the defendants' time records provide no basis for objection.

The defendants incurred fewer hours in connection with each of their other tasks: 43.9 hours opposing the plaintiff's Rule 72 objections, 34.8 hours opposing the plaintiff's motion for reconsideration, and 41.2 hours in connection with their fee application. (Chart of Fees and Costs at 16-18). These hourly amounts are not excessive. Overall, the defendants have billed for a reasonable number of hours, and thus properly used these hours to calculate their total fees.

2. *Percentage Sought for Partial Award*

As discussed above, the defendants [*23] applied a twenty percent discount to the award sought for opposing the plaintiff's motion for sanctions. The plaintiff objects to two aspects of the discount. First, the plaintiff contends that because requests for admission are not true discovery procedures, Rule 37 sanctions are altogether inapplicable.[12] (Pl. Att'y Fee Memo. at 3). Although not phrased in these terms, the plaintiff is essentially arguing that I lack the power to sanction him for bringing a frivolous motion concerning requests for admission. *See Rahman*, 2008 U.S. Dist. LEXIS 61785, 2008 WL 3823958, at *1-2. But Rule 37(a)(5) provides that "reasonable expenses" incurred in connection with motions to compel disclosure or discovery are routinely awarded. The only limitation imposed by this section is one of reasonableness. There is no indication that motions concerning Rule 36 admissions are outside the scope of the court's power. Indeed, such a limitation would defeat the deterrent purpose of this subdivision:

> [T]he rules should deter the abuse implicit in carrying or forcing a discovery dispute to court when no genuine dispute exists. . . . [T]he potential or actual imposition of expenses is virtually the sole formal sanction in the rules to deter [*24] a party from pressing to a court hearing frivolous requests for or objections to discovery.

Fed. R. Civ. P. 37(a)(4) advisory committee's note to 1970 Amendment. Not surprisingly, the plaintiff has failed to

---

[11] In total, the plaintiff submitted a ten-page affirmation, an eighteen-page memorandum, and twenty different exhibits.

[12] The plaintiff apparently had a different understanding when he brought his motion for Rule 37 sanctions in June 2008; that motion was largely based on the defendants' alleged failure to adequately respond to the plaintiff's requests for admissions. (Plaintiff's Notice of Motion for Sanctions Under Rule 37, Fed. R. Civ. P. dated June 17, 2008; Affirmation of Krishnan Chittur dated June 17, 2008 at 6-9).

support his tenuous position with any persuasive authority. (Pl. Att'y Fee Memo. at 3).

Second, the plaintiff argues that the defendants were less than eighty percent successful in opposing the motion, and thus must discount their total fees and costs by more than twenty percent. (Pl. Att'y Fee Memo. at 7). The plaintiff specifically contends that the defendants prevailed on only two out of eight contested document requests, or twenty-five percent of the document request issues. (Pl. Att'y Fee Memo. at 7); *see also Rahman*, 2008 U.S. Dist. LEXIS 61785, 2008 WL 3823958, at *3-4 (discussing eight categories of **[*25]** documents sought by plaintiff). In addition, as discussed above, the plaintiff argues that the defendants cannot collect for time spent on the requests for admission, which comprised half of the overall sanctions motion and thus should account for fifty percent of the defendants' overall award. The plaintiff concludes that the defendants are entitled, at most, to twelve and one-half percent of their total costs and fees. (Pl. Att'y Fee Memo. at 7).

I agree with the logic of separately analyzing each party's success on each issue. *See Rahman*, 2008 U.S. Dist. LEXIS 61785, 2008 WL 3823958, at *1-4 (discussing requests for admission, then document requests). The plaintiff was denied relief altogether with respect to the requests for admission; therefore, the defendants were fully successful in their defense of fifty percent of the overall motion. 2008 U.S. Dist. LEXIS 61785, [WL] at *2. Concerning document requests, however, I held that the defendants had failed to produce two categories of documents: documents showing their corporate structure and certain employee lists. [13] 2008 U.S. Dist. LEXIS 61785, [WL] at *3. I therefore ordered prompt production. *Id.* Although I also ordered production of certain documents created after the plaintiff's termination, I noted that the defendants **[*26]** were not previously obligated to produce post-termination documents. *Id.* In sum, the plaintiff was successful on approximately twenty-five percent of the document request issues; his overall degree of success was twelve and one-half percent.

All things considered, the twenty percent discount applied by the defendants is entirely reasonable, and perhaps even generous.

### 3. *Paralegal Hours Billed*

Among other tasks performed by paralegals, the defendants billed 5.1 hours for filing documents in the court's electronic

document filing system ("ECF") and 2 hours for locating documents in the case file. (Chart of Fees and Costs at 2-5, 15). The plaintiff objects to these hours, arguing that these tasks are akin to a receptionist's duties and are therefore not compensable. (Pl. Att'y Fee Memo. at 11).

There is no question "that paralegals are capable of carrying out many tasks, under the supervision of an attorney, that might otherwise be performed by a lawyer and billed at a higher rate." *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10, 109 S. Ct. 2463, 105 L. Ed. 2d 229 (1989). Thus, it has long **[*27]** been standard practice for courts to include paralegal fees in attorneys' fee awards. *See, e.g., United States Football League v. National Football League*, 887 F.2d 408, 416 (2d Cir. 1989) (finding that billing paralegal time is prevailing practice in New York City that is commendably cost-efficient). However, only legal work is compensable; "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them." *Jenkins*, 491 U.S. at 288 n.10.

Locating documents in the case file is a purely clerical task that cannot be compensated at $ 160.00 per hour. Electronic filing -- a relatively new practice in the Southern District of New York -- necessitates closer examination. Only an attorney can obtain an ECF log-in name and password, which serves as his or her electronic signature for purposes of electronic filing. S.D.N.Y. Electronic Case Filing Rules and Instructions, P 13.20 (2008) ("ECF Rules"). [14] However, although an attorney must approve of all documents filed under his or her log-in name, the filing attorney need not personally complete all of the necessary steps. Rather, the ECF Rules indicate that electronic filing is an appropriate task **[*28]** for supporting staff members. ECF Rules, P 24.1. ECF is intended to replace the manual filing of hard-copy documents and designed to be just as easy; no legal skills are involved. ECF Rules, P 13.2. Although such services are necessary, they should be compensated at rates appropriate for a clerk, not at rates charged by an attorney or paralegal. Accordingly, the defendants will be reimbursed $ 50.00 per hour for the 7.1 hours spent locating documents in the case file and electronic filing. See *Kuper*, 2003 U.S. Dist. LEXIS 27728, 2003 WL 23350111, at *12 (compensating clerical tasks at $ 50.00 per hour rate); *Cowan v. Ernest Codelia, P.C.*, No. 98 Civ. 5548, 2001 U.S. Dist. LEXIS 185, 2001 WL 30501, at *9 (S.D.N.Y. Jan. 12, 2001) (same); *Pascuiti v. New York Yankees*, 108 F. Supp. 2d 258, 267 (S.D.N.Y. 2000) (same); *Lawson v. City of New York*, No. 99 Civ. 10393, 2000 U.S. Dist. LEXIS 15709, 2000 WL 1617014, at *5 (S.D.N.Y. Oct. 27, 2000) (same).

---

[13] I declined to impose sanctions, however, because of the plaintiff's undue delay in raising these issues. *Rahman*, 2008 U.S. Dist. LEXIS 61785, 2008 WL 3823958, at *3.

[14] The ECF Rules manual is available on-line at http://www1.nysd.uscourts.gov/ecf/ECF_rules_SDNY_Aug08.pdf.

#### 4. Computerized Research Costs

Although courts in this district are split on whether the cost of computerized legal research is compensable, see *BD v. DeBuono*, 177 F. Supp. 2d 201, 209 (S.D.N.Y. 2001)(collecting cases demonstrating **[*29]** division in authority but denying recovery), I have previously held that such expenses are recoverable as a component of attorneys' fees where it is clear that counsel regularly charge paying clients separately for them. *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 2008 WL 2229842, at *15 (S.D.N.Y. 2008) (citing *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 212 (S.D.N.Y. 2001)). That is the case here. (Reilly Decl., P 10). Therefore, these costs are appropriately included in the defendants' award request.

#### 5. *Summary of Fees Awarded*

For the reasons stated above, the defendants are entitled to the following fees in connection with their opposition of the plaintiff's motion for sanctions:

Go to table1

In addition, the defendants shall be awarded $ 355.00 for clerical work done by the paralegal and $ 3,199.44 for the costs of mailings and electronic research. After applying the twenty percent discount, the total award amount is $ 36,170.75.

The defendants are also entitled to fees and costs incurred in connection with opposing the plaintiff's **[*30]** Rule 72 objections and motion for reconsideration, as well as those incurred in preparing their fee application. Thus, the defendants shall also be awarded the following fees:

Go to table2

In addition, the defendants incurred $ 1,128.69 for the costs of mailings and electronic research.

In total, defendants are entitled to an award of $ 80,230.44. Conclusion

In conclusion, the plaintiff's motion for reconsideration is denied. The plaintiff is not entitled to IRS Tip Reports or underlying documents; however, the defendants shall designate additional **[*31]** corporate representatives and make them available for deposition. The defendants shall be permitted to take Mr. Rahman's deposition for an additional six hours. All discovery, including the additional depositions, must be completed by January 30, 2009. Finally, the plaintiff's counsel shall pay the defendants $ 80,230.44 for

fees and costs. [17]

SO ORDERED.

/s/ James C. Francis IV

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

January                    7,                    2009

---

[17] The parties did not address whether any fee award should be assessed against the plaintiff directly or against his attorneys. However, it is apparent that the tactical decisions that have led to the award were the responsibility of counsel. *See Greater Buffalo Press, Inc. v. Federal Reserve Bank of New York*, 129 F.R.D. 462, 467 (W.D.N.Y.), *aff'd*, 923 F.2d 843 (2d Cir. 1990) (table).

2009 U.S. Dist. LEXIS 3510, *31

**Table1** (Return to related document text)

| Attorney | Hours | Rates | Total |
|---|---|---|---|
| Mr. Webber | 1.0 | $ 535.00 | $ 535.00 |
| Ms. Feege | 2.7 | $ 440.00 | $ 1188.00 |
| Mr. Reilly | 31.9 | $ 440.00 | $ 14,036.00 |
| Ms. Paraskevas-Thadani | 74 | $ 350.00 | $ 25,900.00 |
| | | | $ 41,659.00 |

**Table1** (Return to related document text)

---

**Table2** (Return to related document text)

| Attorney [15] | Hours | Rates | Total |
|---|---|---|---|
| Mr. Reilly | 35.7 | $ 440.00 | $ 15,708.00 |
| Ms. Paraskevas-Thadani | 74.9 | $ 350.00 | $ 26,215.00 |
| Paralegal [16] | 6.3 | $ 160.00 | $ 1,008.00 |
| | | | $ 42,931.00 |

**Table2** (Return to related document text)

---

End of Document

---

[15] The defendants include one three-hour entry for "GW." (Chart of Fees and Costs at 7, 16). However, this attorney is not identified; thus, there is no way to assess whether the rate charged is reasonable. Accordingly, this charge is not included in the award.

[16] The defendants bill one hour of paralegal work performed by "OB" at $ 170.00 per hour. (Chart of Fees and Costs at 7, 16). Again, without an explanation of why he or she warrants a higher rate, I will award fees at the paralegal rate otherwise applied.

# Suntoke v. PSEG Power Conn., LLC

United States District Court for the District of Connecticut

May 16, 2007, Decided ; May 16, 2007, Filed

CIVIL ACTION NO. 3:06-CV-01520(JCH)

**Reporter**
2007 U.S. Dist. LEXIS 35888 *; 2007 WL 1455847

RUSSI SUNTOKE, Plaintiff v. PSEG POWER CONNECTICUT, LLC, Defendant

**Subsequent History:** Summary judgment granted by Suntoke v. PSEG Power Connecticut, LLC, 2009 U.S. Dist. LEXIS 11434 (D. Conn., Feb. 13, 2009)

**Counsel:** **[*1]** For Russi T. Suntoke, Plaintiff: Evan David Gamm, LEAD ATTORNEY, Mendillo & Gamm, LLC, New Haven, CT.

For PSEG Power CT LLC, Defendant: Elizabeth A. Fowler, LEAD ATTORNEY, Mark S. Baldwin, Stephen R. Klaffky, Brown Rudnick Berlack Israels - Htfd, Hartford, CT;

**Judges:** Janet C. Hall, United States District Judge.

**Opinion by:** Janet C. Hall

# Opinion

## *ORDER*

The parties' Joint Motion for Protective Order [Doc. No. 18] is GRANTED, except as to paragraph 7. If either party wants to designate anything filed with, or presented to, the court as confidential and place it under seal, that party must make a separate motion in accordance with District of Connecticut Local Rule 5(d), specifying precisely what the parties wish to be kept under seal and making a particularized showing of good cause as to why the court should depart from the strong presumption against sealing any court records to public inspection. *See Nixon v. Warner Comm., Inc.*, 435 U.S. 589, 597-99, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978); *United States v. Graham*, 257 F.3d 143, 150 (2d Cir. 2001); *United States v. Amodeo*, 44 F.3d 141, 146 (2d Cir. 1995); *Video Software Dealers Assoc. v. Orion Pictures, Corp.* (In re Orion Pictures Corp.), 21 F.3d 24, 26 (2d Cir. 1994). **[*2]**

In limited circumstances and upon a showing of compelling circumstances, this court may order certain records to be sealed. However, "[i]n most cases, a judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need." *Id.* at 27 (citation omitted); *see Securities & Exchange Comm'n v. The Street.com*, 273 F.3d 222, 232 (2d Cir. 2001). Moreover, ordinarily, a court must make that determination on the basis of a careful, document-by-document review of the particular portions of the document that a party wishes to be kept under seal and after considering whether the requested order is no broader than necessary to serve the interests that require protection. *See United States v. Amodeo,* 71 F.3d 1044, 1051-51 (2d Cir. 1995). A blanket sealing order such as that apparently requested would rarely, if ever, be appropriate. Furthermore, the parties' agreement to seal or limit disclosure of documents on file is not a sufficient basis for granting such an order. *Id.* Until either party demonstrates the existence of extraordinary circumstances or a compelling **[*3]** need to seal from public view any particular portion of any specific document filed in this case, this court will not depart from the governing strong presumption of open access.

If a party (hereinafter "filing party") intends to file anything that contains material designated by another party ("designating party") as "confidential," the filing party must give any designating party 14 days notice of intent to file. If the designating party objects, it should notify the filing party and file a Motion to Seal no later than 5 days before the filing date, and the filing party shall hold his pleadings containing any such designated material until the court acts on the Motion to Seal, at which point the filing party should file within 5 days of the court's Order on the Motion to Seal.

A redacted version of any pleading filed under seal must be filed within 5 days of the court's Order sealing the pleading.

**SO ORDERED**

Dated at Bridgeport, Connecticut, this 16th day of May, 2007.

/s/ Janet C. Hall

2007 U.S. Dist. LEXIS 35888, *3

United States District Judge

---

**End of Document**

# Travelers Indem. Co. v. Excalibur Reinsurance Corp.

United States District Court for the District of Connecticut

August 5, 2013, Decided; August 5, 2013, Filed

3:11 - CV- 1209 (CSH)

**Reporter**

2013 U.S. Dist. LEXIS 110400 *

THE TRAVELERS INDEMNITY COMPANY as successor in interest to GULF INSURANCE COMPANY, Plaintiff, v. EXCALIBUR REINSURANCE CORPORATION f/k/a CAPITAL INSURANCE COMPANY, Defendant.

**Subsequent History:** Motion denied by, As moot, Motion granted by, Motion to strike granted by, Stay granted by Travelers Indem. Co. v. Excalibur Reinsurance Corp., 2014 U.S. Dist. LEXIS 33182 (D. Conn., Mar. 11, 2014)

**Prior History:** Travelers Indem. Co. v. Excalibur Reinsurance Corp., 2013 U.S. Dist. LEXIS 110396 (D. Conn., Aug. 5, 2013)

**Counsel:** [*1] For Travelers Indemnity Company, Successor Gulf Ins Co, Plaintiff: Meredith A Long, Mitchell R. Harris, LEAD ATTORNEYS, Day Pitney LLP-Trmbl St Htfd-CT, Hartford, CT; Thomas O. Farrish, LEAD ATTORNEY, Day Pitney LLP-Htfd-CT, Hartford, CT.

For Excalibur Reinsurance Corporation, formerly known as PMA Capital Ins Co, Defendant: Ann E Halden, Joshua Laurence Milrad, Michael H Goldstein, LEAD ATTORNEYS, Mound, Cotton, Wollan & Greengrass, New York, NY; Raymond S. Mastrangelo, LEAD ATTORNEY, Mound Cotton Wollan & Greengrass -GC NY, Garden City, NY.

For Excalibur Reinsurance Corporation, Counter Claimant: Joshua Laurence Milrad, LEAD ATTORNEY, Mound, Cotton, Wollan & Greengrass, New York, NY.

For Travelers Indemnity Company, Counter Defendant: Meredith A Long, LEAD ATTORNEY, Day Pitney LLP-Trmbl St Htfd-CT, Hartford, CT; Thomas O. Farrish, LEAD ATTORNEY, Day Pitney LLP-Htfd-CT, Hartford, CT.

For Excalibur Reinsurance Corporation, Counter Claimant: Ann E Halden, Michael H Goldstein, LEAD ATTORNEYS, Mound, Cotton, Wollan & Greengrass, New York, NY; Raymond S. Mastrangelo, LEAD ATTORNEY, Mound Cotton Wollan & Greengrass -GC NY, Garden City, NY.

For Travelers Indemnity Company, Counter Defendant:

[*2] Meredith A Long, Mitchell R. Harris, LEAD ATTORNEYS, Day Pitney LLP-Trmbl St Htfd-CT, Hartford, CT; Thomas O. Farrish, LEAD ATTORNEY, Day Pitney LLP-Htfd-CT, Hartford, CT.

**Judges:** CHARLES S. HAIGHT, JR., Senior United States District Judge.

**Opinion by:** CHARLES S. HAIGHT, JR.

# Opinion

## RULING ON MOTIONS TO SEAL AND MOTIONS TO DESIGNATE CONFIDENTIAL DISCOVERY MATERIALS

### HAIGHT, Senior District Judge:

### I. BACKGROUND

Plaintiff, the Travelers Indemnity Company ("Travelers") brings this contract action as successor in interest to Gulf Insurance Company, which entered into a reinsurance contract with defendant Excalibur Reinsurance Corporation ("Excalibur"), formerly known as PMA Capital Insurance Company. This reinsurance case arises out of several "errors and omissions" policies Travelers issued to an insurance and reinsurance broker. The polices had annual periods extending from 1997 to 2001. A number of the broker's insurance company clients brought claims against the broker for losses allegedly sustained due to "reinsurance spirals." [1] The broker

---

[1] A reinsurance spiral may occur when a reinsurer buys reinsurance protection from other reinsurers and "unknowingly gets some of its own business (and therefore its own liabilities) back." Wikipedia, Reinsurance, http://en.wikipedia.org/wiki/Reinsurance. "In the 1980s the London market was badly affected by the creation of reinsurance spirals. This resulted in the same loss going around the market

2013 U.S. Dist. LEXIS 110400, *2

sought coverage for the clients' claims from Travelers, from certain Travelers' insurance company affiliates (the "Affiliates"), and from unaffiliated insurance companies (the "Underwriters"). **[\*3]** In so doing, the broker shared confidential documents with Travelers, including privileged communications with its legal counsel as well as details of settlement negotiations with its clients. Moreover, the Affiliates and Underwriters shared confidential documents with Travelers, including communications with their own attorneys, Mayer, Brown, Rowe and Maw ("Mayer Brown"). [2]

In February 2010 Travelers and the Affiliates reached a confidential settlement with the broker. Because the Underwriters did not settle at that time, Travelers represents that it does not know whether the broker's coverage claims against the Underwriters remain active. In any event, Travelers sought to recover a portion of its share of the settlement from one of its reinsurers, defendant Excalibur. In response to Excalibur's failure **[\*5]** to pay the bulk of Travelers' claims, Travelers filed the present action with this Court on August 1, 2011. Specifically, Travelers has alleged that "Excalibur has failed and refused to pay $1,573,189.58 worth of valid reinsurance claims under the contract, thereby breaching it." Doc. 1, p. 1.

On February 29, 2012, the parties jointly requested the Court's approval of a proffered "Stipulated Protective Order" (herein "SPO"). Doc. 24-1. The Court reviewed, approved, and entered the parties' protective order, as written, on March 1, 2012. Doc. 25. Under that order, "Confidential Discovery Material" is defined as material that "a party believes, in good faith, includes personal information or confidential, commercial, proprietary business information or non-public

---

financial data, or implicates the commercial, proprietary or reputational interests of third parties." Doc. 24-1, ¶ 1. If a party decides to file "Confidential Discovery Material" with the Court, pursuant to the protective order, that party shall make the filing "under seal in accordance with the procedure set forth in the District of Connecticut Local Rule 5(e) and accompanied by a motion to seal from the requesting party." *Id.*, **[\*6]** ¶ 11.

On March 6, 2012, Travelers applied for a prejudgment remedy [Doc. 26]. [3] Excalibur opposed that application, including with its opposition papers several documents that named the broker, contained legal advice obtained by the broker, and described details of settlement discussions between Travelers and the broker. As the case record reflects, Travelers moved to seal such documents [Doc. 40] and the Court granted the motion, denying it only to the extent that the Court required further specific redactions of particular documents [Doc. 48, p. 21-23].

On July 9, 2012, Travelers moved for leave to amend its complaint [Doc. 56]. In opposing Travelers' motion, Excalibur submitted opposition papers which included a declaration from Angela Aloisio [Doc. 59], an employee of Armour Risk Management, Inc.,"the entity that manages the business of Excalibur." [4] Doc. 59, ¶ 1. Attached to Aloisio's declaration were four documents that Travelers designated as "Confidential Discovery Material" pursuant to the terms of the SPO [Doc. 24-1]. Travelers contends that the "four documents invoke the same concerns as the earlier set of documents, and accordingly the Court should seal them" as well. Doc. 62, p. 3.

## II. PENDING MOTIONS

Pending before the Court are eight motions to seal and two

---

thereby artificially inflating market loss figures of big claims." *Id.* This London Market Excess of Loss spiral ("LMX spiral") was eventually "stopped by excluding retrocessional business from reinsurance covers protecting direct insurance accounts." *Id.*

[2] According to Travelers, the Affiliates and the Underwriters hired a single law firm to protect the interests of the primary layer insurers: Mayer, Brown, Rowe and Maw, **[\*4]** an international law firm which officially changed its name to "Mayer Brown" on September 1, 2007. This firm provided legal advice to the Affiliates and the Underwriters concerning the broker's coverage claims and participated in settlement negotiations with the broker on their behalf. As primary insurers, the Affiliates and the Underwriters updated the excess insurers on the status of the underlying claims from time to time. Doc. 77-1, p. 3. Eventually, Travelers and the Affiliates entered into several settlements to resolve the broker's coverage claims in the primary and excess layers. A final confidential settlement agreement between the broker, on one hand, and Travelers and its Affiliates, on the other hand, was entered into on February 17, 2010. *Id.*

---

[3] In seeking a prejudgment remedy, Travelers asserted that "there is probable cause that a judgment in the amount sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account all recoveries made to date, any known defenses, counterclaims or set-offs, will be rendered in this matter in favor of Travelers." Doc. 26, ¶ 3. Travelers requests an order to secure the sum of $1,573,189.58 by attaching the real or personal property of Excalibur within the state of Connecticut and/or garnishing the real or personal property of Excalibur in the custody or control of third persons, including debts owed to **[\*7]** Excalibur by natural persons and corporations, within the state of Connecticut. *Id.*, ¶ 4 (a), (b).

[4] The Court granted Plaintiff's Motion for Leave to Amend Complaint [Doc. 56] on February 1, 2013. Doc. 73. Travelers thereafter filed its Amended Complaint. Doc. 85 ("Amended Complaint," filed 2/15/2013).

motions to designate discovery materials as "confidential." The motions to seal include the following: Doc. 45 (Travelers' Motion to Seal Portions of Excalibur's Motion [*8] to Compel [Doc. 42 & 43] and supporting exhibits [Doc. 44]); Doc. 52 (Travelers' Motion to Seal Portions of Exhibit 1 to Travelers' Opposition to Excalibur's Motion to Compel [Doc. 51-1]); Doc. 58 (Excalibur's Motion to Seal Exhibits 1, 3, 4, & 7 to Declaration of Angela Aloisio); Doc. 61 (Travelers' Motion to Seal Exhibits 1, 3, 4 & 7 to Declaration of Angela Aloisio); Doc. 77 (Travelers' Motion to Seal Portions of Excalibur's Memorandum in Support of its Motion to Compel [Doc. 75] and exhibits attached to Declaration of Raymond S. Mastrangelo); Doc. 84 (Travelers' Motion to Seal Unredacted Memorandum of Law in Support of Motion for Pre-Pleading Security and Exhibit 1 to that Memorandum, an excerpt from Diane Ferro's deposition); Doc. 91 (Travelers' Motion to Seal Unredacted Memorandum of Law in Opposition to Excalibur's Motion to Designate Discovery Material as Confidential and Exhibits 1 & 2 to that Memorandum); and Doc. 101 (Travelers' Motion to Seal Portions of February 26, 2013 Hearing Transcript).

Each party has also filed a motion to designate various discovery materials as "confidential" pursuant to the Court-approved SPO [Doc. 24-1 & 25]. *See* Doc. 74 & 80 (motions re confidential [*9] discovery materials filed by Excalibur and Travelers, respectively).

For the reasons set forth below, all of the foregoing motions to seal and motions to designate discovery materials as confidential will be granted.

## III. DISCUSSION

### A. Motions to Seal

#### 1. Sealing in General

In two previous Rulings on the parties' motions to seal in this case, the Court has set forth the relevant law with respect to sealing. *See* Doc. 38 & 48 (Rulings re: sealing, filed 4/13/2012 & 5/10/2012). The Supreme Court and the Second Circuit have recognized the public's right to access court records and proceedings, which is rooted in both the common law and the First Amendment. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597-98, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110,

119-120 (2d Cir. 2006). [5] Consequently, there is a strong presumption against sealing court records from public inspection.

The public's right to access court documents is not, however, absolute in that it may be surmounted by [*10] a party's showing that sealing will further other substantial interests, for example, a criminal defendant's right to a fair trial or a third party's privacy interests. *Matter of New York Times Co.*, 828 F.2d 110, 114-16 (2d Cir.1987), *cert. denied*, 485 U.S. 977, 108 S. Ct. 1272, 99 L. Ed. 2d 483 (1988). Thus, in limited circumstances and upon a showing of compelling need, the court may order certain records to be sealed. *Lugosch*, 435 F.3d at 123; *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 95-96 (2d Cir. 2004); *Suntoke v. PSEG Power Connecticut, LLC.*, No. 3:06-CV-01520 (JCH), 2007 U.S. Dist. LEXIS 35888, 2007 WL 1455847, at *1 (D. Conn. May 16, 2007).

To be precise, court documents may be sealed if "specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 13-14, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986) ("*Press Enterprise II*") (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984) ("*Press-Enterprise I*")). *Accord New York Times Co.*, 828 F.2d at 116; *Hartford Courant Co.*, 380 F.3d at 95-96 (judicial records may be sealed only when and to the extent necessary to preserve higher values). [6] It thus follows that [*11] "a judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need." *Video Software Dealers Assoc. v. Orion Pictures, Corp.* (*In re Orion Pictures Corp.*), 21 F.3d 24, 27 (2d Cir.1994). *See also Sec. & Exch. Comm'n v. The Street.com*, 273 F.3d 222, 232 (2d Cir. 2001).

In this District, the Local Rules expressly dictate that the

_____

[5] *See also Vassiliades v. Israely*, 714 F. Supp. 604, 605-06 (D. Conn. 1989); *United States v. Gerena*, 703 F. Supp. 211, 212-13 (D. Conn.1988), *aff'd sub nom, United States v. Suarez*, 880 F.2d 626 (2d Cir. 1989).

[6] Although the term "higher values" has not been comprehensively defined, courts have identified particular examples. *See, e.g., Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 125 (2d Cir. 2006) (attorney-client privilege); *United States v. Aref*, 533 F.3d 72, 83 (2d Cir.2008) (national security); *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir.1995) (law enforcement interests and the privacy of innocent third parties); *Pal v. New York Univ.*, No. 06 Civ. 5892(PAC)(FM), 2010 U.S. Dist. LEXIS 53353, 2010 WL 2158283, at *1 (S.D.N.Y. May 27, 2010) (sensitive patient information).

Court may seal a judicial document only by an order which "shall include particularized findings demonstrating that sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons." D. Conn. L. Civ. R. 5(e)(3). **[*12]** [7] "No document shall be sealed merely by stipulation of the parties." *Id.* Furthermore, the blanket sealing of an entire case is disfavored both under rule and case precedent. *See id.* 5(e)(2) ("Except as permitted or required by federal law, no civil case shall be sealed in its entirety."). *See also Crossman v. Astrue*, 714 F.Supp.2d 284, 290 (D. Conn. 2009) (denying plaintiff's request for "blanket order allowing [him] to file every document under seal").

With respect to documents, blanket sealing of *entire* documents or *all* documents within a case is generally disfavored. *See, e.g., Jadwalean Int'l Co. For Operations & Mgmt v. United Tech Corp.* ,3:09-CV-00018(JCH), 2009 U.S. Dist. LEXIS 33520, 2009 WL 1064495, at *1 (D. Conn. April 17, 2009) (rejecting blanket sealing request because "a court must make that determination [of whether to seal] on the basis of a careful, document-by-document review of the *particular portions of the document* that a party wishes to be kept under seal and after considering whether the requested order is no broader than necessary to serve the interests that require protection.") (emphasis added); **[*14]** *Doctor's Assoc. Inc. v. QIP Holders LLC*, No. 3:06-CV-1710 (VLB), 2007 U.S. Dist. LEXIS 70029, 2007 WL 2782516, at *1 (D. Conn. Sept. 24, 2007) (denying request by parties for blanket sealing of documents in that "[t]he presumption that documents should not be sealed necessitates the court's watchful eye when

blanket sealing provisions are proposed.") (citing *Nixon v. Warner Comm., Inc.*, 435 U.S. 589, 597-99, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978)); *Suntoke*, 2007 U.S. Dist. LEXIS 35888, 2007 WL 1455847, at *1 ("A blanket sealing order such as that apparently requested would rarely, if ever, be appropriate.").

With this legal framework regarding sealing in mind, the Court turns to each motion to seal and the parties' proffered reasons for such sealing. The Court notes at the outset that although not a factor in determining whether the motions will be granted, neither party has objected to any of the motions to seal addressed by this Ruling.

## 2. Pending Motions to Seal

All eight pending motions to seal have been filed pursuant to Local Rule 5(e)(3) and (e)(4) of Civil Procedure. As to each motion, the movant alleges that there are "clear and compelling reasons" to seal the material at issue and that the request for sealing is "narrowly tailored to serve those reasons." D. Conn. L. Civ. R. 5(e)(3). **[*15]** Furthermore, to the extent that such a practice is feasible, the materials presented for sealing have been filed in redacted and unredacted form to designate the particular sections that the party would like sealed. That is to say, where specific redactions suffice, counsel have designated such material to be redacted; and where redaction of material would not suffice to protect its confidential nature, a limited number of entire documents have been presented for sealing. In this regard, able counsel have performed dutifully in this sealing endeavor.

Furthermore, counsel have followed the stipulated procedures in the Court-approved SPO [Doc. 24-1] in that they have filed the materials sought to be sealed provisionally under seal and then filed memoranda of law to explain the specific reasons why said material should remain sealed. [8] Doc. 24-1, ¶ 11.

### a. Doc. 45

Examining the individual **[*16]** motions, the Court first addresses Doc. 45, Travelers' Motion to Seal designated portions of Excalibur's Motion to Compel [Doc. 42 & 43] and the Exhibits attached to the Declaration of Raymond

---

[7] Local Rule of Civil Procedure 5(e), captioned "Sealed Proceedings and Documents," provides at subsection 3, in relevant part:

> Every document used by parties moving for or opposing an adjudication by the Court, other than trial or hearing exhibits, shall be filed with the Court. No judicial document shall be filed under seal, except upon entry of an order of the Court either acting *sua sponte* or specifically granting a request to seal that document. Any such order sealing a judicial document shall include *particularized findings demonstrating that sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons.* A statute mandating or permitting the nondisclosure of a class of documents (*e.g.*, personnel **[*13]** files, health care records, or records of administrative proceedings) provides sufficient authority to support an order sealing such documents. . . . No document shall be sealed merely by stipulation of the parties. *A confidentiality order or protective order entered by the Court to govern discovery shall not qualify as an order to seal documents for purposes of this rule.* Any document filed under seal in the absence of a Court order to seal it is subject to unsealing without prior notice to the parties.

D. Conn. L. Civ. R. 5(e)(3) (emphasis added).

---

[8] Counsel have also cooperated by showing opposing counsel potentially confidential papers intended for filing. That way opposing counsel have been provided the opportunity to request any necessary redactions prior to filing and then to file explanatory memoranda in support of sealing.

Mastrangelo in support of that motion [Doc. 44, Ex. 3-12 and 15-17]. After careful review of the material presented for sealing, I find that, as described by counsel, the documents contain "privileged communications between Travelers and its counsel;" "privileged communications between non-parties and their counsel;" and information that "implicates the reputational interests of third parties not before the court." Doc. 45, p. 1

Specifically, the material sought to be redacted from Excalibur's Motion to Compel quotes from and provides privileged or confidential information contained in the attached Exhibits, also sought to be sealed. For example, the Exhibits include, *inter alia,* insurance policies issued by the Underwriters to the broker, whose confidential identity was sealed by the Court's prior Ruling [Doc. 48]. [9] The redactions in those policies protect the identity of that broker. Doc. 44-3 to -4 (Ex. 3-4). Other proposed redactions of the broker's name appear in Exhibits 11, 12, 16 & 17  **[\*17]** (Excalibur's First Set of Document Production Requests and First Set of Interrogatories and Travelers' Responses and Objections to these discovery requests). Doc. 44-11, -12 , -16, & -17.

As set forth *supra*, this Court has previously examined the potential damage to the reputational interest and finances of the broker and has agreed to seal its identity. Therefore, the identity of the broker will remain sealed. Doc. 44-3 to -12 & 44-15 to -17 (Ex. 3-12, 15-17).

Travelers also seeks redaction of language providing legal advice to Travelers in Exhibits  **[\*18]** such as Ex. 5-8 and 10. *See, e.g.,* Doc. 44-5 (Ex. 5: status report sent to Excalibur by Travelers on March 14, 2007, containing a legal memorandum from counsel Mayer Brown, evaluating claims against the broker by its clients and providing other legal advice on a variety of topics); Doc. 44-6 to -8, & 44-10 (Ex. 6-8, 10: detailing privileged legal advice from Mayer Brown to the Underwriters and legal advice to Travelers from its own counsel).

With respect to the attorney-client privilege, it is well-settled within the Second Circuit that the attorney-client privilege

may be a sufficiently compelling reason to defeat the public's right of access to judicial documents. [10] *See, e.g., Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 125 (2d Cir. 2006) (recognizing attorney-client privilege as potential "compelling reason" to seal documents, especially where party asserting the privilege is not the party who seeks to admit such documents into the record). Accordingly, the Court will grant the motion to seal as to the material covered by the attorney-client privilege. [11]

In addition, the Court will approve requested redactions of sections of Exhibits containing confidential settlement discussions between the broker and its clients. Doc. 44-7 to -9 (Ex. 7-9). There is no established presumption of public access with respect to confidential settlement discussions and documents. *See, e.g., Gambale v. Deutsche Bank AG*, 377 F.3d 133, 143 (2d Cir. 2004), *United States v. Glens Falls Newspapers, Inc.*, 160 F.3d 853, 857 (2d Cir. 1998). Rather, the Second Circuit has recognized the value of confidentiality in settlement negotiations. *See, e.g., In re Teligent, Inc.,* 640 F.3d 53, 57-58 (2d Cir. 2011) ("Confidentiality is an important feature of the mediation and other alternative dispute resolution processes. Promising participants confidentiality in these proceedings promotes the free flow of information that may result in the settlement of a dispute, and protect[s] the integrity of alternative dispute resolution generally.") (internal citations omitted); *Palmieri v. New York*, 779 F.2d 861, 865 (2d Cir. 1985) (noting  **[\*21]** that

---

[9] As the Court observed in its ruling on Travelers' previous motion, "[n]on-parties' privacy interests may comprise 'a strong factor weighing against disclosure of their identities.'" Doc. 48, p. 17 (quoting *In re Savitt/Adler Litigation*, No. 95-CV-1842 (RSP/DRH), 1997 U.S. Dist. LEXIS 23671, 1997 WL 797511, at *3 (N.D.N.Y. Dec. 23, 1997)). "Based on Travelers argument that publicity of the broker's identity, and thus its clients' claims against it, would lead to damage to its business reputation and finances," the Court "grant[ed] Travelers' sealing request to the extent that it [sought] protection *solely of the broker's identity.*" Doc. 48, p. 19 (emphasis in original).

[10] The attorney-client privilege extends only to those communications "that are necessary to obtain informed legal advice"  **[\*19]** and which "would not be made without the privilege." *United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 505 (2d Cir.1991). For a communication to be protected by the privilege, (a) the communication must be between client and counsel; (b) the communication must be intended to be kept confidential and actually be kept confidential; and (c) the communication must have been made for the purpose of obtaining or providing legal advice. *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011).

[11] With respect to legal memoranda of Mayer Brown, the Court also recognizes the applicability of the "work product doctrine," which provides qualified immunity of an attorney's work product from discovery or other compelled disclosure. *See* Fed. R. Civ. P. 26(b)(3) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."); *Hickman v. Taylor*, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947). *See also In re Sealed Case*, 676 F.2d 793, 809-10, 219 U.S. App. D.C. 195 (D.C. Cir. 1982) ("to the extent that work product reveals the opinions, judgments,  **[\*20]** and thought processes of counsel, it receives some higher level of protection, and a party seeking discovery must show extraordinary justification").

"[s]ecrecy of settlement terms . . . is a well-established American litigation practice") (citation omitted). [12] Portions of documents pertaining to the details of the broker's dispute with its client, and specifically the negotiations to resolve those disputes, will be sealed. Doc. 44-5 to -10, & 44-15 to -16 (Ex. 5-10 & 15-16).

The Court recognizes that all of the documents at issue in Doc. 45 reveal sensitive business information that both Travelers and the broker seek to protect, such as confidential proprietary information, documents and client data. Doc. 46, p. 11. The parties to an action often have a significant interest in protecting such information from public dissemination. *See, e.g., Crossman v. Astrue*, 714 F.Supp. 2d 284, 287 (D.Conn. 2009) [*22] (holding that "there can be (and often are) considerations of personal privacy, public safety, or a business's propriety information, such as trade secrets or confidential research, that can trump the right of the public to access court records"). The specific portions of documents revealing sensitive business information may be redacted.

Lastly, the Court notes that, as Travelers represents, "the information contained in Exhibits 3-11 and 15 that is subject to this Motion to Seal was furnished by Travelers to Excalibur under the express condition that Excalibur maintain its confidentiality." Doc. 46, p. 12. Although such confidentiality agreements are not binding on the Court with respect to sealing, the Court may consider their terms as one factor in its analysis when deciding to seal. *See Gambale*, 377 F.3d at 143-44 (portions of hearing transcript redacted to remove settlement amount because parties previously agreed to preserve such information as confidential).

In sum, the Court finds that sealing designated portions of Excalibur's Memorandum in Support of its Motion to Compel [Doc. 42, 43] and Exhibits attached to the Declaration of Raymond Mastrangelo [Doc. 44-3 to -12, 44-15 [*23] to -17 (Ex. 3-12, 15-17)] is supported by "clear and compelling reasons" — including, *inter alia*, the reputational interests, settlement discussions, and sensitive business information of a non-party and the attorney-client privilege . *See* D. Conn. L. Civ. R. 5(e)(3). Furthermore, proposed sealing has been "narrowly tailored to serve those reasons" in that Travelers asks "only that the Court seal those portions of those documents that contain attorney-client privileged

communications, attorney work product, confidential policyholder information, and/or descriptions of highly-confidential settlement discussions." Doc. 46, p. 14-15. The remainder of the documents Excalibur submitted with respect to its Motion to Compel [Doc. 42] will remain subject to public inspection.

**b. Doc. 52**

In Doc. 52, Travelers moves the Court to seal portions of Exhibit 1 to Travelers' Opposition to Excalibur's Motion to Compel [Doc. 50-1]. Exhibit 1 is comprised of an email [13] and attachments, which include: (a) a letter from Charlaine Dacres, Travelers' "Reinsurance Claims Consultant," containing the broker's name, names of its insurance company clients, and the gross amount of a settlement between the broker [*24] and Travelers (and its affiliates); a letter from the broker's in-house legal counsel to another broker, detailing the broker's consultations with said in-house counsel and making legal recommendations as to how the broker should respond to its clients' claims; and a portion of an insurance proposal form filled out by the broker, which was provided to Travelers in the context of confidential settlement discussions and contains the broker's comments on then-pending litigation. *See* Doc. 50-1, Doc. 53, p. 2-3.

The Court finds that sealing the designated portions of the documents is proper in that the gross settlement amount between Travelers (and its affiliates) and the broker was part of confidential settlement discussions. *See Gambale*, 377 F. 3d at 143. The letter from the broker's in-house counsel communicated confidential legal advice in response to the broker's clients' claims. *See Lugosch*, 435 F.3d at 125. [*25] Finally, the broker's proposal form, although not traditionally privileged as an insurance document, was conveyed to Travelers during confidential settlement negotiations and contained the broker's evaluation of then-pending litigation against it. Therefore, the proposal may also be sealed.

In sum, as Travelers asserts, Exhibit 1 contains information that is identical or similar to information that the Court already ordered sealed in the context of an earlier motion [Doc. 48]." [14] Doc. 52, p. 1. Specifically, Exhibit 1 contains:

---

[12] *See also Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 980 (6th Cir. 2003) ("There exists a strong public interest in favor of secrecy of matters discussed by parties during settlement negotiations. This is true whether settlement negotiations are done under the auspices of the court or informally between the parties. . . . In order for settlement talks to be effective, parties must feel uninhibited in their communications. ").

[13] The email, dated 8/18/2010, is from Charlaine Dacres of Travelers to Marty Peterson of Guy Carpenter & Company, and simply transmits the attachments by requesting that the recipient "accept this email and attachments" in response to "a request regarding [a certain] insured." Doc. 50-1.

[14] In its prior Ruling, this Court sealed "the broker's identity in view

2013 U.S. Dist. LEXIS 110400, *25

"(a) the identity of a non-party reinsurance broker whose reputational interests would be affected by the public disclosure of its identity; (b) details of confidential settlement negotiations between Travelers and the broker; and (c) the broker's privileged attorney-client communications." *Id.* As the Court has previously held, each of these kinds of information invoke "clear and compelling" grounds to seal. Because Travelers has narrowly tailored its sealing request to serve those particular purposes through careful redactions, this motion will be granted.

### c. Doc. 58 & Doc. 61

In Doc. 58 and Doc. 61, Excalibur and Travelers each move, respectively, to seal Exhibits 1, 3, 4 and 7 to the Declaration of Angela Aloisio, filed by Excalibur in support of its Memorandum in Opposition [Doc. 57] to Travelers' Motion for Leave to Amend Complaint [Doc. 56]. *See* Doc. 59-1, 59-3 to -4, & 59-7. Excalibur filed its motion [Doc. 58] "because Plaintiff has designated these [Exhibits] as confidential documents and has requested Defendant to file them under seal." Doc. 58, p. 2. Travelers then filed its own corresponding motion [Doc. 61] and, as agreed upon with Excalibur, the memorandum in support of both parties' motions to seal [Doc. 62]. *See* Doc. 24-1 (SPO) at ¶ 11.

The Exhibits at issue are attachments to the Declaration of Angela Aloisio, the "Assistant Vice President of Armour Risk Management, Inc.," which is the "entity that manages the business of Excalibur." Doc. 59, ¶ 1. These Exhibits include: Exhibits 1 and 3, two related documents which Travelers indicates are "an internal **[*27]** Travelers report initially created in 2008 and updated over time" and "an update from Travelers to Excalibur that incorporates large portions of the internal report verbatim." Doc. 62, p. 4. Travelers asserts that both documents recount "the advice and impressions that the broker received from its counsel, Slaughter and May, regarding the claims that had been asserted against the broker by its insurance company clients" and "the advice that the Affiliates and Underwriters received from their counsel, Mayer Brown, respecting the applicable policy year." *Id.*, p. 4-5. Each document also includes details of settlement negotiations between the brokers and its clients, amounts claimed by the clients, and the identities of said broker and its clients.

Exhibit 4 is a "report that Travelers submitted to Excalibur shortly after it and the Affiliates concluded their confidential

---

settlement with the broker" and thus contains details of that settlement. *Id.*, p. 5. Lastly, Exhibit 7 is a letter Aloisio allegedly reviewed in May 2010, containing what Travelers describes as "verbatim recitals of two provisions of the confidential settlement agreement" as well as "a term from an earlier, similarly confidential **[*28]** agreement between Travelers and the broker." *Id.*

Upon close review of the documents, the Court concludes that the redacted material is the kind the Court has previously sealed in this matter due to "clear and compelling" reasons — namely, protection of privileged attorney-client communications; confidential settlement negotiations; and documents implicating the privacy, reputational interest, and proprietary information of the non-party broker. *See, e.g., Lugosch*, 435 F.3d at 123 (recognizing attorney-client privilege as sufficiently compelling reason to seal); *Gambale*, 377 F.3d at 143 (no established presumption of access to confidential settlement discussions and documents); *In re Savitt/Adler Litig,*, 1997 U.S. Dist. LEXIS 23671, 1997 WL 797511, at *3 (non-parties' privacy interests comprise "strong factor weighing against disclosure of their identities").

With respect to the tailored scope of the sealing request , the Court concurs with Travelers that the four documents contain such a quantity of confidential information that redaction "is not a practical alternative" to sealing them in their entirety. Doc. 62, p. 5 n. 2. Accordingly, these documents give rise to the rare situation in which the Court will authorize **[*29]** sealing in total. The motions set forth in Doc. 58 and Doc. 61 will be granted.

### d. Doc. 77

In Doc. 77, Travelers requests the Court to seal portions of Excalibur's Supporting Memorandum [Doc. 75-17] with respect to Excalibur's second Motion to Compel [Doc. 75], as well as designated Exhibits to the accompanying declaration of Raymond S. Mastrangelo [Doc. 75-3 to -5 and Doc. 75-8 to -16]. [15] Once again, these documents contain: privileged communications between Travelers and its counsel; privileged communications between nonparties and their counsel; and information implicating the reputational interests of third parties who are not before the Court. Some of the documents also contain details about confidential settlement discussions

---

of the broker's non-party status **[*26]** with respect to the present litigation and the fact that the documents were shared with Travelers in the context of confidential settlement negotiations." Doc. 48, p. 19.

---

[15] Pursuant to the SPO, Travelers designated materials within Excalibur's intended filings as "Confidential Discovery Material." Doc. 24-1, ¶ 11. Excalibur then filed these papers in conjunction with its motion to compel in redacted form; and Travelers filed the corresponding motion to seal and supporting memorandum. Doc. 77, p. 1-2.

2013 U.S. Dist. LEXIS 110400, *29

between Travelers and its insured, and a few were previously filed under seal as a result of earlier motions in this case. [16]

This sealing request is based on reasons the Court has previously held to be "clear and compelling." *See* D. Conn. L. Civ. R. 5(e) (3). Moreover, the redactions sought are "narrowly tailored to serve those reasons." *Id.* But for two documents, Travelers requests to seal only designated portions of the documents at issue; and the totality of the contents of the two Exhibits to be sealed in their entirety make redaction impracticable. In sum, the Court will grant the motion pursuant to Local Rule of Civil Procedure 5(e)(3).

### e. Doc. 84 and 91

Travelers has moved in Doc. 84 and Doc. 91 to seal two sets of its own papers provisionally due to Excalibur's designation of the attached Exhibits as "Confidential Discovery Material" [*31] under the SPO [Doc. 24-1]. The exhibits include excerpts of the deposition transcripts of witnesses Diane Ferro and Angela Aloisio; and Excalibur has designated the entire deposition transcripts of these two witnesses as "Confidential Discovery Material." Travelers explains that it objected to Excalibur's "confidential" designation of the transcripts, but, in accordance with the operative SOP [Doc. 24-1, ¶ 11], filed this motion to afford Excalibur "the opportunity to submit a memorandum in support of sealing." Doc. 84, p. 1; Doc. 91, p. 2.

In particular, pursuant to Doc. 84, Travelers requests that the Court seal provisionally its Unredacted Memorandum of Law in Support of Travelers' Motion for Pre-Pleading Security; and the attached Exhibit 1 (an excerpt from the deposition transcript of Dianne Ferro's deposition). Pursuant to Doc. 91, Travelers seeks to provisionally seal its Unredacted Memorandum of Law in Opposition to Defendant's Motion to Designate Discovery Material as "Confidential Discovery Material" Pursuant to the Stipulated Protective Order, and the accompanying Exhibits 1 & 2 to the Memorandum (excerpts from the revised deposition transcripts of Angela Aloisio and Diane [*32] Ferro, respectively).

Travelers has acted in accordance with the provisions of the

SPO. Doc. 24-1, ¶11 . The documents addressed in Travelers' two motions to seal (Doc. 84 and 91) may therefore be provisionally sealed to preserve their confidentiality pending the outcome of Excalibur's motion to designate the deposition transcripts of witnesses Diane Ferro and Angela Aloisio as "Confidential Discovery Material" and Excalibur's possible filing of a motion to seal the transcripts thereafter. [17] Doc. 74. The motion regarding Excalibur's designation of the transcripts as "confidential" will be resolved below.

### f. Doc. 101

Pursuant to Doc. 101, Travelers seeks to seal designated portions of the transcript of the hearing before this Court on February 26, 2013 [Doc. 95]. In particular, Travelers moves to seal the lines and pages of the transcript identified [*33] in Schedule A, which include materials this Court has previously held warrant sealing, both in this ruling and in prior opinions. Such materials reveal: (a) privileged communications between Travelers and its lawyers; [18] (b) terms of Travelers' confidential settlement agreement with its insured; [19] and (c) information implicating the reputational interests of the non-parties — *i.e.*, the non-party broker and the claimants in the

---

[16] For [*30] purposes of clarity, the Court acknowledges that a few of the documents at issue are the subject of other motions to seal which are also addressed in this Ruling. *See* Doc. 44-9 & 75- 5; Doc. 44-5 & 75-10; Doc. 44-6 & 75-11; and Doc. 44-10 & 75-12. Moreover, the Court has previously granted a motion to seal the designated portions of two particular documents. *See* Doc. 75-8 & 75-9 (redacted material previously sealed in Doc. 35-4 & 35-5 by Doc. 48 (Ruling, dated 5/10/2012)).

---

[17] The Court clarifies that even if it upholds Excalibur's designation of the deposition transcripts as "confidential," the transcripts will only remain sealed if Excalibur requests sealing by "demonstrating that sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons." D. Conn. L. Civ. R. 5(e)(3).

[18] According to Travelers, "[d]uring and after its settlement discussions with the broker, Travelers received advice from counsel" and "Travelers shared some of these communication with Excalibur (under a confidentiality agreement) at a time when the parties still shared a common interest with respect to the broker's claims." Doc. 102, p. 2-3.

Although "it is vital to a claim of privilege that the communications between client and attorney were made in confidence and have been maintained in confidence," *In re Horowitz*, 482 F.2d 72, 81-82 (2d Cir. 1973), disclosing "attorney-client" privileged documents to a party with a "common interest" does not destroy their confidentiality provided that the party with the privilege exercises a degree of care to preserve said confidentiality, *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989). The "common interest rule, as it is called, "serves to protect the confidentiality of communications [*35] passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Schwimmer*,

underlying suit against it. [20] The Court has previously held that information protected by the attorney-client privilege, confidential settlement negotiations and terms, and information infringing the privacy interest of a non-party may all be properly subject to sealing. *See, e.g., Lugosch*, 435 F.3d at 123 (parties have significant interest in protecting documents subject to attorney-client privilege and that interest is sufficient to defeat presumption of public access); *Gambale*, 377 F.3d at 143 (no established presumption of public access with respect to confidential settlement discussions and documents); *In re Savitt/Adler Litigation*, No. 95-CV-1842 (RSP/DRH), 1997 U.S. Dist. LEXIS 23671, 1997 WL 797511, at *3 (N.D.N.Y. Dec. 23, 1997) (non-parties' privacy interests may comprise "a [*34] strong factor weighing against disclosure of their identities"). Such material presents the kind of "substantial interests" that the Second Circuit has recognized as overcoming the presumption of public access to judicial documents. *Lugosch*, 435 F.3d at 123.

The Court has carefully [*36] reviewed Travelers' designated portions of the transcript to be redacted and determined that the designations have in fact been made for the specified "clear and compelling reasons" discussed *supra*. Moreover, these designations have been "narrowly tailored" to serve those reasons, often redacting items by word, phrase, and line as opposed to entire pages. Accordingly, pursuant to Local Rule of Civil Procedure 5(e)(3), Traveler's motion to seal the portions of the February 26, 2013 transcript that are listed in Schedule A will be granted.

## B. Motions to Designate Material as "Confidential Discovery Material"

Finally, the Court will address two motions to designate discovery material as "confidential" pursuant to the SPO. As

set forth *supra*, Travelers and Excalibur entered into the SPO [Doc. 24-1], and the Court adopted and entered that order on March 1, 2012 [Doc. 35]. Pursuant to the SPO, "Confidential Discovery Material" is defined as material that "a [*37] party believes, in good faith, includes personal information or confidential, commercial, proprietary business information or non-public financial data, or implicates the commercial, proprietary or reputational interests of third parties." Doc. 24-1, ¶ 1. If a party decides to file "Confidential Discovery Material" with the Court, that party must give advance notice to the other party and, if said other party so requests, make the filing "under seal in accordance with the procedure set forth in the District of Connecticut Local Rule 5(e) and accompanied by a motion to seal from the requesting party." *Id.*, ¶ 11.

At the outset, the Court notes that in general transcripts of deposition testimony — that is, documents "passed between the parties in discovery" — are not judicial documents to which the public has a presumptive right of access. *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir.1995) ("*Amodeo II*"). Such documents, prior to admission into the record in support of a motion or as evidence at trial, "play no role in the performance of Article III functions" of a federal judge. *Id.; accord SEC v. TheStreet.com*, 273 F.3d 222, 233 (2d Cir.2001) (holding that deposition transcripts [*38] were not "judicial documents" that carried presumption of public access); *Stern v. Cosby*, 529 F. Supp. 2d 417, 421 (S.D.N.Y. 2007) (deposition transcript and videotape held not to comprise "judicial documents" because they were "merely materials generated in discovery" and not currently relevant to court's performance of a judicial function).

As the Supreme Court held in *Seattle Times Co. v. Rhinehart*, "pretrial depositions and interrogatories are not public components of a civil trial." 467 U.S. 20, 33, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984). The Supreme Court reasoned as follows:

> Such proceedings were not open to the public at common law, *Gannett Co. v. DePasquale*, 443 U.S. 368, 389, 99 S.Ct. 2898, 2910, 61 L.Ed.2d 608 (1979), and, in general, they are conducted in private as a matter of modern practice. *See id.*, at 396, 99 S.Ct., at 2913-2914 (BURGER, C.J., concurring); Marcus, Myth and Reality in Protective Order Litigation, 69 Cornell L. Rev. 1 (1983). Much of the information that surfaces during pretrial discovery may be unrelated, or only tangentially related, to the underlying cause of action. Therefore, restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally [*39] public source of information.

---

892 F.2d at 243. Furthermore, "it is . . . unnecessary that there be actual litigation in progress for the common interest rule of the attorney-client privilege to apply." *Id.* at 244 (citation omitted).

[19] As Travelers has represented in its supporting brief, "Travelers (and certain of its affiliates) entered into settlement agreements to resolve the broker's coverage claims under the Gulf policies. The final agreement was a confidential settlement agreement between the broker on the one hand, and Travelers and its affiliates on the other hand, dated February 17, 2010." Doc. 102, p. 2.

[20] For example, as Travelers asserts, the materials describe claims against the non-party broker by its clients, including "allegations that the broker engaged in fraud and a number of other types of wrongdoing." Doc. 102, p. 2. Travelers explains that "[r]evealing the claimants' identities or the identity of the underlying disputes is tantamount to revealing the broker's identity." *Id.*, p. 4.

*Id.* Put simply, the public has no constitutional, statutory, or common-law right of access to unfiled discovery.

As in this case, a party may deem material "confidential" under a stipulated protective order — thereby ensuring, for example, that it may be disclosed only to certain people (*e.g.*, counsel and their staffs, parties, deposition or trial witnesses, experts, etc.) and used only for purposes of the particular litigation. The issue of sealing then only arises when the documents are filed with the Court as "judicial documents" to assist the Court in its Article III function. At that point, the Court must make a determination as to whether such materials warrant sealing.

In deciding whether to seal depositions pursuant to a request under the SPO, the Court may view the terms of the SPO itself as a factor in its analysis. Although not binding, the Court may consider the terms to determine the parties' intentions regarding what should be "confidential." *See Gambale*, 377 F.3d at 143-44 (material in hearing transcript redacted to remove settlement amount because parties previously agreed to preserve such information as confidential). However, under Local Rule 5(e)(3), [**40**] "[n]o document shall be sealed merely by stipulation of the parties." Even if the parties were able to agree as to which materials should be deemed "confidential," in order to seal, it remains incumbent on the Court to make "particularized findings demonstrating that sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons." D. Conn. L. Civ. R. 5(e)(3). *Cf. id.*, 5(e)(3) ("A confidentiality order or protective order entered by the Court to govern discovery *shall not qualify as an order to seal* documents for purposes of this rule.")(emphasis added).

### 1. Pending Motions - Doc. 74 & Doc. 80

### a. Doc. 74

In Doc. 74, Excalibur has moved to designate six deposition transcripts as "confidential" in their entirety. The transcripts include the testimony of the following witnesses: Carol Barnhardt, Steve Ranalli, Ann Brandt, Kathy Barker, Diane Ferro, and Angela Aloisio. Doc. 74, p. 1. As Attorney Raymond S. Mastrangelo, counsel for Excalibur, stated in his affidavit [Doc. 74-1], Travelers has objected to the designation of these entire deposition transcripts as confidential; and the parties have been unable to reach an agreement on this issue without the [**41**] Court's assistance. Doc. 74-1, ¶ 3. Whether Excalibur's designation of the transcripts as confidential may stand is the sole issue before the Court. Excalibur does not, at this time, request that the

documents be sealed. Rather, in its supporting memorandum, "Excalibur notes that Travelers has not given notice under the [SPO] that it intends to file any of the transcripts with the Court, nor is there presently before the Court any motion to seal the depositions." Doc. 74-10.

Since the date the motion was filed, Travelers filed excerpts from the deposition transcripts of two witnesses at issue ( Diane Ferro and Angela Aloisio) in support of Travelers' Motion for Pre-Pleading Security. *See* Doc. 81 & 84. While disputing Excalibur's "confidential" designation of the transcripts, Travelers filed the excerpts provisionally under seal, providing the Court with the opportunity to determine whether their status should remain "confidential." If the Court determines that these transcripts may remain "confidential," pursuant to the SPO, any party intending to file such material with the Court must do so "under seal in accordance with the procedure set forth in the District of Connecticut Local Rule 5(d) [**42**] and accompanied by a motion to seal from the requesting party." Doc. 24-1, ¶ 11. Although Travelers filed the materials under seal with its Motion to Seal [Doc. 83], Excalibur has filed no corresponding memorandum in support of said sealing. The documents will thus only be sealed provisionally. [21]

In brief, Excalibur claims that it "has a good faith basis for designating each of the depositions as confidential because each 'includes personal information, or confidential, commercial, proprietary business information or non-public financial data . . . ' " Doc. 74-10, p. 5 (quoting Doc. 24-1 at ¶ 1). [22] Excalibur states that not only is such designation all that is required under the SPO, but Travelers itself "does not seriously contend that the depositions do not include such information." Doc. 74-10, p. 5. [23] Rather, Travelers [**43**] objects only to the designation of each "deposition as a

---

[21] If Excalibur thereafter requests that the Court seal any portion of the excerpted testimony filed by Travelers in support of its motion for pre-pleading security, Excalibur must designate the particular testimony it would like redacted and file the requisite supporting memorandum, demonstrating "clear and compelling reasons" to seal. D. Conn. L. Civ. R. 5 (e)(3)-(4).

[22] Excalibur explains that "[e]ach of these witnesses were questioned extensively about policies and procedures at Excalibur regarding claims handling and payment" and "[i]n many instances, such questioning went far beyond claims at issue and delved into company policy and strategy which is confidential and proprietary in nature." Doc. 74-10, p. 6.

[23] For example, Excalibur points to the fact that the transcripts at issue reveal the broker's identity. Excalibur thus states, "Travelers does not seriously contend that the depositions do not include such [confidential] information nor could it in light of the exposure of the identity of the Broker in each of the depositions." Doc. 74-10, p. 5.

whole." *Id.*, p. 5-6.

Excalibur quotes the SPO to show that a party may "designate *depositions* by written notice," interpreting that language to mean that a party may designate entire depositions, as opposed to only portions, as confidential. Doc. 74-10, p. 2 ( quoting Doc. 24-1) at ¶ 7) (emphasis in original). With respect to the six depositions at issue, Excalibur maintains that it "did not, nor was it required to specifically delineate by page **[*44]** and line which portions of the deposition[s] [are] confidential." *Id.*, p. 3. Excalibur maintains that "[s]uch a requirement was not contemplated in the [SPO] and would be expensive, onerous and unnecessary at this stage." *Id.*

Travelers, on the other hand, reads the language of the SPO to suggest that "[a] party may not designate an entire transcript as 'confidential' merely because some of the testimony contains confidential information." Doc. 90, p. 2. Rather, the SPO specifies that "discovery material" is defined to include "*deposition testimony.*" *Id.* (quoting Doc. 24-1, ¶ 1) (emphasis in original). Moreover, Travelers contends that Excalibur bears the burden of demonstrating that said testimony qualifies as "confidential" and Excalibur has failed to make such a showing. *Id.* In other words, Excalibur "has identified no basis under which an entire deposition transcript may be designated as confidential." Doc. 90, p. 2-3.

The Court stresses to the parties the distinction between material designated as *confidential during discovery* and material that the Court orders to be *sealed* from the public. In general documents exchanged between parties are not subject to public disclosure unless **[*45]** also filed with the Court. There is no presumptive right of access to said discovery materials. The label of "confidential" pursuant to a protective order, such as the SPO, then provides protection from public dissemination by specifying the proper recipients and use of said materials. Whether particular material is "confidential" pursuant to a governing agreement may require the Court to interpret the language of that agreement. Furthermore, under such agreements, Courts of this Circuit have upheld as confidential not only entire *documents*, but entire *sets* of documents containing material which is "confidential." *See, e.g., Brookdale Univ. Hosp. and Med. Center, Inc. v. Health Ins. Plan of Greater New York*, No. 07-cv-1471 (RRM)(LB), 2008 U.S. Dist. LEXIS 78933, 2008 WL 4541014, at *2 (E.D.N.Y. Oct. 7, 2008) (upholding confidentiality designations regarding categories of documents (including "Business Documents," protecting " trade secrets, confidential research, development, or other commercial information")); *Haus v. New York*, No. 03 Civ. 4915 (RWS) (MHD), 2006 U.S. Dist. LEXIS 35606, at *4-5 (S.D.N.Y. May 24, 2006) (upholding designation of document as "confidential" where "critique reports as a whole" were **[*46]** governed by a

protective order). Such courts have been "disinclined to undertake the type of document-by-document weighing process endorsed by plaintiffs, at least in the context of discovery materials, where the public right of access is at a minimum." 2006 U.S. Dist. LEXIS 35606, at *5 (citing *Amodeo II*, 71 F.3d at 1050).

Sealing, on the other hand, prevents the public from viewing documents used by the court in its judicial function. Accordingly, material to be sealed is subject to the strict standards of Local Rule 5(e)(3). Blanket sealing of documents is disfavored in all but the rarest circumstances; and the sealing of designated portions must be"narrowly tailored" and supported by "clear and compelling reasons." D. Conn. L. Civ. R. 5(e)(3).

In reviewing Excalibur's designation of six deposition transcripts as "confidential," the Court notes that the SPO fails to provide an explicit standard to assist the Court in judging challenges to confidentiality designations. The SPO simply states that under its terms, if the parties are unable to resolve an objection to the designation of any discovery material as confidential, "the designating party may move the Court to designate the Discovery **[*47]** Material as Confidential Discovery Material and the burden will be on the designating party to show that the Discovery Material falls within the scope of Paragraph 1." Doc. 24-1, ¶8. Paragraph one lists the range of materials to be governed by the SPO, "including but not limited to documents, deposition testimony, deposition exhibits, answers to interrogatories, responses to requests to admit and other written, recorded or graphic matter ('Discovery Material') produced by or obtained from any party or non-party respondent from whom Discovery Material may be sought (the 'Producing Party') during this litigation." *Id.*, p. 1.

Travelers makes much of the fact that included in the list of materials in the SPO's preamble are "documents" and "deposition testimony" — *but not* deposition *transcripts.* " Doc. 90, p. 2-3. Travelers argues that "depositions and documents are entirely different creatures" because, for instance, a party "can require the admission of a document in its entirety on submission of a portion under Federal Rule of Evidence 106;" but "deposition testimony [must be] designated by page and line." *Id.*, p. 3. Travelers thus asserts that "[a] deposition is not a single document" **[*48]** but rather a "compilation of *testimony* that can cover a broad swath of topics." *Id.* at p. 3 (emphasis added). Travelers concludes that under the SPO, an entire deposition transcript may not be deemed "confidential," only particular "testimony" contained therein. *Id.*

Excalibur, however, focuses on the SPO's language in ¶ 7

with respect to the manner of designating materials as confidential, which states, in part, "[t]he parties shall designate *depositions* or other pretrial testimony confidential by written notice." Doc. 24-1, ¶ 7 (emphasis added). Excalibur surmises that the SPO contemplates and actually encompasses entire "depositions" being designated as confidential.

I find that, absent clear language barring the designation of an entire deposition transcript as confidential, such designation is allowed. Nowhere in the SPO is there a proscription against designating an entire document as "confidential." Moreover, the SPO expressly governs the handling of "documents" and, despite Travelers' contentions otherwise, a deposition transcript is a form of "document." Granted, a transcript may contain *testimony* on several topics and be comprised of various lines and pages; but many documents, [*49] such as business reports, contain sections, headings, and topics. Furthermore, it is not outside the realm of possibility that some documents, including certain transcripts, may be so rife with confidential material as to necessitate a confidential label for their entire contents under the SPO. Lastly, as Excalibur notes, the parties contemplated designation of "depositions" as confidential by written notice. Doc. 24-1, ¶ 7. Such language suggests that, unlike sealing requests, depositions may be labeled as "confidential" in their entirety under the agreement.

As to the substance of the six transcripts at issue, Excalibur has represented that the questioning "went far beyond claims at issue and delved into company policy and strategy which is confidential and proprietary in nature." Doc. 74-10, p. 6. "Additionally, several of the witnesses deposed are at the most senior levels of management, who thereby are privy to much more confidential information of the company than lower lever employees." [24] Doc. 100, p. 5.

Travelers counters by arguing that the company policies at issue are either known to the public or moot because Excalibur "is effectively no longer in business and has no competitors." Doc. 90, p. 4-5. Travelers thus suggests that "one might legitimately ask whether Excalibur could possibly have any 'Confidential Discovery Information' whatsoever." *Id.*, p. 5.

Traveler's main objection, however, remains the designation of the *entire* transcripts as "confidential." In particular, Travelers objects to the "significant burden" arising under the SPO of having to "give advance notice if it seeks to file

Confidential Discovery Material . . . and respond to any motions to seal if it opposes such motions." Doc. 90, p. 6-7 n. 7 (citing Doc. 24-1, ¶ 11). Travelers, however, agreed to the terms of the SPO and cannot now simply avoid those terms after jointly and successfully presenting the agreement to the Court for approval.

The language of the SPO regarding the standard for designating discovery materials as "confidential" is plainly [*51] "good faith." Doc. 24-1, p. 1. The party making the designation must believe "in good faith" that the material contains "personal information or confidential, commercial, proprietary business information or non-public financial data, or implicates the commercial, proprietary or reputational interests of third parties." *Id.*, ¶1. "Good faith," is generally a subjective standard, "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." Black's Law Dictionary (9th ed. 2009). It is an "an elusive idea, taking on different meanings and emphases as [one moves] from one context to another — whether the particular context is supplied by the type of legal system (*e.g.*, common law, civilian, or hybrid), the type of contract (e.g., commercial or consumer), or the nature of the subject matter of the contract (e.g., insurance, employment, sale of goods, financial services, and so on)." Roger Brownsword, *et al.*, "Good Faith in Contract," in Good Faith in Contract: Concept and [*52] Context 1, 3 (Roger Brownsword ed., 1999).

In the present action, there is no evidence that Excalibur failed to act in subjective "good faith" by designating the six deposition transcripts as "confidential." [25] Rather, Excalibur contends that there are numerous passages contained in the depositions which should be designated as "confidential" and that instead of spending the time and money required to parse each passage, they have requested to designate the transcripts in full for discovery purposes. Doc. 74-10, p. 4.

Based on the language of the SPO and the parties' factual representations, I uphold Excalibur's "good faith" designation of the deposition transcripts as "Confidential Discovery Materials" in light of their contents. There is no indication [*53] that designation of an entire document, or in this case

---

[24] According to Excalibur, "Ms. [*50] Barker is the president of the company; Ms. Ferro and Mr. Ranalli are vice-presidents and Ms. Brandt and Ms. Aloisio are assistant vice-presidents." Doc. 100, p. 5.

[25] Granted, there unfortunately remains a certain level of animosity between the parties' counsel that has pervaded the proceedings and papers in this action. *Ad hominems* and general accusations, absent factual proof, do not, however, equate with establishing "bad faith." *See, e.g.,* Doc. 80-1, p. 2 (Travelers accuses Excalibur of "ostensibly" believing it "can cloak obviously non-confidential deposition testimony" as confidential under the SPO).

transcript, violates the terms of the parties' SPO. Excalibur's motion will be granted.

To be clear, Travelers may nonetheless rest assured that by allowing the designation of said discovery materials as "confidential," the Court does not mean to suggest that it will then *seal* those materials in their entirety if Excalibur later presents them for sealing. In the context of sealing judicial documents, all requests must not only be supported by "clear and compelling reasons," they must be "narrowly tailored" to serve those reasons. D. Conn. L. Civ. R. 5(e)(3). As to the deposition transcripts at issue, if Excalibur ultimately requests sealing by the Court, Excalibur must designate *the particular lines and/or passages to be sealed* and establish the particular basis for each sealing. [26] No general description of the passages or bases for sealing will be sufficient. That should limit Traveler's burden in responding to any motion to seal. Put simply, Travelers will be able to contest specific redactions, as opposed to entire transcripts. Then, if the Court grants a sealing motion, only the properly designated passages will be sealed. **[*54]** As always, redaction will continue as the preferred method for sealing in that blanket sealing is overly broad in all but rare circumstances.

**b. Doc. 80**

Finally, with respect to Doc. 80, Travelers has moved to designate certain discovery materials as "Confidential Discovery Materials" on the basis that they "include deposition excerpts and documents **[*55]** produced by Travelers concerning negotiation and settlement of claims brought against its insured, [and thus] contain confidential business information and other information implicating the reputational interests of non-parties." Doc. 80-1, p. 1.

According to Travelers, Excalibur originally accepted these designations but thereafter, objected in an exercise of gamesmanship. Travelers informs the Court:

---

[26] Under the SPO, if Travelers anticipates filing any "confidential discovery materials" with the Court, Excalibur must review those materials in advance and convey to Travelers whether Excalibur intends to request any portions be sealed. Doc. 24-1, ¶ 11. Such a measure would obviate the need for Travelers to file "confidential" documents under seal if the specific portions presented contain no material that Excalibur wishes sealed. Excalibur has acknowledged such protocol in its brief. Doc. 90, p. 3 ("[A]s Excalibur made clear to Travelers, if and when such notice [of anticipated filing] is provided, Excalibur will respond to any request as to whether the portions of the transcript should be filed under seal."). Such communication between the parties will conserve judicial resources and streamline the proceedings in this complex reinsurance matter.

With the exception of the deposition excerpts, Travelers designated all of the materials as "Confidential Discovery Material" almost a year ago. Travelers' designations are discrete and precise. *Defendant Excalibur . . . did not object to these designations.* Only after Travelers objected to Excalibur's blanket confidentiality designation as to every page and every word of the six deposition transcripts of Excalibur's witnesses (all of which cannot possibly be legitimately confidential) did Excalibur object to Travelers' designations. Inconsistently, while Excalibur ostensibly believes that the Stipulated Protective Order can cloak obviously non-confidential deposition testimony, Excalibur quibbles with Travelers' pointed page and line-specific deposition confidentiality designations. We **[*56]** respectfully submit that Excalibur cannot have it both ways.

*Id.*, p. 2 (emphasis added). Needless to say, courts of jurisprudence afford considerably less credibility to objections made mainly for strategic purposes, as opposed to those supported by law. Bearing in mind the contentious climate between opposing counsel, the Court will examine and address both the grounds for "confidentiality" designations and the bases for objection.

**1. Designated Materials**

First, Travelers has designated various documents relating to the business and financial interests of Travelers and the reputational and financial interests of the broker. Doc. 80-1, p. 6. These documents include such material as correspondence, business papers, summary sheets, and status updates, discussing and detailing confidential settlement discussions between Travelers and the broker and/or the broker and its claimants. Travelers summarized the documents, describing five categories of confidential information:

> (1) material revealing the identity of the Broker or the underlying claimants;

> (2) material revealing details about the claims brought against [the] Broker or commercially sensitive information about the Broker's business **[*57]** operations;

> (3) material discussing Travelers' exposure to the Broker's claims, Travelers' reserves, and confidential reinsurance allocation matters;

> (4) material revealing confidential or commercially-sensitive settlement terms and/or settlement discussions between Travelers and the Broker, or between the Broker and one or more of the claimants; and

> (5) policy and placement material issued by various

insurers to the Broker.

*Id.*

Second, pursuant to the SPO, Travelers designated portions of the deposition of Travelers employee Rosemarie D. Robles as confidential discovery materials. [27] These excerpts include "testimony concerning confidential and privileged documents that, if released to the public, could damage the Broker's reputational interests." Doc. 80-1, p. 15. Travelers contends that none of these designations "could . . . have come as a surprise to Excalibur" in that the documents were shared during pre-litigation dealings, subject to the provisions of two confidentiality agreements. [28] *See* Doc. 80-1,p. 4 (citing Doc. 29, 29-1, & 29-2).

## 2. Analysis

Excalibur objects to Travelers' designation of the materials as "confidential" on the grounds that such designations are either an intentional contrivance or simply baseless. In particular, Excalibur argues that "[t]he primary basis for Travelers'[] confidentiality designations [is] its purported concern for the reputational interests of non-parties, *i.e.*, the Broker," but these "concerns are baseless because the identity of the Broker and its involvement in **[*59]** the underlying PA [Personal Accident] LMX Spiral Claims is long and well-known publicly disseminated information." Doc. 98, p. 2. In fact, according to Excalibur, the broker has revealed the identities of the claims and its settlement with its clients in its publicly available 2009 Annual Report. *Id.,* p. 3.

This Court has previously held that the broker's identity will be protected in this case in light of its non-party status and the potential for harm to its reputation and business from the release of its commercially sensitive business information. The privacy interest of non-parties and the protection of

---

[27] "Discovery Material" is defined as "documents, deposition testimony, deposition exhibits, answers to interrogatories, responses to requests to admit **[*58]** and other written, recorded or graphic matter . . . produced by or obtained from any party or non-party respondent from whom Discovery Material may be sought . . . during this litigation." Doc. 24 (preamble).

[28] The confidentiality contracts mandated that "any materials or information provided in the course of placement of this reinsurance and/or inspection . . . shall be kept confidential" by Excalibur. Doc. 29-1, p. 25 (Article 30). In the second confidentiality agreement, Excalibur explicitly promised to maintain the confidentiality of "all data, reports, interpretations, forecasts, agreements and records and all other information" made available to it in connection with the review of Travelers's records. Doc. 80-3, p. 3.

commercially sensitive information are both valid grounds for maintaining confidentiality. *See, e.g., Amodeo II,* 71 F.3d at 1050-51 (""[t]he privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation.") (quoting *Gardner v. Newsday, Inc. (In re Newsday, Inc.),* 895 F.2d 74, 79-80 (2d Cir.)) ; *In re Savitt/Adler Litigation,* 1997 U.S. Dist. LEXIS 23671, 1997 WL 797511, at *3 (non-parties' privacy interests comprise "strong factor weighing against disclosure of their identities"); *Crossman,* 714 F.Supp. 2d at 287 ("there can be (and often are) considerations of personal **[*60]** privacy, public safety, or a business's proprietary information, such as trade secrets or confidential research, that can trump the right of the public to access court records"); *United States v. Ferguson,* No. 3:06CR137 (CFD), 2008 U.S. Dist. LEXIS 745, 2008 WL 113654, at *1 (D.Conn. Jan. 5, 2008) (granting motions to seal documents "on the ground that the accompanying documents contain detailed, confidential business information" that was unrelated to legal issues in the case, and "because the disclosure of this confidential information would cause undue harm to the businesses involved").

Furthermore, the fact that the broker's name may have appeared in the press in relation to a reinsurance spiral does not necessarily negate the broker's right to privacy as to the specifics of its settlement negotiations with its clients. Granted, a protective order is designed to protect information that is *not* publicly available. *See, e.g, Drape v. UPS, Inc.,* No. 12-2172 KHV/DJW, 2012 U.S. Dist. LEXIS 148256, 2012 WL 4933319, at *6 (D.Kan. Oct. 16, 2012). Difficulties, however, arise when publicly available information is related to preserved confidential information, as in the present case. Here the broker was involved in a business matter covered **[*61]** by the press, but in such a case, the Court may look at the intentions of the parties to preserve particular information as confidential (*e.g.*, the substance of settlement negotiations). *See, e.g., United States v. Mahaffy,* 693 F.3d 113, (2d Cir. 2012)("a business's information may be confidential if the business exclusively possesses the information and considers it to be, and treats it as, confidential") (citing *Carpenter v. United States,* 484 U.S. 19, 26-27, 108 S. Ct. 316, 98 L. Ed. 2d 275 (1987)). Courts also favor redactions of personal identifiers — as implemented by Travelers — rather than designations of entire documents.

Travelers represents that the terms of its settlement with the broker require[d] that Travelers keep all matters relating to the negotiation of the settlement confidential." Doc. 104, p. 6. The broker thus actively attempted to shield the substance of its settlement negotiations from public access.

Absent additional evidence, the Court lacks sufficient information to make a final determination as to what, if any,

information relating to the broker in the "Confidential Discovery Material" has actually been made available to the public. For example, although press articles may include the name [*62] of the broker with respect to the spiral claims, those articles may also identify other brokers involved in the same crises. Therefore, the articles may not, on their own, identify this particular broker as the one discussed in the present litigation. In addition, the alleged articles likely do not include the underlying confidential discussions that occurred prior to the broker's settlement with Travelers and/or its other claimants.

Similarly, the broker's annual report, although distributed to the broker's investors, may not divulge all of the pertinent facts underlying settlement (*e.g.*, the broker's settlement discussions and private communications with Travelers and other claimants). Such a report, by its very design, details *outcomes* — final settlement agreements and the existence of lawsuits — as opposed to private discussions, factual investigations, and analyses leading to such resolutions. The broker's privacy as to the types of materials Travelers seeks to protect is not therefore obliterated by the publication of its name by the press nor by the issuance of its annual report to investors.

At this time, the Court cannot find that all information with respect to the broker in [*63] Travelers' designated confidential materials has in fact been "revealed to the public." [29] In the absence of any demonstration by Excalibur of a need to reveal the broker's identity, or to delve into the specifics of the broker's settlement negotiations, the designated materials fall within the terms of the SPO. [30] These materials include "confidential, commercial, proprietary business information or non-public financial data." Doc. 24-1, p. As Travelers suggests, to facilitate settlement negotiations, cedants must be allowed to "share

confidential materials without fear that the information will end up in the public domain." Doc. 80-1, p. 12. It follows that the settlement negotiations should also be shielded. [31] *See, e.g., Palmieri*, 779 F.2d at 865.

Surprisingly, Excalibur also objects to Travelers' designations because they pertain to certain *entire* documents. Excalibur states that "Travelers improperly designated *every page* of every attachment as confidential." Doc. 98, p. 5 (emphasis added). [32] Yet, conversely, with respect to Travelers' designation of *particular passages* of documents as confidential, Excalibur complains that "[i]f Travelers had chosen to [*65] designate the entire transcript as confidential, Excalibur would have accepted such designation;" but because Travelers has made "a line by line designation, the confidentiality of those designations must be supportable." *Id.*, p. 6-7. Taken in totality, such inconsistent arguments are less than persuasive, especially when viewed in relation to Excalibur's prior motion to designate entire deposition transcripts, Doc. 74, as discussed *supra*.

Ultimately, Excalibur [*66] withdraws its objections to Travelers' designation of excerpts of the Robles deposition transcript, choosing instead to preserve only its objection to "the blanket designation of "any reference to the Broker's name or the name of the underlying claimants." Doc. 98, p. 7-8. This objection, however, directly contradicts one of the bases upon which Excalibur itself has suggested that six deposition transcripts should be considered "confidential" — the identity of the broker. *See* Doc. 74-10, p. 5 (Excalibur has "a good faith basis for designating each of the depositions as confidential as each 'includes personal information, or confidential, commercial, proprietary business information or

[29] Taken to its logical conclusion, Excalibur's arguments would suggest that no company that had ever had its dealings covered in the press or had ever released an annual report to its investors could maintain privacy in its sensitive business information or settlement discussions.

Also, as Travelers points out, "Excalibur cannot credibly maintain that it may designate six entire deposition transcripts as 'Confidential' irrespective of their [*64] contents while at the same time contending that information in the public domain does not qualify as 'Confidential' under the SPO." Doc. 104, p. 5 n.5.

[30] At this time, Excalibur has made no showing that revelation of the broker's sensitive business information and/or settlement negotiations is relevant and necessary for Excalibur to prepare its case for trial. Excalibur has demonstrated no resulting unfairness from maintaining the broker's confidentiality.

[31] As to the insurance policy and placement materials issued by other insurers to the broker, such materials contain third-party commercial and proprietary business information that need not be disclosed. These confidential materials clearly relate to non-parties whose privacy need not be pierced for this action to proceed.

[32] Travelers clarified that Excalibur incorrectly accused Travelers of designating every page of documents at issue:

Excalibur claims that Travelers designated "every page" of a 185-page document. . . as confidential. In reality, Travelers only designated portions of this document as confidential — a fact that Travelers plainly indicated in its Motion. Excalibur also claims that "Travelers improperly designated every page of every attachment as confidential," but fails to cite a single document in support of this bald assertion. *See* Opp. at 5. Had Excalibur bothered to review the documents subject to Travelers' Motion, it would have discovered that attachments to many of those documents were not designated confidential.

Doc. 104, p. 3.

non-public financial data," including the very "identity of the Broker in each of the depositions."). [33]

In sum, the remaining controversy over the identity of the broker seems more an arguing point between the parties than a pressing concern of Excalibur to reveal the broker's identity. Excalibur [*67] has offered no compelling reason to override the privacy interest of the broker in its settlement negotiations with Travelers and other claimants. Excalibur obviously knows the broker's identity so the information has only been shielded from the public during discovery. There is no apparent prejudice to Excalibur from protecting the privacy of the non-party broker in the designated discovery materials. *See, e.g., John Does I-VI v. Yogi*, 110 F.R.D. 629, 633 (D.D.C. 1986) ("Since discovery is had for the purposes of preparing for trial, a court may issue an order to protect potentially embarrassing information about third parties from being released before it is deemed necessary for use at trial.") (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34-35, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984)).

Finally, perhaps in an effort to argue waiver, Excalibur criticizes Travelers for its lack consistency in its treatment of the documents at issue, first designating them as "confidential" and then producing them "without designating them as confidential." Doc. 98, p. 6. Travelers contends that such disclosures were inadvertent. Excalibur insists that such inconsistency has been by "deliberate decision," *id.*, despite Travelers' [*68] notice of inadvertent omissions to Excalibur, including by letter, Doc. 104, p.7. [34] Although charging both parties to make their "confidential" designations consistently, the Court accepts Travelers' representation that, in the process of producing many documents, it inadvertently failed to stamp all designated pages as "confidential."

---

[33] It would seem that, as Travelers contends, "the appearance of the broker's name in Excalibur's documents makes those documents confidential, but its appearance in Travelers' documents does not." Doc. 104, p. 6.

[34] Travelers' counsel, Mitchell R. Harris, included in his Declaration:

By letter dated March 12, 2012, Travelers designated a number of documents it produced to Excalibur through discovery as "Confidential Discovery Material" under the parties' Stipulated Protective Order (ECF No. 24). To denote these designations, Travelers affixed a "Confidential" stamp to the bottom of each document and advised that it was designating 'each and every copy of that document as 'Confidential Discovery Material'; *if any such copy lacks a 'Confidential' stamp, the omission is inadvertent and the copy should be accorded confidential treatment.*"

Doc. 80-2 (Harris Declaration), at ¶ 3 (emphasis added).

Based on the foregoing analysis, the Court will uphold Travelers' designated passages of documents and the Robles deposition transcript as "confidential" over Excalibur's objections. [*69] The motion [Doc. 80] will be granted.

## IV. CONCLUSION

For all of the foregoing reason, the Court hereby GRANTS the following eight motions to seal: Doc. 45 (Travelers' Motion to Seal Portions of Excalibur's Motion to Compel [Doc. 42 & 43] and supporting exhibits [Doc. 44]); Doc. 52 (Travelers' Motion to Seal Portions of Exhibit 1 to Travelers' Opposition to Excalibur's Motion to Compel [Doc. 51-1]); Doc. 58 (Excalibur's Motion to Seal Exhibits 1, 3, 4, & 7 to Declaration of Angela Aloisio); Doc. 61 (Travelers' Motion to Seal Exhibits 1, 3, 4 & 7 to Declaration of Angela Aloisio); Doc. 77 (Travelers' Motion to Seal Portions of Excalibur's Memorandum in Support of its Motion to Compel [Doc. 75] and exhibits attached to Declaration of Raymond S. Mastrangelo); Doc. 84 (Travelers' Motion to Seal Unredacted Memorandum of Law in Support of Motion for Pre-Pleading Security and Exhibit 1 to that Memorandum, an excerpt from Diane Ferro's deposition); Doc. 91 (Travelers' Motion to Seal Unredacted Memorandum of Law in Opposition to Excalibur's Motion to Designate Discovery Material as Confidential and Exhibits 1 & 2 to that Memorandum); and Doc. 101 (Travelers' Motion to Seal Portions of February [*70] 26, 2013 Hearing Transcript).

In addition, the Court upholds the "confidential" designation of discovery materials in: Doc. 74 ( Excalibur's motion to designate as "confidential" the deposition transcripts of six witnesses: Carol Barnhardt, Steve Ranalli, Ann Brandt, Kathy Barker, Diane Ferro, and Angela Aloisio) and Doc. 80 (Travelers' motion to designate as confidential certain discovery materials, including documents and deposition excerpts of the testimony of Rosemarie Robles). These two motions are GRANTED.

Lastly, having upheld Excalibur's designation of six deposition transcripts as "confidential," the Court reminds Excalibur that it has neither filed a motion to seal nor a memorandum in support of sealing the deposition transcript excerpts that Travelers has filed with the Court [Doc. 84 & 90]. The Court herein has *provisionally* sealed the excerpts based on Excalibur's designation of them as "confidential." However, unless Excalibur files and serves its own motion to seal and supporting memorandum by **August 27, 2013**, the excerpts will be unsealed. Excalibur is reminded that "compelling reasons" are required for sealing and redaction is favored as the appropriate means of tailoring [*71] such a sealing request. D. Conn. L. Civ. R. 5(e)(3).

2013 U.S. Dist. LEXIS 110400, *71

It is SO ORDERED.

Dated: New Haven, Connecticut

August 5, 2013

*/s/ Charles S. Haight, Jr.*

CHARLES S. HAIGHT, JR.

Senior United States District Judge

---

**End of Document**

# Travelers Indem. Co. v. Excalibur Reinsurance Corp.

United States District Court for the District of Connecticut

May 10, 2012, Decided; May 10, 2012, Filed

3:11 - CV- 1209 (CSH)

**Reporter**

2012 U.S. Dist. LEXIS 200282 *; 2012 WL 13029602

THE TRAVELERS INDEMNITY COMPANY as successor in interest to GULF INSURANCE COMPANY, Plaintiff, v. EXCALIBUR REINSURANCE CORPORATION f/k/a PMA CAPITAL INSURANCE COMPANY, Defendant.

**Subsequent History:** Motion granted by Travelers Indem. Co. v. Excalibur Reinsurance Corp., 2013 U.S. Dist. LEXIS 13716 (D. Conn., Feb. 1, 2013)

**Counsel:** **[*1]** For Travelers Indemnity Company, Successor Gulf Ins Co, Plaintiff: Meredith A Long, Mitchell R. Harris, LEAD ATTORNEYS, Day Pitney LLP-Trmbl St Htfd-CT, Hartford, CT USA; Thomas O. Farrish, LEAD ATTORNEY, Day Pitney LLP-Htfd-CT, Hartford, CT USA.

For Excalibur Reinsurance Corporation, formerly known as PMA Capital Ins Co, Defendant: Ann E Halden, Michael H Goldstein, LEAD ATTORNEYS, Mound, Cotton, Wollan & Greengrass, New York, NY USA; Joshua Laurence Milrad, LEAD ATTORNEY, Goldberg Segalla LLP - CT, Hartford, CT USA; Raymond S. Mastrangelo, LEAD ATTORNEY, Mound Cotton Wollan & Greengrass -GC NY, Garden City, NY USA.

For Excalibur Reinsurance Corporation, Counter Claimant: Joshua Laurence Milrad, LEAD ATTORNEY, Goldberg Segalla LLP - CT, Hartford, CT USA.

For Travelers Indemnity Company, Counter Defendant: Meredith A Long, LEAD ATTORNEY, Mitchell R. Harris, Day Pitney LLP-Trmbl St Htfd-CT, Hartford, CT USA; Thomas O. Farrish, LEAD ATTORNEY, Day Pitney LLP-Htfd-CT, Hartford, CT USA.

For Excalibur Reinsurance Corporation, Counter Claimant: Ann E Halden, Michael H Goldstein, LEAD ATTORNEYS, Mound, Cotton, Wollan & Greengrass, New York, NY USA; Joshua Laurence Milrad, Goldberg **[*2]** Segalla LLP - CT, Hartford, CT USA; Raymond S. Mastrangelo, LEAD ATTORNEY, Mound Cotton Wollan & Greengrass -GC NY, Garden City, NY USA.

For Travelers Indemnity Company, Counter Defendant: Meredith A Long, Mitchell R. Harris, LEAD ATTORNEYS,

Day Pitney LLP-Trmbl St Htfd-CT, Hartford, CT USA; Thomas O. Farrish, LEAD ATTORNEY, Day Pitney LLP-Htfd-CT, Hartford, CT USA.

**Judges:** Charles S. Haight, Jr., Senior United States District Judge.

**Opinion by:** Charles S. Haight, Jr.

# Opinion

## RULING ON PLAINTIFF'S MOTION TO SEAL

**HAIGHT, Senior District Judge:**

## I. INTRODUCTION

Plaintiff, the Travelers Indemnity Company ("Travelers") commenced the present action for breach of contract as successor in interest to Gulf Insurance Company("Gulf"), which entered into a reinsurance contract with defendant Excalibur Reinsurance Company ("Excalibur"), formerly known as PMA Capital Insurance Company. Travelers has alleged that "Excalibur failed and refused to pay $1,573,189.58 worth of valid reinsurance claims under the contract, thereby breaching it." Doc. #1, p. 1.

In its prayer for relief, Travelers requests compensatory damages arising out of Excalibur's breach of contract and both pre-judgment and post-judgment interest. *Id.*, ¶ 47 (ii). In **[*3]** an effort to secure such damages, Travelers filed with this Court an application for prejudgment remedy ("PJR Application"). Doc. #26. In support of the application, Travelers contends that "there is probable cause that a judgment in the amount sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account all recoveries made to date, any known defenses, counterclaims or set-offs, will be rendered in this matter in favor of Travelers." *Id.*, ¶ 3. Therefore, Travelers seeks an

order to secure the sum of $1,573,189.58 by attaching the real or personal property of Excalibur within the state of Connecticut and/or garnishing the real or personal property of Excalibur in the custody or control of third persons, including debts owed to Excalibur by natural persons and corporations, within the state of Connecticut. *Id.*, ¶ 4 (a), (b).

On February 29, 2012, the parties jointly moved the Court to approve their proffered "Stipulated Protective Order." Doc. #24. Upon review, the Court entered the parties' protective order, as written, on March 1, 2012. Doc. #35. Within that order, "confidential discovery material" is defined as material that "a party believes, [*4] in good faith, includes personal information or confidential, commercial, proprietary business information or non-public financial data, or implicates the commercial, proprietary or reputational interests of third parties." Doc. #24-1, ¶ 1. Moreover, if any party decides to file "confidential discovery material" with the Court, pursuant to the protective order, that party shall make the filing "under seal in accordance with the procedure set forth in the District of Connecticut Local Rule 5(e) and accompanied by a motion to seal from the requesting party." *Id.*, ¶ 11.

On April 3, 2012, in conjunction with Excalibur's opposition memorandum to Travelers's PJR Application. (Doc. 35), and under Local Rule of Civil Procedure 5(e)(3) and (e)(4), Excalibur moved the Court to seal various exhibits appended to the Declaration of Raymond S. Mastrangelo, "an attorney with Mound Cotton Wollan and Greengrass, attorneys for defendant Excalibur."[1] Doc. #35-3, ¶ 1; *see also* Doc. #34. The exhibits Excalibur sought to seal included the following:

    (1) Exhibit 2, letter dated July 29, 2011;
    (2) Exhibit 3, a December 22, 2006 report by a law firm;
    (3) Exhibit 4, language contained in a 1997 insurance policy;

    (4) Exhibit 5, [*5] language contained in a 1998 insurance policy;
    (5) Exhibit 7, letter dated April 1, 2009.

Doc. #34, p. 1; Doc. #35-3, Doc. #36. As the basis for the motion, defendant simply stated that plaintiff designated these documents as "confidential documents" and requested that defendant file them under seal. Doc. #34, p. 2. Defendant filed no memorandum of law or supporting documents in conjunction with its motion and delineated no particular portions of the documents to be sealed (*i.e.*, no proposed redactions).

In its Ruling (Doc. #38) filed on April 13, 2012, familiarity

with which is assumed, the Court denied without prejudice defendant's Motion to File Documents Under Seal (Doc. #34) on the grounds that defendant failed to make the requisite particularized showing of clear and compelling reasons to seal the documents or, as is most often appropriate, to seal specific, denoted portions thereof. *See* D. Conn. L. Civ. R. 5(e)(3). To allow defendant sufficient time to amend its motion - to make the requisite detailed and narrowly tailored request - to seal the documents at issue, the Court temporarily sealed Exhibits 2, 3, 4, 5, and 7 for fourteen (14) days following the entry of the Order.

## II. PENDING MOTION

Pending before [*6] the Court is Plaintiff's Motion to Seal the five documents specified in defendant's previously filed Motion to Seal (Doc. #34). Doc. #40. As set forth *supra*, these documents are comprised of Exhibits 2, 3, 4, 5, and 7 to the declaration of Raymond S. Mastrangelo, which was filed by defendant in support of its opposition to Traveler's PJR Application. Doc. #35-3. Plaintiff brings this motion pursuant to Federal Rule of Civil Procedure 5.2(d) and Local Rule of Civil Procedure 5(e) and has included a supporting memorandum.

Plaintiff explained that under the parties' "Stipulated Protective Order, the parties agreed that if one of them wished to file any document that the other party deemed to be 'Confidential Discovery Material,' the filing party would file the document provisionally under seal, and the party that deemed the document to be 'Confidential Discovery Material' would file a memorandum of law explaining why the document should remain under seal." Doc. #40, p. 1 (citing Doc. #24, ¶ 11). Because Travelers designated the documents as "confidential," Excalibur filed the original motion to seal on April 3, 2012, and contemplated that Travelers would file the supporting memorandum of law. Doc. #40, p. 2. On April 2, 2012, [*7] Travelers was notified by Excalibur of its impending motion to seal. *Id.* Travelers asserts that it was in the process of preparing the supporting memorandum, but had not yet completed or filed it, when the Court ruled on defendant's motion to seal on April 13, 2012.[2] Doc. #40, p. 2.

---

[1] On April 11, 2012, Attorney Raymond S. Mastrangelo entered an appearance on behalf of defendant in this action. Doc. #37.

[2] The Court acknowledges that plaintiff regards the Exhibits at issue as "confidential" under the Stipulated Protective Order and commends the parties in cooperating to preserve their confidentiality pursuant to that order. However, as stated in the Court's previous Ruling, the fact that the parties stipulated to a court-approved protective order is not dispositive on the issue of whether "confidential materials" should be sealed. *See* Doc. #38 (Ruling, filed 4/13/2012), p. 5-6.

Travelers presently moves the Court to seal the documents at issue on the basis that they include "(a) privileged communications between non-parties and their lawyers; (b) details of confidential settlement discussions in matters that may not yet be fully resolved; and (c) information that implicates the reputational interests of third parties who are not before the court." *Id.*, p. 2. In sum, Travelers maintains that "[t]he protection of non-parties' attorney-client privileges and reputational interests, and the protection of confidential settlement communications, constitute clear and compelling reasons to seal the documents." *Id.* For the reasons set forth below, the Court shall grant the motion in part and deny it in part.

## III. DISCUSSION

### A. Sealing in General

In its previous Ruling on defendant's motion to seal, the Court set forth the relevant law with respect to sealing. In sum, there is a strong presumption [*8] of public access to judicial documents and proceedings that is rooted in both the common law and the First Amendment. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597-98, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978). The public's right of access to court documents may, however, be surmounted by a party's showing that sealing the documents will further other substantial interests, such as to preserve higher values. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 123 (2d Cir.2006)); *In re New York Times Co.*, 828 F.2d 110, 114-16 (2d Cir.1987), *cert. denied*, 485 U.S. 977, 108 S. Ct. 1272, 99 L. Ed. 2d 483 (1988).

Consequently, court documents may only be sealed if "specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 13-14, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986) ("*Press Enterprise II* ") (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984) ("*Press-Enterprise I* ")). *See also, e.g., In re Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir. 1994); Sec. & Exch. Comm'n v. The Street.com, 273 F.3d 222, 232 (2d Cir.2001).

In this District, Local Rule of Civil Procedure 5(e)(3) conforms with the common law on sealing, dictating that a court may only grant a request to seal documents when said request is supported by "clear and compelling reasons" and "narrowly tailored to serve those reasons." D. Conn. L. Civ.

R. 5(e)(3).[3] With this legal framework regarding sealing in mind, the Court turns to the various documents at issue and plaintiff's proffered reasons for sealing.

### B. Documents at Issue

Plaintiff contends that the five documents at issue contain attorney-client privileged communications, attorney work product, sensitive business information, and descriptions of highly-confidential settlement [*10] negotiations. Doc. #41, p. 2. By way of factual background, all of these documents "relate to a series of claims made under four insurance policies that Travelers's predecessor, Gulf, issued to an insurance and reinsurance broker." *Id.* The claims allegedly "arose after several of the broker's insurance company clients lodged claims against it for losses that they allegedly sustained as a result of so-called "reinsurance spirals." *Id.* According to Travelers, the claims included "allegations of fraud" and other "wrongdoing" and thus "implicated the broker's reputational interests." *Id.*

In addition to the four excess insurance policies Gulf issued to the broker, other members of the Travelers family of companies (the "Affiliates") issued primary policies to the broker, as did a group of London-based entities (the "Underwriters"). *Id.* The broker put Gulf (now Travelers) on notice of its insurance company clients' claims and similarly notified the Affiliates and Underwriters. *Id.*

_____

[3] Local Rule of Civil Procedure 5(e), captioned "Sealed Proceedings and Documents," provides at subsection 3, in relevant part:

> Every document used by parties moving for or opposing an adjudication by the Court, other than trial or hearing exhibits, shall be filed with the Court. No [*9] judicial document shall be filed under seal, except upon entry of an order of the Court either acting *sua sponte* or specifically granting a request to seal that document. Any such order sealing a judicial document shall include *particularized findings demonstrating that sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons*. A statute mandating or permitting the non-disclosure of a class of documents (*e.g.*, personnel files, health care records, or records of administrative proceedings) provides sufficient authority to support an order sealing such documents. . . . No document shall be sealed merely by stipulation of the parties. A confidentiality order or protective order entered by the Court to govern discovery shall not qualify as an order to seal documents for purposes of this rule. Any document filed under seal in the absence of a Court order to seal it is subject to unsealing without prior notice to the parties.

D. Conn. L. Civ. R. 5(e)(3) (emphasis added).

The Affiliates and Underwriters then hired the law firm of Mayer, Brown, Rowe and Maw ("Mayer Brown") to protect the interests of the primary layer insurers. *Id.*, p. 3. Mayer Brown provided legal advice to the Affiliates [*11] and Underwriters regarding the broker's coverage claims and participated in settlement negotiations with the broker. *Id.* As primary insurers, the Affiliates and Underwriters updated the excess insurers on the status of the underlying claims and thus Travelers received a copy of a Mayer Brown status report, dated December 22, 2006 (referenced herein as Exhibit 3). *Id.*

Travelers and the Affiliates ultimately entered into several settlement agreements to resolve the broker's coverage claims. *Id.* The final agreement was a confidential settlement agreement between the broker on one side and Travelers and the Affiliates on the other side, entered on February 17, 2010. *Id.* Travelers is unaware whether all of the Underwriters have reached similar agreements. *Id.*

Travelers notified Excalibur of the claims against the broker in early 2007 and attached to the claim notice a copy of Mayer Brown's December 22, 2006, status report. *Id.* Travelers thereafter provided Excalibur with a number of status reports throughout 2008 and 2009. *Id.* After the 2010 settlement with the broker, Travelers sought reimbursement from its reinsurers, including Excalibur. *Id.*, p. 3-4. Travelers states that Excalibur refused to pay [*12] the vast majority of the amounts and asked for an opportunity to review documents in Travelers's possession regarding the settlement and the underlying claims. *Id.*, p. 4. In response, Travelers agreed to turn over said documents to Excalibur on two occasions, provided that Excalibur agreed to sign a confidentiality agreement pledging to keep the documents confidential.[4] *Id.* Later, Travelers again provided documents to Excalibur through discovery in this litigation. *Id.*

**1. Exhibit 2**

Plaintiff notes that "Exhibit 2 is a copy of a letter dated July 29, 2011, addressed to Travelers from Excalibur's business manager, Armour Risk Management, Inc., regarding Excalibur's review of [confidential] files maintained by Travelers in connection with the broker's claims." Doc. #41, p. 4; Doc. #36, p. 2-5. The letter describes the legal advice that the law firm of Mayer Brown provided to the Affiliates and Underwriters regarding applicable policies' years, contains details of Travelers's confidential settlement

negotiations with the broker, and refers to legal advice by various Queen's Counsel to Travelers regarding the broker's claim.

The attorney-client privilege is "the oldest of the privileges for confidential [*13] communications known to the common law." *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)). The privilege protects "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance," *Fisher v. United States*, 425 U.S. 391, 403, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976 ), and "attaches not to the information but to the communication of the information," *United States v. Cunningham*, 672 F.2d 1064, 1073 n. 8 (2d Cir.1982).[5] The purpose of the attorney-client privilege is to foster open communication between attorneys and their clients, so that fully informed legal advice may be obtained. *Jacobs*, 117 F.3d at 87.

Furthermore, it is well-settled within the Second Circuit that the attorney-client privilege may be a sufficiently compelling reason to defeat the public's right of access to judicial documents. *See, e.g., Lugosch*, 435 F.3d at 125 (recognizing attorney-client privilege as potential "compelling reason" to seal documents, especially where party asserting the privilege is not the party who seeks [*14] to admit such documents into the record). *See also Diversified Group, Inc. v. Daugerdas*, 217 F.R.D. 152, 160 (S.D.N.Y. 2003) ("It is undeniable that the public has a significant interest in preserving the confidentiality of attorney-client communications. 'Indeed, this is precisely the kind of countervailing concern that is capable of overriding the general preference for public access to judicial records.'") (quoting *Siedle v. Putnam Invs.*, 147 F.3d 7[, 11] (1st Cir.1998)).

Upon review of Exhibit 2, the Court finds that the attorney-client privilege attaches to various portions of the letter. Although authored by the business manager of Excalibur, rather than attorneys Mayer Brown, the letter recounts confidential legal advice given to Travelers's Affiliates and

---

[4] Travelers explains that "the concern for the confidentiality of Travelers' documents that is reflected in Excalibur's motion [Doc. #34] is simply a discharge of Excalibur's obligations under this [confidentiality] agreement." Doc. #41, p. 4 n.4.

---

[5] The Second Circuit has established that the attorney-client privilege attaches:

(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived . . . .

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1036 (2d Cir. 1984) (citations omitted).

the Underwriters. Doc. #36 (sealed), p. 3. Most importantly, from that legal advice, the clients' confidential communications to counsel are either revealed and/or may be inferred.[6] Lastly, paragraph one on page two includes both discussion of Travelers's confidential settlement negotiations with the broker and references to legal advice Travelers requested from Queen's Counsel regarding the broker's claim. *Id.*

Travelers avers that it provided Excalibur's business manager with access to the information set forth in Exhibit 2 pursuant to Excalibur's **[*15]** agreement to, and signature upon, a confidentiality agreement in which Excalibur pledged to maintain the documents it received from Travelers as "confidential." *See Geer v. Gilman Corp.*, No. 3:06 CV 889(JBA), 2007 WL 1423752, at *2 (D.Conn. Feb. 12, 2007) ("a disclosure [of attorney-client communications] to a third party does not waive the privilege unless such disclosure is inconsistent with the 'maintenance of secrecy.'") (quoting *Trudeau v. N.Y. State Consumer Prot. Bd.*, 237 F.R.D. 325, 338-39 (N.D.N.Y.2006)). Given Travelers's requirement that Excalibur maintain secrecy as to these documents, the Court finds that confidentiality was not waived when Travelers shared them with Excalibur.

Furthermore, the Affiliates' disclosure of their discussions with and legal advice from Mayer Brown to Travelers did not waive the Affiliates's attorney-client privilege with respect to such communications because the Affiliates and Travelers shared a "common interest" with respect to the broker's claims. *See Ryan v. Nat'l Union Fire Ins. Co.*, No. 3:03-cv-644 (CFD), 2006 Dist. LEXIS 7366, at *16 n.5 (D. Conn. Feb. 28, 2006) ("common interest doctrine states that the parties with a shared interest in actual or potential litigation against a common adversary may share privileged information without impliedly waiving the attorney-client privilege").[7] The attorney-client privilege comprises a

---

[6] *See Six Grand Jury Witnesses*, 979 F.2d 939, 944 (2d Cir.1992) (attorney-client privilege protects "only legal advice that discloses confidential information given to the lawyer by the client").

[7] As Judge Droney of this District explained in *Ryan v. Nat'l Union Fire Ins. Co.*:

The common interest doctrine states that "parties with a shared interest in actual or potential litigation against a common adversary may share privileged information" without impliedly waiving the attorney-client privilege. 6 Moore's Federal Practice 3d § 26.49[5](Matthew Bender 3d ed.). This is an exception to the general rule that the privilege is waived when privileged information is disclosed to a third party. *Id.*

2006 Dist. LEXIS 7366, at *16 n.5

compelling **[*16]** reason to seal passages which discuss legal advice and thereby reveal confidential client communications. *See* Doc. #36, p. 2, para.2 to p. 3, para. 1.

Furthermore, the substance of the letter contains references to underlying facts of settlement negotiations between Travelers and the broker. The Second Circuit has held that there exists no established presumption of access to confidential settlement discussions and documents. *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 143 (2d Cir. 2004) (citing *United States v. Glens Falls Newspapers, Inc.*, 160 F.3d 853, 857 (2d Cir. 1998)) (no presumptive right to access settlement discussions and documents). Rather, where the parties to the agreement maintain its confidentiality, absent a "showing of public interest in the disclosure" of the agreement's terms, the parties' "reasons for maintaining the confidentiality [may] easily overcome the markedly weak presumption of access." *Gambale*, 377 F.3d at 144.

 **[*17]** Here, Travelers avers that the settlement agreement it entered with the broker was "confidential" and that such confidentiality protected not only the reputational and financial interests of the parties to the settlement, but prevented "a chilling effect on future settlement negotiations" between Travelers and its insureds. Doc. #41, p. 7. Moreover, Travelers argues that "[p]ublic disclosure [of such negotiations] . . . would reveal highly-sensitive information about the strategies used by Travelers, the Affiliates, the Underwriters and the broker to assess and resolve high dollar claims brought against them." *Id.*, p. 8. Travelers maintains that such strategies may be viewed, in and of themselves, as "sensitive business information" or "business propriety information." *Id.*, p. 10. The Court need not, however, address the sensitive nature of such strategies separately because confidential settlement negotiations are, under such circumstances, properly subject to sealing.

As the Second Circuit stated in *Glens Falls*, courts have the "power to prevent access to settlement negotiations when necessary to encourage the amicable resolution of disputes[,]" particularly "[w]here a case is complex and expensive, and resolution of the case will benefit the public." 160 F.3d at 858 (quoting *City of Hartford v. Chase*, 942 F.2d 130, 135 (2d Cir. 1991)).[8] Portions of Exhibit 2 that discuss settlement

---

[8] As the Second Circuit explained in *Glens Falls*:

Few cases would ever be settled if the press or public were in attendance at a settlement conference or privy to settlement proposals. A settlement conference is an opportunity for the parties . . . to have a frank discussion about the value of avoiding a trial. During these colloquies the parties are often called upon to evaluate both the strengths and weaknesses of their respective cases.

negotiations may thus be protected from public [*18] access as "confidential."[9]

Despite finding that compelling reasons exist for sealing various language in Exhibit 2, the Court finds that such reasons do not compel sealing the entire letter. Put simply, plaintiff's request to seal the entire letter is overly broad - *i.e.*, not narrowly tailored - to achieve the necessary ends of protecting privileged and/or confidential information. Not every paragraph of the letter references attorney-client communications or settlement negotiations. For example, most of the introductory paragraph and all of the closing paragraph are general in nature and not subject to protection. Moreover, the second half of the letter is comprised of a list of documents of which Excalibur's business manager requests copies. Although the titles and dates of the documents [*19] are given, the actual contents are not revealed. Absent a compelling reason to seal the mere existence of such documents on the list, the Court declines to seal them in their entirety. Rather, in recognition of the Court's duty to "make its own redactions, supported by specific findings, after a careful review of all claims for and against access," *In re New York Times Co.*, 834 F.2d 1152, 1154 (2d Cir.1987), *cert. denied*, 485 U.S. 977, 108 S. Ct. 1272, 99 L. Ed. 2d 483 (1988), the Court hereby grants in part and denies in part plaintiff's motion to seal Exhibit 2.[10] The Court thus orders redaction of the following portions, thereby unsealing the remainder, of the letter.

Material to be redacted includes: On page one, paragraph one, line two of the letter, the court seals the name preceding the words "claim file," on the grounds that the identity of the non-party broker whose claim file is at the core of the settlement negotiations should be preserved in the interest of privacy and as part of said confidential negotiations. *See also, infra,* Part III.B.3. Page one, paragraph two is sealed in its entirety as it references numerous dates, background facts, and particular negotiations between Travelers and the broker. Page two, paragraph one is sealed as discussing the legal advice of Mayer [*20] Brown to the Affiliates and of two Queen's Counsel to Travelers, both of which either imply or outright reveal their clients' confidential communications. The

remainder of the letter (page two, paragraph two through the end of page three) is a list of documents Excalibur requested to review in regard to the confidential settlement negotiations. The Court hereby redacts all proper names from that document list, thereby protecting the identities of the negotiating parties, and their employees and attorneys, from general disclosure. The remainder of the document, including the last entire sentence, is hereby unsealed.

## 2. Exhibit 3

As described *supra*, Exhibit 3 is a status report dated December 22, 2006 from the law firm of Mayer Brown to the Affiliates and Underwriters. Doc. #36-1, p. 2-32; *see also* Doc. #41, p. 5. Travelers informs the Court that the status report evaluates the claims against the broker by its insurance company clients and the viability of corresponding claims for coverage made by the broker under policies issued by Travelers and other insurers. Doc. #41, p. 5. The report also contains legal advice the Affiliates and Underwriters requested on various related topics. *Id.* [*21] Travelers further indicates that "[a] separate document attached to the report contains a detailed analysis of the claims lodged against the broker" prepared by the broker's counsel, Slaughter & May. *Id.* According to Travelers, that document "was shared with the Affiliates and Underwriters under circumstances that preserved its privileged character." *Id.* Travelers then conveyed the report to Excalibur in early 2007 as an attachment to its claim notice to Excalibur.[11]

Reviewing the nature and substance of Exhibit 3, the Court finds that it indeed contains advice, including evaluations of the broker's claims, by legal counsel Mayer Brown to the Affiliates and Underwriters. From that advice, one can easily infer the clients' confidential communications. Moreover, the document possesses a heading of "Privileged and Confidential - Report to Underwriters," evidencing the intent of counsel, on behalf of their clients, to preserve the confidentiality of such communications. The attached document, which is a separate report and appears to be the work product of attorneys Slaughter and May, similarly contains a "Privileged and Confidential" designation, which appears [*22] at the top of each page. Doc. #36-1, p. 25-32 ("Appendix"). The substance and language of that document also provides legal evaluation of the broker's clients' claims and was produced

---

[9] Travelers has indicated that disclosure of the settlement negotiations described in Exhibit 2 might be of particular harm to the Underwriters, who "may have yet to settle with the broker." Doc. #41, p. 8-9.

[10] *See also United States v. Amodeo*, 44 F.3d 141, 147 (2d Cir. 1995).

---

160 F.3d at 858. The court thus "conclude[d] that the presumption of access to settlement negotiations, draft agreements, and conference statements is negligible to nonexistent." *Id.*

---

[11] Travelers argues that it did not waive the privileged character of the December 22, 2006 status report by disclosing it to Excalibur in early 2007 because at that time, Travelers and Excalibur shared a "common interest" in the defense of the broker's claims. Doc. #41, p. 3 n.3. (citing *Ryan v. Nat'l Union Fire Ins. Co.*, No. 3:03-cv-644 (CFD), 2006 LEXIS 7366, at *16 n.5 (D. Conn. Feb. 28, 2006)).

"under circumstances that preserved its privileged character." Doc. #41, p. 5.

Given the nature of Exhibit 3, describing confidential communications between the Affiliates and Underwriters and their attorneys Mayer Brown, legal analysis by said attorneys in preparation for potential litigation, and Travelers' averment that these documents, including the Slaughter and May attachment, have been conveyed solely in a manner to preserve their confidentiality, the Court finds that the entire Exhibit 3 shall be sealed.

Both the attorney-client privilege and the attorney work product doctrine, when proven to be present and intact, are sufficient and appropriate compelling reasons to shield documents from public access. *See, e.g., Lugosch*, 435 F.3d at 125 (attorney-client privilege); *see In re Grand Jury Subpoenas Dated Oct. 22, 1991, and Nov. 1, 1991*, 959 F.2d 1158, 1166 (2d Cir. 1992) (work-product privilege protects "work product of the lawyer" by prohibiting "unwarranted inquiries into the files and the mental impressions of an attorney") (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11, 67 S. Ct. 385, 91 L. Ed. 451 (1947)); *United States v. Adlman*, 134 F.3d 1194, 1197 (2d Cir. 1998) (special treatment [*23] for opinion work product justified because, "[a]t its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case") (quoting *United States v. Nobles*, 422 U.S. 225, 238, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975)).[12]

Because Exhibit 3 is clearly work product of attorneys, which is also rife with discussion of confidential attorney-client communications and settlement negotiations, the Court finds it impracticable to seal specific portions via redactions. Thus, plaintiff's motion to seal Exhibit 3 is granted and the entire document shall remain sealed.

### 3. Exhibits 4 and 5

Exhibits 4 and 5 are copies of insurance policies issued by Underwriters to the broker, covering, respectively the periods of July 1, 1997 to June 30, 1998 and from July 1, 1998 to June 30, 1999. These policies were documents that came into

---

[12] In a civil case, materials prepared by a party's attorney in anticipation of litigation or for trial are not discoverable except on a showing that the party seeking production has "substantial need" for the materials for preparation of its case and "is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed. R. Civ. P. 26(b)(3); *see also In re Grand Jury Subpoenas*, 959 F.2d at 1166.

Travelers's possession as part of the settlement negotiations referenced above. Travelers maintains that the policies should be sealed as containing sensitive business information in that they identify the broker by name. Doc. #41, p. 10 (citing *Crossman v. Astrue*, 714 F. Supp. 2d 284, 287 (D. Conn. 2009) ("[T]here can be (and often are) considerations of personal privacy, public safety, or a business's proprietary information, [*24] such as trade secrets or confidential research, that can trump the right of the public to access court records.").

Travelers maintains that the identity of the broker should be shielded "[o]ut of respect for the broker and its reputational interests." Doc. #41, p. 11. Specifically, "[p]ublic disclosure of information concerning the disputes that arose between the broker and its insurance company clients could cause reputational and financial damage to those parties," especially where the disputes "involved millions of dollars in claimed liability and allegations that implicated the broker's reputational interests." *Id.* Travelers further argues that the identity of the broker "is not required to adjudicate any of the claims or defenses raised in this lawsuit." *Id.* Hence, a balancing of the broker's interest in maintaining its reputation and keeping its settlement negotiations confidential outweighs the public's interest in access to the broker's identity.

The Court notes that, in general, insurance policies are not documents shielded from public disclosure. Moreover, where the terms of said policies are at issue in litigation, courts must routinely analyze and interpret them. However, [*25] the identity of the broker, who is not a party to the litigation and, according to Travelers, "not required to adjudicate any of the claims or defenses raised in this lawsuit," Doc. #41, p. 11, is a separate consideration. Non-parties' privacy interests may comprise "a strong factor weighing against disclosure of their identities." *In re Savitt/Adler Litigation*, No. 95-CV-1842 (RSP/DRH), 1997 U.S. Dist. LEXIS 23671, 1997 WL 797511, at *3 (N.D.N.Y. Dec. 23, 1997). *See also In re New York Times*, 828 F.2d at 116 ("The job of protecting [privacy] interests rests heavily upon the shoulders of the trial judge, since all the parties who may be harmed by disclosure are typically not before the court.").

Specifically with respect to privacy interests, the Second Circuit has "held that the privacy interests of innocent third parties should weigh heavily in a court's balancing equation. Such interests, while not always fitting comfortably under the rubric 'privacy,' are a venerable common law exception to the presumption of access." *United States v. Amodeo* ("*Amodeo II*"), 71 F.3d 1044, 1050-51 (2d Cir. 1995) (internal citations, quotations and alterations omitted); *accord Sec. & Exch. Comm'n v. The Street.Com*, 273 F.3d 222, 232 (2d Cir. 2001). In *Amodeo II*, the Second Circuit established the steps a court

must follow to determine the weight to be accorded to such privacy interests. First, a court should "consider the degree to which the subject matter is traditionally [*26] considered private rather than public. Financial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." *Id.* at 1051. Second, a court should consider "[t]he nature and degree of injury. . . . This will entail consideration not only of the sensitivity of the information and the subject but also of how the person seeking access intends to use the information." *Id.*; *see also Joy* [*v. North*], 692 F.2d [880,] at 893 [(2d Cir.1982), *cert. denied sub nom. Citytrust v. Joy*, 460 U.S. 1051, 103 S. Ct. 1498, 75 L. Ed. 2d 930 (1983)] ("The importance of the material to the adjudication, the damage disclosure might cause, and the public interest in such materials should be taken into account before a seal is imposed."). Lastly, a court must consider the reliability of the information. *Id.*

Applying the *Amodeo II* factors to Exhibits 4 and 5, the Court initially notes that an insurance policy is not a traditionally private document, especially when its terms are the subject of dispute in litigation. Here, however, the insurance documents were conveyed to Travelers as part of confidential settlement negotiations. Second, and more importantly, Travelers [*27] avers that the nature and degree of injury to the broker, should its identity be revealed in this litigation, could be costly to its reputation and finances. As a non-party, whose identity is of no known relevance in this matter, the Court must consider whether it serves a higher value to prevent such harm. Third, the reliability of the insurance documents is not in issue.

Based on Travelers argument that publicity of the broker's identity, and thus its clients' claims against it, would lead to damage to its business reputation and finances, the Court shall, at this time, grant Travelers' sealing request to the extent that it seeks protection *solely of the broker's identity*. Specifically, the Court seals the broker's identity in view of the broker's non-party status with respect to the present litigation and the fact that the documents were shared with Travelers in the context of confidential settlement negotiations. Moreover, according to Travelers, both the size of the claims and allegations of fraud against the broker suggest that revealing its identity could result in substantial financial loss.[13]

In sum, rather than sealing the entire documents of Exhibits 4

and 5, the Court shall [*28] seal *only* the references in those insurance policies to the *identity of the broker*.[14] Such redactions are both feasible and sufficiently "narrowly tailored" to achieve the ends of protecting a non-party to the case at bar yet leaving the language of the policies subject to public access. *See* D. Conn. L. Civ. R. 5(e)(3) (any order sealing judicial document "shall include particularized findings demonstrating that sealing is supported by clear and compelling reasons *and is narrowly tailored to serve those reasons"*) (emphasis added) ; *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 95-96 (2d Cir.2004) (judicial records may be sealed only when and to the extent necessary to preserve higher values). Accordingly, Travelers's motion to seal Exhibits 4 and 5 shall be granted in part and denied in part.[15] Plaintiff is hereby ordered to redact all references to the broker's identity and resubmit the documents to the Court within fourteen (14) days of the entry of this Ruling. The remainder of Exhibits 4 and 5 shall be unsealed.

### 4. Exhibit 7

According to Travelers, Exhibit 7 is one of several status reports Travelers provided to Excalibur between Excalibur's first notice of claim in early 2007 and first reinsurance billing in April of 2010. Doc. #41, p. 5. The status report is captioned [*29] as "Privileged and Confidential" and contains "privileged and confidential legal advice the Affiliates and Underwriters had received from Mayer Brown." *Id.* Moreover, the report contains Travelers's descriptions of the "then-existing status of confidential settlement discussions between the broker and its various insurers (including Travelers)." *Id.* Said status update thus describes instructions from the clients and details discussed as part of the confidential settlement negotiations, including "the amount of money the broker was willing to offer in order to settle the client[s'] claims against it" and "the broker's allocation strategy" for such claims. *Id.*, p. 10.

---

[13] Should the Court later determine that the broker's actual identity bears on its decision regarding the PJR Application and/or any other later-filed motion, the Court will reassess its decision to shield the broker's identity from public access.

[14] Those references to be sealed shall, by implication, include any information that might identify the broker, such as its address and the names of shareholders and/or partners. *See, e.g.*, Doc. #36-2, p. 2 ("Address(es) of the Firm"); Doc. #36-3, p. 7-8 (listing "fellow shareholders or partners" of broker).

[15] The Court notes that although Travelers requested the sealing of the entire documents of Exhibits 4 and 5 in the text of its motion to seal and supporting memorandum, Travelers conceded at footnote 7 of it supporting memorandum that "Travelers would be willing . . . to withdraw any objection to the public filing of Exhibits 4 and 5 if each appearance of the broker's name were redacted." *See* Doc. #41, p. 13 n. 7.

The Court hereby finds that privileged communications between the Affiliates and the Underwriters and their attorneys and confidential settlement negotiations both comprise compelling reasons to seal language in this "Status Update." Narrowly tailoring its redactions to maximize the public's access to this judicial document, the Court hereby seals only the following:

> (1) the contents of the "Re:" heading, including the identity of the "Insured," the "Claimant," the "DOL," "Policy," "Policy Term," and "Treaty No;"
>
> (2) the third paragraph, **[*30]** starting with "We" and concluding with " policy;"
>
> (3) and the fourth paragraph, starting with "As" and ending with "allocation."

Doc. #36-4, p. 2. The "Re" information reveals the identity of the broker and its claim, which the Court has sealed in order to protect the broker's privacy as a non-party likely to incur both reputational and financial harm, if revealed. The third and fourth paragraphs summarize information regarding the substance of confidential settlement negotiations, including clients' confidential queries and instructions and counsel's resulting legal advice as to facts pertaining to settlement. The remainder of Exhibit 7 shall be unsealed.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Motion to Seal Exhibits (Doc. #40) is GRANTED IN PART and DENIED IN PART. In recognition of the general presumption in favor of public access to judicial documents, and pursuant to Local Rule of Civil Procedure 5(e)(3), the Court has thoroughly reviewed the plaintiff's sealing request to determine whether sealing is supported by "clear and compelling reasons" and "narrowly tailored to serve those reasons."[16] *See, e.g., Lugosch*, 435 F.3d at 123 (2d Cir.2006)); *In re New York Times Co.*, 828 F.2d at 114-16; and D. Conn. L. Civ. R. 5(e)(3). The Court thus holds that sealing is granted with respect **[*31]** to specific language, due to "clear and compelling reasons," as follows:

> (1) Portions of Exhibit 2 (letter dated July 29, 2011), as

designated by the Court, shall be sealed to protect material subject to the attorney-client privilege and confidential settlement negotiations.

(2) Exhibit 3 (report by law firm dated December 22, 2006) shall be sealed in its entirety because it is composed of confidential legal advice - resulting from and revealing confidential client communications, attorney work product, and discussion of confidential settlement negotiations.

(3) All references to the identity of the broker in Exhibits 4 and 5 (sections of 1997 and 1998 insurance policies issued by the Underwriters to the broker) shall be sealed to protect the broker's privacy interest as a non-party to this litigation in danger of substantial reputational and financial harm. The remainder of Exhibits 4 and 5 shall be unsealed.

(4) With respect to Exhibit 7 (letter dated April 1, 2009), the particular language designated by the Court shall be redacted to protect the privacy interest of the named non-party broker, material subject to the attorney-client privilege, and the substance of confidential settlement **[*32]** negotiations.

Accordingly, Plaintiff is hereby ORDERED to resubmit Exhibits 2, 4, 5, and 7 with the redactions directed by the Court within fourteen (14) days following the entry of this Ruling. Exhibit 3 shall remain sealed in its entirety.

It is SO ORDERED.

Dated: New Haven, Connecticut

May 10, 2012

/s/ *Charles S. Haight, Jr.*

Charles S. Haight, Jr.

Senior United States District Judge

---

---

[16] As set forth *supra*, the Court designates particular language within the Exhibits for sealing, thereby protecting only those portions for which there are clear and compelling reasons to seal. Federal Rule of Civil Procedure 5.2(d), captioned "Filings Made Under Seal," contemplates that the court may order limited redactions as follows:

> The court may order that a filing be made under seal without redaction. The court may later unseal the filing or *order the person who made the filing to file a redacted version for the public record*.

Fed. R. Civ. P. 5.2(d) (emphasis added).

# United States SEC v. Ahmed

United States District Court for the District of Connecticut

September 19, 2017, Decided; September 19, 2017, Filed

Civil No. 3:15cv675 (JBA)

**Reporter**
2017 U.S. Dist. LEXIS 213773 *

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION, Plaintiff, v. IFTIKAR AHMED, Defendant,
and IFTIKAR ALI AHMED SOLE PROP; I-CUBED
DOMAINS, LLC; SHALINI AHMED; SHALINI AHMED
2014 GRANTOR RETAINED ANNUITY TRUST; DIYA
HOLDINGS LLC; DIYA REAL HOLDINGS, LLC; I.I. 1, a
minor child, by and through his next friends IFTIKAR and
SHALINI AHMED, his parents; I.I. 2, a minor child, by and
through his next friends IFTIKAR and SHALINI AHMED,
his parents; and I.I. 3, a minor child, by and through his next
friends IFTIKAR and SHALINI AHMED, his parents, Relief
Defendants.

**Prior History:** SEC v. Ahmed, 123 F. Supp. 3d 301, 2015
U.S. Dist. LEXIS 106314 (D. Conn., Aug. 12, 2015)

**Counsel:**  [*1] For United States Securities and Exchange
Commission, Plaintiff: John B. Hughes, LEAD ATTORNEY,
U.S. Attorney's Office-NH, New Haven, CT; Nicholas Peter
Heinke, LEAD ATTORNEY, PRO HAC VICE, Jeffrey E.
Oraker, Mark Lander Williams, Terry R. Miller, U.S.
Securities and Exchange Commission - CO, Denver, CO.

Iftikar Ahmed, Defendant, Pro se, Kolkatta, West Bengal.

Iftikar Ali Ahmed Sole Prop, Defendant, Pro se.

For I-Cubed Domains, LLC, Shalini Ahmed, Shalini Ahmed
2014 Grantor Retained Annuity Trust, DIYA Holdings LLC,
DIYA Real Holdings, LLC, I.I. 1, A minor child, by and
through his next friends Iftikar and Shalini Ahmed, his
parents, I.I. 2, A minor child, by and through his next friends
Iftikar and Shalini Ahmed, his parents, I.I. 3, A minor child,
by and through his next friends Iftikar and Shalini Ahmed, his
parents, Defendants: Alexander Sakin, Jonathan Harris, L.
Reid Skibell, Priya Chaudhry, Steven Gabriel Hayes-
Williams, LEAD ATTORNEYS, PRO HAC VICE, Harris, St.
Laurent & Chaudhry LLP, New York, NY; David B. Deitch,
LEAD ATTORNEY, PRO HAC VICE, Harris, St. Laurent &
Chaudhry LLP - VA, Reston, VA; Kristen Luise Zaehringer,
Paul E. Knag, Murtha Cullina, LLP-Stmfd, Stamford, CT.

For  [*2]  Nonparty, Movant: Michael D. Blanchard, Morgan,

Lewis & Bockius LLP - Htfd, CT, Hartford, CT.

For Oak Management Corporation, Movant: David T.
Grudberg, Carmody Torrance Sandak & Hennessey, LLP -
NH, New Haven, CT.

**Judges:** Janet Bond Arterton, United States District Judge.

**Opinion by:** Janet Bond Arterton

# Opinion

## ORDER DENYING OAK MANAGEMENT
## CORPORATION'S MOTION TO SEAL

Non-party Oak Management Corporation ("Oak") asks [Doc.
# 454] that this Court seal Exhibit 8 [Doc. # 453-10] to the
Declaration of David K. Momborquette, which Oak filed in
support of its Motion [Doc. # 453] to Quash Rule 30(b)(6)
Subpoena. Oak notes that "[t]he deposition transcript excerpts
that comprise Exhibit 8 were designated 'Confidential' by the
parties pursuant to the protective order currently in place" and
asks that Exhibit 8 be filed under seal, "in accord with the
parties' designation." (Oak's Mot. to Seal [Doc. # 454] at 2.)

However, the Court's Protective Order [Doc. # 62]
specifically notes:

> [A]ny documents which become part of an official
> judicial proceeding or which are filed with the Court are
> public documents, and such documents will be sealed by
> the Court only upon motion and in accordance with
> applicable law, including Rule 5(e) of the Local Rules of
> this Court. *This Protective [*3]  Order does not provide
> for the automatic sealing of any documents*.

(Protective Order [Doc. 62] at 3 (emphasis added).) Any order
to seal the Court issues must include "particularized findings
demonstrating that sealing is supported by clear and
compelling reasons and is narrowly tailored to support those
reasons." D. Conn. L. Civ. R. 5(e)(3). In order for a document

to be properly sealed, the Court must determine the weight of the presumption of public access to that document and balance against it any competing considerations, such as the privacy interests of those resisting disclosure. *See United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995). In evaluating a motion to seal, "a judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need." *Video Software Dealers Assoc. v. Orion Pictures, Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 27 (2d Cir. 1994).

Thus, the Court will not seal Exhibit 8 simply because the parties have designated it as confidential, but rather must balance the public's presumptive right of access and any competing considerations. Because the document in question was filed as part of a motion made by Oak seeking action by the court, the presumption of public access is strong. *See Amodeo*, 71 F.3d at 1050 (2d Cir. 1995). The only countervailing factor Oak asserts is its vague contention that "[s]ealing is appropriate where materials constitute **[*4]** confidential . . . commercial information, which includes, among other things, information about a business's operations." (Oak's Mot. to Seal at 2.)[1]

Oak does not identify what in particular about the information contained in Exhibit 8 is confidential and why protection of this confidentiality outweighs the public's right of access to judicial documents. The testimony excerpted in Exhibit 8 includes (but is not limited to) the following topics: Mr. Ahmed's role as a member and in managing different funds, carried interest, whether employees of Oak invested in the funds, eligibility for and receipt of bonuses, what interests and accounts Mr. Ahmed has forfeited, the balances of Mr. Ahmed's accounts at the time he was terminated, the decision-making process for determining what to do with the forfeited accounts, factors Oak considered when concluding an investment was likely to be profitable, and the values of different stock shares. Although relating to Oak's "business's

operations," the Court is unpersuaded Exhibit 8 must be sealed absent any explanation of why this information must **[*5]** be kept from the public despite the presumption of access.

For the foregoing reasons, Oak's Motion to Seal is DENIED.

IT IS SO ORDERED.

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 19th day of September 2017.

---

[1] Oak cites *Louis Vuitton Malletier S.A. v. Sunny Merchandise Corporation*, 97 F. Supp. 3d 485 (S.D.N.Y. 2015) for the proposition that "redactions of 'confidential business information,' including 'internal business documents, investigative reports, and information about business operations,' were proper." (Oak's Mot. to Seal at 2 (quoting *Louis Vuitton*, 97 F. Supp. 3d at 510-12).) Here, Oak has not asked the Court to redact specific information but rather requests that the document be sealed in its entirety, which has been viewed with disfavor in this district. *See Jadwalean Int'l Co. for Operations & Mgmt. v. United Tech Corp.*, 3:09-cv-18(JCH), 2009 U.S. Dist. LEXIS 33520, 2009 WL 1064495 at *1 (D. Conn. April 17, 2009); *Doctor's Assoc. Inc. v. QIP Holders LLC*, No. 3:06-cv-1710(VLB), 2007 U.S. Dist. LEXIS 70029, 2007 WL 2782516, at * 1 (D. Conn. Sept. 24, 2007).

# United States v. Chevron Corp.

United States District Court for the Northern District of California

March 12, 1996, DATED ; March 13, 1996, FILED

No. C-94-1885 SBA

**Reporter**

1996 U.S. Dist. LEXIS 4154 *; 96-1 U.S. Tax Cas. (CCH) P50,201; 77 A.F.T.R.2d (RIA) 96-1548

UNITED STATES OF AMERICA, Petitioner, vs. CHEVRON CORPORATION and JOHN ROSS, Respondents.

## Case Summary

### Procedural Posture

Petitioner United States appealed from the magistrate's findings and recommendations to the court on the applicability of the attorney-client privilege to documents withheld by respondent corporation in an Internal Revenue Service audit of respondent corporation's income tax returns. Respondents, corporation and individual, also challenged the magistrate's application of the "crime or fraud" exception to some of the documents.

### Overview

During the Internal Revenue Service's audit of its income tax returns, respondent corporation withheld 648 documents on the grounds of attorney-client privilege. Petitioner United States filed this action seeking judicial enforcement of its summons. A magistrate found that most of the documents were protected by the attorney-client privilege, and the court rejected those findings and recommendations. The magistrate's statement of the law that only "purely business advice" fell outside of the attorney-client privilege was incorrect and substantially reduced respondent corporation's burden of demonstrating that the primary purpose of each document was the production of legal advice. The magistrate also presumed that each of the documents was protected rather than requiring respondent corporation to prove that it had not waived the attorney-client privilege with respect to each document. The court also held that redaction was appropriate, and the magistrate had to make specific findings of fact with respect to each document although he could group the documents into categories and address each group as a whole. The court did not address "crime or fraud" exception.

### Outcome

The court rejected the magistrate's findings and recommendations with respect to the application of the attorney-client privilege to documents withheld by respondent corporation during an audit. The court held that the magistrate applied the wrong legal standard and burden of proof when he determined that the documents were privileged. The court did not address the "crime or fraud" exception because it was not fully raised before the magistrate.

**Counsel: [*1]** For UNITED STATES OF AMERICA, Plaintiff: Jay R. Weill, [COR LD NTC], U S Attorney's Office, San Francisco, CA. Michael J. Yamaguchi, USAtty, [COR LD NTC], U.S. Attorney's Office, San Francisco, CA.

For CHEVRON CORPORATION, defendant: Richard E. Nielsen, [COR LD NTC], Alson R. Kemp, Jr., [COR NTC], Pillsbury Madison & Sutro LLP, San Francisco, CA. Michael F. Kelleher, [COR NTC], John P. McAllister, [COR NTC], Washington, DC.

**Judges:** SAUNDRA BROWN ARMSTRONG, United States District Judge

**Opinion by:** SAUNDRA BROWN ARMSTRONG

## Opinion

*ORDER REJECTING FINDINGS AND RECOMMENDATIONS AND REMANDING MATTER TO MAGISTRATE*

This matter comes before the Court on petitioner's and respondents' respective objections to the Magistrate's Findings and Recommendations. Having read and considered the papers submitted in connection with these objections, and being fully informed, the Court REJECTS the Magistrate's Findings and Recommendations and REMANDS this matter to Chief Magistrate Judge Langford for further findings and recommendations consistent with this order.

1996 U.S. Dist. LEXIS 4154, *1

*BACKGROUND*

This matter arises out of the Internal Revenue Service's ("IRS") audit of Chevron Corporation's ("Chevron") income tax returns for the years 1985 through 1987. During the course of the audit, the IRS requested information on the issue of whether Chevron was entitled to a tax credit on its United States income tax return for certain taxes paid to the Indonesian government by a company in which Chevron is a 50-percent shareholder.

On September 1, 1993 and November 3, 1993, the IRS issued extensive document requests to Chevron. After conducting various reviews of **[*2]** its documents, Chevron produced (1) documents and (2) a privilege log regarding documents it decided to withhold on the ground of attorney-client privilege. On March 29, 1994, the IRS issued a designated summons requiring Chevron to appear on April 12, 1994 and to produce the withheld documents. On April 12, 1994, Chevron appeared, but objected to the summons on the basis of attorney-client privilege.

On May 26, 1994, the government filed this action seeking judicial enforcement of the summons. On November 8, 1994, this Court referred the matter to Chief Magistrate Judge Langford for findings and recommendations on the following issue:

> Whether and to what extent the documents sought by the IRS through its March 29, 1994 summons are protected by the attorney-client privilege?

On January 25, 1996, Chief Magistrate Judge Langford issued his Findings and Recommendations ("Findings"). The Magistrate found that most of the disputed documents are protected under the attorney-client privilege, but that 129 documents are not protected under the "crime or fraud" exception to the attorney-client privilege. Both parties filed timely objections.

The government contends that the **[*3]** Magistrate applied the wrong legal test in determining whether the documents are privileged, and impermissibly shifted the burden of proof to the government. The government also contends that the Magistrate erred: (1) by not finding that Chevron has waived the attorney-client privilege with respect to these documents, (2) by not requiring Chevron to provide redacted versions of the documents, and (3) by not making specific findings with respect to each document.

Chevron contends that the Magistrate properly found that all the documents are privileged, but then improperly found that the "crime or fraud" exception applies to some of those documents. Chevron contends that the "crime or fraud" exception does not apply to any of the documents.

Each party opposes the other's objections.

*DISCUSSION*

*I. Purpose of the Disputed Communications*

The government asserts that the Magistrate improperly presumed that all of the documents in question are privileged, thereby shifting the burden of proof to the government. Chevron contests this assertion, and argues that the Magistrate applied the proper legal standard and found that each of the documents was primarily made for the purpose **[*4]** of obtaining or providing legal advice. Chevron is incorrect. A review of the Magistrate's Findings reveals that the wrong legal standard was applied, and that the Magistrate improperly presumed that all of the documents in question are privileged.

A. Magistrate's Findings

The Magistrate begins his Findings by correctly stating that the party asserting the privilege has the burden of proof, and that the attorney-client privilege is strictly construed. (Findings at 9:18-21.) However, it is clear from the rest of the Findings that the Magistrate did not properly apply these principles.

> The third element of the Wigmore test requires that communications between the client and the attorney be information directly related to the legal advice sought. More simply put, the attorney-client privilege is triggered only by the exchange of *some measure of legal advice,* as contrasted with *purely business advice.*
> * * *
>
> Considering the unique position of counsel for corporations like Chevron, information is necessarily *made available to counsel* which would otherwise be confidential. Corporate counsel generally have to know *everything* about the corporation's *business decisions,* **[*5]** to safely guide a corporation through potentially dangerous legal waters.

In this case, the attorney-client privilege is being invoked by Chevron to protect documents which largely reflect *an amalgamation of tax and business strategy.* This strategy involves *both business people and their business-related decisions,* as well as attorneys and their legal advice regarding past decisions made and future decisions considered. It is therefore extremely difficult to determine exactly where the business advice starts and the legal advice ends -- this precludes a neat separation between the two.

1996 U.S. Dist. LEXIS 4154, *5

While it may seem unusual that information *carbon copied to attorneys (or sent to attorneys on a distribution list)* could fall within the attorney-client privilege, it logically follows that a business organization, especially a corporation as large as Chevron, would proceed in this manner . . .

Moreover, it seems *reasonable* to make attorneys *aware of all information regarding pending or ongoing business decisions* so they may accurately identify and rectify legal indiscretions. . . .

The corporate attorney's primary responsibility is to ensure the legal health of the corporation. [**6**] As such, *all facts* provided to the attorney would be considered communications *which relate to that purpose* (protecting the legal interests of the corporation).
* * *

Therefore, the best course in this case, *and indeed in all cases involving corporations which legitimately involve counsel in making business decisions,* is to allow any controverted documents *presumptively* to fall within the protection of attorney-client privilege. . . .
(Findings at 10-14 (emphasis added).)

B. Business v. Legal Advice

The first legal error which the Magistrate made relates to the distinction between legal advice, which can be protected, and non-legal, or business advice, which can not. The Magistrate stated that "the attorney-client privilege is triggered only by the exchange of *some measure of legal advice,* as contrasted with *purely business advice.*" (Findings at 10:16-17 (emphasis added).) This is simply incorrect. It is not sufficient that "some measure" of legal advice be exchanged. "A party seeking to withhold discovery based upon the attorney-client privilege must prove that all of the communications it seeks to protect were made 'primarily for the purpose of [**7**] generating legal advice.'" *Griffith v. Davis,* 161 F.R.D. 687, 697 (C.D. Cal. 1995) *(quoting McCaugherty v. Siffermann,* 132 F.R.D. 234, 238 (N.D. Cal. 1990)) (emphasis in original). "No privilege can attach to any communication as to which a business purpose would have served as a *sufficient cause,* i.e., any communication that would have been made because of a business purpose, even if there had been no perceived additional interest in securing legal advice." *McCaugherty,* 132 F.R.D. at 238 *(citing Fisher v. United States,* 425 U.S. 391, 403, 48 L. Ed. 2d 39, 96 S. Ct. 1569 (1975)) (emphasis in original). "If the document was prepared for purposes of simultaneous review by legal and nonlegal personnel, it cannot be said that the primary purpose of the document is to secure legal advice." *United States v. IBM Corp.,* 66 F.R.D. 206, 213 (S.D.N.Y. 1974); *see also North Carolina Elec.*

*Membership Corp. v. Carolina Power & Light Co.,* 110 F.R.D. 511, 514 (M.D.N.C. 1986) ("Corporate documents prepared for simultaneous review by legal and nonlegal personnel are often held not to be privileged because they are not shown to be communications made for the primary purpose of seeking legal advice.").

The [**8**] Magistrate's finding that only "purely business advice" fell outside of the privilege was thus incorrect, and substantially reduced Chevron's burden of demonstrating that the *primary purpose* of each document was the production of legal advice.

C. Chevron Must Prove That The Privilege Applies

The presumption which was applied by the Magistrate was also incorrect. The Court first rejects Chevron's argument that the Magistrate did not apply a presumption, but instead made a finding with respect to each document. This argument is wholly inconsistent with the Magistrate's finding that "therefore, the best course in this case, *and indeed in all cases involving corporations which legitimately involve counsel in making business decisions,* is to allow any controverted documents *presumptively* to fall within the protection of attorney-client privilege. . . ." (Findings at 13-14 (emphasis added).) The language of the Findings clearly demonstrates that the Magistrate *presumed* that each of the controverted documents was protected.

Some courts have applied a presumption that all communications to *outside counsel* are primarily related to legal advice. *See Diversified Indus.,* [**9**] *Inc. v. Meredith,* 572 F.2d 596, 610 (8th Cir. 1977). In this context, the presumption is logical since outside counsel would not ordinarily be involved in the business decisions of a corporation. However, the *Diversified* presumption cannot be applied to *in-house counsel* because in-house counsel are frequently involved in the business decisions of a company. While an attorney's status as in-house counsel does not dilute the attorney-client privilege, *Upjohn Co. v. United States,* 449 U.S. 383, 395, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981), a corporation must make a *clear showing* that in-house counsel's advice was given in a professional legal capacity. *In re Sealed Case,* 237 U.S. App. D.C. 312, 737 F.2d 94, 99 (D.C. Cir. 1984) ("The Company can shelter [in-house counsel's] advice only upon a clear showing that [in-house counsel] gave it in a professional legal capacity.").

The Magistrate *presumed* that all of the disputed documents were privileged because Chevron was legitimately involving its in-house counsel in its *business decisions.* By doing so, the Magistrate failed to apply the burden of proof which was accurately stated at the beginning of the Findings. "The party asserting the privilege has the burden [**10**] to prove that the

1996 U.S. Dist. LEXIS 4154, *10

privilege applies." (Findings at 9:18-19.) In addition to demonstrating the elements required to initially establish the privilege, "the asserting party must prove that it has not waived the privilege." *Weil v. Investment/Indicators,* 647 F.2d 18, 25 (9th Cir. 1991). As the documents in question are an amalgamation of business and legal advice, Chevron bears this burden with respect to *each document* which it asserts is privileged. *See Clarke v. American Commerce National Bank,* 974 F.2d 127, 129 (9th Cir. 1992) ("We have noted that blanket assertions of the [attorney-client] privilege are 'extremely disfavored.' The privilege must ordinarily be raised as to each record sought to allow the court to rule with specificity."); *McCaugherty,* 132 F.R.D. at 238 ("Where there is a clear business purpose in the environment in which the communications occurred[], the court should sustain an assertion of privilege only where there is a clear evidentiary predicate for concluding that *each* communication in question was made *primarily* for the purpose of generating legal advice."). The Magistrate clearly did not require Chevron to meet this burden of proof.

[*11] The Magistrate applied the wrong standard and burden of proof in determining that the controverted documents were privileged. The Court will therefore remand this matter to the Magistrate for findings which are consistent with this order.

### III. Waiver

After presuming that all of the documents were made for the primary purpose of generating legal advice, the Magistrate found that Chevron had not waived the attorney-client privilege with respect to those documents. The government argues that the Magistrate erred in this regard as well.

The Magistrate found that Chevron had not waived the privilege by producing "non-privileged" documents on the same subject matter as the "privileged" documents in question. The Magistrate noted that "the produced documents that the government has matched by subject matter to listed documents are all 'non-privileged.' This does not meet the requirement . . . that disclosed documents on the same subject matter also be privileged, in order to result in waiver of the attorney-client privilege." (Findings at 17:11-17.) The government argues that many of the "non-privileged" documents which were disclosed would be privileged under the same theory [*12] as the documents that Chevron contends are privileged.

The Magistrate's statement of law is correct. However, it is unclear from the Findings whether the Magistrate has made an independent determination that the matched documents are not privileged, or whether he simply accepted Chevron's characterization of those documents. Since "the asserting party must prove that it has not waived the privilege", *Weil,* 647 F.2d at 25, Chevron has the burden of proving that the matched documents cited by the government were not privileged. If Chevron meets this burden, then it will not have waived the privilege simply by disclosing non-privileged documents which are related to the same subject matter as the controverted documents.

The Magistrate also found that Chevron had not impliedly waived its privilege by claiming the tax credits at issue, and that Chevron had not asserted the advice of counsel in support of a claim or defense. The Court concurs in the Magistrate's Findings with respect to these two issues.

### IV. Redaction

The Magistrate concluded in one sentence that "providing redacted documents would also seem out of the question, since it would only take a clever IRS agent [*13] or opposing attorney to deduce the substance of the general correspondence between the corporate client and the attorney." (Findings at 14:2-4.) The Magistrate cited no authority for this finding.

Since the Magistrate did not put Chevron to its burden of proof with respect to each document, it is unclear whether the Magistrate reviewed each document to determine whether a meaningful redaction is possible. If non-privileged material is contained in a document which the Magistrate finds to be privileged, then that material should be disclosed. *See Resolution Trust Corp. v. Diamond,* 773 F. Supp. 597, 601 (S.D.N.Y. 1991) The fact that a clever opposing attorney may be able to guess as to what advice was given is not sufficient to withhold non-privileged material. *See Matter of Fischel,* 557 F.2d 209, 212 (9th Cir. 1977) ("An attorney's involvement in, or recommendation of, a transaction does not place a cloak of secrecy around all the incidents of such a transaction."). Instead, Chevron may only refuse to provide redacted materials where, with respect to each document, the privileged material is "so inextricably intertwined with the rest of the text that they cannot be separated." [*14] *Resolution Trust Corp.,* 773 F. Supp. at 601.

Furthermore, the Court rejects Chevron's suggestion that it would be unreasonably burdensome to require Chevron to review for redaction 648 documents. The only case which Chevron cites for this proposition is *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.,* 32 F.3d 851 (3d Cir. 1994). *Rhone-Poulenc* merely states that "because some documents may contain both discoverable and privileged information it would be appropriate, if not too burdensome, to redact them accordingly." *Id.* at 864.

1996 U.S. Dist. LEXIS 4154, *14

The Court finds that it is not unduly burdensome to require Chevron to review and redact the documents which are found to be privileged. Chevron cannot avoid disclosure of non-privileged material simply because that material is intermingled with privileged material. This is a case which involves an enormous amount of documents. Chevron has produced approximately 15,000 pages of documents in response to the IRS Subpoena. Furthermore, assuming that the privileged and non-privileged material is intermingled, Chevron is responsible for that fact. In the context of this case, it is not *unduly* burdensome to require Chevron to redact all 2,000 pages **[*15]** of the 648 documents if the Magistrate ultimately determines that they all contain both privileged and non-privileged material.

### V. Crime/Fraud Exception

Chevron contends that the Magistrate erroneously applied the crime or fraud exception to the attorney-client privilege. The government disagrees. Resolution of this issue will require examination of each document which is alleged to fall within the exception. Moreover, it is apparent from the briefing filed in connection with the parties' objections that this issue was not fully raised before the Magistrate. As the Court is remanding this action to the Magistrate, the Court need not address this issue at this time. Instead, the parties should present their respective positions on this issue to the Magistrate.

### VI. Specific Findings

The government contends that the Magistrate erred by not making a specific finding of fact with respect to each controverted document. The Court agrees. As Chevron must meet its burden of proof with respect to each document, the Magistrate must make a specific finding accordingly. This, however, does not mean that the Magistrate must provide a separate analysis for each of the over six **[*16]** hundred documents. After each document has been reviewed, and Chevron has met its burden with respect to that document, it is entirely appropriate for the Magistrate to group the documents into categories of documents which raise similar legal issues, and to address each group as a whole. *See McCaugherty,* 132 F.R.D. at 237-245.

### CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED THAT the Findings and Recommendations of Chief Magistrate Judge Langford are

REJECTED, except as provided herein.

IT IS FURTHER ORDERED THAT:

(1) Pursuant to Civil Local Rule 72-1, the Court refers this matter to Chief Magistrate Judge Langford for further findings and recommendations consistent with this order.

(2) The Chief Magistrate Judge shall file the findings and recommendations with the Clerk of Court and serve a copy on the parties in this action.

(3) Pursuant to Civil Local Rule 72-3, unless otherwise provided, within 15 days of the service of the findings and recommendations, any party may serve and file objections thereto, together with notice setting the objections for hearing before this Court. The objecting party shall note each particular finding and recommendation to which **[*17]** an objection is made, shall note the legal authority for the objection, and shall propose alternative findings or recommendations.

(4) Unless otherwise provided, within 10 days of the service of the objections, any party may serve and file a response thereto. Within 5 days of the service of the response, the objecting party may file a reply thereto.

(5) The memoranda and other papers filed in support of the objections, in opposition thereto, and reply shall conform with Civil Local Rules 7-2 to 7-12.

IT IS SO ORDERED.

DATED: March 12, 1996

SAUNDRA BROWN ARMSTRONG

United States District Judge

# United States v. Chevron Corp.

United States District Court for the Northern District of California

May 29, 1996, Decided ; May 30, 1996, FILED

No. C 94-1885 SBA

**Reporter**

1996 U.S. Dist. LEXIS 8646 *; 96-2 U.S. Tax Cas. (CCH) P50,569; 78 A.F.T.R.2d (RIA) 96-5146

UNITED STATES OF AMERICA, Petitioner, vs. CHEVRON CORPORATION and JOHN ROSS, Respondents.

## Case Summary

### Procedural Posture

Respondents, corporation and associated individual, filed a motion for clarification of the court's order rejecting the findings and recommendations of a magistrate judge concerning the application of the attorney-client privilege to documents sought by petitioner United States.

### Overview

As part of an audit of the corporation's tax returns, the United States sought certain documents that the corporation and the associated individual claimed were protected by the attorney-client privilege. The court issued an order rejecting the magistrate judge's recommendation concerning application of the privilege to those documents. The corporation and the associated individual sought clarification of that order. The court clarified its order, ruling that (1) the "primary purpose" test applied to segregable portions of communications between attorney and client; and (2) the parties shared the burden of proving waiver of the privilege. The court found that the corporation was permitted to assert the attorney-client privilege as to segregable portions of the withheld documents unless those documents were prepared for simultaneous review by both legal and nonlegal personnel or were otherwise non-privileged. Further, the corporation bore the initial burden of proving the privilege applied, while the United States bore the burden of production that the privilege had been waived. The ultimate burden of proving the privilege had not been waived remained with the corporation.

### Outcome

The court granted the motion for clarification and held that the parties should have shared the burden of establishing waiver of the attorney-client privilege.

**Counsel:** **[*1]** For UNITED STATES OF AMERICA, Plaintiff: Jay R. Weill, U S Attorney's Office, San Francisco, CA. Michael J. Yamaguchi, USAtty, U.S. Attorney's Office, San Francisco, CA.

For CHEVRON CORPORATION, defendant: Richard E. Nielson, Alson R. Kemp, Jr., Pillsbury Madison & Sutro LLP, San Francisco, CA. Michael F. Kelleher, John P. McAllister, Groom & Nordberg, Washington, DC.

**Judges:** SAUNDRA BROWN ARMSTRONG, United States District Judge. Chief Mag. Judge F. S. Langford

**Opinion by:** SAUNDRA BROWN ARMSTRONG

## Opinion

*ORDER GRANTING RESPONDENTS' MOTION FOR CLARIFICATION*

This matter is before the Court on Respondents' motion for clarification of this Court's March 13, 1996 Order rejecting Chief Magistrate Judge Langford's Findings and Recommendations ("Findings") concerning the application of attorney-client privilege to documents withheld by Respondents. In order to provide further guidance to the parties in pursuing this matter before the Magistrate Judge upon remand, the Court provides the following clarification of its March 13, 1996 Order.

*Background*

This matter arises out of the Internal Revenue Service's ("IRS") audit of Chevron corporation's ("Chevron") tax returns for the years 1985 through **[*2]** 1987. On November 8, 1994 this Court instructed the Magistrate Judge to provide findings and recommendations on the issue of whether and to what extent documents sought by the IRS from Chevron are

protected by the attorney-client privilege. On January 25, 1996, Chief Magistrate Judge Langford issued his Findings and Recommendations ("Findings") on this issue. The Magistrate Judge found that most of the documents withheld by Chevron are protected by the attorney-client privilege. Both parties filed objections to the Findings with this Court.

On March 13, 1996, this Court issued an Order rejecting the Findings of Chief Magistrate Judge Langford on several grounds. This Court found *inter alia* that the Magistrate Judge had applied the wrong legal standard in determining that the withheld documents are protected from discovery by attorney-client privilege, and remanded the matter for further findings and recommendations. Chevron now seeks clarification of two legal issues addressed in that Order: (1) whether the "primary purpose" test for establishing attorney-client privilege, applies to each communication within a document or applies to each document as a whole; and (2) the allocation **[*3]** of burdens of proof between the parties on remand to determine whether Chevron has waived the attorney-client privilege based on prior disclosure of allegedly non-privileged documents.

### I. *The "Primary Purpose Test" Applies to Segregable Portions of Communications Between Attorney and Client*

Chevron seeks clarification concerning its burden of proof in showing that the withheld documents are protected by the attorney-client privilege. In the March 13, 1996 Order, the Court held that, to the extent that the withheld documents relate to a combination of both legal and business advice, the applicable legal test requires Chevron to "prove that all of the communications it seeks to protect were made 'primarily for the purpose of generating legal advice.'" (Order at 5:14-17 (citing *Griffin v. Davis,* 161 F.R.D. 687, 697 (C.D. Cal. 1995) (emphasis in original).)

Chevron does not dispute that the "primary purpose" test represents the appropriate standard of inquiry into the privileged nature of the withheld documents. (Mot. for Reconsideration at 2:12-15.) Chevron's request for clarification arises from an ambiguity interjected by the use of the word "document" in this Court's **[*4]** conclusion that Chevron bears the "burden of demonstrating that the *primary purpose* of each document was the production of legal advice." (Order at 6:11-13 (emphasis in bold added).) Chevron contends that the "primary purpose" test must be applied to distinct communications within each document and not to the document as a whole. (*Id.* at 2:17-19.) The IRS argues that the court must look at the primary purpose of the entire document rather than its component paragraphs or sentences. (Opp'n. at 2:19-21.)

Chevron is correct. The use of the word "document" in the

March 13, 1996 Order was not a rejection of the long recognized rule that the attorney-client privilege applies to discrete communications contained within a document.

> "Such *parts of* [the attorney's letters] are privileged as contain, or have opinions based on, information furnished by an officer or employee of the defendant in confidence without the presence of third persons."

*United States v. United Shoe Machinery Corp.,* 89 F. Supp. 357, 359 (D. Mass. 1950); *see also, Merrin Jewelry Co. v. St. Paul Fire and Marine Ins. Co.,* 49 F.R.D. 54, 57 (S.D.N.Y. 1970) ("With the exception of the last **[*5]** two paragraphs on page four of the report - which are in the nature of advice - the report of [the attorney] is found to be outside the scope of the attorney-client privilege.")

That the document as a whole addresses predominantly business matters does not negate the privilege as to the portion containing requests for legal advice.

> "With the exception of three sentences recording legal department advice not directly related to the conversation with a third party, the memorandum refers entirely to business matters. As such it is not a communication between client and attorney and therefore the document is not privileged, with the exception of the three sentences referred to above, which should be excised."

*Barr Marine Products Co., Inc. v. Borg-Warner Corp.,* 84 F.R.D. 631, 640 (E.D. Pa. 1979).

Thus, despite the overall nature of the document, the client may assert the attorney-client privilege over isolated sentences or paragraphs within a document. *Sequa Corp. v. Gelmin,* 1994 U.S. Dist. LEXIS 14005, *12 (S.D.N.Y. Sept. 30, 1994) (recognizing application of privilege to discrete sentences within document); *Great Plains Mut. Ins. Co. v. Mutual Reinsurance* **[*6]** *Bureau,* 150 F.R.D. 193 (D. Kan. 1993) (portions of board meeting during which legal issues were discussed were held privileged). *Welch v. Board of Directors of Wildwood Golf Club,* 146 F.R.D. 131, 139 (W.D. Pa. 1993) (privilege successfully asserted for portions of board minutes in which legal advice regarding potential litigation was discussed); *In re Grand Jury Subpoenas Dated Dec. 18, 1981,* 561 F. Supp. 1247, 1258-59 (E.D.N.Y. 1982) (applying attorney-client privilege to separate sentences and sections of attorney's draft letters.).

The attorney-client privilege does not attach, however, to documents which were prepared for simultaneous review by both legal and nonlegal personnel within the corporation. *F.T.C. v. TRW, Inc.,* 479 F. Supp. 160, 163 (D.D.C. 1979), aff'd, 628 F.2d 207 (D.C. Cir. 1980). This rule applies to the

document *as a whole* because each communication within that document was provided to nonlegal personnel for their review. Thus, those communications cannot be said to have been made for the primary purpose of seeking legal advice. (*See* Order at 5-6.)

The court may conduct an *in camera* review of withheld documents to allow the client to [*7] demonstrate to the court that the attorney-client privilege applies to segregable portions of the withheld documents. *Eastern Technologies, Inc. v. Chem-Solv, Inc.,* 128 F.R.D. 74 (ED. Pa. 1989). Once the client has satisfied the court that the privilege applies, the court must excise privileged portions of the document prior to allowing discovery by the opposing party. *United States v. (Under Seal),* 748 F.2d 871, 878 (4th Cir. 1984) ("privileged communications within each document must be removed by the district court before the document is turned over to the government"); *In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989,* 133 F.R.D. 515, 522 (N.D. Ill. 1990), (applying the privilege to a document that contained both legal and nonlegal communications, the court ordered that the legal portions of the document be redacted and the rest turned over to the opposing party); *Cuno, Inc. v. Pall Corp.,* 121 F.R.D. 198, 203 (E.D.N.Y. 1988) (nonprivileged portions of documents ordered produced.); *Research Inst. for Medicine and Chemistry, Inc. v. Wisconsin Alumni Res. Found.,* 114 F.R.D. 672, 676 n.4 (W.D. Wis. 1987) (nonprivileged portions of multiple-subject document [*8] not exempt from production); *Barr Marine Products,* 84 F.R.D. at 640 (excising paragraph prior to allowing discovery of document).

In light of the foregoing, this Court finds that Chevron may assert the attorney-client privilege as to discrete and segregable portions of the withheld documents *unless* those documents were prepared for simultaneous review by both legal and nonlegal personnel, or are otherwise non-privileged. The privilege will apply to such portions of the documents as were communicated by Chevron to its counsel for the *primary purpose* of obtaining *legal* advice. The Magistrate Judge may then supervise redaction of the privileged portions of the withheld documents prior to their production to the IRS.

## II. *The Parties Share the Burden of Proof With Respect to the Issue of Subject Matter Waiver of Attorney-Client Privilege*

Chevron seeks clarification from this Court on the respective burdens of the parties on the issue of waiver. In his Findings, the Magistrate Judge found that Chevron had not waived the attorney-client privilege by producing "non-privileged" documents on the same subject matter as those it withheld from the IRS. In its March [*9] 13, 1996 Order, this Court held that it could not determine from the Findings whether the

Magistrate Judge had made an independent determination on this issue or merely accepted Chevron's characterization of the non-privileged nature of the previously produced documents. On remand, the Court held that Chevron would have "the burden of proving that the matched documents cited by the government were not privileged." (Order at 9:16-17).

The problem posed by Chevron is a classic one - - if the government bears no burden whatsoever, then the only way that Chevron can prove "non-waiver" is by disproving the entire universe of possible bases for waiver. This burden would obviously be unsustainable.

A solution to this conundrum has been suggested by Paul Rice in his book, *Attorney-Client Privilege in the United States.*

> The prevalent, albeit unstated, practice appears to be to impose the initial burden of establishing the basic elements on the privilege proponent. Once the proponent does so, the burden of going forward with the evidence shifts to the opponent to establish a prima facie case of waiver - facts upon which a reasonable person could find that the privilege has been relinquished. [*10] If the privilege opponent succeeds in making such a showing, the burden of going forward with evidence shifts back to the proponent to rebut the prima facie case by demonstrating that the privilege is still viable. For example, once it is established that third parties were either present at an attorney-client meeting or permitted to examine confidential attorney-client communications, the proponent must prove that those third parties were acting as agents of either the attorney or the client in order to avoid a finding that confidentiality was missing.

P. Rice, *Attorney-Client Privilege in the United States,* § 9:20 at 9-42, 43 (LCP 1993) (footnotes omitted).

The Court finds that this "shared burden" approach to establishing waiver of the attorney-client privilege alleviates the onerous burden on, a client asserting attorney-client privilege to prove a negative, i.e. that the privilege has not been waived, while still placing the ultimate burden of proof on the client.

Thus, the party asserting the attorney-client privilege bears the initial burden of proving that the communication in question is privileged. If the party seeking discovery asserts that the privilege which [*11] initially attached to the communication in question was subsequently waived, that party must bear the burden of *production* on the issue of waiver. *See e.g., GTE Directories Service Corp. v. Pacific Bell Directory,* 135 F.R.D. 187, 192 n.2 (N.D. Cal. 1991) (Brazil, Mag.) (opponent shares the burden of demonstrating elements of privilege attached to the documents which were

1996 U.S. Dist. LEXIS 8646, *11

disclosed in order to demonstrate waiver). Once the opponent has proffered evidence that the claimed privilege has been waived, the party asserting attorney-client privilege bears the ultimate burden of proving that the privilege was not waived. In other words, the party asserting the privilege must prove that the acts proffered by the other side do not constitute a waiver with respect to the withheld documents. *See Weil v. Investment/Indicators, Research & Management,* 647 F.2d 18, 25 (9th Cir. 1981) (party asserting attorney-client privilege bears ultimate burden of establishing all elements of the privilege including non-waiver.); *In re Grand Jury Proceedings,* 73 F.R.D. 647, 652 (M.D. Fla. 1977) (burden is on proponent of privilege to rebut prima facie case of waiver).

This Court does not express **[*12]** any opinion as to whether the IRS has already satisfied its burden of production on the issue of waiver.

For the foregoing reasons,
　　IT IS HEREBY ORDERED THAT:

The Order issued on March 13, 1996 is amended to include the foregoing clarification on the proper application of the "primary purpose" test to the documents withheld by Chevron, and the allocation of the respective burdens of the parties on the issue of subject-matter waiver.

IT IS SO ORDERED.

DATED: May 29, 1996

SAUNDRA BROWN ARMSTRONG

United States District Judge

---

**End of Document**

# United States v. Wells Fargo Bank N.A.

United States District Court for the Southern District of New York

June 30, 2015, Decided; June 30, 2015, Filed

12-CV-7527 (JMF)

**Reporter**
2015 U.S. Dist. LEXIS 84602 *; 2015 WL 3999074

UNITED STATES, Plaintiff, -v- WELLS FARGO BANK N.A., et al., Defendants.

**Prior History:** United States v. Wells Fargo Bank, N.A., 972 F. Supp. 2d 593, 2013 U.S. Dist. LEXIS 136539 (S.D.N.Y., 2013)

**Counsel:  [*1]** For United States of America, Plaintiff: Jeffrey Stuart Oestericher, U.S. Attorney's Office, SDNY (86 Chambers St.), New York, NY; Rebecca Sol Tinio, U.S. Attorney's Office, SDNY, New York, NY; Sarah Jean North, United States Attorney's Office, SDNY, New York, NY.

For Wells Fargo Bank, N.A., Defendant: Amy Pritchard Williams, LEAD ATTORNEY, PRO HAC VICE, K&L Gates LLP, Charlotte, NC; Jennifer M Wollenberg, LEAD ATTORNEY, PRO HAC VICE, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, DC; William Farnham Johnson, LEAD ATTORNEY, Fried, Frank, Harris, Shriver & Jacobson, New York, NY; Douglas W. Baruch, PRO HAC VICE, Fried, Frank, Harris, Shriver & Jacobson, LLP (DC), Washington, DC; Michael J. Missal, PRO HAC VICE, K&L Gates LLP, Washington, DC.

**Judges:** JESSE M. FURMAN, United States District Judge.

**Opinion by:** JESSE M. FURMAN

# Opinion

MEMORANDUM OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

The United States brings this civil fraud action against Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or the "Bank") and a Bank employee, Kurt Lofrano (together with the Bank, "Defendants"), alleging that Wells Fargo and Lofrano engaged in misconduct with respect to government-insured home mortgage loans **[*2]** and seeking tens of millions of dollars in damages and civil penalties. In his answer, Lofrano asserted as a defense that he relied on the advice of counsel and, consistent with that assertion, he testified at his deposition that he consulted counsel. (Answer & Aff. Defenses Def. Kurt Lofrano (Docket No. 94) ("Answer") 36; Decl. Rebecca S. Tinio ("Tinio Decl."), Ex. B. at 120). In light of Lofrano's defense, the Government seeks to obtain discovery with respect to the advice that Lofrano received from counsel, relying on the well-established principle that where a party asserts an advice-of-counsel defense, that party impliedly waives any privilege that would otherwise attach to communications between him and his counsel. (Mem. Law. U.S. Supp. Mot. To Reopen Fact. Discovery Limited Purpose & To Compel Prod. Document Def. Wells Fargo ("Gov't's Mem.") 7 (citing *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)). More specifically, the Government moves to reopen fact discovery — which closed on May 15, 2015 — for the limited purpose of taking discovery concerning Lofrano's advice-of-counsel defense or, in the alternative, for an order barring Lofrano from asserting the defense. (Docket No. 196; Gov't's Mem. 2).

The wrinkle in this case **[*3]** is that the attorney-client privilege at issue indisputably belongs to Wells Fargo — not to Lofrano — and Wells Fargo has (to all appearances) consistently invoked its privilege to protect the communications at issue, including, most recently, by objecting to questions at Lofrano's deposition that would have called for him to reveal any such communications. (*See, e.g.*, Tinio Decl., Ex. B at 122). Thus, the Government's motion presents a complicated — and, it turns out, unresolved — question of law: Whether an employee's intention to pursue an advice-of-counsel defense, without more, constitutes an implied waiver of the corporation's attorney-client privilege, even if the employee lacks authority to waive the privilege on behalf of the corporation, where the corporation has consistently asserted the privilege and where almost no privileged information has yet been revealed. For the reasons stated below, the Court holds that Lofrano may not impliedly waive Wells Fargo's privilege by asserting an advice-of-counsel defense and that nothing Wells Fargo has done — yet — constitutes a waiver of the privilege. Accordingly, it denies

2015 U.S. Dist. LEXIS 84602, *3

the Government's motion to reopen discovery, but without [*4] prejudice to renewal based on further developments.

As an initial matter, Defendants argue that the Court should deny the Government's request to reopen discovery solely on the grounds that it is untimely. (Mem. Law Kurt Lofrano Opp'n U.S.'s Mot. To Reopen Fact Discovery & Compel Prod. Documents Def. Wells Fargo ("Lofrano's Mem.") 14-16; Wells Fargo Bank, N.A.'s Mem. Law Opp'n U.S.'s Mot. To Reopen Fact Discovery & Compel Prod. Documents ("Wells Fargo's Mem.") 9-13). That argument is not without some force, as the Government has been on notice since Lofrano filed his answer (if not before) that he was asserting an advice-of-counsel defense. However, as the Government notes (*see* Reply Mem. Law U.S. Further Supp. Mot. To Reopen Fact Discovery & To Compel Prod. Documents Def. Wells Fargo ("Gov't's Reply") 1, 4), courts had held that, at least where a party asserting an advice-of-counsel defense is the holder of the relevant privilege, the opposing party need not move to compel; instead, the burden is on the "party who intends to rely at trial on a good faith defense" to "make a full disclosure during discovery" and the "failure to do so constitutes a waiver of that defense." *Arista Records LLC v. Lime Grp. LLC*, No. 06-CV-5936 (KMW), 2011 U.S. Dist. LEXIS 42881, 2011 WL 1642434, at *2 (S.D.N.Y. Apr. 20, 2011) (internal [*5] quotation marks omitted).[1] Given those holdings, and the relative novelty of the issue presented, the Court finds that there is good cause for the Government's

_____

[1] That is not to say, although the Government does say it (Gov't's Mem. 14; Gov't's Reply 2), that Lofrano forfeited his right to present an advice-of-counsel defense because he did not seek to compel Wells Fargo to disclose privileged information. The mandate for a party asserting an advice-of-counsel defense to provide full disclosure during discovery simply means that the party may not "block[] his adversary from conducting discovery on th[e] issue" by asserting the privilege. *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2000). In this case, Lofrano has not blocked the Government from pursuing anything; Wells Fargo has. Indeed, until Lofrano's deposition, the Government did not request any information from Lofrano about the advice-of-counsel defense. (Lofrano's Mem. 4-5). Nor did Lofrano withhold any information on privilege grounds until that point, and, even at the deposition, he refused to answer questions only because Wells Fargo objected. If the Government believed that [*6] Wells Fargo's assertion of the privilege was improper, it was the Government's responsibility to bring the issue to the Court's attention, not Lofrano's. *See Vicinanzo v. Brunschwig & Fils, Inc.*, 739 F. Supp. 891, (S.D.N.Y. 1990) (noting that "[f]actual matters reasonably likely to lead to the discovery of admissible evidence must be produced *upon request*" and that "[w]here a party intends to rely . . . on the advice of counsel as a defense . . . that advice becomes a factual issue" (emphasis added)).

failure to raise the issue earlier than the present motion and will address the merits of the motion.

Turning to the merits, the Government argues that Lofrano's assertion of the advice-of-counsel defense waives the attorney-client privilege. (Mem. Law U.S. Supp. Mot. Reopen Fact Discovery Limited Purpose & To Compel Production Documents Def. Wells Fargo ("Gov't's Mem.") 7). The principal cases upon which the Government relies, however, do not involve the wrinkle that is presented here; instead, they all involve the more usual situation where the party asserting the defense is the holder of the privilege. *See, e.g., In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (stating that the "quintessential example" of a situation in which a waiver is implied "in the interests of fairness" is that "the defendant who asserts an advice-of-counsel defense . . . is thereby deemed to have waived his attorney-client privilege with respect [*7] to the advice that he received" (internal quotation marks omitted)); *Bilzerian*, 926 F.2d at 1292 ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes."). Those cases apply the well-established principle that a party may not "use the attorney-client privilege as both sword and shield," *Computer Assocs. Int'l, Inc. v. Simple.com, Inc.*, No. 02-CV-2748 (DRH) (MLO), 2006 U.S. Dist. LEXIS 77077, 2006 WL 3050883, at *4 (E.D.N.Y. Oct. 23, 2006), but that principle has no application here, as it is Lofrano who seeks to pursue an advice-of-counsel defense, but it is Wells Fargo (which is not asserting the defense (Wells Fargo's Mem. 13)) that seeks to protect the privilege. Put simply, here, unlike in those other cases, "the sword and the shield are wielded by different parties." *United States v. W.R. Grace*, 439 F. Supp. 2d 1125, 1144 (D. Mont. 2006).

The question, then, is whether principles of fairness compel a finding that Lofrano's assertion of his intent to pursue the defense waives Wells Fargo's privilege. That is an unresolved issue, and the few courts to have reached it appear to be divided. *Compare Moskowitz v. Lopp*, 128 F.R.D. 624, 637-38 (E.D. Pa. 1989) ("Although in theory the privilege belongs to the corporation, fairness dictates that it be waived where a corporate officer asserts the reliance on counsel defense."), *with Ross v. City of Memphis*, 423 F.3d 596, 597-98 (6th Cir. 2005) (holding [*8] that a municipal officer's assertion of the advice of counsel defense does not constitute a waiver of the city's privilege). In the Court's view, the better view is that, at least where — as here — the relevant employee does not have authority to waive the privilege on behalf of the corporation, *see, e.g., Commodity Futures Trading Com. v. Weintraub*, 471 U.S. 343, 348, 105 S. Ct. 1986, 85 L. Ed. 2d 372 (1985) ("The parties in this case agree that, for solvent corporations, the power to waive the corporate attorney-client privilege rests

with the corporation's management and is normally exercised by its officers and directors."); *United States v. Ghavami*, 882 F.Supp.2d 532, 544 (S.D.N.Y. 2012) ("[A] corporate employee without authority cannot effect waiver of a privilege that belongs to the corporation."), the privilege is not waived by the employee's mere invocation of an advice-of-counsel defense during discovery. Holding otherwise would mean that almost *any* employee could waive the privilege, which would — in turn — "render[] the privilege intolerably uncertain." *Ross*, 423 F.3d at 604. And as the Supreme Court has cautioned, "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Upjohn Co. v. United States*, 449 U.S. 383, 393, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). Allowing any employee to waive the privilege by asserting an advice-of-counsel defense [*9] could also create an incentive for plaintiffs to pursue claims against individual employees in the hopes of forcing a waiver of the corporation's privilege.

In arguing otherwise, the Government relies on the Second Circuit's decision in *In re Grand Jury Proceedings*, 219 F.3d 175 (2d Cir. 2000), but that decision actually cuts against the Government here. In that case, the Second Circuit vacated a district court's finding that the grand jury testimony of a corporation's chairman, chief executive officer, and founder waived the corporation's attorney-client privilege even though the corporation itself had consistently asserted its privilege. *See id.* at 181, 184, 192. The Court held that there are circumstances in which a corporate officer may waive the corporation's privilege, even if the corporation objects, but its reasoning does not support a finding of waiver here. First, the officer in that case was a much higher-ranking employee than Lofrano is. (*See* Lofrano's Mem. 1-2 & n.1 (noting that Lofrano "is several levels removed from Wells Fargo's executive management, and has no ability to force Wells Fargo to disclose privileged documents"). Second, in *In re Grand Jury Proceedings*, the Second Circuit cautioned that, in deciding whether the officer's testimony [*10] constituted a waiver, the district court should ask "not whether the reference to the attorney's advice was a deliberate attempt at exculpation, but rather whether it was a deliberate attempt *on the part of the corporation* to exculpate itself, as opposed to [the officer's] effort to exculpate himself personally." 219 F.3d at 188. Here, there is no suggestion that Lofrano is attempting to use privileged communications to exculpate Wells Fargo; instead, he seeks to defend himself individually. Further, although the Second Circuit did not decide the question, it instructed the district court that the appellate record suggested that "it would be unfair to impute a waiver to [the corporation]" based on the officer's discussion of counsel's advice because (1) the officer was subpoenaed in his individual capacity; (2) even if the officer was using counsel's

advice as a sword, that would not mean that the corporation was also doing so; (3) the corporation had made its assertion of privilege "unmistakably clear"; and (4) there was no prejudice to the opposing party in deeming the privilege intact. *Id.* at 189-90. All of those factors also counsel against a finding of waiver here: (1) Lofrano is being sued in his individual [*11] capacity; (2) Wells Fargo has not pursued an advice-of-counsel defense; (3) Wells Fargo has made its assertion of privilege "unmistakably clear" by asserting privilege in response to the Government's discovery requests and objecting to Lofrano's discussion of communications with counsel during his deposition; and (4) because no evidence has been introduced at trial or in a motion for summary judgment, and Lofrano has disclosed almost no privileged information — either that would help him or that would harm him — there is, as of yet, no real prejudice to the Government.

That said, and as the Government notes in its reply, it is not yet clear whether Wells Fargo intends to object to Lofrano's assertion of an advice-of-counsel defense. (*See* Gov't's Reply 5 (noting that "Defendants studiously avoid any explanation of what Wells Fargo intends to do when Lofrano makes this anticipated defense")). Although Lofrano's mere statement that he intends to pursue such a defense—which is essentially all that has occurred thus far — does not waive Wells Fargo's privilege, Wells Fargo's failure to object to Lofrano's disclosure of privileged information in support of that defense at trial very well [*12] might. Relatedly — although the Court need not, and does not, resolve the question now — Lofrano's right to present a defense could conceivably overcome Wells Fargo's right to maintain its privilege. *Cf. W.R. Grace*, 439 F. Supp. 2d at 1137-45 (holding that a company's attorney-client privilege must "yield where its invocation is incompatible with a criminal defendants' Sixth Amendment right[]" to present a defense). Regardless, if Lofrano is ultimately allowed to disclose some otherwise privileged information in order to pursue his defense, the Court will have to decide both the scope of the privileged information that he is entitled to disclose, as well as the scope of what the Government would, in fairness, be entitled to pursue, either through questioning at trial or through limited additional discovery. Wells Fargo urges the Court to delay deciding those issues until "some later point in this case as trial approaches." (Wells Fargo's Mem. 20). But, given the impact that the Court's decisions are likely to have on the litigation, including potentially the need for further discovery, the Court believes the better course is to resolve the issue as soon as possible. The Court will address these issues further at the conference to be [*13] held today. Additionally, no later than **July 10, 2015**, the parties shall meet and confer, and submit a joint letter to the Court proposing both a procedure and a schedule for resolving these issues.

2015 U.S. Dist. LEXIS 84602, *13

One final matter remains. All parties filed their memoranda of law and associated papers under seal, but the only explanations that they have given are (1) the fact that the material has been marked confidential and (2) isolated statements that the documents contain confidential business information. (*See* Docket Nos. 218, 220). There is plainly, however, no basis to keep the papers, including legal analysis, under seal in their entirety. *See, e.g., MacroMavens, LLC v. Deutsche Bank Secs.*, No. 09-CV-7819 (PKC), 2011 U.S. Dist. LEXIS 46316, 2011 WL 1796138, at *2 (S.D.N.Y. Apr. 27, 2011) ("[P]laintiff has no discernable basis to contend that portions of the memoranda outlining the legal standard for excluding expert testimony ought to be sealed."); *see also Broadspring, Inc. v. Congoo, LLC*, No. 13-CV-1866 (JMF), 2014 U.S. Dist. LEXIS 116070, 2014 WL 4100615, at *23 (S.D.N.Y. Aug. 20, 2014) ("[A]lthough the Court recognizes that the documents at issue are confidential . . . , it sees no reason why the memoranda of law the parties filed in support of and in opposition to the instant re-designation motion should remain under seal, as the memoranda appear to contain only general descriptions of the documents rather than the confidential information itself."). Moreover, the mere fact **[*14]** that information is subject to a confidentiality agreement between litigants is not a valid basis to overcome the presumption in favor of public access to judicial documents. *See, e.g., Dandong v. Pinnacle Performance Ltd.*, 10-CV-8086 (JMF), 2012 U.S. Dist. LEXIS 177525, 2012 WL 6217646, at *2 (S.D.N.Y. Dec. 3, 2012) ("The consent of the parties is not a valid basis to justify sealing, as the rights involved are the rights of the public." (internal quotation marks omitted)); *Vasquez v. City of N.Y.*, No. 10-CV-6277 (LBS), 2012 U.S. Dist. LEXIS 138444, 2012 WL 4377774, at *3 (S.D.N.Y. Sept. 24, 2012) (similar). And furthermore, conclusory statements that documents contain confidential business information are a far cry from the "particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection" that is required to justify keeping the information under seal. *Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616, 630 (S.D.N.Y.2011). Accordingly, any party who believes that the papers should remain under seal or be filed publicly only in redacted form shall file a letter brief, not to exceed five pages and no later than **July 10, 2015**, addressing the propriety of doing so. *See, e.g., Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006) (discussing the presumption in favor of public access). If no party files a brief justifying the maintenance of a particular document under seal or in redacted form, the relevant party shall publicly file an un-redacted **[*15]** version of the document within **two business days**.

SO ORDERED.

Date: June 30, 2015

New York, New York

/s/ Jesse M. Furman

JESSE M. FURMAN

United States District Judge